**IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA,
NORTHERN DIVISION**

| | | |
|---|---|---|
| **LARRY STEPHENS AND DEBORAH STEPHENS,** | ) | |
| | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **CIVIL ACTION NO. 2:07CV128-ID** |
| | ) | |
| **STRONGBUILT, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**EVIDENTIARY SUBMISSION IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

Comes now the defendant, **STRONGBUILT, INC.**, and submits the following evidence in support of its motion for summary judgment:

1.    Deposition of Larry Stephens attached hereto and marked as Exhibit 1.

2.    Deposition of Ken Killen attached hereto and marked as Exhibit 2.

3.    Deposition of David Stephens attached hereto and marked as Exhibit 3.

4.    Deposition of Terry Stephens attached hereto and marked as Exhibit 4.

5.    Deposition of Dr. Raymond Thompson attached hereto and marked as Exhibit 5.

6.    Deposition of Michael McFadden attached hereto and marked as Exhibit 6.

7.     Deposition of Jaiton Stephens taken on February 21, 2008 attached hereto and marked as Exhibit 7.

8.     Deposition of Matt Stephens taken on December 17, 2007 attached hereto and marked as Exhibit 8.

9.     Deposition of Jaiton Stephens taken on May 19, 2008 attached hereto and marked as Exhibit 9.

10.    Deposition of Matt Stephens taken on May 19, 2008 attached hereto and marked as Exhibit 10.

11.    Instructions for StrongBuilt BLS 15 attached hereto and marked as Exhibit 11.

12.    StrongBuilt's Answers to Plaintiffs' Interrogatories attached hereto and marked as Exhibit 12.

13.    Report of L. J. Smith attached hereto and marked as Exhibit 13.

14.    Report of Ellis Sisk attached hereto and marked as Exhibit 14.


/s/ David Lee
David A. Lee (LEE019)
ASB-3165-E47D
Attorney for Defendant

OF COUNSEL:
PARSONS, LEE & JULIANO, P.C.
300 Protective Center
2801 Highway 280 South
P. O. Box 530630 (35253-0630)
Birmingham, AL 35223-2480
(205) 326-6600

## CERTIFICATE OF SERVICE

I hereby certify that I have served on this the day of 30th day of May, 2008, a copy of the foregoing pleading via United States mail, postage prepaid and properly addressed on counsel for all parties as follows:

Dennis R. Weaver, Esq.
William H. Hassinger, Esq.
Weaver Tidmore, LLC
200 Cahaba Park Circle, Suite 214
Birmingham, Alabama 35242

/s/ David A. Lee
OF COUNSEL

# FREEDOM COURT REPORTING

---

Page 1

1  IN THE UNITED STATES DISTRICT COURT
2  MIDDLE DISTRICT OF ALABAMA
3  NORTHERN DISTRICT
4
5  LARRY AND DEBORA STEPHENS,
6     Plaintiffs,
7
8  VS.     CIVIL ACTION
9      NO. 2:07 CV 128-10
10
11  STRONG BUILT INC.,
12     Defendant.
13
14  VIDEO DEPOSITION OF LARRY STEPHENS
15
16     STIPULATIONS
17     IT IS STIPULATED AND AGREED, by and
18  between the parties, through their
19  respective counsel, that the video
20  deposition of LARRY STEPHENS may be taken
21  before Scott Wilmeth, CCR, State of Alabama
22  at Large, at 200 Cahaba Park Circle, Suite
23  214, Birmingham, Alabama, on November 29,

---

Page 2

1  2007, commencing at 11:12 a.m.
2     IT IS FURTHER STIPULATED AND
3  AGREED that the reading and signature to the
4  deposition by the witness is waived, said
5  deposition to have the same force and effect
6  as if full compliance had been had with all
7  laws and rules of court relating to taking
8  of depositions.
9     IT IS FURTHER STIPULATED AND
10  AGREED that it shall not be necessary for
11  any objections to be made by counsel as to
12  any questions, except as to form or leading
13  questions, and that counsel for the parties
14  may make objections and assign grounds at
15  the time of the trial, or at the time said
16  deposition is offered in evidence, or prior
17  thereto.
18     IT IS FURTHER STIPULATED AND
19  AGREED that notice of filing of the
20  deposition by the Commissioner is waived.
21
22
23

---

Page 3

1     I N D E X
2
3  EXAMINATION BY:     PAGE NO
4  Mr. Lee-------------------------- 6
5  Mr. Weaver-------------------------- 127
6  Mr. Lee-------------------------- 132
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

---

Page 4

1  BEFORE:  Scott Wilmeth, RPR
2     Commissioner
3
4  APPEARING ON BEHALF OF THE PLAINTIFFS:
5    Mr. Dennis R. Weaver
6    Mr. W.H. Hassinger
7    Weaver & Tidmore
8    200 Cahaba Park Circle, Suite 214
9    Birmingham, Alabama  35242
10
11  APPEARING ON BEHALF OF THE DEFENDANT:
12    Mr. David A. Lee
13    Parsons, Lee & Juliano
14    300 Protective Center
15    2801 Highway 280 South
16    Birmingham, Alabama  35223
17
18  ALSO PRESENT:
19   Debora Stephens
20  April Leemon, Paralegal
21  Stephanie Wininger, Videographer
22
23

---

1 (Pages 1 to 4)

# FREEDOM COURT REPORTING

Page 5

1     I, Scott Wilmeth, CCR, RPR, State
2   of Alabama at Large, acting as commissioner,
3   certify that on this date, in accordance
4   with the Federal Rules of Civil Procedure
5   and the foregoing stipulations of counsel,
6   there came before me at 200 Cahaba Park
7   Circle, Suite 214, Birmingham, Alabama, on
8   November 29, 2007, LARRY STEPHENS, witness
9   in the above cause for oral examination,
10  whereupon the following proceedings were
11  had:
12
13     THE VIDEOGRAPHER: This begins
14  videotape number one in the deposition of
15  Larry Stephens, et al, versus Strong Built,
16  Incorporated, Case Number 2:07 CV 128-10, in
17  the United States District Court, Middle
18  District, Northern Division. We are on the
19  record at 11:12 a.m. on Thursday, November
20  29th, 2007. This deposition is taking place
21  in Birmingham, Alabama. My name is
22  Stephanie Wininger, representing Freedom
23  Court Reporting. Would counsel identify

Page 6

1   yourself and state who you represent,
2   please?
3     MR. WEAVER: Rusty Weaver,
4   attorney for the plaintiff.
5     MR. HASSINGER: Will Hassinger,
6   co-counsel for the plaintiff.
7     MR. LEE: And I'm David Lee. I
8   represent Strong Built.
9     THE VIDEOGRAPHER: Would the
10  court reporter please swear in the witness.
11
12     LARRY STEPHENS,
13  having been first duly sworn, was examined
14  and testified as follows:
15     THE COURT REPORTER: Usual
16  stipulations?
17     MR. LEE: That's fine with me.
18
19  EXAMINATION BY MR. LEE:
20  Q.     Would you tell us your name,
21  please, sir?
22  A.     Larry Wayne Stephens.
23  Q.     Mr. Stephens, my name is David

Page 7

1   Lee. I'm a lawyer here in Birmingham and I
2   represent strong built in this lawsuit that
3   you and your wife have filed. I think we
4   need to -- to clip you up there. As I said,
5   I represent Strong Built in this lawsuit
6   that you and your wife have filed. I'm
7   going to be asking you some questions today.
8   If I ask you something that you don't
9   understand, just tell me --
10  A.     Okay.
11  Q.     -- and I'll be happy to reask the
12  question. If you need to take a break for
13  any reason, tell me that as well, and we'll
14  be happy to do that. Or if you need to
15  consult with your lawyers, hey, I'll be
16  happy to accommodate that as well, okay?
17  A.     Uh-huh.
18  Q.     And I'll tell you right now, I've
19  got a cold today, kind of under the weather,
20  so I'm going to try to speak as clearly as I
21  can, but if you have a problem understanding
22  anything I ask you, just tell me and I'll be
23  happy to reask the question, okay?

Page 8

1   A.     Okay.
2   Q.     Where do you live, Mr. Stephens?
3   A.     I live in Tallassee.
4   Q.     What is your home address?
5   A.     97 Manning Circle.
6   Q.     Manning Circle, did you say?
7   A.     Yes, sir.
8   Q.     And that's in Tallassee?
9   A.     Uh-huh.
10  Q.     What is the zip code down there?
11  A.     I don't know.
12  Q.     How long have you lived at that
13  address?
14  A.     Well, I moved away for awhile,
15  but I've been there a year -- about a year
16  and a half now.
17  Q.     Okay. Where else have you lived
18  besides there?
19  A.     Titus.
20  Q.     Pardon?
21  A.     Up in Titus.
22  Q.     How do you spell that?
23  A.     I don't know.

2   (Pages 5 to 8)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 9

1 Q.     What county is that in?
2 A.     It's Elmore County.
3 Q.     Elmore County?
4 A.     Yeah, it's -- it's like ten miles
5 north of Wetumpka.
6 Q.     Okay.  The address that you live
7 at now, is that -- is that a home or a
8 mobile home or what?
9 A.     Mobile home.
10 Q.     Mobile home.  Do you and your
11 wife own that home?
12 A.     Yeah.
13 Q.     You do?
14 A.     Uh-huh.
15 Q.     Okay.  Anybody live there with
16 you?
17 A.     Just my son.
18 Q.     Okay.  And tell me the name and
19 age of your son.
20 A.     It's Jaiton Stephens.
21 Q.     Pardon?
22 A.     Jaiton.
23 Q.     Spell -- spell your son's first

Page 10

1 name.
2 A.     She gave him that name.  It's a
3 weird name.  J-a -- J-a-i -- I can't --
4         MR. LEE:  Maybe she can help us.
5 J-a --
6         DEBORA STEPHENS: I-t-o-n --
7         MR. WEAVER:  Okay.  Jaiton?
8         DEBORA STEPHENS:  Uh-huh.
9 Q.     (By Mr. Lee)  Okay.  How old is
10 Jaiton?
11 A.     18.
12 Q.     Okay.  Is that your son with
13 Debora?
14 A.     Well, I adopted him.
15 Q.     Okay.  That's her -- her son?
16 A.     From her first marriage, yeah.
17 Q.     Okay, I got you.  You adopted
18 him --
19 A.     Yeah.
20 Q.     -- from her first marriage?  All
21 right.  And so you've lived at your current
22 address for about one year?
23 A.     Uh-huh.

Page 11

1 Q.     Is that correct?
2 A.     Yeah, a little over a year.
3 Q.     All right.  And where did you --
4 you say you -- where did you live before
5 that?
6 A.     In Titus.
7 Q.     All right.  And how long did you
8 live there?
9 A.     We was there about ten years.
10 Q.     Ten years?
11 A.     Yeah.
12 Q.     What was the reason for moving
13 from that location to where you live now?
14 A.     Closer to her work.
15 Q.     Okay, all right.  Where does your
16 wife work?
17 A.     She works at Community Hospital
18 in Tallassee.
19 Q.     And what does -- what does she
20 do?
21 A.     She works in medical -- medical
22 records.
23 Q.     Community Hospital in Tallassee,

Page 12

1 did you say?
2 A.     Yes, sir.
3 Q.     Medical records department?
4 A.     Uh-huh.
5 Q.     How long has she been there,
6 roughly?
7 A.     About three years.
8 Q.     Okay.  And where did she work
9 before that?
10 A.     I don't know.
11 Q.     You don't know?
12 A.     No, I don't -- I didn't keep up
13 with all that.
14 Q.     Okay.  What -- what is your age?
15 How old are you?
16 A.     I'm 38.
17 Q.     38?
18 A.     Uh-huh.
19 Q.     And your date of birth?
20 A.     July 21st, '69.
21 Q.     And your Social Security number?
22 A.     It's 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.
23 Q.     6493?

3 (Pages 9 to 12)

# FREEDOM COURT REPORTING

Page 13

1  A.      Yes, sir.
2  Q.      Okay. And, now, you told me that
3  your wife was married one time before. How
4  about yourself? Have you ever been married?
5  A.      Yeah, I was married once before.
6  Q.      Okay. What was your first wife's
7  name?
8  A.      Tammy, Tammy.
9  Q.      Tammy? Okay. That's my wife's
10 name. And then your wife number two is
11 Debora?
12 A.      Yes, sir.
13 Q.      And how long -- and this is going
14 to put you on the spot. How long have you
15 and your wife Debora been married?
16 A.      About --
17 Q.      This is one -- this is one
18 question you'd better not mess up. You can
19 mess up all the rest of them. You'd better
20 not mess up this one.
21 A.      She knows. I can't remember that
22 no wise. 14, 15 years.
23 Q.      Okay.

Page 14

1  A.      Well, how long?
2  Q.      I'll ask her. She'll -- she'll
3  know.
4  A.      I don't know how long.
5  Q.      What about Tammy? How long were
6  you married to her?
7  A.      Two years.
8  Q.      Two years. Tell me about your
9  education, Mr. Stephens.
10 A.      It ain't good.
11 Q.      Sir?
12 A.      It ain't good.
13 Q.      It's not? Can you read and
14 write?
15 A.      No, sir.
16 Q.      Okay. You can't read or write a
17 lick?
18 A.      No, sir.
19 Q.      If you're going to sign your
20 name --
21 A.      I can sign my name.
22 Q.      Okay. You can -- you can sign
23 your name?

Page 15

1  A.      Yeah.
2  Q.      But other than signing your name,
3  can you write any at all?
4  A.      Not really.
5  Q.      Okay. And you can't read at all?
6  A.      Huh-uh.
7  Q.      The answer is no?
8  A.      No.
9  Q.      Okay. How far did you get -- get
10 in school?
11 A.      The 10th grade.
12 Q.      Which school did you quit? Where
13 were -- where were you going when you quit?
14 A.      Tallassee.
15 Q.      Tallassee High School?
16 A.      Uh-huh.
17 Q.      And what year was it when you
18 dropped out of school?
19 A.      I don't know. I can't remember
20 that.
21 Q.      Okay. Why -- why did you drop
22 out of school?
23 A.      I don't know.

Page 16

1  Q.      Okay. Did you just go to work
2  or --
3  A.      Yeah, I was working and just --
4  just didn't go back.
5  Q.      Okay. Well, let's talk about
6  your employment history. Where all have you
7  worked, starting with high school?
8  A.      I worked with my uncle until he
9  died.
10 Q.      What was his name?
11 A.      Ronnie Wood, Ronnie Wood.
12 Q.      Ronnie Wood?
13 A.      Yes, sir.
14 Q.      And what type of business was he
15 in?
16 A.      It was tire and muffler.
17 Q.      Tire and muffler?
18 A.      Yes, sir.
19 Q.      He -- he repaired -- repaired
20 tires and replaced mufflers?
21 A.      Yeah, yeah, a little gas station
22 and stuff like that.
23 Q.      Okay, all right. When did he

4  (Pages 13 to 16)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 17

1  pass away?
2  A.        Probably about 18 years ago.
3  Q.        Okay.  How long did you work for
4  him?
5  A.        Just through school, and then
6  when I got out of school, I worked with him.
7  And -- and he died on Halloween and then I
8  had some help to get a job at GKN after
9  that, so I don't know really how long I
10  worked with him.
11  Q.        Okay, all right.  What was your
12  next job?
13  A.        At GKN.
14  Q.        GKN?
15  A.        Yes, sir.
16  Q.        What is that?
17  A.        They build helicopter parts.
18  Q.        And what did you do, in terms of
19  helicopter parts?
20  A.        I built -- I assembled the -- the
21  wings of the Black Hawks.
22  Q.        And how long did you work for
23  them?

Page 18

1  A.        Two years and seven months.
2  Q.        Where -- where is GKN located?
3  A.        It's in Tallassee.
4  Q.        Tallassee?
5  A.        Uh-huh.
6  Q.        You say two years and seven
7  months?
8  A.        Uh-huh.  They had a big layoff.
9  Q.        What -- what years are we talking
10  about?  What -- what time frame?
11  A.        I don't know.
12  Q.        Are you talking about in the
13  1990s or the 2000s or --
14  A.        It was in the '90s.
15  Q.        In the '90s.  Okay, all right.
16  And then where -- where else did you work?
17  A.        Construction of -- after I left
18  from there.
19  Q.        Construction?
20  A.        Yes, sir.
21  Q.        Who -- who all have you worked
22  for in the construction business?
23  A.        It was just -- I don't know, but

Page 19

1  most of it was subcontract.
2  Q.        What would you do?
3  A.        Drywall.
4  Q.        Did you work for yourself?
5  A.        Yes, sir.
6  Q.        Okay, all right.  Have you had
7  any other employers other than your uncle
8  and GKN?
9  A.        (Witness shakes head from side to
10  side.)
11  Q.        The answer is no?
12  A.        No.
13  Q.        Okay.  Let me -- your lawyer may
14  have explained this to you before we got
15  here this morning.  It's important, when
16  answering questions, to -- to give an
17  answer, as opposed to sort of nodding.  You
18  know, we all sort of nod our heads or shake
19  our heads from time to time.  I'm -- I'm
20  horrible about it and Rusty is too, but
21  he -- neither one of us are giving
22  depositions today.  You are.  And -- and the
23  court reporter has to take down what you're

Page 20

1  saying, so if you -- if you'll just give
2  a -- a good answer, like, "yes" or "no" or
3  some other answer that the court reporter
4  can take down, the -- the record will be a
5  lot clearer, okay?
6  A.        Okay.
7  Q.        All right.  How long -- how many
8  years would you say you were self-employed,
9  doing subcontract type work?
10  A.        Probably about 12 years.
11  Q.        Okay.  And who -- who did you
12  typically work for?  What builders?
13  A.        I don't know which one it is.
14  Q.        Did you do residential type work
15  or construction --
16  A.        Yeah.
17  Q.        I mean, commercial work or what?
18  A.        Mostly residential, with houses.
19  Q.        Okay.  Putting up Sheetrock and
20  stuff like that?
21  A.        Yeah.
22  Q.        Okay.  Did you file tax returns?
23  A.        I got a 1099.

5 (Pages 17 to 20)

# FREEDOM COURT REPORTING

Page 21

1  Q.      I know.  But at the end of the
2  year, did you file a tax return?
3  A.      Uh-huh.
4  Q.      Okay.  And did you do that, you
5  know, say, in the three or four year period
6  prior to this accident?
7  A.      Do what, now?
8  Q.      You know, this accident happened
9  on December the 2nd of '06, as I understand
10 it.  And my question is, for the two or
11 three year period before that, did you file
12 tax returns?
13 A.      Uh-huh.
14 Q.      You did?
15 A.      Yeah.
16 Q.      Okay.  And I guess we -- either
17 you or your wife have copies of those
18 somewhere?
19 A.      Yeah.
20 Q.      Okay.  What -- what would you
21 say -- this -- this accident happened --
22 well, let me just ask you right off the bat.
23 Did it happen on December the 2nd of '06?

Page 22

1  A.      Yes, sir.
2  Q.      Okay.  What day of the week was
3  that?
4  A.      Saturday.
5  Q.      Now, were you working regularly
6  that year?  That -- that was the end of the
7  year.  Did you work regularly in the year
8  2006?
9  A.      It was -- 2006 was slow, pretty
10 slow.
11 Q.      Okay.  Have you got any idea how
12 much money you made in 2006?
13 A.      Not really.
14 Q.      What about 2005?  Did you work
15 much in 2005?
16 A.      Yeah, we'll have -- we'll have
17 good months and bad months.  It's just in
18 the wintertime, it -- it kills everything,
19 so -- so I -- I don't know how much I made;
20 just --
21 Q.      When you worked, doing drywall
22 work, what did you do?
23 A.      I hung it and finished it.

Page 23

1  Q.      I'm talking about when you
2  weren't doing that type of work, when you --
3  when it was slow, what -- what did you do?
4  A.      I tried to find another job.
5  Q.      Okay, all right.  Now, do you
6  understand that you are a plaintiff in this
7  lawsuit, where you're suing somebody for
8  money damages?
9  A.      (Witness nods head up and down.)
10 MR. WEAVER:  Remember to try to
11 speak out loud.
12 A.      Yeah.
13 Q.      (By Mr. Lee)  Okay.  Have you
14 ever sued anybody else before?
15 A.      No, sir.
16 Q.      This is the first time you've
17 ever filed a lawsuit?
18 A.      Yes, sir.
19 Q.      For any reason?
20 A.      Yeah.
21 Q.      Has anybody ever sued you before?
22 A.      No, sir.
23 Q.      Okay.  Have you ever filed for

Page 24

1  bankruptcy, ever?
2  A.      No, sir.
3  Q.      Have you ever been arrested for
4  any reason whatsoever?
5  A.      In my entire life?
6  Q.      In your -- ever since you've been
7  on the surface of the earth --
8  A.      Yes, sir.
9  Q.      -- have you ever been arrested?
10 A.      Yes, sir.
11 Q.      Okay.  Tell me about that.
12 A.      It was just a DUI.
13 Q.      First, how many times have you
14 been arrested?
15 A.      Just twice.
16 Q.      Two times.  And when was arrest
17 number one?
18 A.      The day before my first marriage.
19 Q.      That sort of got it off to a bad
20 start.
21 A.      Yeah.
22 Q.      What was that, a DUI charge?
23 A.      Yes, sir.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

**FREEDOM COURT REPORTING**

Page 25

1  Q.    And what year was that?
2  A.    I have no idea.
3  Q.    What county was it in?
4  A.    It was -- it was in Tallapoosa
5  County.
6  Q.    And were you convicted of DUI?
7  A.    Yeah.
8  Q.    Okay.  And arrest number two?
9  A.    Right after my divorce, another
10 DUI.
11 Q.    Okay.  And was that Tallapoosa
12 County as well?
13 A.    No, it was Elmore, just across
14 the river in Tallassee.
15 Q.    Yeah, I know -- I know -- I know
16 about it.  And then were you convicted of
17 DUI the second time?
18 A.    Yeah.
19 Q.    Okay.  Any other arrests at all
20 or --
21 A.    No.
22 Q.    No other criminal convictions?
23 A.    No.

Page 26

1  Q.    Okay.  Have you filed for Social
2  Security disability benefits as a result of
3  this accident?
4  A.    No.
5  Q.    Have not?
6  A.    No, I -- I filed before, because
7  I was going to the doctor and they -- they
8  thought I had MS.
9  Q.    Okay.
10 A.    And he had me to file.
11 Q.    Okay.  So you actually filed for
12 Social Security disability benefits before
13 your accident?
14 A.    Yes, sir.
15 Q.    And -- and you -- you had signs
16 and symptoms of multiple sclerosis?
17 A.    Yeah.  Then they ruled it out.
18 It was just migraines, so --
19 Q.    Okay.  Now, MS, I have a friend
20 who has MS.  That -- that affects your
21 balance and motor skills and so forth, does
22 it not?
23 A.    I don't know.

Page 27

1  Q.    Well, what --
2  A.    I mean, because they ruled it
3  out.  It was just migraine headaches.
4  Q.    Well, what -- what symptoms were
5  you having that --
6  A.    Just bad headaches.
7  Q.    Bad headaches?
8  A.    Yes, sir.
9  Q.    Where did you file for Social
10 Security disability?  What -- what county
11 was that?
12 A.    Tallapoosa County.
13 Q.    Do you remember what year you
14 filed for disability?
15 A.    I think it was in '06.
16 Q.    Okay.  When in '06?
17 A.    I don't know.
18 Q.    You don't know how -- did you
19 have a lawyer helping you?
20 A.    Huh-uh.
21 Q.    The answer is no?
22 A.    No.
23 Q.    Okay.  You did it on your own?

Page 28

1  A.    Yes, sir.
2  Q.    Did your wife help you with that?
3  A.    Yeah.
4  Q.    Did you have any symptoms of --
5  of MS other than headaches?
6  A.    Huh-uh, no, sir.
7  Q.    Did you have -- did you have any
8  trouble walking?
9  A.    No, sir.
10 Q.    Any trouble with balance?
11 A.    No, sir.
12 Q.    Any trouble with your arms or
13 legs at all?
14 A.    No, sir.
15 Q.    Okay.  Have you ever filed a
16 workers' compensation claim in your whole
17 life?
18 A.    No, sir.
19 Q.    Do you have any relatives, close
20 relatives that live in Tallapoosa County,
21 Elmore County, like your parents or --
22 A.    Yes, sir.
23 Q.    All right.  Tell me who your

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 29

1 parents are.
2 A.      Roger and Joan Wood.
3 A.      Roger and Joan --
4 A.      Wood.
5 Q.      Wood?
6 A.      Yes, sir.
7 Q.      Is that your stepdad?
8 A.      Yeah.
9 Q.      And where do they live?
10 A.      Right next door.
11 Q.      Right next door to you?
12 A.      Yeah, yes, sir.
13 Q.      Okay.  Well, what about brothers
14 or sisters?
15 A.      I've got a sister that lives
16 in -- she lives in Friendship.  I don't know
17 the name of her subdivision.
18 Q.      What county is that in?
19 A.      Elmore.
20 Q.      What's her name?
21 A.      Heather Vance.
22 Q.      Heather --
23 A.      Vance.

Page 30

1 Q.      Vance?
2 A.      Yes, sir.
3 Q.      V-a-n-c-e?
4 A.      Yes, sir.
5 Q.      Okay.  And then what -- what's
6 her husband's name?
7 A.      Chad, Chad.
8 Q.      Chad?  Okay, all right.  Any
9 other close relatives, brothers, sisters?
10 A.      Huh-uh, no, I just -- it's just
11 two of us.
12 Q.      Just the two of you?
13 A.      Yes, sir.
14 Q.      Do you take any medications now?
15 A.      Yeah, it's some kind of flushing
16 pill.
17 Q.      Do you know what it is?  Do you
18 know what the name of it is?
19 A.      Huh-uh.
20 Q.      You say it's a flushing pill?
21 A.      Yeah, it's like cholesterol
22 flushing or something.
23 Q.      Oh.  Have you got high

Page 31

1 cholesterol?
2 A.      I don't know.
3 Q.      Okay.  Well -- well, tell me
4 this:  Who is your primary doctor?  Who --
5 who do you primarily see?
6 A.      Dr. Peaden.
7 Q.      Dr. who?
8 A.      Peaden, Peaden
9 Q.      Peaden?  Do you know how to spell
10 that?
11       DEBORA STEPHENS:  P-e-a-d-e-n.
12 Q.      (By Mr. Lee)  What's his first
13 name?  Do you know?
14 A.      Michael, Mark.
15       DEBORA STEPHENS:  Michael.
16 A.      Michael, yeah.
17 Q.      (By Mr. Lee)  Michael?  All
18 right.  Where is Dr. Peaden's office?
19 A.      It's right above Tallassee
20 hospital.
21 Q.      And what all does Dr. Peaden see
22 you for?
23 A.      He's just -- just a family

Page 32

1 doctor.
2 Q.      Okay.  How long has he been your
3 family doctor?
4 A.      I don't know.  About two years, I
5 think.
6 Q.      Okay.  Who did you see before
7 that?
8 A.      I didn't.
9 Q.      Okay.
10 A.      Dr. Russell.
11 Q.      What's his first name?
12 A.      Melvin.
13 Q.      Melvin?
14 A.      I think it is.
15 Q.      Okay.  And where is his office?
16 A.      Right next door to Peaden.
17 Q.      Is he still living, Dr. Russell?
18 A.      Yes, sir.
19 Q.      How long did you see him as a
20 doctor?
21 A.      Most of my life.
22 Q.      When did you quit -- why did you
23 quit seeing him?  Just liked -- just liked

8  (Pages 29 to 32)

## FREEDOM COURT REPORTING

Page 33

1  Dr. Peaden better?
2  A.      Yeah.
3  Q.      Okay.  Would you see Dr. Russell
4  for routine illnesses and so forth?
5  A.      Yeah, just sick or something like
6  that.
7  Q.      Okay.  Have you ever been in the
8  hospital before, other than for the accident
9  that's involved in this lawsuit?
10  A.      No, sir.
11  Q.      Never been hospitalized?
12  A.      No, I don't think I have.
13  Q.      In the last 20 years, have you
14  seen any doctors other than Dr. Peaden and
15  Dr. Russell, other than the doctors you saw
16  for this accident?
17  A.      I don't think I have.
18  Q.      Have you ever been to a
19  chiropractor in your life?
20  A.      I don't think I have.
21  Q.      Have you ever seen any physical
22  therapist?
23  A.      For, like, what?

Page 34

1  Q.      Well, to help you get over the
2  injuries you sustained in this accident?
3  Have you ever been to see any kind of
4  physical therapist at all, somebody that
5  helped, you know, exercise you and --
6  A.      Yeah, I went to -- yeah, I went
7  to therapy.
8  Q.      Okay.  After this accident?
9  A.      Yeah, after the accident.
10  Q.      All right.  But what about before
11  the accident?  Have you ever been to
12  physical therapy before the accident?
13  A.      I can't remember.
14  Q.      Who -- when you have to have
15  prescriptions filled, what -- what drug
16  stores do you go to?
17  A.      We use The Apothecary now.
18  Q.      The Apothecary?
19  A.      Yeah.
20  Q.      Is that the name of it?
21  A.      Yeah.
22  Q.      And where is that located?
23  A.      It's in Tallassee.

Page 35

1  Q.      What other drug stores or
2  pharmacies have you used?
3  A.      That's the only one I think I've
4  used, is that one.
5  Q.      Do you have health insurance?
6  A.      Yes, sir.
7  Q.      Okay.  Who is that with?
8  A.      Through her.
9  Q.      And is that BlueCross and
10  BlueShield or somebody else?
11  A.      Yeah, BlueCross BlueShield.
12  Q.      Did you have health insurance
13  through your wife at the time of this
14  accident?
15  A.      Yes, sir.
16  Q.      Okay.  And did BlueCross and
17  BlueShield pay your medical expenses?
18  A.      Yes, sir.
19  Q.      Have you ever had any prior
20  accidents or injuries?  You know, before
21  this accident in December of 2006, had you
22  ever been injured or hurt before?
23  A.      No.

Page 36

1  Q.      Okay.  Never had any broken bones
2  or --
3  A.      Huh-uh, I ain't never had no
4  broken bones.
5  Q.      Or stitches or anything like
6  that?
7  A.      I might have had some stitches,
8  but it was just from the job, at work.
9  Q.      Okay.  But -- but nothing
10  significant?
11  A.      Yeah, nothing serious.
12  Q.      Did you have any kind of physical
13  handicaps or physical limitations at the
14  time of the accident?
15  A.      Huh-uh.
16  Q.      The answer is no?
17  A.      No, sir.
18  Q.      Who -- who -- who diagnosed you
19  or who thought -- who suspected that you had
20  MS?
21  A.      Dr. Peaden.
22  Q.      And you say he ruled that out?
23  A.      Yes, sir.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 37

1   Q.      And concluded that you had
2   migraine headaches?
3   A.      Yes, sir.
4   Q.      All right. Well, let's talk
5   about this tree stand. First of all, who --
6   who was the owner of the tree stand?
7   A.      My uncle.
8   Q.      Okay. What -- what -- what's his
9   name?
10  A.      David Stephens.
11  Q.      Where did he buy the tree stand?
12  A.      His -- my other uncle bought a
13  couple of them for Christmas and gave it to
14  them for Christmas presents.
15  Q.      Okay, all right. So who bought
16  the tree stands?
17  A.      Terry Stephens.
18  Q.      Are Terry and David brothers?
19  A.      Yes, sir.
20  Q.      Did he buy two tree stands and
21  distribute them for Christmas?
22  A.      Yes, sir.
23  Q.      All right. Where did -- where

Page 38

1   did Terry Stephens buy this stand?
2   A.      I think he said at Wal-Mart.
3   Q.      And when did he buy this stand?
4   What year was it?
5   A.      I don't know.
6   Q.      Approximately what year was it?
7   A.      I don't know.
8   Q.      You have no idea?
9   A.      Huh-uh.
10  Q.      Do you know how much Terry paid
11  for it?
12  A.      No, sir.
13  Q.      Was the stand already put
14  together when you first saw it or did you
15  help assemble it?
16  A.      It was already put together.
17  Q.      Well, let me -- let me break that
18  down. Did you help assemble the tree stand,
19  put it together?
20  A.      No, sir. I helped them put it in
21  the tree.
22  Q.      You helped put it up on the tree?
23  A.      Yes, sir.

Page 39

1   Q.      Okay. Was it put up on the tree
2   prior to your accident?
3   A.      Sir?
4   Q.      Was it put up on the tree before
5   your accident?
6   A.      Yes, sir.
7   Q.      Okay. So it had been in
8   operation for awhile?
9   A.      Yeah, we'd -- we'd put them up
10  and take them down every year, so -- and we
11  had just moved it to a different spot that
12  year.
13  Q.      Okay. Well, let's go at it this
14  way. For how many years had you been using
15  this particular tree stand?
16  A.      I think I've been in it twice;
17  the year before that and the year that it
18  fell.
19  Q.      2006 and 2005?
20  A.      Yes, sir.
21  Q.      Okay. Now, you -- you've been in
22  it twice, but you're not saying it's a two
23  year old tree stand, are you?

Page 40

1   A.      No, I'm not saying it's a two
2   year old tree stand.
3   Q.      Okay. We -- we believe it's much
4   older than that.
5   A.      Yeah, it's older than that.
6   Q.      Well, give me your best judgment
7   as to how old the tree stand was at the time
8   of your accident?
9   A.      I -- I don't know if -- I don't
10  know if it's 2004 or I -- I really don't
11  know. I don't know how old it is.
12  Q.      All right. Well, take -- take me
13  through the history of this particular
14  stand. You say Terry Stephens bought it at
15  Wal-Mart?
16  A.      Yes, sir.
17  Q.      Where -- who put the stand
18  together the first time?
19  A.      I don't know.
20  Q.      Where was it put when it was
21  first bought?
22  A.      Where it was put, first bought, I
23  don't know.

10  (Pages 37 to 40)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 41

1  Q.      Okay.
2  A.      I was just -- when he got it for
3  Christmas, they carried it out to the barn
4  and put it together, so I don't know.
5  Q.      Do y'all have a farm or something
6  or do they have a farm?
7  A.      No, they just got a little old
8  barn out back.
9  Q.      Out back of whose house?
10 A.      My grandma's.
11 Q.      Okay.  Is that where it was put
12 together?
13 A.      Yes, sir.
14 Q.      What is your grandmother's name?
15 A.      Betty Stephens, Betty Stephens.
16 Q.      Betty, Betty Stephens?
17 A.      Uh-huh.
18 Q.      Is that your dad's mother?
19 A.      My mama's mama.
20 Q.      That's your mother's --
21 A.      Yeah.  My mother was Stephens,
22 maiden name.
23 Q.      Okay.  Well, that was -- she

Page 42

1  didn't have to change names, did she?
2  A.      Huh?  Well, she's a Wood now.
3  Q.      Well, I know.  Okay.
4  A.      But that's -- that's -- the one
5  that owned the stand was her brother, my
6  mama's brother.
7  Q.      All right.  You're saying that
8  Betty Stephens, who was your grandmother,
9  had a barn and that's where the tree stand
10 was put together the first time?
11 A.      Yes, sir, uh-huh.
12 Q.      All right.  And -- and your
13 testimony is you did not help put the stand
14 together?
15 A.      Right.  No, I didn't.
16 Q.      Okay.  And you weren't present
17 when it was put together?
18 A.      I wasn't there.  I mean, I don't
19 know who put it together, but I wasn't
20 there.
21 Q.      Okay.  Have you asked anybody,
22 any relatives to find out who put the stand
23 together?

Page 43

1  A.      No.
2  Q.      Do you have a -- an opinion about
3  who did it, whether it was Terry or
4  somebody --
5  A.      It was probably David.
6  Q.      You think David may have put the
7  stand together?
8  A.      Yes, sir.
9  Q.      Have you ever talked to David
10 about how the stand was put together?
11 A.      No.
12 Q.      Do you know if David followed the
13 instructions --
14 A.      Yeah.
15 Q.      Well, how do you know that, if
16 you don't --
17 A.      Because the one that -- the other
18 one that he's got, he followed the
19 instructions to put it together.
20 Q.      And how do you know that?
21 A.      Because he wouldn't know how to
22 put it together if he didn't.
23 Q.      Well, did you help him put the

Page 44

1  other one together?
2  A.      No, the -- the one before that, I
3  was out there, but he was putting it
4  together and had the paper and all, going by
5  the paper.
6  Q.      Was it a Strong Built stand as
7  well or some other kind of stand?
8  A.      It was some other kind of stand.
9  Q.      Well, when you say he bought two
10 stands, did he buy two Strong Built stands
11 or did he buy one Strong Built and one other
12 kind of stand?
13 A.      I think both of them were Strong
14 Built, I think.  My other uncle's got -- got
15 one of them.
16 Q.      Does he still have it?
17 A.      I don't know.  I -- I think he
18 might have sold it, because he didn't hunt
19 that much.
20 Q.      All right.  I want to be clear
21 about this.  The -- the stand that you got
22 hurt on, you were not present when that
23 stand was put together the first time?

11  (Pages 41 to 44)

# FREEDOM COURT REPORTING

Page 45

1  A.      Huh-uh.

2  Q.      Okay.  And you don't really know
3  who put it together, but you think David may
4  have done it?

5  A.      Yeah, I think David put it
6  together.

7  Q.      All right.  And -- and you don't
8  know whether he used the instructions to put
9  this stand together when he put it together?

10  A.      No, but I'm sure he did.

11  Q.      Okay.  And you were -- were you
12  present when he put another stand together?

13  A.      Yeah, I was out there.

14  Q.      Okay.  And did you help him put
15  it together?

16  A.      Huh-uh.

17  Q.      Did you watch him put it
18  together?

19  A.      No, I just -- I was out there and
20  just glanced over there every once in awhile
21  and made sure he was doing it right or help
22  him out.

23  Q.      Did you know how to put the

Page 46

1  stands together?

2  A.      Yeah.

3  Q.      Had you put other stands
4  together?

5  A.      Uh-huh.

6  Q.      You had?

7  A.      Yeah.

8  Q.      Had you ever put any Strong Built
9  stands together before?

10  A.      Huh-uh.

11  Q.      When -- when -- you've told me
12  that you -- you can't read or write, though;
13  correct?

14  A.      Right.

15  Q.      When you put the stands
16  together --

17  A.      Went by the picture.

18  Q.      You went by the picture?

19  A.      Uh-huh.

20  Q.      Okay.  But you couldn't read the
21  words?

22  A.      Right.

23  Q.      Correct?

Page 47

1  A.      (Witness nods head up and down.)

2  Q.      Have you -- I mean, I -- I guess
3  the answer to this question is obvious.
4  You've never been able to read and
5  understand any of the written instructions
6  or any of the warnings that -- that are
7  contained in the instructions from Strong
8  Built, have you?

9  A.      No, sir.

10  Q.      Okay.  Has anybody read those
11  written instructions to you or read the
12  warnings that are, you know, in the written
13  instruction booklet to you?

14  A.      No, sir.

15  Q.      Now, these tree stands have
16  warning labels on them and you've seen those
17  before, haven't you?

18  A.      Uh-huh.

19  Q.      Is that a yes?

20  A.      Yeah, I've seen them.

21  Q.      Okay.  Has any -- and I -- you
22  haven't been able to read and understand the
23  warnings on the labels because you can't

Page 48

1  read; correct?

2  A.      Right.

3  Q.      And you --

4  A.      I mean, the stand looked fine.
5  All the bolts was tight and everything,
6  so --

7  MR. WEAVER:  Wait till he asks
8  you a question and answer his question,
9  okay?

10  THE WITNESS:  All right.

11  Q.      (By Mr. Lee)  Has anybody ever
12  read the warnings to you that are on the
13  warning labels on the stand itself?

14  A.      No.

15  Q.      Okay, all right.  You're not
16  critical of the warning labels on the stand
17  itself, are you?

18  A.      What does that mean?

19  Q.      You don't have any criticism of
20  it?  You're not -- you don't think it's a
21  bad warning, because you've never read it
22  and nobody's ever read it to you; is that
23  correct?

# FREEDOM COURT REPORTING

Page 49

1  A.    I don't know.
2  Q.    Sir?
3  A.    I don't know. I don't know what
4  you're talking about.
5  Q.    Okay, all right. Have you ever
6  read any written material sent by Strong
7  Built in conjunction with their tree stands?
8  A.    No, sir.
9  Q.    Has anybody ever read to you any
10  of the written material --
11  A.    No, sir.
12  Q.    -- sent by Strong Built?
13  A.    No, sir.
14  Q.    Have you ever seen any
15  instructional videos that Strong Built has
16  put out?
17  A.    No, sir.
18  Q.    Have you ever seen anything on a
19  computer, like on the web site, that -- that
20  Strong Built posts on its web site with
21  regard to use of a tree stand and so forth?
22  A.    Huh-uh.
23  Q.    The answer is no?

Page 50

1  A.    No, sir.
2  Q.    All right. Now, did y'all use
3  these tree stands to hunt?
4  A.    Yes, sir.
5  Q.    Okay. Do you have any idea where
6  this tree stand was first placed when it was
7  first bought, what -- what property -- what
8  property it was located on?
9  A.    No, sir.
10  Q.    Or how long it stayed there?
11  A.    Huh-uh, I don't know.
12  Q.    Or whether it was taken down
13  after hunting season? Do you -- I don't
14  guess you have any information about that,
15  do you?
16  A.    Not -- I know we always pulled
17  our stands out after hunting season, so we
18  all put them all in the barn, so --
19  Q.    But really, you can only attest,
20  of -- of -- of your own personal
21  knowledge --
22  A.    Right.
23  Q.    -- that -- that y'all did this

Page 51

1  on -- from the two year period before this
2  accident?
3  A.    Yeah.
4  Q.    On this -- on this particular
5  stand?
6  A.    Yes, sir.
7  Q.    Because your first contact with
8  this stand was, what, two years before the
9  accident?
10  A.    Yes, sir, uh-huh.
11  Q.    Is that right?
12  A.    Yeah.
13  Q.    And whether it was taken out of
14  the woods or put in the barn, you can't say,
15  because your first contact with this stand
16  was two years before the accident; right?
17  A.    No, it's been in the barn before,
18  because I put mine in there, and then when
19  I'd go put mine out -- two years ago, he
20  asked me to help him put his up, so I went
21  and helped him then, and back in '06 I
22  helped him --
23  Q.    Okay.

Page 52

1  A.    -- put it to the tree.
2  Q.    All right. Well, what about in
3  2003 or 2002 or 2001?
4  A.    I don't know.
5  Q.    You don't have any idea about
6  that, do you?
7  A.    Huh-uh, no, sir.
8  Q.    Okay. You're telling me your
9  first -- I want to be sure I'm -- I'm clear
10  about this, now. Your first contact with
11  this particular stand would have been in
12  2004?
13  A.    Yeah.
14  Q.    Okay. And that's when you helped
15  put it in the barn?
16  A.    Uh-huh.
17  Q.    Did you hunt on that stand?
18  A.    Not in 2004, I didn't.
19  Q.    What about 2005?
20  A.    Yeah, I got in it one time.
21  Q.    Did you have any trouble with it
22  in 2005?
23  A.    Huh-uh, no, it was fine.

13 (Pages 49 to 52)

# FREEDOM COURT REPORTING

Page 53

1  Q.    Seem safe and stable to you?
2  A.    Yeah, yeah, good and steady and
3  it was fine.
4  Q.    Okay. Hunted -- you hunted one
5  time in it in 2005?
6  A.    Yes, sir.
7  Q.    Did you inspect the stand before
8  you got in it? Did you look at it?
9  A.    It looked fine to me.
10 Q.    No, that's -- that's not my
11 question.
12 A.    Yeah.
13 Q.    My question is, in 2005, before
14 you climbed up the stand, did you look at it
15 and inspect it?
16 A.    I know it was just -- I know it
17 was tight to the tree and everything was
18 fine with it, so --
19 Q.    Did you look at any of the bolts
20 or the rails or anything like that at all?
21 A.    Once I got up in it. You know,
22 I -- you have to get all the way up in it to
23 see the rails, so --

Page 54

1  Q.    Well, they've got rails that go
2  all the way to the ground, don't they?
3  A.    Well, they've just got the
4  ladder.
5  Q.    Well, that's what I'm talking
6  about. It had rails on the ladder?
7  A.    The ladder was -- the ladder
8  looked fine.
9  Q.    Well, you've been in the
10 construction business a long time, haven't
11 you, Mr. Stephens?
12 A.    Uh-huh, yes, sir.
13 Q.    And if you saw a bolt or a rail
14 or a ladder rung that looked rusty or worn
15 out, you wouldn't climb up in it, would you?
16 A.    No, huh-uh.
17 Q.    Okay. Because you know that if
18 bolts get rusty --
19 A.    Yeah.
20 Q.    -- they can break, can't they?
21 A.    Yeah, they can break.
22 Q.    Or they can bend?
23 A.    Uh-huh.

Page 55

1  Q.    Do you understand that?
2  A.    Yeah.
3  Q.    Okay. And you know that from
4  your construction business --
5  A.    Yeah.
6  Q.    -- do you not?
7  A.    Which all them bolts looked fine,
8  so --
9  Q.    I -- I hear you, but I just want
10 to make sure that that's something that you
11 know to look out for?
12 A.    Yeah.
13 Q.    Correct?
14 A.    Yeah.
15 Q.    You don't have to have anybody
16 tell you to look out for a rusted bolt or a
17 weak rail or a weak --
18 A.    No, if it don't feel safe, I
19 ain't getting in it.
20 Q.    Okay. That's just based on your
21 hunting experience, perhaps?
22 A.    Yeah, just --
23 Q.    And your experience in the

Page 56

1  construction business?
2  A.    Yeah. Yeah, if it wasn't safe, I
3  wasn't getting in it, so --
4  Q.    If this ladder stand looked
5  rusted and worn out and weak, you wouldn't
6  get in it?
7  A.    No.
8  Q.    Okay. Because that's a long ways
9  to fall, isn't it?
10 A.    Yes, sir.
11 Q.    Okay. And you're saying that
12 when you hunted in it in that one time in
13 2005, it looked fine to you?
14 A.    Yeah.
15 Q.    You didn't see anything that
16 caused you concern; is that correct?
17 A.    No, I didn't.
18 Q.    Okay. And was -- and it was
19 mounted up on a tree -- was it mounted to a
20 tree?
21 A.    Yes, sir.
22 Q.    And was it the same tree that it
23 was mounted to at the time of the accident

14 (Pages 53 to 56)

# FREEDOM COURT REPORTING

Page 57

1  or some different tree?
2  A.      It was a different tree.
3  Q.      Okay.  But it didn't wobble or
4  shake or anything like that at all?
5  A.      Huh-uh, no.
6  Q.      Did you climb -- what -- what --
7  how high -- how high was the stand?  Was it
8  a 15 foot stand or what?
9  A.      I don't know if it was 20 foot or
10 a 16 foot.  I don't know which one it was.
11 Q.      Okay.  How was it -- in 2005, how
12 was it mounted to the -- to the tree?  Tell
13 me -- tell me that.
14 A.      It was just mounted to the tree.
15 Q.      Yeah, but --
16 A.      I mean --
17 Q.      How was it physically mounted to
18 the tree?
19 A.      It had a -- a strap on it, on the
20 top, and it had the brace strap.
21 Q.      All right.  There was a strap
22 across the top, did you say?
23 A.      Yeah, to hold the stand in its

Page 58

1  place.
2  Q.      Okay.  What type of strap was it?
3  A.      It was one of them ratchet
4  straps.
5  Q.      All right.  And then what else?
6  How else was it mounted to the tree?
7  A.      And the brace.
8  Q.      Where was the brace?
9  A.      It was about halfway down, a
10 little closer to the ground.  I mean, you
11 know, it was -- it couldn't go up too high,
12 because it kicks away from the tree, so the
13 brace wasn't long enough.
14 Q.      Okay.  And how was the brace
15 placed against the tree?
16 A.      It had a ratchet strap on it too.
17 Q.      What month was it when you
18 hunted -- hunted in it in 2005?
19 A.      Sir?
20 Q.      What -- which month were you in
21 it in 2005?
22 A.      I don't know.
23 Q.      Okay.  But you only hunted --

Page 59

1  hunted in it on that one occasion?
2  A.      Just every once in awhile, I'd
3  hunt out there with them.
4  Q.      No, you said that you only -- had
5  only been on this particular stand on one --
6  on one occasion in 2005; is that right?
7  A.      Yeah.
8  Q.      Did you typically use some other
9  stand besides this one?
10 A.      Yeah, I've used other stands;
11 just -- just I went with my cousin to there
12 and I got in that stand, so --
13 Q.      Do you know who put that stand up
14 against that tree in 2005?
15 A.      Me and my uncle.
16 Q.      You and your uncle?
17 A.      Yes, sir, me and David.
18 Q.      All right.  And then I take it
19 you didn't have any problem in 2005?
20 A.      Huh-uh, no, sir.
21 Q.      Did y'all take it down at the end
22 of the hunting -- hunting season?
23 A.      Yes, sir.

Page 60

1  Q.      How did -- who took it down in
2  2005?
3  A.      Me and David.
4  Q.      How did y'all take the stand
5  down?
6  A.      Got the strap down, and then the
7  other one, and lowered it down and took it
8  apart and put it on the truck.
9  Q.      That was in 2005?
10 A.      Yes, sir.
11 Q.      But who -- who physically did the
12 work, in terms of taking it down; you or
13 David?
14 A.      David.
15 Q.      David?  Okay.  What were you
16 doing?
17 A.      Holding it steady for him.
18 Q.      Holding it at the bottom?
19 A.      Yeah, uh-huh.
20 Q.      Okay, all right.  Now, this
21 accident happened in 2006; right?
22 A.      Yes, sir.
23 Q.      Now, were y'all in the process of

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 61

1  putting it up or taking it down when it
2  happened?
3  A.    It was already up. We put it up,
4  like, two weeks before hunting season.
5  Q.    Okay. Were you -- on the day of
6  the accident, were you going to hunt or were
7  you going to physically --
8  A.    Yeah, I was going to hunt.
9  Q.    Okay. You weren't there to take
10  it down that day?
11  A.    Huh-uh.
12  Q.    All right. Where -- where was
13  the -- where was the -- the tree stand
14  stored at the end of 2005?
15  A.    Do what?
16  Q.    Where was the tree stand that's
17  the subject of this lawsuit, where was it
18  stored in 2005, when y'all took it down?
19  A.    In the barn.
20  Q.    All right. Was it inside the
21  barn?
22  A.    Uh-huh.
23  Q.    Okay. Is it -- was it covered?

Page 62

1  A.    Yeah.
2  Q.    Is the barn door -- does it have
3  doors on it?
4  A.    Uh-huh.
5  Q.    Keep it from getting wet?
6  A.    Yeah, got --
7  Q.    Sir?
8  A.    Got concrete floors in it.
9  Q.    Okay.
10  A.    And one -- where we put them at.
11  Q.    All right, all right. So when
12  did y'all put this stand up in 2006?
13  A.    November the 3rd, I think.
14  Q.    And how does that date stick out
15  in your mind?
16  A.    I think it was -- well, it was --
17  it was two weeks before the season. I mean,
18  I don't know exactly what date, but it
19  was -- it was on a -- on a Sunday, I think.
20  Q.    Okay. Are y'all -- y'all are
21  obviously deer hunting; right?
22  A.    Yes, sir.
23  Q.    All right. Now, did you inspect

Page 63

1  the tree stand before y'all put it up before
2  the 2006 hunting season?
3  A.    Yeah, everything looked fine on
4  it.
5  Q.    Okay. Didn't look rusty to you
6  at all?
7  A.    Yeah, it had some rust on it, but
8  not -- not that I'd think it would do what
9  it did. I mean, it wasn't -- it wasn't that
10  bad.
11  Q.    Did you look at the rails on the
12  stand?
13  A.    Yeah, it was just looked like --
14  like it was welded up.
15  Q.    Did you look at the -- the -- the
16  ladder itself?
17  A.    Yeah, I -- I looked at the
18  ladder. I mean, it looked --
19        MR. WEAVER: David, I'm sorry,
20  you're talking about in 2006 when he put it
21  up? I just didn't hear your question.
22        MR. LEE: Yeah, yeah, I'm
23  talking -- we're now talking about --

Page 64

1        MR. WEAVER: Okay.
2        MR. LEE: -- in 2006, when it was
3  put up two weeks before hunting season.
4        MR. WEAVER: Right, okay.
5  Q.    (By Mr. Lee) Did you look at
6  the -- the rungs or the rails on the ladder
7  itself?
8  A.    Well, I didn't, like, study them
9  or nothing. It was just -- you know, I
10  looked over them.
11  Q.    Okay. How did -- how did it
12  appear to you in 2006?
13  A.    They looked okay.
14  Q.    Did they appear rusty to you?
15  A.    Not really.
16  Q.    Did you see any dents or --
17  A.    Huh-uh.
18  Q.    -- dings in the ladder itself?
19  A.    No, I didn't see none of that.
20  Q.    Okay, all right. So, now, who --
21  who installed it on November the 3rd of
22  2006? Who did that?
23  A.    Me and David put it on the tree.

16 (Pages 61 to 64)

# FREEDOM COURT REPORTING

Page 65

```
1    Q.      All right.  Are y'all gun hunting
2    or bow hunting?
3    A.      Gun hunting.
4    Q.      Okay.  And did y'all put it on
5    the tree where the accident occurred?
6    A.      Yes, sir.
7    Q.      So it wasn't moved after that?
8    A.      Huh-uh.
9    Q.      All right.  Now, tell me exactly
10   and precisely, Mr. Stephens, how y'all
11   installed the tree stand.  Tell me exactly
12   what you did.
13   A.      Just the same way we put it up
14   the year before.  I just put a -- put a new
15   ratchet strap on it and strapped it down
16   with the brace, put it to the tree.
17   Q.      Did y'all have any instructions
18   to put it up, written instructions with you?
19   A.      No.
20   Q.      Do you -- do you -- do you have
21   any idea at all where the instructions are
22   now, that came with that tree stand?
23   A.      No, sir, I don't.
```

Page 66

```
1    Q.      Okay.  Would it be your best
2    judgment that those instructions were thrown
3    away or discarded at some point in time in
4    the past?
5    A.      Probably, yeah.
6    Q.      Okay.  And you've -- you've never
7    seen them, I don't guess, have you?
8    A.      Huh-uh.
9    Q.      Have you -- well, don't let me
10   ask it that way.  Let me ask it this way:
11   Have you ever seen the written
12   instructions --
13   A.      No.
14   Q.      -- for the tree stand that is the
15   subject of this litigation?
16   A.      No.
17   Q.      The answer is no?
18   A.      No.
19   Q.      Okay.
20           MR. WEAVER:  David, if you get to
21   a stopping point, can we take about a three
22   or four minute break?  We've been going
23   about an hour.
```

Page 67

```
1            MR. LEE:  Yeah.  No, I'm at a
2    good stopping point now.
3            THE VIDEOGRAPHER:  We are off the
4    video record at 12:03 p.m.
5            (Whereupon, a recess was taken.)
6            THE VIDEOGRAPHER:  We are back on
7    the video record at 12:11 p.m.  This begins
8    videotape number two.
9    Q.      (By Mr. Lee)  Okay.  We took a
10   little break there, Mr. Stephens.  Your
11   testimony before the break was you've never
12   seen the written instructions that came with
13   the stand; correct?
14   A.      No, sir.
15   Q.      You're not saying that no
16   instructions went with the stand.  You're
17   just saying you hadn't seen them?
18   A.      I ain't -- I know I seen them
19   when they opened it up, while they opened
20   presents up, but I didn't see them put it
21   together.
22   Q.      Okay.  You saw paperwork that
23   came with the stand?
```

Page 68

```
1    A.      Right.
2    Q.      When he got it for Christmas?
3    A.      Yeah.
4    Q.      Were you there when he got the
5    Christmas present?
6    A.      Yeah.
7    Q.      Were you -- was -- are you
8    talking about this stand in particular?
9    A.      Yeah.
10   Q.      The one that's in this lawsuit?
11   A.      Uh-huh.
12   Q.      And do you have any idea how --
13   how many years ago that stand was a
14   Christmas present?
15   A.      No, huh-uh.
16   Q.      No clue?
17   A.      Huh-uh.
18   Q.      But you do know when he opened up
19   the box, there was paperwork inside?
20   A.      Uh-huh.
21   Q.      Correct?
22   A.      Correct.
23   Q.      You just never looked at the
```

17 (Pages 65 to 68)

# FREEDOM COURT REPORTING

Page 69

1  paperwork?
2  A.      No, I didn't look.
3         MR. WEAVER: Don't forget to say
4  "yes" or "no" out loud, or whatever.
5         THE WITNESS: Okay.
6  Q.      (By Mr. Lee) And you weren't
7  with him when he put the stand together the
8  first time; correct?
9  A.      Do what?
10  Q.      You weren't with your uncle when
11  he put the stand together for the first
12  time?
13  A.      No, sir.
14  Q.      And you have no idea what he did
15  with the paperwork?
16  A.      No, sir.
17  Q.      Probably threw it away?
18  A.      Probably.
19  Q.      All right. Now, let's -- let's
20  go back to when the stand was installed.
21  What -- you say it was installed on or about
22  Sunday, November the 3rd of 2006; right?
23  A.      Yeah, around that area.

Page 70

1  Q.      All right. Now, what -- what
2  type of tree was it put up against?
3  A.      A pine tree.
4  Q.      And what was the approximate
5  diameter of that pine tree, if you know?
6  What -- what size was it?
7  A.      I don't know.
8  Q.      Could you wrap your arms all the
9  way around it?
10  A.      Yeah.
11  Q.      Okay. Was it a big pine tree,
12  small --
13  A.      No, it wasn't no big one. It was
14  about medium-sized.
15  Q.      Okay. Was it straight?
16  A.      Uh-huh.
17  Q.      It was?
18  A.      Yeah, all of them's straight.
19  Q.      Well, what about the bottom of
20  it, the base of it? How did it look?
21  A.      It looked good. I always -- we
22  always look at our trees, so, yeah.
23  Q.      What are you looking for, Mr.

Page 71

1  Stephens?
2  A.      Just a good healthy tree.
3  Q.      Okay, all right. Now, take me
4  through the process of how this particular
5  stand was put up. When I say, "this
6  particular stand," I'm talking about the
7  stand that you got hurt on. How -- how --
8  tell me physically, step-by-step, how it was
9  put together.
10  A.      Put it on the tree and tighten it
11  down.
12  Q.      How did you tighten it down?
13  A.      With a ratchet strap.
14  Q.      Where was the ratchet strap
15  placed?
16  A.      It was on the side of the tree.
17  Q.      Near the top, near the bottom,
18  near the middle, where?
19  A.      At -- one at the top and one for
20  the brace.
21  Q.      And where was the brace placed?
22  A.      It was -- I don't -- just on the
23  stand.

Page 72

1  Q.      Yeah, but where on the stand?
2  A.      I don't know. It was -- it
3  was -- I mean, I don't know exactly how high
4  or -- or --
5  Q.      That's what I'm asking you. How
6  far off the ground was the -- was the brace?
7  A.      I think it was about the fourth
8  step up, I think.
9  Q.      Like the fourth step up?
10  A.      I think.
11  Q.      And was there -- are you saying
12  that there was some ratchet strap there too?
13  A.      Yeah, to hold it to the tree.
14  Q.      All right. Anything besides
15  those two ratchet straps holding the stand
16  to the tree? Anything else?
17  A.      No.
18  Q.      Was there any type of chain
19  around it?
20  A.      No, there wasn't no chain around
21  it.
22  Q.      Was there any kind of rope around
23  it?

18 (Pages 69 to 72)

# FREEDOM COURT REPORTING

Page 73

1  A.     Huh-uh.
2  Q.     You're saying that the only thing
3  that was holding it to the tree were two
4  ratchet straps?
5  A.     Yes, sir.
6  Q.     One at the top --
7  A.     Yes, sir.
8  Q.     -- and one about the fourth step
9  up; is that right?
10 A.     Yes, sir.
11 Q.     All right.  What was the angle
12 that the tree stand was placed against the
13 tree?
14 A.     I don't know.
15 Q.     Can you use your hand and sort of
16 point at the angle?
17 A.     No, it was -- it was angled a
18 little bit (indicating).  It wasn't no big
19 angle.  It was just angled just pretty much
20 straight up (indicating).
21 Q.     Okay.  You say that the stand was
22 pretty much straight up?
23 A.     Yeah.

Page 74

1  Q.     Okay.  So it wasn't much of an
2  angle to it at all?
3  A.     No, it wasn't much of an angle to
4  it.  You can't hardly get no angles to them.
5  Q.     Did y'all put the stand together
6  on the ground before you put it up against
7  the tree or did you -- how -- how did you
8  work it to get it up?
9  A.     No, we just slid the ladder
10 together and put it up.
11 Q.     Okay.  Was it all one -- was
12 it -- was it all together at the time y'all
13 put it up against the tree?
14 A.     Uh-huh, yeah.
15 Q.     Okay.
16 A.     It was all the way down, slid all
17 the way into each other.
18 Q.     Okay.
19 A.     It was all the way in.
20 Q.     I guess what I'm asking, did you
21 have to use another ladder -- well, did you
22 use another ladder to help put the -- put
23 the tree stand up or not?

Page 75

1  A.     Huh-uh.
2  Q.     No?
3  A.     No.
4  Q.     Okay, all right.  Did you put the
5  stand partially together and put it up and
6  then assemble the rest of it?
7  A.     Huh-uh.
8  Q.     Okay.  Your testimony is that
9  when the stand was put up against the tree,
10 it was all put together in one piece?
11 A.     Yeah.
12 Q.     Correct?
13 A.     Yeah.
14 Q.     All right.  Who -- who taught you
15 how to put together a tree stand and put it
16 up?
17 A.     My daddy.
18 Q.     Is he still living?
19 A.     Uh-huh.
20 Q.     Do you know what kind of tree
21 stands he used to have?
22 A.     No, not really.
23 Q.     Did anybody else teach you how to

Page 76

1  do it besides your dad?
2  A.     No.
3  Q.     What about the -- the platform at
4  the top?  Do you understand what I'm saying
5  when I say, "the platform"?
6  A.     Uh-huh.
7  Q.     Was that put together?
8  A.     Yeah, it was already on there.
9  Q.     Okay.  Who -- who put that on the
10 stand?
11 A.     Strong Built.
12 Q.     No, I'm talking about who -- when
13 y'all were putting the thing together --
14 A.     No, that was welded.
15 Q.     I understand.  But you've got
16 to -- that has to go into part of the ladder
17 itself, doesn't it?
18 A.     I don't know.
19 Q.     These things fit together in
20 pieces, do they not?
21 A.     Uh-huh, yeah, I'm trying to think
22 how that one was put together.  I think
23 it -- I think it bolted to it.

19  (Pages 73 to 76)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 77

1  Q.      Okay.  Was it already bolted when
2  y'all took it to the woods?
3  A.      Uh-huh.
4  Q.      So y'all -- if it unbolts, y'all
5  didn't take the bolts out?
6  A.      Huh-uh.
7  Q.      Is that right?
8  A.      Right.
9  Q.      Okay.  The -- the strap at the
10 top, can you tell me physically where it was
11 at the top that held the stand to the -- to
12 the --
13 A.      Just where they've got the plate
14 that goes to the tree (indicating) --
15 Q.      Uh-huh.
16 A.      -- it bolted to the -- I mean it
17 was hooked to the plate around the tree.
18 Q.      Okay.  Anything else done to it
19 to secure the -- the stand to the tree
20 besides what you've just told us?
21 A.      No, that was it.
22 Q.      And what you've -- what you've
23 told us is two ratchet straps?

Page 78

1  A.      Yeah.
2  Q.      And the brace?
3  A.      Yeah.  But it had -- in that V
4  part that goes to the tree, it's got spikes
5  in it, and the tighter you get it, the
6  farther it goes into the tree, so --
7  Q.      Okay.
8  A.      -- it's pretty secure.
9  Q.      All right.  Did y'all test it
10 out?  Did anybody test it out on November
11 the 3rd?
12 A.      My uncle did.
13 Q.      He did?
14 A.      Yeah, he went up it.
15 Q.      And that's David?
16 A.      Uh-huh.
17 Q.      Did he have any problems with it
18 on November the 3rd?
19 A.      Huh-uh.
20 Q.      Did you go up it on November the
21 3rd?
22 A.      No, sir.
23 Q.      How many times did he go up and

Page 79

1  down it?
2  A.      That year, just once.
3  Q.      When you -- on November the 3rd?
4  A.      I didn't go up and down it.
5  Q.      I'm talking about did -- did --
6  A.      He went up it twice, I think.
7  Q.      That same day?
8  A.      Yeah.
9  Q.      Or at different times?
10 A.      Just the same time we was there.
11 Q.      Did it seem unsteady or wobbly
12 or --
13 A.      No, it was tight.
14 Q.      How -- how -- how tall is your
15 Uncle David?
16 A.      I think he's, I don't know six --
17 about six foot.
18 Q.      And how much does he weigh?
19 A.      I don't know.
20 Q.      In your best judgment?
21 A.      I don't know.
22 Q.      More or less than 200 pounds?  I
23 mean, is he a heavyset guy, skinny guy?

Page 80

1  A.      No, he's skinny.
2  Q.      Skinny guy?
3  A.      He's skinny.
4  Q.      You don't have any idea how much
5  he weighs?
6  A.      No, I don't know.
7  Q.      How tall are you and how much do
8  you weigh?
9  A.      I was six foot.  And I don't know
10 what I weigh now.
11 Q.      At the time, how much did you
12 weigh?
13 A.      160 -- my bad, 260 -- 261.
14 Q.      At the time of this accident, you
15 weighed 261 pounds?
16 A.      Yes, sir.
17 Q.      Do you weigh more or less than
18 that now?
19 A.      I don't know.
20 Q.      You haven't weighed lately?
21 A.      I haven't weighed lately.
22 Q.      You're saying on November the
23 3rd, when y'all installed it, you didn't go

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 81

1  up and down it at all?
2  A.        No, sir.
3  Q.        Do you -- did -- at the time of
4  this accident, did you weigh more or less
5  than -- than your Uncle David?
6  A.        I don't know what he weighs. I
7  mean --
8  Q.        Okay, all right. So I take it on
9  November the 3rd, y'all weren't really
10  hunting that day?
11  A.        No.
12  Q.        That was just to get
13  everything --
14  A.        Yeah.
15  Q.        How many stands did y'all have
16  altogether, tree stands?
17  A.        We had a -- two of them out there
18  and -- and got some on my -- on my hunting
19  land.
20  Q.        How many do you have on your
21  place?
22  A.        About six.
23  Q.        So y'all have, what, eight stands

Page 82

1  altogether?
2  A.        Yeah.
3  Q.        How many of those eight stands
4  are Strong Built stands?
5  A.        That was the only one.
6  Q.        All the rest of them are
7  manufactured by somebody else?
8  A.        Yeah.
9  Q.        Okay. Do you know who
10  manufactured any of the other tree stands?
11  A.        Not really. I think one of
12  them's a Buckshot. I don't know the other
13  one.
14  Q.        Okay. Were all six of these
15  stands stored together in the barn?
16  A.        Yeah.
17  Q.        Okay. Did y'all -- you said that
18  you completely disassembled them each year
19  to put them in the barn; correct?
20  A.        No, we just took them down. We
21  put them in the truck to get them to the
22  stand. Like, take the ladder apart; that's
23  the only thing.

Page 83

1  Q.        Okay.
2  A.        We don't fool with nothing else
3  on there; just take them -- the ladders
4  apart.
5  Q.        Okay. Before your accident, do
6  you know if any of the parts on the -- that
7  came -- any of the original parts that came
8  with the tree stand had to be replaced?
9  A.        Not that I know of.
10  Q.        Like any of the straps, for
11  example, did they have to be replaced?
12  A.        What -- like which strap?
13  Q.        That -- that held the stand to
14  the tree?
15  A.        We get new ones every year.
16  Q.        Oh, you do?
17  A.        Yeah.
18  Q.        So the -- the -- the ratchet
19  straps that were on this particular stand
20  were not the original Strong Built straps;
21  correct?
22  A.        Correct.
23  Q.        Okay. Y'all replaced those

Page 84

1  straps every year?
2  A.        Yeah.
3  Q.        Where did you get the new straps?
4  A.        Wal-Mart.
5  Q.        Do you know what type of straps
6  you got?
7  A.        I don't know.
8  Q.        Who bought the straps?
9  A.        David bought them.
10  Q.        Do you know who manufactured
11  the -- the ratchet straps that were on the
12  tree --
13  A.        No, sir.
14  Q.        -- at the time of the accident?
15  A.        No, sir, I don't.
16  Q.        Have you ever seen any hunters
17  use harnesses, like safety harnesses, you
18  know, when -- when hunting on tree stands?
19  Have you ever seen that happen before?
20  A.        Yeah, I've got one.
21  Q.        Oh, you do have one?
22  A.        Yeah.
23  Q.        When did you buy yours?

21  (Pages 81 to 84)

**FREEDOM COURT REPORTING**

Page 85

1    A.    I think I got mine at the end
2    of -- or the new one at the end of '05.
3    Q.    So you had a -- was it a full
4    body safety harness?
5    A.    Uh-huh.
6    Q.    It was?
7    A.    Yeah.
8    Q.    Okay. Where did you buy that
9    one?
10   A.    My uncle picked it up for me. I
11   don't know where he got them at, because he
12   got him one too.
13   Q.    Well, what is your understanding
14   of the purpose of a full body safety
15   harness?
16   A.    It -- it's safety.
17   Q.    To keep you from falling out of a
18   tree or off a stand?
19   A.    Yeah, yeah.
20   Q.    Did you wear it?
21   A.    Uh-huh. I had it on that
22   morning.
23   Q.    Okay. Did you have it connected?

Page 86

1    A.    I wasn't in the -- all the way in
2    the stand yet.
3    Q.    Okay. You weren't using that --
4    the -- the safety harness as you were
5    walking up the ladder is what you're saying;
6    right?
7    A.    Right.
8    Q.    And your testimony is that there
9    were no ropes whatsoever with the -- that --
10   that y'all used with the stand when y'all
11   assembled it a month or so before this
12   accident; is that correct?
13   A.    Correct.
14   Q.    Have you seen tree stands that do
15   have in fact -- do in fact have ropes on --
16   on them?
17   A.    No, besides the rope we put on to
18   pull our guns up with.
19   Q.    And you hadn't seen any stands
20   with ropes that are used for -- to assist
21   with stability?
22   A.    No, sir.
23   Q.    All right. Let's talk about the

Page 87

1    accident itself. Tell me -- tell me what
2    happened.
3    MR. WEAVER: David, you still
4    using that?
5    A.    I was just going up the stand
6    and -- and it just collapsed on me.
7    Q.    (By Mr. Lee) Who was with you?
8    A.    My cousin. He wasn't there with
9    me. He was at his stand.
10   Q.    He -- he was what?
11   A.    At his stand.
12   Q.    All right. What -- what was your
13   cousin's name?
14   A.    Matt.
15   Q.    Matt --
16   A.    Stephens.
17   Q.    Stephens? How old is he?
18   A.    18.
19   Q.    Okay, all right. Tell me -- tell
20   me, when you got there that day, which
21   was -- we've -- we've said it was December
22   the 2nd of 2006; right?
23   A.    Yes, sir.

Page 88

1    Q.    Did you look at the stand?
2    A.    Yeah.
3    Q.    What -- tell me what you saw when
4    you looked at it.
5    A.    Looked like we just put it up.
6    Q.    Had anybody used that stand from
7    the time that y'all put it up until the time
8    you were going to use it?
9    A.    Just that he said that he hunted
10   in it and -- like, my cousin, he said he
11   hunted in it and it was fine.
12   Q.    Matt?
13   A.    Yeah.
14   Q.    Okay. Did you test it, shake it,
15   try to move it or anything before you
16   started climbing up it?
17   A.    Yeah. It --
18   Q.    Tell me what you did.
19   A.    I just grabbed it and shook it a
20   little bit and it was pretty tight, so I
21   went up it.
22   Q.    You said, "pretty tight." Was
23   it --

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 89

1  A.       Yeah, it was tight. I mean, when
2  I got to the -- right when I got up to the
3  top was when it collapsed on me.
4  Q.       How did it collapse?
5  A.       The brace on it broke.
6  Q.       The brace broke?
7  A.       Yes, sir.
8  Q.       When you say the -- and when you
9  say, "brace," are you talking about the
10 brace that is -- that was on the fourth --
11 A.       Right.
12 Q.       -- ladder?
13 A.       Yeah, yes, sir.
14 Q.       How -- how do you know that the
15 brace broke?
16 A.       Because that was the only reason
17 why it had to collapse. And when I was
18 laying on the ground, I looked and the brace
19 was down and it broke from the stand, so --
20 Q.       Okay. Is the -- is the brace
21 itself -- how -- how was it connected to the
22 stand?
23 A.       It was welded to a bracket and

Page 90

1  the bracket goes over the stand and bolts
2  down.
3  Q.       Okay.
4  A.       And the bracket was still on the
5  step.
6  Q.       All right. Did you hear the --
7  hear or see the brace break?
8  A.       No, sir, I didn't. I was above
9  it.
10 Q.       Okay, all right. So you're --
11 how far up the stand were you?
12 A.       I was all the way at the top,
13 fixing to climb -- climb in it.
14 Q.       And tell me what -- what
15 physically happened.
16 A.       Just when I hit the ground, I hit
17 the last step and I went to the right and --
18 and I've been hurting ever since.
19 Q.       Well, but I'm talking about when
20 you say it collapsed, how did it collapse?
21 Did it go backwards?
22 A.       No, it went into the tree.
23 Q.       Collapsed into the tree?

Page 91

1  A.       Yes, sir.
2  Q.       Well, what -- what went into the
3  tree?
4  A.       The stand.
5  Q.       The -- the ladder itself?
6  A.       Yes, sir.
7  Q.       So the ladder itself went in
8  towards the tree?
9  A.       Yeah, it went in -- went in
10 towards the tree.
11 Q.       Okay. And what happened when it
12 went in towards the tree?
13 A.       That's when I fell.
14 Q.       Did you fall backwards?
15 A.       It kind of jarred and I -- I just
16 fell straight down. It just --
17 Q.       Before you started climbing
18 the -- the tree stand that day, did you look
19 at the brace?
20 A.       No.
21 Q.       Okay. Did you look at the brace
22 when y'all installed the tree stand on or
23 about November the 3rd of 2006?

Page 92

1  A.       Yeah.
2  Q.       And how did it look on that
3  occasion?
4  A.       It looked fine.
5  Q.       Did you look at the bolts on the
6  brace itself?
7  A.       I don't think I did.
8  Q.       Okay. Do you know whether those
9  bolts were rusty or not?
10 A.       I don't know.
11 Q.       Okay. You just -- did you just
12 look at the brace from a distance?
13 A.       Well, I was just standing right
14 up at it, you know, just looking at the
15 brace. I didn't, like, grab it or shake it
16 or nothing.
17 Q.       Was there any type of side brace
18 up at the top of this tree stand?
19 A.       It had, like, a gun rest.
20 Q.       A gun rest?
21 A.       Yeah. It's like a -- a rail that
22 goes all the way around you.
23 Q.       Is that up at the top?

23 (Pages 89 to 92)

# FREEDOM COURT REPORTING

Page  93

1  A.     Yes, sir.
2  Q.     Okay.  Well, I'm talking about
3  on -- on either side of the ladder, was
4  there any kind of bracing on either side of
5  the ladder?
6  A.     No, sir; no, sir.
7  Q.     Up towards the top is what I'm
8  talking about.
9  A.     No, sir.
10  Q.     What I -- what I hear you saying
11  is that you had the ladder itself, you had
12  the brace, the horizontal brace, I guess, is
13  what you call it --
14  A.     Uh-huh.
15  Q.     -- that was on the fourth step
16  up, up against the tree; correct?
17  A.     Yeah.
18  Q.     And then there was, I guess, the
19  top of the platform up against the tree; is
20  that correct?
21  A.     Right.
22  Q.     Okay.  And then you had a ratchet
23  strap up at the top?

Page  94

1  A.     Yes, sir.
2  Q.     And then you -- you also said
3  there was a ratchet strap, what, on the
4  brace itself?
5  A.     Yes, sir.
6  Q.     How -- how was it wrapped?  Was
7  it wrapped around the brace or what --
8  what -- how was it --
9  A.     No, it had holes in the brace.
10  Q.     Sir?
11  A.     It's got, like, holes in the
12  brace --
13  Q.     Uh-huh.
14  A.     -- for the hook to hook in it.
15  Q.     Okay.  Were -- were these brand
16  new straps --
17  A.     Yes, sir.
18  Q.     -- that y'all had just bought
19  that year?
20  A.     Yes, sir.
21  Q.     Do you know if there was any
22  failure of those straps?
23  A.     The straps was fine.

Page  95

1  Q.     What -- what do you think -- it's
2  your -- as I understand your testimony here
3  today, you're -- you're saying that there
4  was a failure of the brace?
5  A.     Yes, sir.
6  Q.     Is that correct?
7  A.     Yes, sir.
8  Q.     Are you aware of anything else
9  that failed on this particular stand other
10  than the brace?
11  A.     Not that I know of.
12  Q.     Okay.  What -- what, in your
13  opinion, caused that brace to fail?
14  A.     I don't know.
15  Q.     Was there any type of cross brace
16  up at the top of the tree stand?
17  A.     What do you mean, "cross brace"?
18  Q.     It's a cross brace that connects
19  the top platform, the front seat to the
20  bottom of the platform at the footrest to
21  the handrail.  Anything like that at all?
22  A.     I don't know.  I can't remember
23  that stand.

Page  96

1  Q.     Okay.  But you -- the only --
2  what -- what's clear to you is the only
3  brace that was there was that one horizontal
4  brace that was on the fifth step?
5  A.     Yeah.
6  Q.     Okay.  Did -- did you have
7  anything in your hands when you were
8  climbing up the ladder?
9  A.     No, sir.
10  Q.     What about your gun?  Did you
11  have it with you?
12  A.     Yeah, I had it with me, but I
13  didn't have it in my hands.
14  Q.     How -- how were you carrying the
15  gun up the ladder?
16  A.     I don't -- I think I had it tied
17  to the rope on the ground.
18  Q.     Were you going to lift it up off
19  the ground with a rope?
20  A.     Yeah.
21  Q.     But the rope wasn't connected to
22  the tree, was it?
23  A.     Huh-uh, it was just a -- a little

24  (Pages  93  to  96)

# FREEDOM COURT REPORTING

Page 97

1  bitty rope (indicating).
2  Q.      Okay.  What -- what did you have
3  with you as you were climbing up the stand?
4  A.      Just me.
5  Q.      Just you and the -- but you said
6  you had this full safety harness on?
7  A.      Yeah.
8  Q.      Did y'all have to -- when you put
9  the stand up on November the 3rd of 2006,
10  did y'all have to bolt anything together?
11  A.      No, sir.
12  Q.      To your knowledge, in 2006,
13  before this accident, did you ever test any
14  of the bolts or inspect any of the bolts or
15  anything like that at all, study the bolts?
16  A.      No, sir.
17  Q.      Okay.  Did you -- when you bought
18  the -- the safety harness, did it come with
19  a set of instructions?
20  A.      I don't think it did.
21  Q.      You don't know who manufactured
22  the safety harness?
23  A.      No, I don't know.

Page 98

1  Q.      And who -- who gave you the
2  safety harness?
3  A.      My uncle.
4  Q.      Okay.  If it did -- if it did
5  come with a set of instructions, you didn't
6  read them or have somebody read them to you,
7  did you?
8  A.      Well, we wear our safety
9  harnesses all the time, so --
10  MR. WEAVER:  You need to listen
11  to his question.  Be sure you listen to his
12  question and answer it.
13  Q.      (By Mr. Lee)  Yeah.  And my
14  question is when you -- well, first of all,
15  how many years have you been wearing safety
16  harnesses?
17  A.      Probably about 20 years.
18  Q.      20 years?
19  A.      Uh-huh.
20  Q.      In -- in the 20 year period that
21  you've been wearing safety harnesses, nobody
22  has ever read to you the instructions on
23  using a safety harness; is that correct?

Page 99

1  A.      No.  My daddy showed me how to
2  use one.
3  Q.      Okay.  Has it always been your
4  custom, habit and practice not to secure the
5  safety harness until you got up to the top
6  of the tree stand?
7  A.      No, we always hooked it to the
8  tree when we got in the stand.
9  Q.      That's what I'm talking about.
10  A.      Yeah.
11  Q.      Did -- did -- did you always wait
12  till you got into the tree stand at the top
13  before you put the --
14  A.      Yes, sir.
15  Q.      Before you connected the safety
16  harness?
17  A.      Yes, sir.
18  Q.      Is that correct?
19  A.      Yes, sir.
20  Q.      And you understand that the
21  purpose of a safety harness is to keep you
22  from falling --
23  A.      Out of the tree stand.

Page 100

1  Q.      -- out of the tree stand?
2  A.      Yes, sir.
3  Q.      Or if the tree stand fails, to
4  keep you from falling to the ground;
5  correct?
6  A.      Yeah.
7  Q.      How did you -- once -- once you
8  got to the top of the tree stand, how would
9  you physically connect the safety harness?
10  What would you connect it to?
11  A.      It's got a band on it.  It's got
12  a band on my harness that goes around it.
13  Q.      Goes around what?
14  A.      Around the tree and goes back
15  into my safety harness.
16  Q.      How much slack would you have
17  between the tree and the -- and the safety
18  harness when you would typically use the
19  safety harness?  How much -- how much slack?
20  A.      Mine's got two foot.
21  Q.      Okay.  All right.  What was the
22  weather like that day?
23  A.      I don't know.

25  (Pages 97 to 100)

# FREEDOM COURT REPORTING

| Page 101 |
|---|

1 Q.    Sir?
2 A.    I don't know.
3 Q.    I mean, was it raining or
4 anything?
5 A.    I don't think it was.
6 Q.    You don't know whether it was
7 raining or not?
8 A.    I know it wasn't raining.
9 Q.    Okay. Was it -- what time --
10 what time did the accident occur?
11 A.    I think about 15 to 6:00.
12 Q.    You say it happened about 15 till
13 6:00?
14 A.    Yeah.
15 Q.    And, of course, that's a.m.; is
16 that right?
17 A.    Yeah, in the morning.
18 Q.    In the morning? And whose
19 property did the accident occur on?
20 A.    It was a friend of ours.
21 Q.    What's his name?
22 A.    Tray Taylor.
23 Q.    Tray what?

| Page 102 |
|---|

1 A.    Taylor.
2 Q.    Taylor?
3 A.    Yes, sir.
4 Q.    How -- how far did you fall to
5 the ground? Do you know?
6 A.    I don't know if it was a 20 foot
7 or a 16 foot.
8 Q.    And tell me, how did you land?
9 A.    Just straight down on my feet.
10 Q.    And tell me what happened when
11 you landed. Did you feel pain immediately?
12 A.    Yeah, it knocked the breath out
13 of me.
14 Q.    Could you -- were you -- were you
15 knocked unconscious or --
16 A.    No, sir, huh-uh. It was just --
17 Q.    And what happened?
18 A.    It was hurting very bad, just --
19 Q.    What -- what was hurting?
20 Both -- both of your --
21 A.    Both my legs.
22 Q.    Did you have a cell phone with
23 you?

| Page 103 |
|---|

1 A.    Yes, sir.
2 Q.    Did you call somebody for help?
3 A.    Yeah, I called my wife.
4 Q.    What about your cousin that was
5 out there? Did he hear you?
6 A.    I tried to call him, but the
7 service was in and out, so I couldn't get
8 him, so I just called home.
9 Q.    Okay. Who -- who came and got
10 you?
11 A.    My wife and most of my uncles
12 and -- and my daddy.
13 Q.    All right. Who -- who came, now?
14 Your wife came?
15 A.    Yeah.
16 Q.    And that's Debora?
17 A.    Uh-huh.
18 Q.    And then who else came?
19 A.    And Ricky, Ricky and Eddie.
20 Q.    And your dad?
21 A.    And my dad.
22 Q.    And what's his name?
23 A.    Roger Wood, Roger Wood.

| Page 104 |
|---|

1 Q.    And Ricky. And who is that?
2 A.    Stephens.
3 Q.    Is that a cousin?
4 A.    Uncle.
5 Q.    And then who else came?
6 A.    Eddie Stephens.
7 Q.    Is he an uncle too?
8 A.    Yes, sir.
9 Q.    All right. Were you -- could you
10 get it up at all?
11 A.    No, no, I couldn't move.
12 Q.    Okay, all right. What -- what --
13 what did they do for you?
14 A.    My daddy brought a army cot, and
15 they put me on it and put me in the back of
16 the truck and carried me to the hospital.
17 Q.    Which -- which hospital did you
18 go to?
19 A.    I went to Tallassee.
20 Q.    What's -- what's the name of that
21 hospital?
22 A.    Sir?
23 Q.    What's the name of that hospital?

26  (Pages 101 to 104)

# FREEDOM COURT REPORTING

Page 105

1  A.      Community Hospital in Tallassee.
2  Q.      Did they treat you there or send
3  you somewhere else?
4  A.      They had to send me to
5  Montgomery.
6  Q.      Which hospital did you go there?
7  A.      Baptist South.
8  Q.      In Montgomery?
9  A.      Yes, sir.
10  Q.      Okay. Did you spend the night at
11  all at Community Hospital --
12  A.      No.
13  Q.      -- or did you just go straight to
14  the Baptist?
15  A.      Just went straight to Baptist.
16  Q.      And how long were you at the
17  Baptist Hospital? How many days?
18  A.      I don't know. Four days, I
19  think.
20  Q.      Tell -- tell me what happened to
21  you. What were your injuries?
22  A.      I had both my tibia and fibula
23  pushed up behind my knees six inches, and my

Page 106

1  right kneecap was shattered four -- the left
2  kneecap was broke in four places.
3  Q.      Okay. What -- what did they do
4  to repair all that?
5  A.      The first surgery, he -- he
6  pulled them out and lined them up and put
7  halos on them -- in them for, I think, 12,
8  14 days before he done the first surgery.
9  Q.      Who was your doctor?
10  A.      Freeman.
11  Q.      Okay. And what else did they do?
12  A.      When he done that, he sent me --
13  I stayed there four days. He sent me home,
14  to keep from getting pneumonia or something
15  at the hospital. Then he left from the
16  house and went back and had the major
17  surgery done.
18  Q.      Where was the major surgery done?
19  A.      It was the same place.
20  Q.      When was that done?
21  A.      I don't know. You'd have to ask
22  her.
23  Q.      Sir?

Page 107

1  A.      I don't know. You'd have to ask
2  her that.
3  Q.      Well, we -- we can -- was it
4  several weeks after the accident or --
5  A.      I don't know exactly what date it
6  was when they done it.
7  Q.      Okay. Well, what did they do the
8  second time?
9  A.      They put plates and screws and
10  just rebuilt it at all back.
11  Q.      And I see you're in a wheelchair,
12  Mr. Stephens. Can you walk at all?
13  A.      Just a little. It goes to
14  hurting real bad and I have to get off of
15  them.
16  Q.      Like, how -- how often do you use
17  your wheelchair?
18  A.      I use the wheelchair mostly.
19  Q.      But -- but you can get up and
20  walk around some in the house?
21  A.      Yeah, I can get up and walk
22  around a little in the house. Just they go
23  to hurting real bad, because the left one --

Page 108

1  the left one hurts me real bad.
2  Q.      Okay. Are you able to drive?
3  A.      No, not really.
4  Q.      You don't do any driving?
5  A.      No.
6  Q.      Can you walk around with crutches
7  or a cane or anything like that?
8  A.      Yeah, I use a cane when I do
9  walk.
10  Q.      Okay. You haven't -- you
11  don't -- you haven't lost any feeling in
12  your legs, have you?
13  A.      No, sir, huh-uh.
14  Q.      Okay. When you walk, do you have
15  a limp?
16  A.      Yeah.
17  Q.      Okay.
18  A.      Yeah, my -- my right leg is
19  pretty much a stiff leg. That's as far as
20  it will bend (indicating). It won't bend no
21  farther. It's pretty much a stiff leg.
22  Q.      Have you got scars on your legs?
23  A.      Yeah, I've got them all over here

27  (Pages 105 to 108)

# FREEDOM COURT REPORTING

| Page 109 | Page 111 |
|---|---|
| 1  and there and down here (indicating). | 1   A.      Yeah, I still take pain pills, |
| 2  Q.        Okay. | 2   pain medicine. |
| 3  A.        On both sides (indicating). | 3   Q.      For your legs? |
| 4  Q.        How often do you -- do you walk? | 4   A.      Yes, sir. |
| 5  Do you walk a little bit every day? | 5   Q.      What -- what medicine do you take |
| 6  A.        Yeah, I walk a little every day, | 6   for your -- |
| 7  hoping that it'll just quit, where I can | 7   A.      I don't know the name of it. |
| 8  walk with them, but I walk with them some. | 8   Q.      Would your wife know that? |
| 9  Q.        Okay.  Now, you told me that you | 9   A.      Yeah. |
| 10  had applied for Social Security disability | 10   Q.      Tell me what you do on a regular |
| 11  benefits sometime in 2005? | 11   basis.  Tell -- give me some idea of what |
| 12  A.        Yeah. | 12   you do on a daily basis. |
| 13  Q.        Was that denied or was it | 13   A.      Now? |
| 14  granted? | 14   Q.      Yeah. |
| 15  A.        All of them gets denied. | 15   A.      Pretty much nothing; can't do |
| 16  Q.        Okay.  I -- were you working any | 16   nothing near as what I used to could do. |
| 17  in 2006? | 17   Q.      Well, what do you do? |
| 18  A.        No, sir. | 18   A.      I've got -- I've got a couple of |
| 19  Q.        So you didn't work any that -- | 19   hogs I fool with.  I borrowed my |
| 20  A.        Wait.  Yeah, I did.  Yeah, I | 20   granddaddy's power wheelchair to get down |
| 21  worked some. | 21   there to them, so that's about it. |
| 22  Q.        How much? | 22   Q.      Okay.  You raise some hogs? |
| 23  A.        Not as much.  I didn't work that | 23   A.      Yeah. |

| Page 110 | Page 112 |
|---|---|
| 1  much. | 1   Q.      Do you watch television any? |
| 2  Q.        Is that -- was that because of | 2   A.      I kind of stay outside mostly. |
| 3  the migraine headaches? | 3   Q.      When you walk, do you walk |
| 4  A.        Yeah, and then it was a bad year | 4   outside some? |
| 5  too. | 5   A.      No, sir, huh-uh, I don't walk |
| 6  Q.        Do you still suffer from migraine | 6   outside none. |
| 7  headaches? | 7   Q.      You walk, what, on the inside of |
| 8  A.        Not really, not now; just -- I | 8   the house? |
| 9  mean, I -- I still get them, maybe once a | 9   A.      Yeah, because it's just -- you |
| 10  week now. | 10   know, in that trailer, there's stuff I can |
| 11  Q.        Well, did you -- did you apply | 11   grab and help -- help with the cane and |
| 12  for Social Security disability benefits for | 12   stuff. |
| 13  any reason other than migraine headaches? | 13   Q.      Okay.  Besides raise the hogs, |
| 14  A.        No, sir. | 14   what else do you do? |
| 15  Q.        What was -- was that the basis of | 15   A.      Hardly nothing. |
| 16  it? | 16   Q.      Do you go anywhere with your |
| 17  A.        Yeah.  Because they shut me down | 17   wife, like out to supper or anything like |
| 18  when I get them, so -- | 18   that? |
| 19  Q.        Yeah.  But you say those | 19   A.      Every once in awhile, we might go |
| 20  headaches have gotten better? | 20   out, but that's about it.  Most of the time, |
| 21  A.        Yes, sir. | 21   she works all the time. |
| 22  Q.        Okay.  Do you take anything for | 22   Q.      And y'all eat supper at home |
| 23  pain now? | 23   mostly? |

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 113

1  A.      Yeah.
2  Q.      How old is your -- well, I
3  forgot.  Do you have a son or a daughter?
4  A.      I've got two sons.
5  Q.      Are both of those from her?
6  A.      Yeah.
7  Q.      You -- you adopted them both?
8  A.      Yes, sir.
9  Q.      Two sons.  Tell me their names
10 and ages.
11 A.      Brett Stephens.
12 Q.      How old is he?
13 A.      He's 16.  He's 16.
14 Q.      Yeah.  And what's the other one's
15 name?
16 A.      Jaiton.
17 Q.      How old is he?
18 A.      18.
19 Q.      Do they both live at home?
20 A.      Yes, sir.
21 Q.      Where do they go to school?
22 A.      Jaiton's out and Brett goes to
23 Tallassee.

Page 114

1  Q.      Are either one of them active in
2  sports, like football or baseball or
3  anything?
4  A.      No, huh-uh.
5  Q.      Do they hunt any?
6  A.      Yes, sir.
7  Q.      Are you -- are you able to go
8  hunting at all now, like, in a golf cart or
9  anything like that at all?
10 A.      Yeah, I -- if I had one, I'd get
11 in it and go in that, but --
12 Q.      How -- well, how do you go
13 hunting?  Tell me, what -- what do you do?
14 I guess you stay out of tree stands,
15 obviously?
16 A.      Yeah, I just sit on the ground.
17 Q.      Yeah.
18 A.      If I get to go.
19 Q.      So if you hunt now, you hunt on
20 the ground?
21 A.      Yes, sir.
22 Q.      And you can do that okay, I
23 guess?

Page 115

1  A.      Should.
2  Q.      Okay.  How -- how do you get to
3  the -- how do you get to the woods when you
4  go hunting?  Do you take a truck down there
5  or do you take a golf cart?
6  A.      No, if I go, I take my truck.
7  Q.      What about fishing?  Do you do
8  any -- any fishing at all?
9  A.      I wish I could, but all the
10 places we fish, you had to have a boat, so
11 after I fell, we sold my boat, so I ain't
12 got to go fishing none.
13 Q.      What other activities do you do?
14 A.      I don't know.  Before I fell,
15 that's all I done, was hunt and fish and
16 work, so --
17 Q.      Well, do you -- are -- do
18 anything around the house, like wash dishes
19 or cook or --
20 A.      I don't cook.  I ain't good at
21 that.
22 Q.      No good at cooking?
23 A.      Right.  I have to clean the mess

Page 116

1  up.
2  Q.      Do you help clean up the dishes
3  and stuff?
4  A.      Yeah.
5  Q.      Do you do any type of yard work
6  at all?
7  A.      No.
8  Q.      Do y'all have a -- how -- how
9  much property do you have?
10 A.      Not much; about -- might be a
11 half acre.
12 Q.      Do you have a riding lawn mower
13 at all?
14 A.      No, sir.
15 Q.      Who -- who keeps up with the
16 grass and stuff?
17 A.      I've got friends.
18 Q.      Plus you've got two boys too?
19 A.      Yeah.
20 Q.      Do they -- do they do much yard
21 work?
22 A.      Huh-uh.  My oldest one will, but
23 the youngest one, he works all the time.

29  (Pages 113 to 116)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 117

1  When he gets out of school, he goes to work,
2  so --
3  Q.    Okay.  Do you have any idea how
4  much you've incurred in the way of medical
5  expenses?
6  A.    No, sir, I don't.
7  Q.    But whatever medical expenses
8  you've incurred have been paid by BlueCross
9  and BlueShield is what you've said; right?
10       MR. WEAVER:  Object to the form.
11  Q.    (By Mr. Lee)  As far as you know?
12  A.    I don't know on that.
13  Q.    But that's who your health
14  insurance was through; right?
15  A.    Yeah.
16  Q.    You may have had some co-pays
17  or -- or did you have any co-pays?
18  A.    Yeah, we've got co-pays.
19  Q.    Okay.  Do you know how much -- do
20  you know how much your co-pays have added up
21  to?
22  A.    No, sir, I don't.
23  Q.    And I'm not real clear about your

Page 118

1  lost income.
2       Are y'all making a lost income
3  claim, Rusty?
4       MR. WEAVER:  (Counsel nods head
5  up and down).
6       MR. LEE:  And he's shaking --
7  he's shaking his head yes.
8       MR. HASSINGER:  Yes.
9  Q.    (By Mr. Lee)  Okay.  Now, you had
10  applied for Social Security disability
11  benefits before the accident; right?
12  A.    Yes, sir.
13  Q.    And you -- and it was your
14  position that you were totally disabled due
15  to migraine headaches; is that right?
16  A.    Yes, sir.
17  Q.    Okay.  But you're saying that you
18  did work some in 2005 and 2006?
19  A.    Yes, sir; yes, sir.
20  Q.    Okay.  But not much?
21  A.    Yeah, not that much.
22  Q.    Okay.  Would you work by the hour
23  or was it by the job or --

Page 119

1  A.    By the job.
2  Q.    And that varied, I guess,
3  depending on the job; right?
4  A.    Yeah.
5  Q.    Would you -- would you report all
6  of your income on your tax returns?
7  A.    Yes, sir.
8  Q.    Or would y'all cheat a little
9  bit?
10  A.    Huh-uh.
11  Q.    Okay.  Didn't do any cheating?
12  A.    Huh-uh.
13  Q.    So whatever -- whatever is
14  reported on your tax returns is what you
15  actually earned --
16  A.    Yeah.
17  Q.    -- for the years before the
18  accident?
19  A.    Yes, sir.
20  Q.    Is that right?
21  A.    Yes, sir.
22  Q.    Okay.  Tell me about the pain
23  that you have now.  What -- how -- how would

Page 120

1  you describe the pain?
2  A.    About a six.
3  Q.    Sir?
4  A.    About a six.
5  Q.    Six --
6  A.    Yeah, in between one and ten,
7  about a six.
8  Q.    And do you take medicine just
9  about every day to help control it?
10  A.    Yeah, I take pain medicine.
11  Q.    Does -- is the pain worse if you
12  get up and start trying to walk around on
13  your -- on your legs?
14  A.    Yeah, or if I move or something,
15  it -- it'll hurt, go to hurting, hurting
16  pretty bad.
17  Q.    Have you told me everything you
18  know, in terms of how the accident occurred
19  and why it occurred?
20  A.    Yes, sir; yes, sir.
21  Q.    And you've told me all about your
22  injuries and damages?
23  A.    Uh-huh.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 121

1  Q.      Okay.  You have?
2  A.      Yes, sir.
3  Q.      You've told me how y'all
4  installed the tree stand several weeks
5  before the accident?
6  A.      Yes, sir.
7  Q.      And you've told me what parts
8  were on the tree stand that helped secure
9  the stand to the tree; correct?
10  A.      Yes, sir.
11  Q.      And your testimony here is that
12  the only thing that you are aware of that
13  failed was the brace?
14  A.      Yes, sir.
15  Q.      On the stand itself; is that
16  correct?
17  A.      Yes, sir.
18  Q.      But you don't know why the brace
19  failed?
20  A.      Just broke at the weld.
21  Q.      But you don't know what caused it
22  to break at the weld?
23  A.      No, sir, I don't.

Page 122

1  Q.      Is that correct?
2  A.      Correct.
3  Q.      Do you have any -- do you have
4  any experience doing any welding yourself?
5  Have you done any welding in the past?
6  A.      No, sir.
7  Q.      Okay.  But you do know that rust
8  is an enemy of a weld, do you not?
9  A.      Right, yes, sir.
10  Q.      Okay.  I mean, if you have a
11  rusty spot at a weld, that can weaken that
12  weld and it can break?
13  A.      Yes, sir.
14  Q.      Okay.  And you knew that before
15  the accident?
16  A.      Yes, sir.
17  Q.      If -- if this tree stand had a
18  lot of rust on it, do you have any
19  explanation why it got all this rust on it,
20  if y'all kept it inside every year?
21  A.      No, sir.
22  Q.      And you don't have any idea how
23  old it was?

Page 123

1  A.      No, sir, I don't.
2  Q.      Do you know of anyone else who's
3  ever had any trouble or problems with a
4  Strong Built tree stand?
5  A.      No, sir.
6  Q.      Have you ever heard -- heard
7  anybody that complained about Strong Built
8  products or tree stands --
9  A.      No, sir.
10  Q.      -- or ladder stands?
11          MR. WEAVER:  Excluding your
12  lawyer.
13          THE WITNESS:  Huh?
14          MR. WEAVER:  Other than me.
15  A.      Oh.  No, sir.
16  Q.      (By Mr. Lee)  That's his job, to
17  criticize.  I'm -- I'm keeping him out of
18  the mix.
19          What -- tell me about the clothes
20  you had on that day, just --
21  A.      I just had a hunting suit on.
22  Q.      Had a hunting suit on.  Anything
23  in your -- any -- any drinks or --

Page 124

1  A.      Huh-uh.
2  Q.      -- anything you were carrying up
3  there with you, like a water bottle or
4  anything?
5  A.      No.
6  Q.      Had boots on?
7  A.      Yes, sir.
8  Q.      Would have had a, what, full body
9  safety harness?
10  A.      Yeah.
11  Q.      What type of clothes did you have
12  on under your hunting suit?
13  A.      Just blue jeans and a sweatshirt.
14  Q.      What about long johns?
15  A.      Huh-uh.
16  Q.      What type of gun did you have
17  with you that day?
18  A.      .300 mag.
19  Q.      Who -- who manufactured that gun?
20  A.      I think Winchester.  No, it was a
21  Savage, my bad.
22  Q.      It's a Savage?
23  A.      Yes.

31  (Pages 121 to 124)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 125

1  Q.      Have you still got that gun?
2  A.      Yes, sir.
3  Q.      All of the parts of the tree
4  stand that you were climbing on, on the day
5  of the accident, did y'all maintain those
6  and keep those and turn them over to your
7  lawyer?
8  A.      Do what?
9  Q.      All of the components and all the
10 parts --
11 A.      Uh-huh.
12 Q.      -- and the things that were used
13 with that particular tree stand on the day
14 of the accident, did y'all keep those and
15 maintain them and turn them over to your
16 lawyer after this accident?
17 A.      Yes, sir.
18 Q.      Okay. Did you throw anything
19 away?
20 A.      Not that I can think of. I don't
21 think we did.
22 Q.      Okay. So whatever was out there
23 that day that was being used, y'all kept?

Page 126

1  A.      Yeah.
2  Q.      Okay. And if it's not there, it
3  wasn't being used on that particular stand;
4  is that correct?
5  A.      Right.
6  Q.      Your wife has a claim, Mr.
7  Stephens, in this lawsuit. And I'll just
8  tell you in advance, you know, it's about as
9  embarrassing for me to ask these type of
10 questions as it is for you to answer them,
11 so I'll just give you that right off the
12 bat. Has this accident negatively impacted
13 your sexual relationship with your wife?
14 A.      It did for awhile.
15 Q.      Okay.
16 A.      Because I ain't --
17 Q.      While you were recovering, I
18 guess?
19 A.      Yeah.
20 Q.      Okay. Has that improved, though,
21 since -- since your recovery?
22 A.      Yeah.
23 Q.      Okay. This accident hasn't

Page 127

1  limited your ability to have sexual
2  relations with your wife, has it?
3  A.      Huh-uh.
4      MR. LEE: Okay. Give me just a
5  minute.
6      MR. WEAVER: I've got a couple of
7  questions, if you want me to go ahead.
8      MR. LEE: Go ahead.
9
10 EXAMINATION BY MR. WEAVER:
11 Q.      Larry, I've just got a couple of
12 quick questions that is basically just
13 following up on some things that have
14 already been asked. You were asked earlier
15 about prior injuries and other times you had
16 been to the doctor and so forth, and I know
17 you went through everything that you could
18 remember, but I know about some other things
19 from talking with Ms. Stephens that -- that
20 you may have forgotten about.
21      You used to be a volunteer
22 firefighter; right?
23 A.      Yeah.

Page 128

1  Q.      And you got hurt when you were a
2  volunteer fire -- firefighter?
3  A.      Yeah.
4  Q.      And you had to go to the doctor
5  for that? Do you remember --
6  A.      Yeah, I had smoke -- smoke
7  inhalation, but it wasn't nothing.
8  Q.      But you did see a doctor for
9  that?
10 A.      Yeah.
11 Q.      Do you remember who you saw?
12 A.      Dr. Russell.
13 Q.      Dr. Russell. And you also, in
14 addition to -- and I didn't hear all the
15 questions, because I was taking some notes,
16 but I want to make sure that you've told Mr.
17 Lee who all the -- your doctors are, because
18 he needs to look at their records, in the
19 course of doing his job. I know you said
20 Dr. Russell and -- is it Dr. Peaden?
21 A.      Uh-huh.
22 Q.      And also, I know that when you
23 were having those migraines, you saw Dr.

32  (Pages 125 to 128)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 129

1  Epperson?
2  A.    Yeah, Dr. Epperson.
3  Q.    And I don't know if you told Mr.
4  Lee about that. I want to make sure that we
5  got that out there. And the only other
6  doctor I had notes of that I never -- I
7  didn't hear you mention, I don't know if you
8  did or not, but you had a -- you had your
9  knee cleaned out early in 2006?
10 A.    Yeah.
11 Q.    You had a scope, didn't you?
12 A.    Yes, sir.
13 Q.    And do you remember who -- what
14 the doctor was for that? Was it one of the
15 ones you've already mentioned?
16 A.    I think that was Dr. Samuelson.
17 Q.    Okay.
18        THE COURT REPORTER: I'm sorry,
19 what was that?
20        THE WITNESS: Samuelson.
21 Q.    (By Mr. Weaver) Was that done at
22 Baptist South in Montgomery?
23 A.    No, it was done at Tallassee.

Page 130

1  Q.    Tallassee? Okay.
2        MR. LEE: Community Hospital?
3        THE WITNESS: Yes, sir.
4  Q.    (By Mr. Weaver) And again, I'm
5  just -- I need to make sure that Mr. Lee has
6  all these doctors and -- and injuries that
7  he asked about, because I just didn't take
8  good notes about who you said. You think
9  that's all the doctors and injuries there,
10 that -- that we've talked about, between me
11 and Mr. Lee?
12 A.    I think it is.
13 Q.    Okay. One other question that
14 Mr. Lee had asked you about. The particular
15 stand that you were injured on, he asked you
16 if you had any contact with it, and I
17 really didn't understand. Y'all were kind
18 of having a conversation back and forth.
19 Had you seen the stand that you were
20 actually injured on prior to 2005? And let
21 me -- let me make sure I'm being clear. I
22 know you got in it once in 2005 and you got
23 in it in 2006.

Page 131

1  A.    Uh-huh.
2  Q.    Had you ever seen the stand in
3  the barn prior to that?
4  A.    Yeah, in 2004, I seen it in
5  there.
6  Q.    So it had been stored in the barn
7  prior to that?
8  A.    Yeah.
9  Q.    And you had seen it in there
10 before?
11 A.    Yeah.
12 Q.    He had asked you about contact,
13 and I didn't understand if you were talking
14 about being in it or if you had just seen
15 it, in passing, in the barn.
16 A.    Yeah.
17 Q.    Other than a brand new -- you've
18 been hunting all your life, haven't you?
19 A.    Yes, sir.
20 Q.    Other than a brand new tree
21 stand, and I'm talking about all tree
22 stands, climbers, ladders, lock-ons, have
23 you ever been in a tree stand other than a

Page 132

1  brand new one that didn't have some surface
2  rust on it?
3  A.    Not really.
4  Q.    Just about all of them had a
5  little surface rust?
6  A.    Yeah, yeah, all of them had a
7  little surface rust.
8        MR. WEAVER: That's all I've got.
9
10 RE-EXAMINATION BY MR. LEE:
11 Q.    What -- which knee was scoped out
12 in early 2006?
13 A.    My right one.
14 Q.    Okay. And where was it done at?
15 Community Hospital?
16 A.    Yeah; yes, sir.
17 Q.    Okay. And you say that was Dr.
18 Samuelson?
19 A.    Samuelson.
20 Q.    Okay. And then Dr. Epperson was
21 the doctor that treated you for the
22 migraines?
23 A.    Yes, sir.

33 (Pages 129 to 132)

# FREEDOM COURT REPORTING

| | | Page 133 |
|---|---|---|
| 1 | Q. | And where is he located? |
| 2 | A. | He's -- he's in Montgomery. |
| 3 | Q. | Do you know his first name? |
| 4 | A. | No, sir. |
| 5 | Q. | And I want to be clear about |
| 6 | this. What -- what role -- what did you |
| 7 | physically do, in terms of putting this tree |
| 8 | stand up in November of 2006? What -- what |
| 9 | was your role? What did you do? |
| 10 | A. | Just holding it to the tree till |
| 11 | we get it tied down. |
| 12 | Q. | Who -- who put the brace on it? |
| 13 | A. | My uncle. |
| 14 | Q. | You didn't have any part of that? |
| 15 | A. | Just held it up for him while he |
| 16 | put it on there. |
| 17 | Q. | Okay. And that was your uncle -- |
| 18 | A. | David. |
| 19 | Q. | David. You were just basically |
| 20 | holding the ladder to the tree? |
| 21 | A. | Yes, sir. |
| 22 | Q. | And that was -- that was your |
| 23 | role; right? |

| | | Page 134 |
|---|---|---|
| 1 | A. | Yes, sir. |
| 2 | Q. | Where -- where does -- where does |
| 3 | David live? |
| 4 | A. | Right next door to me. |
| 5 | Q. | Y'all have got a whole family |
| 6 | living next to you, don't you? |
| 7 | A. | Yeah, most of them have went |
| 8 | away. |
| 9 | Q. | What does David do for a living? |
| 10 | A. | Nothing. |
| 11 | Q. | Is he disabled in some -- |
| 12 | A. | Yeah. |
| 13 | Q. | What's wrong with him? |
| 14 | A. | He's got a bad leg. |
| 15 | Q. | How old a fellow is David? |
| 16 | A. | How old is he? |
| 17 | Q. | Yeah. |
| 18 | A. | 44, I think. |
| 19 | | MR. LEE: Okay, all right. Well, |
| 20 | thank you very much for coming today. |
| 21 | Appreciate that. |
| 22 | | MR. WEAVER: Nothing further. |
| 23 | | THE VIDEOGRAPHER: We are off the |

| | Page 135 |
|---|---|
| 1 | video record and this is the end of the |
| 2 | deposition at 1:15 p.m. |
| 3 | |
| 4 | FURTHER THE DEPONENT SAITH NOT |
| 5 | |

| | Page 136 |
|---|---|
| 1 | C E R T I F I C A T E |
| 2 | |
| 3 | STATE OF ALABAMA |
| 4 | COUNTY OF JEFFERSON |
| 5 | I hereby certify that the above |
| 6 | and foregoing deposition was taken down by |
| 7 | me in stenotype, and the questions and |
| 8 | answers thereto were transcribed by means of |
| 9 | computer-aided transcription, and that the |
| 10 | foregoing represents a true and correct |
| 11 | transcript of the testimony given by said |
| 12 | witness upon said hearing. |
| 13 | I further certify that I am |
| 14 | neither of counsel, nor of kin to the |
| 15 | parties in the action, nor am I in anywise |
| 16 | interested in the result of said cause. |
| 17 | |
| 18 | |
| 19 | |
| 20 | SCOTT WILMETH, CSR, RPR |
| 21 | Certificate Number: 392 |
| 22 | My Commission Expires: 9-30-08 |
| 23 | |

34 (Pages 133 to 136)

# FREEDOM COURT REPORTING

**A**
ability 127:1
able 47:4,22
   108:2 114:7
accident 21:6,8
   21:21 26:3,13
   33:8,16 34:2,8
   34:9,11,12
   35:14,21 36:14
   39:2,5 40:8
   51:2,9,16
   56:23 60:21
   61:6 65:5
   80:14 81:4
   83:5 84:14
   86:12 87:1
   97:13 101:10
   101:19 107:4
   118:11 119:18
   120:18 121:5
   122:15 125:5
   125:14,16
   126:12,23
accidents 35:20
accommodate
   7:16
acre 116:11
acting 5:2
action 1:8
   136:15
active 114:1
activities 115:13
added 117:20
addition 128:14
address 8:4,13
   9:6 10:22
adopted 10:14
   10:17 113:7
advance 126:8
age 9:19 12:14
ages 113:10
ago 17:2 51:19
   68:13
AGREED 1:17

2:3,10,19
ahead 127:7,8
ain't 14:10,12
   36:3 55:19
   67:18 115:11
   115:20 126:16
al 5:15
Alabama 1:2,21
   1:23 4:9,16 5:2
   5:7,21 136:3
altogether 81:16
   82:1
angle 73:11,16
   73:19 74:2,3
angled 73:17,19
angles 74:4
answer 15:7
   19:11,17 20:2
   20:3 27:21
   36:16 47:3
   48:8 49:23
   66:17 98:12
   126:10
answering 19:16
answers 136:8
anybody 9:15
   23:14,21 42:21
   47:10 48:11
   49:9 55:15
   75:23 78:10
   88:6 123:7
anywise 136:15
apart 60:8 82:22
   83:4
Apothecary
   34:17,18
appear 64:12,14
APPEARING
   4:4,11
applied 109:10
   118:10
apply 110:11
Appreciate
   134:21

approximate
   70:4
Approximately
   38:6
April 4:20
area 69:23
arms 28:12 70:8
army 104:14
arrest 24:16
   25:8
arrested 24:3,9
   24:14
arrests 25:19
asked 42:21
   51:20 127:14
   127:14 130:7
   130:14,15
   131:12
asking 7:7 72:5
   74:20
asks 48:7
assemble 38:15
   38:18 75:6
assembled 17:20
   86:11
assign 2:14
assist 86:20
attest 50:19
attorney 6:4
aware 95:8
   121:12
awhile 8:14 39:8
   45:20 59:2
   112:19 126:14
a.m 2:1 5:19
   101:15

**B**
back 16:4 41:8,9
   51:21 67:6
   69:20 100:14
   104:15 106:16
   107:10 130:18
backwards

90:21 91:14
bad 22:17 24:19
   27:6,7 48:21
   63:10 80:13
   102:18 107:14
   107:23 108:1
   110:4 120:16
   124:21 134:14
balance 26:21
   28:10
band 100:11,12
bankruptcy
   24:1
Baptist 105:7,14
   105:15,17
   129:22
barn 41:3,8 42:9
   50:18 51:14,17
   52:15 61:19,21
   62:2 82:15,19
   131:3,6,15
base 70:20
baseball 114:2
based 55:20
basically 127:12
   133:19
basis 110:15
   111:11,12
bat 21:22 126:12
begins 5:13 67:7
BEHALF 4:4,11
believe 40:3
bend 54:22
   108:20,20
benefits 26:2,12
   109:11 110:12
   118:11
best 40:6 66:1
   79:20
better 13:18,19
   33:1 110:20
Betty 41:15,15
   41:16,16 42:8
big 18:8 70:11

70:13 73:18
Birmingham
   1:23 4:9,16 5:7
   5:21 7:1
birth 12:19
bit 73:18 88:20
   109:5 119:9
bitty 97:1
Black 17:21
blue 124:13
BlueCross 35:9
   35:11,16 117:8
BlueShield
   35:10,11,17
   117:9
boat 115:10,11
body 85:4,14
   124:8
bolt 54:13 55:16
   97:10
bolted 76:23
   77:1,16
bolts 48:5 53:19
   54:18 55:7
   77:5 90:1 92:5
   92:9 97:14,14
   97:15
bones 36:1,4
booklet 47:13
boots 124:6
borrowed
   111:19
bottle 124:3
bottom 60:18
   70:19 71:17
   95:20
bought 37:12,15
   40:14,21,22
   44:9 50:7 84:8
   84:9 94:18
   97:17
bow 65:2
box 68:19
boys 116:18

# FREEDOM COURT REPORTING

brace 57:20 58:7
58:8,13,14
65:16 71:20,21
72:6 78:2 89:5
89:6,9,10,15
89:18,20 90:7
91:19,21 92:6
92:12,15,17
93:12,12 94:4
94:7,9,12 95:4
95:10,13,15,17
95:18 96:3,4
121:13,18
133:12
bracing 93:4
bracket 89:23
90:1,4
brand 94:15
131:17,20
132:1
break 7:12
38:17 54:20,21
66:22 67:10,11
90:7 121:22
122:12
breath 102:12
Brett 113:11,22
broke 89:5,6,15
89:19 106:2
121:20
broken 36:1,4
brother 42:5,6
brothers 29:13
30:9 37:18
brought 104:14
Buckshot 82:12
build 17:17
builders 20:12
built 1:11 5:15
6:8 7:2,5 17:20
44:6,10,11,14
46:8 47:8 49:7
49:12,15,20
76:11 82:4

83:20 123:4,7
business 16:14
18:22 54:10
55:4 56:1
buy 37:11,20
38:1,3 44:10
44:11 84:23
85:8

**C**

C 136:1,1
Cahaba 1:22 4:8
5:6
call 93:13 103:2
103:6
called 103:3,8
cane 108:7,8
112:11
carried 41:3
104:16
carrying 96:14
124:2
cart 114:8 115:5
Case 5:16
cause 5:9 136:16
caused 56:16
95:13 121:21
CCR 1:21 5:1
cell 102:22
Center 4:14
Certificate
136:21
certify 5:3 136:5
136:13
Chad 30:7,7,8
chain 72:18,20
change 42:1
charge 24:22
cheat 119:8
cheating 119:11
chiropractor
33:19
cholesterol
30:21 31:1

Christmas 37:13
37:14,21 41:3
68:2,5,14
Circle 1:22 4:8
5:7 8:5,6
Civil 1:8 5:4
claim 28:16
118:3 126:6
clean 115:23
116:2
cleaned 129:9
clear 44:20 52:9
96:2 117:23
130:21 133:5
clearer 20:5
clearly 7:20
climb 54:15 57:6
90:13,13
climbed 53:14
climbers 131:22
climbing 88:16
91:17 96:8
97:3 125:4
clip 7:4
close 28:19 30:9
closer 11:14
58:10
clothes 123:19
124:11
clue 68:16
code 8:10
cold 7:19
collapse 89:4,17
90:20
collapsed 87:6
89:3 90:20,23
come 97:18 98:5
coming 134:20
commencing 2:1
commercial
20:17
Commission
136:22
commissioner

2:20 4:2 5:2
Community
11:17,23 105:1
105:11 130:2
132:15
compensation
28:16
complained
123:7
completely
82:18
compliance 2:6
components
125:9
computer 49:19
computer-aided
136:9
concern 56:16
concluded 37:1
concrete 62:8
conjunction
49:7
connect 100:9
100:10
connected 85:23
89:21 96:21
99:15
connects 95:18
construction
18:17,19,22
20:15 54:10
55:4 56:1
consult 7:15
contact 51:7,15
52:10 130:16
131:12
contained 47:7
control 120:9
conversation
130:18
convicted 25:6
25:16
convictions
25:22

cook 115:19,20
cooking 115:22
copies 21:17
correct 11:1
46:13,23 48:1
48:23 55:13
56:16 67:13
68:21,22 69:8
75:12 82:19
83:21,22 86:12
86:13 93:16,20
95:6 98:23
99:18 100:5
121:9,16 122:1
122:2 126:4
136:10
cot 104:14
counsel 1:19
2:11,13 5:5,23
118:4 136:14
county 9:1,2,3
25:3,5,12
27:10,12 28:20
28:21 29:18
136:4
couple 37:13
111:18 127:6
127:11
course 101:15
128:19
court 1:1 2:7
5:17,23 6:10
6:15 19:23
20:3 129:18
cousin 59:11
87:8 88:10
103:4 104:3
cousin's 87:13
covered 61:23
co-counsel 6:6
co-pays 117:16
117:17,18,20
criminal 25:22
critical 48:16

# FREEDOM COURT REPORTING

criticism 48:19
criticize 123:17
cross 95:15,17
  95:18
crutches 108:6
CSR 136:20
current 10:21
custom 99:4
CV 1:9 5:16

**D**

D 3:1
dad 76:1 103:20
  103:21
daddy 75:17
  99:1 103:12
  104:14
dad's 41:18
daily 111:12
damages 23:8
  120:22
date 5:3 12:19
  62:14,18 107:5
daughter 113:3
David 4:12 6:7
  6:23 37:10,18
  43:5,6,9,12
  45:3,5 59:17
  60:3,13,14,15
  63:19 64:23
  66:20 78:15
  79:15 81:5
  84:9 87:3
  133:18,19
  134:3,9,15
day 22:2 24:18
  61:5,10 79:7
  81:10 87:20
  91:18 100:22
  109:5,6 120:9
  123:20 124:17
  125:4,13,23
days 105:17,18
  106:8,13

Debora 1:5 4:19
  10:6,8,13
  13:11,15 31:11
  31:15 103:16
December 21:9
  21:23 35:21
  87:21
deer 62:21
Defendant 1:12
  4:11
denied 109:13
  109:15
Dennis 4:5
dents 64:16
department
  12:3
depending
  119:3
DEPONENT
  135:4
deposition 1:14
  1:20 2:4,5,16
  2:20 5:14,20
  135:2 136:6
depositions 2:8
  19:22
describe 120:1
diagnosed 36:18
diameter 70:5
died 16:9 17:7
different 39:11
  57:1,2 79:9
dings 64:18
disability 26:2
  26:12 27:10,14
  109:10 110:12
  118:10
disabled 118:14
  134:11
disassembled
  82:18
discarded 66:3
dishes 115:18
  116:2

distance 92:12
distribute 37:21
District 1:1,2,3
  5:17,18
Division 5:18
divorce 25:9
doctor 26:7 31:4
  32:1,3,20
  106:9 127:16
  128:4,8 129:6
  129:14 132:21
doctors 33:14,15
  128:17 130:6,9
doing 20:9 22:21
  23:2 45:21
  60:16 122:4
  128:19
door 29:10,11
  32:16 62:2
  134:4
doors 62:3
Dr 31:6,7,18,21
  32:10,17 33:1
  33:3,14,15
  36:21 128:12
  128:13,20,20
  128:23 129:2
  129:16 132:17
  132:20
drinks 123:23
drive 108:2
driving 108:4
drop 15:21
dropped 15:18
drug 34:15 35:1
drywall 19:3
  22:21
due 118:14
DUI 24:12,22
  25:6,10,17
duly 6:13

**E**

E 3:1 136:1,1

earlier 127:14
early 129:9
  132:12
carned 119:15
earth 24:7
eat 112:22
Eddie 103:19
  104:6
education 14:9
effect 2:5
eight 81:23 82:3
either 21:16
  93:3,4 114:1
Elmore 9:2,3
  25:13 28:21
  29:19
embarrassing
  126:9
employers 19:7
employment
  16:6
enemy 122:8
entire 24:5
Epperson 129:1
  129:2 132:20
et 5:15
evidence 2:16
exactly 62:18
  65:9,11 72:3
  107:5
examination 3:3
  5:9 6:19
  127:10
examined 6:13
example 83:11
Excluding
  123:11
exercise 34:5
expenses 35:17
  117:5,7
experience
  55:21,23 122:4
Expires 136:22
explained 19:14

explanation
  122:19

**F**

F 136:1
fact 86:15,15
fail 95:13
failed 95:9
  121:13,19
fails 100:3
failure 94:22
  95:4
fall 56:9 91:14
  102:4
falling 85:17
  99:22 100:4
family 31:23
  32:3 134:5
far 15:9 72:6
  90:11 102:4
  108:19 117:11
farm 41:5,6
farther 78:6
  108:21
Federal 5:4
feel 55:18
  102:11
feeling 108:11
feet 102:9
fell 39:18 91:13
  91:16 115:11
  115:14
fellow 134:15
fibula 105:22
fifth 96:4
file 20:22 21:2
  21:11 26:10
  27:9
filed 7:3,6 23:17
  23:23 26:1,6
  26:11 27:14
  28:15
filing 2:19
filled 34:15

# FREEDOM COURT REPORTING

**find** 23:4 42:22
**fine** 6:17 48:4
  52:23 53:3,9
  53:18 54:8
  55:7 56:13
  63:3 88:11
  92:4 94:23
**finished** 22:23
**fire** 128:2
**firefighter**
  127:22 128:2
**first** 6:13 9:23
  10:16,20 13:6
  23:16 24:13,18
  31:12 32:11
  37:5 38:14
  40:18,21,22
  42:10 44:23
  50:6,7 51:7,15
  52:9,10 69:8
  69:11 98:14
  106:5,8 133:3
**fish** 115:10,15
**fishing** 115:7,8
  115:12
**fit** 76:19
**fixing** 90:13
**floors** 62:8
**flushing** 30:15
  30:20,22
**followed** 43:12
  43:18
**following** 5:10
  127:13
**follows** 6:14
**fool** 83:2 111:19
**foot** 57:8,9,10
  79:17 80:9
  100:20 102:6,7
**football** 114:2
**footrest** 95:20
**force** 2:5
**foregoing** 5:5
  136:6,10

**forget** 69:3
**forgot** 113:3
**forgotten** 127:20
**form** 2:12
  117:10
**forth** 26:21 33:4
  49:21 127:16
  130:18
**four** 21:5 66:22
  105:18 106:1,2
  106:13
**fourth** 72:7,9
  73:8 89:10
  93:15
**frame** 18:10
**Freedom** 5:22
**Freeman** 106:10
**friend** 26:19
  101:20
**friends** 116:17
**Friendship**
  29:16
**front** 95:19
**full** 2:6 85:3,14
  97:6 124:8
**further** 2:2,9,18
  134:22 135:4
  136:13

### G

**gas** 16:21
**getting** 55:19
  56:3 62:5
  106:14
**give** 19:16 20:1
  40:6 111:11
  126:11 127:4
**given** 136:11
**giving** 19:21
**GKN** 17:8,13,14
  18:2 19:8
**glanced** 45:20
**go** 16:1,4 34:16
  39:13 51:19

54:1 58:11
69:20 76:16
78:20,23 79:4
80:23 90:21
104:18 105:6
105:13 107:22
112:16,19
113:21 114:7
114:11,12,18
115:4,6,12
120:15 127:7,8
128:4
**goes** 77:14 78:4
  78:6 90:1
  92:22 100:12
  100:13,14
  107:13 113:22
  117:1
**going** 7:7,20
  13:13 14:19
  15:13 26:7
  44:4 61:6,7,8
  66:22 87:5
  88:8 96:18
**golf** 114:8 115:5
**good** 14:10,12
  20:2 22:17
  53:2 67:2
  70:21 71:2
  115:20,22
  130:8
**gotten** 110:20
**grab** 92:15
  112:11
**grabbed** 88:19
**grade** 15:11
**granddaddy's**
  111:20
**grandma's**
  41:10
**grandmother**
  42:8
**grandmother's**
  41:14

**granted** 109:14
**grass** 116:16
**ground** 54:2
  58:10 72:6
  74:6 89:18
  90:16 96:17,19
  100:4 102:5
  114:16,20
**grounds** 2:14
**guess** 21:16 47:2
  50:14 66:7
  74:20 93:12,18
  114:14,23
  119:2 126:18
**gun** 65:1,3 92:19
  92:20 96:10,15
  124:16,19
  125:1
**guns** 86:18
**guy** 79:23,23
  80:2

### H

**habit** 99:4
**half** 8:16 116:11
**halfway** 58:9
**Halloween** 17:7
**halos** 106:7
**hand** 73:15
**handicaps** 36:13
**handrail** 95:21
**hands** 96:7,13
**happen** 21:23
  84:19
**happened** 21:8
  21:21 60:21
  61:2 87:2
  90:15 91:11
  101:12 102:10
  102:17 105:20
**happy** 7:11,14
  7:16,23
**harness** 85:4,15
  86:4 97:6,18

97:22 98:2,23
99:5,16,21
100:9,12,15,18
100:19 124:9
**harnesses** 84:17
  84:17 98:9,16
  98:21
**Hassinger** 4:6
  6:5,5 118:8
**Hawks** 17:21
**head** 19:9 23:9
  47:1 118:4,7
**headaches** 27:3
  27:6,7 28:5
  37:2 110:3,7
  110:13,20
  118:15
**heads** 19:18,19
**health** 35:5,12
  117:13
**healthy** 71:2
**hear** 55:9 63:21
  90:6,7 93:10
  103:5 128:14
  129:7
**heard** 123:6,6
**hearing** 136:12
**Heather** 29:21
  29:22
**heavyset** 79:23
**held** 77:11 83:13
  133:15
**helicopter** 17:17
  17:19
**help** 10:4 17:8
  28:2 34:1
  38:15,18 42:13
  43:23 45:14,21
  51:20 74:22
  103:2 112:11
  112:11 116:2
  120:9
**helped** 34:5
  38:20,22 51:21

## FREEDOM COURT REPORTING

Page 141

51:22 52:14
121:8
helping 27:19
hey 7:15
high 15:15 16:7
30:23 57:7,7
58:11 72:3
Highway 4:15
history 16:6
40:13
hit 90:16,16
hogs 111:19,22
112:13
hold 57:23 72:13
holding 60:17
60:18 72:15
73:3 133:10,20
holes 94:9,11
home 8:4 9:7,8,9
9:10,11 103:8
106:13 112:22
113:19
hook 94:14,14
hooked 77:17
99:7
hoping 109:7
horizontal 93:12
96:3
horrible 19:20
hospital 11:17
11:23 31:20
33:8 104:16,17
104:21,23
105:1,6,11,17
106:15 130:2
132:15
hospitalized
33:11
hour 66:23
118:22
house 41:9
106:16 107:20
107:22 112:8
115:18

houses 20:18
Huh 42:2 123:13
huh-uh 15:6
27:20 28:6
30:10,19 36:3
36:15 38:9
45:1,16 46:10
49:22 50:11
52:7,23 54:16
57:5 59:20
61:11 64:17
65:8 66:8
68:15,17 73:1
75:1,7 77:6
78:19 96:23
102:16 108:13
112:5 114:4
116:22 119:10
119:12 124:1
124:15 127:3
hung 22:23
hunt 44:18 50:3
52:17 59:3
61:6,8 114:5
114:19,19
115:15
hunted 53:4,4
56:12 58:18,18
58:23 59:1
88:9,11
hunters 84:16
hunting 50:13
50:17 55:21
59:22,22 61:4
62:21 63:2
64:3 65:1,2,3
81:10,18 84:18
114:8,13 115:4
123:21,22
124:12 131:18
hurt 35:22 44:22
71:7 120:15
128:1
hurting 90:18

102:18,19
107:14,23
120:15,15
hurts 108:1
husband's 30:6

**I**
idea 22:11 25:2
38:8 50:5 52:5
65:21 68:12
69:14 80:4
111:11 117:3
122:22
identify 5:23
illnesses 33:4
immediately
102:11
impacted 126:12
important 19:15
improved
126:20
inches 105:23
income 118:1,2
119:6
Incorporated
5:16
incurred 117:4
117:8
indicating 73:18
73:20 77:14
97:1 108:20
109:1,3
information
50:14
inhalation 128:7
injured 35:22
130:15,20
injuries 34:2
35:20 105:21
120:22 127:15
130:6,9
inside 61:20
68:19 112:7
122:20

inspect 53:7,15
62:23 97:14
installed 64:21
65:11 69:20,21
80:23 91:22
121:4
instruction
47:13
instructional
49:15
instructions
43:13,19 45:8
47:5,7,11
65:17,18,21
66:2,12 67:12
67:16 97:19
98:5,22
insurance 35:5
35:12 117:14
interested
136:16
involved 33:9
it'll 109:7
120:15
I-t-o-n 10:6

**J**
Jaiton 9:20,22
10:7,10 113:16
Jaiton's 113:22
jarred 91:15
jeans 124:13
JEFFERSON
136:4
Joan 29:2,3
job 17:8,12 23:4
36:8 118:23
119:1,3 123:16
128:19
johns 124:14
judgment 40:6
66:2 79:20
Juliano 4:13
July 12:20

J-a 10:3,5
J-a-i 10:3

**K**
keep 12:12 62:5
85:17 99:21
100:4 106:14
125:6,14
keeping 123:17
keeps 116:15
kept 122:20
125:23
kicks 58:12
kills 22:18
kin 136:14
kind 7:19 30:15
34:3 36:12
44:7,8,12
72:22 75:20
91:15 93:4
112:2 130:17
knee 129:9
132:11
kneecap 106:1,2
knees 105:23
knew 122:14
knocked 102:12
102:15
know 8:11,23
12:10,11 14:3
14:4 15:19,23
17:9 18:11,23
19:18 20:13
21:1,5,8 22:19
25:15,15,15
26:23 27:17,18
29:16 30:17,18
31:2,9,13 32:4
34:5 35:20
38:5,7,10 40:9
40:10,11,11,19
40:23 41:4
42:3,19 43:12
43:15,20,21

# FREEDOM COURT REPORTING

44:17 45:2,8
45:23 47:12
49:1,3,3 50:11
50:16 52:4
53:16,16,21
54:17 55:3,11
57:9,10 58:11
58:22 59:13
62:18 64:9
67:18 68:18
70:5,7 72:2,3
73:14 75:20
76:18 79:16,19
79:21 80:6,9
80:19 81:6
82:9,12 83:6,9
84:5,7,10,18
85:11 89:14
92:8,10,14
94:21 95:11,14
95:22 97:21,23
100:23 101:2,6
101:8 102:5,6
105:18 106:21
107:1,5 111:7
111:8 112:10
115:14 117:11
117:12,19,20
120:18 121:18
121:21 122:7
123:2 126:8
127:16,18
128:19,22
129:3,7 130:22
133:3
**knowledge**
50:21 97:12
**knows** 13:21

**L**

**labels** 47:16,23
48:13,16
**ladder** 54:4,6,7
54:7,14 56:4

63:16,18 64:6
64:18 74:9,21
74:22 76:16
82:22 86:5
89:12 91:5,7
93:3,5,11 96:8
96:15 123:10
133:20
**ladders** 83:3
131:22
**land** 81:19 102:8
**landed** 102:11
**Large** 1:22 5:2
**Larry** 1:5,14,20
5:8,15 6:12,22
127:11
**lately** 80:20,21
**lawn** 116:12
**laws** 2:7
**lawsuit** 7:2,5
23:7,17 33:9
61:17 68:10
126:7
**lawyer** 7:1 19:13
27:19 123:12
125:7,16
**lawyers** 7:15
**laying** 89:18
**layoff** 18:8
**leading** 2:12
**Lee** 3:4,6 4:12
4:13 6:7,7,17
6:19 7:1 10:4,9
23:13 31:12,17
48:11 63:22
64:2,5 67:1,9
69:6 87:7
98:13 117:11
118:6,9 123:16
127:4,8 128:17
129:4 130:2,5
130:11,14
132:10 134:19
**Leemon** 4:20

**left** 18:17 106:1
106:15 107:23
108:1
**leg** 108:18,19,21
134:14
**legs** 28:13
102:21 108:12
108:22 111:3
120:13
**let's** 16:5 37:4
39:13 69:19,19
86:23
**lick** 14:17
**life** 24:5 28:17
32:21 33:19
131:18
**lift** 96:18
**liked** 32:23,23
**limitations**
36:13
**limited** 127:1
**limp** 108:15
**lined** 106:6
**listen** 98:10,11
**litigation** 66:15
**little** 11:2 16:21
41:7 58:10
67:10 73:14
88:20 96:23
107:13,22
109:5,6 119:8
132:5,7
**live** 8:2,3 9:6,15
11:4,8,13
28:20 29:9
113:19 134:3
**lived** 8:12,17
10:21
**lives** 29:15,16
**living** 32:17
75:18 134:6,9
**located** 18:2
34:22 50:8
133:1

**location** 11:13
**lock-ons** 131:22
**long** 8:12 11:7
12:5 13:13,14
14:1,4,5 17:3,9
17:22 20:7
32:2,19 50:10
54:10 56:8
58:13 105:16
124:14
**look** 53:8,14,19
55:11,16 63:5
63:11,15 64:5
69:2 70:20,22
88:1 91:18,21
92:2,5,12
128:18
**looked** 48:4 53:9
54:8,14 55:7
56:4,13 63:3
63:13,17,18
64:10,13 68:23
70:21 88:4,5
89:18 92:4
**looking** 70:23
92:14
**lost** 108:11
118:1,2
**lot** 20:5 122:18
**loud** 23:11 69:4
**lowered** 60:7

**M**

**mag** 124:18
**maiden** 41:22
**maintain** 125:5
125:15
**major** 106:16,18
**making** 118:2
**mama** 41:19
**mama's** 41:19
42:6
**Manning** 8:5,6
**manufactured**

82:7,10 84:10
97:21 124:19
**Mark** 31:14
**marriage** 10:16
10:20 24:18
**married** 13:3,4
13:5,15 14:6
**material** 49:6,10
**Matt** 87:14,15
88:12
**mean** 20:17 27:2
42:18 47:2
48:4,18 57:16
58:10 62:17
63:9,18 72:3
77:16 79:23
81:7 89:1
95:17 101:3
110:9 122:10
**means** 136:8
**medical** 11:21
11:21 12:3
35:17 117:4,7
**medications**
30:14
**medicine** 111:2
111:5 120:8,10
**medium-sized**
70:14
**Melvin** 32:12,13
**mention** 129:7
**mentioned**
129:15
**mess** 13:18,19
13:20 115:23
**Michael** 31:14
31:15,16,17
**middle** 1:2 5:17
71:18
**migraine** 27:3
37:2 110:3,6
110:13 118:15
**migraines** 26:18
128:23 132:22

# FREEDOM COURT REPORTING

miles 9:4
mind 62:15
mine 51:18,19
85:1
Mine's 100:20
minute 66:22
127:5
mix 123:18
mobile 9:8,9,10
money 22:12
23:8
Montgomery
105:5,8 129:22
133:2
month 58:17,20
86:11
months 18:1,7
22:17,17
morning 19:15
85:22 101:17
101:18
mother 41:18,21
mother's 41:20
motor 26:21
mounted 56:19
56:19,23 57:12
57:14,17 58:6
move 88:15
104:11 120:14
moved 8:14
39:11 65:7
moving 11:12
mower 116:12
muffler 16:16
16:17
mufflers 16:20
multiple 26:16

**N**

N 3:1
name 5:21 6:20
6:23 9:18 10:1
10:2,3 13:7,10
14:20,21,23

15:2 16:10
29:17,20 30:6
30:18 31:13
32:11 34:20
37:9 41:14,22
87:13 101:21
103:22 104:20
104:23 111:7
113:15 133:3
names 42:1
113:9
near 71:17,17,18
111:16
necessary 2:10
need 7:4,12,14
98:10 130:5
needs 128:18
negatively
126:12
neither 19:21
136:14
never 33:11 36:1
36:3 47:4
48:21 66:6
67:11 68:23
129:6
new 65:14 83:15
84:3 85:2
94:16 131:17
131:20 132:1
night 105:10
nobody's 48:22
nod 19:18
nodding 19:17
nods 23:9 47:1
118:4
north 9:5
Northern 1:3
5:18
notes 128:15
129:6 130:8
notice 2:19
November 1:23
5:8,19 62:13

64:21 69:22
78:10,18,20
79:3 80:22
81:9 91:23
97:9 133:8
number 5:14,16
12:21 13:10
24:17 25:8
67:8 136:21

**O**

Object 117:10
objections 2:11
2:14
obvious 47:3
obviously 62:21
114:15
occasion 59:1,6
92:3
occur 101:10,19
occurred 65:5
120:18,19
offered 2:16
office 31:18
32:15
Oh 30:23 83:16
84:21 123:15
okay 7:10,16,23
8:1,17 9:6,15
9:18 10:7,9,12
10:15,17 11:15
12:8,14 13:2,6
13:9,23 14:16
14:22 15:5,9
15:21 16:1,5
16:23 17:3,11
18:15 19:6,13
20:5,6,11,19
20:22 21:4,16
21:20 22:2,11
23:5,13,23
24:11 25:8,11
25:19 26:1,9
26:11,19 27:16

27:23 28:15
29:13 30:5,8
31:3 32:2,6,9
32:15 33:3,7
34:8 35:7,16
36:1,9 37:8,15
39:1,7,13,21
40:3 41:1,11
41:23 42:3,16
42:21 45:2,11
45:14 46:20
47:10,21 48:9
48:15 49:5
50:5 51:23
52:8,14 53:4
54:17 55:3,20
56:8,11,18
57:3,11 58:2
58:14,23 60:15
60:20 61:5,9
61:23 62:9,20
63:5 64:1,4,11
64:13,20 65:4
66:1,6,19 67:9
67:22 69:5
70:11,15 71:3
73:21 74:1,11
74:15,18 75:4
75:8 76:9 77:1
77:9,18 78:7
81:8 82:9,14
82:17 83:1,5
83:23 85:8,23
86:3 87:19
88:14 89:20
90:3,10 91:11
91:21 92:8,11
93:2,22 94:15
95:12 96:1,6
97:2,17 98:4
99:3 100:21
101:9 103:9
104:12 105:10
106:3,11 107:7

108:2,10,14,17
109:2,9,16
110:22 111:22
112:13 114:22
115:2 117:3,19
118:9,17,20,22
119:11,22
121:1 122:7,10
122:14 125:18
125:22 126:2
126:15,20,23
127:4 129:17
130:1,13
132:14,17,20
133:17 134:19
old 10:9 12:15
39:23 40:2,7
40:11 41:7
87:17 113:2,12
113:17 122:23
134:15,16
older 40:4,5
oldest 116:22
once 13:5 45:20
53:21 59:2
79:2 100:7,7
110:9 112:19
130:22
ones 83:15
129:15
one's 113:14
opened 67:19,19
68:18
operation 39:8
opinion 43:2
95:13
opposed 19:17
oral 5:9
original 83:7,20
outside 112:2,4
112:6
owned 42:5
owner 37:6

# FREEDOM COURT REPORTING

Page 144

**P**

**PAGE** 3:3
**paid** 38:10 117:8
**pain** 102:11
  110:23 111:1,2
  119:22 120:1
  120:10,11
**paper** 44:4,5
**paperwork**
  67:22 68:19
  69:1,15
**Paralegal** 4:20
**Pardon** 8:20
  9:21
**parents** 28:21
  29:1
**Park** 1:22 4:8
  5:6
**Parsons** 4:13
**part** 76:16 78:4
  133:14
**partially** 75:5
**particular** 39:15
  40:13 51:4
  52:11 59:5
  68:8 71:4,6
  83:19 95:9
  125:126:3
  130:14
**parties** 1:18
  2:13 136:15
**parts** 17:17,19
  83:6,7 121:7
  125:3,10
**pass** 17:1
**passing** 131:15
**pay** 35:17
**Peaden** 31:6,8,8
  31:9,21 32:16
  33:1,14 36:21
  128:20
**Peaden's** 31:18
**period** 21:5,11
  51:1 98:20

**personal** 50:20
**pharmacies** 35:2
**phone** 102:22
**physical** 33:21
  34:4,12 36:12
  36:13
**physically** 57:17
  60:11 61:7
  71:8 77:10
  90:15 100:9
  133:7
**picked** 85:10
**picture** 46:17,18
**piece** 75:10
**pieces** 76:20
**pill** 30:16,20
**pills** 111:1
**pine** 70:3,5,11
**place** 5:20 58:1
  81:21 106:19
**placed** 50:6
  58:15 71:15,21
  73:12
**places** 106:2
  115:10
**plaintiff** 6:4,6
  23:6
**Plaintiffs** 1:6 4:4
**plate** 77:13,17
**plates** 107:9
**platform** 76:3,5
  93:19 95:19,20
**please** 6:2,10,21
**Plus** 116:18
**pneumonia**
  106:14
**point** 66:3,21
  67:2 73:16
**position** 118:14
**posts** 49:20
**pounds** 79:22
  80:15
**power** 111:20
**practice** 99:4

**precisely** 65:10
**prescriptions**
  34:15
**present** 4:18
  42:16 44:22
  45:12 68:5,14
**presents** 37:14
  67:20
**pretty** 22:9
  73:19,22 78:8
  88:20,22
  108:19,21
  111:15 120:16
**primarily** 31:5
**primary** 31:4
**prior** 2:16 21:6
  35:19 39:2
  127:15 130:20
  131:3,7
**probably** 17:2
  20:10 43:5
  66:5 69:17,18
  98:17
**problem** 7:21
  59:19
**problems** 78:17
  123:3
**Procedure** 5:4
**proceedings**
  5:10
**process** 60:23
  71:4
**products** 123:8
**property** 50:7,8
  101:19 116:9
**Protective** 4:14
**pull** 86:18
**pulled** 50:16
  106:6
**purpose** 85:14
  99:21
**pushed** 105:23
**put** 13:14 38:13
  38:16,19,20,22

39:1,4,9 40:17
  40:20,22 41:4
  41:11 42:10,13
  42:17,19,22
  43:6,10,19,22
  43:23 44:23
  45:3,5,8,9,12
  45:14,17,23
  46:3,8,15
  49:16 50:18
  51:14,18,19,20
  52:1,15 59:13
  60:8 61:3
  62:10,12 63:1
  63:20 64:3,23
  65:4,13,14,14
  65:16,18 67:20
  69:7,11 70:2
  71:5,9,10 74:5
  74:6,10,13,22
  74:22 75:4,5,9
  75:10,15,15
  76:7,9,22
  82:19,21 86:17
  88:5,7 97:8
  99:13 104:15
  104:15 106:6
  107:9 133:12
  133:16
**putting** 20:19
  44:3 61:1
  76:13 133:7
**P-e-a-d-e-n**
  31:11
**p.m** 67:4,7 135:2

**Q**

**question** 7:12,23
  13:18 21:10
  47:3 48:8,8
  53:11,13 63:21
  98:11,12,14
  130:13
**questions** 2:12

2:13 7:7 19:16
  126:10 127:7
  127:12 128:15
  136:7
**quick** 127:12
**quit** 15:12,13
  32:22,23 109:7

**R**

**R** 4:5 136:1
**rail** 54:13 55:17
  92:21
**rails** 53:20,23
  54:1,6 63:11
  64:6
**raining** 101:3,7
  101:8
**raise** 111:22
  112:13
**ratchet** 58:3,16
  65:15 71:13,14
  72:12,15 73:4
  77:23 83:18
  84:11 93:22
  94:3
**read** 14:13,16
  15:5 46:12,20
  47:4,10,11,22
  48:1,12,21,22
  49:6,9 98:6,6
  98:22
**reading** 2:3
**real** 107:14,23
  108:1 117:23
**really** 15:4 17:9
  22:13 40:10
  45:2 50:19
  64:15 75:22
  81:9 82:11
  108:3 110:8
  130:17 132:3
**reask** 7:11,23
**reason** 7:13
  11:12 23:19

**FREEDOM COURT REPORTING**

24:4 89:16 110:13
**rebuilt** 107:10
**recess** 67:5
**record** 5:19 20:4 67:4,7 135:1
**records** 11:22 12:3 128:18
**recovering** 126:17
**recovery** 126:21
**regard** 49:21
**regular** 111:10
**regularly** 22:5,7
**relating** 2:7
**relations** 127:2
**relationship** 126:13
**relatives** 28:19 28:20 30:9 42:22
**remember** 13:21 15:19 23:10 27:13 34:13 95:22 127:18 128:5,11 129:13
**repair** 106:4
**repaired** 16:19 16:19
**replaced** 16:20 83:8,11,23
**report** 119:5
**reported** 119:14
**reporter** 6:10,15 19:23 20:3 129:18
**Reporting** 5:23
**represent** 6:1,8 7:2,5
**representing** 5:22
**represents** 136:10

**residential** 20:14,18
**respective** 1:19
**rest** 13:19 75:6 82:6 92:19,20
**result** 26:2 136:16
**return** 21:2
**returns** 20:22 21:12 119:6,14
**RE-EXAMIN...** 132:10
**Ricky** 103:19,19 104:1
**riding** 116:12
**right** 7:18 10:21 11:3,7,15 16:23 17:11 18:15 19:6 20:7 21:22 23:5 25:9 28:23 29:10,11 30:8 31:18,19 32:16 34:10 37:4,15,23 40:12 42:7,12 42:15 44:20 45:7,21 46:14 46:22 48:2,10 48:15 49:5 50:2,22 51:11 51:16 52:2 57:21 58:5 59:6,18 60:20 60:21 61:12,20 62:11,11,21,23 64:4,20 65:1,9 68:1 69:19,22 70:1 71:3 72:14 73:9,11 75:4,14 77:7,8 78:9 81:8 86:6 86:7,23 87:12 87:19,22 89:2

89:11 90:6,10 90:17 92:13 93:21 100:21 101:16 103:13 104:9,12 106:1 108:18 115:23 117:9,14 118:11,15 119:3,20 122:9 126:5,11 127:22 132:13 133:23 134:4 134:19
**river** 25:14
**Roger** 29:2,3 103:23,23
**role** 133:6,9,23
**Ronnie** 16:11,11 16:12
**rope** 72:22 86:17 96:17,19 96:21 97:1
**ropes** 86:9,15,20
**roughly** 12:6
**routine** 33:4
**RPR** 4:1 5:1 136:20
**ruled** 26:17 27:2 36:22
**rules** 2:7 5:4
**rung** 54:14
**rungs** 64:6
**Russell** 32:10,17 33:3,15 128:12 128:13,20
**rust** 63:7 122:7 122:18,19 132:2,5,7
**rusted** 55:16 56:5
**rusty** 6:3 19:20 54:14,18 63:5 64:14 92:9 118:3 122:11

**S**
**safe** 53:1 55:18 56:2
**safety** 84:17 85:4,14,16 86:4 97:6,16 97:22 98:2,8 98:15,21,23 99:5,15,21 100:9,15,17,19 124:9
**SAITH** 135:4
**Samuelson** 129:16,20 132:18,19
**Saturday** 22:4
**Savage** 124:21 124:22
**saw** 33:15 38:14 54:13 67:22 88:3 128:11,23
**saying** 20:1 39:22 40:1 42:7 56:11 67:15,17 72:11 73:2 76:4 80:22 86:5 93:10 95:3 118:17
**scars** 108:22
**school** 15:10,12 15:15,18,22 16:7 17:5,6 113:21 117:1
**sclerosis** 26:16
**scope** 129:11
**scoped** 132:11
**Scott** 1:21 4:1 5:1 136:20
**screws** 107:9
**season** 50:13,17 59:22 61:4 62:17 63:2 64:3

**seat** 95:19
**second** 25:17 107:8
**secure** 77:19 78:8 99:4 121:8
**Security** 12:21 26:2,12 27:10 109:10 110:12 118:10
**see** 31:5,21 32:6 32:19 33:3 34:3 53:23 56:15 64:16,19 67:20 90:7 107:11 128:8
**seeing** 32:23
**seen** 33:14,21 47:16,20 49:14 49:18 66:7,11 67:12,17,18 84:16,19 86:14 86:19 130:19 131:2,4,9,14
**self-employed** 20:8
**send** 105:2,4
**sent** 49:6,12 106:12,13
**serious** 36:11
**service** 103:7
**set** 97:19 98:5
**seven** 18:1,6
**sexual** 126:13 127:1
**shake** 19:18 57:4 88:14 92:15
**shakes** 19:9
**shaking** 118:6,7
**shattered** 106:1
**Sheetrock** 20:19
**she'll** 14:2,2
**shook** 88:19

**FREEDOM COURT REPORTING**

Page 146

showed 99:1
shut 110:17
sick 33:5
side 19:9,10
  71:16 92:17
  93:3,4
sides 109:3
sign 14:19,21,22
signature 2:3
significant
  36:10
signing 15:2
signs 26:15
sir 6:21 8:7 12:2
  13:1,12 14:11
  14:15,18 16:13
  16:18 17:15
  18:20 19:5
  22:1 23:15,18
  23:22 24:2,8
  24:10,23 26:14
  27:8 28:1,6,9
  28:11,14,18,22
  29:6,12 30:2,4
  30:13 32:18
  33:10 35:6,15
  35:18 36:17,23
  37:3,19,22
  38:12,20,23
  39:3,6,20
  40:16 41:13
  42:11 43:8
  47:9,14 49:2,8
  49:11,13,17
  50:1,4,9 51:6
  51:10 52:7
  53:6 54:12
  56:10,21 58:19
  59:17,20,23
  60:10,22 62:7
  62:22 65:6,23
  67:14 69:13,16
  73:5,7,10
  78:22 80:16

81:2 84:13,15
86:22 87:23
89:7,13 90:8
91:1,6 93:1,6,6
93:9 94:1,5,10
94:17,20 95:5
95:7 96:9
97:11,16 99:14
99:17,19 100:2
101:1 102:3,16
103:1 104:8,22
105:9 106:23
108:13 109:18
110:14,21
111:4 112:5
113:8,20 114:6
114:21 116:14
117:6,22
118:12,16,19
118:19 119:7
119:19,21
120:3,20,20
121:2,6,10,14
121:17,23
122:6,9,13,16
122:21 123:1,5
123:9,15 124:7
125:2,17
129:12 130:3
131:19 132:16
132:23 133:4
133:21 134:1
sister 29:15
sisters 29:14
  30:9
sit 114:16
site 49:19,20
six 79:16,17 80:9
  81:22 82:14
  105:23 120:2,4
  120:5,7
size 70:6
skills 26:21
skinny 79:23

80:1,2,3
slack 100:16,19
slid 74:9,16
slow 22:9,10
  23:3
small 70:12
smoke 128:6,6
Social 12:21
  26:1,12 27:9
  109:10 110:12
  118:10
sold 44:18
  115:11
somebody 23:7
  34:4 35:10
  43:4 82:7 98:6
  103:2
son 9:17,19
  10:12,15 113:3
sons 113:4,9
son's 9:23
sorry 63:19
  129:18
sort 19:17,18
  24:19 73:15
South 4:15
  105:7 129:22
speak 7:20
  23:11
spell 8:22 9:23
  9:23 31:9
spend 105:10
spikes 78:4
sports 114:2
spot 13:14 39:11
  122:11
stability 86:21
stable 53:1
stand 37:5,6,11
  38:1,3,13,18
  39:15,23 40:2
  40:7,14,17
  42:5,9,13,22
  43:7,10 44:6,7

44:8,12,21,23
45:9,12 48:4
48:13,16 49:21
50:6 51:5,8,15
52:11,17 53:7
53:14 56:4
57:7,8,23 59:5
59:9,12,13
60:4 61:13,16
62:12 63:1,12
65:11,22 66:14
67:13,16,23
68:8,13 69:7
69:11,20 71:5
71:6,7,23 72:1
72:15 73:12,21
74:5,23 75:5,9
75:15 76:10
77:11,19 82:22
83:8,13,19
85:18 86:2,10
87:5,9,11 88:1
88:6 89:19,22
90:1,11 91:4
91:18,22 92:18
95:9,16,23
97:3,9 99:6,8
99:12,23 100:1
100:3,8 121:4
121:8,9,15
122:17 123:4
125:4,13 126:3
130:15,19
131:2,21,23
133:8
standing 92:13
stands 37:16,20
  44:10,10 46:1
  46:3,9,15
  47:15 49:7
  50:3,17 59:10
  75:21 81:15,16
  81:23 82:3,4
  82:10,15 84:18

86:14,19
  114:14 123:8
  123:10 131:22
start 24:20
  120:12
started 88:16
  91:17
starting 16:7
state 1:21 5:1
  6:1 136:3
States 1:1 5:17
station 16:21
stay 112:2
  114:14
stayed 50:10
  106:13
steady 53:2
  60:17
stenotype 136:7
step 72:8,9 73:8
  90:5,17 93:15
  96:4
stepdad 29:7
Stephanie 4:21
  5:22
Stephens 1:5,14
  1:20 4:19 5:8
  5:15 6:12,22
  6:23 8:2 9:20
  10:6,8 14:9
  31:11,15 37:10
  37:17 38:1
  40:14 41:15,15
  41:16,21 42:8
  54:11 65:10
  67:10 71:1
  87:16,17 104:2
  104:6 107:12
  113:11 126:7
  127:19
step-by-step
  71:8
stick 62:14
stiff 108:19,21

# FREEDOM COURT REPORTING

**STIPULATED**
1:17 2:2,9,18
**stipulations**
1:16 5:5 6:16
**stitches** 36:5,7
**stopping** 66:21
67:2
**stored** 61:14,18
82:15 131:6
**stores** 34:16
35:1
**straight** 70:15
70:18 73:20,22
91:16 102:9
105:13,15
**strap** 57:19,20
57:21 58:2,16
60:6 65:15
71:13,14 72:12
77:9 83:12
93:23 94:3
**strapped** 65:15
**straps** 58:4
72:15 73:4
77:23 83:10,19
83:20 84:1,3,5
84:8,11 94:16
94:22,23
**strong** 1:11 5:15
6:8 7:2,5 44:6
44:10,11,13
46:8 47:7 49:6
49:12,15,20
76:11 82:4
83:20 123:4,7
**study** 64:8 97:15
**stuff** 16:22
20:20 112:10
112:12 116:3
116:16
**subcontract**
19:1 20:9
**subdivision**
29:17

**subject** 61:17
66:15
**sued** 23:14,21
**suffer** 110:6
**suing** 23:7
**suit** 123:21,22
124:12
**Suite** 1:22 4:8
5:7
**Sunday** 62:19
69:22
**supper** 112:17
112:22
**sure** 45:10,21
52:9 55:10
98:11 128:16
129:4 130:5,21
**surface** 24:7
132:1,5,7
**surgery** 106:5,8
106:17,18
**suspected** 36:19
**sustained** 34:2
**swear** 6:10
**sweatshirt**
124:13
**sworn** 6:13
**symptoms** 26:16
27:4 28:4

**T**
**T** 136:1,1
**take** 7:12 19:23
20:4 30:14
39:10 40:12,12
59:18,21 60:4
61:9 66:21
71:3 77:5 81:8
82:22 83:3
110:22 111:1,5
115:4,5,6
120:8,10 130:7
**taken** 1:20 50:12
51:13 67:5

136:6
**talk** 16:5 37:4
86:23
**talked** 43:9
130:10
**talking** 18:9,12
23:1 49:4 54:5
63:20,23,23
68:8 71:6
76:12 79:5
89:9 90:19
93:2,8 99:9
127:19 131:13
131:21
**tall** 79:14 80:7
**Tallapoosa** 25:4
25:11 27:12
28:20
**Tallassee** 8:3,8
11:18,23 15:14
15:15 18:3,4
25:14 31:19
34:23 104:19
105:1 113:23
129:23 130:1
**Tammy** 13:8,8,9
14:5
**taught** 75:14
**tax** 20:22 21:2
21:12 119:6,14
**Taylor** 101:22
102:1,2
**teach** 75:23
**television** 112:1
**tell** 6:20 7:9,13
7:18,22 9:18
14:8 24:11
28:23 31:3
55:16 57:12,13
65:9,11 71:8
77:10 87:1,1
87:19,19 88:3
88:18 90:14
102:8,10

105:20,20
111:10,11
113:9 114:13
119:22 123:19
126:8
**telling** 52:8
**ten** 9:4 11:9,10
120:6
**terms** 17:18
60:12 120:18
133:7
**Terry** 37:17,18
38:1,10 40:14
43:3
**test** 78:9,10
88:14 97:13
**testified** 6:14
**testimony** 42:13
67:11 75:8
86:8 95:2
121:11 136:11
**thank** 134:20
**them's** 70:18
82:12
**therapist** 33:22
34:4
**therapy** 34:7,12
**thereto** 2:17
136:8
**thing** 73:2 76:13
82:23 121:12
**things** 76:19
125:12 127:13
127:18
**think** 7:3 27:15
32:5,14 33:12
33:17,20 35:3
38:2 39:16
43:6 44:13,14
44:17 45:3,5
48:20 62:13,16
62:19 63:8
72:7,8,10
76:21,22,23

79:6,16 82:11
85:1 92:7 95:1
96:16 97:20
101:5,11
105:19 106:7
124:20 125:20
125:21 129:16
130:8,12
134:18
**thought** 26:8
36:19
**three** 12:7 21:5
21:11 66:21
**threw** 69:17
**throw** 125:18
**thrown** 66:2
**Thursday** 5:19
**tibia** 105:22
**Tidmore** 4:7
**tied** 96:16
133:11
**tight** 48:5 53:17
79:13 88:20,22
89:1
**tighten** 71:10,12
**tighter** 78:5
**till** 48:7 99:12
101:12 133:10
**time** 2:15,15
13:3 18:10
19:19,19 23:16
25:17 35:13
36:14 40:7,18
42:10 44:23
52:20 53:5
54:10 56:12,23
66:3 69:8,12
74:12 79:10
80:11,14 81:3
84:14 88:7,7
98:9 101:9,10
107:8 112:20
112:21 116:23
**times** 24:13,16

# FREEDOM COURT REPORTING

78:23 79:9
127:15
**tire** 16:16,17
**tires** 16:20
**Titus** 8:19,21
11:6
**today** 7:7,19
19:22 95:3
134:20
**told** 13:2 46:11
77:20,23 109:9
120:17,21
121:3,7 128:16
129:3
**top** 57:20,22
71:17,19 73:6
76:4 77:10,11
89:3 90:12
92:18,23 93:7
93:19,23 95:16
95:19 99:5,12
100:8
**totally** 118:14
**trailer** 112:10
**transcribed**
136:8
**transcript**
136:11
**transcription**
136:9
**Tray** 101:22,23
**treat** 105:2
**treated** 132:21
**tree** 37:5,6,11,16
37:20 38:18,21
38:22 39:1,4
39:15,23 40:2
40:7 42:9
47:15 49:7,21
50:3,6 52:1
53:17 56:19,20
56:22 57:1,2
57:12,14,18
58:6,12,15

59:14 61:13,16
63:1 64:23
65:5,11,16,22
66:14 70:2,3,5
70:11 71:2,10
71:16 72:13,16
73:3,12,13
74:7,13,23
75:9,15,20
77:14,17,19
78:4,6 81:16
82:10 83:8,14
84:12,18 85:18
86:14 90:22,23
91:3,8,10,12
91:18,22 92:18
93:16,19 95:16
96:22 99:6,8
99:12,23 100:1
100:3,8,14,17
114:14 121:4,8
121:9 122:17
123:4,8 125:3
125:13 131:20
131:21,23
133:7,10,20
**trees** 70:22
**trial** 2:15
**tried** 23:4 103:6
**trouble** 28:8,10
28:12 52:21
123:3
**truck** 60:8 82:21
104:16 115:4,6
**true** 136:10
**try** 7:20 23:10
88:15
**trying** 76:21
120:12
**turn** 125:6,15
**twice** 24:15
39:16,22 79:6
**two** 13:10 14:7,8
18:1,6 21:10

24:16 25:8
30:11,12 32:4
37:20 39:22
40:1 44:9,10
51:1,8,16,19
61:4 62:17
64:3 67:8
72:15 73:3
77:23 81:17
100:20 113:4,9
116:18
**type** 16:14 20:9
20:14 23:2
58:2 70:2
72:18 84:5
92:17 95:15
116:5 124:11
124:16 126:9
**typically** 20:12
59:8 100:18

---

### U

**uh-huh** 7:17 8:9
9:14 10:8,23
12:4,18 15:16
18:5,8 21:3,13
41:17 42:11
46:5,19 47:18
51:10 52:16
54:12,23 60:19
61:22 62:4
68:11,20 70:16
74:14 75:19
76:6,21 77:3
77:15 78:16
85:5,21 93:14
94:13 98:19
103:17 120:23
125:11 128:21
131:1
**unbolts** 77:4
**uncle** 16:8 19:7
37:7,12 59:15
59:16 69:10

78:12 79:15
81:5 85:10
98:3 104:4,7
133:13,17
**uncles** 103:11
**uncle's** 44:14
**unconscious**
102:15
**understand** 7:9
21:9 23:6 47:5
47:22 55:1
76:4,15 95:2
99:20 130:17
131:13
**understanding**
7:21 85:13
**United** 1:1 5:17
**unsteady** 79:11
**use** 34:17 49:21
50:2 59:8
73:15 74:21,22
84:17 88:8
99:2 100:18
107:16,18
108:8
**Usual** 6:15

---

### V

**V** 78:3
**Vance** 29:21,23
30:1
**varied** 119:2
**versus** 5:15
**video** 1:14,19
67:4,7 135:1
**Videographer**
4:21 5:13 6:9
67:3,6 134:23
**videos** 49:15
**videotape** 5:14
67:8
**volunteer**
127:21 128:2
**VS** 1:8

**V-a-n-c-e** 30:3

---

### W

**wait** 48:7 99:11
109:20
**waived** 2:4,20
**walk** 107:12,20
107:21 108:6,9
108:14 109:4,5
109:6,8,8
112:3,3,5,7
120:12
**walking** 28:8
86:5
**Wal-Mart** 38:2
40:15 84:4
**want** 44:20 52:9
55:9 127:7
128:16 129:4
133:5
**warning** 47:16
48:13,16,21
**warnings** 47:6
47:12,23 48:12
**wash** 115:18
**wasn't** 42:18,19
56:2,3 58:13
63:9,9 65:7
70:13 72:20
73:18 74:1,3
86:1 87:8
96:21 101:8
126:3 128:7
**watch** 45:17
112:1
**water** 124:3
**way** 39:14 53:22
54:2 65:13
66:10,10 70:9
74:16,17,19
86:1 90:12
92:22 117:4
**Wayne** 6:22
**ways** 56:8

# FREEDOM COURT REPORTING

Page 149

| | | | | |
|---|---|---|---|---|
| weak 55:17,17 | 106:16 127:17 | wobble 57:3 | **Y** | 97:7 98:13 |
| 56:5 | 134:7 | wobbly 79:11 | yard 116:5,20 | 99:10 100:6 |
| weaken 122:11 | weren't 23:2 | Wood 16:11,11 | yeah 9:4,12 | 101:14,17 |
| wear 85:20 98:8 | 42:16 61:9 | 16:12 29:2,4,5 | 10:16,19 11:2 | 102:12 103:3 |
| wearing 98:15 | 69:6,10 81:9 | 42:2 103:23,23 | 11:11 13:5 | 103:15 107:21 |
| 98:21 | 86:3 | woods 51:14 | 15:1 16:3,21 | 108:8,16,18,23 |
| weather 7:19 | wet 62:5 | 77:2 115:3 | 16:21 20:16,21 | 109:6,12,20,20 |
| 100:22 | Wetumpka 9:5 | words 46:21 | 21:15,19 22:16 | 110:4,17,19 |
| Weaver 3:5 4:5 | we'll 7:13 22:16 | work 11:14,16 | 23:12,20 24:21 | 111:1,9,14,23 |
| 4:7 6:3,3 10:7 | 22:16 | 12:8 16:1 17:3 | 25:7,15,18 | 112:9 113:1,6 |
| 23:10 48:7 | we're 63:23 | 17:22 18:16 | 26:17 28:3 | 113:14 114:10 |
| 63:19 64:1,4 | we've 66:22 | 19:4 20:9,12 | 29:8,12 30:15 | 114:16,17 |
| 66:20 69:3 | 87:21,21 | 20:14,17 22:7 | 30:21 31:16 | 116:4,19 |
| 87:3 98:10 | 117:18 130:10 | 22:14,22 23:2 | 33:2,5 34:6,6,9 | 117:15,18 |
| 117:10 118:4 | whatsoever 24:4 | 36:8 60:12 | 34:19,21 35:11 | 118:21 119:4 |
| 123:11,14 | 86:9 | 74:8 109:19,23 | 36:11 39:9 | 119:16 120:6 |
| 127:6,10 | wheelchair | 115:16 116:5 | 40:5 41:21 | 120:10,14 |
| 129:21 130:4 | 107:11,17,18 | 116:21 117:1 | 43:14 45:5,13 | 124:10 126:1 |
| 132:8 134:22 | 111:20 | 118:18,22 | 46:2,7 47:20 | 126:19,22 |
| web 49:19,20 | wife 7:3,6 9:11 | worked 16:7,8 | 51:3,12 52:13 | 127:23 128:3,6 |
| week 22:2 | 11:16 13:3,10 | 17:6,10 18:21 | 52:20 53:2,2 | 128:10 129:2 |
| 110:10 | 13:15 21:17 | 22:21 109:21 | 53:12 54:19,21 | 129:10 131:4,8 |
| weeks 61:4 | 28:2 35:13 | workers 28:16 | 55:2,5,12,14 | 131:11,16 |
| 62:17 64:3 | 103:3,11,14 | working 16:3 | 55:22 56:2,2 | 132:6,6,16 |
| 107:4 121:4 | 111:8 112:17 | 22:5 109:16 | 56:14 57:15,23 | 134:7,12,17 |
| weigh 79:18 | 126:6,13 127:2 | works 11:17,21 | 59:7,10 60:19 | year 8:15,15 |
| 80:8,10,12,17 | wife's 13:6,9 | 112:21 116:23 | 61:8 62:1,6 | 10:22 11:2 |
| 81:4 | Wilmeth 1:21 | worn 54:14 56:5 | 63:3,7,13,17 | 15:17 21:2,5 |
| weighed 80:15 | 4:1 5:1 136:20 | worse 120:11 | 63:22,22 66:5 | 21:11 22:6,7,7 |
| 80:20,21 | Winchester | wouldn't 43:21 | 67:1 68:3,6,9 | 25:1 27:13 |
| weighs 80:5 81:6 | 124:20 | 54:15 56:5 | 69:23 70:10,18 | 38:4,6 39:10 |
| weird 10:3 | wings 17:21 | wrap 70:8 | 70:22 72:1,13 | 39:12,17,17,23 |
| weld 121:20,22 | Wininger 4:21 | wrapped 94:6,7 | 73:23 74:14 | 40:2 51:1 |
| 122:8,11,12 | 5:22 | write 14:14,16 | 75:11,13 76:8 | 65:14 79:2 |
| welded 63:14 | wintertime | 15:3 46:12 | 76:21 78:1,3 | 82:18 83:15 |
| 76:14 89:23 | 22:18 | written 47:5,11 | 78:14 79:8 | 84:1 94:19 |
| welding 122:4,5 | wise 13:22 | 47:12 49:6,10 | 81:14 82:2,8 | 98:20 110:4 |
| went 34:6,6 | wish 115:9 | 65:18 66:11 | 82:16 83:17 | 122:20 |
| 46:17,18 51:20 | witness 2:4 5:8 | 67:12 | 84:2,20,22 | years 11:9,10 |
| 59:11 67:16 | 6:10 19:9 23:9 | wrong 134:13 | 85:7,19,19 | 12:7 13:22 |
| 78:14 79:6 | 47:1 48:10 | W.H 4:6 | 88:2,13,17 | 14:7,8 17:2 |
| 88:21 90:17,22 | 69:5 123:13 | | 89:1,13 91:9 | 18:1,6,9 20:8 |
| 91:2,7,9,9,12 | 129:20 130:3 | **X** | 92:1,21 93:17 | 20:10 32:4 |
| 104:19 105:15 | 136:12 | X 3:1 | 96:5,12,20 | 33:13 39:14 |

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

51:8,16,19
68:13 98:15,17
98:18 119:17
**youngest** 116:23
**y'all** 41:5 50:2
50:23 59:21
60:4,23 61:18
62:12,20,20
63:1 65:1,4,10
65:17 74:5,12
76:13 77:2,4,4
78:9 80:23
81:9,15,23
82:17 83:23
86:10,10 88:7
91:22 94:18
97:8,10 112:22
116:8 118:2
119:8 121:3
122:20 125:5
125:14,23
130:17 134:5

**Z**

**zip** 8:10

**0**

**05** 85:2
**06** 21:9,23 27:15
27:16 51:21

**1**

**1:15** 135:2
**10th** 15:11
**1099** 20:23
**11:12** 2:1 5:19
**12** 20:10 106:7
**12:03** 67:4
**12:11** 67:7
**127** 3:5
**128-10** 1:9 5:16
**132** 3:6
**14** 13:22 106:8
**15** 13:22 57:8
101:11,12

**16** 57:10 102:7
113:13,13
**160** 80:13
**18** 10:11 17:2
87:18 113:18
**1990s** 18:13

**2**

**2nd** 21:9,23
87:22
**2:07** 1:9 5:16
**20** 33:13 57:9
98:17,18,20
102:6
**200** 1:22 4:8 5:6
79:22
**2000s** 18:13
**2001** 52:3
**2002** 52:3
**2003** 52:3
**2004** 40:10
52:12,18 131:4
**2005** 22:14,15
39:19 52:19,22
53:5,13 56:13
57:11 58:18,21
59:6,14,19
60:2,9 61:14
61:18 109:11
118:18 130:20
130:22
**2006** 22:8,9,12
35:21 39:19
60:21 62:12
63:2,20 64:2
64:12,22 69:22
87:22 91:23
97:9,12 109:17
118:18 129:9
130:23 132:12
133:8
**2007** 2:1 5:8,20
**21st** 12:20
**214** 1:23 4:8 5:7

**260** 80:13
**261** 80:13,15
**280** 4:15
**2801** 4:15
**29** 1:23 5:8
**29th** 5:20

**3**

**3rd** 62:13 64:21
69:22 78:11,18
78:21 79:3
80:23 81:9
91:23 97:9
**300** 4:14 124:18
**35223** 4:16
**35242** 4:9
**38** 12:16,17
**392** 136:21

**4**

**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**
12:22
**44** 134:18

**6**

**6** 3:4
**6:00** 101:11,13
**6493** 12:23
**69** 12:20

**9**

**9-30-08** 136:22
**90s** 18:14,15
**97** 8:5

1              IN THE UNITED STATES DISTRICT COURT

2                  MIDDLE DISTRICT OF ALABAMA

3                      NORTHERN DIVISION

4

5

6    LARRY STEPHENS and

7    DEBORA STEPHENS

8

9    VERSUS                        NO.  2:07cv128-10

10

11   STRONG BUILT, INC.

12

13   ************************************************************

14                   DEPOSITION OF MR. KENNETH KILLEN was

15   taken in the above-entitled cause, pursuant to the following

16   stipulations, before MARY ALICE FOUNTAIN, Certified Court

17   Reporter for the State of Louisiana, at the law office of James

18   E. Paxton, 124 Hancock Street, St. Joseph, Louisiana 71366,

19   February 29, 2008.

20

21

22

23

24

25

Page 2

```
 1  APPEARANCES:
 2
 3  Mr. W.H. Hassinger          FOR PLAINTIFFS:
 4  WEAVER TIDMORE
 5  200 Cahaba Park Circle #214
 6  Birmingham, AL 35242
 7
 8  Mr. David A. Lee           FOR DEFENDANTS:
 9  PARSONS LEE JULIANO
10  300 Protective Center
11  2801 Highway 280S
12  Birmingham, AL 35223
13
14  ALSO PRESENT:
15  Bob Kidd - Videographer
16  L.J. Smith - Investigator
17
18          STIPULATIONS
19      It is stipulated and agreed between counsel that
20  this Deposition of Mr. Ken Killen is taken by counsel for
21  the Plaintiff for purposes of discovery or for use as
22  evidence in this action pursuant to Rule (b)(6) of the
23  Federal Rules of Civil Procedure. All objections are
24  reserved until the time of trial, except those to the form
25  of the question and the responsiveness of the witness, which
```

Page 3

```
 1  shall be made at this time.
 2      The witness and parties hereto waive all
 3  formalities in connection with the taking of said
 4  deposition, except the reading and signing thereof by the
 5  witness.
 6
 7          * * * * * * *
 8
 9          MR. KENNETH KILLEN, having been duly
10  sworn, testified as follows:
11  MR. KIDD:
12      Will the attorneys identify themselves and
13  their clients at this time please?
14  MR. HASSINGER:
15      My name is Will Hassinger. I'm co-counselor
16  for the plaintiff, Larry and Debora Stephens.
17  MR. LEE:
18      And I'm David Lee and I represent the
19  defendant, Strong Built, Incorporated.
20  MR. KIDD:
21      Today is Friday, February 29, 2008. We're
22  located at the law office of James E. Paxton, 124
23  Hancock Street in St. Joseph, Louisiana. And this
24  is the video deposition of Mr. Ken Killen in the
25  matter of Larry Stephens and Debora Stephens,
```

Page 4

```
 1      plaintiffs, versus Strong Built, Incorporated,
 2      defendants. You may begin, counselor.
 3  EXAMINATION BY MR. HASSINGER:
 4  Q.  Mr. Killen, would you state your name for the record,
 5  please, your full name?
 6  A.  Ken Killen.
 7  Q.  It's just Ken Killen?
 8  A.  Naw, it's Kenneth Knight Killen.
 9      MR. HASSINGER:
10          And Mr. Killen, as we said before, my name is
11      Will Hassinger. I represent Larry and Debora
12      Stephens in this matter.
13  Q.  Could you start off by just telling me where you live,
14  Mr. Killen?
15  A.  I live in Waterproof, Louisiana.
16  Q.  And what's your home address?
17  A.  Highway 573.
18  Q.  Is there a number?
19  A.  There is, but they're new. The 911 numbers are new
20  here. I'm not positive what it is.
21  Q.  Your date of birth, Mr. Killen?
22  A.  June 23rd, 1955.
23  Q.  Have you ever given a deposition before?
24  A.  Yes.
25  Q.  On how many occasions?
```

Page 5

```
 1  A.  I don't recall. Maybe fifteen, twenty.
 2  Q.  Okay.
 3      MR. HASSINGER:
 4          Well, even though you're somewhat experienced
 5      with giving depositions, I want to tell you some
 6      basic ground rules, okay. The Court Reporter is
 7      taking down everything you say, so make sure that
 8      you answer audibly. Sometimes I'll say ah-hah or
 9      ah-ah, but try not to do that. Try and answer with
10      a yes or no. And again, because she is taking down
11      everything we say, try and wait until I finish the
12      question before you answer it. If I ask a question
13      and you answer it, I'm gonna assume that you
14      understood the question. So if you don't
15      understand it, and I promise, sometime in this
16      deposition I will say something that makes
17      absolutely no sense, just ask me to rephrase it and
18      I'll be happy to do that for you. Okay.
19  MR. KILLEN:
20          Okay.
21  MR. HASSINGER:
22          If you need a break to grab some water, go to
23      the bathroom, just let me know, I'll happy to give
24      you one.
25  Q.  Are you on any medications today or do you suffer from
```

2 (Pages 2 to 5)

Page 6

1  any illness that prevent you from giving complete and
2  truthful answers to my questions today?
3  A.  No.
4  Q.  Okay.  Are you married Mr. Killen?
5  A.  Yes.
6  Q.  What's your wife's name?
7  A.  Honda.
8  Q.  Can you spell that for me?
9  A.  H-O-N-D-A.
10  Q.  Do you have any immediate family, Mr. Killen, other
11  than Honda?
12  A.  Yes.
13  Q.  Okay.  Do you have any sons?
14  A.  One son.
15  Q.  And what's his name?
16  A.  Bryant.
17  Q.  How old is Bryant?
18  A.  Twenty-three.
19  Q.  Okay.  Any daughters?
20  A.  No.
21  Q.  So you just -- it's just you and Honda and the one son?
22  A.  Correct.
23  Q.  Does he live at home with you?
24  A.  No.
25  Q.  Okay.  Where does Bryant live?

Page 7

1  A.  Baton Rouge.
2  Q.  Does Bryant work for you?
3  A.  No.  He's in college.
4  Q.  Do you have any family members that work at  - work out
5  or for Strong Built, Incorporated?
6  A.  No.  Other than my wife.
7  Q.  In what capacity does your wife work for Strong Built?
8  A.  She works in the office in payables.
9  Q.  Accounts receivable and payable or just accounts
10  payable?
11  A.  Payable.
12  Q.  And what's the business address of Strong Built,
13  Incorporated?
14  A.  It's on Highway 568.
15  Q.  Is it a stand-alone building or is it an office within
16  some other office space?
17  A.  It's several buildings.
18  Q.  What's your job title at Strong Built?
19  A.  I'm the president and pretty much anything comes along,
20  as far as sales, making sales calls, negotiating price
21  product, that type.
22  Q.  Before we get a little more into your capacity at
23  Strong Built, would you describe your educational history
24  to me?  Just starting with high school.
25  A.  Graduated from Tensas Academy here in St. Joseph.

Page 8

1  Q.  What year was that?
2  A.  1973.
3  Q.  Did you go to college?
4  A.  I went three years to LSU.
5  Q.  Did you receive a degree from LSU?
6  A.  No.
7  Q.  Did you have any  - after you went to LSU did you have
8  any further vocational school or anything of that nature?
9  A.  No.
10  Q.  Tell me a little bit about your work history Mr.
11  Killen, starting with either your first job going forward
12  or your most recent job going backward, whichever one is
13  easier for you?
14  A.  After ah, well, I started farming in about  76, I
15  guess.  And farmed till probably 1987.
16  Q.  What did you farm?
17  A.  Cotton, soybeans, wheat, rice.  Then I started Strong
18  Built in 85.  And it been there until, you know,
19  throughout.
20  Q.  Did you own the farm that you worked on?
21  A.  No, I didn't.
22  Q.  Who did own the farm you worked on?
23  A.  Some was family farm, and some was property I rented.
24  Q.  Why did you get out of farming?
25  A.  Well, I started the business.  And it just kind of

Page 9

1  mushroomed, started growing, and couldn't do both.
2  Q.  You just had a better opportunity to  - to make more
3  money and do something that you're little more excited about
4  and decided to do something else?
5  A.  Right.
6  Q.  Okay.  You ever been convicted of or pled guilty to any
7  crime other than a minor traffic violation?
8  A.  No.
9  Q.  Now you said you started Strong Built in  85, is that
10  right?
11  A.  That's right.
12  Q.  Okay.  Is that the year that Strong Built was
13  incorporated?
14  A.  No, I think it was maybe  87, 86,  87.
15  Q.  What type of corporation is it?
16  A.  It's a S ...., I'm pretty sure.
17  Q.  You testified a second ago that some of your titles
18  within Strong Built are basically, you know, president,
19  founder.  Could you talk to me in a little more detail about
20  the capacity in which you work at Strong Built?  You said
21  you negotiated some price.  I'd like to know who you
22  negotiate prices with, you know, what you do as president,
23  how you're involved in sales, things of that nature.  In
24  other words, just elaborate on what you do at Strong Built,
25  for me.

3 (Pages 6 to 9)

One Penn Plaza, NYC
email@tobyfeldman.com

Toby Feldman, Inc.
NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS

tel (212) 244.3990
tel (800) 246.4950

Page 10

1  A.  Today?
2  Q.  Yes, sir.  Actually, why don't we start off at the
3  inception of the incorporation in approximately 1986.  And
4  then take me forward through today.
5  A.  Well, in 86, it was actually I started doing it to
6  keep farm labor busy in the off-season.  And it started
7  growing.  It was incorporated.  Start hiring a few people.
8  Ah, started producing product as far as, I mean, we had a
9  complete fab shop, welding shop, paint facility, ah, boxing,
10  you know, the whole nine yards, warehouse and everything.
11  And then years went along we started farming some of the
12  work out.  Had some contract, contract people that did work
13  in different locations.  And then in 2000, we took the
14  production to China.  And it's been there since, and all the
15  negotiating I mentioned, you know, was product ah, selection
16  product type.  That type of stuff is done between here and
17  overseas.
18  Q.  And what type of products does Strong Built has Strong
19  Built manufactured and continue to manufacture to this day,
20  starting back with 85 and 86, when you first started out?
21  A.  Mostly tree stands.  We do some gun safes, and some gun
22  cases, some ATV products.  But majority of it is tree
23  stands.
24  Q.  Do you report to anybody within the company or since
25  you're the president and founder you pretty much that the

Page 11

1  buck just stop there?
2  A.  Yeah, stops here.
3  Q.  How many employees do you have?
4  A.  Now?  Less then ten.
5  Q.  Could you name them for me?
6  A.  Betty Westmoreland.
7  Q.  And what does Betty do?
8  A.  She's a receptionist.
9  Q.  How long has she worked there?
10  A.  Couple of years.
11  Q.  Okay.
12  A.  Betty Rhodes.
13  Q.  Is that R-H-O-D-E-S?
14  A.  That's right.
15  Q.  And what does she do?
16  A.  She handles all the logistics.
17  Q.  Okay.  How long has she been there?
18  A.  She's been there maybe three years.
19  Q.  And who else?
20  A.  Kemp Harrison.
21  Q.  What does Kemp do?
22  A.  He helps me.  He helps me with the pricing, and does a
23  lot of the freight, a lot of the freight and negotiations
24  and logistics.
25  Q.  How long has Kent been there?

Page 12

1  A.  He's been there two years.
2  Q.  Okay.  Who else?
3  A.  Ken Mahoney.
4  Q.  And what does Ken do?
5  A.  He is in the warehouse and does the actual shipping and
6  palletizing and preparing shipments.
7  Q.  And how has Ken been there?
8  A.  Oh, maybe twelve, fifteen years.  I'm not sure.
9  Q.  Who else besides Ken?
10  A.  John Lee.
11  Q.  What does John do?
12  A.  He works in the warehouse.
13  Q.  Is he just a general laborer there in the warehouse for
14  you?
15  A.  Yeah.  Um-hum (yes).
16  Q.  How long has John been there?
17  A.  He's been there close to ten years probably.  Maybe
18  longer.
19  Q.  All right.  I believe that's five employees.  Who else?
20  A.  Dan Ramo.
21  Q.  R-A-M-O?
22  A.  Right.
23  Q.  Okay, what does Dan do?
24  A.  He's in the warehouse also.
25  Q.  Okay.  How long has Dan been there?

Page 13

1  A.  Close to ten years probably.
2  Q.  All right.  Who else?
3  A.  Albert Lee.
4  Q.  What does Albert do?
5  A.  Albert ah, works in the, what was the fab shop,
6  assembly, does some assembly, and works on just any project,
7  small projects that we do, you know, in the states.
8  Q.  How long has Albert been there?
9  A.  Ah, probably close to ten years also.
10  Q.  Okay.  Who else?
11  A.  I think that's it right now.
12  Q.  Okay.
13  A.  No, Keith Bruce.
14  Q.  What does Keith do?
15  A.  Keith's our truck driver.
16  Q.  All right.
17      MR. HASSINGER:
18          I'm gonna hand you what I'm gonna mark in as
19      Plaintiff's exhibit 1, the deposition notice that's
20      been filed today.
21      MR. KILLEN:
22          Um-hum.
23      MR. HASSINGER:
24          Can you take a second to read over this
25      document and just let me know when you're finished,

One Penn Plaza, NYC                    Toby Feldman, Inc.                    tel (212) 244.3990
email@tobyfeldman.com      NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS      tel (800) 246.4950

Page 14

1  and when you are just hand it back to me.  Take
2  your time.
3      MR. KILLEN:
4      Okay.
5  Q.  Do you have personal knowledge of all the topics listed
6  in that deposition notice?
7  A.  Yes.
8  Q.  Okay.  So there's no topics for which you don't have
9  sufficient knowledge to testify?
10  A.  No.
11  Q.  Okay.  Let me ask you this, Ken.  What did you do to
12  prepare for the deposition today?
13  A.  I reviewed some of the depositions that had been taken,
14  yesterday.  And ah, looked at the stand.
15  Q.  Okay.
16  A.  Took some photographs.
17  Q.  Did you review any documents other than the depositions
18  you said that you've read?
19  A.  I don't think so.
20  Q.  Okay.  Did you have any communications with anyone
21  today about the deposition today other than of course, with
22  your attorney?
23  A.  No.
24  Q.  Okay.  You didn't - did you consult with any experts
25  about your deposition today?

Page 15

1  A.  Well, L.J. was there yesterday, also.  The three of us
2  were looking at the - at the stand.
3  Q.  Okay.  When'd you first find out about the deposition?
4  A.  Ahhh, when it was sent to me.  I don't remember the
5  day.
6  Q.  Okay.  That's fair enough.  Do you have an
7  understanding of the tree stand that made the basis of this
8  litigation?
9  A.  That's it in the other room,
10  Q.  Yes.
11  A.  I'm assuming?  Yes.
12  Q.  Okay.  So whenever I refer to the tree stand from this
13  point on, that's the tree stand that I'm referring to, okay?
14  A.  Okay.
15  Q.  All right.  Tell me how that tree stand was designed.
16  And I know that's a broad question, and you can take as long
17  as you like to answer it.  And if you need me to clarify
18  anything for you, I'll do the best I can to do that, but
19  ah, I know that you're not an engineer.  So I would just
20  like to know how you came about - how you - strike that.
21  I'd like to know how you came to design that tree stand?
22  A.  Well, it goes back to the late  80's.  It was ah, what
23  we were trying to produce was a one-man ladder stand.  And
24  we've produced some that were one piece.
25  Q.  When you say - when you say we produce  em, who -- to

Page 16

1  whom are you referring?
2  A.  Strong Built.
3  Q.  Who within the Strong Built, Incorporated helped you
4  design the tree stand though?
5  A.  Oh, I did most of it.
6  Q.  Okay.
7  A.  It ah,
8  Q.  Anybody else other than you?
9  A.  Well, whoever was employed then that was out in the fab
10  shop, you know.  Workers, just workers.  Nobody - nobody
11  in design.
12  Q.  Nobody, no engineers?
13  A.  No.
14  Q.  Tell me a little bit more about it.  You said it was
15  just you and some workers out in the fab shop.  You just
16  trial and error, trying to put together just a one-man tree
17  stand?
18  A.  Well, yeah.  And there are a lot of factors.  It was a
19  one-man tree stand.  It was - we produced one piece for a
20  few years.  We produced it - then we wanted a stand that
21  would come apart that you could assemble.  We produced it
22  for several years with a top that was all welded.  Pelletize
23  it wasn't molted together.  It just, the ladders were swaged
24  and stabbed together, stabbed into the top.  And then
25  because of freight reasons and warehouse reasons, we wanted

Page 17

1  a stand that would take apart, palletize easier, and ship.
2  You know, just really take up less room.  So that's when we
3  designed the basic ladder that bolts together.
4  Q.  About what year was the tree stand that made the basis
5  of this litigation designed?  It sounds to me like you're
6  saying that's not the, you know, that's not the first one;
7  you had played around with it a little while, is that
8  correct?
9  A.  Um-hum (yes).
10  Q.  Okay.  Well, about what year did you design that tree
11  stand?
12  A.  That tree stand somewhere around  92 to 94.  I mean,
13  93, but I'm not positive.  It would be  93, so there's a
14  range.
15  Q.  And you would say that even though there were no
16  engineers, there wasn't even really a design team; you were
17  in charge of the design?
18  A.  Correct.
19  Q.  How long did it take to design that tree stand?
20  A.  I don't remember.
21  Q.  Well, I mean, would you say  - I mean, did you start
22  off with a, you know, fabrication spec?
23  A.  Ah, no, we worked with - we worked with some
24  measurements trying to, you know, produce a stand that was,
25  that would ship UPS, with UPS.  And I forget what their,

One Penn Plaza, NYC
email@tobyfeldman.com

Toby Feldman, Inc.
NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS

tel (212) 244.3990
tel (800) 246.4950

Page 18

1   back in those days, what their length, height, and width,
2   you know the circumference of the  - I don't remember the
3   inches, but they had a  - I remember it being that was a
4   factor.
5   Q.   So you designed it for cost efficiency?
6   A.   Partly, yes.
7   Q.   And you can't remember the names of anybody else other
8   than yourself when that tree stand was designed that helped
9   you in the fab shop trying to put it together?
10  A.   No.  No.
11  Q.   Do any of those people still work for you?
12  A.   No.
13  Q.   Okay.  Who ultimately signed off or said
14           "This is the design that we're gonna use."?
15  A.   Me.
16  Q.   And is the fabrication shop that was used to assemble
17  that tree stand still present at Strong Built, still one of
18  those buildings that's a part of Strong Built, Incorporated?
19  A.   Yes.
20  Q.   My first question to really start the line of
21  questioning is, how was the tree stand designed.  I'd like
22  to kind of go back to that, and for you to tell me, just
23  from the very beginning, start to finish, from that first
24  piece of  - for that first piece of graded steel, what y'all
25  did to design it and fabricate it.

Page 19

1   MR. LEE:
2        Now let me just get some clarification.  He's
3        talked to you a little bit about the evolution of
4        the stand.
5   MR. HASSINGER:
6        Um-hum.
7   MR. LEE:
8        And that stand, I guess changes from the
9        original manufacturer.  Are you talking about the
10       stand now that is the subject of this litigation,
11       how that particular stand was designed?
12  MR. HASSINGER:
13       I am.
14  MR. LEE:
15       Okay.  You understand what he's asking.
16  MR. KILLEN:
17       Um-hum (yes).
18  MR. LEE:
19       Okay, go ahead.
20  A.   Well, that particular was kind of evolved from years of
21  previous ladder stands.  I mean, like I said there was some
22  one piece ladder stands that were completely, you know, ten
23  feet long, fifteen feet long.  And then when we started with
24  a stand that would take apart, it consisted of the ladders
25  and the brace and the top.  But the top was welded.  The top

Page 20

1   was a one-piece unit.  So the top was in a separate box.
2   So then when we tried, you know, we produced that for years
3   in twelve, sixteen, and fifteen foot heights.  And then when
4   we got to the stand in the other room here, it was after
5   years of producing ladders.  And some of the  - there wasn't
6   just one ladder being produced.  There were several
7   different type of ladder stands that were being produced
8   that used the same ladder sections, the same brace, and the
9   same foot platform.  They were configured different and had
10  different seats on  em.
11  Q.   But as the stands evolved, there were, probably there
12  were different welds involved, correct, depending on the
13  type of stand?
14  A.   Correct.
15  Q.   Did you have a weld design for each one of those?
16  A.   I'm not following you on weld design.  What you talking
17  about?
18  Q.   Okay, there's  - well, before  - before something is
19  welded there should be a weld design, a weld specification
20  to be followed.  Where was any sort of weld design?
21  A.   No, all this work was done in jigs, metal jigs.  There
22  were different metal jigs, you know.  They were the first
23  thing fabricated after we finalize on a design or on
24  anything, the metal jigs were built.  And everything was
25  built in the jigs.

Page 21

1   Q.   Who was in charge of doing the welding itself?
2   A.   There was  - at times, you know, as many as twenty
3   welders.  There was, as I said earlier, there was contract
4   welders.  There was  - there was a complete fab shop in
5   Alabama that did a lot of welding during some of that time
6   frame.
7   Q.   The contract labor that you used, the contract welders,
8   were they all certified welders?
9   A.   No.
10  Q.   They were not all certified welders?
11  A.   No.
12  Q.   And they weren't provided with any specific weld
13  design?
14  A.   No.  They were provided with the jigs.
15  Q.   Could you elaborate on jigs for me a little bit?
16  A.   Well, it's a piece of metal that's got metal stops in
17  different places, so tubing or angle or whatever the
18  product, the channel or whatever the product, the type of
19  steel might be, fit into it.  And then they're captured.
20  They can't move right or left or up or down.  And then your
21  other component parts are placed in it, on it, inside it,
22  wherever they went.  It's like a puzzle.  And then it's
23  welded.
24  Q.   Up until about what time did you fabricate and produce
25  the tree stands and your other products here in the United

One Penn Plaza, NYC                              Toby Feldman, Inc.                    tel (212) 244.3990
email@tobyfeldman.com         NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS        tel (800) 246.4950

Page 22

1   States?
2   A.  Up until 2000.
3   Q.  And it's your contention that that tree stand, the tree
4   stand that made the basis of this litigation, was
5   manufactured before 2000?
6   A.  Definitely.
7   Q.  Okay.
8   A.  No doubt about it.
9   Q.  Let me get to that in a minute.  But we will address
10  it, because I know that  - I know that that's an issue in
11  this litigation, okay.
12  A.  Yeah, big time.
13  Q.  To the best of your knowledge, when was the tree stand
14  manufactured that made the basis of this litigation?
15  A.  In the  - in the mid 90's.  Could've been from 93,
16  maybe as far as  96.  But I'm gon' say  95, you know, 93
17  to 95.  Maybe 96.
18  Q.  Is there no way to pinpoint which year it might have
19  been?
20  A.  No, there's no way to pinpoint the exact year.
21  Q.  Why?
22  A.  Because when we were producing a particular model,
23  whether it be in-house  - I mean, I can tell  - I can tell
24  certain things about the stand that I know that stand was
25  probably produced in-house.  Ah, because of certain

Page 23

1   characteristics that are on it.  And all I can do there is
2   a range.
3   Q.  How long does it take to manufacture a tree stand  -
4   how long does it take Strong Built to manufacture a basic
5   tree stand that made the subject of this litigation ah, when
6   you were still doing your manufacturing state side?
7   A.  I'm not sure because we, you know, we didn't
8   manufacture that way.  We didn't manufacture a completed
9   unit.  We would work on ladders, work on nothing but
10  ladders.  Because, the reason being, it wasn't the welders
11  or the jigs, or any of that, it was the ah, fab shop.  The
12  fab shop that had to prepare.  If a piece was five inches
13  or if a piece was ten inches, if it had a angle cut, if it
14  had a hole in it, or whatever, whatever the configuration,
15  they had to prepare it.  And it had limitations on the shop
16  because of the size and the employees.  And mainly, you
17  know, how much equipment you have.  So they would prepare
18  these parts, and then the welders would work on the parts.
19  Now if they worked on ladders all week and built up a pile
20  of ladders, then they  - they would go to be painted,
21  cleaned and painted.  And then they would work on the brace
22  and the top platform and the foot platform, and so on and
23  so on.
24  Q.  So you're saying that it's impossible to give a, you
25  know, an exact time frame for how long it takes to put

Page 24

1   together a tree stand ready for the market because you work
2   on different component parts at different times, and then
3   the end result is a tree stand, but ah, but you don't
4   A.  I'm not saying it's impossible.  I'm saying I can't
5   tell you.
6   Q.  Yeah, it's not a trick --
7   A.  I mean, I'm not gon' sit here and
8   Q.  it's not a trick question.
9   A.  say
10  Q.  I'm essentially just saying it's not like you sit down
11  and put together a tree stand, go from point A to point Z,
12  and then it's done?
13  A.  Right.  And if you're asking about the welding, you
14  know, you know, that's just one part of it.  It's gotta be
15  cleaned.  It's gotta be prepared.  It's gotta be painted.
16  It's gotta be dried.  It's gotta be boxed.  It's gotta be
17  palletized.  I mean,
18  Q.  Well, what insures that all that takes place?
19  A.  What insures that all of that take place?
20  Q.  Yeah, everything you just named in the welding process,
21  how are you certain that all that takes place in every weld,
22  in every Strong Built tree stand?
23  A.  I had supervisors over crews.
24  Q.  Okay.  And what are the supervisors names?
25  A.  Ah, well, this goes back ah, one's Greg Lee.

Page 25

1   Q.  Where is Greg Lee now, do you know?
2   A.  He's still in Waterproof.
3   Q.  Even though you don't currently do the welding in
4   Waterproof any longer because it's manufactured  - it's done
5   in China now, correct?
6   A.  That's right.
7   Q.  All right.  But Greg Lee is still in Waterproof?
8   A.  Well, I think he works off-shore.
9   Q.  Okay.  What other welding supervisors can you name me?
10      MR. LEE:
11          What time frame are we talking about?
12      MR. HASSINGER:
13          Right now we're talking about when this Strong
14      Built tree stands were manufactured state side.
15      So, late 90's.
16      MR. LEE:
17          Well, when you state side, you mean the United
18      States.
19      MR. HASSINGER:
20          That's correct.
21      MR. LEE:
22          He's described there was some fabrication done
23      here, then later in Alabama.  And I'm  - and I'm -
24      I guess the question I'm asking you is, when you're
25      asking about supervisors, are you talking about

One Penn Plaza, NYC
email@tobyfeldman.com

Toby Feldman, Inc.
NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS

tel (212) 244.3990
tel (800) 246.4950

Page 26

1    supervisors here in Louisiana versus Alabama or,
2    what are you talking about?
3        MR. HASSINGER:
4            I wanna know every weld supervisor that Mr.
5        Killen knows during the time frame where tree
6        stands were being manufactured in Alabama and
7        Louisiana.
8        MR. LEE:
9            All right.
10   A.   Okay, Greg Lee wasn't in welding department.
11   Q.   He was just a - he wasn't in welding but he supervised
12   the welding?
13   A.   No. No. I didn't understand the question if you were
14   asking about welding supervisors.
15   Q.   Okay. I'd like to - I'd like to know from you who the
16   welding supervisors were?
17   A.   The one I had in Waterproof was Dale Goodwin.
18   Q.   How long did you use Dale Goodwin?
19   A.   Probably ten or twelve years maybe.
20   Q.   Is Dale Goodwin a certified welder?
21   A.   I don't know that. He wasn't then.
22   Q.   So the welding supervisor that you used, to your
23   knowledge, was not a certified welder?
24   A.   I don't believe.
25   Q.   What made you think he was qualified to be a welding

Page 27

1    supervisor if he wasn't a certified welder?
2    A.   Oh, he had done a lot of welding. He had done a lot of
3    welding, practical use. There weren't requirements that
4    anybody be certified.
5        MR. HASSINGER:
6            Back when - essentially there is some dispute
7        as to, in this litigation, as to what year the tree
8        stand was manufactured, when the tree stand was
9        bought. And so, to clarify, I'm really asking -
10       I'm really going to be asking two sets of
11       questions. One, questions regarding the
12       manufacture design and testing of your tree stands
13       up until you outsourced to China. And then the
14       manufacture, design and testing of your tree stands
15       since you moved your operation to China. Okay?
16       MR. KILLEN:
17           Okay.
18   Q.   To try and keep things in a more chronological order,
19   tell me - tell me how you tested the safety of the tree
20   stands when your operation was still here in Louisiana and
21   Alabama and state side?
22       MR. LEE:
23           Objection to the form. Go ahead and - you can
24       answer.
25   A.   Well, the testing - I mean, going way back in the

Page 28

1    early years was all practical testing. It was done at the
2    shop or done on the farm or done in the woods, you know,
3    with family and friends, as far as the usage. And then we
4    had some testing done at some testing labs.
5    Q.   And what testing labs did you use?
6    A.   We had a lot of product tested, so I'm not gon' swear
7    that this or that. I'm almost positive that that particular
8    model was tested at probably three or four different labs.
9    Q.   Can you name me any?
10   A.   One was Quality Assurance, I think. One was Consumer
11   Products Testing. And I don't know if they Inc. or LLC's
12   or what they were. One was Scientific Testing Lab. And one
13   was I think it was Mac Tech. And then the company changed
14   their name to Law or vice versa. Maybe it was Law and
15   changed to Mac Tech. I don't - but I know all those were
16   used.
17   Q.   What, did Strong Built have a policy concerning the
18   retention of records concerning the safety of the tree
19   stands?
20   A.   Repeat that.
21       MR. LEE:
22           Objection to the form.
23   Q.   Did Strong Built have a policy concerning the retention
24   of records concerning the testing of their tree stands?
25   A.   No.

Page 29

1    Q.   Do you have records from Quality Assurance or Consumer
2    Products Testing or Scientific Testing Labs, any of these
3    - any of these independent testing companies?
4    A.   I thought that had been provided.
5        MR. LEE:
6            We did. We responded to - well, this may been
7        when Rusty was dealing with, but we in response to
8        Request for Production we sent him some of the
9        reports that we had.
10       MR. HASSINGER:
11           Okay.
12       MR. LEE:
13           And I know Mac Tech is one of em. I know
14       Scientific Testing Lab is one. I know there was
15       one for K-Mart. That may be Quality Assurance.
16       I'm not sure.
17       MR. HASSINGER:
18           Okay.
19       MR. LEE:
20           So we produced those reports that we had.
21       MR. HASSINGER:
22           Fair enough.
23   Q.   Can you tell me
24       MR. LEE:
25           And I've got em here today, too.

8 (Pages 26 to 29)

Page 30

1  Q.  Can you tell me how many separate tests were made of
2  the weld that connects the brace to the ladder?
3  A.  How many - wait repeat it?
4  Q.  How many separate tests were made of the weld
5  connecting the brace to the ladder?
6      MR. LEE:
7          Objection to the form.
8  A.  I don't know. At the lab, I don't know. The weld is
9  - the weld didn't break. The weld is still on the
10 material. The weld is still on the clip. Now if we gon'
11 spend a lot of time here on welding, and the weld didn't
12 break.
13 Q.  I'm interested to hear more about that from you. What
14 did break?
15 A.  It looks like the metal tore.
16 Q.  So you don't think it had - you don't - tell you
17 what, we'll get to that at the end of this, all right.
18 A.  Okay.
19 Q.  All right. Did the design - did the designs of your
20 tree stands over time change as a result of safety testing?
21     MR. LEE:
22         Objection to the form. Broad.
23 A.  I don't recall changing any design because of failure
24 to any test. But now, I don't - not on this unit
25 especially. Now, we've produced fifty or sixty different

Page 31

1  models. So I'm not gon' sit here and say there's never been
2  one that somebody said,
3          "Well, you ought to try a brace here or there."
4  I'm not gon' say that's never happened. I don't recall any
5  though.
6  Q.  Let's talk some about the outsourcing of Strong Built's
7  manufacturing to China, okay? Tell me again, what year you
8  decided to move your operation to China?
9  A.  2000. On my own positive, 2000.
10 Q.  Okay. And what helped you come to that decision?
11 A.  Several competitors had already moved. And it was just
12 a matter of time that if ah, I mean, you know China wanted
13 to be the labor force of the world, and if you were gon'
14 compete in the arena and the playing field be level ah, and
15 all the companies ended up moving.
16 Q.  What's the relationship between Strong Built
17 headquarters here in Waterproof and the Chinese labor? What
18 I'm asking you is do you have a contract with a Chinese
19 labor workforce?
20 A.  No, I deal with a company. And that company ah,
21 produces - they produce a lot products. Some I know about,
22 some I don't. And ah, and they're in charge, you know.
23 Q.  What's the name of that company?
24 A.  TNI.
25 Q.  All right. Can you give me a ballpark of how many tree

Page 32

1  stands are manufactured per year by TNI?
2  A.  For Strong Built?
3  Q.  Yeah.
4  A.  Well, it varies. It varies annually.
5  Q.  All right, starting with the first year, in about 2000.
6  A.  Well, I can't remember year by year. It varies because
7  of the accounts you have. I mean, if you're catering to,
8  let's just say - let's just say there's ah, ten or twelve
9  major accounts in the United States. Big, big, big
10 accounts. And if you're catering to five of those, it's a
11 lot more business than if you're catering to one or two of
12 those. If you're catering six of em, you know, and that
13 varies from year to year.
14 Q.  The tree stand that made the basis of this litigation,
15 do you know the weight load that it's rated for?
16 A.  Three hundred pounds.
17 Q.  How did - how did - what testing was done to
18 determine the three hundred pound weight limit?
19 A.  Well, then they go to the labs, they have a formula, I
20 believe now that there're TMA standards in place nowadays.
21 I think it's two times. Some of em are tested three times,
22 whatever, three to four times.
23 Q.  And so they test it from two to three to four times.
24 But ultimately, don't they test it until - until the tree
25 stand fails?

Page 33

1  A.  The labs we used in recent years, yes.
2  Q.  Okay. And what's the mechanism with that failure?
3  A.  What is the mechanism?
4  Q.  Of the failure. In other words, once it gets to a
5  certain weight limit, the tree stand buckles or fails. And
6  I'm asking you how that happens.
7      MR. LEE:
8          How do they physically make it fail at a
9  testing lab?
10     MR. HASSINGER:
11         No. What part of the tree stand fails when
12 it's exceeded the weight limit?
13     MR. LEE:
14         Objection. It's overly broad.
15 A.  It would depend on what type of stand it was. Are we
16 talking about this ladder? I'm not sure either way. I'm
17 not sure.
18 Q.  So you're not sure once they test it for a certain
19 weight or magnitude, you know, that's rated for three
20 hundred pounds; so they may test it for six hundred pounds;
21 they may test it for nine hundred pounds; at some point
22 though, there's a failure. The tree stand structurally
23 fails.
24 A.  Well, on, you know, there's a lot of different factors,
25 there's a lot of different tests, and there's a lot of

9 (Pages 30 to 33)

Page 34

1  different ways they do their tests. And some of it now is
2  repetition. Ladder rungs or the weights applied supplied
3  to it, and it's supplied to it, I don't know if it's five
4  thousands times or ten thousand times. And then they can
5  apply weight to it and start to deform it there'll be
6  permanent defamation after the weight's released. I mean,
7  it's gon' bend.
8  Q.  Tell me how the design of your tree stands, like a
9  basic fifteen foot tree stand that's out there is different
10  from the design that you have today?
11  A.  That tree stand that was manufactured in the mid 90's.
12  And the difference today would be ah, some added safety
13  features that were - they came about through the Tree Stand
14  Manufacturers Association.
15  Q.  Okay. And what kind of safety features are present
16  today that weren't when that tree stand was manufactured?
17  A.  Well, there's a safety DVD that comes with every stand.
18  There's a full body restraint harness that comes with every
19  stand. And there's some - some rope that comes with every
20  stand to help attach it to the tree before - before you
21  climb it, which had nothing to do with the failure of this
22  one. None - none of those.
23  Q.  Who's your contact at TNI in China?
24  A.  Ah, Brian Shi. S-H-I.
25  Q.  Do you have an address for him or an address for TNI?

Page 35

1  A.  Well, we correspond by telephone and e-mail. I have
2  all that. I can get all that for you.
3  Q.  Okay. All right. The manufacturing process for the
4  tree stand back in the 90's and the current ones you have
5  now are they - is that a patent to the manufacturing
6  process?
7  A.  No.
8  Q.  Is there a reason for that?
9  A.  No.
10  Q.  Are tree stands regulated by any governmental
11  organization or agency?
12  A.  Not to my knowledge.
13  Q.  You referred to an agency a few minutes ago in your
14  testimony ah, The Tree Stands
15  A.  The Manufacturers Association?
16  Q.  Um-hum.
17  A.  I did.
18  Q.  Are you a member of that association?
19  A.  Yes.
20  Q.  What are the qualifications to become a member of that
21  association, just be a tree stand manufacturer?
22  A.  Ah, well, I don't really know because we've been a part
23  of it for - since the last 90's or whenever it was formed.
24  There were requirements. There were requirements. And
25  there's testing requirements before your product would be

Page 36

1  a certified product.
2  Q.  And your product is certified?
3  A.  Yes.
4  Q.  But as we sit here today, you don't have any documents
5  for product specifications for the tree stand that made the
6  basis of that litigation - for this litigation or the
7  current tree stands that you have?
8  A.  No.
9  Q.  And you don't have any specification - you don't have
10  a weld design, you don't have a weld's specification?
11  A.  No.
12  Q.  Who's responsible for keeping track of reports or
13  injuries or damages caused by alleged defects in Strong
14  Built tree stands?
15  A.  My wife does most of em.
16  Q.  So if I were - so you've obtained your knowledge or
17  reports of injuries and damages caused by alleged defects
18  in Strong Built stands just through your wife?
19  A.  Yes, unless I'm served. Yes, I learn it from her.
20  Q.  All right. Has Strong Built previously been the
21  subject of tree stand failure litigation?
22  A.  It has.
23  Q.  Approximately how many times?
24  A.  Oh, I don't know.
25  Q.  More than ten?

Page 37

1  A.  Yes.
2  Q.  More than twenty?
3  A.  Probably.
4  Q.  In those specific instances, tell me a little - tell
5  me a little bit about that litigation as far as what - what
6  was the basis of it.
7       MR. LEE:
8           I object. That's overly broad. I mean, lots
9       of different types of accidents that can involve
10      tree stands that have nothing whatsoever to do with
11      what we're talking about in this case. If you want
12      to ask him in general some of the types of
13      litigation he's been involved in, I'll be happy to
14      do it. But, you know, you know somebody may be -
15      just as an example, somebody may be sitting in a
16      stand and just fall out. Ah, and his company be
17      sued.
18  Q.  Has Strong Built been the basis of any, of any product
19  liability litigation before?
20  A.  Product liability litigation?
21  Q.  Yes, sir. In other words, has it been alleged that a
22  Strong Built product has failed resulting in injury to a
23  plaintiff?
24  A.  Yes. I mean, and when somebody gets hurt, it's always
25  somebody's fault. Or, it appears, you know.

10 (Pages 34 to 37)

One Penn Plaza, NYC                     Toby Feldman, Inc.                      tel (212) 244.3990
email@tobyfeldman.com       NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS        tel (800) 246.4950

Page 38

1        MR. LEE:
2            Let's talk
3    A.  They gon' make it - it's not gon' be their fault.
4    Q.  Um-hum.
5    A.  If they gon' bring litigation about, they're assuming
6    it's somebody else's fault.
7    Q.  Oh, I mean, I, you know, I won't get into - I don't
8    want to get into any discourse with you. You're, you know,
9    you're somewhat right. Sometimes it is, you know,
10   somebody's fault. Sometimes it isn't. I'd like to know,
11   Mr. Killen, I'd like to know first, talk to me about why
12   you're certain that that tree stand was manufactured in
13   Alabama, Louisiana or before you outsourced your labor to
14   China?
15   A.  Well, I know it wasn't produced in Alabama because of
16   a dye. A dye that was produced to make a bend. And I know
17   it wasn't produced in China because of the paint. So that
18   takes it back, which we hadn't even gotten into how long I
19   produced in Alabama. But that takes it back probably before
20   96. So it could be in that range, 93 to 96, without a
21   doubt.
22   Q.  Why was there a different - why was there a different
23   dye used in Louisiana and Alabama?
24   A.  Well, if you gon' make a dye, and a dye is a piece of
25   equipment that's harder than the steel you're working on.

Page 39

1    It's got to be hard enough to punch a hole, make a cut, make
2    a bend, whatever, thousands of thousands of time and not
3    wear out. So our dyes were built in-house. And ah, out of
4    material that we had. And if you would take one part to ten
5    different dye makers and ask them,
6            "Produce me a dye that would be a eighty degree
7            bend on a piece of one-inch steel, half-inch
8            steel",
9    whatever your specs were, there wouldn't be any of  em
10   identical, because you got a dye maker that's gon' make it
11   like he thinks it ought to be made to do the job.
12   Q.  What about the paint?
13   A.  The paint that we use?
14       MR. HASSINGER:
15           Strike - strike that.
16   Q.  Talk to me about the difference in paint between your
17   states operation and your outsourcing off-shore labor?
18   A.  The paint that we use in the states was a fast dry
19   aerosol, fast air dry enamel.
20   Q.  Why did you use that - why did you use that paint here
21   in the states?
22   A.  It was - we dipped. It was dipped, dipped in a tank
23   full of paint. It had a trolley system. It didn't in the
24   early days. But anyway, they completed submerged, came up,
25   dripped, went through an oven, and was air dry. Now

Page 40

1    everything in China is ah, powder-coat paint which is
2    electrostatic process that the parts are charged with a
3    magnetic - and the paint's charged and the paint goes on
4    as a powder and then goes through the oven and is baked.
5    Totally different process.
6    Q.  And that's the basic of your assertion that that tree
7    stand was made in the state rather than China because you
8    can tell the difference in paint?
9    A.  Absolutely not. No, that's not correct.
10   Q.  Well, I mean
11   A.  That is one of the things.
12   Q.  Okay.
13   A.  That is one of the things.
14   Q.  Tell me more.
15   A.  The other is the dye.
16   Q.  Have you ever been to the location in China where the
17   tree stands for Strong Built is currently manufactured?
18   A.  Yes, sir.
19   Q.  About how many times?
20   A.  Four or five.
21   Q.  What kind of quality control measures do they have
22   their regarding the manufacture of Strong Built tree stands?
23   A.  They have our - they have our QA manual there. That's
24   where our Quality Control manual is.
25   Q.  So in other words, the same standards that would apply

Page 41

1    A.  State side.
2    Q.  would apply in China?
3    A.  Correct.
4        MR. LEE:
5            We been going a little bit over an hour.
6        Whenever you get to a good stopping point, I don't
7        want to disrupt your train of thought, but whenever
8        we get to a good stopping point, let's take a
9        break.
10       MR. HASSINGER:
11           That's fine with me. Let's ah, let's take
12       about a ten minute break. Is that okay with
13       everybody.
14       MR. KIDD:
15           Okay, we're off record. And the time is 11:08.
16       a.m.
17   OFF RECORD
18   ON RECORD
19       MR. KIDD:
20           Stand by. Court Reporter, are you ready?
21       COURT REPORTER:
22           Ready.
23       MR. KIDD:
24           All right, camera is restarting. This is tape
25       number 2. The time is 11:23. And this is video

11 (Pages 38 to 41)

Page 42

1    deposition continuation of Mr. Ken Killen.
2         Attorney you may began.
3    Q.   Mr. Killen, concerning the tree stand that made the
4    subject of this litigation, you've explained a little bit
5    of how y'all came about in the fabrication shop to design
6    it. Were any alternative designs at that time considered,
7    to your recollection?
8    A.   Well, I'm gon' say yes, because there were different
9    models. There were several different models that were the
10   same height that used some of the same components. So I'm
11   not gon' say alterations, but there were different
12   variations of it. I don't know if that's the question
13   Q.   If you could go back and redesign that tree stand, what
14   would you have done if anything to have made it safer for
15   the hunter?
16        MR. LEE:
17        Objection.
18   A.   I can't think of anything. Other than, you know, what
19   - what we've all decided there with the TMA on the straps
20   for ah, direction of it and enclosing that full body
21   harness, you know, and enclosing the safety DVD. Those are
22   all positive, I mean, safe - safe for the hunter, you know.
23   Q.   Are you a hunter, Mr. Killen?
24   A.   I am.
25   Q.   Because there's a strong chance that many people on a

Page 43

1    jury would not be hunters. Would you mind telling me what
2    you consider to be appropriate safety behavior for a hunter
3    assembling and hunting out of a tree stand?
4    A.   Well, I can't from memory tell you everything that are
5    in the instructions that accompany these stands. But it's
6    all in there. I mean, there's safe practices. You know,
7    handling firearms or handling sharp objects or ah, doing it
8    inebriated, or, I mean, you know, the majority of it is
9    common sense, even though, you know, it's warned over and
10   over and over.
11   Q.   Do you think that knowing what you know and examining
12   the tree stand and having read the depositions that our
13   client contributed to his injury in this case?
14   A.   Absolutely! And you gon' be astonished when you see
15   it, how your firm's been hosed down on this deal.
16   Q.   Tell me, Mr. Killen, how you believe the accident
17   occurred?
18   A.   You wanna look at the stand or look at the photographs
19   or?
20   Q.   Just try and explain it to me. I've got the
21   photographs. And if you'd like illustrate, that's fine
22   also.
23   A.   Well, the first thing is, and I don't remember who's
24   depo it was, and I'm not saying he didn't buy the stands at
25   Wal Mart. But he didn't buy this stand at Wal Mart. And

Page 44

1    I doubt he bought any Strong Built at Wal Mart in 04. Then
2    the stand's been modified.
3    Q.   Tell me how the stand's been modified.
4    A.   The stand's been modified with an eye bolt, some of the
5    bolts that probably came with this unit are in the wrong
6    places. And then somebody has added ah, a gun rest, he
7    called it. I don't remember if his name was David or Larry
8    or Peanut or, I don't remember which one. The ah, the owner
9    of the stand ah, denied anybody had ever welded on anything.
10   And, you know, it's obvious what went on there. But the
11   main thing here, and it looks like it's still attached, and
12   this is y'all's photograph, that they had a rope or a rachet
13   strap that's in yellow, that appears to be still attached
14   to this stand. Now this was to keep this stand from going
15   out away from the tree, not into the tree, because they
16   never used the brace. It's impossible for them to have used
17   this brace. This brace was broken off of this stand prior
18   to when he so-called put it up here two weeks before - I
19   don't remember every word of his deposition. But he said
20   he put it on this Pine tree in November, and he hadn't used
21   it. And it sat there two weeks. It never was on there.
22   Q.   You're saying
23   A.   He testified to he put the brace on, he got in his
24   climbing stand and he climbed up there and he attached the
25   rachet strap. Well, how would he get in his climbing stand

Page 45

1    after he had already put that brace on? The brace would be
2    in your way. That never happened. But I can prove to you
3    that they never used that brace, ever. He said he used the
4    stand ah, the stand had been in three or four locations.
5    There's photographs that I know the stand has - the stand's
6    a decade old or fifteen years old. It's been on numerous
7    locations. I can show you the marks. I can show you
8    everything. But the platform, it was assembled incorrectly.
9    The labeling, the warning labels, the platform is assembled
10   - I don't suppose to wanna see all those, do you,
11   photographs? Now those were y'all's photographs.
12   Q.   What I'm interested in
13   A.   And I've got some photographs.
14   Q.   What I'm interested in is your contention that the
15   brace was never used.
16   A.   Okay.
17   Q.   You're saying that there's never a brace used to
18   connect the tree to the ladder itself, at all?
19   A.   At this stand location, when this accident happened, or
20   you talking about, ever, over the fifteen years or so that
21   they've had this?
22   Q.   I'm talking about this stand at this location.
23   A.   They never used it. And I know you're wondering how
24   can I sit here two states over and tell you they never used
25   that.

12 (Pages 42 to 45)

One Penn Plaza, NYC
email@tobyfeldman.com

Toby Feldman, Inc.
NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS

tel (212) 244.3990
tel (800) 246.4950

Page 46

1    Q.   That is what I'm wondering.  And I bet you have a good
2    answer for it.
3    A.   Okay.
4         MR. KILLEN:
5             You wanna look.  I can bring the part in here
6         or we can look out there, or I don't know how you
7         wanna do it with Court Reporter and Videographer.
8         MR. HASSINGER:
9             David, what do you think the easiest way to do
10        that is?
11        MR. KILLEN:
12            I can do it by photographs but it's still gon'
13        be tough for you.
14        MR. LEE:
15            You can probably ask him a million questions.
16        And I can probably get right down to it if you
17        want me to ask him a few questions.
18        MR. HASSINGER:
19            Why don't you do that.
20        MR. KILLEN:
21            What about my photographs?
22        MR. LEE:
23            We're gonna use those, too.  And also we got
24        some on tape here.  But let's just go through it
25        this way.  Just a minute, Ken, let me show you

Page 47

1             what I'm gonna mark as exhibit number 1.
2    EXAMINATION BY MR. LEE:
3    Q.   And I represent to you, this is a photograph what as
4    given to us by the plaintiffs that shows the subject tree
5    stand, you know, as it was immediately after the accident.
6    Do you see this photograph here?
7    A.   Yes, sir.  It's not marked.
8    Q.   I've marked it.  You can't see it.  It's exhibit number
9    1,
10   A.   Okay, I'm sorry.
11   Q.   All right.  All right, this is a photograph that was
12   taken by some family member or a friend of the plaintiff
13   A.   DeWitt.  DeRod or DeWitter.
14   Q.   After the accident, without any changes being made to
15   the stand immediately after the accident, that's what has
16   been given to us and represented to us.  First thing I wanna
17   do is ask you about, about the stand.  This stand ah,
18   appears to have caved in or collapsed in towards the tree.
19   Is that correct?
20   A.   Yes, sir.
21   Q.   Okay.  Now, at the top, what do you, what do you
22   describe this thing at the top of this stand, what do you
23   call that?
24   A.   There's a foot platform and a seat platform.
25   Q.   Okay.

Page 48

1    A.   It's the top of the stand.
2    Q.   Okay.  Now at the very top, there has been something
3    that has been added to this stand, is that correct?
4    A.   That's correct.
5    Q.   Okay.  And tell us what that is?
6    A.   Well, it's a arm rest/gun rest.  You know, something to
7    rest your rifle on to shoot off of.  But it wasn't  - it
8    wasn't produced by Strong Built.  And in his deposition, I
9    don't  - I think it was David ah, he said nobody  - no one
10   had ever welded on any that he couldn't weld, and this and
11   that.  That was welded with a welding rod.  That was not
12   welded with a wire welding machine that we use.  Ah, it
13   burned the paint off of it.  It burned the paint off where
14   it was welded.
15   Q.   Okay.  There's  - the very top of this there's some
16   additional rails that have been added, there's some
17   additional welding that's been added that was not done by
18   Strong Built, is that correct?
19   A.   That's correct.
20   Q.   Okay.  You can also see a different color paint.
21   Whatever they added to this particular stand has been
22   painted, is that correct?
23   A.   Painted green.
24   Q.   And it's a different color green than the paint that
25   was used

Page 49

1    A.   That's correct.
2    Q.   at Strong Built, correct?
3    A.   Right.
4    Q.   And there're welds on this particular addition that
5    were not done by Strong Built, is that correct?
6    A.   That's correct.
7    Q.   And these welds also show cracks in them, is that
8    correct?
9    A.   Yes.
10   Q.   And you can tell that the welding was done ah, after
11   A.   It was done with a welding rod after assembly.
12   Q.   After assembly.
13   A.   Reason being after assembly is because it's welded on
14   the front to one piece that's bolted onto the platform
15   that's another piece.  It would've been impossible to
16   assemble it.
17   Q.   Okay.
18   A.   As well as the two different pieces.
19   Q.   And you also see evidence of burning of the paint where
20   they welded it, is that --
21   A.   Correct.
22   Q.   is that correct?
23   A.   Now there's more to the top.
24   Q.   All right, go ahead.  Tell us about that.
25   A.   The platform is on backwards.  Where  - when he's

13 (Pages 46 to 49)

One Penn Plaza, NYC
email@tobyfeldman.com

Toby Feldman, Inc.
NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS

tel (212) 244.3990
tel (800) 246.4950

Page 50

1  climbing up this platform, when he's - I'm sorry - when
2  he's climbing up his ladder and he's fixing to get into his
3  stand, he's got the platform four to six inches out where
4  he's got to lean out, get all his body weight out.
5  Q.   And that is depicted in exhibit number 2?
6  A.   That does.  This is the back and that's the front.  The
7  front's got the - still got the decals weight limits on it
8  where when you climbed up, you know, you were looking at it.
9  Now, to accept the ladder, the diagonal braces are in the
10 wrong place.  They put the diagonal braces in between the
11 support arm and the platform,   And there were quarter-inch
12 steel braces on each side which made this thing ah, half-
13 inch too wide.  So they went to put a twenty-inch ladder,
14 you know, in a twenty and a half-inch hole, they had to bend
15 this piece, which is still bent.  They had to get that extra
16 half an inch, which I got photographs of all that, because
17 it was assembled wrong.
18 Q.   This - this stand-in platform that we're talking about
19 is depicting
20 A.   The foot platform
21 Q.   Yeah, the foot platform that we have marked as exhibit
22 number 6, you're saying that that is mounted backwards,
23 correct?
24 A.   From front to back.  Not upside down.  It's right as
25 far as up and down.  But from front to back or forward to

Page 51

1  back, whatever.
2  Q.   And the way they have got this mounted, you have to
3  literally step and over into the stand, is that correct?
4  A.   Well, I mean, you have to get your body weight out
5  farther from the tree than you would if it was turned around
6  correct.  Plus, the way they've got it, it's a little gap
7  or hole there for your heel.  You know, there's nothing
8  there.
9  Q.   Exactly.  Now this thing is, the top part, that's a
10 substantial modification to what you designed, is that
11 correct, where the, the part where they have welded onto the
12 top of this platform?
13 A.   Yeah, we produce a shooting rest for that stand.
14 Q.   But that's something that just literally slides into
15 the two holes up top, is that correct?
16 A.   That's correct.
17 Q.   Okay.  This has actually been welded to the platform,
18 is that true?
19 A.   That's true.
20 Q.   Okay.  Is there any way in the world - first of all,
21 your company did not do that additional, do that welding,
22 A.   No.
23 Q.   is that correct?
24 A.   No.  It wouldn't even fit in the box.
25 Q.   That was gon' be my next question.  Anyway this, this

Page 52

1  stand could have fit new in the box with that type of
2  modification?
3  A.   No way.  Impossible.
4  Q.   So any suggestion that this stand has not been
5  modified, that additional rails have not been added
6  A.   Oh, that was suggested.
7       MR. LEE:
8          No, listen - you listen to my question and
9       give me an answer to my question.
10      MR. KILLEN:
11         Okay.
12 Q.   Any suggestion that additional rails have not been
13 added, additional welding has not been done to this stand
14 ah, is not correct?
15 A.   That's true.
16 Q.   Okay.  Now, going back to the way that this stand has
17 caved into the tree, actually caved in towards the tree, is
18 that correct?
19 A.   Yes, sir.
20 Q.   Okay.  Now, there is a clip that once was attached to
21 the vertical brace, is that correct?
22 A.   That's right.
23 Q.   Okay.  Now that
24 A.   No, horizontal brace.
25 Q.   Horizontal is what I'm, what I should've said.  There's

Page 53

1  a horizontal brace.  And we've got that here today.  But the
2  clip for that horizontal brace is still on the fifth ladder
3  rung, is it not?
4  A.   That's correct.
5  Q.   Okay.  Now on - on the tree side of that clip, on the
6  tree side of that clip, there is a bolt.
7  A.   Yes, sir.
8  Q.   Is that correct?
9  A.   Yes, sir, with a wing nut.
10 Q.   Okay.  The side that broke would be away from the tree,
11 is that correct?
12 A.   That's correct.
13 Q.   On the opposite side of that one.
14 A.   That's right.  Now you couldn't tell which side it was
15 on, except for the fact that it's bent in.  And the top of
16 the ladder is bent.  So that determines which direction that
17 ladder was when that picture was taken.  And that clip is
18 still on that stand.
19 Q.   Exactly.  And that clip on the side that is broken
20 A.   Was facing out in the area that he was hunting.  So he
21 never had it on there.
22 Q.   In other words, it was not --
23 A.   He never had it on there when he put it up.
24 Q.   it was not facing towards the tree?
25 A.   It was not on there, period.  But it was not, the

14 (Pages 50 to 53)

One Penn Plaza, NYC
email@tobyfeldman.com

Toby Feldman, Inc.
NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS

tel (212) 244.3990
tel (800) 246.4950

Page 54

1  broken piece even was not facing toward the tree.
2  Q.  And that's the part I'm talking about, the broken
3  piece.  It's not facing towards the tree?
4  A.  No, sir.
5  Q.  Okay.  It's facing away from the tree?
6  A.  Right.
7  Q.  And we can show that here.  Now the, before we leave
8  that, the - the ah, there's been a lot of discussion about
9  the weld and whether the weld failed.  Is the weld on that
10  particular clip still there?
11  A.  Yes, sir.
12  Q.  Is there any evidence that the weld itself broke?
13  A.  No, sir.
14  Q.  Now, on the ladder rung itself, and you've got some
15  photographs of that.  And we can show it on the stand.  On
16  the ladder rung itself, are there some marks on that ladder
17  rung that would tell, tell you which side of that ah, rung
18  the bolt was?
19  A.  Still there today.  Yes.
20  Q.  Okay.  And on the fifth ladder rung where this clip is
21  located, are there some, some marks where those bolts were
22  located?
23  A.  Well, it's the same bolt every time.  There are some
24  marks on the fifth rung.
25  Q.  I'm talking about - I'm gonna move to the other rungs

Page 55

1  in a minute.
2  A.  Okay.  I think there was as many, I'm not gon' say six,
3  but I'm pretty sure, and we were gon' count  em.  But
4  there's five different positions that that brace has been
5  on, used.
6  Q.  But all of those marks --
7  A.  On the fifth rung.  On the fifth rung only.
8  Q.  and all of those bolt marks are on the same side of the
9  rung, are they not?
10  A.  Yes, sir.
11  Q.  Okay.  They're not on the other side?
12  A.  No, sir.
13  Q.  There're also some marks on the seventh rung, is that
14  correct?
15  A.  There's two that I see on the seventh rung?
16  Q.  Okay.  And they're on the same side that the bolt clip
17  is now, is that correct?
18  A.  That's right.
19  Q.  So that tells you that that clip has been on two
20  different rungs?
21  A.  It has been.
22  Q.  Okay.  Now before the failure, and this is an important
23  point, before, before that horizontal brace came off, you
24  could flip ladder section around and still
25  have the clip as it is now, is that true?

Page 56

1  A.  Now repeat that.
2  Q.  Before you had a a, a inward bend, before you had this
3  accident, that ladder section could go, could be - well,
4  it can only go up.  I mean, there's a - there's a top, the
5  top section is crimped, is that correct?
6  A.  It's swaged or crimped, yes.
7  Q.  Okay.  But before there was a failure it didn't matter
8  which side the ladder section was facing, is that correct?
9  A.  That's right.
10  Q.  Okay.  But once there was a failure, once there was a
11  bending of that crimped area, we can see exactly where that
12  bending took place, can we not?
13  A.  Exactly.
14  Q.  It bends in.
15  A.  It bends in just like the photograph shows.
16  Q.  And the severed clip is bending out away from the tree?
17  A.  It's pointing out away from the tree.
18  Q.  Pointing out away from the tree.  Now you got some
19  photographs.
20  A.  I do.
21  Q.  Let's look at some of these pictures.
22  A.  On each one I could tell the story on.
23  Q.  All right, well, let's
24  A.  I don't know how you wanna ask it.
25  Q.  All right.

Page 57

1       MR. LEE:
2            Since we've been talking about welding and
3       additions, I wanna mark this as an exhibit.
4  Q.  Look at this photograph here, Ken, and tell me what
5  that - is that a picture that you took?
6  A.  It is.
7  Q.  Okay.  And what does that picture show?
8  A.  Well, the picture doesn't really show the different
9  colors, but you can tell they're different color.  It shows
10  where this addition was added onto the stand.  This
11  particular photograph doesn't show that it was welded with
12  a rod instead of a wire welder, but it shows where the ah,
13  original paint was burned back, you know, when this was
14  added on.
15  Q.  Well, you can definitely see a different color between
16  that paint and that paint, can't you?
17  A.  Well, I'm not that great with colors.  I can.  I mean,
18  I've looked at the, the ah, I've looked at the stand.
19  Q.  Okay.  The weld is depicted in exhibit number 3.  Did
20  your company do that welding?
21  A.  No, sir.
22  Q.  Okay.  This was something that was done afterwards?
23  A.  Correct.
24  Q.  And this
25  A.  Testified to under oath that it wasn't though.

Page 58

1    MR. LEE:
2        Just answer the question I'm asking.
3    MR. KILLEN:
4        Okay.
5    Q.  And the question I'm asking is, did your company do
6    this work
7    A.  No, sir.
8    Q.  or add that addition?
9    A.  No, sir.
10   Q.  And you can see that there's some, I don't know how you
11   describe that, but that burning is reflective of welding
12   that was done after this was painted, is that correct?
13   A.  Yes, sir.
14   Q.  Okay.
15       MR. LEE:
16           All right, what are we on now, four?  Yeah.
17   Q.  Exhibit number 4, tell us what that is?
18   A.  This is the seventh rung.  This is the seventh rung
19   from the ground, established by the one that was on the
20   ground with the mud in the end of it.  This is the mid
21   section, seventh rung.  There're two marks, there're two
22   different marks where this unit had been up for a long time
23   for one bolt to rub marks on it.  So it was either hauled
24   on the back of a truck without taking the brace off or it
25   was put on a small tree that the wind blew.  For some reason

Page 59

1    this thing has rubbed two marks on the seventh rung.
2    Q.  And those are bolt marks?
3    A.  Those are bolt marks from the clip that's broken.
4    Q.  Okay.  Exhibit number 5.
5    A.  Exhibit number 5, shows two things.  Shows platforms -
6    three things.  It shows the platforms mounted backwards.
7    It shows this diagonal quarter-inch brace on the inside of
8    the support arm, which added width to the platform.
9    Quarter-inch material was used.  Quarter-inch on the other
10   side.  That added a half an inch.  As you can see from the
11   photograph, this is bent.  They had to bend that to get the
12   ladder to accept it.
13   Q.  All right.  That was a modification to your original
14   product, is that correct?
15   A.  Well, it wasn't - it wasn't put together as ah, Matt
16   read the instructions to.
17   Q.  It wasn't assembled correctly?
18   A.  It wasn't assembled correctly.  And then instead of
19   taking it back apart, they just bent it.
20   Q.  Exhibit number 6.
21   A.  Exhibit number 6 shows something that you got to have
22   another photograph to show.  And I tried to copy plaintiff
23   photograph, and my copy didn't come out.  So we need to look
24   at their original, which shows right after the accident
25   Q.  Let's mark the one we're talking about.  This is gonna

Page 60

1    be exhibit number 7.  You're gonna read - you're gonna be
2    looking at exhibit 6 and 7 together, is that correct?
3    A.  That's correct.
4    Q.  All right.  Now for the record, exhibit number 7 is a
5    photograph that was produced ah, by the plaintiff
6    immediately after the accident?
7    A.  Right.  Ah, and, and the accident happened, I think,
8    best that I recall, in  06.  So ah, immediately after the
9    accident, here's a photograph of the broken clip.  It's
10   covered with rust.  It's covered with rust.  In exhibit ah,
11   7.  I'm sorry.  It maybe a 7.
12   Q.  This one is exhibit number 7.
13   A.  Okay, number 7 shows the clip that's covered with rust.
14   The weld's still on it.  Not the best photograph in the
15   world, but the metal's tore.  Okay, it's covered with rust,
16   taken right after the accident.  Okay, exhibit number 6, I
17   took the photograph yesterday.  This is over what, a year
18   and a month, thirteen months later, where the ladder bent
19   the same time supposedly that this clip broke that caused
20   the accident.  And it's still shiny metal today.  It hadn't
21   rusted.  Now they're both out in the weather.  They're both
22   there together.  They both were photographed by DeWitt.  And
23   one piece is rusted and one piece is not.
24   Q.  All right.  And the point is, even the area that was
25   fractured --

Page 61

1    A.  That happened prior.
2    Q.  the area that's fractured shows rust, correct?
3    A.  Covered with rust.
4    Q.  And you wouldn't expect to see that within a week or
5    two of
6    A.  Even - even if I did - even if it was salt water I
7    would expect to see it on both pieces.
8    Q.  All right.
9    Q.  Exhibit number
10       MR. LEE:
11           What number are we on now?
12       COURT REPORTER:
13           Eight.
14   Q.  Eight.
15   A.  Exhibit 8 is just another picture of the platform
16   mounted backwards.
17   Q.  Okay.  And exhibit number 9.
18   A.  With the braces on the inside.
19   Q.  And exhibit number 9.
20   A.  Exhibit number 9 needs to be shown with this photograph
21   that isn't marked.
22       MR. LEE:
23           Well, hold up, we'll mark it.
24       MR. KILLEN:
25           Okay.

One Penn Plaza, NYC
email@tobyfeldman.com
Toby Feldman, Inc.
NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS
tel (212) 244.3990
tel (800) 246.4950

Page 62

1    MR. LEE:
2        This'll be exhibit number 10.
3    A.  Now this didn't cause the accident or anything.  It
4    just improper assembly, that that bolt is too short, not
5    even capturing the nylon in the lock nut, because that bolt
6    went where exhibit number 9.  And this bolt went there.  I
7    mean, when that was seen, when that was tightened up,
8    whoever put it together, Matt, David or Larry, that was
9    obvious.  I mean, that was obvious,
10       "Hey, we need to take that off.  Here's one
11       that's too long.  Let's put it there."
12   Q.  Okay.
13   MR. LEE:
14       Let's look at this, some of this film that we
15       got here.  I want you to narrate this if you will.
16       Let me get you to zoom in on this, okay.
17   MR. KIDD:
18       Okay.  Ken, will you move to the left just a
19       little bit.  Thank you, sir.  All right, I'm on
20       your screen.
21   Q.  Now what do we see in here, Ken, this video here?
22   A.  You see two units.  Got the foot platform.  You got the
23   seat platform.  One, they were both produced during the same
24   time frame.  They both had ah, produced in the states and
25   they were ah, painted with enamel.  One is plaintiff's stand

Page 63

1    that he's made the modification to.
2    Q.  All right, let me stop - stop the video there.  The
3    one closest to us in the video that has the black stuff, you
4    know, wrapped around the top, is that - is that the stand
5    that's the subject of this lawsuit?
6    A.  Yes, sir.
7    Q.  And the one on the other side of that is one that's
8    substantially similar to it that was made in the United -
9    made in the United States, is that correct?
10   A.  That's correct.
11   Q.  Okay.  And this, the one with the tape around it shows
12   the modifications that were done ah, by someone after this
13   stand was manufactured, is that correct?
14   A.  That's correct.
15   Q.  And it's welded on top?
16   A.  It's welded onto the unit, yes.
17   Q.  Okay.  Which would render it physically impossible to
18   place into a box, is that correct?  The box that y'all ship?
19   A.  The box that we ship, impossible.
20   Q.  Okay.  Would  - not fit?
21   A.  No, sir.
22   Q.  Okay.
23   A.  It's actually on two different pieces of material.
24   Well, this is the top.  This is the seat platform.  The "V"
25   back there is what connects the tree.  That eye bolt in it,

Page 64

1    that was a modification by someone.  This is a support arm.
2    This support arm is a different piece.  It's bolted right
3    here with this bolt.  This addition was welded on seat
4    platform and then welded to this - that's two different
5    pieces.
6    Q.  All right.
7    A.  I mean, the bolts you couldn't really unbolt this thing
8    now.  If it - if it had come from the factory, you know,
9    it would've been onto the same piece.  But we make a unit
10   similar that stabs into these open holes here.
11   Q.  Okay.  We'll see that in just a second.  Do you see the
12   different paint colors there?
13   A.  I do.
14   Q.  Is that a different paint than that right there?
15   A.  That's a different color, yes, sir.
16   Q.  Okay.  And this thing right here is what we're talking
17   that was added, is that correct?
18   A.  Right.
19   Q.  And this is welded, correct?
20   A.  Right.
21   Q.  And this what we see right here shows the burning of
22   your paint from the  - from the welding that was done ah,
23   after this product was manufactured and sold, is that
24   correct?
25   A.  That's right.

Page 65

1    Q.  Tell us what we've got there.
2    A.  That's a safety bar and shooting rest.
3    Q.  Is that something that y'all manufactured?
4    A.  Yes, sir.
5    Q.  Rather than weld something on, that's what y'all - you
6    just - that just fits into those holes in the back, is that
7    correct?
8    A.  Well, and it goes into the box.  Right.  Holes in the
9    top.  You can pause it -- I mean, you saw the instructions,
10   I mean, the warning labels on the front of that one.
11   Q.  And what are we showing here?
12   A.  Their addition, their welding, where the burned paint
13   is.  You can see some of their green color got down here.
14   But that's where the paint burned when they welded that on.
15   That was done with a welding rod, too.
16   Q.  All right, this is with the stand mounted up against
17   the tree, is that correct?
18   A.  Right.
19   Q.  Right in here does it also show this inward, the
20   relation towards the tree?
21   A.  It shows the bend.  It's still in the  - in the middle
22   section.
23   Q.  And that's - and that's consistent with the photograph
24   that shows the inward deflection that were produced by the
25   plaintiff in their photograph, is that correct?

One Penn Plaza, NYC
email@tobyfeldman.com

Toby Feldman, Inc.
NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS

tel (212) 244.3990
tel (800) 246.4950

Page 66

1  A.  That's correct.
2  Q.  This also shows this mounted backwards.  This - this
3  right here, this section should be placed on the other side,
4  is that true?
5  A.  That's right.  You can see a hole right here where your
6  heel, where you could, you know, you could possibly step
7  through with it mounted like that.
8  Q.  Same position of the ladder just a different angle of
9  the video, is that correct?
10  A.  Yes, sir.
11      MR. LEE:
12          Getting all this on tape?
13  Q.  Is that the clip right there?
14  A.  That is the clip.
15  Q.  If you count rungs, that's on the fifth - fifth rung,
16  is that correct?
17  A.  Yes, sir.
18  Q.  Again, this shows it being mounted backward, is that
19  correct?
20  A.  Right.
21  Q.  And this also shows this inward deflection.
22  A.  Right.
23  Q.  Or is that the clip there?
24  A.  That is the clip.
25  Q.  And it shows in that video that the broken part of the

Page 67

1  clip is facing?
2  A.  Away from the tree.
3  Q.  Away from the tree, not towards the tree, is that
4  correct?
5  A.  It was never used during this so-called accident.
6  Q.  Also shows rust.
7  A.  Covered with rust.  But that the ladder that's bent
8  doesn't have any rust on it.  It all happened at the same
9  time supposedly.
10  Q.  Now this, this shows the bolt size.
11  A.  Stop it there and I'll ah - now all this rolling of
12  this metal, both sides of the clip are like that.  This rung
13  is covered with marks.  It was right there the whole time,
14  it was back and forth.  But this roll of this metal, that
15  did not happen in one instance.  That happened over years
16  and years, back and forth, back and forth, back and forth.
17  You couldn't take that piece and do all that in one motion.
18  That was from transportation or that was from a decade on
19  a tree that was swaying in the wind.
20  Q.  So that shows the horizontal brace and it shows how it
21  would fit on the broken part of the clip, is that correct?
22  A.  Right.  That metal is torn away.
23  Q.  And it shows how it be pointing away from the tree?
24  A.  Right.  And you can't take it off.  It hadn't been
25  removed.  All the marks are on the backside, the bolt's

Page 68

1  rusted, too.  It's tight as it can be right now.
2  Q.  And you can't even roll that over if you wanted to?
3  A.  You can't roll it around, and whether it was this way
4  today and that way tomorrow.  That never happened.
5  Q.  That's another photograph showing the clip.  Let me
6  pause it right here.  All right, do we see some marks on
7  that rail?
8  A.  Your marks are on the other side of the rail.  You do
9  see some marks on that rail.
10  Q.  That just show you can slide it sideways.
11  A.  But you can't spend it around.
12  Q.  You can't spend it around and rotate it.
13      MR. LEE:
14          All right, that's  hold on , let me stop it
15      right there.
16  Q.  All right.  Tell us about that.
17  A.  Well, this is where - this is where the bolt is still
18  on the unit.  They still on that rung.  This only clip over
19  here on the other side.  That's where it was in three
20  different locations.  Years of wear.  We could go out there
21  and take that bolt and start rubbing on that thing, and by
22  dark we probably wouldn't have a mark in it.  That's from
23  years and years and years.  Okay, there's three.  There it
24  is, this is still all frozen up.  There's four.
25  Q.  Point to them.

Page 69

1  A.  Right here.  Or, we can bring the unit in.  Not real
2  good light there, but  - I thought there was five.  There
3  may be one under the clip.
4  Q.  That shows it's on the fifth rung counting up.  One,
5  two, three, four, five.  Is that correct?
6  A.  That's correct.
7  Q.  Let me stop it right here.  I wanna show you one of the
8  photographs, Mr. Killen, that was produced to us by the
9  plaintiff.  This is exhibit number 1.  Do you see a yellow
10  rachet strap that's still strapped to the tree and still
11  hooked to a rung on the ladder?
12  A.  It's definitely yellow.  I'm assuming it's a rachet
13  strap.  Yeah, I do.
14  Q.  Now is it correct that where this strap is connected to
15  this rung, that it's on the fourth rung and not the fifth
16  rung?
17  A.  That's correct.
18  Q.  Okay.  Starting from the bottom, the end of the yellow
19  rachet strap that is connected to the ladder is on the
20  fourth rung and not on the fifth rung where the broken clip
21  is located, is that correct?
22  A.  That's right.
23  Q.  Okay.  Now if, assuming now, of course family members
24  or friends of the plaintiff took this photograph, assuming
25  that this strap was not moved, then that tells you that the

18 (Pages 66 to 69)

Page 70

1  strap was in no way connected to that ah, horizontal brace?
2       MR. HASSINGER:
3            Object to the form.
4  Q.  It's on two different - two different --
5  A.  Well,
6  Q.  two different rungs?
7  A.  the brace didn't attach like that anyway.  The brace
8  was attached to the tree with the rachet strap.  The end of
9  the brace that has a "V" in it.  So it wouldn't necessarily
10 have to be attached to the ladder at all.
11 Q.  I'm not talking about how it suppose to be
12 A.  Okay.
13 Q.  attached.  I'm talking about how the plaintiffs and
14 their family members testified that it was attached.  And
15 my point by this is, if this yellow strap is on the fourth
16 rung and not the fifth rung, then that was not connected in
17 anyway shape, form or fashion to a horizontal brace?
18 A.  No, that's not correct.  That's not ah, that's not the
19 story that this yellow is telling here.  The yellow strap
20 or a rachet or a rope would only be attached to the tree and
21 the other, the end of the brace that's touching the tree.
22 There's no reason for this to be attached on the fourth or
23 the fifth or sixth or any of  em.  The reason this is
24 attached is so that that ladder would not bow outward.  And
25 it didn't.

Page 71

1  Q.  I understand.
2  A.  And it didn't because it's got it on there.
3  Q.  I understand why it's there.  But you're not hearing my
4  question.
5  A.  Okay, I'm listening.
6  Q.  I want you to assume that there has been testimony
7  A.  Yes, sir.
8  Q.  that you haven't sat through.
9  A.  Okay.
10 Q.  I'm asking you to assume hypothetically that there has
11 been testimony that this yellow strap was connected to the
12 tree, and it also connected to the other end of this
13 horizontal brace.  My point is, this, the position of this
14 yellow strap is on a different rung than the clip is
15 located.
16 A.  Absolutely.
17 Q.  No question about that?
18 A.  No question.
19 Q.  Okay.  And, again this is another photograph, if you
20 start counting rungs, it shows that this on the fifth - the
21 clip is on the fifth rung, is that correct?
22 A.  That's right.
23 Q.  This is another  - this is - this video shows the
24 subject ladder section, you know, taken off and now on the
25 ground.  And it shows where the clip is located.  It also

Page 72

1  shows where these bolt marks are, is that correct?
2  A.  That's right.
3  Q.  And are the bolt marks on the same side as the bolt is
4  now?
5  A.  Yes, sir.
6  Q.  All right, let's stop it right here.  All right, look
7  at this section of video.  Do you still see the weld that's
8  still there?
9  A.  Yes, sir.
10 Q.  Point that out.
11      MR. KILLEN:
12           I wanna take this mic off for just a second.
13 A.  This is - this is the weld right here.  This is part
14 of the tube that's broken.  And then the weld, this is
15 actually part of the tube, the weld's on the bottom side of
16 that.  But you can see how this thing has been rolled and
17 back and forth from years and years to start rolling this
18 metal.  This was a "U" shaped clip.  Ninety degree, open
19 ninety degree, "U" shape.  But this has been rolled from
20 years and years and years.  Ah, you - you can't  - you
21 can't make  - you can't do that in one motion.
22 Q.  And that shows the inward deflection of the bending, is
23 that correct?
24 A.  That's it.
25 Q.  All right.  Based  - based upon your, you know,

Page 73

1  personal inspection of this ladder stand, based upon the
2  inward deflection that we show on that ah, section of
3  ladder; also, based upon the position that the clip is
4  located and based upon your education, training and
5  experience, is it your opinion that the  - that at the time
6  of the accident the horizontal brace was not in place?
7       MR. HASSINGER:
8            Object to the form.
9       MR. LEE:
10           You can answer.
11 A.  It was not even  - it was not there at all.  It's
12 obvious.  It was not there at all.
13 Q.  Okay.  Now, do your instructions say, and do your
14 instructions warn the consumer that the horizontal brace is
15 an integral of the overall safety of this particular part?
16 A.  Yes.
17 Q.  Do your instructions ah, tell the consumer they're not
18 to use this stand without the horizontal brace in place?
19 A.  I think it says
20           "You could be seriously injured or killed."
21 Q.  Okay.  All right, Mr. Killen, as designed and as
22 manufactured ah, this particular stand, do you have a  -
23 have an opinion ah, based upon your education, training and
24 experience, as to whether or not this stand was  - was
25 reasonably safe when you manufactured and sold it?

One Penn Plaza, NYC                    Toby Feldman, Inc.                    tel (212) 244.3990
email@tobyfeldman.com          NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS          tel (800) 246.4950



Page 74

1    MR. HASSINGER:
2         Object to the form.
3    MR. LEE:
4         You can answer.
5    A.  Absolutely!
6    Q.  Now, and we've gone through this, but your testimony is
7    that this stand was not used as intended?'
8    A.  Absolutely!
9    Q.  Okay.  Is it your testimony that this stand has
10   received substantial modifications to it?
11   A.  It has.
12   Q.  Is it your testimony that this stand been abused and
13   misused over time?
14   MR. HASSINGER:
15        Object to the form.
16   MR. LEE:
17        You can answer.
18   A.  It has.
19   Q.  The tearing of this horizontal brace ah, do your
20   instructions tell the consumer, your written instructions,
21   do they tell  - does it tell the  - the ah, consumer that
22   when this stand is to be moved or transported or stored,
23   that this horizontal brace is suppose to be taken off?
24   A.  I believe so.
25   Q.  And if your instructions say that, and if this hor -if

Page 75

1    - if there's testimony that ah, that ah, from family
2    members that this brace was not taken off, that would be a
3    violation of the written instructions, is that correct?
4    A.  Yes, sir, there was testimony that it was welded on.
5    Q.  All right.
6    MR. LEE:
7         We gon' take just a little bit of a break.  I
8    want you to walk in here and who you what we're
9    talking about with the ladder itself.
10   MR. KIDD:
11        Okay, we're off record.  It's 12:15 p.m.
12   OFF RECORD
13   ON RECORD
14   MR. KIDD:
15        Let me know when you're ready, counsel.
16   MR. LEE:
17        I'm ready.
18   MR. KIDD:
19        Stand by.  Camera's restarting.  This is tape
20   number 3, of the video deposition of Ken Killen.
21   It's 12:30 p.m.  You may continue, counsel.
22   MR. LEE:
23        That's all the questions I have for right now.
24   MR. HASSINGER:
25        That's all, that's everything that I have for

Page 76

1    right now, too.
2    MR. KIDD:
3         Ready to go off record?
4    MR. LEE:
5         Yes, sir.
6    MR. KIDD:
7         For the final time we're off record.
8
9
10
11
12        (End of Deposition)
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 77

1         C E R T I F I C A T E
2    STATE OF LOUISIANA
3    PARISH OF MADISON
4
5         I, Mary Alice Fountain, Certified Court Reporter for
6    State of Louisiana, in and for the above named parish and state,
7    do hereby certify as follows:
8         That the deposition of Mr. Kenneth Killen was taken
9    before me at the law office of James E. Paxton, 124 Hancock
10   Street, St. Joseph, Louisiana 71366, on the 29th day of February,
11   2008, recorded on cassette recorder, and by me reduced to
12   typewritten form.
13        That the foregoing is a true and correct transcript of
14   the deposition of said witness to the best of my ability and
15   understanding.
16        I further certify that I am not of counsel, nor related
17   to any of the parties to this cause, not in the employ of any of
18   them; nor do I have any interest in the result of this matter.
19        Tallulah, Louisiana, this 13rd day of March, 2008.
20
21        _____
22        MARY ALICE FOUNTAIN
23        Certified Court Reporter
24
25

One Penn Plaza, NYC                    Toby Feldman, Inc.                    tel (212) 244.3990
email@tobyfeldman.com    NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS    tel (800) 246.4950

Kenneth Killen

2/29/2008

Page 78

```
 1
 2                    ACKNOWLEDGEMENT
 3
 4          I, Kenneth Killen deponent in the foregoing deposition,
 5     do hereby certify that the same was submitted to me for
 6     examination;  that I have read the deposition and find it to be
 7     a true and correct transcription of the testimony as given by
 8     me on February 29, 2008, Tallulah, Louisiana, with the exception
 9     of any corrections listed on the errata sheet.
10
11
12
13
14
15          _____
16                    KENNETH KILLEN
17
18
19
20
21
22
23
24
25
```

One Penn Plaza, NYC                 Toby Feldman, Inc.                  tel (212) 244.3990
email@tobyfeldman.com    NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS    tel (800) 246.4950

## A

**ability** 77:14
**about** 8:10,14 9:3
9:19 14:21,25
15:3,20 16:14
17:4,10 19:3,9
20:17 21:24 22:8
22:24 24:13 25:11
25:13,25,25 26:2
26:14 30:13 31:6
31:21 32:5 33:16
34:13 37:5,11
38:5,11 39:12,16
40:19 41:12 42:5
45:20,22 46:21
47:17,17 49:24
50:18 54:2,8,25
57:2 59:25 68:16
70:11,13 71:17
75:9
**above** 77:6
**above-entitled** 1:15
**absolutely** 5:17
40:9 43:14 71:16
74:5,8
**abused** 74:12
**Academy** 7:25
**accept** 50:9 59:12
**accident** 43:16
45:19 47:5,14,15
56:3 59:24 60:6,7
60:9,16,20 62:3
67:5 73:6
**accidents** 37:9
**accompany** 43:5
**accounts** 7:9,9 32:7
32:9,10
**ACKNOWLED...**
78:2
**action** 2:22
**actual** 12:5
**actually** 10:2,5
51:17 52:17 63:23
72:15
**add** 58:8
**added** 34:12 44:6

48:3,16,17,21
52:5,13 57:10,14
59:8,10 64:17
**addition** 49:4 57:10
58:8 64:3 65:12
**additional** 48:16,17
51:21 52:5,12,13
**additions** 57:3
**address** 4:16 7:12
22:9 34:25,25
**aerosol** 39:19
**after** 8:7,14 20:4,23
34:6 45:1 47:5,14
47:15 49:10,11,12
49:13 58:12 59:24
60:6,8,16 63:12
64:23
**afterwards** 57:22
**again** 5:10 31:7
66:18 71:19
**against** 65:16
**agency** 35:11,13
**ago** 9:17 35:13
**agreed** 2:19
**ah** 8:14 10:8,9,15
13:5,9 14:14
15:19,22 16:7
17:23 22:25 23:5
23:11 24:3,25,25
31:12,14,20,22
32:8 34:12,24
35:14,22 37:16
39:3 40:1 41:11
42:20 43:7 44:6,8
44:9 45:4 47:17
48:9,12 49:10
50:12 52:14 54:8
54:17 57:12,18
59:15 60:5,7,8,10
62:24,25 63:12
64:22 67:11 70:1
70:18 72:20 73:2
73:17,22,23 74:19
74:21 75:1,1
**ahead** 19:19 27:23
49:24

**Ahhh** 15:4
**ah-ah** 5:9
**ah-hah** 5:8
**air** 39:19,25
**AL** 2:6,12
**Alabama** 1:2 21:5
25:23 26:1,6
27:21 38:13,15,19
38:23
**Albert** 13:3,4,5,8
**Alice** 1:16 77:5,22
**alleged** 36:13,17
37:21
**almost** 28:7
**along** 7:19 10:11
**already** 31:11 45:1
**alterations** 42:11
**alternative** 42:6
**always** 37:24
**angle** 21:17 23:13
66:8
**annually** 32:4
**another** 49:15
59:22 61:15 68:5
71:19,23
**answer** 5:8,9,12,13
15:17 27:24 46:2
52:9 58:2 73:10
74:4,17
**answers** 6:2
**anybody** 10:24
16:8 18:7 27:4
44:9
**anyone** 14:20
**anything** 7:19 8:8
15:18 20:24 42:14
42:18 44:9 62:3
**anyway** 39:24
51:25 70:7,17
**apart** 16:21 17:1
19:24 59:19
**APPEARANCES**
2:1
**appears** 37:25
44:13 47:18
**applied** 34:2

**apply** 34:5 40:25
41:2
**appropriate** 43:2
**approximately**
10:3 36:23
**area** 53:20 56:11
60:24 61:2
**arena** 31:14
**arm** 48:6 50:11
59:8 64:1,2
**around** 17:7,12
51:5 55:24 63:4
63:11 68:3,11,12
**asking** 19:15 24:13
25:24,25 26:14
27:9,10 31:18
33:6 58:2,5 71:10
**assemble** 16:21
18:16 49:16
**assembled** 45:8,9
50:17 59:17,18
**assembling** 43:3
**assembly** 13:6,6
49:11,12,13 62:4
**assertion** 40:6
**association** 34:14
35:15,18,21
**assume** 5:13 71:6
71:10
**assuming** 15:11
38:5 69:12,23,24
**Assurance** 28:10
29:1,15
**astonished** 43:14
**attach** 34:20 70:7
**attached** 44:11,13
44:24 52:20 70:8
70:10,13,14,20,22
70:24
**attorney** 14:22 42:2
**attorneys** 3:12
**ATV** 10:22
**audibly** 5:8
**away** 44:15 53:10
54:5 56:16,17,18
67:2,3,22,23

**a.m** 41:16

## B

**b** 2:22
**back** 10:20 14:1
15:22 18:1,22
24:25 27:6,25
35:4 38:18,19
42:13 50:6,24,25
51:1 52:16 57:13
58:24 59:19 63:25
65:6 67:14,16,16
67:16 72:17
**backside** 67:25
**backward** 8:12
66:18
**backwards** 49:25
50:22 59:6 61:10
66:2
**baked** 40:4
**ballpark** 31:25
**bar** 65:2
**based** 72:25,25
73:1,3,4,23
**basic** 5:6 17:3 23:4
34:9 40:6
**basically** 9:18
**basis** 15:7 17:4
22:4,14 32:14
36:6 37:6,18
**bathroom** 5:23
**Baton** 7:1
**become** 35:20
**before** 1:16 4:10,23
5:12 7:22 20:18
20:18 22:5 34:20
34:20 35:25 37:19
38:13,19 44:18
54:7 55:22,23,23
56:2,2,7 77:9
**began** 42:2
**begin** 4:2
**beginning** 18:23
**behavior** 43:2
**being** 18:3 20:6,7
23:10 26:6 47:14
49:13 66:18

Page 2

**believe** 12:19 26:24
32:20 43:16 74:24
**bend** 34:7 38:16
39:2,7 50:14 56:2
59:11 65:21
**bending** 56:11,12
56:16 72:22
**bends** 56:14,15
**bent** 50:15 53:15
53:16 59:11,19
60:18 67:7
**besides** 12:9
**best** 15:18 22:13
60:8,14 77:14
**bet** 46:1
**better** 9:2
**Betty** 11:6,7,12
**between** 2:19 10:16
31:16 39:16 50:10
57:15
**big** 22:12 32:9,9,9
**Birmingham** 2:6
2:12
**birth** 4:21
**bit** 8:10 16:14 19:3
21:15 37:5 41:5
42:4 62:19 75:7
**black** 63:3
**blew** 58:25
**Bob** 2:15
**body** 34:18 42:20
50:4 51:4
**bolt** 44:4 53:6
54:18,23 55:8,16
58:23 59:2,3 62:4
62:5,6 63:25 64:3
67:10 68:17,21
72:1,3,3
**bolted** 49:14 64:2
**bolts** 17:3 44:5
54:21 64:7
**bolt's** 67:25
**both** 9:1 60:21,21
60:22 61:7 62:23
62:24 67:12
**bottom** 69:18 72:15

**bought** 27:9 44:1
**bow** 70:24
**box** 20:1 51:24 52:1
63:18,18,19 65:8
**boxed** 24:16
**boxing** 10:9
**brace** 19:25 20:8
23:21 30:2,5 31:3
44:16,17,17,23
45:1,1,3,15,17
52:21,24 53:1,2
55:4,23 58:24
59:7 67:20 70:1,7
70:7,9,17,21
71:13 73:6,14,18
74:19,23 75:2
**braces** 50:9,10,12
61:18
**break** 5:22 30:9,12
30:14 41:9,12
75:7
**Brian** 34:24
**bring** 38:5 46:5
69:1
**broad** 15:16 30:22
33:14 37:8
**broke** 53:10 54:12
60:19
**broken** 44:17 53:19
54:1,2 59:3 60:9
66:25 67:21 69:20
72:14
**Bruce** 13:13
**Bryant** 6:16,17,25
7:2
**buck** 11:1
**buckles** 33:5
**building** 7:15
**buildings** 7:17
18:18
**built** 1:11 3:19 4:1
7:5,7,12,18,23
8:18 9:9,12,18,20
9:24 10:18,19
16:2,3 18:17,18
20:24,25 23:4,19

24:22 25:14 28:17
28:23 31:16 32:2
36:14,18,20 37:18
37:22 39:3 40:17
40:22 44:1 48:8
48:18 49:2,5
**Built's** 31:6
**burned** 48:13,13
57:13 65:12,14
**burning** 49:19
58:11 64:21
**business** 7:12 8:25
32:11
**busy** 10:6
**buy** 43:24,25

---

**C**

**C** 77:1,1
**Cahaba** 2:5
**call** 47:23
**called** 44:7
**calls** 7:20
**came** 15:20,21
34:13 39:24 42:5
44:5 55:23
**camera** 41:24
**Camera's** 75:19
**capacity** 7:7,22
9:20
**captured** 21:19
**capturing** 62:5
**case** 37:11 43:13
**cases** 10:22
**cassette** 77:11
**catering** 32:7,10,11
32:12
**cause** 1:15 62:3
77:17
**caused** 36:13,17
60:19
**caved** 47:18 52:17
52:17
**Center** 2:10
**certain** 22:24,25
24:21 33:5,18
38:12
**certified** 1:16 21:8

21:10 26:20,23
27:1,4 36:1,2 77:5
77:23
**certify** 77:7,16 78:5
**chance** 42:25
**change** 30:20
**changed** 28:13,15
**changes** 19:8 47:14
**changing** 30:23
**channel** 21:18
**characteristics**
23:1
**charge** 17:17 21:1
31:22
**charged** 40:2,3
**China** 10:14 25:5
27:13,15 31:7,8
31:12 34:23 38:14
38:17 40:1,7,16
41:2
**Chinese** 31:17,18
**chronological**
27:18
**Circle** 2:5
**circumference** 18:2
**Civil** 2:23
**clarification** 19:2
**clarify** 15:17 27:9
**cleaned** 23:21
24:15
**client** 43:13
**clients** 3:13
**climb** 34:21
**climbed** 44:24 50:8
**climbing** 44:24,25
50:1,2
**clip** 30:10 52:20
53:2,5,6,17,19
54:10,20 55:16,19
55:25 56:16 59:3
60:9,13,19 66:13
66:14,23,24 67:1
67:12,21 68:5,18
69:3,20 71:14,21
71:25 72:18 73:3
**close** 12:17 13:1,9

**closest** 63:3
**collapsed** 47:18
**college** 7:3 8:3
**color** 48:20,24 57:9
57:15 64:15 65:13
**colors** 57:9,17
64:12
**come** 16:21 31:10
59:23 64:8
**comes** 7:19 34:17
34:18,19
**common** 43:9
**communications**
14:20
**companies** 29:3
31:15
**company** 10:24
28:13 31:20,20,23
37:16 51:21 57:20
58:5
**compete** 31:14
**competitors** 31:11
**complete** 6:1 10:9
21:4
**completed** 23:8
39:24
**completely** 19:22
**component** 21:21
24:2
**components** 42:10
**concerning** 28:17
28:18,23,24 42:3
**configuration**
23:14
**configured** 20:9
**connect** 45:18
**connected** 69:14,19
70:1,16 71:11,12
**connecting** 30:5
**connection** 3:3
**connects** 30:2
63:25
**consider** 43:2
**considered** 42:6
**consisted** 19:24
**consistent** 65:23

One Penn Plaza, NYC
email@tobyfeldman.com

Toby Feldman, Inc.
NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS

tel (212) 244.3990
tel (800) 246.4950

consult 14:24
consumer 28:10
  29:1 73:14,17
  74:20,21
contact 34:23
contention 22:3
  45:14
continuation 42:1
continue 10:19
  75:21
contract 10:12,12
  21:3,7,7 31:18
contributed 43:13
control 40:21,24
convicted 9:6
copy 59:22,23
corporation 9:15
correct 6:22 17:8
  17:18 20:12,14
  25:5,20 40:9 41:3
  47:19 48:3,4,18
  48:19,22 49:1,2,5
  49:6,8,21,22
  50:23 51:3,6,11
  51:15,16,23 52:14
  52:18,21 53:4,8
  53:11,12 55:14,17
  56:5,8 57:23
  58:12 59:14 60:2
  60:3 61:2 63:9,10
  63:13,14,18 64:17
  64:19,24 65:7,17
  65:25 66:1,9,16
  66:19 67:4,21
  69:5,6,14,17,21
  70:18 71:21 72:1
  72:23 75:3 77:13
  78:7
corrections 78:9
correctly 59:17,18
correspond 35:1
cost 18:5
Cotton 8:17
Could've 22:15
counsel 2:19,20
  75:15,21 77:16

counselor 4:2
count 55:3 66:15
counting 69:4
  71:20
Couple 11:10
course 14:21 69:23
Court 1:1,16 5:6
  41:20,21 46:7
  61:12 77:5,23
covered 60:10,10
  60:13,15 61:3
  67:7,13
co-counselor 3:15
cracks 49:7
crews 24:23
crime 9:7
crimped 56:5,6,11
current 35:4 36:7
currently 25:3
  40:17
cut 23:13 39:1

D
Dale 26:17,18,20
damages 36:13,17
Dan 12:20,23,25
dark 68:22
date 4:21
daughters 6:19
David 2:8 3:18 44:7
  46:9 48:9 62:8
day 10:19 15:5
  77:10,19
days 18:1 39:24
deal 31:20 43:15
dealing 29:7
Debora 1:7 3:16,25
  4:11
decade 45:6 67:18
decals 50:7
decided 9:4 31:8
  42:19
decision 31:10
defamation 34:6
defects 36:13,17
defendant 3:19
defendants 2:8 4:2

definitely 22:6
  57:15 69:12
deflection 65:24
  66:21 72:22 73:2
deform 34:5
degree 8:5 39:6
  72:18,19
denied 44:9
department 26:10
depend 33:15
depending 20:12
depicted 50:5 57:19
depicting 50:19
depo 43:24
deponent 78:4
deposition 1:14
  2:20 3:4,24 4:23
  5:16 13:19 14:6
  14:12,21,25 15:3
  42:1 44:19 48:8
  75:20 76:12 77:8
  77:14 78:4,6
depositions 5:5
  14:13,17 43:12
DeRod 47:13
describe 7:23 47:22
  58:11
described 25:22
design 15:21 16:4
  16:11 17:10,16,17
  17:19 18:14,25
  20:15,16,19,20,23
  21:13 27:12,14
  30:19,23 34:8,10
  36:10 42:5
designed 15:15
  17:3,5 18:5,8,21
  19:11 51:10 73:21
designs 30:19 42:6
detail 9:19
determine 32:18
determines 53:16
DeWitt 47:13 60:22
DeWitter 47:13
diagonal 50:9,10
  59:7

difference 34:12
  39:16 40:8
different 10:13
  20:7,9,10,12,22
  21:17 24:2,2 28:8
  30:25 33:24,25
  34:1,9 37:9 38:22
  38:22 39:5 40:5
  42:8,9,11 48:20
  48:24 49:18 55:4
  55:20 57:8,9,15
  58:22 63:23 64:2
  64:4,12,14,15
  66:8 68:20 70:4,4
  70:6 71:14
dipped 39:22,22,22
direction 42:20
  53:16
discourse 38:8
discovery 2:21
discussion 54:8
dispute 27:6
disrupt 41:7
DISTRICT 1:1,2
DIVISION 1:3
document 13:25
documents 14:17
  36:4
doing 10:5 21:1
  23:6 43:7
done 10:16 20:21
  24:12 25:4,22
  27:2,2 28:1,2,2,4
  32:17 42:14 48:17
  49:5,10,11 52:13
  57:22 58:12 63:12
  64:22 65:15
doubt 22:8 38:21
  44:1
down 5:7,10 21:20
  24:10 43:15 46:16
  50:24,25 65:13
dried 24:16
dripped 39:25
driver 13:15
dry 39:18,19,25

duly 3:9
during 21:5 26:5
  62:23 67:5
DVD 34:17 42:21
dye 38:16,16,23,24
  38:24 39:5,6,10
  40:15
dyes 39:3

E
E 1:18 3:22 77:1,1
  77:9
each 20:15 50:12
  56:22
earlier 21:3
early 28:1 39:24
easier 8:13 17:1
easiest 46:9
education 73:4,23
educational 7:23
efficiency 18:5
Eight 61:13,14
eighty 39:6
either 8:11 33:16
  58:23
elaborate 9:24
  21:15
electrostatic 40:2
else's 38:6
em 15:25 20:10
  29:13,25 32:12,21
  36:15 39:9 55:3
  70:23
employ 77:17
employed 16:9
employees 11:3
  12:19 23:16
enamel 39:19 62:25
enclosing 42:20,21
end 24:3 30:17
  58:20 69:18 70:8
  70:21 71:12 76:12
ended 31:15
engineer 15:19
engineers 16:12
  17:16
enough 15:6 29:22

Page 4

39:1
**equipment** 23:17
  38:25
**errata** 78:9
**error** 16:16
**especially** 30:25
**essentially** 24:10
  27:6
**established** 58:19
**even** 5:4 17:15,16
  25:3 38:18 43:9
  51:24 54:1 60:24
  61:6,6,6 62:5 68:2
  73:11
**ever** 4:23 9:6 40:16
  44:9 45:3,20
  48:10
**every** 24:21,22 26:4
  34:17,18,19 44:19
  54:23
**everybody** 41:13
**everything** 5:7,11
  10:10 20:24 24:20
  40:1 43:4 45:8
  75:25
**evidence** 2:22
  49:19 54:12
**evolution** 19:3
**evolved** 19:20
  20:11
**exact** 22:20 23:25
**exactly** 51:9 53:19
  56:11,13
**examination** 4:3
  47:2 78:6
**examining** 43:11
**example** 37:15
**exceeded** 33:12
**except** 2:24 3:4
  53:15
**exception** 78:8
**excited** 9:3
**exhibit** 13:19 47:1
  47:8 50:5,21 57:3
  57:19 58:17 59:4
  59:5,20,21 60:1,2

60:4,10,12,16
61:9,15,17,19,20
62:2,6 69:9
**expect** 61:4,7
**experience** 73:5,24
**experienced** 5:4
**experts** 14:24
**explain** 43:20
**explained** 42:4
**extra** 50:15
**eye** 44:4 63:25
**e-mail** 35:1

---

### F

F 77:1
**fab** 10:9 13:5 16:9
  16:15 18:9 21:4
  23:11,12
**fabricate** 18:25
  21:24
**fabricated** 20:23
**fabrication** 17:22
  18:16 25:22 42:5
**facility** 10:9
**facing** 53:20,24
  54:1,3,5 56:8 67:1
**fact** 53:15
**factor** 18:4
**factors** 16:18 33:24
**factory** 64:8
**fail** 33:8
**failed** 37:22 54:9
**fails** 32:25 33:5,11
  33:23
**failure** 30:23 33:2,4
  33:22 34:21 36:21
  55:22 56:7,10
**fair** 15:6 29:22
**fall** 37:16
**family** 6:10 7:4
  8:23 28:3 47:12
  69:23 70:14 75:1
**far** 7:20 10:8 22:16
  28:3 37:5 50:25
**farm** 8:16,20,22,23
  10:6 28:2
**farmed** 8:15

**farming** 8:14,24
  10:11
**farther** 51:5
**fashion** 70:17
**fast** 39:18,19
**fault** 37:25 38:3,6
  38:10
**features** 34:13,15
**February** 1:19 3:21
  77:10 78:8
**Federal** 2:23
**feet** 19:23,23
**few** 10:7 16:20
  35:13 46:17
**field** 31:14
**fifteen** 5:1 12:8
  19:23 20:3 34:9
  45:6,20
**fifth** 53:2 54:20,24
  55:7,7 66:15,15
  69:4,15,20 70:16
  70:23 71:20,21
**fifty** 30:25
**filed** 13:20
**film** 62:14
**final** 76:7
**finalize** 20:23
**find** 15:3 78:6
**fine** 41:11 43:21
**finish** 5:11 18:23
**finished** 13:25
**firearms** 43:7
**firm's** 43:15
**first** 8:11 10:20
  15:3 17:6 18:20
  18:23,24 20:22
  32:5 38:11 43:23
  47:16 51:20
**fit** 21:19 51:24 52:1
  63:20 67:21
**fits** 65:6
**five** 12:19 23:12
  32:10 34:3 40:20
  55:4 69:2,5
**fixing** 50:2
**flip** 55:24,24

**followed** 20:20
**following** 1:15
  20:16
**follows** 3:10 77:7
**foot** 20:3,9 23:22
  34:9 47:24 50:20
  50:21 62:22
**force** 31:13
**foregoing** 77:13
  78:4
**forget** 17:25
**form** 2:24 27:23
  28:22 30:7,22
  70:3,17 73:8 74:2
  74:15 77:12
**formalities** 3:3
**formed** 35:23
**formula** 32:19
**forth** 67:14,16,16
  67:16 72:17
**forward** 8:11 10:4
  50:25
**founder** 9:19 10:25
**Fountain** 1:16 77:5
  77:22
**four** 28:8 32:22,23
  40:20 45:4 50:3
  58:16 68:24 69:5
**fourth** 69:15,20
  70:15,22
**fractured** 60:25
  61:2
**frame** 21:6 23:25
  25:11 26:5 62:24
**freight** 11:23,23
  16:25
**Friday** 3:21
**friend** 47:12
**friends** 28:3 69:24
**from** 5:25 6:1 7:25
  8:5 15:12 18:23
  18:23 19:8,20
  22:15 24:11 26:15
  29:1 30:13 32:13
  32:23 34:10 36:19
  43:4 44:14,15

50:24,25 51:5
53:10 54:5 56:16
56:17,18 58:19
59:3,10 64:8,22
64:22 67:2,3,18
67:18,23 68:22
69:18 72:17,19
75:1
**front** 49:14 50:6,24
  50:25 65:10
**front's** 50:7
**frozen** 68:24
**full** 4:5 34:18 39:23
  42:20
**further** 8:8 77:16

---

### G

**gap** 51:6
**general** 12:13
  37:12
**gets** 33:4 37:24
**Getting** 66:12
**give** 5:23 23:24
  31:25 52:9
**given** 4:23 47:4,16
  78:7
**giving** 5:5 6:1
**go** 5:22 8:3 18:22
  19:19 23:20 24:11
  27:23 32:19 42:13
  46:24 49:24 56:3
  56:4 68:20 76:3
**goes** 15:22 24:25
  40:3,4 65:8
**going** 8:11,12 27:10
  27:25 41:5 44:14
  52:16
**gon** 22:16 24:7 28:6
  30:10 31:1,4,13
  34:7 38:3,3,5,24
  39:10 42:8,11
  43:14 46:12 51:25
  55:2,3 75:7
**gone** 74:6
**gonna** 5:13 13:18
  13:18 18:14 46:23
  47:1 54:25 59:25

60:1,1
**good** 41:6,8 46:1
69:2
**Goodwin** 26:17,18
26:20
**gotta** 24:14,15,15
24:16,16,16
**gotten** 38:18
**governmental**
35:10
**grab** 5:22
**graded** 18:24
**Graduated** 7:25
**great** 57:17
**green** 48:23,24
65:13
**Greg** 24:25 25:1,7
26:10
**ground** 5:6 58:19
58:20 71:25
**growing** 9:1 10:7
**guess** 8:15 19:8
25:24
**guilty** 9:6
**gun** 10:21,21 44:6

**H**

**half** 50:12,16 59:10
**half-inch** 39:7
50:14
**Hancock** 1:18 3:23
77:9
**hand** 13:18 14:1
**handles** 11:16
**handling** 43:7,7
**happen** 67:15
**happened** 31:4
45:2,19 60:7 61:1
67:8,15 68:4
**happens** 33:6
**happy** 5:18,23
37:13
**hard** 39:1
**harder** 38:25
**harness** 34:18
42:21
**Harrison** 11:20

**Hassinger** 2:3 3:14
3:15 4:3,9,11 5:3
5:21 13:17,23
19:5,12 25:12,19
26:3 27:5 29:11
29:17,21 33:10
39:14 41:10 46:8
46:18 70:2 73:7
74:1,14 75:24
**hauled** 58:23
**having** 3:9 43:12
**headquarters**
31:17
**hear** 30:13
**hearing** 71:3
**heel** 51:7 66:6
**height** 18:1 42:10
**heights** 20:3
**help** 34:20
**helped** 16:3 18:8
31:10
**helps** 11:22,22
**her** 36:19
**hereto** 3:2
**Hey** 62:10
**high** 7:24
**Highway** 2:11 4:17
7:14
**him** 29:8 34:25
37:12 46:15,17
**hiring** 10:7
**history** 7:23 8:10
**hold** 61:23 68:14
**hole** 23:14 39:1
50:14 51:7 66:5
**holes** 51:15 64:10
65:6,8
**home** 4:16 6:23
**Honda** 6:7,11,21
**hooked** 69:11
**hor** 74:25
**horizontal** 52:24,25
53:1,2 55:23
67:20 70:1,17
71:13 73:6,14,18
74:19,23

**hosed** 43:15
**hour** 41:5
**hundred** 32:16,18
33:20,20,21
**hunter** 42:15,22,23
43:2
**hunters** 43:1
**hunting** 43:3 53:20
**hurt** 37:24
**hypothetically**
71:10
**H-O-N-D-A** 6:9

**I**

**identical** 39:10
**identify** 3:12
**illness** 6:1
**illustrate** 43:21
**immediate** 6:10
**immediately** 47:5
47:15 60:6,8
**important** 55:22
**impossible** 23:24
24:4 44:16 49:15
52:3 63:17,19
**improper** 62:4
**Inc** 1:11 28:11
**inception** 10:3
**inch** 50:13,16 59:10
**inches** 18:3 23:12
23:13 50:3
**incorporated** 3:19
4:1 7:5,13 9:13
10:7 16:3 18:18
**incorporation** 10:3
**incorrectly** 45:8
**independent** 29:3
**inebriated** 43:8
**injured** 73:20
**injuries** 36:13,17
**injury** 37:22 43:13
**inside** 21:21 59:7
61:18
**inspection** 73:1
**instance** 67:15
**instances** 37:4
**instead** 57:12 59:18

**instructions** 43:5
59:16 65:9 73:13
73:14,17 74:20,20
74:25 75:3
**insures** 24:18,19
**integral** 73:15
**intended** 74:7
**interest** 77:18
**interested** 30:13
45:12,14
**Investigator** 2:16
**involve** 37:9
**involved** 9:23 20:12
37:13
**inward** 56:2 65:19
65:24 66:21 72:22
73:2
**in-house** 22:23,25
39:3
**issue** 22:10

**J**

**James** 1:17 3:22
77:9
**jigs** 20:21,21,22,24
20:25 21:14,15
23:11
**job** 7:18 8:11,12
39:11
**John** 12:10,11,16
**Joseph** 1:18 3:23
7:25 77:10
**JULIANO** 2:9
**June** 4:22
**jury** 43:1
**just** 4:7,13 5:17,23
6:21,21 7:9,24
8:25 9:2,24 11:1
12:13 13:6,25
14:1 15:19 16:10
16:15,15,16,23
17:2 18:22 19:2
20:6 24:10,14,20
26:11 31:11 32:8
32:8 35:21 36:18
37:15,16 43:20
46:24,25 51:14

56:15 58:2 59:19
61:15 62:4,18
64:11 65:6,6 66:8
68:10 72:12 75:7

**K**

**keep** 10:6 27:18
44:14
**keeping** 36:12
**Keith** 13:13,14
**Keith's** 13:15
**Kemp** 11:20,21
**Ken** 2:20 3:24 4:6,7
12:3,4,7,9 14:11
42:1 46:25 57:4
62:18,21 75:20
**Kenneth** 1:14 3:9
4:8 77:8 78:4,16
**Kent** 11:25
**Kidd** 2:15 3:11,20
41:14,19,23 62:17
75:10,14,18 76:2
76:6
**killed** 73:20
**Killen** 1:14 2:20
3:9,24 4:4,6,7,8
4:10,14,21 5:19
6:4,10 8:11 13:21
14:3 19:16 26:5
27:16 38:11 42:1
42:3,23 43:16
46:4,11,20 52:10
58:3 61:24 69:8
72:11 73:21 75:20
77:8 78:4,16
**kind** 8:25 18:22
19:20 34:15 40:21
**Knight** 4:8
**know** 5:23 8:18
9:18,21,22 10:10
10:15 13:7,25
15:16,19,20,21
16:10 17:2,6,22
17:24 18:2 19:22
20:2,22 21:2
22:10,10,16,24
23:7,17,25 24:14

One Penn Plaza, NYC
email@tobyfeldman.com

Toby Feldman, Inc.
NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS

tel (212) 244.3990
tel (800) 246.4950

Page 6

24:14 25:1 26:4
26:15,21 28:2,11
28:15 29:13,13,14
30:8,8 31:12,21
31:22 32:12,15
33:19,24 34:3
35:22 36:24 37:14
37:14,25 38:7,8,9
38:10,11,15,16
42:12,18,21,22
43:6,8,9,11 44:10
45:5,23 46:6 47:5
48:6 50:8,14 51:7
56:24 57:13 58:10
63:4 64:8 66:6
71:24 72:25 75:15
**knowing** 43:11
**knowledge** 14:5,9
22:13 26:23 35:12
36:16
**knows** 26:5
**K-Mart** 29:15

**L**

**lab** 28:12 29:14
30:8 33:9
**labeling** 45:9
**labels** 45:9 65:10
**labor** 10:6 21:7
31:13,17,19 38:13
39:17
**laborer** 12:13
**labs** 28:4,5,8 29:2
32:19 33:1
**ladder** 15:23 17:3
19:21,22 20:6,7,8
30:2,5 33:16 34:2
45:18 50:2,9,13
53:2,16,17 54:14
54:16,16,20 55:24
56:3,8 59:12
60:18 66:8 67:7
69:11,19 70:10,24
71:24 73:1,3 75:9
**ladders** 16:23
19:24 20:5 23:9
23:10,19,20

**Larry** 1:6 3:16,25
4:11 44:7 62:8
**last** 35:23
**late** 15:22 25:15
**later** 25:23 60:18
**law** 1:17 3:22 28:14
28:14 77:9
**lawsuit** 63:5
**lean** 50:4
**learn** 36:19
**leave** 54:7
**Lee** 2:8,9 3:17,18
12:10 13:3 19:1,7
19:14,18 24:25
25:1,7,10,16,21
26:8,10 27:22
28:21 29:5,12,19
29:24 30:6,21
33:7,13 37:7 38:1
41:4 42:16 46:14
46:22 47:2 52:7
57:1 58:1,15
61:10,22 62:1,13
66:11 68:13 73:9
74:3,16 75:6,16
75:22 76:4
**left** 21:20 62:18
**length** 18:1
**less** 11:4 17:2
**let** 5:23 13:25 14:11
19:2 22:9 46:25
62:16 63:2 68:5
68:14 69:7 75:15
**let's** 31:6 32:8,8
38:2 41:8,11,11
46:24 56:21,23
59:25 62:11,14
72:6
**level** 31:14
**liability** 37:19,20
**light** 69:2
**like** 9:21 15:17,20
15:21 17:5 18:21
19:21 21:22 24:10
26:15,15 30:15
34:8 38:10,11

39:11 43:21 44:11
56:15 66:7 67:12
70:7
**limit** 32:18 33:5,12
**limitations** 23:15
**limits** 50:7
**line** 18:20
**listed** 14:5 78:9
**listen** 52:8,8
**listening** 71:5
**literally** 51:3,14
**litigation** 15:8 17:5
19:10 22:4,11,14
23:5 27:7 32:14
36:6,6,21 37:5,13
37:19,20 38:5
42:4
**little** 7:22 8:10 9:3
9:19 16:14 17:7
19:3 21:15 37:4,5
41:5 42:4 51:6
62:19 75:7
**live** 4:13,15 6:23,25
**LLC's** 28:11
**load** 32:15
**located** 3:22 54:21
54:22 69:21 71:15
71:25 73:4
**location** 40:16
45:19,22
**locations** 10:13
45:4,7 68:20
**lock** 62:5
**logistics** 11:16,24
**long** 11:9,17,25
12:16,25 13:8
15:16 17:19 19:23
19:23 23:3,4,25
26:18 38:18 58:22
62:11
**longer** 12:18 25:4
**look** 43:18,18 46:5
46:6 56:21 57:4
59:23 62:14 72:6
**looked** 14:14 57:18
57:18

**looking** 15:2 50:8
60:2
**looks** 30:15 44:11
**lot** 11:23,23 16:18
21:5 27:2,2 28:6
30:11 31:21 32:11
33:24,25,25 54:8
**lots** 37:8
**Louisiana** 1:17,18
3:23 4:15 26:1,7
27:20 38:13,23
77:2,6,10,19 78:8
**LSU** 8:4,5,7
**L.J** 2:16 15:1

**M**

**Mac** 28:13,15
29:13
**machine** 48:12
**made** 3:1 15:7 17:4
22:4,14 23:5
26:25 30:1,4
32:14 36:5 39:11
40:7 42:3,14
47:14 50:12 63:1
63:8,9
**MADISON** 77:3
**magnetic** 40:3
**magnitude** 33:19
**Mahoney** 12:3
**main** 44:11
**mainly** 23:16
**major** 32:9
**majority** 10:22
43:8
**make** 5:7 9:2 33:8
38:3,16,24 39:1,1
39:10 64:9 72:21
**maker** 39:10
**makers** 39:5
**makes** 5:16
**making** 7:20
**manual** 40:23,24
**manufacture** 10:19
23:3,4,8,8 27:12
27:14 40:22
**manufactured**

10:19 22:5,14
25:4,14 26:6 27:8
32:1 34:11,16
38:12 40:17 63:13
64:23 65:3 73:22
73:25
**manufacturer** 19:9
35:21
**Manufacturers**
34:14 35:15
**manufacturing**
23:6 31:7 35:3,5
**many** 4:25 11:3
21:2 30:1,3,4
31:25 36:23 40:19
42:25 55:2
**March** 77:19
**mark** 13:18 47:1
57:3 59:25 61:23
68:22
**marked** 47:7,8
50:21 61:21
**market** 24:1
**marks** 45:7 54:16
54:21,24 55:6,8
55:13 58:21,22,23
59:1,2,3 67:13,25
68:6,8,9 72:1,3
**married** 6:4
**Mart** 43:25,25 44:1
**Mary** 1:16 77:5,22
**material** 30:10 39:4
59:9 63:23
**Matt** 59:15 62:8
**matter** 3:25 4:12
31:12 56:7 77:18
**may** 4:2 29:6,15
33:20,21 37:14,15
42:2 69:3 75:21
**maybe** 5:1 9:14
11:18 12:8,17
22:16,17 26:19
28:14 60:11
**mean** 10:8 17:12,21
17:21 19:21 22:23
24:7,17 25:17

One Penn Plaza, NYC
email@tobyfeldman.com

Toby Feldman, Inc.
NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS

tel (212) 244.3990
tel (800) 246.4950

27:25 31:12 32:7
34:6 37:8,24 38:7
40:10 42:22 43:6
43:8 51:4 56:4
57:17 62:7,9 64:7
65:9,10
**measurements**
17:24
**measures** 40:21
**mechanism** 33:2,3
**medications** 5:25
**member** 35:18,20
47:12
**members** 7:4 69:23
70:14 75:2
**memory** 43:4
**mentioned** 10:15
**metal** 20:21,22,24
21:16,16 30:15
60:20 67:12,14,22
72:18
**metal's** 60:15
**mic** 72:12
**mid** 22:15 34:11
58:20
**middle** 1:2 65:21
**might** 21:19 22:18
**million** 46:15
**mind** 43:1
**minor** 9:7
**minute** 22:9 41:12
46:25 55:1
**minutes** 35:13
**misused** 74:13
**model** 22:22 28:8
**models** 31:1 42:9,9
**modification** 51:10
52:2 59:13 63:1
64:1
**modifications**
63:12 74:10
**modified** 44:2,3,4
52:5
**molted** 16:23
**money** 9:3
**month** 60:18

**months** 60:18
**more** 7:22 9:2,3,19
16:14 27:18 30:13
32:11 36:25 37:2
40:14 49:23
**most** 8:12 16:5
36:15
**Mostly** 10:21
**motion** 67:17 72:21
**mounted** 50:22
51:2 59:6 61:16
65:16 66:2,7,18
**move** 21:20 31:8
54:25 62:18
**moved** 27:15 31:11
69:25 74:22
**moving** 31:15
**much** 7:19 10:25
23:17
**mud** 58:20
**mushroomed** 9:1

**N**

**name** 3:15 4:4,5,10
6:6,15 11:5 25:9
28:9,14 31:23
44:7
**named** 24:20 77:6
**names** 18:7 24:24
**narrate** 62:15
**nature** 8:8 9:23
**Naw** 4:8
**necessarily** 70:9
**need** 5:22 15:17
59:23 62:10
**needs** 61:20
**negotiate** 9:22
**negotiated** 9:21
**negotiating** 7:20
10:15
**negotiations** 11:23
**never** 31:1,4 44:16
44:21 45:2,3,15
45:17,23,24 53:21
53:23 67:5 68:4
**new** 4:19,19 52:1
**next** 51:25

**nine** 10:10 33:21
**ninety** 72:18,19
**nobody** 16:10,10
16:12 48:9
**none** 34:22,22
**NORTHERN** 1:3
**nothing** 23:9 34:21
37:10 51:7
**notice** 13:19 14:6
**November** 44:20
**nowadays** 32:20
**number** 4:18 41:25
47:1,8 50:5,22
57:19 58:17 59:4
59:5,20,21 60:1,4
60:12,13,16 61:9
61:11,17,19,20
62:2,6 69:9 75:20
**numbers** 4:19
**numerous** 45:6
**nut** 53:9 62:5
**nylon** 62:5

**O**

**oath** 57:25
**object** 37:8 70:3
73:8 74:2,15
**Objection** 27:23
28:22 30:7,22
33:14 42:17
**objections** 2:23
**objects** 43:7
**obtained** 36:16
**obvious** 44:10 62:9
62:9 73:12
**occasions** 4:25
**occurred** 43:17
**off** 4:13 10:2 17:22
18:13 41:15,17
44:17 48:7,13,13
55:23 58:24 62:10
67:24 71:24 72:12
74:23 75:2,11,12
76:3,7
**office** 1:17 3:22 7:8
7:15,16 77:9
**off-season** 10:6

**off-shore** 25:8
39:17
**Oh** 12:8 16:5 27:2
36:24 38:7 52:6
**okay** 5:2,6,18,20
6:4,13,19,25 9:6
9:12 11:11,17
12:2,23,25 13:10
13:12 14:4,8,11
14:15,20,24 15:3
15:6,12,13,14
16:6 17:10 18:13
19:15,19 20:18
22:7,11 24:24
25:9 26:10,15
27:15,17 29:11,18
30:18 31:7,10
33:2 34:15 35:3
40:12 41:12,15
45:16 46:3 47:10
47:21,25 48:2,5
48:15,20 49:17
51:17,20 52:11,16
52:20,23 53:5,10
54:5,20 55:2,11
55:16,22 56:7,10
57:7,19,22 58:4
58:14 59:4 60:13
60:15,16 61:17,25
62:12,16,18 63:11
63:17,20,22 64:11
64:16 68:23 69:18
69:23 70:12 71:5
71:9,19 73:13,21
74:9 75:11
**old** 6:17 45:6,6
**once** 33:4,18 52:20
56:10,10
**one** 5:24 6:14,21
8:12 15:24 16:19
17:6 18:17 19:22
20:6,15 24:14
26:17 27:11 28:10
28:10,12,12 29:13
29:14,15 31:2
32:11 34:22 39:4

40:11,13 44:8
48:9 49:14 53:13
56:22 58:19,23
59:25 60:12,23,23
62:10,23,25 63:3
63:7,7,11 65:10
67:15,17 69:3,4,7
72:21
**ones** 35:4
**one's** 24:25
**one-inch** 39:7
**one-man** 15:23
16:16,19
**one-piece** 20:1
**only** 55:7 56:4
68:18 70:20
**onto** 49:14 51:11
57:10 63:16 64:9
**open** 64:10 72:18
**operation** 27:15,20
31:8 39:17
**opinion** 73:5,23
**opportunity** 9:2
**opposite** 53:13
**order** 27:18
**organization** 35:11
**original** 19:9 57:13
59:13,24
**other** 6:10 7:6,16
9:7,24 14:17,21
15:9 16:8 18:7
20:4 21:21,25
25:9 33:4 37:21
40:15,25 42:18
53:22 54:25 55:11
59:9 63:7 66:3
68:8,19 70:21
71:12
**ought** 31:3 39:11
**out** 7:4 8:24 10:12
10:20 15:3 16:9
16:15 34:9 37:16
39:3,3 43:3 44:15
46:6 50:3,4,4 51:4
53:20 56:16,17,18
59:23 60:21 68:20

Page 8

72:10
**outsourced** 27:13
38:13
**outsourcing** 31:6
39:17
**outward** 70:24
**oven** 39:25 40:4
**over** 13:24 24:23
30:20 41:5 43:9
43:10,10 45:20,24
51:3 60:17 67:15
68:2,18 74:13
**overall** 73:15
**overly** 33:14 37:8
**overseas** 10:17
**own** 8:20,22 31:9
**owner** 44:8

_____

**P**
**paint** 10:9 38:17
39:12,13,16,18,20
39:23 40:1,3,8
48:13,13,20,24
49:19 57:13,16,16
64:12,14,22 65:12
65:14
**painted** 23:20,21
24:15 48:22,23
58:12 62:25
**paint's** 40:3
**palletize** 17:1
**palletized** 24:17
**palletizing** 12:6
**parish** 77:3,6
**Park** 2:5
**PARSONS** 2:9
**part** 18:18 24:14
33:11 35:22 39:4
46:5 51:9,11 54:2
66:25 67:21 72:13
72:15 73:15
**particular** 19:11,20
22:22 28:7 48:21
49:4 54:10 57:11
73:15,22
**parties** 3:2 77:17
**Partly** 18:6

**parts** 21:21 23:18
23:18 24:2 40:2
**patent** 35:5
**pause** 65:9 68:6
**Paxton** 1:18 3:22
77:9
**payable** 7:9,10,11
**payables** 7:8
**Peanut** 44:8
**Pelletize** 16:22
**people** 10:7,12
18:11 42:25
**per** 32:1
**period** 53:25
**permanent** 34:6
**personal** 14:5 73:1
**photograph** 44:12
47:3,6,11 56:15
57:4,11 59:11,22
59:23 60:5,9,14
60:17 61:20 65:23
65:25 68:5 69:24
71:19
**photographed**
60:22
**photographs** 14:16
43:18,21 45:5,11
45:11,13 46:12,21
50:16 54:15 56:19
69:8
**physically** 33:8
63:17
**picture** 53:17 57:5
57:7,8 61:15
**pictures** 56:21
**piece** 15:24 16:19
18:24,24 19:22
21:16 23:12,13
38:24 39:7 49:14
49:15 50:15 54:1
54:3 60:23,23
64:2,9 67:17
**pieces** 49:18 61:7
63:23 64:5
**pile** 23:19
**Pine** 44:20

**pinpoint** 22:18,20
**place** 24:18,19,21
32:20 50:10 56:12
63:18 73:6,18
**placed** 21:21 66:3
**places** 21:17 44:6
**plaintiff** 2:21 3:16
37:23 47:12 59:22
60:5 65:25 69:9
69:24
**plaintiffs** 2:3 4:1
47:4 70:13
**plaintiff's** 13:19
62:25
**platform** 20:9
23:22,22 45:8,9
47:24,24 49:14,25
50:1,3,11,18,20
50:21 51:12,17
59:8 61:15 62:22
62:23 63:24 64:4
**platforms** 59:5,6
**played** 17:7
**playing** 31:14
**please** 3:13 4:5
**pled** 9:6
**Plus** 51:6
**point** 15:13 24:11
24:11 33:21 41:6
41:8 55:23 60:24
68:25 70:15 71:13
72:10
**pointing** 56:17,18
67:23
**policy** 28:17,23
**position** 66:8 71:13
73:3
**positions** 55:4
**positive** 4:20 17:13
28:7 31:9 42:22
**possibly** 66:6
**pound** 32:18
**pounds** 32:16
33:20,20,21
**powder** 40:4
**powder-coat** 40:1

**practical** 27:3 28:1
**practices** 43:6
**prepare** 14:12
23:12,15,17
**prepared** 24:15
**preparing** 12:6
**present** 2:14 18:17
34:15
**president** 7:19 9:18
9:22 10:25
**pretty** 7:19 9:16
10:25 55:3
**prevent** 6:1
**previous** 19:21
**previously** 36:20
**price** 7:20 9:21
**prices** 9:22
**pricing** 11:22
**prior** 44:17 61:1
**probably** 8:15
12:17 13:1,9
20:11 22:25 26:19
28:8 37:3 38:19
44:5 46:15,16
68:22
**Procedure** 2:23
**process** 24:20 35:3
35:6 40:2,5
**produce** 15:23,25
17:24 21:24 31:21
39:6 51:13
**produced** 15:24
16:19,20,21 20:2
20:6,7 22:25
29:20 30:25 38:15
38:16,17,19 48:8
60:5 62:23,24
65:24 69:8
**produces** 31:21
**producing** 10:8
20:5 22:22
**product** 7:21 10:8
10:15,16 21:18,18
28:6 35:25 36:1,2
36:5 37:18,20,22
59:14 64:23

**production** 10:14
29:8
**products** 10:18,22
21:25 28:11 29:2
31:21
**project** 13:6
**projects** 13:7
**promise** 5:15
**property** 8:23
**Protective** 2:10
**prove** 45:2
**provided** 21:12,14
29:4
**punch** 39:1
**purposes** 2:21
**pursuant** 1:15 2:22
**put** 16:16 18:9
23:25 24:11 44:18
44:20,23 45:1
50:10,13 53:23
58:25 59:15 62:8
62:11
**puzzle** 21:22
**p.m** 75:11,21

_____

**Q**
**QA** 40:23
**qualifications**
35:20
**qualified** 26:25
**quality** 28:10 29:1
29:15 40:21,24
**quarter-inch** 50:11
59:7,9,9
**question** 2:25 5:12
5:12,14 15:16
18:20 24:8 25:24
26:13 42:12 51:25
52:8,9 58:2,5 71:4
71:17,18
**questioning** 18:21
**questions** 6:2 27:11
27:11 46:15,17
75:23

_____

**R**
**R** 77:1

One Penn Plaza, NYC
email@tobyfeldman.com

Toby Feldman, Inc.
NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS

tel (212) 244.3990
tel (800) 246.4950

**rachet** 44:12,25
69:10,12,19 70:8
70:20
**rail** 68:7,8,9
**rails** 48:16 52:5,12
**Ramo** 12:20
**range** 17:14 23:2
38:20
**rated** 32:15 33:19
**rather** 40:7 65:5
**read** 13:24 14:18
43:12 59:16 60:1
78:6
**reading** 3:4
**ready** 24:1 41:20
41:22 75:15,17
76:3
**real** 69:1
**really** 17:2,16
18:20 27:9,10
35:22 57:8 64:7
**reason** 23:10 35:8
49:13 58:25 70:22
70:23
**reasonably** 73:25
**reasons** 5:1 16:25,25
**recall** 5:1 30:23
31:4 60:8
**receivable** 7:9
**receive** 8:5
**received** 74:10
**recent** 8:12 33:1
**receptionist** 11:8
**recollection** 42:7
**record** 4:4 41:15,17
41:18 60:4 75:11
75:12,13 76:3,7
**recorded** 77:11
**recorder** 77:11
**records** 28:18,24
29:1
**redesign** 42:13
**reduced** 77:11
**refer** 15:12
**referred** 35:13
**referring** 15:13

16:1
**reflective** 58:11
**regarding** 27:11
40:22
**regulated** 35:10
**related** 77:16
**relation** 65:20
**relationship** 31:16
**released** 34:6
**remember** 15:4
17:20 18:2,3,7
32:6 43:23 44:7,8
44:19
**removed** 67:25
**render** 63:17
**rented** 8:23
**repeat** 28:20 30:3
56:1
**repetition** 34:2
**rephrase** 5:17
**report** 10:24
**Reporter** 1:17 5:6
41:20,21 46:7
61:12 77:5,23
**reports** 29:9,20
36:12,17
**represent** 3:18 4:11
47:3
**represented** 47:16
**Request** 29:8
**requirements** 27:3
35:24,24,25
**reserved** 2:24
**responded** 29:6
**response** 29:7
**responsible** 36:12
**responsiveness**
2:25
**rest** 44:6 48:6,7
51:13 65:2
**restarting** 41:24
75:19
**restraint** 34:18
**rest/gun** 48:6
**result** 24:3 30:20
77:18

**resulting** 37:22
**retention** 28:18,23
**review** 14:17
**reviewed** 14:13
**Rhodes** 11:12
**rice** 8:17
**rifle** 48:7
**right** 9:5,10,11
11:14 12:19,22
13:2,11,16 15:15
21:20 24:13 25:6
25:7,13 26:9
30:17,19 31:25
32:5 35:3 36:20
38:9 41:24 46:16
47:11,11 49:3,24
50:24 52:22 53:14
54:6 55:18 56:9
56:23,25 58:16
59:13,24 60:4,7
60:16,24 61:8
62:19 63:2 64:2,6
64:14,16,18,20,21
64:25 65:8,16,18
65:19 66:3,5,5,13
66:20,22 67:13,22
67:24 68:1,6,6,14
68:15,16 69:1,7
69:22 71:22 72:2
72:6,6,6,13,25
73:21 75:5,23
76:1
**rod** 48:11 49:11
57:12 65:15
**roll** 67:14 68:2,3
**rolled** 72:16,19
**rolling** 67:11 72:17
**room** 15:9 17:2
20:4
**rope** 34:19 44:12
70:20
**rotate** 68:12
**Rouge** 7:1
**rub** 58:23
**rubbed** 59:1
**rubbing** 68:21

**Rule** 2:22
**rules** 2:23 5:6
**rung** 53:3 54:14,16
54:17,17,20,24
55:7,7,9,13,15
58:18,18,21 59:1
66:15 67:12 68:18
69:4,11,15,15,16
69:20,20 70:16,16
71:14,21
**rungs** 34:2 54:25
55:20 66:15 70:6
71:20
**rust** 60:10,10,13,15
61:2,3 67:6,7,8
**rusted** 60:21,23
68:1
**Rusty** 29:7
**R-A-M-O** 12:21
**R-H-O-D-E-S**
11:13

— S —

**S** 9:16
**safe** 42:22,22 43:6
73:25
**safer** 42:14
**safes** 10:21
**safety** 27:19 28:18
30:20 34:12,15,17
42:21 43:2 65:2
73:15
**sales** 7:20,20 9:23
**salt** 61:6
**same** 20:8,8,9
40:25 42:10,10
54:23 55:8,16
60:19 62:23 64:9
66:8 67:8 72:3
78:5
**sat** 44:21 71:8
**saw** 65:9
**saying** 17:6 23:24
24:4,4,10 43:24
44:22 45:17 50:22
**says** 73:19
**school** 7:24 8:8

**Scientific** 28:12
29:2,14
**screen** 62:20
**seat** 47:24 62:23
63:24 64:3
**seats** 20:10
**second** 9:17 13:24
64:11 72:12
**section** 55:24 56:3
56:5,8 58:21
65:22 66:3 71:24
72:7 73:2
**sections** 20:8
**see** 43:14 45:10
47:6,8 48:20
49:19 55:15 56:11
57:15 58:10 59:10
61:4,7 62:21,22
64:11,11,21 65:13
66:5 68:6,9 69:9
72:7,16
**seen** 62:7
**selection** 10:15
**sense** 5:17 43:9
**sent** 15:4 29:8
**separate** 20:1 30:1
30:4
**seriously** 73:20
**served** 36:19
**sets** 27:10
**seventh** 55:13,15
58:18,18,21 59:1
**several** 7:17 16:22
20:6 31:11 42:9
**severed** 56:16
**shape** 70:17 72:19
**shaped** 72:18
**sharp** 43:7
**sheet** 78:9
**Shi** 34:24
**shiny** 60:20
**ship** 17:1,25 63:18
63:19
**shipments** 12:6
**shipping** 12:5
**shoot** 48:7

One Penn Plaza, NYC
email@tobyfeldman.com

Toby Feldman, Inc.
NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS

tel (212) 244.3990
tel (800) 246.4950

**shooting** 51:13 65:2
**shop** 10:9,9 13:5
  16:10,15 18:9,16
  21:4 23:11,12,15
  28:2 42:5
**short** 62:4
**should've** 52:25
**show** 45:7,7 46:25
  49:7 54:7,15 57:7
  57:8,11 59:22
  65:19 68:10 69:7
  73:2
**showing** 65:11 68:5
**shown** 61:20
**shows** 47:4 56:15
  57:9,12 59:5,5,6,7
  59:21,24 60:13
  61:2 63:11 64:21
  65:21,24 66:2,18
  66:21,25 67:6,10
  67:20,20,23 69:4
  71:20,23,25 72:1
  72:22
**side** 23:6 25:14,17
  27:21 41:1 50:12
  53:5,6,10,13,14
  53:19 54:17 55:8
  55:11,16 56:8
  59:10 63:7 66:3
  68:8,19 72:3,15
**sides** 67:12
**sideways** 68:10
**signed** 18:13
**signing** 3:4
**similar** 63:8 64:10
**since** 10:14,24
  27:15 35:23 57:2
**sir** 10:2 37:21
  40:18 47:7,20
  52:19 53:7,9 54:4
  54:11,13 55:10,12
  57:21 58:7,9,13
  62:19 63:6,21
  64:15 65:4 66:10
  66:17 71:7 72:5,9
  75:4 76:5

**sit** 24:7,10 31:1
  36:4 45:24
**sitting** 37:15
**six** 32:12 33:20
  50:3 55:2
**sixteen** 20:3
**sixth** 70:23
**sixty** 30:25
**size** 23:16 67:10
**slide** 68:10
**slides** 51:14
**small** 13:7 58:25
**Smith** 2:16
**sold** 64:23 73:25
**some** 5:5,22 7:16
  8:23,23 9:17,21
  10:11,12,21,21,22
  13:6 14:13,16
  15:24 16:15 17:23
  19:2,21 20:5 21:5
  25:22 27:6 28:4,4
  29:8 31:6,21,22
  32:21 33:21 34:1
  34:12,19,19 37:12
  42:10 44:4 45:13
  46:24 47:12 48:15
  48:16 54:14,16,21
  54:21,23 55:13
  56:18,21 58:10,25
  62:14 65:13 68:6
  68:9
**somebody** 31:2
  37:14,15,24 38:6
  44:6
**somebody's** 37:25
  38:10
**someone** 63:12
  64:1
**something** 5:16 9:3
  9:4 20:18 48:2,6
  51:14 57:22 59:21
  65:3,5
**sometime** 5:15
**Sometimes** 5:8 38:9
  38:10
**somewhat** 5:4 38:9

**somewhere** 17:12
**son** 6:14,21
**sons** 6:13
**sorry** 47:10 50:1
  60:11
**sort** 20:20
**sounds** 17:5
**soybeans** 8:17
**so-called** 44:18
  67:5
**space** 7:16
**spec** 17:22
**specific** 21:12 37:4
**specification** 20:19
  36:9,10
**specifications** 36:5
**specs** 39:9
**spell** 6:8
**spend** 30:11 68:11
  68:12
**St** 1:18 3:23 7:25
  77:10
**stabbed** 16:24,24
**stabs** 64:10
**stand** 14:14 15:2,7
  15:12,13,15,21,23
  16:4,17,19,20
  17:1,4,11,12,19
  17:24 18:8,17,21
  19:4,8,10,11,24
  20:4,13 22:3,4,13
  22:24,24 23:3,5
  24:1,3,11,22 27:8
  27:8 32:14,25
  33:5,11,15,22
  34:9,11,13,16,17
  34:19,20 35:4,21
  36:5,21 37:16
  38:12 40:7 41:20
  42:3,13 43:3,12
  43:18,25 44:9,14
  44:14,17,24,25
  45:4,4,5,19,22
  47:5,15,17,17,22
  48:1,3,21 50:3
  51:3,13 52:1,4,13

**52**:16 53:18 54:15
  57:10,18 62:25
  63:4,13 65:16
  73:1,18,22,24
  74:7,9,12,22
  75:19
**standards** 32:20
  40:25
**stands** 10:21,23
  19:21,22 20:7,11
  21:25 25:14 26:6
  27:12,14,20 28:19
  28:24 30:20 32:1
  34:8 35:10,14
  36:7,14,18 37:10
  40:17,22 43:5,24
**stand's** 44:2,3,4
  45:5
**stand-alone** 7:15
**stand-in** 50:18
**start** 4:13 10:2,7
  17:21 18:20,23
  34:5 68:21 71:20
  72:17
**started** 8:14,17,25
  9:1,9 10:5,6,8,11
  10:20 19:23
**starting** 7:24 8:11
  10:20 32:5 69:18
**state** 1:17 4:4 23:6
  25:14,17 27:21
  40:7 41:1 77:2,6,6
**states** 1:1 13:7 22:1
  25:18 32:9 39:17
  39:18,21 45:24
  62:24 63:9
**steel** 18:24 21:19
  38:25 39:7,8
  50:12
**step** 51:3 66:6
**Stephens** 1:6,7 3:16
  3:25,25 4:12
**still** 18:11,17,17
  23:6 25:2,7 27:20
  30:9,10 44:11,13
  46:12 50:7,15

**53**:2,18 54:10,19
  55:24 60:14,20
  65:21 68:17,18,24
  69:10,10 72:7,8
**stipulated** 2:19
**stipulations** 1:16
  2:18
**stop** 11:1 63:2,2
  67:11 68:14 69:7
  72:6
**stopping** 41:6,8
**stops** 11:2 21:16
**stored** 74:22
**story** 56:22 70:19
**strap** 44:13,25
  69:10,13,14,19,25
  70:1,8,15,19
  71:11,14
**strapped** 69:10
**straps** 42:19
**Street** 1:18 3:23
  77:10
**strike** 15:20 39:15
  39:15
**strong** 1:11 3:19
  4:1 7:5,7,12,18,23
  8:17 9:9,12,18,20
  9:24 10:18,18
  16:2,3 18:17,18
  23:4 24:22 25:13
  28:17,23 31:6,16
  32:2 36:13,18,20
  37:18,22 40:17,22
  42:25 44:1 48:8
  48:18 49:2,5
**structurally** 33:22
**stuff** 10:16 63:3
**subject** 19:10 23:5
  36:21 42:4 47:4
  63:5 71:24
**submerged** 39:24
**submitted** 78:5
**substantial** 51:10
  74:10
**substantially** 63:8
**sued** 37:17

One Penn Plaza, NYC
email@tobyfeldman.com

Toby Feldman, Inc.
NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS

tel (212) 244.3990
tel (800) 246.4950

suffer 5:25
sufficient 14:9
suggested 52:6
suggestion 52:4,12
supervised 26:11
supervisor 26:4,22
  27:1
supervisors 24:23
  24:24 25:9,25
  26:1,14,16
supplied 34:2,3
support 50:11 59:8
  64:1,2
suppose 45:10
  70:11 74:23
supposedly 60:19
  67:9
sure 5:7 9:16 12:8
  23:7 29:16 33:16
  33:17,18 55:3
swaged 16:23 56:6
swaying 67:19
swear 28:6
sworn 3:10
system 39:23
S-H-I 34:24

**T**

T 77:1,1
take 10:4 13:24
  14:1 15:16 17:1,2
  17:19 19:24 23:3
  23:4 24:19 39:4
  41:8,11 62:10
  67:17,24 68:21
  72:12 75:7
taken 1:15 2:20
  14:13 47:12 53:17
  60:16 71:24 74:23
  75:2 77:8
takes 23:25 24:18
  24:21 38:18,19
taking 3:3 5:7,10
  58:24 59:19
talk 9:19 31:6 38:2
  38:11 39:16
talked 19:3

talking 19:9 20:16
  25:11,13,25 26:2
  33:16 37:11 45:20
  45:22 50:18 54:2
  54:25 57:2 59:25
  64:16 70:11,13
  75:9
Tallulah 77:19
  78:8
tank 39:22
tape 41:24 46:24
  63:11 66:12 75:19
team 17:16
tearing 74:19
Tech 28:13,15
  29:13
telephone 35:1
tell 5:5 8:10 15:15
  16:14 18:22 22:23
  22:23 24:5 27:19
  27:19 29:23 30:1
  30:16 31:7 34:8
  37:4,4 40:8,14
  43:4,16 44:3
  45:24 48:5 49:10
  49:24 53:14 54:17
  54:17 56:22 57:4
  57:9 58:17 65:1
  68:16 73:17 74:20
  74:21,21
telling 4:13 43:1
  70:19
tells 55:19 69:25
ten 11:4 12:17 13:1
  13:9 19:22 23:13
  26:19 32:8 34:4
  36:25 39:4 41:12
Tensas 7:25
test 30:24 32:23,24
  33:18,20,21
tested 27:19 28:6,8
  32:21
testify 14:9
testimony 35:14

71:6,11 74:6,9,12
  75:1,4 78:7
testing 27:12,14,25
  28:1,4,4,5,11,12
  28:24 29:2,2,3,14
  30:20 32:17 33:9
  35:25
tests 30:1,4 33:25
  34:1
Thank 62:19
their 3:13 17:25
  18:1 28:14,24
  34:1 38:3 40:22
  59:24 65:12,12,13
  65:25 70:14
themselves 3:12
thereof 3:4
thing 20:23 43:23
  44:11 47:16,22
  50:12 51:9 59:1
  64:7,16 68:21
  72:16
things 9:23 22:24
  27:18 40:11,13
  59:5,6
think 9:14 13:11
  14:19 25:8 26:25
  28:10,13 30:16
  32:21 42:18 43:11
  46:9 48:9 55:2
  60:7 73:19
thinks 39:11
thirteen 60:18
This'll 62:2
though 5:4 16:4
  17:15 25:3 31:5
  33:22 43:9 57:25
thought 29:4 41:7
  69:2
thousand 34:4
thousands 34:4
  39:2,2
three 8:4 11:18
  15:1 28:8 32:16
  32:18,21,22,23
  33:19 45:4 59:6

68:19,23 69:5
through 10:4 34:13
  36:18 39:25 40:4
  46:24 66:7 71:8
  74:6
throughout 8:19
TIDMORE 2:4
tight 68:1
tightened 62:7
till 8:15
time 2:24 3:1,13
  14:2 21:5,24
  22:12 23:25 25:11
  26:5 30:11,20
  31:12 39:2 41:15
  41:25 42:6 54:23
  58:22 60:19 62:24
  67:9,13 73:5
  74:13 76:7
times 21:2 24:2
  32:21,21,22,23
  34:4,4 36:23
  40:19
title 7:18
titles 9:17
TMA 32:20 42:19
TNI 31:24 32:1
  34:23,25
today 3:21 5:25 6:2
  10:1,4 13:20
  14:12,21,21,25
  29:25 34:10,12,16
  36:4 53:1 54:19
  60:20 68:4
together 16:16,23
  16:24 17:3 18:9
  24:1,11 59:15
  60:2,22 62:8
tomorrow 68:4
top 16:22,24 19:25
  19:25,25 20:1
  23:22 47:21,22
  48:1,2,15 49:23
  51:9,12,15 53:15
  56:4,5 63:4,15,24
  65:9

topics 14:5,8
tore 30:15 60:15
torn 67:22
Totally 40:5
touching 70:21
tough 46:13
toward 54:1
towards 47:18
  52:17 53:24 54:3
  65:20 67:3
track 36:12
traffic 9:7
train 41:7
training 73:4,23
transcript 77:13
transcription 78:7
transportation
  67:18
transported 74:22
tree 10:21,22 15:7
  15:12,13,15,21
  16:4,16,19 17:4
  17:10,12,19 18:8
  18:17,21 21:25
  22:3,3,13 23:3,5
  24:1,3,11,22
  25:14 26:5 27:7,8
  27:12,14,19 28:18
  28:24 30:20 31:25
  32:14,24 33:5,11
  33:22 34:8,9,11
  34:13,16,20 35:4
  35:10,14,21 36:5
  36:7,14,21 37:10
  38:12 40:6,17,22
  42:3,13 43:3,12
  44:15,15,20 45:18
  47:4,18 51:5
  52:17,17 53:5,6
  53:10,24 54:1,3,5
  56:16,17,18 58:25
  63:25 65:17,20
  67:2,3,3,19,23
  69:10 70:8,20,21
  71:12
trial 2:24 16:16

One Penn Plaza, NYC
email@tobyfeldman.com

Toby Feldman, Inc.
NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS

tel (212) 244.3990
tel (800) 246.4950

Page 12

| | | | | |
|---|---|---|---|---|
| trick 24:6,8 | understanding | **W** | weld 20:15,16,19 | 21:22 39:25 44:10 |
| tried 20:2 59:22 | 15:7 77:15 | wait 5:11 30:3 | 20:19,20 21:12 | 50:13 62:6,6 |
| trolley 39:23 | understood 5:14 | waive 3:2 | 24:21 26:4 30:2,4 | were 15:2,23,24 |
| truck 13:15 58:24 | unit 20:1 23:9 | Wal 43:25,25 44:1 | 30:8,9,9,10,11 | 16:23 17:15,16 |
| true 51:18,19 52:15 | 30:24 44:5 58:22 | walk 75:8 | 36:10 48:10 54:9 | 19:22 20:6,7,9,11 |
| 55:25 66:4 77:13 | 63:16 64:9 68:18 | wanna 26:4 43:18 | 54:9,9,12 57:19 | 20:12,22,22,24 |
| 78:7 | 69:1 | 45:10 46:5,7 | 65:5 72:7,13,14 | 21:8,10,14 22:22 |
| truthful 6:2 | United 1:1 21:25 | 47:16 56:24 57:3 | welded 16:22 19:25 | 23:6 25:14 26:6 |
| try 5:9,9,11 27:18 | 25:17 32:9 63:8,9 | 69:7 72:12 | 20:19 21:23 44:9 | 26:13,16 28:12,15 |
| 31:3 43:20 | units 62:22 | want 5:5 37:11 | 48:10,11,12,14 | 30:1,4 31:13 |
| trying 15:23 16:16 | unless 36:19 | 38:8 41:7 46:17 | 49:13,20 51:11,17 | 34:13 35:24,24 |
| 17:24 18:9 | until 2:24 5:11 8:18 | 62:15 71:6 75:8 | 57:11 63:15,16 | 36:16 39:3,9 42:6 |
| tube 72:14,15 | 21:24 22:2 27:13 | wanted 16:20,25 | 64:3,4,19 65:14 | 42:8,9,9,11 45:11 |
| tubing 21:17 | 32:24,24 | 31:12 68:2 | 75:4 | 49:5 50:8,11 |
| turned 51:5 | UPS 17:25,25 | warehouse 10:10 | welder 26:20,23 | 54:21 55:3 60:22 |
| twelve 12:8 20:3 | upside 50:24 | 12:5,12,13,24 | 27:1 57:12 | 62:23,25 63:12 |
| 26:19 32:8 | usage 28:3 | 16:25 | welders 21:3,4,7,8 | 65:24 |
| twenty 5:1 21:2 | use 2:21 18:14 | warn 73:14 | 21:10 23:10,18 | weren't 21:12 27:3 |
| 37:2 50:14 | 26:18 27:3 28:5 | warned 43:9 | welding 10:9 21:1,5 | 34:16 |
| twenty-inch 50:13 | 39:13,18,20,20 | warning 45:9 65:10 | 24:13,20 25:3,9 | Westmoreland |
| Twenty-three 6:18 | 46:23 48:12 73:18 | wasn't 16:23 17:16 | 26:10,11,12,14,16 | 11:6 |
| two 12:1 27:10 | used 18:16 20:8 | 20:5 23:10 26:10 | 26:22,25 27:2,3 | we'll 30:17 61:23 |
| 32:11,21,23 44:18 | 21:7 26:22 28:16 | 26:11,21 27:1 | 30:11 48:11,12,17 | 64:11 |
| 44:21 45:24 49:18 | 33:1 38:23 42:10 | 38:15,17 48:7,8 | 49:10,11 51:21 | we're 3:21 18:14 |
| 51:15 55:15,19 | 44:16,16,20 45:3 | 57:25 59:15,15,17 | 52:13 57:2,20 | 25:13 37:11 41:15 |
| 58:21,21 59:1,5 | 45:3,15,17,23,24 | 59:18 | 58:11 64:22 65:12 | 46:23 50:18 59:25 |
| 61:5 62:22 63:23 | 48:25 55:5 59:9 | water 5:22 61:6 | 65:15 | 64:16 75:8,11 |
| 64:4 69:5 70:4,4,6 | 67:5 74:7 | Waterproof 4:15 | welds 20:12 49:4,7 | 76:7 |
| type 7:21 9:15 | | 25:2,4,7 26:17 | weld's 36:10 60:14 | we've 15:24 30:25 |
| 10:16,16,18 20:7 | | 31:17 | 72:15 | 35:22 42:19 53:1 |
| 20:13 21:18 33:15 | **V** | way 22:18,20 23:8 | well 5:4 8:14,25 | 57:2 65:1 74:6 |
| 52:1 | V 63:24 70:9 | 27:25 33:16 45:2 | 10:5 15:1,22 16:9 | whatsoever 37:10 |
| types 37:9,12 | variations 42:12 | 46:9,25 51:2,6,20 | 16:18 17:10,21 | wheat 8:17 |
| typewritten 77:12 | varies 32:4,4,6,13 | 52:3,16 68:3,4 | 19:20 20:18 21:16 | When'd 15:3 |
| | versa 28:14 | 70:1 | 24:18,25 25:8,17 | whichever 8:12 |
| **U** | versus 1:9 4:1 26:1 | ways 34:1 | 27:25 29:6 31:3 | while 17:7 |
| U 72:18,19 | vertical 52:21 | wear 39:3 68:20 | 32:4,6,19 33:24 | whole 10:10 67:13 |
| ultimately 18:13 | very 18:23 48:2,15 | weather 60:21 | 34:17 35:1,22 | wide 50:13 |
| 32:24 | vice 28:14 | WEAVER 2:4 | 38:15,24 40:10 | width 18:1 59:8 |
| Um-hum 12:15 | video 3:24 41:25 | week 23:19 61:4 | 42:8 43:4,23 | wife 7:6,7 36:15,18 |
| 13:22 17:9 19:6 | 62:21 63:2,3 66:9 | weeks 44:18,21 | 44:25 48:6 49:18 | wife's 6:6 |
| 19:17 35:16 38:4 | 66:25 71:23 72:7 | weight 32:15,18 | 51:4 54:23 56:3 | wind 58:25 67:19 |
| unbolt 64:7 | 75:20 | 33:5,12,19 34:5 | 56:23 57:8,15,17 | wing 53:9 |
| under 57:25 69:3 | Videographer 2:15 | 50:4,7 51:4 | 59:15 61:23 63:24 | wire 48:12 57:12 |
| understand 5:15 | 46:7 | weights 34:2 | 65:8 68:17 70:5 | witness 2:25 3:2,5 |
| 19:15 26:13 71:1 | violation 9:7 75:3 | weight's 34:6 | went 8:4,7 10:11 | 77:14 |
| 71:3 | vocational 8:8 | | | |

One Penn Plaza, NYC
email@tobyfeldman.com

Toby Feldman, Inc.
NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS

tel (212) 244.3990
tel (800) 246.4950

**wondering** 45:23
  46:1
**woods** 28:2
**word** 44:19
**words** 9:24 33:4
  37:21 40:25 53:22
**work** 7:2,4,4,7 8:10
  9:20 10:12,12
  18:11 20:21 23:9
  23:9,18,21 24:1
  58:6
**worked** 8:20,22
  11:9 17:23,23
  23:19
**workers** 16:10,10
  16:15
**workforce** 31:19
**working** 38:25
**works** 7:8 12:12
  13:5,6 25:8
**world** 31:13 51:20
  60:15
**wouldn't** 39:9
  51:24 61:4 68:22
  70:9
**would've** 49:15
  64:9
**wrapped** 63:4
**written** 74:20 75:3
**wrong** 44:5 50:10
  50:17
**W.H** 2:3

**Y**
**yards** 10:10
**yeah** 11:2 12:15
  16:18 22:12 24:6
  24:20 32:3 50:21
  51:13 58:16 69:13
**year** 8:1 9:12 17:4
  17:10 22:18,20
  27:7 31:7 32:1,5,6
  32:6,13,13 60:17
**years** 8:4 10:11
  11:10,18 12:1,8
  12:17 13:1,9
  16:20,22 19:20

20:2,5 26:19 28:1
  33:1 45:6,20
  67:15,16 68:20,23
  68:23,23 72:17,17
  72:20,20,20
**yellow** 44:13 69:9
  69:12,18 70:15,19
  70:19 71:11,14
**yesterday** 14:14
  15:1 60:17
**y'all** 18:24 42:5
  63:18 65:3,5
**y'all's** 44:12 45:11

**Z**
**Z** 24:11
**zoom** 62:16

**#**
**#214** 2:5

**0**
**04** 44:1
**06** 60:8

**1**
**1** 13:19 47:1,9 69:9
**10** 62:2
**11:08** 41:15
**11:23** 41:25
**12:15** 75:11
**12:30** 75:21
**124** 1:18 3:22 77:9
**13rd** 77:19
**1955** 4:22
**1973** 8:2
**1986** 10:3
**1987** 8:15

**2**
**2** 41:25 50:5
**2:07cv128-10** 1:9
**200** 2:5
**2000** 10:13 22:2,5
  31:9,9 32:5
**2008** 1:19 3:21
  77:11,19 78:8

**23rd** 4:22
**280S** 2:11
**2801** 2:11
**29** 1:19 3:21 78:8
**29th** 77:10

**3**
**3** 57:19 75:20
**300** 2:10
**35223** 2:12
**35242** 2:6

**4**
**4** 58:17

**5**
**5** 59:4,5
**568** 7:14
**573** 4:17

**6**
**6** 2:22 50:22 59:20
  59:21 60:2,16

**7**
**7** 60:1,2,4,11,11,12
  60:13
**71366** 1:18 77:10
**76** 8:14

**8**
**8** 61:15
**80's** 15:22
**85** 8:18 9:9 10:20
**86** 9:14 10:5,20
**87** 9:14,14

**9**
**9** 61:17,19,20 62:6
**90's** 22:15 25:15
  34:11 35:4,23
**911** 4:19
**92** 17:12
**93** 17:13,13 22:15
  22:16 38:20
**94** 17:12
**95** 22:16,17
**96** 22:16,17 38:20

38:20

One Penn Plaza, NYC
email@tobyfeldman.com
Toby Feldman, Inc.
NATIONWIDE SERVICES FOR LEGAL PROFESSIONALS
tel (212) 244.3990
tel (800) 246.4950

# FREEDOM COURT REPORTING

---

Page 1

1    IN THE UNITED STATES DISTRICT COURT
2    MIDDLE DISTRICT OF ALABAMA
3    NORTHERN DIVISION
4
5    CASE NUMBER:  2:07-cv-128-10
6    LARRY STEPHENS, ET AL.,
7        Plaintiffs,
8        VS.
9    STRONG BUILT, INC.,
10       Defendant.
11
12       S T I P U L A T I O N
13       IT IS STIPULATED AND AGREED by
14   and between the parties through their
15   respective counsel, that the video
16   deposition of DAVID STEPHENS may be taken
17   before RENA' MESSICK LANIER, Certified
18   Court Reporter and Notary Public for the
19   State of Alabama at Large, at the offices
20   of Morris, Haynes & Hornsby at 131 Main
21   Street, Alexander City, Alabama 35010, on
22   the 17th day of December, 2007.
23       IT IS FURTHER STIPULATED AND

---

Page 2

1    AGREED that the signature to and the
2    reading of the deposition by the witness
3    is waived, the deposition to have the same
4    force and effect as if full compliance had
5    been had with all laws and rules of Court
6    relating to the taking of depositions.
7        IT IS FURTHER STIPULATED AND
8    AGREED that it shall not be necessary for
9    any objections to be made by counsel to
10   any questions except as to form or leading
11   questions, and that counsel for the
12   parties may make objections and assign
13   grounds at the time of the trial, or at
14   the time said deposition is offered in
15   evidence, or prior thereto.
16       IT IS FURTHER STIPULATED AND
17   AGREED that the notice of filing of the
18   deposition by the Commissioner is waived.
19
20
21
22
23

---

Page 3

1            I N D E X
2    EXAMINATION BY:              PAGE
3    MR. LEE                  6
4    EXHIBITS          MARKED
5    (None marked to this deposition)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

---

Page 4

1    IN THE UNITED STATES DISTRICT COURT
2    MIDDLE DISTRICT OF ALABAMA
3    NORTHERN DIVISION
4
5    CASE NUMBER:  2:07-cv-128-10  .
6    LARRY STEPHENS, ET AL.,
7        Plaintiffs,
8        VS.
9    STRONG BUILT, INC.,
10       Defendant.
11   BEFORE:
12       RENA' M. LANIER, Commissioner
13   APPEARANCES:
14       WEAVER & TIDMORE, by WILLIAM
15   HASSINGER, 300 Cahaba Park Circle, Suite
16   200, Birmingham, Alabama 35242, (205)
17   980-6065, appearing for the Plaintiffs.
18       PARSONS, LEE & JULIANO, by DAVID
19   LEE, 300 Protective Center, 2801 Highway
20   280 South, Birmingham, Alabama 35223,
21   (205) 326-6600, appearing for the
22   Defendant.
23       ALSO PRESENT:  Patrick Sheehan

---

1 (Pages 1 to 4)

# FREEDOM COURT REPORTING

Page 5

1     I, RENA' MESSICK LANIER, a
2  Certified Court Reporter of Elmore County,
3  Alabama, acting as Commissioner, certify
4  that on this date, as provided by the
5  Federal Rules of Civil Procedure and the
6  foregoing stipulation of counsel, there
7  came before me at the offices of Morris,
8  Haynes & Hornsby, 131 Main Street,
9  Alexander City, Alabama 35010, beginning
10 at 10:00 a.m., DAVID STEPHENS, witness in
11 the above cause, for oral examination,
12 whereupon the following proceedings were
13 had:
14     THE VIDEO SPECIALIST: This
15 begins Videotape No. 1 in the deposition
16 of David Stephens in the matter of Larry
17 Stephens, et al., versus Strong Built,
18 Incorporated, Case No. 2:07-cv-128-10. On
19 the Record at 10:00 a.m., on Monday,
20 December 17th, 2007.
21     The deposition is taking
22 place at 131 Main Street, Alexander City,
23 Alabama. The videographer is Patrick

Page 6

1  Sheehan.
2     Counsel, please identify
3  yourselves and state whom you represent.
4     MR. HASSINGER: I'm Will
5  Hassinger, co-counsel for the plaintiff,
6  Larry Stephens.
7     MR. LEE: And I'm David Lee,
8  and I represent Strong Built.
9     THE VIDEO SPECIALIST: Okay.
10 Court Reporter, please swear in the
11 witness.
12     DAVID STEPHENS,
13 the witness, after having first been duly
14 sworn, was examined and testified as
15 follows:
16     THE COURT REPORTER: Do we
17 have usual stipulations?
18     MR. LEE: That's fine.
19     MR. HASSINGER: That's fine.
20     EXAMINATION
21 BY MR. LEE:
22  Q.  Would you tell us your name,
23 please, sir?

Page 7

1  A.  David C. Stephens.
2  Q.  Mr. Stephens, my name is
3  David Lee. I'm a lawyer in Birmingham,
4  and I represent Strong Built in a lawsuit
5  that has been filed by Mr. Larry Stephens,
6  who I understand is your cousin; is that
7  correct?
8  A.  Nephew.
9  Q.  Nephew. I'm sorry. You're
10 his uncle, correct?
11 A.  (Nodding head.)
12 Q.  I'm going to be asking you
13 some questions today. And if I ask you
14 something that you don't understand or
15 doesn't make sense, just tell me and I'll
16 be happy to reask the question again.
17     And if you need to take a
18 break for any reason, just tell me, and
19 we'll be happy to take a break as well,
20 okay?
21 A.  Okay.
22 Q.  And one more thing. We have
23 a court reporter here who is taking down

Page 8

1  all of the questions that I ask. And
2  she's also taking down all of your
3  answers.
4     So it's important for you to
5  give a verbal answer so that she can take
6  down, you know, what your response is,
7  okay?
8  A.  Okay.
9  Q.  What is your home address,
10 please, sir?
11 A.  127 Manning Circle.
12 Q.  What circle?
13 A.  Manning.
14 Q.  Manning Circle. And where
15 is that?
16 A.  Tallassee.
17 Q.  Okay. And the zip code?
18 A.  36078.
19 Q.  And you are Larry Stephens'
20 uncle; is that correct?
21 A.  Yes.
22 Q.  How so? Are you related to
23 his brother?

2  (Pages 5 to 8)

# FREEDOM COURT REPORTING

Page 9

1    A.    Related to his mama.
2    Q.    Related to his mother.
3    Okay.  You and Mr. Stephens' mother are
4    brother and sister?
5    A.    Yes, sir.
6    Q.    Okay.  Do you live close to
7    Larry?
8    A.    Yeah.  About -- about a
9    hundred yard.
10    Q.    Okay.  So y'all live real
11    close --
12    A.    Yeah.
13    Q.    -- to each other on the same
14    property?
15    A.    (Nodding head.)
16    Q.    Is that correct?
17    A.    Yeah.
18    Q.    Where do you work,
19    Mr. Stephens?
20    A.    Don't.
21    Q.    And why don't you work?
22    A.    Doctor messed my knee up.
23    He put me out of work.

Page 10

1    Q.    Tell me about that.  What
2    happened with your knee?
3    A.    I worked for Mount Vernon
4    Mill.  And I fell down the steps one night
5    going into work.
6    Q.    And what happened?
7    A.    I had four knee surgeries on
8    it.
9    Q.    On your left knee?
10    A.    Uh-huh.
11    Q.    And that's -- are you
12    totally disabled now?
13    A.    (Nodding head.)
14    Q.    You need to answer out.
15    A.    Yeah.
16    Q.    Okay.  Because of your knee?
17    A.    Yes, sir.
18    Q.    Do you receive social
19    security disability?
20    A.    Not yet.
21    Q.    Have you applied for
22    social --
23    A.    Yes, sir.

Page 11

1    Q.    Has that been ruled upon,
2    your --
3    A.    I got a lawyer on it.
4    Q.    Who is your lawyer?
5    A.    Bobby Boles.
6    Q.    B-O-L-E-S?
7    A.    Yeah.
8    Q.    Where is he located?
9    A.    Tallasee.
10    Q.    When did your accident
11    happen?
12    A.    2003.
13    Q.    2003.  Are you married,
14    Mr. Stephens?
15    A.    Yes, sir.
16    Q.    What's your wife's name?
17    A.    Jackie.
18    Q.    And how long have you and
19    Mrs. Jackie Stephens been married?
20    A.    Twenty-seven years.
21    Q.    Do you have any children?
22    A.    Got two.
23    Q.    And what are their names and

Page 12

1    ages?
2    A.    Janna is twenty-six.  Matt
3    is eighteen.
4    Q.    And I think we're going to
5    take Matt's deposition when we get through
6    with yours?
7    A.    Yes, sir.
8    Q.    Is that right?
9    A.    (Nodding head.)
10    Q.    He was with Larry on the day
11    of this accident?
12    A.    Yes, sir.
13    Q.    Perhaps in a different
14    location but hunting with him; is that
15    correct?
16    A.    Yes, sir.
17    Q.    All right.  Do you -- I have
18    no reason to believe this, but I just want
19    to ask you.  Do you have any criminal
20    history at all?
21    Have you ever been arrested
22    for any reason or convicted of any crimes?
23    A.    No.  Drunk.

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 13

1  Q.  Okay.  When was that?
2  A.  Shoot.  That's been years
3  ago.  Back when I was a teenager.
4  Q.  Okay.  Did you have like a
5  DUI or something?
6  A.  No.  Public drunkenness.
7  Q.  Okay.  Other than that,
8  public intoxication --
9  A.  That's it.
10  Q.  -- is that the only time?
11  A.  That's it.
12  Q.  Do you have a lawsuit that's
13  pending over your knee accident?  No?
14  A.  No.
15  Q.  You just have a claim for
16  social security disability benefits; is
17  that right?
18  A.  Yes, sir.
19  Q.  All right.  Well, let's
20  spend our time year here today talking
21  about this ladder stand.
22  A.  Okay.
23  Q.  First of all, do you know

Page 14

1  who manufactured the ladder stand that is
2  the subject of this litigation?
3  A.  Who made it?
4  Q.  Yes, sir.
5  A.  Strong Built.
6  Q.  Okay.  How did you come into
7  possession of this stand?
8  A.  Got it for Christmas.
9  Q.  And who purchased the stand?
10  A.  What you mean who purchased
11  it?
12  Q.  Who bought it?
13  A.  One of my brothers.
14  Q.  Which one was that?
15  A.  Terry.
16  Q.  Terry?
17  A.  (Nodding head.)
18  Q.  T-E-R-R-Y?
19  A.  Yeah.
20  Q.  Do you know when he
21  purchased the ladder stand, what year?
22  A.  I want -- 2004 when I got
23  it.

Page 15

1  Q.  I know that's when you got
2  it.
3  A.  For Christmas.
4  Q.  Yeah.  You got it for
5  Christmas in 2004?
6  A.  '04.
7  Q.  Is that --
8  A.  I don't know when he bought
9  it.
10  Q.  Okay.
11  A.  I don't know.
12  Q.  All you can say is you know
13  when you got it?
14  A.  I know when I got it.
15  Q.  All right.  And you got it
16  in December of 2004?
17  A.  Yeah.
18  Q.  But the ladder stand or the
19  tree stand itself was bought by your
20  brother, Terry, correct?
21  A.  Correct.
22  Q.  And you don't know what year
23  he bought it?

Page 16

1  A.  No.
2  Q.  Okay.  Do you know where he
3  bought it?
4  A.  No.  I didn't never ask him.
5  Q.  Okay.  I think Larry or
6  perhaps his wife said that they may have
7  gotten it from Wal-Mart.
8  Do you know that to be true
9  or not?
10  A.  I don't know.  I didn't ask
11  him where he got it for me.
12  Q.  Okay.  Now, tell me about
13  Christmas of '04.  Did y'all get together
14  as a family somewhere and exchange
15  Christmas gifts?
16  A.  Uh-huh.  Do it every year.
17  Q.  All right.  Where did
18  that -- that year, 2004, where did y'all
19  celebrate Christmas as a family?
20  A.  I think it was at my mama's.
21  Q.  Okay.  What's her name?
22  A.  Betty.
23  Q.  Stephens?

4  (Pages 13 to 16)

## FREEDOM COURT REPORTING

Page 17

1    A.    Yeah.
2    Q.    And where does she live?
3    A.    Same place. Lives right
4  behind me.
5    Q.    Okay. When you got this
6  tree stand as a gift, was it wrapped in
7  Christmas --
8    A.    Yeah.
9    Q.    -- paper?
10   A.    Sure was.
11   Q.    Okay. And was it in a box?
12   A.    Box.
13   Q.    Had it ever been opened?
14   A.    Nope.
15   Q.    When did you open the box
16  for the first time?
17   A.    I believe I'd say Christmas
18  morning, when I opened it for the first
19  time.
20   Q.    Did you get the gift
21  Christmas Eve?
22   A.    Eve, yeah.
23   Q.    Okay.

Page 18

1    A.    Night.
2    Q.    And took it home, I guess?
3    A.    Yeah.
4    Q.    Did somebody else, some
5  other family member of yours also get a
6  tree stand for Christmas that year?
7    A.    Yeah.
8    Q.    Who was that?
9    A.    I think my mother's brother
10  got one.
11   Q.    Which one?
12   A.    Ricky.
13   Q.    Ricky Stevens? Is that
14  correct?
15   A.    Yeah.
16   Q.    And what kind of stand did
17  he get?
18   A.    Strong Built.
19   Q.    Was it the same model as
20  yours?
21   A.    It's shorter than mine was.
22   Q.    What length stand did you
23  get?

Page 19

1    A.    Sixteen-foot I believe it
2  was.
3    Q.    And what type -- what stand
4  did Ricky get?
5    A.    I think a twelve.
6    Q.    And you're sure it was a
7  Strong Built stand as well?
8    A.    (Nodding head.)
9    Q.    You --
10   A.    Yes, sir.
11   Q.    Do y'all still have that
12  stand?
13   A.    Yes, sir.
14   Q.    Where is it located?
15   A.    In the woods.
16   Q.    The twelve-footer is?
17   A.    Yes, sir.
18   Q.    Okay. Have y'all ever had
19  any trouble with that stand?
20   A.    No, sir.
21   Q.    Where in the woods is it
22  right now?
23   A.    On our hunting land.

Page 20

1    Q.    Where is that? See, I'm not
2  sure where this is. That's why I'm --
3    A.    In Tallassee.
4    Q.    Okay. Do you have some
5  hunting property in Tallassee?
6    A.    Yes, sir.
7    Q.    Okay. Is that out there by
8  your house?
9    A.    No. On down -- on down over
10  there by the airport is where it's at.
11   Q.    Okay. And you know where
12  that stand is now?
13   A.    Yeah.
14   Q.    If we were in Tallassee, you
15  could drive me out out there and take --
16   A.    Yeah. Take you right to it.
17   Q.    Okay. Do y'all leave it out
18  in the woods year round? Or do you
19  take --
20   A.    No. Take them down at the
21  end of hunting season.
22   Q.    Okay. All right. Let's --
23  the sixteen-foot stand is the one that's

5 (Pages 17 to 20)

# FREEDOM COURT REPORTING

Page 21

1  the subject of this lawsuit?  Is that what
2  you're saying?
3      A.    Yes.
4      Q.    All right.  And you tell --
5  you're telling me that you opened the box
6  for the first time at home on Christmas
7  Day; is that correct?
8      A.    Yes, sir.
9      Q.    Okay.  What did you do?
10     A.    Me and Matt put it together.
11     Q.    Okay.  To your knowledge,
12 did all of the parts come with the stand
13 that was in the box?
14     A.    Yeah.
15     Q.    You weren't missing
16 anything?
17     A.    No.
18     Q.    Did the ladder stand come
19 with written instructions?
20     A.    Yeah.
21     Q.    Okay.  Do you still have
22 those written instructions?
23     A.    No.

Page 22

1      Q.    What happened to them?
2      A.    I do not know.  Probably
3  throwed them away.  My wife did.
4      Q.    Did you have experience
5  putting together tree stands or ladder
6  stands prior to putting this one together?
7      A.    What?  Have I ever done it
8  before?
9      Q.    Yes, sir.
10     A.    Yeah.
11     Q.    Lots of times?
12     A.    Yeah.
13     Q.    How many times would you
14 say?
15     A.    Probably about twenty or
16 thirty times.
17     Q.    Okay.  When you put this
18 stand together, the stand that's the
19 subject of this lawsuit, did you know how
20 to do it?
21     A.    What?
22     Q.    Did you know how to put it
23 together?

Page 23

1      A.    Yeah.  By the instructions.
2      Q.    Okay.  That was going to be
3  my next question.  Did you know how to do
4  it on your own?  Or did you have to follow
5  the instructions to put it together?
6      A.    No.  We read -- Matt read
7  the instructions, and we went by that.
8      Q.    You said Matt read the
9  instructions?
10     A.    Yeah.
11     Q.    Had he ever put together any
12 ladder stands before?
13     A.    Yeah.
14     Q.    Can you read and write
15 yourself?
16     A.    I can't read.
17     Q.    Matt obviously can read?
18     A.    Yeah.
19     Q.    Okay.  And what you're
20 saying is the two of you put the stand
21 together; is that right?
22     A.    Yes, sir.
23     Q.    And you say Matt followed

Page 24

1  the instructions?
2      A.    Instructions (nodding).
3      Q.    When y'all were putting this
4  stand together, do you recall having any
5  trouble putting it together?
6      A.    Huh-uh.
7      Q.    The answer is no?
8      A.    No.
9      Q.    To your knowledge, was there
10 anything confusion -- confusing about the
11 written instructions that Matt read and
12 y'all followed while putting the stand
13 together?
14     A.    No.
15     Q.    Did Matt read to you --
16 well, first of all let me ask:  Did the
17 stand come with any labels on it, like
18 warning labels or anything like that?
19     A.    It got three -- it got a
20 weight limit, three hundred pounds, on it.
21     Q.    Okay.  You could see that on
22 the stand itself, correct?
23     A.    Yeah.

6  (Pages  21  to  24)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 25

1  Q.  Did Matt or anybody else
2  read to you any of the content of those
3  warning labels?  Did they read to you what
4  it had to say or anything like that at
5  all?
6  A.  That's the only one we seen
7  on it.
8  Q.  Okay.  Now, it came with the
9  components of the stand.  It came with
10  some written instructions.  It came with
11  some warning labels.
12  Anything else come with the
13  stand that you can recall as we --
14  A.  Not as I remember.
15  Q.  What about any kind of
16  instructional videos or anything like
17  that?
18  A.  Not as I remember.
19  Q.  Okay.  Now, did y'all
20  completely assemble the thing on Christmas
21  Day of 2004?
22  A.  Put it together?
23  Q.  Yes, sir.

Page 26

1  A.  Yeah.
2  Q.  When did y'all take it to
3  the woods for the first time?
4  A.  I want to say in January.
5  Sometime in January.
6  Q.  Of 2005?
7  A.  Yeah.
8  Q.  Now, where did you take it
9  in January of 2005?
10  A.  Out there where we was
11  hunting.
12  Q.  And where was that?
13  A.  Down in Friendship.
14  Q.  In Friendship?
15  A.  (Nodding head.)
16  Q.  Is that a community?
17  A.  Yeah.
18  Q.  Is that near your house?
19  A.  No.
20  Q.  Is it near Tallassee?
21  A.  Out there where I carried
22  them, whatever they was that came they
23  came down for y'all to see what tree it

Page 27

1  was on and all that.
2  Q.  Yeah.  Were you with us that
3  day?
4  A.  Yeah.
5  Q.  Okay.  That's -- that is the
6  area where the accident occurred?
7  A.  Yeah.
8  Q.  Okay.
9  A.  It was in that -- that --
10  that land right there was altogether.  It
11  wasn't in that spot there, you know.
12  Q.  I understand.  But it was in
13  that general area?
14  A.  Yeah.
15  Q.  All right.  Well, that was
16  going -- that's why I'm asking these
17  questions.
18  In 2005, was the stand in the
19  same general area as it was at the time of
20  the accident?
21  A.  Yeah.
22  Q.  Okay.  Now, do you recall
23  what type of tree this stand was put up

Page 28

1  against in 2005?
2  A.  A pine.
3  Q.  A pine tree.  Do you know
4  anything about the size of the tree or
5  anything like that?
6  A.  No.
7  Q.  When y'all took it to the
8  woods for the first time to put it up, did
9  you have to take the instructions with you
10  to put it up?
11  A.  Huh-uh.
12  Q.  Okay.  In other words,
13  y'all -- y'all put the stand together at
14  home with the instructions, but y'all
15  didn't take the instructions to the woods
16  with you?
17  A.  To put it up, huh-uh.
18  Q.  Is that right?
19  A.  Yeah.
20  Q.  Okay.  How -- tell me this.
21  How did y'all physically put the tree
22  stand up in January of 2005?
23  How did you attach it to the

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

| | |
|---|---|
| Page 29 | Page 31 |

**Page 29**

1 tree?
2     A.   What did we use? Or what?
3     Q.   Right. How did --
4     A.   Straps.
5     Q.   Were they ratchet straps?
6     A.   Yeah.
7     Q.   And where did you secure the
8 ratchet straps?
9     A.   On -- with the brace and up
10 at the top.
11     Q.   Okay. How else did you
12 secure the stand to the tree?
13     A.   How what now?
14     Q.   How else did you secure the
15 ladder stand to the tree other than using
16 the straps?
17     A.   That's it.
18     Q.   Okay. Was there a brace
19 that went from the ladder to the tree
20 itself?
21     A.   Yeah.
22     Q.   Like a horizontal brace?
23     A.   It went out and then like

**Page 30**

1 that to the tree.
2     Q.   Okay. Do you know where
3 y'all attached that -- which ladder rung
4 y'all put that on?
5     A.   The first one, I believe.
6     Q.   On the bottom?
7     A.   Not the very bottom step.
8     Q.   Well, that's what I'm
9 talking about. Which step?
10     A.   About the fourth or fifth
11 one up.
12     Q.   Okay. And how did -- tell
13 me this: How is that brace attached to
14 the stand itself?
15     A.   What you mean how is it
16 attached?
17     Q.   Is it bolted on to the --
18     A.   It's welded.
19     Q.   Welded on?
20     A.   And then a bolt goes through
21 it.
22     Q.   Okay. And the bolt goes
23 where?

**Page 31**

1     A.   With the weld and brace.
2     Q.   Can you move that brace if
3 you want to from one location to another?
4     A.   It's -- no. Huh-uh. Can't.
5     Q.   Okay. And what purpose does
6 the bolt serve?
7     A.   Keep the brace from falling
8 off.
9     Q.   Okay. And does that brace
10 telescope out? Does it come out?
11     A.   (Nodding head.) It comes
12 out and hooks around the tree.
13     Q.   Okay. And then you say you
14 put a ratchet strap around that somehow?
15     A.   (Nodding head.)
16     Q.   Is that right?
17     A.   Yes, sir.
18     Q.   How did you do that?
19     A.   Wrapped it around it. And
20 then come around back around and hooked it
21 and then tightened the strap up.
22     Q.   Okay. Wrapped it around
23 what, the ratchet strap?

**Page 32**

1     A.   The strap. I mean, the
2 brace.
3     Q.   Okay. And then wrapped it
4 around the tree?
5     A.   Tree.
6     Q.   Okay.
7     A.   If I ain't mistaken you got
8 two -- well, you got two holes you can put
9 the hooks in, and then ratchet it against
10 the tree.
11     Q.   All right. Now, what about
12 the first ladder section that's on the
13 ground? Do you have to push that into the
14 ground somehow?
15     A.   Yeah.
16     Q.   Okay. And did y'all do all
17 of that too?
18     A.   Yes.
19     Q.   And we're still talking
20 about in January of '05, right?
21     A.   (Nodding head.)
22     Q.   Are you with me on that?
23     A.   Yeah.

8 (Pages 29 to 32)

# FREEDOM COURT REPORTING

Page 33

```
1      Q.    Okay.  Did you all have any
2   trouble with that stand in January of '05?
3      A.    No.
4      Q.    Okay.  How many times would
5   you say y'all used it in the 2005 hunting
6   season?
7      A.    I probably got in it
8   about -- in 2005 about twenty times.
9      Q.    Twenty times?
10     A.    (Nodding head.)
11     Q.    Did anybody use that stand
12  other than yourself?
13     A.    I think Matt and Peanut did
14  when they went.  Larry.  We call him
15  Peanut.
16     Q.    All right.  So you used it
17  twenty times, roughly twenty times --
18     A.    Yeah.
19     Q.    -- in 2005.
20           How many times would you say
21  Matt used it?
22     A.    I don't -- he used it
23  several times.
```

Page 35

```
1   it down.
2      A.    Unhooked it, the straps.
3   Got the climber.  Went up to the top strap
4   and unhooked it and laid it on the ground.
5   And then took the ladders apart.
6      Q.    You said you took the
7   climber.  What are you talking about, the
8   climber?
9      A.    Tree climber.
10     Q.    You have a tree climber?
11     A.    (Nodding head.)
12     Q.    You have a tree climber
13  that's different?
14     A.    You go up to hook the top
15  strap.
16     Q.    Okay.  And now just so the
17  Record is clear, a tree climber is
18  something different than --
19     A.    The ladder stand.
20     Q.    -- the ladder stand?
21     A.    (Nodding head.)
22     Q.    How do you go up a tree
23  using a tree climber?
```

Page 34

```
1      Q.    I guess we can ask him.  How
2   many times did Larry use it?
3      A.    Probably about seven or
4   eight times.
5      Q.    I'm talking about in 2005.
6      A.    Five.
7      Q.    Anybody have any trouble
8   with it at all in --
9      A.    Huh-uh.
10     Q.    -- 2005?  No?
11     A.    No.
12     Q.    Now, when did y'all take it
13  down if you took it down?
14     A.    End of hunting season.
15     Q.    And when was that?
16     A.    January 30th.  Last day of
17  hunting season.
18     Q.    January the 30th?
19     A.    Yeah.
20     Q.    Which would be 2006, right?
21     A.    Correct.
22     Q.    Okay.  And how did you take
23  it down?  Tell me what y'all did to take
```

Page 36

```
1      A.    You hook it around the tree
2   and do the bottom part, and pull yourself
3   up with it.
4      Q.    Okay.  And that's how you
5   climbed the tree to help --
6      A.    To hook the top strap.
7      Q.    Okay.  To both put it up and
8   take it down as well?
9      A.    Yes, sir.
10     Q.    All right.  When y'all took
11  it down in January of '06, where did you
12  store it?
13     A.    Behind my house in the shed,
14  barn, whatever you want to call it.
15           MR. HASSINGER:  I'm sorry.
16  Just to keep the Record clear, are we
17  talking about January '05?  Or '06?
18           MR. LEE:  '06.  He said he
19  took it down in January of '06.
20           MR. HASSINGER:  But he got it
21  for Christmas in '04, and then put it up
22  in January of '05.
23     A.    Yeah.
```

9 (Pages 33 to 36)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 37

1        MR. LEE:  And it stayed up.
2        A.    Hunting season goes out --
3    like this is, would be out in '08.
4        Q.    You said it was stored in
5    some kind of shed?
6        A.    Yeah.
7        Q.    Can you describe that shed
8    for me?
9        A.    It's just a shed.
10       Q.    Is it enclosed?
11       A.    Yeah.
12       Q.    Okay.  Do you have doors on
13   it?
14       A.    Yeah.
15       Q.    Okay.  And is it completely
16   enclosed?
17       A.    Yes.
18       Q.    Out of the weather?
19       A.    (Nodding head.)  Uh-huh.
20       Q.    Okay.  And where in the shed
21   did y'all keep these stands?
22       A.    Whereabouts?
23       Q.    Yes, sir.

Page 38

1        A.    In the shed.  I can't tell
2    you exactly the position we had them.
3        Q.    But inside the shed
4    somewhere?
5        A.    Yeah.
6        Q.    Not exposed to the weather?
7        A.    Huh-uh.
8        Q.    How many -- you need to say
9    say yes or no.
10       A.    No.
11       Q.    How many tree stands did
12   y'all have in there together?
13       A.    I'd say four.  Around that.
14   That ain't counting my climbers and all
15   now.
16       Q.    Yeah.  I'm just talking
17   about ladder stands.
18       A.    Oh.
19       Q.    You have four different
20   ladder stands?
21       A.    No.  I ain't got but three
22   different ladder stands.
23       Q.    And how many climbers?

Page 39

1        A.    A couple of them.
2        Q.    Now, when y'all took the
3    tree stand down in January of 2006, did
4    you inspect the tree stand to see if it
5    had been damaged in any way?
6        A.    Bent or anything like that?
7        Q.    Damaged?  Bent?  Broken?
8    Anything.
9        A.    No -- yeah.  We didn't -- it
10   wasn't nothing wrong with it.
11       Q.    You did?  And how did you
12   just inspect it?  Just look at it?
13       A.    Yeah.  Basically.
14       Q.    Okay.  Now, you say you used
15   it about twenty times, correct?
16       A.    Yeah.
17       Q.    How tall are you,
18   Mr. Stephens?
19       A.    Six, two.
20       Q.    And how much do you weigh?
21       A.    Two hundred.
22       Q.    Two hundred pounds?
23       A.    (Nodding head.)

Page 40

1        Q.    And Matt, your son, how tall
2    is he, and how much does he weigh?
3        A.    He's about six, three and
4    weighs about two-ten.
5        Q.    All right.  Now, once the
6    tree stands were placed in the shed, were
7    they ever taken out before the next
8    hunting season?
9        A.    Huh-uh.
10       Q.    They stayed in there the
11   whole time?
12       A.    Yes, sir.
13       Q.    All right.  Now, we fast
14   forward to the next hunting season.  When
15   did y'all put them back up?
16       A.    When in '06?
17       Q.    Yes, sir.
18       A.    About a week or two before
19   hunting season came in.
20       Q.    When was that?  And when was
21   that?
22       A.    '06.
23       Q.    Yes, sir.  What month?

10  (Pages  37 to 40)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 41

1    A.    November.
2    Q.    Okay. About a week or two
3  before hunting season began?
4    A.    Yes, sir.
5    Q.    And tell me, what did you do
6  before putting the stands up? Did you do
7  another inspection? Did you --
8    A.    Looked at all the bolts and
9  stuff on them, made sure they were tight
10  and stuff.
11    Q.    And what else?
12    A.    That was about it. Made
13  sure they wasn't rusted up and stuff.
14    Q.    Anything else?
15    A.    And I put some Styrofoam
16  around my top brace where to prop my gun
17  on.
18    Q.    Anything else?
19    A.    That's it.
20    Q.    Did you replace the ratchet
21  straps, the webbing on the ratchet straps?
22    A.    Every year we redone them,
23  put new ones on them.

Page 42

1    Q.    So you put new ratchet
2  straps on them?
3    A.    (Nodding head.)
4    Q.    You need to answer out.
5    A.    Yeah.
6    Q.    Where did you get the
7  webbing for the ratchet straps?
8    A.    Where did we buy them?
9    Q.    Yes.
10    A.    Wal-Mart I believe is where
11  we got them. Where some of mine come
12  from.
13    Q.    And did you replace the
14  strap on the stand that -- that's the
15  subject of this lawsuit?
16    A.    Do what now?
17    Q.    Did you replace the webbing
18  on the stand that's the subject of this
19  lawsuit?
20    A.    The straps?
21    Q.    Yes, sir.
22    A.    Yeah. It had new straps on
23  it.

Page 43

1    Q.    Okay. Do you replace the
2  straps every year?
3    A.    Yes, sir.
4    Q.    And why is that?
5    A.    Because them things get
6  messed up, rot on you.
7    Q.    You just do it whether it
8  needs it or not?
9    A.    (Nodding head.)
10    Q.    You --
11    A.    Done it on that -- yeah.
12  Might as well say because them ratchet
13  straps don't last long.
14    Q.    Okay. All right. You said
15  you also inspected the bolts?
16    A.    Yeah.
17    Q.    Did you have to replace any
18  of the bolts?
19    A.    Not then.
20    Q.    What about ever?
21    A.    Huh-uh.
22        THE COURT REPORTER:  Is that
23  no?

Page 44

1    A.    Just make sure -- yes,
2  ma'am. Just make sure they're tight and
3  stuff.
4    Q.    All right. You never
5  replaced any of the bolts?
6    A.    Huh-uh.
7    Q.    No?
8    A.    No.
9    Q.    You said you also looked at
10  the stand to see if it was rusted; is that
11  correct?
12    A.    Yes.
13    Q.    Did you see any rust on the
14  stand?
15    A.    No.
16    Q.    If you had seen rust on the
17  stand, would you have used it?
18        MR. HASSINGER:  Object to the
19  form.
20    Q.    (BY MR. LEE) You can
21  answer. If you had seen rust on the tree
22  stand before y'all took it out to the
23  woods in November of 2006, would you have

11 (Pages 41 to 44)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 45

1   still used the stand anyway?
2       A.    Any time you got a metal
3   stand you're going to have some kind of
4   rust on it.
5       Q.    Okay.
6       A.    Any time.
7       Q.    Okay.  You said that you
8   didn't see rust on this particular stand
9   though?
10      A.    No, not then.  But, I mean,
11  if I had really, really looked at it, you
12  probably could have found a speck.
13      Q.    Yeah.  Well, if it had been
14  real rusty, would you have used it?
15      A.    No.
16      Q.    If there had been a lot of
17  rust all over the stand --
18      A.    All over it, no.
19      Q.    -- you would not have used
20  it?
21      A.    I wouldn't have trusted it.
22      Q.    And why would you not have
23  trusted it?

Page 46

1       A.    Rusted.
2       Q.    And what can rust do?
3       A.    Make it weak.
4       Q.    And when something is weak,
5   it could fail, correct?
6       A.    Do what now?
7       Q.    If something is weak, it can
8   fail?
9       A.    Yeah.
10      Q.    Did you inspect the welds on
11  the tree stand?
12      A.    No.  I ain't no -- I ain't
13  no inspector on weld.
14      Q.    Well, you're enough of an
15  inspector to see if there's rust on a
16  weld?  You can see that, can you not?
17      A.    Oh, yeah.
18      Q.    Okay.  If you had seen rust
19  on any of the welds, would you have used
20  the tree stand?
21      A.    Now, what you talking about
22  rust now?  The whole thing rusted up?  Or
23  just a little speck?

Page 47

1       Q.    I'm not talking about a
2   little speck of rust.  I'm talking about a
3   lot of rust.
4       A.    The whole thing?
5       Q.    A lot of rust all over the
6   stand.
7       A.    Oh, no.  I wouldn't have
8   used it.
9       Q.    For the same reason?
10      A.    Yeah.
11      Q.    That rust can make a weld
12  weak?
13      A.    Yes.
14      Q.    Before you took the tree
15  stand to the woods in November of '06, did
16  you see any damage to the stand itself?
17      A.    Huh-uh.
18      Q.    No?
19      A.    No.
20      Q.    If the tree stand had looked
21  bent or damaged in any way, would you have
22  used it?
23      A.    No.

Page 48

1       Q.    And why not?
2       A.    Being dented, that would
3   make it weak.
4       Q.    And if the tree stand was
5   bent, dented and perhaps weak, it would be
6   in your opinion dangerous and unsafe to
7   use; is that correct?
8       A.    Right.
9       Q.    All right.  Now, after you
10  changed the webbing on the ratchet strap
11  and did your inspection of the stand, did
12  y'all then take them to the woods, take
13  the stands to the woods?
14      A.    Yeah.
15      Q.    Okay.  Did you put all the
16  stands up the same day?
17      A.    Put two -- put two up that
18  day.  And we went back and put the other
19  one up.
20      Q.    Okay.  The first day you
21  went out there, did you put the stand
22  that's the subject of this lawsuit up?
23      A.    Yeah.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 49

1    Q.    All right.  Now, tell me how
2  you did it and who helped you.
3    A.    What you mean how we did it?
4    Q.    How did you put the stand
5  up?
6    A.    Me and Peanut, Larry, stood
7  it up against the tree.  And he put the
8  bottom strap on and held the ladder when I
9  got the climber and went up and done the
10  top strap.
11    Q.    You used the climber this
12  time as well?
13    A.    (Nodding head.)  Do on all
14  of them.
15    Q.    Okay.  And Larry was at the
16  bottom?
17    A.    Yeah.
18    Q.    Anybody else help you
19  besides you and Larry?
20    A.    (Shaking head.)
21        THE COURT REPORTER:  No?
22    A.    No.  Me and Larry put up all
23  of our stands.

Page 50

1    Q.    All right.  It was just the
2  two of you there; is that correct?
3    A.    Yes, sir.
4    Q.    Now, the tree that you put
5  it on, was that the same tree it was on at
6  the time of this accident?
7    A.    Yes.
8    Q.    Okay.  And what type of tree
9  was that?
10    A.    Pine.
11    Q.    Do you know anything about
12  the size of that pine tree?
13    A.    How big around it was, like
14  that?
15    Q.    Yes, sir.
16    A.    It was a good size tree.
17    Q.    Do you know what the
18  instructions say in terms of the
19  recommended size of a tree that you should
20  put a ladder stand up against?
21    A.    I go by the cut in the tree,
22  I mean, the stand, if it fits good against
23  it.

Page 51

1    Q.    Okay.  When you say the cut,
2  you mean on the horizontal brace?
3    A.    Yeah.
4    Q.    Is that what you're talking
5  about?  All right.
6        But you've never read or had
7  anybody read to you what the manufacturer
8  recommends in terms of the size of the
9  tree that this stand should --
10    A.    Yeah.  Matt did.
11    Q.    Okay.  What did Matt tell
12  you about the size of the tree?
13    A.    I can't remember right off.
14    Q.    And y'all didn't have those
15  instructions with you when you --
16    A.    Huh-uh.
17    Q.    -- put it up the second
18  time; is that correct?
19    A.    Yeah.
20    Q.    Now, before we get too far
21  into this, let's go back to the year
22  before.
23        Once y'all put that stand up

Page 52

1  the first year, did y'all ever move it or
2  take it down before the end of the hunting
3  season?
4    A.    Huh-uh.
5    Q.    Okay.  And the same question
6  about the next hunting season when this
7  accident occurred.
8        Once you put it up, did you
9  ever take it down or move it or anything
10  like that at all?
11    A.    When -- when he fell?
12    Q.    Yes, sir.
13    A.    Yeah.  We took it down after
14  he fell.
15    Q.    Before he fell?
16    A.    No.
17    Q.    Once you put it up --
18    A.    It stayed there.
19    Q.    The whole time until he
20  fell?
21    A.    Yes, sir.
22    Q.    All right.  Now, take me --
23  because you and Larry were there and I was

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 53

1　not, what I want you to do is take me
2　through exactly what y'all did to put this
3　tree up on the -- on -- put the stand up
4　on the tree, you know, at the beginning of
5　the hunting season when this accident
6　occurred.
7　　　　Tell me what y'all physically
8　did to put the stand up against the tree.
9　　　A.　We stuck the bottom down
10　on -- we leaned it out. Stuck the bottom
11　down. Raised it up and got down and
12　raised it up and pushed it up on the tree.
13　　　Q.　Okay. And what type of
14　angle was the stand at against the tree?
15　　　A.　About -- it wasn't straight
16　up, and it wasn't real leaned out.
17　　　Q.　Okay. Do you know what
18　degrees it was?
19　　　A.　No.
20　　　Q.　Okay. Why don't you do
21　this? Raise your hand up and show me
22　which -- let's pretend like this is the
23　tree. And maybe we can get this on camera

Page 54

1　here if we can. Let that be the tree.
2　　　A.　All right.
3　　　Q.　And kind of show me what
4　angle.
5　　　A.　About like that right there
6　(indicating).
7　　　Q.　Use your arm as being the
8　ladder stand, and use my note pad as being
9　the tree.
10　　　A.　(Indicating.)
11　　　Q.　Okay. That's -- this is --
12　this is the --
13　　　A.　It's the tree stand.
14　　　Q.　That's the tree stand. And
15　this --
16　　　A.　That's the tree.
17　　　Q.　-- is the tree. And that's
18　the way it appeared up against the tree?
19　　　A.　Yeah. You make it -- make
20　it where it be flush up here against the
21　tree good.
22　　　Q.　All right. And who taught
23　you how to put a stand up against a tree

Page 55

1　like that?
2　　　A.　My brother-in-law.
3　　　Q.　Okay. And what's his name?
4　　　A.　Roger.
5　　　Q.　And his last name?
6　　　A.　Wood.
7　　　Q.　He still -- does he live
8　near y'all?
9　　　A.　Yes.
10　　　Q.　In Tallassee?
11　　　A.　(Nodding head.)
12　　　Q.　Is that a yes?
13　　　A.　Yes, sir.
14　　　Q.　All right. So you put the
15　bottom of the ladder into the ground,
16　leaned it up against the tree.
17　　　　And you said Larry put the
18　strap around the bottom?
19　　　A.　Yes, sir.
20　　　Q.　Where around the bottom?
21　　　A.　The brace.
22　　　Q.　The horizontal brace?
23　　　A.　(Nodding head.)

Page 56

1　　　Q.　Okay. Is that a yes?
2　　　A.　Yes.
3　　　Q.　And then you climbed up
4　the --
5　　　A.　Tree with a climber and done
6　the top.
7　　　Q.　Okay. And where did you
8　secure the strap at the top? Where did
9　you put the strap?
10　　　A.　It's got a bar come down. I
11　hooked it around one bar and then the
12　other and the ratchet tightened it up.
13　　　Q.　When you say a bar, is that
14　the type of bar that came with the stand
15　itself?
16　　　A.　Yeah.
17　　　Q.　Okay. Did you replace
18　anything on the stand other than the
19　webbing for the ratchet straps?
20　　　A.　Huh-uh.
21　　　Q.　Is that a no?
22　　　THE COURT REPORTER: No?
23　　　A.　No. Yeah. Yes, I did.

14 (Pages 53 to 56)

# FREEDOM COURT REPORTING

Page 57

1  Insulation I got around the top of it.
2      Q.    And that was to rest your
3  gun on?
4      A.    Yes, sir.
5      Q.    What about any of the bars
6  up top?  Did you have to replace --
7      A.    No.
8      Q.    -- any of those bars?
9          Okay.  Am I to understand
10  that the only two things that were holding
11  this tree stand to the tree were two
12  ratchet straps, one around the horizontal
13  base and then the one up top?
14      A.    Yes.
15      Q.    Is that correct?
16      A.    Yes, sir.
17      Q.    Anything else?
18      A.    That's it.
19      Q.    Did y'all have any kind of
20  ropes or anything like that, or chains
21  wrapped around the tree and the stand to
22  help secure it in any way?
23      A.    Huh-uh.  Had a rope on a

Page 58

1  tree stand --
2      Q.    Where was --
3      A.    -- where we pull the gun up.
4      Q.    Other than that --
5      A.    Huh-uh.
6      Q.    -- any other ropes or chains
7  or anything like that?
8      A.    Huh-uh.  No.
9      Q.    Nothing to help secure --
10      A.    No.
11      Q.    -- the stand to the tree,
12  correct?
13      A.    Right.
14      Q.    Have you seen other tree
15  stands where they have chains and ropes
16  and so forth that are used to help secure
17  the stand to a tree?
18      A.    When they lock them.  Got a
19  lock or something on them.
20      Q.    Okay.  Now, you said this
21  stand was put up in November of '06?
22      A.    (Nodding head.)
23      Q.    Is that correct?

Page 59

1      A.    Yeah.
2      Q.    After you put the stand up,
3  did you walk up and down the ladder to see
4  if it was tight and secure?
5      A.    Yes.
6      Q.    You tested it?
7      A.    Shook it.  See if it would
8  move around the three or anything like
9  that, and it wouldn't.
10      Q.    You tried to shake it and
11  couldn't do it?
12      A.    (Nodding head.)  Yes, sir.
13      Q.    All right.  What about climb
14  up it?  Did you do that?
15      A.    Yeah.
16      Q.    How many times did you do
17  that?
18      A.    About three or four times.
19      Q.    On the day you put it up?
20      A.    Oh, no.  About twice.  I --
21  yeah.  About twice.
22      Q.    Okay.  Did you have any
23  trouble going --

Page 60

1      A.    Huh-uh.
2      Q.    -- up and down?
3          You climbed up it twice to
4  test it?  Is that what you did?
5      A.    Yeah.
6      Q.    Everything feel safe and
7  secure?
8      A.    Yeah.
9      Q.    You didn't feel unstable or
10  shaky or anything like that at all?
11      A.    No.
12      Q.    What about Mr. Stephens,
13  Larry Stephens?  Did he go up it on the
14  day that y'all installed it?
15      A.    I cannot remember.  I -- I
16  can't remember if he did or not.
17      Q.    All right.  Now, was it on
18  that same tree the entire time leading up
19  to his accident?
20      A.    Yeah.
21      Q.    It wasn't ever moved?
22      A.    No.
23      Q.    How many times was this tree

## 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 61

1  stand used before the accident?
2      A.    Before Larry got hurt?
3      Q.    Yes, sir.
4      A.    I probably been in it three
5  or four times.
6      Q.    That -- that year?
7      A.    Yeah.
8      Q.    Any trouble that year?
9      A.    Huh-uh.  And Matt probably
10  been in it probably about that many.  I
11  really don't know.
12      Q.    Did he have any trouble?
13      A.    Said he didn't.
14      THE COURT REPORTER:  Said he
15  did or did not?
16      A.    Didn't.
17      Q.    Did not.  Anybody else other
18  than you or Matt use it that --
19      A.    Huh-uh.
20      Q.    -- hunting season?
21      A.    No, sir.
22      Q.    Okay.  Am I also to
23  understand that on the day of the accident

Page 62

1  that was the first time that Larry had
2  tried to go up it that year?
3      A.    I -- I don't know if he had
4  been with Matt while I was at work then or
5  not.  But I think it is the first time he
6  had went with him.
7      Q.    That year?
8      A.    That year.
9      Q.    He had been up it the year
10  before?
11      A.    Oh, yeah.
12      Q.    But the only person -- the
13  only people that you know for sure that
14  had gone up it that year would have been
15  you and Matt?
16      A.    Right.
17      Q.    Okay.
18      A.    Well, no.  Peanut, he went
19  up it, but he come back out of it.
20      Q.    On the day of the accident?
21      A.    Yeah.
22      Q.    So your testimony is it had
23  been used six or eight times on the -- or

Page 63

1  during the hunting season when this
2  accident occurred; is that right?
3      A.    Yeah.  Hunting season hadn't
4  been in long when he fell.
5      Q.    Now, was this the second
6  hunting season that y'all had used this
7  tree stand before his accident?
8      A.    No.  We used it in 2005.
9      Q.    I know that.  That's --
10  that's the first hunting season you used
11  it, right?
12      A.    Right.
13      Q.    And then 2006 would have
14  been the second?
15      A.    Second.
16      Q.    And that's my question.  Was
17  this the second hunting season?
18      A.    Yeah.
19      Q.    How many different trees had
20  this tree stand been attached to before
21  the accident?
22      A.    Probably three.
23      Q.    All right.  So that tells me

Page 64

1  that at some point in time y'all moved it
2  from one tree to another?
3      A.    Uh-huh.
4      Q.    When was that?
5      A.    The first, 2005, we moved
6  it -- it wasn't as far as from here to the
7  door.
8      Q.    Okay.  Who moved it?
9      A.    Me and -- me and Larry.
10      Q.    And why did y'all move it?
11      A.    Because we didn't like the
12  spot where it was at.  You couldn't see
13  over the bush.
14      Q.    Okay.  Did you take it down
15  the way you've previously described?
16      A.    Yes.
17      Q.    Put it back up the way
18  you --
19      A.    Same way.
20      Q.    Have to replace any parts or
21  anything like that at all?
22      A.    Huh-uh.
23      Q.    Any bolts?  Any nuts?  Any

16  (Pages 61 to 64)

# FREEDOM COURT REPORTING

Page 65

1  parts?
2      A.    Huh-uh.
3      Q.    Any rails?  Anything?
4      A.    Huh-uh.
5      Q.    The answer is no?
6      A.    No.
7      Q.    Do you know anything about
8  the size of the second tree that it was
9  placed up against?
10     A.    No.  Just -- but it looked
11 about like the same one.  About like that.
12     Q.    Hold your hands up so the
13 camera can see it.
14     A.    About like that
15 (indicating).
16     Q.    Okay.  That was the first
17 tree or the second tree?
18     A.    The second one.
19     Q.    How big was the first one?
20 Show me.
21     A.    About the same size.  About
22 like that (indicating).
23     Q.    And the next -- the tree

Page 66

1  where the accident occurred, how --
2      A.    Same.  About -- about -- it
3  might have been that big or a little
4  smaller.
5      Q.    Show me with your hands.
6      A.    About like that
7  (indicating).
8      Q.    Okay.  So you think -- were
9  all three trees pine trees?
10     A.    Yes, sir.
11     Q.    All right.  Were any
12 alterations whatsoever made to the tree
13 stand that's the subject of this lawsuit
14 other than webbing on the ratchet strap
15 being changed?  Anything other than that?
16     A.    I don't know what you're
17 talking about.
18     Q.    Did y'all make any changes
19 or any alterations to the tree stand other
20 than changing out the webbing on the
21 ratchet straps?
22     A.    And -- nothing but putting
23 my insulation on the top of it, gun rest.

Page 67

1      Q.    Those are the only two
2  alterations?
3      A.    Yes.
4      Q.    Did y'all add any additional
5  rails to the top of the stand?
6      A.    Huh-uh.
7      Q.    You sure about that?
8      A.    I -- no.  I don't think we
9  did.  I can't be a hundred percent.
10     Q.    Did y'all take any parts
11 from a different stand and put it on this
12 stand?
13     A.    Oh, no.
14     Q.    If additional rails were
15 added to the top of the stand, do you have
16 any idea who did that work?
17     A.    Huh-uh.
18          THE COURT REPORTER:  No?
19     A.    No.
20     Q.    Did anybody do any
21 additional welding at the top of the
22 stand?
23     A.    I -- nobody but y'all.

Page 68

1  Strong Built, I reckon.
2      Q.    Okay.  Well, let me just ask
3  you in general.  From the time you took
4  possession of the tree stand until the
5  time of the accident, did anybody do
6  any --
7      A.    I didn't.  I can't weld.  So
8  I -- can't nobody in our family weld.
9          MR. HASSINGER:  David, just
10 try -- try to let him finish the question
11 before you answer because it's hard for
12 her to write over both of y'all.
13     A.    Okay.
14     Q.    My question is:  From the
15 time you opened up the tree stand or
16 ladder stand out of the box on Christmas
17 of '04 until the time of the accident, did
18 anybody do any additional welding to the
19 stand?
20     A.    You saying did we add
21 something?  Or -- I don't understand what
22 you're saying.
23     Q.    Did anybody do any welding

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

1  to this stand --
2      A.    No.
3      Q.    -- after you took possession
4  of it?  The answer is no?
5      A.    No.
6      Q.    And you're also telling me
7  that nobody added any additional rails to
8  the stand; is that correct?
9      A.    Not as I know of.
10     Q.    Okay.  All of the bolts that
11 are on this tree stand now, are all of
12 those the bolts that came with the stand
13 built -- I mean, the stand from Strong
14 Built?
15     A.    Yeah.
16     Q.    You're saying that you
17 didn't replace any of the bolts on the
18 stand?
19     A.    Except that one on the
20 brace.
21     Q.    Y'all replaced that one?
22     A.    Yeah.
23     Q.    And when was that done?

1      A.    In 2006.
2      Q.    You talking about on the
3  horizontal brace?
4      A.    Yeah.  Bottom base is what I
5  call it.
6      Q.    Okay.  The one that
7  telescopes out --
8      A.    Yes.
9      Q.    -- against the tree; is that
10 correct?
11     A.    Yes, sir.
12     Q.    And why did y'all replace
13 that bottom bolt?
14     A.    Because it was rusted.
15     Q.    What did you do with that
16 bolt?
17     A.    What did we do with it?
18     Q.    Yes, sir.
19     A.    Throwed it away.
20     Q.    And what type of bolt did
21 you replace it with?
22     A.    What you mean what type?
23 Name brand?  Or what?

1      Q.    What size bolt was it?  What
2  kind of bolt was it?  Where did you buy
3  it?
4      A.    Got it from Tallassee True
5  Value.
6      Q.    True Value Hardware?
7      A.    Yeah.
8      Q.    And do you know what kind of
9  bolt it was?
10     A.    No.
11     Q.    Do you know how long it was?
12     A.    About like that
13 (indicating).
14     Q.    Okay.  You're -- hold your
15 hand up again.  Let me see.  A little
16 longer than an inch maybe?
17     A.    Maybe.
18     Q.    Do you know what strength
19 bolt you put in there?  What the strength
20 was?
21     A.    No.  I just told -- went
22 over there and told them what I needed,
23 what it was for and that's what they give

1  me.
2      Q.    Did you take the stand over
3  there --
4      A.    No.
5      Q.    -- to let them look at it?
6            All right.  Did you have a
7  nut with this bolt?
8      A.    Yes, sir.
9      Q.    Do you still have the bolt
10 and the nut that you put in there?  Is it
11 part -- was it recovered, you know, after
12 the accident?
13     A.    Do I got it?
14     Q.    Yes, sir.
15     A.    No.  I didn't go out there
16 and take the stand down.
17     Q.    Okay.
18     A.    Jaiton did.
19     Q.    Do you know what type of
20 material this bolt was made out of that
21 you put in there?
22     A.    No.
23     Q.    You don't know whether it

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 73

1  was steel or whether it was treated with
2  anything?
3      A.    They said it was case hard
4  bolt is what they told us.
5      Q.    A case hard bolt?
6      A.    Yeah.
7      Q.    Which True Value did you go
8  to?
9      A.    Tallassee.
10      Q.    In Tallassee.  Did you buy
11  more than one of those bolts?
12      A.    That's the only bolt.  But I
13  bought some more stuff.
14      Q.    What else did you buy there
15  that day?
16      A.    I can't remember.  We was
17  working on my sister's house, and I had to
18  pick up some Sheetrock and stuff like
19  that.
20      Q.    Did you buy anything else
21  for the tree stand --
22      A.    No.
23      Q.    -- other than that bolt?

Page 74

1      A.    No.
2      Q.    Did you pay cash?  Or check?
3  Or how did you pay for it?
4      A.    Cash.
5      Q.    Do you have any receipt for
6  what you bought that day?
7      A.    No.  (Shaking head.)
8      Q.    When do you think you would
9  have bought this from True Value?
10      A.    Had to be in November
11  sometime when we got the stand out and
12  looked at them.
13      Q.    November of 2006?
14      A.    Yeah.
15      THE VIDEO SPECIALIST:  I just
16  got about five minutes on this tape.
17      Q.    (BY MR. LEE)  And your
18  testimony is you replaced the bolt that
19  goes through the bottom brace or the
20  horizontal brace because the bolt that was
21  in it looked rusty?
22      A.    Had some rust on it.
23      Q.    Had some rust on it.  And

Page 75

1  you took that rusty bolt and threw it
2  away?
3      A.    Yeah.
4      Q.    And replaced it with a
5  new -- was it a new bolt?
6      A.    Yes.
7      Q.    Did it have a nut on the end
8  of it?
9      A.    Yes.
10      Q.    Was it a locking nut?  Or
11  what type of bolt was it?
12      A.    Just regular nut with a lock
13  washer on it.
14      Q.    All right.  You put a nut
15  with a lock washer on this new bolt; is
16  that correct?
17      A.    Yes.
18      Q.    Okay.  And the only thing
19  that you can do in terms of describing
20  this bolt is tell me it was about an inch
21  long; is that right?
22      A.    Yeah.  It might not have
23  even been an inch long.

Page 76

1      Q.    All right.  Other than
2  replace that bolt and replace the straps,
3  any other alterations or changes to the
4  Strong Built stand?
5      A.    No.
6      Q.    Who was with you when you
7  put the new bolt in?  Was Mr. Larry
8  Stephens with you?
9      A.    Yes, sir.
10      Q.    Did he put the bolt in?  Or
11  did you do it?
12      A.    I did it.
13      Q.    Was he with you when you did
14  it?
15      A.    Yeah.
16      Q.    And did y'all do that when
17  you got to the woods?  Or --
18      A.    At the house.
19      Q.    At the house?
20      A.    (Nodding head.)
21      Q.    Did you do any other
22  preventative maintenance to the tree stand
23  other than what we've talked about on the

19 (Pages 73 to 76)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 77

1 hunting season when this accident
2 occurred?
3     A.    Huh-uh.
4     Q.    Anything else?
5     A.    Huh-uh.
6         THE COURT REPORTER:  No?
7     A.    No.
8     Q.    Do you recall what color the
9 ratchet strap was, the webbing, with the
10 original tree stand?  Do you remember what
11 color it was?
12     A.    No.
13     Q.    Do you remember how many
14 ratchet straps came with the stand
15 originally?
16     A.    No.
17     Q.    Did y'all ever take off or
18 remove any of the warning labels that were
19 on the tree stand?
20     A.    Huh-uh.
21     Q.    Is that a no?
22     A.    No.
23     Q.    And this brace that we're

Page 78

1 talking about where the new bolt was put
2 in, that's an adjustable brace; it can,
3 you know, go out and come in and so forth
4 is that correct?
5     A.    Huh-uh.
6         THE COURT REPORTER:  No?
7     Q.    (BY MR. LEE) Your answer is
8 no?
9     A.    No.
10     Q.    You can't pull it out and
11 make it longer?
12     A.    Huh-uh.
13         THE COURT REPORTER:  No?
14     A.    No.  I'm having to do this
15 because I can't hear out of this ear.
16 That's why I'm turning my head, y'all.
17     Q.    Well, what brace is it that
18 you're talking about that you put the new
19 bolt on?
20     A.    What you mean make it --
21 slidable brace?
22     Q.    Right.
23     A.    Is that what you're talking

Page 79

1 about?  No, it ain't.
2     Q.    It doesn't telescope out and
3 slide out?
4     A.    No.
5     Q.    It's one length?  Is that
6 what you're saying?
7     A.    Yeah.
8     Q.    And that's the brace that's
9 on the bottom?
10     A.    (Nodding head.)
11     Q.    Is that a yes?
12     A.    Yes.
13     Q.    Okay.  You're saying that
14 the brace was not adjustable in length?
15 Is that what you're telling me?
16     A.    No.  It's just one length.
17     Q.    One length.
18         MR. LEE:  Do we need to
19 change the tape now?
20         THE VIDEO SPECIALIST:  This
21 marks the end of Tape No. 1 in the
22 deposition of Larry -- David Stephens.
23 Going off the Record.  The time is 10:57

Page 80

1 a.m.
2     (Short break.)
3         THE VIDEO SPECIALIST:  We're
4 back on the Record.  This marks the
5 beginning of Tape No. 2 in the deposition
6 of David Stephens.  The time is 11:06 a.m.
7     Q.    (BY MR. LEE) Mr. Stephens,
8 I want to go back over something that we
9 were talking about before we took our
10 break.
11         And that is, during an off-
12 the-Record discussion, you think this was
13 the third hunting season when the accident
14 occurred?
15         This thing was being used for
16 the third hunting season; is that right?
17     A.    Okay.  I got it in '04.  Put
18 it up in '05, '06.
19     Q.    Hold on.  Let's slow down.
20 You got the thing in December of '04?
21     A.    Yeah.  No.  It would be two
22 hunting seasons.
23     Q.    Let's -- let's go over this.

# 367 VALLEY AVENUE
# (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

Page 81

1　It was put up in the woods for the first
2　time in January or '05; is that right?
3　　　A.　Right.
4　　　Q.　And that was hunting season
5　number one, correct?
6　　　A.　Yeah.
7　　　Q.　And then when was it taken
8　down?
9　　　A.　'05.
10　　　Q.　What month?
11　　　A.　January.  End of hunting
12　season.
13　　　Q.　Okay.  So it was up just a
14　brief period of time in '05?
15　　　A.　Yeah.
16　　　Q.　Who used it in '05, January
17　of '05?
18　　　A.　Me and Matt.
19　　　Q.　And how many times would you
20　say you and Matt used it in January of
21　'05?
22　　　A.　I probably went up about
23　three or four times.

Page 82

1　　　Q.　What about Matt?
2　　　A.　That was on the weekends is
3　the only time I had done it.
4　　　　　Probably about the same
5　amount.
6　　　Q.　So maybe six to eight times?
7　　　A.　Yeah.
8　　　Q.　And that was in January of
9　'05?
10　　　A.　Right.
11　　　Q.　Hunting season number one.
12　　　　　And then when was it put up a
13　second time?
14　　　A.　November of --
15　　　Q.　Of '0 --
16　　　A.　-- '05.
17　　　Q.　-- '05.  And that's hunting
18　season number two, correct?
19　　　A.　Yeah.
20　　　Q.　And then it was -- remained
21　there until what, January of '06?
22　　　A.　Yep.
23　　　Q.　And then how many times

Page 83

1　would you say it was used from November of
2　'05 to January of '06?
3　　　A.　I don't -- a bunch.  I
4　probably went it up a bunch, several,
5　several times.
6　　　Q.　Is that the time when you
7　estimated you probably used it twenty
8　times?
9　　　A.　Yeah.
10　　　Q.　And then your son, Matt,
11　used it a number of times himself,
12　correct?
13　　　A.　Yeah.  Whichever one he
14　didn't go to, I went to.  And then we
15　swapped back and forth.  Because we got
16　two of them.
17　　　Q.　And then you said that that
18　year that in fact Larry Stephens had used
19　it six or seven times himself?
20　　　A.　Yeah.
21　　　Q.　Or seven or eight times I
22　think is what you said, correct?
23　　　A.　Correct.

Page 84

1　　　Q.　So it got a lot of use
2　during the hunting -- second hunting
3　season between November of '05 --
4　　　A.　Yes.
5　　　Q.　-- and January of '06,
6　correct?
7　　　A.　Yes.
8　　　Q.　And then it came down when?
9　January of '06?
10　　　A.　Yep.
11　　　Q.　And went back up in November
12　of '06?
13　　　A.　Yep.
14　　　Q.　Correct?  So that would be
15　the third hunting season?
16　　　A.　Yep.
17　　　Q.　Correct?
18　　　A.　(Nodding head.)
19　　　Q.　Now, where was the -- where
20　was the tree stand or ladder stand stored
21　after the first hunting season?
22　　　A.　In the shed.
23　　　Q.　In the shed.  And what about

# FREEDOM COURT REPORTING

Page 85

1  after the second hunting season?
2       A.    Shed.
3       Q.    All right.  And then so
4  we're also clear about it, the only
5  changes you made to the stand after either
6  hunting season was the new webbing on the
7  ratchet strap, correct?
8       A.    Yeah.
9       Q.    And then the new bolt for
10 the brace?
11      A.    Now, that bolt there now, I
12 thought about that.  That one might not
13 have had the bolt.  The other one might
14 have had the bolt.  One of them got a
15 bolt, and one of them ain't.
16      Q.    You mean one stand has a
17 bolt?
18      A.    Yeah.  And one of them
19 ain't.
20      Q.    All right.  Well, if this
21 stand has a bolt, then that's the stand
22 that you replaced; is that correct?
23      A.    Yeah.  If that one has got

Page 86

1  the bolt, it is.
2       Q.    Okay.  And after which
3  hunting season was this new bolt put in?
4       A.    Before we put it up in '06.
5       Q.    The last time, correct?
6       A.    Yeah.
7       Q.    So you've had it up three
8  different hunting seasons.  And how many
9  different trees would you say that it was
10 up against?
11      A.    I'd say about four.
12      Q.    Okay.
13      A.    Because I moved it one time
14 I told you.
15      Q.    Yeah.  Was that during the
16 second hunting season or the first?
17      A.    First.  No.  I take that
18 back.  It was the second one.
19      Q.    The second hunting season?
20      A.    Yeah.
21      Q.    Okay.
22      A.    Because it wasn't up no time
23 when we first got it.

Page 87

1       Q.    All right.  It was during
2  the second hunting season --
3       A.    Yeah.
4       Q.    -- that it was moved,
5  correct?
6       A.    Right.
7       Q.    And that was just to get to
8  a better location?
9       A.    Better location.
10      Q.    But all four trees --
11      A.    Pines.
12      Q.    Were every one of them pine
13 trees?
14      A.    (Nodding head.)
15      Q.    You're shaking your head?
16      A.    Yes, sir.
17      Q.    Okay.  And the size of
18 those -- each of those pines can you show
19 me?
20      A.    About like that
21 (indicating).
22      Q.    Okay.  And on the ladder, do
23 you recall which rung on the ladder the

Page 88

1  instructions say to put the bottom brace?
2  Which step?  Which rung?
3       A.    The fourth or fifth step.
4       Q.    Okay.  And do you know which
5  step or ladder rung y'all actually placed
6  the brace on?
7       A.    It's welded to the thing, to
8  the ladder, the bottom part of the ladder.
9  I ain't talking about the very bottom
10 step.  Third, four, fifth -- fourth or
11 fifth step I'm talking about.
12      Q.    Okay.  You're saying you
13 can't change it because it's welded?  Is
14 that what you're telling me?
15      A.    Uh-huh.
16           THE COURT REPORTER:  Yes?
17      Q.    (BY MR. LEE)  Is that a yes?
18      A.    Yes.  I mean, you could
19 change it.  You'll have to take the middle
20 section off and put it up.  But what good
21 is that going to do?
22      Q.    All right.  Did you ever --
23 at any time you used this ladder stand,

22  (Pages 85 to 88)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 89

1  did you ever change the step which this
2  brace was attached?
3      A.   No.
4      Q.   And your testimony is it was
5  either the fourth or the fifth step?
6      A.   Yes, sir.
7      Q.   Okay.  You can't recall
8  which?
9      A.   I can't recall.
10     Q.   All right.  What was shipped
11 in the box with the tree stand to be used
12 to attach the brace to the tree?
13     A.   I can't remember.
14     Q.   Do you know what type of
15 bolt came with the horizontal brace, the
16 bottom brace that was -- that came with
17 the stand itself in the original
18 equipment?
19     A.   No.  I don't know.
20     Q.   Do you know whether -- what
21 type of nut was on there?
22     A.   No.
23     Q.   And the nut that you bought,

Page 90

1  was it a wing nut?  Do you know what a
2  wing nut is?
3      A.   Yeah.  No, it wasn't a wing
4  nut.
5      Q.   Do you know whether the bolt
6  and the nut that came with the original
7  equipment was a wing nut?
8      A.   I can't remember.
9      Q.   Do you know what size tree
10 the written instructions say you ought to
11 place this stand up against?
12     A.   No.
13     Q.   When -- when you all moved
14 the ladder stand from one location to
15 another, whether it was from one tree to
16 another or whether it was to take the
17 stand down and take it back to the shed to
18 store it, you know, for the off season,
19 did y'all ever remove this brace at the
20 bottom, this horizontal brace at the
21 bottom?  Did y'all ever take that off?
22     A.   Take it off?
23     Q.   Yes, sir.

Page 91

1      A.   I think we just laid it
2  back.  On one of them we did.  And the
3  other one is welded.  And I can't remember
4  which one.
5      Q.   Okay.  The one that was
6  welded, you left it on there?
7      A.   Yeah.
8      Q.   And the one that was not
9  welded, you laid it back; is that right?
10     A.   Yeah.  Loosened the bolt and
11 laid it back.
12     Q.   But did not take it off?
13     A.   Huh-uh.
14          THE COURT REPORTER:  No?
15     Q.   (BY MR. LEE) Is that no?
16     A.   Yeah.
17     Q.   On either stand did y'all
18 completely remove the bottom brace?
19     A.   Huh-uh.
20     Q.   Is that a no?
21     A.   No.
22     Q.   Do you know what the
23 instructions say on how many people should

Page 92

1  be used to put the stand up and take it
2  down?
3      A.   No.
4      Q.   Who -- who selected the tree
5  on which this stand was installed --
6      A.   Me.
7      Q.   -- on the -- on the season
8  right before this accident occurred?
9      A.   Who?
10     Q.   Yes, sir.
11     A.   Whose idea was it to put it
12 there?
13     Q.   Yes, sir.
14     A.   Mine.  Well, me and Larry.
15 I guess it was both of us.
16     Q.   Both of you looked at it?
17     A.   Yeah.
18     Q.   And can you -- other than
19 show me with your hands, you got any idea
20 on the diameter of that tree where the
21 accident occurred?
22     A.   No.
23     Q.   You know, how --

23  (Pages 89 to 92)

# FREEDOM COURT REPORTING

Page 93

1    A.    How big around?
2    Q.    Yeah.
3    A.    About like that
4  (indicating).
5    Q.    Okay.  When was the last
6  time you saw this tree stand before the
7  accident?
8    A.    What you mean the last time
9  I seen it?
10   Q.    Yeah.  You know when
11 Mr. Stephens' accident occurred?
12   A.    December 2nd, wasn't it?  Or
13 5th?  Something?
14   Q.    December of '06.  When was
15 the last time you had seen it?  The
16 accident happened on December the 2nd of
17 2006.
18   A.    Before the accident?
19   Q.    Yes.
20   A.    Or after?  Probably the
21 weekend be -- yeah, the weekend before.
22   Q.    And what can you tell me
23 about it the weekend before?  Did you use

Page 94

1  it that weekend?
2    A.    Uh-huh.
3    Q.    Is that a yes?
4    A.    Yes.
5    Q.    Did you hunt in that stand
6  yourself?
7    A.    Yes.
8    Q.    Did you have any problems
9  with it that weekend?
10   A.    No, sir.
11   Q.    You're saying it seemed
12 steady?
13   A.    Yes, sir.
14   Q.    It seemed safe?
15   A.    Yes.
16   Q.    Did it seem secure to you?
17   A.    Yes.
18   Q.    Did you see anything wrong
19 or unusual with the stand?
20   A.    Huh-uh.  No.
21   Q.    Who hunted with you on that
22 occasion?
23   A.    Who went with me?

Page 95

1    Q.    Yes, sir.
2    A.    I think Matt did.
3    Q.    Did he hunt in some other
4  stand?
5    A.    Yeah.
6    Q.    Do you have any -- and I may
7  have asked you this, but I want to be
8  sure.
9          Do you have any judgment as
10 to how many times that stand had been used
11 during the third hunting season, the
12 season when this accident occurred?
13   A.    I -- I probably got it in
14 about three or four times.
15   Q.    And Matt?
16   A.    And Matt a couple.
17   Q.    Okay.  This happened early
18 during the season, didn't it?
19   A.    What?  When he got hurt?
20   Q.    Yes, sir.
21   A.    Yeah.
22   Q.    When you put the tree stand
23 up for the last time in November of 2006,

Page 96

1  did you see any rust on the horizontal
2  brace or this bottom brace that we've been
3  talking about other than the bolt that you
4  replaced?
5          Did you see any rust on the
6  brace itself?
7    A.    I can't remember.
8    Q.    You --
9    A.    I don't think so.  But it
10 could have been.  I -- I didn't really
11 look at it that good.  The bolt, which I
12 put the bolt in.
13   Q.    If that horizontal brace --
14 you know, we've seen it since the
15 accident.  You know, we've been over to
16 the lawyer's office and looked at it.
17   A.    Uh-huh.
18   Q.    If it shows a lot of rust on
19 there, do you know when that rust
20 developed?
21   A.    No.
22   Q.    Okay.  There also seemed to
23 be some dents and bending of material in

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 97

```
 1   that particular area.
 2        Do you know how or when that
 3   occurred?
 4        A.   In the brace area?
 5        Q.   Yes.
 6        A.   I reckon it happened after
 7   they got it down.  I don't know about the
 8   bending and stuff.  Or bent when he was up
 9   on it with him.
10        Q.   There also appears to be
11   some dents in the metal along the fifth
12   and sixth ladder rungs, you know, the
13   ladder steps.
14        Do you know if there was any
15   dents in that area?  Or how they got
16   there?
17        A.   I don't know.
18        Q.   How long have you been
19   putting up tree stands, Mr. Stephens?
20        About how many years?  What's
21   your background in putting up tree stands?
22        A.   Several years.  A bunch.
23        Q.   Approximately how many
```

Page 98

```
 1   years?
 2        A.   I'll say about thirteen or
 3   fourteen years.
 4        Q.   How many different tree
 5   stands do you own now?
 6        A.   How many I own now?
 7        Q.   Yes, sir.
 8        A.   Two now.  That was my third
 9   one.  I got -- we got shooting houses and
10   stuff now.
11        Q.   Other than the other -- you
12   said it was a twelve-foot Strong Built.
13        Do you have any other Strong
14   Built products besides --
15        A.   Huh-uh.
16        Q.   -- besides those two ladder
17   stands?
18        A.   That's it.
19        Q.   All the tree stands that you
20   own, have all of them come with written
21   instructions and warning labels?
22        A.   Yeah.
23        Q.   And you said that because
```

Page 99

```
 1   you can't read you have not been able to
 2   read the instructions yourself?
 3        A.   Huh-uh.
 4        Q.   Is that correct?
 5        A.   Correct.
 6        Q.   You've relied on other
 7   people --
 8        A.   Matt --
 9        Q.   -- to --
10        A.   -- read them to me.
11        Q.   I understand.  You relied on
12   other people to read them?
13        A.   Yes, sir.
14        Q.   But you don't have any
15   criticism of the written instructions, do
16   you?
17        A.   What you mean?
18        Q.   You're not critical, you
19   don't say the instructions are not clear,
20   do you?
21        A.   No.
22        Q.   Okay.  Do you know
23   whether -- well, I think your brother,
```

Page 100

```
 1   Larry Stephens, he can't read either; is
 2   that true?
 3        A.   Nephew.
 4        Q.   I'm sorry.  Your nephew.  I
 5   keep saying your brother.  Your nephew,
 6   Larry Stephens, he can't read either, can
 7   he?
 8        A.   Huh-uh.  (Shaking head.)
 9        Q.   Do you know if he ever
10   looked at the written instructions that
11   came with this particular stand or not?
12        A.   I don't think he did.
13   Because me and Matt was the only ones out
14   there.
15        Q.   That put it together?
16        A.   Yes, sir.
17        Q.   And you don't -- you do not
18   still have the written instructions that
19   came with this --
20        A.   No.
21        Q.   -- particular stand?
22        Have you ever taken any type
23   of hunting safety course?
```

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 101

```
1      A.    Me?
2      Q.    Yes, sir.
3      A.    No.
4      Q.    How about a bow hunter
5  education course?
6      A.    No.
7      Q.    Have you ever taken any of
8  those?
9      A.    I ain't a bow hunter.
10     Q.    Have you ever worked for any
11 company that builds tree stands?
12     A.    No, sir.
13     Q.    What about your nephew,
14 Larry? Has he ever worked for a tree
15 stand company to your knowledge?
16     A.    Not as I know of.
17     Q.    And you're saying that
18 Mr. Larry Stephens, your nephew, had used
19 this particular stand on a number of
20 occasions before the accident?
21     A.    I ain't saying he been up in
22 there a number of occasions. Not that --
23 not before the accident.
```

Page 102

```
1          What you saying now? He'd
2  been up in it more than one time?
3      Q.    Yes.
4      A.    Oh, yeah. Before he got
5  hurt.
6      Q.    Right. I think you told me
7  that Larry in the second hunting season
8  went up it seven or eight times?
9      A.    Uh-huh.
10     Q.    Is that a yes?
11     A.    Been up it several times,
12 yes.
13     Q.    Okay. Now, am I -- I want
14 to get to start talking about this
15 accident here in a few minutes. But I
16 want to be sure I'm clear about one thing.
17         You never had any trouble
18 with this stand before this accident; is
19 that --
20     A.    No, sir.
21     Q.    Is that a true statement?
22     A.    Yes, sir.
23     Q.    Your son had never had any
```

Page 103

```
1  trouble with this stand before the
2  accident, correct?
3      A.    No, sir.
4      Q.    Is that a correct statement?
5      A.    Yes, sir.
6      Q.    And to your knowledge, your
7  nephew, Larry Stephens, had never had any
8  trouble with this stand before the
9  accident; is that correct?
10     A.    Right.
11     Q.    And you've never had any
12 trouble with the other Strong Built stand
13 that you have?
14     A.    (Shaking head.)
15     Q.    Is that also correct?
16     A.    Right.
17     Q.    How old are you,
18 Mr. Stephens?
19     A.    Forty-seven.
20     Q.    And what's your date of
21 birth?
22     A.    9/25th/60.
23     Q.    And your social security
```

Page 104

```
1  number?
2      A.    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.
3      Q.    What's your -- you married?
4      A.    Yes, sir.
5      Q.    What's your wife's name?
6      A.    Jackie.
7      Q.    Jackie?
8      A.    (Nodding head.)
9      Q.    Does she work anywhere?
10     A.    Huh-uh.
11     Q.    What does she do?
12     A.    She's disabled.
13     Q.    Both of you disabled?
14     A.    Yes, sir.
15     Q.    What do y'all do for income?
16     A.    She draws a check. And I'm
17 working on mine.
18     Q.    What's her disability?
19     A.    Back.
20     Q.    What is your education? How
21 far did you get in school?
22     A.    Seventh.
23     Q.    And what school were you
```

26 (Pages 101 to 104)

# FREEDOM COURT REPORTING

Page 105

1  going to when you quit?
2      A.    Southside.
3      Q.    Is that --
4      A.    Tallassee.
5      Q.    -- Middle School maybe?
6      A.    Uh-huh.
7      Q.    Where all have you worked?
8      A.    I worked at West Point
9  Pepperell in Opelika.
10     Q.    What did you do for them?
11     A.    Run a tie machine.
12     Q.    What type of machine?
13     A.    Ran a tie machine.  Tied
14  knots and made the cloth back together.
15     Q.    Oh,.  What else did you do?
16     A.    And Tallassee Mills.
17     Q.    Tyson?
18     A.    Tallassee Mills.
19     Q.    What did you do for them?
20     A.    Same thing.
21     Q.    Ran a tie machine?
22     A.    (Nodding head).  Yes, sir.
23     Q.    And where else did you work?

Page 106

1      A.    That's it.
2      Q.    How long did you work for
3  West Point Pepperell?  How many years?
4      A.    About -- about ten now.  And
5  then the rest of it was at Tallassee.
6      Q.    How many years with
7  Tallassee?
8      A.    I -- I started -- I -- about
9  eleven.
10     Q.    Did you get hurt on the job?
11  Is that where you hurt your knees?
12     A.    Yes.
13     Q.    Which one was that?
14     A.    Which one what?
15     Q.    Which employment?
16     A.    Mill.  Mount Vernon Mills.
17  Tallassee Mills.
18     Q.    And what was the date of
19  that accident?
20     A.    '03.
21     Q.    Okay.  And you haven't
22  worked anywhere since '03, 2003?
23     A.    (Shaking head.)

Page 107

1      Q.    Is that a no?
2      A.    No.  I worked in the mill
3  until they shut down about two years ago.
4      Q.    Did you work after you were
5  hurt?
6      A.    (Nodding head.)  Yes, sir.
7      Q.    Okay.  All right.  Let's
8  turn our attention to this accident.
9  Where were you on the day of the accident?
10     A.    At home.
11     Q.    Did you get a telephone call
12  or something?
13     A.    Yeah.  They called my mama,
14  and she called me and told me about it.
15     Q.    Who called your mother?
16     A.    I think Peanut's wife,
17  Deborah.
18     Q.    Okay.  And then your mother
19  called you?
20     A.    Yep.
21     Q.    What did your mother tell
22  you?
23     A.    Go out there and help them.

Page 108

1  But they done got him up before we got out
2  there.
3      Q.    All right.  You went to the
4  area where the accident occurred?
5      A.    No.  No.  I passed them
6  going to the hospital.
7      Q.    Okay.  You were going to the
8  accident scene?
9      A.    Yeah.
10     Q.    And you saw them coming in
11  the opposite direction?
12     A.    Yeah.
13     Q.    And were they in a pick-up
14  truck or something?
15     A.    Yeah.
16     Q.    And as I understand it, they
17  placed Mr. Stephens in the back of the
18  truck --
19     A.    Yeah.
20     Q.    -- on an army cot; is that
21  right?
22     A.    That's right.
23     Q.    And what did you do after

27  (Pages 105 to 108)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 109

1    that?
2        A.    What did I do?
3        Q.    (Nodding head.)
4        A.    I had to go to Tuskegee.
5    They carried him -- I went by the
6    emergency room.  And then they waiting
7    on -- to do his X-rays.  And then I left
8    and had to go to Tuskegee.
9        Q.    What did you have to do over
10   there?
11       A.    Get my wife.  Pick my wife's
12   medicine up.
13       Q.    Did you talk with Larry in
14   the emergency room?
15       A.    No.
16       Q.    Okay.  All right.  After
17   Tuskegee, what did you do?
18       A.    Went -- they called us and
19   told us they were taking him to
20   Montgomery.
21       Q.    Did you go to the hospital
22   there?
23       A.    Yeah.

Page 110

1        Q.    Did you talk to Mr. Stephens
2    there, Larry Stephens?
3        A.    Larry?
4        Q.    Yeah.
5        A.    Yeah.  After -- after they
6    brought him out of surgery putting the
7    rods in his leg, we did.  I did.
8        Q.    Okay.  What did y'all talk
9    about?
10       A.    Nothing really.  Because he
11   was hurting too bad.
12       Q.    Well, I guess what I should
13   have asked is:  Did you talk to him about
14   how the accident occurred?
15       A.    No.  Not then.
16       Q.    Okay.  When was the first
17   time you talked to him about how the
18   accident occurred?
19       A.    Probably about three days
20   later.  Because he got to come home.  And
21   that's the first time I really got to talk
22   to him.
23       Q.    When he was at home?

Page 111

1        A.    Yeah.
2        Q.    And tell me, what did you
3    ask him and what did he say?
4        A.    I asked him what happened.
5    And he said he got to the very top step
6    and reached to grab the ladder -- I mean,
7    the rail and said the ladder bent in with
8    him and throwed him out.
9        Q.    Did ask you him what caused
10   the ladder to bend in and throw him out?
11       A.    No.  I never did ask him.
12       Q.    Did he offer any explanation
13   as to what caused the ladder to bend in
14   and throw him out?
15       A.    Said he didn't know right
16   then, you know.
17       Q.    Okay.  At that -- when you
18   talked to him at home, was the stand still
19   out in the woods?
20       A.    I think so.
21       Q.    Okay.
22       A.    Yeah, I know it was.
23   Because he done come home.  And then he

Page 112

1    got Jaiton to go out there and get it.
2        Q.    Got his son to go out?
3        A.    Yeah.
4        Q.    Okay.
5        A.    His son and his brother-in-
6    law went and got it.
7        Q.    Jaiton?
8        A.    His son.
9        Q.    Yeah.  I think it's
10   J-A-I-T-O-N.
11             All right.  Did you ever go
12   out and look at the stand in the woods?
13       A.    What you mean?  After he got
14   hurt?
15       Q.    Yes.
16       A.    No.
17       Q.    Okay.  You never went out
18   and saw it?
19       A.    Bent into the tree?
20       Q.    (Nodding head.)
21       A.    Huh-uh.
22       Q.    Exactly.  You never saw
23   that?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 113

1    A.    Huh-uh.  I seen pictures.
2  That's all I seen.
3    Q.    Who took those picture?  Do
4  you know?
5    A.    Dwight.
6    Q.    Pardon?
7    A.    Dwight.
8    Q.    Who is Dwight?
9    A.    Deborah's brother-in-law.
10    Q.    What's his last name?
11    A.    Jones.
12    Q.    Where does he live?
13    A.    Tallassee.
14    Q.    And what does he do for a
15  living?
16    A.    Works for SouthBell, I
17  think.  Phone company.
18    Q.    And that's Deborah Stephens'
19  brother-in-law?
20    A.    Yeah.
21    Q.    He's the one that took the
22  pictures at the accident scene?
23    A.    And went and helped Jaiton

Page 114

1  take the stand out.
2    Q.    Dwight also helped him take
3  the stand out?
4    A.    (Nodding head.)
5    Q.    What did they do with the
6  stand after they took it down?
7    A.    Brought it to the house.
8    Q.    To your house?
9    A.    To his.
10    Q.    To Larry's house?
11    A.    Yes.
12    Q.    Has the stand ever been back
13  to your house?
14    A.    No.
15    Q.    Have you seen it since --
16  have you physically seen it?  I'm not
17  talking about in pictures.  I'm talking
18  about physically.
19    A.    Since it's been back?
20    Q.    Yes.
21    A.    Yeah, I seen it.
22    Q.    Where?
23    A.    Laying down there at

Page 115

1  Peanut's house.
2    Q.    Tell me, did you look at it
3  closely?
4    A.    No.
5    Q.    Could you tell what happened
6  that caused it?
7    A.    I couldn't tell.
8    Q.    In other words, you couldn't
9  tell what caused it to bend in?
10    A.    No.
11    Q.    Or caused the accident?
12    A.    No.
13    Q.    How long did it stay down at
14  Mr. Stephens' house, Larry's house?
15    A.    I do not know.  It wasn't
16  very long.
17    Q.    Where did it go after that?
18    A.    I -- I reckon the lawyer got
19  it.
20    Q.    Okay.  Do you know what
21  lawyer was first contacted?
22    A.    No.
23    Q.    Have you ever given any kind

Page 116

1  of written statement to any lawyer?
2    A.    Have I?
3    Q.    Yes, sir.
4    A.    Not as I know of.
5    Q.    Has --
6    A.    What you mean now?
7    Q.    Has anybody ever written out
8  some sort of statement about what you know
9  about this and you signed it?
10    A.    No.
11    Q.    Okay.  Have you ever given
12  any telephone statement to any lawyer on
13  the phone?
14    A.    No.
15    Q.    Am I to understand,
16  Mr. Stephens, that you really don't know
17  why this accident occurred?
18    A.    No.  I don't know why --
19  what made the tree stand bend.  No, I
20  don't.
21    Q.    Okay.  Larry Stephens is
22  heavier than you are, isn't he?
23    A.    Yeah.

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 117

1  Q.    Who could have done any work
2  on this stand before the accident other
3  than you and Matt or Larry Stephens?
4       Anybody else that you can
5  think of?
6  A.    Not as I can think of.
7  Q.    So any changes that were
8  done to this particular stand would have
9  to have either been done under you, Matt
10  or Larry?
11  A.    Uh-huh.
12  Q.    Is that right?  You need to
13  answer.
14  A.    Yes, sir.
15  Q.    Have you ever had any
16  conversations with anybody employed by
17  Strong Built about this accident?
18  Q.    Did anybody call me or
19  anything?
20  Q.    Or you called them?
21  A.    No.
22  Q.    Have you ever had any
23  discussions --

Page 118

1  A.    No.
2  Q.    -- at all?
3  A.    No.
4  Q.    Have you ever heard anybody
5  complain about Strong Built, about their
6  tree stands, ladder stands or anything
7  like that at all?
8  A.    Oh, yeah.
9  Q.    Who?
10  A.    What?  Complain about how
11  they built and stuff?
12  Q.    Yes.
13  A.    Yeah.  One of my friends.
14  Q.    Who was that?
15  A.    PeeWee Hudson.
16  Q.    PeeWee Hudson?
17  A.    John Hudson.
18  Q.    Who is he?
19  A.    Friend.
20  Q.    Where does he live?
21  A.    In Kent.
22  Q.    Kent?
23  A.    Yeah.

Page 119

1  Q.    Is that Alabama?
2  A.    Yes.
3  Q.    Is that near Tallassee?
4  A.    Yes.
5  Q.    What does he say about
6  Strong Built stands?
7  A.    He just said they wasn't
8  worth a dang to him.
9  Q.    Did he have one?
10  A.    Yeah.  He got two or three
11  of them.
12  Q.    What was his complaint about
13  it?
14  A.    He just said he didn't like
15  them.
16  Q.    When did y'all have this
17  discussion?
18  A.    When?
19  Q.    Uh-huh.  Was it before or
20  after Larry's accident?
21  A.    Before.
22  Q.    Why were y'all talking about
23  Strong Built stands before the accident?

Page 120

1  A.    Because I told him I had --
2  I was getting one for Christmas.  Told my
3  brother that's what I wanted.  And he's
4  talking about you don't want them.
5  Q.    Why not?
6  A.    I don't know why he don't
7  like them.  I liked it myself.
8  Q.    You don't know why John
9  Hudson --
10  A.    Huh-uh.
11  Q.    -- didn't like it?  Where
12  does Mr. Hudson work?
13  A.    For some asphalt company.
14  Q.    Where are they located?
15  A.    I really don't know.
16  Q.    Do you know whether Mr. John
17  Hudson had a similar stand as you did?
18  A.    Got -- got three of them.
19  Q.    Okay.  Do you know if it was
20  the same type of stand?
21  A.    Yeah.
22  Q.    He's got three stands.
23  Anybody ever fallen out of his stands?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 121

1    A.    Not as I know of.
2    Q.    You don't know why he didn't
3  like the stand?
4    A.    Huh-uh.
5    Q.    Is that a no?
6    A.    Yes, sir.
7    Q.    Anybody else ever complain
8  about a Strong Built stand other than
9  Mr. John Hudson?
10   A.    Not as I know of.
11   Q.    Tell me -- I'm almost
12 through, Mr. Stephens. Tell me just as
13 clearly as you can remember what all you
14 had to do to assemble this stand together.
15 Tell me what you had to do.
16   A.    What you mean what I had to
17 do?
18   Q.    What did you have to do to
19 put it together?
20   A.    I can't really remember
21 right off what all we had to do.
22   Q.    Did you have to put some
23 bolts in?

Page 122

1    A.    Yeah. Had to put some bolts
2  in.
3    Q.    Tighten the bolts down?
4    A.    Yeah.
5    Q.    Put ladder sections
6  together?
7    A.    Yeah. There's three ladder
8  sections.
9    Q.    What else can you recall
10 having to do?
11   A.    I can't remember.
12   Q.    Would y'all check these
13 bolts and check the tightness of them
14 every year --
15   A.    Yeah.
16   Q.    -- before you put them out
17 in the woods?
18   A.    Yes.
19   Q.    What other things would you
20 do in terms of preventative maintenance
21 besides check -- test the bolts and change
22 the straps? Anything else?
23   A.    That's about it.

Page 123

1    Q.    Did y'all put any type of
2  lubricant or oil or anything, WD-40,
3  anything on the stands before they went
4  out in the woods or while they were
5  sitting in the shed?
6    A.    I -- not as I know of we
7  didn't. I mean, they could have, but I
8  don't normally do it.
9    Q.    Okay. You were with them
10 every year?
11   A.    Putting them up and stuff.
12   Q.    Exactly. When the stands
13 were taken out of the woods and put up,
14 you were there when it happened?
15   A.    Yes.
16   Q.    And when they went back out
17 into the woods, you were present every
18 time that occurred, right?
19   A.    Right.
20   Q.    And you don't remember any
21 type of lubricant being sprayed on the
22 stand?
23   A.    Not as I know of. I mean,

Page 124

1  it could have got on there in the shed
2  with them doing something. But other than
3  that, I don't know.
4    Q.    What about repainting any of
5  the stands? Did you ever do any of that?
6    A.    Yeah.
7    Q.    You did?
8    A.    (Nodding head.)
9    Q.    What about this particular
10 stand? Was it ever --
11   A.    I --
12   Q.    -- repainted?
13   A.    I can't remember.
14   Q.    Anything else y'all can
15 recall doing to the stands?
16   A.    No.
17   Q.    How is Larry doing now?
18   A.    He's doing good until
19 tomorrow.
20   Q.    What's tomorrow?
21   A.    He's got to have another
22 surgery.
23   Q.    What kind of surgery is he

31 (Pages 121 to 124)

# FREEDOM COURT REPORTING

Page 125

1  going to have?
2      A.   I don't know what they're
3  going to do to him.
4      Q.   Where is his surgery
5  tomorrow?
6      A.   In Montgomery.
7      Q.   Safety harnesses.  Do you
8  know what I'm talking about?
9      A.   Yeah.
10     Q.   Do you use safety harnesses
11  when you hunt in tree stands?
12     A.   I don't.  Not in a ladder
13  stand.
14     Q.   That's what I'm talking
15  about.
16     A.   Huh-uh.
17     Q.   What about Larry?  Does he
18  use safety --
19     A.   I don't know if he did or
20  not.  He does when he's in the climber.  I
21  don't know about if he had it on when he
22  was in the ladder stand.
23     Q.   Okay.  Thank you very much.

Page 126

1      MR. HASSINGER:  I don't have
2  anything.
3      THE VIDEO SPECIALIST:  This
4  marks the end of Tape No. 2 and concludes
5  the deposition of David Stephens.  Going
6  off the Record.  The time is 11:44 a.m.
7      * * * * * * * * * * * * *
8      FURTHER DEPONENT SAITH NOT
9      * * * * * * * * * * * * *
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 127

1      REPORTER'S CERTIFICATE
2  STATE OF ALABAMA:
3  TALLAPOOSA COUNTY:
4      I, Rena' Messick Lanier,
5  Certified Court Reporter and Commissioner
6  for the State of Alabama at Large, do
7  hereby certify that the above and
8  foregoing transcript of the proceedings in
9  this matter was reported by me.
10     I further certify that the
11  foregoing computer-printed pages contain a
12  true and correct transcript of the
13  proceedings held in this matter.
14     I further certify that I am
15  neither of kin nor of counsel to the
16  parties to said cause, nor in any manner
17  interested in the results thereof.
18
19
20     _____
      Rena' M. Lanier, Certified
21     Court Reporter (ABCR No. 0031)
22
23

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

| A | | | | |
|---|---|---|---|---|
| **ABCR** 127:21 | **Alabama** 1:2,19 | **asked** 95:7 | **bend** 111:10,13 | 70:13 74:19 |
| **able** 99:1 | 1:21 4:2,16,20 | 110:13 111:4 | 115:9 116:19 | 79:9 88:1,8,9 |
| **accident** 11:10 | 5:3,9,23 119:1 | **asking** 7:12 | **bending** 96:23 | 89:16 90:20,21 |
| 12:11 13:13 | 127:2,6 | 27:16 | 97:8 | 91:18 96:2 |
| 27:6,20 50:6 | **Alexander** 1:21 | **asphalt** 120:13 | **benefits** 13:16 | **bought** 14:12 |
| 52:7 53:5 | 5:9,22 | **assemble** 25:20 | **bent** 39:6,7 | 15:8,19,23 |
| 60:19 61:1,23 | **alterations** | 121:14 | 47:21 48:5 | 16:3 73:13 |
| 62:20 63:2,7 | 66:12,19 67:2 | **assign** 2:12 | 97:8 111:7 | 74:6,9 89:23 |
| 63:21 66:1 | 76:3 | **attach** 28:23 | 112:19 | **bow** 101:4,9 |
| 68:5,17 72:12 | **altogether** 27:10 | 89:12 | **better** 87:8,9 | **box** 17:11,12,15 |
| 77:1 80:13 | **amount** 82:5 | **attached** 30:3,13 | **Betty** 16:22 | 21:5,13 68:16 |
| 92:8,21 93:7 | **angle** 53:14 54:4 | 30:16 63:20 | **big** 50:13 65:19 | 89:11 |
| 93:11,16,18 | **answer** 8:5 | 89:2 | 66:3 93:1 | **brace** 29:9,18,22 |
| 95:12 96:15 | 10:14 24:7 | **attention** 107:8 | **Birmingham** | 30:13 31:1,2,7 |
| 101:20,23 | 42:4 44:21 | **a.m** 5:10,19 80:1 | 4:16,20 7:3 | 31:9 32:2 |
| 102:15,18 | 65:5 68:11 | 80:6 126:6 | **birth** 103:21 | 41:16 51:2 |
| 103:2,9 106:19 | 69:4 78:7 | | **Bobby** 11:5 | 55:21,22 69:20 |
| 107:8,9 108:4 | 117:13 | B | **Boles** 11:5 | 70:3 74:19,20 |
| 108:8 110:14 | **answers** 8:3 | **back** 13:3 31:20 | **bolt** 30:20,22 | 77:23 78:2,17 |
| 110:18 113:22 | **anybody** 25:1 | 40:15 48:18 | 31:6 70:13,16 | 78:21 79:8,14 |
| 115:11 116:17 | 33:11 34:7 | 51:21 62:19 | 70:20 71:1,2,9 | 85:10 88:1,6 |
| 117:2,17 | 49:18 51:7 | 64:17 80:4,8 | 71:19 72:7,9 | 89:2,12,15,16 |
| 119:20,23 | 61:17 67:20 | 83:15 84:11 | 72:20 73:4,5 | 90:19,20 91:18 |
| **acting** 5:3 | 68:5,18,23 | 86:18 90:17 | 73:12,23 74:18 | 96:2,2,6,13 |
| **add** 67:4 68:20 | 116:7 117:4,16 | 91:2,9,11 | 74:20 75:1,5 | 97:4 |
| **added** 67:15 | 117:18 118:4 | 104:19 105:14 | 75:11,15,20 | **brand** 70:23 |
| 69:7 | 120:23 121:7 | 108:17 114:12 | 76:2,7,10 78:1 | **break** 7:18,19 |
| **additional** 67:4 | **anyway** 45:1 | 114:19 123:16 | 78:19 85:9,11 | 80:2,10 |
| 67:14,21 68:18 | **apart** 35:5 | **background** | 85:13,14,15,17 | **brief** 81:14 |
| 69:7 | **APPEARAN...** | 97:21 | 85:21 86:1,3 | **Broken** 39:7 |
| **address** 8:9 | 4:13 | **bad** 110:11 | 89:15 90:5 | **brother** 8:23 9:4 |
| **adjustable** 78:2 | **appeared** 54:18 | **bar** 56:10,11,13 | 91:10 96:3,11 | 15:20 18:9 |
| 79:14 | **appearing** 4:17 | 56:14 | 96:12 | 99:23 100:5 |
| **ages** 12:1 | 4:21 | **barn** 36:14 | **bolted** 30:17 | 120:3 |
| **ago** 13:3 107:3 | **appears** 97:10 | **bars** 57:5,8 | **bolts** 41:8 43:15 | **brothers** 14:13 |
| **AGREED** 1:13 | **applied** 10:21 | **base** 57:13 70:4 | 43:18 44:5 | **brother-in** 112:5 |
| 2:1,8,17 | **Approximately** | **Basically** 39:13 | 64:23 69:10,12 | **brother-in-law** |
| **ain't** 32:7 38:14 | 97:23 | **began** 41:3 | 69:17 73:11 | 55:2 113:9,19 |
| 38:21 46:12,12 | **area** 27:6,13,19 | **beginning** 5:9 | 121:23 122:1,3 | **brought** 110:6 |
| 79:1 85:15,19 | 97:1,4,15 | 53:4 80:5 | 122:13,21 | 114:7 |
| 88:9 101:9,21 | 108:4 | **begins** 5:15 | **bottom** 30:6,7 | **builds** 101:11 |
| **airport** 20:10 | **arm** 54:7 | **believe** 12:18 | 36:2 49:8,16 | **built** 1:9 4:9 |
| **al** 1:6 4:6 5:17 | **army** 108:20 | 17:17 19:1 | 53:9,10 55:15 | 5:17 6:8 7:4 |
| | **arrested** 12:21 | 30:5 42:10 | 55:18,20 70:4 | 14:5 18:18 |

# FREEDOM COURT REPORTING

19:7 68:1
69:13,14 76:4
98:12,14
103:12 117:17
118:5,11 119:6
119:23 121:8
**bunch** 83:3,4
97:22
**bush** 64:13
**buy** 42:8 71:2
73:10,14,20
**B-O-L-E-S** 11:6

**C**

**C** 7:1
**Cahaba** 4:15
**call** 33:14 36:14
70:5 107:11
117:18
**called** 107:13,14
107:15,19
109:18 117:20
**camera** 53:23
65:13
**carried** 26:21
109:5
**case** 1:5 4:5 5:18
73:3,5
**cash** 74:2,4
**cause** 5:11
127:16
**caused** 111:9,13
115:6,9,11
**celebrate** 16:19
**Center** 4:19
**CERTIFICA...**
127:1
**Certified** 1:17
5:2 127:5,20
**certify** 5:3 127:7
127:10,14
**chains** 57:20
58:6,15
**change** 79:19

88:13,19 89:1
122:21
**changed** 48:10
66:15
**changes** 66:18
76:3 85:5
117:7
**changing** 66:20
**check** 74:2
104:16 122:12
122:13,21
**children** 11:21
**Christmas** 14:8
15:3,5 16:13
16:15,19 17:7
17:17,21 18:6
21:6 25:20
36:21 68:16
120:2
**circle** 4:15 8:11
8:12,14
**City** 1:21 5:9,22
**Civil** 5:5
**claim** 13:15
**clear** 35:17
36:16 85:4
99:19 102:16
**clearly** 121:13
**climb** 59:13
**climbed** 36:5
56:3 60:3
**climber** 35:3,7,8
35:9,10,12,17
35:23 49:9,11
56:5 125:20
**climbers** 38:14
38:23
**close** 9:6,11
**closely** 115:3
**cloth** 105:14
**code** 8:17
**color** 77:8,11
**come** 14:6 21:12
21:18 24:17

25:12 31:10,20
42:11 56:10
62:19 78:3
98:20 110:20
111:23
**comes** 31:11
**coming** 108:10
**Commissioner**
2:18 4:12 5:3
127:5
**community**
26:16
**company** 101:11
101:15 113:17
120:13
**complain** 118:5
118:10 121:7
**complaint**
119:12
**completely**
25:20 37:15
91:18
**compliance** 2:4
**components**
25:9
**computer-pri...**
127:11
**concludes** 126:4
**confusing** 24:10
**confusion** 24:10
**contacted**
115:21
**contain** 127:11
**content** 25:2
**conversations**
117:16
**convicted** 12:22
**correct** 7:7,10
8:20 9:16
12:15 15:20,21
18:14 21:7
24:22 34:21
39:15 44:11
46:5 48:7 50:2

51:18 57:15
58:12,23 69:8
70:10 75:16
78:4 81:5
82:18 83:12,22
83:23 84:6,14
84:17 85:7,22
86:5 87:5 99:4
99:5 103:2,4,9
103:15 127:12
**cot** 108:20
**counsel** 1:15 2:9
2:11 5:6 6:2
127:15
**counting** 38:14
**County** 5:2
127:3
**couple** 39:1
95:16
**course** 100:23
101:5
**court** 1:1,18 2:5
4:1 5:2 6:10,16
7:23 43:22
49:21 56:22
61:14 67:18
77:6 78:6,13
88:16 91:14
127:5,21
**cousin** 7:6
**co-counsel** 6:5
**crimes** 12:22
**criminal** 12:19
**critical** 99:18
**criticism** 99:15
**cut** 50:21 51:1

**D**

**D** 3:1
**damage** 47:16
**damaged** 39:5,7
47:21
**dang** 119:8
**dangerous** 48:6

**date** 5:4 103:20
106:18
**David** 1:16 4:18
5:10,16 6:7,12
7:1,3 68:9
79:22 80:6
126:5
**day** 1:22 12:10
21:7 25:21
27:3 34:16
48:16,18,20
59:19 60:14
61:23 62:20
73:15 74:6
107:9
**days** 110:19
**Deborah** 107:17
113:18
**Deborah's** 113:9
**December** 1:22
5:20 15:16
80:20 93:12,14
93:16
**Defendant** 1:10
4:10,22
**degrees** 53:18
**dented** 48:2,5
**dents** 96:23
97:11,15
**DEPONENT**
126:8
**deposition** 1:16
2:2,3,14,18 3:5
5:15,21 12:5
79:22 80:5
126:5
**depositions** 2:6
**describe** 37:7
**described** 64:15
**describing** 75:19
**developed** 96:20
**diameter** 92:20
**different** 12:13
35:13,18 38:19

# FREEDOM COURT REPORTING

38:22 63:19
67:11 86:8,9
98:4
**direction** 108:11
**disability** 10:19
13:16 104:18
**disabled** 10:12
104:12,13
**discussion** 80:12
119:17
**discussions**
117:23
**DISTRICT** 1:1
1:2 4:1,2
**DIVISION** 1:3
4:3
**Doctor** 9:22
**doing** 124:2,15
124:17,18
**door** 64:7
**doors** 37:12
**draws** 104:16
**drive** 20:15
**Drunk** 12:23
**drunkenness**
13:6
**DUI** 13:5
**duly** 6:13
**Dwight** 113:5,7
113:8 114:2

### E

**E** 3:1
**ear** 78:15
**early** 95:17
**education** 101:5
104:20
**effect** 2:4
**eight** 34:4 62:23
82:6 83:21
102:8
**eighteen** 12:3
**either** 85:5 89:5
91:17 100:1,6

117:9
**eleven** 106:9
**Elmore** 5:2
**emergency**
109:6,14
**employed**
117:16
**employment**
106:15
**enclosed** 37:10
37:16
**entire** 60:18
**equipment**
89:18 90:7
**estimated** 83:7
**et** 1:6 4:6 5:17
**Eve** 17:21,22
**evidence** 2:15
**exactly** 38:2
53:2 112:22
123:12
**examination** 3:2
5:11 6:20
**examined** 6:14
**exchange** 16:14
**EXHIBITS** 3:4
**experience** 22:4
**explanation**
111:12
**exposed** 38:6

### F

**fact** 83:18
**fail** 46:5,8
**fallen** 120:23
**falling** 31:7
**family** 16:14,19
18:5 68:8
**far** 51:20 64:6
104:21
**fast** 40:13
**Federal** 5:5
**feel** 60:6,9
**fell** 10:4 52:11

52:14,15,20
63:4
**fifth** 30:10 88:3
88:10,11 89:5
97:11
**filed** 7:5
**filing** 2:17
**fine** 6:18,19
**finish** 68:10
**first** 6:13 13:23
17:16,18 21:6
24:16 26:3
28:8 30:5
32:12 48:20
52:1 62:1,5
63:10 64:5
65:16,19 81:1
84:21 86:16,17
86:23 110:16
110:21 115:21
**fits** 50:22
**five** 34:6 74:16
**flush** 54:20
**follow** 23:4
**followed** 23:23
24:12
**following** 5:12
**follows** 6:15
**force** 2:4
**foregoing** 5:6
127:8,11
**form** 2:10 44:19
**forth** 58:16 78:3
83:15
**Forty-seven**
103:19
**forward** 40:14
**found** 45:12
**four** 10:7 38:13
38:19 59:18
61:5 81:23
86:11 87:10
88:10 95:14
**fourteen** 98:3

**fourth** 30:10
88:3,10 89:5
**Friend** 118:19
**friends** 118:13
**Friendship**
26:13,14
**full** 2:4
**further** 1:23 2:7
2:16 126:8
127:10,14

### G

**general** 27:13,19
68:3
**getting** 120:2
**gift** 17:6,20
**gifts** 16:15
**give** 8:5 71:23
**given** 115:23
116:11
**go** 35:14,22
50:21 51:21
60:13 62:2
72:15 73:7
78:3 80:8,23
83:14 107:23
109:4,8,21
112:1,2,11
115:17
**goes** 30:20,22
37:2 74:19
**going** 7:12 10:5
12:4 23:2
27:16 45:3
59:23 79:23
88:21 105:1
108:6,7 125:1
125:3 126:5
**good** 50:16,22
54:21 88:20
96:11 124:18
**gotten** 16:7
**grab** 111:6
**ground** 32:13,14

35:4 55:15
**grounds** 2:13
**guess** 18:2 34:1
92:15 110:12
**gun** 41:16 57:3
58:3 66:23

### H

**hand** 53:21
71:15
**hands** 65:12
66:5 92:19
**happen** 11:11
**happened** 10:2,6
22:1 93:16
95:17 97:6
111:4 115:5
123:14
**happy** 7:16,19
**hard** 68:11 73:3
73:5
**Hardware** 71:6
**harnesses** 125:7
125:10
**Hassinger** 4:15
6:4,5,19 36:15
36:20 44:18
68:9 126:1
**Haynes** 1:20 5:8
**head** 7:11 9:15
10:13 12:9
14:17 19:8
26:15 31:11,15
32:21 33:10
35:11,21 37:19
39:23 42:3
43:9 49:13,20
55:11,23 58:22
59:12 74:7
76:20 78:16
79:10 84:18
87:14,15 100:8
103:14 104:8
105:22 106:23

# FREEDOM COURT REPORTING

107:6 109:3
112:20 114:4
124:8
**hear** 78:15
**heard** 118:4
**heavier** 116:22
**held** 49:8 127:13
**help** 36:5 49:18
57:22 58:9,16
107:23
**helped** 49:2
113:23 114:2
**Highway** 4:19
**history** 12:20
**hold** 65:12 71:14
80:19
**holding** 57:10
**holes** 32:8
**home** 8:9 18:2
21:6 28:14
107:10 110:20
110:23 111:18
111:23
**hook** 35:14 36:1
36:6
**hooked** 31:20
56:11
**hooks** 31:12
32:9
**horizontal** 29:22
51:2 55:22
57:12 70:3
74:20 89:15
90:20 96:1,13
**Hornsby** 1:20
5:8
**hospital** 108:6
109:21
**house** 20:8
26:18 36:13
73:17 76:18,19
114:7,8,10,13
115:1,14,14
**houses** 98:9

**Hudson** 118:15
118:16,17
120:9,12,17
121:9
**huh-uh** 24:6
28:11,17 31:4
34:9 38:7 40:9
43:21 44:6
47:17 51:16
52:4 56:20
57:23 58:5,8
60:1 61:9,19
64:22 65:2,4
67:6,17 77:3,5
77:20 78:5,12
91:13,19 94:20
98:15 99:3
100:8 104:10
112:21 113:1
120:10 121:4
125:16
**hundred** 9:9
24:20 39:21,22
67:9
**hunt** 94:5 95:3
125:11
**hunted** 94:21
**hunter** 101:4,9
**hunting** 12:14
19:23 20:5,21
26:11 33:5
34:14,17 37:2
40:8,14,19
41:3 52:2,6
53:5 61:20
63:1,3,6,10,17
77:1 80:13,16
80:22 81:4,11
82:11,17 84:2
84:2,15,21
85:1,6 86:3,8
86:16,19 87:2
95:11 100:23
102:7

**hurt** 61:2 95:19
102:5 106:10
106:11 107:5
112:14
**hurting** 110:11

### I

**idea** 67:16 92:11
92:19
**identify** 6:2
**important** 8:4
**inch** 71:16 75:20
75:23
**income** 104:15
**Incorporated**
5:18
**indicating** 54:6
54:10 65:15,22
66:7 71:13
87:21 93:4
**inside** 38:3
**inspect** 39:4,12
46:10
**inspected** 43:15
**inspection** 41:7
48:11
**inspector** 46:13
46:15
**installed** 60:14
92:5
**instructional**
25:16
**instructions**
21:19,22 23:1
23:5,7,9 24:1,2
24:11 25:10
28:9,14,15
50:18 51:15
88:1 90:10
91:23 98:21
99:2,15,19
100:10,18
**insulation** 57:1
66:23

**interested**
127:17
**intoxication**
13:8

### J

**Jackie** 11:17,19
104:6,7
**Jaiton** 72:18
112:1,7 113:23
**Janna** 12:2
**January** 26:4,5
26:9 28:22
32:20 33:2
34:16,18 36:11
36:17,19,22
39:3 81:2,11
81:16,20 82:8
82:21 83:2
84:5,9
**job** 106:10
**John** 118:17
120:8,16 121:9
**Jones** 113:11
**judgment** 95:9
**JULIANO** 4:18
**J-A-I-T-O-N**
112:10

### K

**keep** 31:7 36:16
37:21 100:5
**Kent** 118:21,22
**kin** 127:15
**kind** 18:16
25:15 37:5
45:3 54:3
57:19 71:2,8
115:23 124:23
**knee** 9:22 10:2,7
10:9,16 13:13
**knees** 106:11
**knots** 105:14
**know** 8:6 13:23
14:20 15:1,8

15:11,12,14,22
16:2,8,10
20:11 22:2,19
22:22 23:3
27:11 28:3
30:2 50:11,17
53:4,17 61:11
62:3,13 63:9
65:7 66:16
69:9 71:8,11
71:18 72:11,19
72:23 78:3
88:4 89:14,19
89:20 90:1,5,9
90:18 91:22
92:23 93:10
96:14,15,19
97:2,7,12,14
97:17 99:22
100:9 101:16
111:15,16,22
113:4 115:15
115:20 116:4,8
116:16,18
120:6,8,15,16
120:19 121:1,2
121:10 123:6
123:23 124:3
125:2,8,19,21
**knowledge**
21:11 24:9
101:15 103:6

### L

**L** 1:12
**labels** 24:17,18
25:3,11 77:18
98:21
**ladder** 13:21
14:1,21 15:18
21:18 22:5
23:12 29:15,19
30:3 32:12
35:19,20 38:17

38:20,22 49:8
50:20 54:8
55:15 59:3
68:16 84:20
87:22,23 88:5
88:8,8,23
90:14 97:12,13
98:16 111:6,7
111:10,13
118:6 125:7,
125:12,22
**ladders** 35:5
**laid** 35:4 91:1,9
91:11
**land** 19:23 27:10
**Lanier** 1:17 4:12
5:1 127:4,20
**Large** 1:19
127:6
**Larry** 1:6 4:6
5:16 6:6 7:5
8:19 9:7 12:10
16:5 33:14
34:2 49:6,15
49:19,22 52:23
55:17 60:13
61:2 62:1 64:9
76:7 79:22
83:18 92:14
100:1,6 101:14
101:18 102:7
103:7 109:13
110:2,3 116:21
117:3,10
124:17 125:17
**Larry's** 114:10
115:14 119:20
**law** 112:6
**laws** 2:5
**lawsuit** 7:4
13:12 21:1
22:19 42:15,19
48:22 66:13
**lawyer** 7:3 11:3

11:4 115:18,21
116:1,12
**lawyer's** 96:16
**Laying** 114:23
**leading** 2:10
60:18
**leaned** 53:10,16
55:16
**leave** 20:17
**Lee** 3:3 4:18,19
6:7,7,18,21 7:3
36:18 37:1
44:20 74:17
78:7 79:18
80:7 88:17
91:15
**left** 10:9 91:6
109:7
**leg** 110:7
**length** 18:22
79:5,14,16,17
**let's** 13:19 20:22
51:21 53:22
80:19,23,23
107:7
**liked** 120:7
**limit** 24:20
**litigation** 14:2
**little** 46:23 47:2
66:3 71:15
**live** 9:6,10 17:2
55:7 113:12
118:20
**Lives** 17:3
**living** 113:15
**located** 11:8
19:14 120:14
**location** 12:14
31:3 87:8,9
90:14
**lock** 58:18,19
75:12,15
**locking** 75:10
**long** 11:18 43:13

63:4 71:11
75:21,23 97:18
106:2 115:13
115:16
**longer** 71:16
78:11
**look** 39:12 72:5
96:11 112:12
115:2
**looked** 41:8 44:9
45:11 47:20
65:10 74:12,21
92:16 96:16
100:10
**Loosened** 91:10
**lot** 45:16 47:3,5
84:1 96:18
**Lots** 22:11
**lubricant** 123:2
123:21

## M

**M** 4:12 127:20
**machine** 105:11
105:12,13,21
**Main** 1:20 5:8
5:22
**maintenance**
76:22 122:20
**mama** 9:1
107:13
**mama's** 16:20
**manner** 127:16
**Manning** 8:11
8:13,14
**manufactured**
14:1
**manufacturer**
51:7
**marked** 3:4,5
**marks** 79:21
80:4 126:4
**married** 11:13
11:19 104:3

**material** 72:20
96:23
**Matt** 12:2 21:10
23:6,8,17,23
24:11,15 25:1
33:13,21 40:1
51:10,11 61:9
61:18 62:4,15
81:18,20 82:1
83:10 95:2,15
95:16 99:8
100:13 117:3,9
**matter** 5:16
127:9,13
**Matt's** 12:5
**ma'am** 44:2
**mean** 14:10
30:15 32:1
45:10 49:3
50:22 51:2
69:13 70:22
78:20 85:16
88:18 93:8
99:17 111:6
112:13 116:6
121:16 123:7
123:23
**medicine** 109:12
**member** 18:5
**messed** 9:22
43:6
**Messick** 1:17
5:1 127:4
**metal** 45:2 97:11
**middle** 1:2 4:2
88:19 105:5
**mill** 10:4 106:16
107:2
**Mills** 105:16,18
106:16,17
**mine** 18:21
42:11 92:14
104:17
**minutes** 74:16

102:15
**missing** 21:15
**mistaken** 32:7
**model** 18:19
**Monday** 5:19
**Montgomery**
109:20 125:6
**month** 40:23
81:10
**morning** 17:18
**Morris** 1:20 5:7
**mother** 9:2,3
107:15,18,21
**mother's** 18:9
**Mount** 10:3
106:16
**move** 31:2 52:1
52:9 59:8
64:10
**moved** 60:21
64:1,5,8 86:13
87:4 90:13

## N

**N** 1:12 3:1
**name** 6:22 7:2
11:16 16:21
55:3,5 70:23
104:5 113:10
**names** 11:23
**near** 26:18,20
55:8 119:3
**necessary** 2:8
**need** 7:17 10:14
38:8 42:4
79:18 117:12
**needed** 71:22
**needs** 43:8
**neither** 127:15
**nephew** 7:8,9
100:3,4,5
101:13,18
103:7
**never** 16:4 44:4

# FREEDOM COURT REPORTING

51:6 102:17,23 103:7,11 111:11 112:17 112:22
**new** 41:23 42:1 42:22 75:5,5 75:15 76:7 78:1,18 85:6,9 86:3
**night** 10:4 18:1
**nodding** 7:11 9:15 10:13 12:9 14:17 19:8 24:2 26:15 31:11,15 32:21 33:10 35:11,21 37:19 39:23 42:3 43:9 49:13 55:11,23 58:22 59:12 76:20 79:10 84:18 87:14 104:8 105:22 107:6 109:3 112:20 114:4 124:8
**Nope** 17:14
**normally** 123:8
**NORTHERN** 1:3 4:3
**Notary** 1:18
**note** 54:8
**notice** 2:17
**November** 41:1 44:23 47:15 58:21 74:10,13 82:14 83:1 84:3,11 95:23
**number** 1:5 4:5 81:5 82:11,18 83:11 101:19 101:22 104:1
**nut** 72:7,10 75:7 75:10,12,14

89:21,23 90:1 90:2,4,6,7
**nuts** 64:23

### O

**O** 1:12
**Object** 44:18
**objections** 2:9 2:12
**obviously** 23:17
**occasion** 94:22
**occasions** 101:20,22
**occurred** 27:6 52:7 53:6 63:2 66:1 77:2 80:14 92:8,21 93:11 95:12 97:3 108:4 110:14,18 116:17 123:18
**offer** 111:12
**offered** 2:14
**office** 96:16
**offices** 1:19 5:7
**Oh** 38:18 46:17 47:7 59:20 62:11 67:13 102:4 105:15 118:8
**oil** 123:2
**okay** 6:9 7:20,21 8:7,8,17 9:3,6 9:10 10:16 13:1,4,7,22 14:6 15:10 16:2,5,12,21 17:5,11,23 19:18 20:4,7 20:11,17,22 21:9,11,21 22:17 23:2,19 24:21 25:8,19 27:5,8,22

28:12,20 29:11 29:18 30:2,12 30:22 31:5,9 31:13,22 32:3 32:6,16 33:1,4 34:22 35:16 36:4,7 37:12 37:15,20 39:14 41:2 43:1,14 45:5,7 46:18 48:15,20 49:15 50:8 51:1,11 52:5 53:13,17 53:20 54:11 55:3 56:1,7,17 57:9 58:20 59:22 61:22 62:17 64:8,14 65:16 66:8 68:2,13 69:10 70:6 71:14 72:17 75:18 79:13 80:17 81:13 86:2,12 86:21 87:17,22 88:4,12 89:7 91:5 93:5 95:17 96:22 99:22 102:13 106:21 107:7 107:18 108:7 109:16 110:8 110:16 111:17 111:21 112:4 112:17 115:20 116:11,21 120:19 123:9 125:23
**old** 103:17
**once** 40:5 51:23 52:8,17
**ones** 41:23 100:13
**Opelika** 105:9

**open** 17:15
**opened** 17:13,18 21:5 68:15
**opinion** 48:6
**opposite** 108:11
**oral** 5:11
**original** 77:10 89:17 90:6
**originally** 77:15
**ought** 90:10

### P

**P** 1:12
**pad** 54:8
**PAGE** 3:2
**pages** 127:11
**paper** 17:9
**Pardon** 113:6
**Park** 4:15
**PARSONS** 4:18
**part** 36:2 72:11 88:8
**particular** 45:8 97:1 100:11,21 101:19 117:8 124:9
**parties** 1:14 2:12 127:16
**parts** 21:12 64:20 65:1 67:10
**passed** 108:5
**Patrick** 4:23 5:23
**pay** 74:2,3
**Peanut** 33:13,15 49:6 62:18
**Peanut's** 107:16 115:1
**PeeWee** 118:15 118:16
**pending** 13:13
**people** 62:13 91:23 99:7,12

**Pepperell** 105:9 106:3
**percent** 67:9
**period** 81:14
**person** 62:12
**phone** 113:17 116:13
**physically** 28:21 53:7 114:16,18
**pick** 73:18 109:11
**pick-up** 108:13
**picture** 113:3
**pictures** 113:1 113:22 114:17
**pine** 28:2,3 50:10,12 66:9 87:12
**pines** 87:11,18
**place** 5:22 17:3 90:11
**placed** 40:6 65:9 88:5 108:17
**plaintiff** 6:5
**Plaintiffs** 1:7 4:7 4:17
**please** 6:2,10,23 8:10
**point** 64:1 105:8 106:3
**position** 38:2
**possession** 14:7 68:4 69:3
**pounds** 24:20 39:22
**present** 4:23 123:17
**pretend** 53:22
**preventative** 76:22 122:20
**previously** 64:15
**prior** 2:15 22:6
**probably** 22:2 22:15 33:7

# FREEDOM COURT REPORTING

34:3 45:12
61:4,9,10
63:22 81:22
82:4 83:4,7
93:20 95:13
110:19
**problems** 94:8
**Procedure** 5:5
**proceedings**
5:12 127:8,13
**products** 98:14
**prop** 41:16
**property** 9:14
20:5
**Protective** 4:19
**provided** 5:4
**public** 1:18 13:6
13:8
**pull** 36:2 58:3
78:10
**purchased** 14:9
14:10,21
**purpose** 31:5
**push** 32:13
**pushed** 53:12
**put** 9:23 21:10
22:17,22 23:5
23:11,20 25:22
27:23 28:8,10
28:13,17,21
30:4 31:14
32:8 36:7,21
40:15 41:15,23
42:1 48:15,17
48:17,18,21
49:4,7,22 50:4
50:20 51:17,23
52:8,17 53:2,3
53:8 54:23
55:14,17 56:9
58:21 59:2,19
64:17 67:11
71:19 72:10,21
75:14 76:7,10

78:1,18 80:17
81:1 82:12
86:3,4 88:1,20
92:1,11 95:22
96:12 100:15
121:19,22
122:1,5,16
123:1,13
**putting** 22:5,6
24:3,5,12 41:6
66:22 97:19,21
110:6 123:11

**Q**
**question** 7:16
23:3 52:5
63:16 68:10,14
**questions** 2:10
2:11 7:13 8:1
27:17
**quit** 105:1

**R**
**rail** 111:7
**rails** 65:3 67:5
67:14 69:7
**Raise** 53:21
**raised** 53:11,12
**Ran** 105:13,21
**ratchet** 29:5,8
31:14,23 32:9
41:20,21 42:1
42:7 43:12
48:10 56:12,19
57:12 66:14,21
77:9,14 85:7
**reached** 111:6
**read** 23:6,6,8,14
23:16,17 24:11
24:15 25:2,3
51:6,7 99:1,2
99:10,12 100:1
100:6
**reading** 2:2
**real** 9:10 45:14

53:16
**really** 45:11,11
61:11 96:10
110:10,21
116:16 120:15
121:20
**reask** 7:16
**reason** 7:18
12:18,22 47:9
**recall** 24:4 25:13
27:22 77:8
87:23 89:7,9
122:9 124:15
**receipt** 74:5
**receive** 10:18
**reckon** 68:1
97:6 115:18
**recommended**
50:19
**recommends**
51:8
**Record** 5:19
35:1 36:16
79:23 80:4
126:6
**recovered** 72:11
**redone** 41:22
**regular** 75:12
**related** 8:22 9:1
9:2
**relating** 2:6
**relied** 99:6,11
**remained** 82:20
**remember** 25:14
25:18 51:13
60:15,16 73:16
77:10,13 89:13
90:8 91:3 96:7
121:13,20
122:11 123:20
124:13
**remove** 77:18
90:19 91:18
**Rena** 1:17 4:12

5:1 127:4,20
**repainted**
124:12
**repainting** 124:4
**replace** 41:20
42:13,17 43:1
43:17 56:17
57:6 64:20
69:17 70:12,21
76:2,2
**replaced** 44:5
69:21 74:18
75:4 85:22
96:4
**reported** 127:9
**reporter** 1:18
5:2 6:10,16
7:23 43:22
49:21 56:22
61:14 67:18
77:6 78:6,13
88:16 91:14
127:5,21
**REPORTER'S**
127:1
**represent** 6:3,8
7:4
**respective** 1:15
**response** 8:6
**rest** 57:2 66:23
106:5
**results** 127:17
**Ricky** 18:12,13
19:4
**right** 12:8,17
13:17,19 15:15
16:17 17:3
19:22 20:16,22
21:4 23:21
27:10,15 28:18
29:3 31:16
32:11,20 33:16
34:20 36:10
40:5,13 43:14

44:4 48:8,9
49:1 50:1 51:5
51:13 52:22
54:2,5,22
55:14 58:13
59:13 60:17
62:16 63:2,11
63:12,23 66:11
72:6 75:14,21
76:1 78:22
80:16 81:2,3
82:10 85:3,20
87:1,6 88:22
89:10 91:9
92:8 102:6
103:10,16
107:7 108:3,21
108:22 109:16
111:15 112:11
117:12 121:21
123:18,19
**rods** 110:7
**Roger** 55:4
**room** 109:6,14
**rope** 57:23
**ropes** 57:20 58:6
58:15
**rot** 43:6
**roughly** 33:17
**round** 20:18
**ruled** 11:1
**rules** 2:5 5:5
**Run** 105:11
**rung** 30:3 87:23
88:2,5
**rungs** 97:12
**rust** 44:13,16,21
45:4,8,17 46:2
46:15,18,22
47:2,3,5,11
74:22,23 96:1
96:5,18,19
**rusted** 41:13
44:10 46:1,22

# FREEDOM COURT REPORTING

70:14
rusty 45:14
74:21 75:1

---

**S**

S 1:12
safe 60:6 94:14
safety 100:23
125:7,10,18
SAITH 126:8
saw 93:6 108:10
112:18,22
saying 21:2
23:20 68:20,22
69:16 79:6,13
88:12 94:11
100:5 101:17
101:21 102:1
scene 108:8
113:22
school 104:21,23
105:5
season 20:21
33:6 34:14,17
37:2 40:8,14
40:19 41:3
52:3,6 53:5
61:20 63:1,3,6
63:10,17 77:1
80:13,16 81:4
81:12 82:11,18
84:3,15,21
85:1,6 86:3,16
86:19 87:2
90:18 92:7
95:11,12,18
102:7
seasons 80:22
86:8
second 51:17
63:5,14,15,17
65:8,17,18
82:13 84:2
85:1 86:16,18

86:19 87:2
102:7
section 32:12
88:20
sections 122:5,8
secure 29:7,12
29:14 56:8
57:22 58:9,16
59:4 60:7
94:16
security 10:19
13:16 103:23
see 20:1 24:21
26:23 39:4
44:10,13 45:8
46:15,16 47:16
59:3,7 64:12
65:13 71:15
94:18 96:1,5
seen 25:6 44:16
44:21 46:18
58:14 93:9,15
96:14 113:1,2
114:15,16,21
selected 92:4
sense 7:15
serve 31:6
seven 34:3 83:19
83:21 102:8
Seventh 104:22
shake 59:10
shaking 49:20
74:7 87:15
100:8 103:14
106:23
shaky 60:10
shed 36:13 37:5
37:7,9,20 38:1
38:3 40:6
84:22,23 85:2
90:17 123:5
124:1
Sheehan 4:23
6:1

Sheetrock 73:18
shipped 89:10
Shook 59:7
Shoot 13:2
shooting 98:9
Short 80:2
shorter 18:21
show 53:21 54:3
65:20 66:5
87:18 92:19
shows 96:18
shut 107:3
signature 2:1
signed 116:9
similar 120:17
sir 6:23 8:10 9:5
10:17,23 11:15
12:7,12,16
13:18 14:4
19:10,13,17,20
20:6 21:8 22:9
23:22 25:23
31:17 36:9
37:23 40:12,17
40:23 41:4
42:21 43:3
50:3,15 52:12
52:21 55:13,19
57:4,16 59:12
61:3,21 66:10
70:11,18 72:8
72:14 76:9
87:16 89:6
90:23 92:10,13
94:10,13 95:1
95:20 98:7
99:13 100:16
101:2,12
102:20,22
103:3,5 104:4
104:14 105:22
107:6 116:3
117:14 121:6
sister 9:4

sister's 73:17
sitting 123:5
six 39:19 40:3
62:23 82:6
83:19
sixteen-foot 19:1
20:23
sixth 97:12
size 28:4 50:12
50:16,19 51:8
51:12 65:8,21
71:1 87:17
90:9
slidable 78:21
slide 79:3
slow 80:19
smaller 66:4
social 10:18,22
13:16 103:23
somebody 18:4
son 40:1 83:10
102:23 112:2,5
112:8
sorry 7:9 36:15
100:4
sort 116:8
South 4:20
SouthBell
113:16
Southside 105:2
SPECIALIST
5:14 6:9 74:15
79:20 80:3
126:3
speck 45:12
46:23 47:2
spend 13:20
spot 27:11 64:12
sprayed 123:21
stand 13:21 14:1
14:7,9,21
15:18,19 17:6
18:6,16,22
19:3,7,12,19

20:12,23 21:12
21:18 22:18,18
23:20 24:4,12
24:17,22 25:9
25:13 27:18,23
28:13,22 29:12
29:15 30:14
33:2,11 35:19
35:20 39:3,4
42:14,18 44:10
44:14,17,22
45:1,3,8,17
46:11,20 47:6
47:15,16,20
48:4,11,21
49:4 50:20,22
51:9,23 53:3,8
53:14 54:8,13
54:14,23 56:14
56:18 57:11,21
58:1,11,17,21
59:2 61:1 63:7
63:20 66:13,19
67:5,11,12,15
67:22 68:4,15
68:16,19 69:1
69:8,11,12,13
69:18 72:2,16
73:21 74:11
76:4,22 77:10
77:14,19 84:20
84:20 85:5,16
85:21,21 88:23
89:11,17 90:11
90:14,17 91:17
92:1,5 93:6
94:5,19 95:4
95:10,22
100:11,21
101:15,19
102:18 103:1,8
103:12 111:18
112:12 114:1,3
114:6,12

# FREEDOM COURT REPORTING

116:19 117:2,8
120:17,20
121:3,8,14
123:22 124:10
125:13,22
**stands** 22:5,6
23:12 37:21
38:11,17,20,22
40:6 41:6
48:13,16 49:23
58:15 97:19,21
98:5,17,19
101:11 118:6,6
119:6,23
120:22,23
123:3,12 124:5
124:15 125:11
**start** 102:14
**started** 106:8
**state** 1:19 6:3
127:2,6
**statement**
102:21 103:4
116:1,8,12
**STATES** 1:1 4:1
**stay** 115:13
**stayed** 37:1
40:10 52:18
**steady** 94:12
**steel** 73:1
**step** 30:7,9 88:2
88:3,5,10,11
89:1,5 111:5
**Stephens** 1:6,16
4:6 5:10,16,17
6:6,12 7:1,2,5
8:19 9:3,19
11:14,19 16:23
39:18 60:12,13
76:8 79:22
80:6,7 83:18
93:11 97:19
100:1,6 101:18
103:7,18

108:17 110:1,2
113:18 115:14
116:16,21
117:3 121:12
126:5
**steps** 10:4 97:13
**Stevens** 18:13
**STIPULATED**
1:13,23 2:7,16
**stipulation** 5:6
**stipulations**
6:17
**stood** 49:6
**store** 36:12
90:18
**stored** 37:4
84:20
**straight** 53:15
**strap** 31:14,21
31:23 32:1
35:3,15 36:6
42:14 48:10
49:8,10 55:18
56:8,9 66:14
77:9 85:7
**straps** 29:4,5,8
29:16 35:2
41:21,21 42:2
42:7,20,22
43:2,13 56:19
57:12 66:21
76:2 77:14
122:22
**Street** 1:21 5:8
5:22
**strength** 71:18
71:19
**Strong** 1:9 4:9
5:17 6:8 7:4
14:5 18:18
19:7 68:1
69:13 76:4
98:12,13
103:12 117:17

118:5 119:6,23
121:8
**stuck** 53:9,10
**stuff** 41:9,10,13
44:3 73:13,18
97:8 98:10
118:11 123:11
**Styrofoam**
41:15
**subject** 14:2
21:1 22:19
42:15,18 48:22
66:13
**Suite** 4:15
**sure** 17:10 19:6
20:2 41:9,13
44:1,2 62:13
67:7 95:8
102:16
**surgeries** 10:7
**surgery** 110:6
124:22,23
125:4
**swapped** 83:15
**swear** 6:10
**sworn** 6:14

---

**T**

**T** 1:12,12
**take** 7:17,19 8:5
12:5 20:15,16
20:19,20 26:2
26:8 28:9,15
34:12,22,23
36:8 48:12,12
52:2,9,22 53:1
64:14 67:10
72:2,16 77:17
86:17 88:19
90:16,17,21,22
91:12 92:1
114:1,2
**taken** 1:16 40:7
81:7 100:22

101:7 123:13
**talk** 109:13
110:1,8,13,21
**talked** 76:23
110:17 111:18
**talking** 13:20
30:9 32:19
34:5 35:7
36:17 38:16
46:21 47:1,2
51:4 66:17
70:2 78:1,18
78:23 80:9
88:9,11 96:3
102:14 114:17
114:17 119:22
120:4 125:8,14
**tall** 39:17 40:1
**TALLAPOOSA**
127:3
**Tallassee** 8:16
11:9 20:3,5,14
26:20 55:10
71:4 73:9,10
105:4,16,18
106:5,7,17
113:13 119:3
**tape** 74:16 79:19
79:21 80:5
126:4
**taught** 54:22
**teenager** 13:3
**telephone**
107:11 116:12
**telescope** 31:10
79:2
**telescopes** 70:7
**tell** 6:22 7:15,18
10:1 16:12
21:4 28:20
30:12 34:23
38:1 41:5 49:1
51:11 53:7
75:20 93:22

107:21 111:2
115:2,5,7,9
121:11,12,15
**telling** 21:5 69:6
79:15 88:14
**tells** 63:23
**ten** 106:4
**terms** 50:18 51:8
75:19 122:20
**Terry** 14:15,16
15:20
**test** 60:4 122:21
**tested** 59:6
**testified** 6:14
**testimony** 62:22
74:18 89:4
**Thank** 125:23
**thereof** 127:17
**thereto** 2:15
**the-Record**
80:12
**thing** 7:22 25:20
46:22 47:4
75:18 80:15,20
88:7 102:16
105:20
**things** 43:5
57:10 122:19
**think** 12:4 16:5
16:20 18:9
19:5 33:13
62:5 66:8 67:8
74:8 80:12
83:22 91:1
95:2 96:9
99:23 100:12
102:6 107:16
111:20 112:9
113:17 117:5,6
**third** 80:13,16
84:15 88:10
95:11 98:8
**thirteen** 98:2
**thirty** 22:16

# FREEDOM COURT REPORTING

thought 85:12
three 24:19,20
   38:21 40:3
   59:8,18 61:4
   63:22 66:9
   81:23 86:7
   95:14 110:19
   119:10 120:18
   120:22 122:7
threw 75:1
throw 111:10,14
throwed 22:3
   70:19 111:8
TIDMORE 4:14
tie 105:11,13,21
Tied 105:13
tight 41:9 44:2
   59:4
Tighten 122:3
tightened 31:21
   56:12
tightness 122:13
time 2:13,14
   13:10,20 17:16
   17:19 21:6
   26:3 27:19
   28:8 40:11
   45:2,6 49:12
   50:6 51:18
   52:19 60:18
   62:1,5 64:1
   68:3,5,15,17
   79:23 80:6
   81:2,14 82:3
   82:13 83:6
   86:5,13,22
   88:23 93:6,8
   93:15 95:23
   102:2 110:17
   110:21 123:18
   126:6
times 22:11,13
   22:16 33:4,8,9
   33:17,17,20,23

34:2,4 39:15
59:16,18 60:23
61:5 62:23
81:19,23 82:6
82:23 83:5,8
83:11,19,21
95:10,14 102:8
102:11
today 7:13 13:20
told 71:21,22
   73:4 86:14
   102:6 107:14
   109:19 120:1,2
tomorrow
   124:19,20
   125:5
top 29:10 35:3
   35:14 36:6
   41:16 49:10
   56:6,8 57:1,6
   57:13 66:23
   67:5,15,21
   111:5
totally 10:12
transcript 127:8
   127:12
treated 73:1
tree 15:19 17:6
   18:6 22:5
   26:23 27:23
   28:3,4,21 29:1
   29:12,15,19
   30:1 31:12
   32:4,5,10 35:9
   35:10,12,17,22
   35:23 36:1,5
   38:11 39:3,4
   40:6 44:21
   46:11,20 47:14
   47:20 48:4
   49:7 50:4,5,8
   50:12,16,19,21
   51:9,12 53:3,4
   53:8,12,14,23

54:1,9,13,14
54:16,17,18,21
54:23 55:16
56:5 57:11,11
57:21 58:1,11
58:14,17 60:18
60:23 63:7,20
64:2 65:8,17
65:17,23 66:12
66:19 68:4,15
69:11 70:9
73:21 76:22
77:10,19 84:20
89:11,12 90:9
90:15 92:4,20
93:6 95:22
97:19,21 98:4
98:19 101:11
101:14 112:19
116:19 118:6
125:11
trees 63:19 66:9
   66:9 86:9
   87:10,13
trial 2:13
tried 59:10 62:2
trouble 19:19
   24:5 33:2 34:7
   59:23 61:8,12
   102:17 103:1,8
   103:12
truck 108:14,18
true 16:8 71:4,6
   73:7 74:9
   100:2 102:21
   127:12
trusted 45:21,23
try 68:10,10
turn 107:8
turning 78:16
Tuskegee 109:4
   109:8,17
twelve 19:5
twelve-foot

98:12
twelve-footer
   19:16
twenty 22:15
   33:8,9,17,17
   39:15 83:7
Twenty-seven
   11:20
twenty-six 12:2
twice 59:20,21
   60:3
two 11:22 23:20
   32:8,8 39:19
   39:21,22 40:18
   41:2 48:17,17
   50:2 57:10,11
   67:1 80:21
   82:18 83:16
   98:8,16 107:3
   119:10
two-ten 40:4
type 19:3 27:23
   50:8 53:17
   56:14 70:20,22
   72:19 75:11
   89:14,21
   100:22 105:12
   120:20 123:1
   123:21
Tyson 105:17
T-E-R-R-Y
   14:18

U

U 1:12
Uh-huh 10:10
   16:16 37:19
   64:3 88:15
   94:2 96:17
   102:9 105:6
   117:11 119:19
uncle 7:10 8:20
understand 7:6
   7:14 27:12

57:9 61:23
68:21 99:11
108:16 116:15
unhooked 35:2
   35:4
UNITED 1:1 4:1
unsafe 48:6
unstable 60:9
unusual 94:19
use 29:2 33:11
   34:2 48:7 54:7
   54:8 61:18
   84:1 93:23
   125:10,18
usual 6:17

V

Value 71:5,6
   73:7 74:9
verbal 8:5
Vernon 10:3
   106:16
versus 5:17
video 1:15 5:14
   6:9 74:15
   79:20 80:3
   126:3
videographer
   5:23
videos 25:16
Videotape 5:15
VS 1:8 4:8

W

waiting 109:6
waived 2:3,18
walk 59:3
Wal-Mart 16:7
   42:10
want 12:18
   14:22 26:4
   31:3 36:14
   53:1 80:8 95:7
   102:13,16
   120:4

# FREEDOM COURT REPORTING

wanted 120:3
warning 24:18
  25:3,11 77:18
  98:21
washer 75:13,15
wasn't 27:11
  39:10 41:13
  53:15,16 60:21
  64:6 86:22
  90:3 93:12
  115:15 119:7
way 39:5 47:21
  54:18 57:22
  64:15,17,19
WD-40 123:2
weak 46:3,4,7
  47:12 48:3,5
weather 37:18
  38:6
WEAVER 4:14
webbing 41:21
  42:7,17 48:10
  56:19 66:14,20
  77:9 85:6
week 40:18 41:2
weekend 93:21
  93:21,23 94:1
  94:9
weekends 82:2
weigh 39:20
  40:2
weighs 40:4
weight 24:20
weld 31:1 46:13
  46:16 47:11
  68:7,8
welded 30:18,19
  88:7,13 91:3,6
  91:9
welding 67:21
  68:18,23
welds 46:10,19
went 23:7 29:19
  29:23 33:14

35:3 48:18,21
49:9 62:6,18
71:21 81:22
83:4,14 84:11
94:23 102:8
108:3 109:5,18
112:6,17
113:23 123:3
123:16
weren't 21:15
West 105:8
  106:3
we'll 7:19
we're 12:4 32:19
  77:23 80:3
  85:4
we've 76:23 96:2
  96:14,15
whatsoever
  66:12
Whereabouts
  37:22
Whichever
  83:13
wife 16:6 22:3
  107:16 109:11
wife's 11:16
  104:5 109:11
WILLIAM 4:14
wing 90:1,2,3,7
witness 2:2 5:10
  6:11,13
Wood 55:6
woods 19:15,21
  20:18 26:3
  28:8,15 44:23
  47:15 48:12,13
  76:17 81:1
  111:19 112:12
  122:17 123:4
  123:13,17
words 28:12
  115:8
work 9:18,21,23

10:5 62:4
67:16 104:9
105:23 106:2
107:4 117:1
120:12
worked 10:3
101:10,14
105:7,8 106:22
107:2
working 73:17
104:17
Works 113:16
worth 119:8
wouldn't 45:21
  47:7 59:9
wrapped 17:6
  31:19,22 32:3
  57:21
write 23:14
  68:12
written 21:19,22
  24:11 25:10
  90:10 98:20
  99:15 100:10
  100:18 116:1,7
wrong 39:10
  94:18

**X**

X 3:1
X-rays 109:7

**Y**

yard 9:9
yeah 9:8,12,17
  10:15 11:7
  14:19 15:4,17
  17:1,8,22 18:3
  18:7,15 20:13
  20:16 21:14,20
  22:10,12 23:1
  23:10,13,18
  24:23 26:1,7
  26:17 27:2,4,7
  27:14,21 28:19

29:6,21 32:15
32:23 33:18
34:19 36:23
37:6,11,14
38:5,16 39:9
39:13,16 42:5
42:22 43:11,16
45:13 46:9,17
47:10 48:14,23
49:17 51:3,10
51:19 52:13
54:19 56:16,23
59:1,15,21
60:5,8,20 61:7
62:11,21 63:3
63:18 69:15,22
70:4 71:7 73:6
74:14 75:3,22
76:15 79:7
80:21 81:6,15
82:7,19 83:9
83:13,20 85:8
85:18,23 86:6
86:15,20 87:3
90:3 91:7,10
91:16 92:17
93:2,10,21
95:5,21 98:22
102:4 107:13
108:9,12,15,19
109:23 110:4,5
111:1,22 112:3
112:9 113:20
114:21 116:23
118:8,13,23
119:10 120:21
122:1,4,7,15
124:6 125:9
year 13:20 14:21
15:22 16:16,18
18:6 20:18
41:22 43:2
51:21 52:1
61:6,8 62:2,7,8

62:9,14 83:18
122:14 123:10
years 11:20 13:2
97:20,22 98:1
98:3 106:3,6
107:3
Yep 82:22 84:10
84:13,16
107:20
y'all 9:10 16:13
16:18 19:11,18
20:17 24:3,12
25:19 26:2,23
28:7,13,13,14
28:21 30:3,4
32:16 33:5
34:12,23 36:10
37:21 38:12
39:2 40:15
44:22 48:12
51:14,23 52:1
53:2,7 55:8
57:19 60:14
63:6 64:1,10
66:18 67:4,10
67:23 68:12
69:21 70:12
76:16 77:17
78:16 88:5
90:19,21 91:17
104:15 110:8
119:16,22
122:12 123:1
124:14

**Z**

zip 8:17

**0**

0 82:15
0031 127:21
03 106:20,22
04 15:6 16:13
  36:21 68:17
  80:17,20

# FREEDOM COURT REPORTING

**05** 32:20 33:2
36:17,22 80:18
81:2,9,14,16
81:17,21 82:9
82:16,17 83:2
84:3
**06** 36:11,17,18
36:19 40:16,22
47:15 58:21
80:18 82:21
83:2 84:5,9,12
86:4 93:14
**08** 37:3

**1**
**1** 5:15 79:21
**10:00** 5:10,19
**10:57** 79:23
**11:06** 80:6
**11:44** 126:6
**127** 8:11
**131** 1:20 5:8,22
**17th** 1:22 5:20

**2**
**2** 80:5 126:4
**2nd** 93:12,16
**2:07-cv-128-10**
1:5 4:5 5:18
**200** 4:16
**2003** 11:12,13
106:22
**2004** 14:22 15:5
15:16 16:18
25:21
**2005** 26:6,9
27:18 28:1,22
33:5,8,19 34:5
34:10 63:8
64:5
**2006** 34:20 39:3
44:23 63:13
70:1 74:13
93:17 95:23
**2007** 1:22 5:20

**205** 4:16,21
**280** 4:20
**2801** 4:19

**3**
**30th** 34:16,18
**300** 4:15,19
**326-6600** 4:21
**35010** 1:21 5:9
**35223** 4:20
**35242** 4:16
**36078** 8:18

**4**
**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**
104:2

**5**
**5th** 93:13

**6**
**6** 3:3

**9**
**9/25th/60** 103:22
**980-6065** 4:17

# FREEDOM COURT REPORTING

**TRAVEL TRANSCRIPT**

IN THE UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


CASE NUMBER:   2:07-cv-128-10

LARRY STEPHENS, ET AL.,

       Plaintiffs,

       VS.

STRONG BUILT, INC.,

       Defendant.


\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**DEPOSITION OF**

**TERRY STEPHENS**

**January 23rd, 2008**

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*


TRAVEL TRANSCRIPT PREPARED BY

FREEDOM COURT REPORTING

RENA' M. LANIER, CCR

(334) 300-3832

Page 1

```
1      IN THE UNITED STATES DISTRICT COURT
2        MIDDLE DISTRICT OF ALABAMA
3            NORTHERN DIVISION
4
5  CASE NUMBER:  2:07-cv-128-10
6  LARRY STEPHENS, ET AL.,
7         Plaintiffs,
8         VS.
9  STRONG BUILT, INC.,
10        Defendant.
11
12      S T I P U L A T I O N
13      IT IS STIPULATED AND AGREED by
14  and between the parties through their
15  respective counsel, that the video
16  deposition of TERRY STEPHENS may be taken
17  before RENA' MESSICK LANIER, Certified
18  Court Reporter and Notary Public for the
19  State of Alabama at Large, at the offices
20  of Morris, Haynes & Hornsby at 131 Main
21  Street, Alexander City, Alabama  35010, on
22  the 23rd day of January, 2008.
23      IT IS FURTHER STIPULATED AND
```

Page 2

```
1  AGREED that the signature to and the
2  reading of the deposition by the witness
3  is waived, the deposition to have the same
4  force and effect as if full compliance had
5  been had with all laws and rules of Court
6  relating to the taking of depositions.
7      IT IS FURTHER STIPULATED AND
8  AGREED that it shall not be necessary for
9  any objections to be made by counsel to
10  any questions except as to form or leading
11  questions, and that counsel for the
12  parties may make objections and assign
13  grounds at the time of the trial, or at
14  the time said deposition is offered in
15  evidence, or prior thereto.
16      IT IS FURTHER STIPULATED AND
17  AGREED that the notice of filing of the
18  deposition by the Commissioner is waived.
19
20
21
22
23
```

Page 3

```
1            I N D E X
2  EXAMINATION BY:              PAGE
3  MR. LEE                 6
4  EXHIBITS          MARKED
5     (None marked to this deposition)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
```

Page 4

```
1      IN THE UNITED STATES DISTRICT COURT
2        MIDDLE DISTRICT OF ALABAMA
3            NORTHERN DIVISION
4
5  CASE NUMBER:  2:07-cv-128-10
6  LARRY STEPHENS, ET AL.,
7         Plaintiffs,
8         VS.
9  STRONG BUILT, INC.,
10        Defendant.
11  BEFORE:
12      RENA' M. LANIER, Commissioner
13  APPEARANCES:
14      WEAVER & TIDMORE, by WILLIAM
15  HASSINGER, 300 Cahaba Park Circle, Suite
16  200, Birmingham, Alabama  35242, (205)
17  980-6065, appearing for the Plaintiffs.
18      PARSONS, LEE & JULIANO, by DAVID
19  LEE, 300 Protective Center, 2801 Highway
20  280 South, Birmingham, Alabama  35223,
21  (205) 326-6600, appearing for the
22  Defendant.
23      ALSO PRESENT:  Jeff Jeffcoat
```

Page 5

1    I, RENA' MESSICK LANIER, a
2 Certified Court Reporter of Elmore County,
3 Alabama, acting as Commissioner, certify
4 that on this date, as provided by the
5 Federal Rules of Civil Procedure and the
6 foregoing stipulation of counsel, there
7 came before me at the offices of Morris,
8 Haynes & Hornsby, 131 Main Street,
9 Alexander City, Alabama 35010, beginning
10 at 10:06 a.m., TERRY STEPHENS, witness in
11 the above cause, for oral examination,
12 whereupon the following proceedings were
13 had:
14    THE VIDEO SPECIALIST: This
15 begins Videotape No. 1 in the deposition
16 of Terry Stephens in the matter of Larry
17 Stephens versus Strong Built, Inc., Case
18 No. 2:07-cv-128-10 in the U.S. District
19 Court, Middle District of Alabama,
20 Northern District.
21    We are on the Record at 11:06
22 (sic.) a.m., on Wednesday, January 23rd,
23 2008. The deposition is taking place in

Page 6

1 Alexander City, Alabama. I'm Jeff
2 Jeffcoat.
3    Would, Counsel, please
4 identify yourselves and state whom you
5 represent?
6    MR. HASSINGER: My name is
7 Will Hassinger. I'm co-counsel for the
8 plaintiffs, Larry and Deborah Stephens.
9    MR. LEE: I'm David Lee, and
10 I represent the defendant, Strong Built.
11    THE VIDEO SPECIALIST: Would
12 the court Reporter please swear in the
13 witness.
14    TERRY STEPHENS,
15 the witness, after having first been duly
16 sworn, was examined and testified as
17 follows:
18    THE COURT REPORTER: And do
19 we have usual stipulations?
20    MR. LEE: That's fine.
21    MR. HASSINGER: That's fine.
22    EXAMINATION
23 BY MR. LEE:

Page 7

1    Q. Would you give us your name,
2 please, sir?
3    A. Terry Michael Stephens.
4    Q. Mr. Stephens, my name is
5 David Lee. I'm a lawyer in Birmingham,
6 and I represent Strong Built in a civil
7 lawsuit that's been filed by I guess it's
8 your brother, is that right, Larry
9 Stephens?
10    A. Nephew.
11    Q. Nephew. Nephew. I'm sorry.
12 -- nephew, Larry Stephens, and his wife,
13 Deborah.
14    I'm going to be asking you
15 some questions today. If I ask you
16 something that you don't understand, you
17 just tell me, and I'll be happy to reask
18 the question again.
19    Or if you need to take a
20 break at any time, tell me that as well,
21 and we'll be happy to accommodate that.
22    A. Yes, sir.
23    Q. What is your home address?

Page 8

1    A. 2751 Airport Road, Coosada,
2 Alabama.
3    Q. Could you spell that?
4    A. C-O-O-S-A-D-A.
5    Q. And the zip code?
6    A. I believe it's 36025.
7    Q. How old are you,
8 Mr. Stephens?
9    A. I'm forty-six.
10    Q. And are you married?
11    A. Yes, sir.
12    Q. What's your wife's name?
13    A. Michelle Garner Stephens.
14    Q. And how old is your wife?
15    A. She's thirty-six.
16    Q. And are you -- do you have
17 any children?
18    A. Yes, sir.
19    Q. How many children do you
20 have?
21    A. I have one.
22    Q. Boy or girl?
23    A. Little girl.

Page 9

1 Q. And how old is she?
2 A. She's ten.
3 Q. How are you related to Larry
4 Stephens?
5 A. He's my nephew.
6 Q. And are you related to his
7 father or mother?
8 A. His mother.
9 Q. Okay. You and Larry's
10 mother are brother and sister; is that
11 right?
12 A. Yes, sir.
13 Q. Okay. What's Larry's
14 mother's name?
15 A. Joan Wood.
16 Q. We are here about an
17 accident that Larry was involved in
18 sometime ago involving a ladder stand.
19 And we've taken Larry's
20 deposition. And as I understand it,
21 this -- the ladder stand that's the
22 subject of this litigation was a Christmas
23 gift --

Page 10

1 A. Yes, sir.
2 Q. -- from you to somebody
3 else?
4 A. Yes, sir.
5 Q. Is that correct? That's why
6 we are here to take your deposition and
7 find out more about that.
8 When did you buy the subject
9 ladder stand?
10 A. The end of November, first
11 of December of 2004.
12 Q. And did you buy it new?
13 A. Yes, sir.
14 Q. Was it new in the box?
15 A. Yes, sir.
16 Q. And where did you buy the
17 stand from?
18 A. At the Prattville Wal-Mart.
19 Q. Do you have a receipt for
20 that?
21 A. No, sir.
22 Q. Would you pay for that by
23 cash or credit?

Page 11

1 A. Cash, yes, sir.
2 Q. Check or cash?
3 A. Cash.
4 Q. Tell me about where this
5 stand was at the Wal-Mart. Was it inside
6 the store or --
7 A. Yes, sir. It was inside.
8 Q. -- outside? Take me -- take
9 me through that.
10 A. If you go through the front
11 door, not the food side but the other
12 side, walk straight -- straight on back
13 past the clothing and everything to the
14 back. Take a left.
15 Right there in the sporting
16 goods section, there's the gun counter
17 where -- the counter where they have the
18 guns inside the case. And they was
19 setting directly in the front of them.
20 Counter is here. Front of
21 the store is here. Counter is here. And
22 there was a bunch of them setting right
23 here.

Page 12

1 Q. Okay. Were they on the
2 floor?
3 A. Yes, sir.
4 Q. Okay.
5 A. On a pallet.
6 Q. On a pallet?
7 A. Yes, sir.
8 Q. Okay. Were they running
9 some kind of special on them? Or --
10 A. Yes, sir. They had a sale
11 on them. And I purchased four of them.
12 Q. Okay. Now, the stand that's
13 the subject of this lawsuit is a Strong
14 Built stand.
15 A. Built (nodding head.)
16 Q. Did you purchase four Strong
17 Built stands?
18 A. Yes, sir. All of them
19 ladder stands.
20 Q. Do you know how much you
21 paid for them?
22 A. I believe they were a
23 hundred and nine dollars and ninety-nine

Page 13

```
 1   cents apiece.
 2      Q.   The other three stands, do
 3   you still have those?
 4      A.   No, sir.  I give one to --
 5   to Larry for a Christmas present.  I give
 6   one to my brother, David, for a Christmas
 7   present.  One of them was a Dirty Santa.
 8   And I don't know who got that one.
 9         And the other, Daniel Slocomb
10   got it.  And he lives in Southwest Texas
11   now.
12      Q.   All right.  You bought four
13   of them?  Larry Stephens got one.
14      A.   David Stephens got one.
15   Daniel Slocomb got one.  And I don't know
16   who got the one in that Dirty Santa.  And
17   it was a Christmas party.  We were
18   partaking to it.
19      Q.   Okay.  What size stands were
20   these?
21      A.   As in what do you mean?
22      Q.   Length.
23      A.   Length?
```

Page 14

```
 1      Q.   (Nodding head.)
 2      A.   Sixteen foot.
 3      Q.   And were they all the same
 4   make and model?
 5      A.   Yes, sir.
 6      Q.   Have you seen the other
 7   stands lately, like the one that David has
 8   or Daniel has or -- and I don't guess you
 9   have any idea where the Dirty Santa one
10   went?
11      A.   No, sir.  No, sir.  I -- I
12   don't hunt.  I knew them boys did, and I
13   got them and gave them to them for
14   Christmas presents.  And I figured Dirty
15   Santa, you know, I ain't much of a
16   shopper.
17      Q.   Yeah.
18      A.   You know, so I mean
19   that's -- that's -- as far as seeing them,
20   no, sir, I haven't.
21      Q.   Okay.  You don't, for
22   example -- David Stephens, that's your
23   brother?
```

Page 15

```
 1      A.   Yes, sir.
 2      Q.   You don't know whether he
 3   still has the one you gave him?
 4      A.   No, sir.  I haven't even
 5   discussed it with them.  I couldn't tell
 6   you if he's got it or not.
 7      Q.   Okay.  Daniel Slocomb?
 8      A.   I haven't seen Daniel since
 9   2004.  He moved after Christmas to Texas,
10   and I haven't spoken with him since.
11      Q.   Do you know what part of
12   Texas?
13      A.   Somewhere in Southwest
14   Texas.  I see his brother every now and
15   then.  But --
16      Q.   What's his brother's name?
17      A.   Keith.
18      Q.   And where does Keith live?
19      A.   In Montgomery, Alabama.
20      Q.   Do you know where he works?
21      A.   No, sir.
22      Q.   Does he have family that
23   still lives in that area?
```

Page 16

```
 1      A.   Keith is the only one --
 2   Keith and Daniel -- I've met his Mom and
 3   dad, but I couldn't tell you their names.
 4   And --
 5      Q.   Are you related in any way
 6   to Daniel Slocomb?
 7      A.   No, sir.
 8      Q.   He's just a friend of yours?
 9      A.   Actually, he was a
10   co-employee.
11      Q.   He worked with you?
12      A.   Yeah.
13      Q.   Where did he work?
14      A.   He worked for Slocomb
15   Restoration, his brother.  But --
16      Q.   Does Keith work there?
17      A.   Yes, sir.  Or he did.  It's
18   no longer.
19      Q.   Slocomb Restoration?
20      A.   Yes.
21      Q.   Where are they located?
22      A.   In Montgomery, Alabama.
23      Q.   What type of work do they
```

Page 17

1  do?  What type of restoration work do they
2  do?
3      A.  Houses.
4      Q.  Okay.  But you're certain
5  that the -- that all four of these stands
6  were exactly the same?
7      A.  They were all four in the
8  same type box.
9      Q.  Okay.  Did you ever open any
10 of the boxes?
11     A.  No, sir.
12     Q.  Did you help put any of
13 these stands together?
14     A.  No, sir.
15     Q.  I take it then you didn't
16 read any of the materials that came with
17 them, like the instructions or --
18     A.  No, sir.  But I will tell
19 you this.  On the box itself, it's got
20 a -- like a star sticker on it printed in
21 the box as certified inspection on it.
22         I mean, as far as the
23 materials and stuff inside the box, I

Page 18

1  didn't open them.  I bought them.  I
2  wrapped them up.  I give them away.
3      Q.  Okay.  All right.  Tell me
4  about what you can recall about the
5  outside of the box.
6          What did the boxes look like?
7      A.  They're square.
8      Q.  Do you remember what color
9  the boxes were?
10     A.  They're white with a picture
11 of the stand.
12     Q.  And then you saw some kind
13 of star on there you say?
14     A.  Yes, sir.  It's -- I --
15 certified.  I couldn't say it was an
16 inspected star or anything, but it had
17 certified on it.  I remember that.
18 Because I was looking for the Strong
19 Built, you know.
20     Q.  Did it say Strong Built on
21 the outside of the box?
22     A.  Yes, sir, it did.
23     Q.  Were you in the market for a

Page 19

1  Strong Built stand?
2      A.  No, sir.  I -- I went in
3  looking for Christmas presents.  And I
4  knew them boys hunted.  I said, well, this
5  was a pretty cheap present, but something
6  they wasn't expecting.  And that's what I
7  got.
8      Q.  Okay.  And they were all
9  four Strong Built stands?
10     A.  Yes, sir.
11     Q.  And you said Wal-Mart was
12 having a sale on them?
13     A.  I assume it was a sale.  You
14 know, when I say a sale, I've seen them in
15 other places that was a lot higher, you
16 know.
17     Q.  Okay.  So you took -- is
18 there anything else you can tell me about
19 the box?
20     A.  No, sir.  Other than it's
21 square.  It's probably 30x30 square.
22     Q.  Okay.
23     A.  I mean, that's just a

Page 20

1  guesstimate.
2      Q.  And it was just a white box?
3      A.  Yeah.
4      Q.  But in terms of the contents
5  of the box, you never saw that?
6      A.  No, sir.  I --
7      Q.  Or never looked inside the
8  box?
9      A.  No, sir.
10     Q.  Do you know of anybody else
11 that owns a Strong Built stand?
12     A.  No, sir.  Like I said --
13     Q.  Okay.
14     A.  -- I don't hunt.
15     Q.  Right.  Have you ever heard
16 of anybody criticize the Strong Built
17 ladder stands?
18     A.  No, sir.  That ain't one of
19 my topics of conversation.
20     Q.  Okay.  Nobody, you know,
21 since your nephew's accident, nobody has
22 said to you, you know, I've got a Strong
23 Built stand myself, and I've had problems

Page 21

1  with it or anything like that?
2      A.  Up until y'all contacted me,
3  I didn't even know it was that stand.
4      Q.  Okay.  When did you find out
5  about the accident?
6      A.  Probably -- well, he was
7  already in the hospital undergoing surgery
8  when I found out that it happened.
9      Q.  Okay.
10     A.  See, I don't live up there
11  with them.
12     Q.  Did you -- have you had any
13  conversations with Larry or Deborah
14  Stephens about the accident itself?
15     A.  No, sir.  I seen them
16  Christmas-time for just a few moments, and
17  I came back home.  I live in Millbrook,
18  Coosada, Prattville, you know.
19         And telephone conversation, I
20  know it's a shame to say, but I think I've
21  spoken to my mama probably four times in
22  the last five or -- since my dad died.
23     Q.  And how long has that been?

Page 22

1      A.  I couldn't tell you.
2      Q.  More than two or three
3  years?
4      A.  Yes, sir.
5      Q.  Are you just not close with
6  your family?
7      A.  Well, I was.  But it seemed
8  like when my dad died that they went their
9  way and I went mine.
10     Q.  Okay.  You don't recall how
11  many years ago it was that your dad died?
12     A.  No, sir.
13     Q.  And so I'm clear about this,
14  you've never had any conversations at all
15  with regard to this accident, how --
16     A.  No, sir.
17     Q.  -- it occurred, why it
18  occurred?
19     A.  No, sir.
20     Q.  Okay.  You didn't have any
21  involvement in installing this tree stand
22  or --
23     A.  No, sir.

Page 23

1      Q.  -- ladder stand?  Okay.
2         Do you even know where the
3  accident occurred?
4      A.  No, sir.
5      Q.  Okay.  Have you seen any
6  post-accident photographs of the stand?
7      A.  No, sir.  My nephew was
8  telling me that he had an X-ray of what
9  happened to him.  And I said I wouldn't
10  begin to even know what to look for if I
11  seen it.
12     Q.  When were you first
13  contacted about this case, this lawsuit
14  that's pending?
15     A.  A couple of weeks ago, two
16  or three weeks ago.  When was it when I --
17         MR. HASSINGER:  About three
18  weeks --
19     A.  Yeah.
20         MR. HASSINGER:  -- when I
21  called Deborah to get in touch with you.
22     Q.  (BY MR. LEE)  Okay.  Did you
23  have any conversations -- well, tell me

Page 24

1  what conversations you had about coming
2  here today.
3      A.  My nephew called me and said
4  there was a lawyer was going to be calling
5  me to talk to me about the accident he
6  had.
7         And I asked him, I said,
8  well, why is he calling me?  He said
9  because the ladder stand that I was in was
10  the one you gave me for Christmas.
11         That's the first time I knew
12  it was the one I give him.  He called me.
13  And he was wanting to set up a time to
14  meet with me.
15         And I was in the process of
16  moving our shop from one location to the
17  next.  That's the reason it took us so
18  long to get here.
19     Q.  Okay.  When you say your
20  nephew, you're talking about Larry
21  Stephens?
22     A.  Yes, sir.
23     Q.  Okay.  Did Larry remind you

Page 25

```
1   about what year --
2       A.   No.
3       Q.   -- you gave this to him --
4       A.   No, sir.
5       Q.   -- as a Christmas gift?
6       A.   No, sir.  I knew exactly
7   when he was talking about.  Like I said,
8   me and my little brother, Eddie, are real
9   close.
10          When Larry had this accident,
11  I had no idea that he was even hunting.
12  And I kept trying to find out what
13  happened.  They said he fell out of a
14  ladder stand.
15          And then -- well, that was
16  the extent of the conversation until Larry
17  called me and told me that he was going to
18  be calling me to set up a time to talk to
19  him.
20      Q.   Okay.  And did you meet with
21  Larry's lawyer to sit down and talk?
22      A.   I assume this fellow is his
23  lawyer?
```

Page 26

```
1       Q.   Yes, sir.
2       A.   This morning we met at
3   Huddle House, and we come over here.
4       Q.   All right.  Do you mind
5   telling me what y'all talked about at the
6   Huddle House?
7       A.   What we talked about?
8       Q.   Yes, sir.
9       A.   Breakfast.  We eat
10  breakfast.  You know, to be honest with
11  you, I can't exactly remember what we
12  talked about other than eating breakfast,
13  picking at the waitress.
14      Q.   Okay.  Did y'all talk about
15  the ladder stand at all or this accident?
16      A.   No, sir.  I -- him and I --
17  he was telling me what type work they done
18  and everything.  And I asked him where
19  their office was at.  He told me they was
20  in Birmingham.  And I told him I do a lot
21  of work up there for Shelby Concrete.
22      Q.   Okay.  But you didn't have
23  any discussions with him about when you
```

Page 27

```
1   bought the ladder stand?
2       A.   No, sir.
3       Q.   Or where?
4       A.   No, sir.  No, sir.
5       Q.   Okay.  And you're one
6   hundred percent certain and positive that
7   this stand was purchased either in late
8   November or early December of 2004?
9       A.   Yes, sir.
10      Q.   At the Prattville Wal-Mart?
11      A.   Yes, sir.
12      Q.   And you paid cash for all
13  four of them?
14      A.   Yes, sir.
15      Q.   Do you have any idea when
16  this stand was manufactured, what year?
17      A.   No, sir.
18      Q.   And you're certain it was
19  the Prattville Wal-Mart?
20      A.   I know for a fact it was.
21      Q.   You've had no conversation
22  with any person regarding how or why the
23  accident occurred?
```

Page 28

```
1       A.   No, sir.
2       Q.   And you don't know of
3   anything defective or wrong with the stand
4   that you gave Larry as a Christmas gift?
5       A.   No, sir.
6       Q.   And you don't know where
7   these other stands that you bought may be
8   now; is that true?
9       A.   Yes, sir.  That's true.
10      Q.   Tell me what type of work
11  you do, Mr. Stephens.
12      A.   I did restoration on homes.
13  Now I work on classic cars, turbos, blower
14  engines and hydraulics.
15      Q.   Okay.  Do you do that out of
16  your house or a shop?
17      A.   No, sir.  I have a shop.
18      Q.   Okay.  Where is it located?
19      A.   Believe it or not, we just
20  moved to this new shop, and I couldn't
21  even tell you the address.
22      Q.   Okay.
23      A.   But it's located in
```

Page 29

1 Millbrook.
2    Q.  Millbrook?
3    A.  Yes, sir.
4    Q.  Do you have a business phone
5 there?
6    A.  Not yet.
7    Q.  Not yet.
8    A.  The number we're using is a
9 cell phone.  And it's (334) 782-8866.
10    Q.  Is that your cell phone?
11    A.  No.  That's William's.  The
12 name of the business is William's Classic
13 Cars and Restoration.
14    Q.  Do you own that business?
15 Or --
16    A.  No, sir.
17    Q.  -- you just work there?
18    A.  Yes, sir.
19    Q.  What's the best way to get
20 in touch with you?  Do you have a cell
21 phone or a house phone?
22    A.  House phone.  (334)
23 285-6466.

Page 30

1    Q.  Okay.  And do you have a
2 cell phone number too?
3    A.  My wife would be the best
4 way.  300 -- (334) --
5    Q.  Let's see.  (334) --
6    A.  -- 300-3958.
7    Q.  That's your wife's cell
8 phone?
9    A.  Yes.  Yes.
10    Q.  You're working for William's
11 Classic Cars now?
12    A.  Yes, sir.
13    Q.  Where did you work
14 immediately before that?
15    A.  I've been working -- when
16 Slocomb Restoration shut down, I went to
17 work for William.
18    Q.  Okay.  How long have you
19 been with William?
20    A.  Forever.
21    Q.  Forever?
22    A.  Oh, God.  You'd have to ask
23 him to verify.  Eight, ten years.  A long

Page 31

1 time.
2    Q.  Okay.  What is your date of
3 birth, Mr. Stephens?
4    A.  12/3/61.
5    Q.  And your social security
6 number?
7    A.  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.
8    Q.  Have you ever been a party
9 to any other -- to any lawsuit yourself?
10    A.  No, sir.
11    Q.  You ever sued anybody or
12 been sued?
13    A.  No, sir.
14    Q.  Okay.  Michelle, is that
15 your only marriage?  Or have you been
16 married before that?
17    A.  I was married prior.
18    Q.  What was your ex-wife's
19 name?
20    A.  Sheila Holland.  That's her
21 maiden name.
22    Q.  And roughly when to when
23 were you married to Ms. Holland?

Page 32

1    A.  Twenty years ago.
2    Q.  Okay.  So it's been a long
3 time?
4    A.  Oh, yeah.
5    Q.  Okay.
6    A.  Yeah.  I've been -- me and
7 Michelle has been together for thirteen.
8    Q.  Thirteen years?
9    A.  Uh-huh.
10    Q.  I certainly have no reason
11 to believe this, but let me just ask you.
12 Have you ever been arrested or convicted
13 of any crimes for any reason?
14    A.  Yes, sir.
15    Q.  Okay.  Tell me about that.
16    A.  Huh?
17    Q.  How many times -- how many
18 criminal convictions do you have?  And I'm
19 not talking about traffic tickets, like a
20 speeding ticket or anything like that.
21        I'm talking about, you know,
22 arrests that involve some type of crime.
23    A.  Convictions?

Page 33

1    Q.   Why don't we do this? Let's
2  start with the arrests, and then you tell
3  me about the convictions.
4    A.   Whoo. Lord have mercy.
5    Q.   Is there a lot of them?
6    A.   Yes, sir. Prior to -- to me
7  getting married, yes, sir.
8    Q.   Okay. Would it be easier to
9  tell me about the convictions?
10   A.   Yes, sir.
11   Q.   Okay. Tell me how many
12 convictions you've had.
13   A.   Probably four.
14   Q.   All right. And tell me what
15 those four are.
16   A.   Attempted murder.
17   Q.   Okay. When was that?
18   A.   Forty years ago. That was
19 about -- seriously, it was over twenty
20 years. It's been well over twenty years.
21   Q.   Who --
22   A.   Every one of them were.
23   Q.   Sir?

Page 34

1    A.   Every one of these were over
2  twenty years.
3    Q.   Okay. Who did you allegedly
4  attempt to kill?
5    A.   Wayne Worthington.
6    Q.   Wayne who?
7    A.   Worthington.
8    Q.   Worthington. And did you
9  have a trial? Or did you plead guilty?
10 Or what?
11   A.   I had a trial.
12   Q.   And a jury found you guilty?
13   A.   Actually, the judge did.
14   Q.   The judge found you guilty.
15 Okay. And what county was that in
16 Alabama?
17   A.   Montgomery County. It
18 happened on Maxwell Air Force Base.
19   Q.   All right. And the second
20 one?
21   A.   Cherokee County, Georgia.
22   Q.   And what was that
23 conviction?

Page 35

1    A.   Assault.
2    Q.   How long ago was that?
3    A.   That was over --
4    Q.   Over twenty years?
5    A.   Oh, yeah. Yeah.
6    Q.   Did you have a trial there?
7    A.   No, sir. I stayed in jail
8  up there for about eight months before I
9  finally went before the magistrate and was
10 given five years supervised probation back
11 in the State of Alabama.
12   Q.   Who did you allegedly
13 assault in that deal?
14   A.   I have no idea what the
15 boy's name is.
16   Q.   Was it some type of bar room
17 brawl or fight?
18   A.   Yes, sir.
19   Q.   Okay. And then the third
20 one?
21   A.   It was back when I was real
22 young. I can't remember exactly what they
23 charged us with. I was about twelve or

Page 36

1  thirteen years old. Theft I think is what
2  it was ended up.
3    Q.   Was that a youthful offender
4  thing? Or --
5    A.   Yes, sir.
6    Q.   Okay. What county was that
7  in?
8    A.   Tallapoosa.
9    Q.   All right. And then the
10 fourth one?
11   A.   The third and the fourth one
12 extended -- were -- were kind of together.
13   Q.   Uh-huh.
14   A.   And it was possession of
15 stolen property, you know.
16   Q.   Okay. Still when you were
17 age twelve to thirteen?
18   A.   Yes, sir. I was --
19   Q.   Did you receive youthful
20 offender status there?
21   A.   Yes, sir. Mrs. Sullivan was
22 my lawyer. I remember her. Ruth.
23   Q.   Okay. And that was in

Page 37

1  Tallapoosa County?
2  A.  Yes.
3  Q.  Have you had any criminal
4  arrests or convictions in the last ten
5  years?
6  A.  No, sir.
7  Q.  Have -- when's the last time
8  you've seen Larry Stephens?
9  A.  The last time I seen him?
10  Q.  Uh-huh.
11  A.  Christmas.
12  Q.  This past Christmas?
13  A.  Uh-huh.
14  Q.  At a family get-together or
15  something?
16  A.  Actually, they were going
17  and I was coming.  Because I was running
18  late because my wife had to work late.
19  Q.  Okay.  Did you ask him how
20  he was doing?
21  A.  I could see he was doing a
22  little better, you know.  He was moving
23  around.

Page 38

1  Q.  How was he --
2  A.  But I --
3  Q.  Was he on crutches?  Or was
4  he using a stick?
5  A.  No.  He was in that little
6  chair with it driving.
7  Q.  Okay.  A motorized chair?
8  A.  You know, prior -- before
9  that he was just, you know, like down in
10  the dump.  He had a little smile on his
11  face that day.
12  Q.  Okay.  What about his wife?
13  Did you have any conversations with her?
14  A.  No.  Deborah and I don't
15  speak a lot.
16  Q.  And why is that?
17  A.  I don't know if it's her
18  attitude or mine.  No.  We just don't --
19  you know, it ain't -- it ain't so much as
20  that.  We just don't speak, you know.
21     I call.  She'll answer the
22  phone.  We'll speak a little bit.  You
23  know, if I bump into them, you know.

Page 39

1  Q.  Well, have y'all ever had
2  any disagreements about anything?
3  A.  No.  No.  No.  Her and I
4  ain't never had no disagreement.  We just
5  don't get -- we just -- I don't know.  You
6  ever met somebody you don't, you know,
7  coddle to?
8  Q.  You just don't geehaw with?
9  A.  Yeah.  Yeah.
10  Q.  Okay.  I know what you mean.
11  A.  Me and her boys get along
12  good.
13  Q.  A couple of these questions
14  I guess I know the answer to.  Since you
15  didn't open the box, you don't have any
16  idea whether all the parts to the stand
17  were in the box or not?
18  A.  No, sir.  I couldn't tell
19  you that.
20  Q.  And do you have any
21  information regarding any additions or
22  alterations that were made to the stand --
23  A.  No, sir.

Page 40

1  Q.  -- from the time --
2  A.  No.
3  Q.  -- you gave it as a
4  Christmas gift until the time of the
5  accident?
6  A.  No, sir.
7  Q.  Have you ever gotten up into
8  a ladder stand or a tree stand yourself?
9  A.  No, sir.
10  Q.  Other than the ladder stand,
11  did you give these people any other gifts?
12     For example, any type of
13  safety harnesses or anything like that?
14  Ratchet straps?
15  A.  No, sir.  No, sir.
16  Q.  Larry was telling me he
17  can't read or right.  And let me just ask
18  you yourself.  Can you read and write?
19  A.  Yes, sir.
20  Q.  What -- what -- how far
21  along in school did you get?
22  A.  I went all through school.
23  Q.  You graduated from high

Page 41

1 school?
2    A.   Yes, sir.
3    Q.   What high school did you go
4 to?
5    A.   Tallassee.
6    Q.   What year did you graduate?
7    A.   I finished school in Memphis
8 Federal Penitentiary if that tells you how
9 long them --
10    Q.   Oh, you did?
11    A.   -- charges were.
12    Q.   Was that relating to the
13 theft?
14    A.   No.  That was the attempted
15 murder.
16    Q.   Oh, attempted murder?
17    A.   Uh-huh.
18    Q.   You had to spend time in
19 the --
20    A.   Yes, sir.
21    Q.   -- penitentiary in Memphis,
22 Tennessee?
23    A.   Yes, sir.

Page 42

1    Q.   What -- how well do you know
2 Larry Stephens?
3    A.   What do you mean?  How well
4 do I know --
5    Q.   Larry.  Did you grow up with
6 him?
7    A.   Yes, sir.  He's my nephew,
8 but I consider him a little brother, you
9 know.
10    Q.   Yeah.  What -- tell me about
11 him growing up.  Did he ever have any -- I
12 know you've had some problems with the
13 law.  What about him?
14    A.   Huh-uh.  I don't -- I think
15 he got a DUI or something another, you
16 know, but as far as anything -- I was the
17 black sheep.
18    Q.   Okay.  Did he grow up as a
19 hunter?  Did Larry grow up --
20    A.   They all did.
21    Q.   Do you have any training or
22 expertise with regard to welding?
23    A.   No, sir.  I -- I've tried to

Page 43

1 weld before, and that's not my thing
2 neither.
3    Q.   Okay.  And you certainly
4 don't have any training or expertise with
5 regard to installing tree stands?
6    A.   No, sir.  No, sir.
7    Q.   All right.  Mr. Stephens, I
8 thank you for coming here today.  I think
9 that's all I have.
10         MR. HASSINGER:  Nothing.
11         THE VIDEO SPECIALIST:  Okay.
12 The time is 10:37.  Here ends the
13 deposition.  We're now off the Record.
14
15    * * * * * * * * * * * * * *
16    FURTHER DEPONENT SAITH NOT
17    * * * * * * * * * * * * * *
18
19
20
21
22
23

Page 44

1         REPORTER'S CERTIFICATE
2 STATE OF ALABAMA:
3 TALLAPOOSA COUNTY:
4         I, Rena' Messick Lanier,
5 Certified Court Reporter and Commissioner
6 for the State of Alabama at Large, do
7 hereby certify that the above and
8 foregoing transcript of the proceedings in
9 this matter was reported by me.
10        I further certify that the
11 foregoing computer-printed pages contain a
12 true and correct transcript of the
13 proceedings held in this matter.
14        I further certify that I am
15 neither of kin nor of counsel to the
16 parties to said cause, nor in any manner
17 interested in the results thereof.
18
19    _____
20    Rena' M. Lanier, Certified
21    Court Reporter (ABCR No. 0031)
22
23

# FREEDOM COURT REPORTING

**1**

IN THE UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION

CIVIL ACTION NUMBER:

2:07-CV-128-ID

LARRY STEPHENS, et al.,

    Plaintiff,

vs.

STRONGBUILT, INC.,

    Defendant.

DEPOSITION TESTIMONY OF:

RAYMOND G. THOMPSON, Ph.D., P.E.

April 17, 2008

10:00 a.m.

COURT REPORTER:

Susan A. McLane, CCR

**2**

S T I P U L A T I O N S

IT IS STIPULATED AND AGREED by and between the parties through their respective counsel that the deposition of RAYMOND G. THOMPSON, P.E., may be taken before Susan A. McLane, CCR, and Notary Public for the State of Alabama at Large, at the offices of WEAVER & TIDMORE, Birmingham, Alabama, on the 17th of April, 2008, commencing at approximately 10:00 a.m.

IT IS FURTHER STIPULATED AND AGREED that the signature to and the reading of the deposition by the witness is not waived, the deposition to have the same force and effect as if full compliance had been had with all laws and rules of Court relating to the taking of depositions.

IT IS FURTHER STIPULATED AND AGREED that it shall not be necessary for any objections to be made by counsel as to any questions except as to form or leading questions, and that counsel for the parties

**3**

may make objections and assign grounds at the time of trial, or at the time said deposition is offered in evidence, or prior thereto.

    Please be advised that this is the same and not retained by the Court Reporter, nor filed with the Court.

**4**

A P P E A R A N C E S

FOR THE PLAINTIFFS:

    Dennis R. Weaver, Esq.

    William H. Hassinger, IV, Esq.

    WEAVER & TIDMORE

    300 Cahaba Park Circle

    Suite 200

    Birmingham, Alabama 35242

FOR THE DEFENDANT:

    David A. Lee, Esq.

    PARSONS, LEE & JULIANO

    300 Protective Center

    2801 Highway 280 South

    Birmingham, Alabama 35223

1 (Pages 1 to 4)

# FREEDOM COURT REPORTING

5

1           I N D E X

2

3

4   EXAMINATION        PAGE NO.

5   Mr. Lee         7

6   Mr. Weaver     165

7   Mr. Lee         175

8   Certificate     194

9

10

11      INDEX OF EXHIBITS

12   EXHIBITS       PAGE NO.

13   DEFENDANT'S 1     23

14   DEFENDANT'S 2     52

15   DEFENDANT'S 3     52

16   DEFENDANT'S 4     76

17   DEFENDANT'S 6    120

18   DEFENDANT'S 7    120

19

20

21

22

23

6

1      I, Susan A. McLane, CCR, of

2  Birmingham, Alabama, and Notary Public for

3  the State of Alabama at Large, acting as

4  Commissioner, certify that on this date as

5  provided by the Federal Rules of Civil

6  Procedure, and the foregoing stipulations

7  of counsel, there came before me at the

8  offices of WEAVER & TIDMORE, Birmingham,

9  Alabama, on the 17th day of April, 2008,

10  commencing at or about 10:00 a.m., RAYMOND

11  G. THOMPSON, Ph.D., P.E., witness in the

12  above cause, for oral examination,

13  whereupon, the following proceedings were

14  had:

15

16      RAYMOND G. THOMPSON, Ph.D., P.E.,

17  having been first duly sworn, was examined

18  and testified as follows:

19

20      COURT REPORTER: Usual

21  stipulations?

22      MR. LEE: Yeah.

23

7

1  EXAMINATION BY MR. LEE:

2     Q.  Tell us your name, please, sir.

3     A.  Raymond George Thompson.

4     Q.  Dr. Thompson, my name is David

5  Lee, I'm a lawyer here in Birmingham.  And

6  I represent Strongbuilt Incorporated in a

7  lawsuit that's been filed by Mr. Larry

8  Stephens and his wife, Debora.  You have

9  been identified as an expert witness for

10  the plaintiffs and I'm going to be asking

11  you some questions today.  If I ask you

12  anything that does not make sense or that

13  you don't understand, just tell me and I'll

14  be glad to re-ask the question, okay?

15     A.  Yes, sir.

16     Q.  What is your business address,

17  please, sir?

18     A.  Business address is 1500 1st

19  Avenue North, Birmingham, Alabama 35203.

20     Q.  And what's the name of your

21  business?

22     A.  Vista Engineering and

23  Consulting, LLC.

8

1     Q.  And what does your company do?

2     A.  The company does consulting for

3  industry -- for manufacturing industries.

4  We do research and development government

5  contracts, and we do expert witness work

6  for legal companies.

7     Q.  What percentage of your business

8  involves expert witness work?

9     A.  About 30 percent.  It varies

10  from year to year, but usually in a 30 to

11  50 percent range.

12     Q.  And do you work for both the

13  plaintiffs and the defendants?

14     A.  Yes, sir.

15     Q.  Do you have any judgment as to

16  what percentage of your work is for the

17  plaintiff versus the defendant?

18     A.  It's about 60/40 on the

19  plaintiff's side.

20     Q.  How much do you charge for your

21  expert witness work?  You know, in

22  particular, how much are you charging in

23  this particular case?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

9

1      A.   This case is -- because we
2 started last year, it's $255 an hour for my
3 time. And I have other fee schedules for
4 other employees based on their experience
5 and their work.
6      Q.   And does it matter what you're
7 doing in terms of what you charge per hour?
8      A.   No, sir.
9      Q.   I've seen some experts, you
10 know, if they're sitting there doing some
11 research, it's $255 per hour, but if you're
12 sitting in a deposition getting grilled,
13 it's $300 an hour or, you know, $350 for
14 court or whatever. You're telling me that
15 you charge $255 per hour no matter what
16 you're doing?
17      A.   That's correct.
18      MR. WEAVER: At least as of now.
19      Q.   Has that fee arrangement changed
20 any? You said this case started last year.
21 Do you now charge more than that?
22      A.   This year my fee is $265 an
23 hour.

10

1      Q.   Tell me about your education,
2 please, sir.
3      A.   I went to West End High School
4 here in town, then to the University of
5 Alabama in Birmingham where I got a degree
6 in engineering, bachelor's. I then
7 received my master's degree in engineering
8 specializing in material science at UAB,
9 proceeded to go to Vanderbilt University
10 where I earned my Ph.D. in material science
11 and engineering.
12      Q.   And any education beyond that?
13      A.   My education -- you mean degree
14 type education?
15      Q.   Yes, sir.
16      A.   No, sir.
17      Q.   Your BS in engineering from UAB,
18 was that just a general engineering degree
19 or did you specialize in any particular
20 area?
21      A.   That was a general engineering
22 degree. In those years we took -- for the
23 general degree we took equal amounts of

11

1 civil, mechanical, electrical and
2 materials. I think I got everything in
3 there.
4      Q.   What year did you graduate from
5 -- well, what year did you receive your BS
6 from UAB?
7      A.   1974.
8      Q.   And then you got your master's
9 degree in material science?
10      A.   Yes, sir.
11      Q.   And --
12      A.   Specializing in material
13 science, I think, is the way the degree
14 reads. It's a master's in engineering, my
15 specialty area was material science and
16 engineering.
17      Q.   What year was that?
18      A.   1975.
19      Q.   And then your Ph.D., when did
20 you receive that?
21      A.   That was granted in 1979.
22      Q.   What type of engineering are we
23 talking about in this case?

12

1      A.   In this case, I have the
2 engineering -- if you will, principles that
3 I looked at in this case are the
4 engineering mechanics, the loads on the
5 ladder and then the metallurgy of the
6 materials that were used in the welding
7 that was done.
8      Q.   And if I ask you in terms of,
9 you know, the subspecialty of engineering,
10 what subspecialty would apply to this
11 particular work that you've done in this
12 case? Is it civil, mechanical, is it --
13      A.   This is -- this depends, you
14 know, subspecialties are hard to define.
15 Lots of those are defined sometimes just by
16 where you go to school and how the faculty
17 is divided up. But these would fall under
18 mechanical engineering and the material
19 science and engineering curriculums at most
20 places.
21      Q.   All right. Tell me about your
22 employment history after you -- let's start
23 with after you received your Ph.D.

3 (Pages 9 to 12)

**FREEDOM COURT REPORTING**

13

1    A.  After I received my Ph.D., I
2 took a position at Clemson University in
3 the ceramic engineering department as an
4 assistant professor.  In 19 -- actually
5 hired in 1978.
6    Q.  What do you do in terms of --
7 I've never heard of ceramic engineering.
8 What is that?
9    A.  Ceramic engineering is one of
10 those groups of things that deals with
11 materials in engineering.  And the ceramic
12 engineering department at Clemson dealt
13 strongly in concrete, bricks, mortar, as
14 construction materials.  And then as
15 technical materials, the ceramics are
16 things like -- I hate to say pottery.  I'm
17 trying to think of -- electronic materials
18 are often ceramic in nature, aluminum --
19 mostly oxides or a combination of oxides.
20    Q.  And you taught at Clemson from
21 1978 until when?
22    A.  Until 1981.
23    Q.  And what was your title,

14

1 professor?
2    A.  Assistant professor.
3    Q.  What did you do after that?
4    A.  After that, I took a position at
5 the University of Alabama in Birmingham in
6 1981 as an associate professor.  I may have
7 started as assistant professor.  I think I
8 started as an assistant professor in '81.
9    Q.  And what did you teach?
10    A.  At -- I taught in the department
11 of material science and engineering, which
12 became the department of mechanical and
13 materials engineering, which then became,
14 again, the department of material science
15 and engineering over the years I was there.
16    Q.  You were there at UAB from 1981
17 until when?
18    A.  1981 until 2000.
19    Q.  And when you left there in 2000,
20 were you an associate professor?
21    A.  I was a full professor.
22    Q.  All right.  And then in 2000,
23 what happened?

15

1    A.  2000 -- well, 1998, I started
2 Vista Engineering, Inc.
3    Q.  In 1998?
4    A.  1998.  And then it became a
5 full-time job, so I left UAB to run Vista
6 Engineering, Inc., full time.
7    Q.  And that started in --
8    A.  2000.
9    Q.  And you've been doing that full
10 time since 2000?
11    A.  Yes, sir.  Notice a little name
12 difference between that name and my current
13 employment I gave today.
14    Q.  Tell me about that.  What was
15 the change?
16    A.  Vista Engineering, Inc., did
17 what Vista Engineering and Consulting does.
18 One of the projects we had or one of the
19 projects we had when we started the company
20 was a research and development project to
21 grow diamonds.  And we started with a
22 patent out of UAB, which we got a license
23 too, and the project was successful to the

16

1 point we got investors from out of St.
2 Louis.  And the investment company wasn't
3 interested in investing in the consulting
4 activities, they just wanted to invest in
5 the diamond activities.  And they wanted
6 the name -- we had to keep the name the
7 same, Vista Engineering, Inc., had to keep
8 that company whole.  With the diamond --
9 because we had some contracts with
10 government agencies that wouldn't allow us
11 to change the contract to a different
12 company, so we had to come up with two
13 companies.  So Vista Engineering, Inc.,
14 went to strictly diamond technology.  And
15 then Vista Engineering -- another company
16 was formed, Vista Engineering, Inc.,
17 Consulting, LLC, that did the consulting
18 work.
19    Q.  My curiosity is up.  And I'm
20 sure yours is too.  How do you grow a
21 diamond?
22    A.  We grow diamonds and it's
23 ingenious -- when I was a student, that

4  (Pages 13 to 16)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

17

1 shows you how technology changes over the
2 years. When I was a student, they said you
3 couldn't do this. To make diamonds you had
4 to take carbon or charcoal and squeeze it,
5 you know, with earthly type forces and high
6 temperatures and convert the coal to
7 diamonds, which is one way you can do that.
8 Turns out there's a much easier way to grow
9 diamonds. You can take methane gas, and
10 methane gas comes from many places. Cows
11 make a lot of it, for example. Take --
12 which is just carbon and hydrogen.
13 Well, we can take that into a
14 reactor at approximately room pressure. We
15 have to increase the temperature to about
16 1600 to 1800 degrees Fahrenheit. But under
17 the right conditions, the carbon and
18 hydrogen breaks down so we get carbon
19 atoms. And if you have the right kind of
20 material catalyst in the reactor, the
21 carbon comes down and deposits in the
22 structure of a diamond. So basically you
23 can sit there and you can grow diamonds

18

1 from gas.
2 Q. I can tell, Dr. Thompson, my
3 hands are going to be full today because
4 you're a lot smarter than I am. But how
5 long does it take to grow a diamond?
6 That's one -- I'm going to ask you a
7 compound question. Rusty can object to it
8 if he wants to. How long does it take to
9 grow a diamond and is it a real diamond
10 when you get done?
11 MR. WEAVER: No objection. I
12 want to know the answer.
13 A. We grow diamonds at the rate --
14 if we put down a surface like this cup
15 holder -- and we can grow diamonds over
16 that whole surface if you wish. And the
17 diamonds that we grow, we grow to add to a
18 product in functionality to different
19 things like tools and seal materials and
20 miniature electronic devices and other
21 stuff. We don't grow gem quality diamonds,
22 although some people do, it's quite capable
23 of doing that. What we grow -- to answer

19

1 the first question, we grow at two microns
2 an hour, and a micron is a millionth of a
3 meter, which is a little bit -- about three
4 millionths of a foot, three millionths of a
5 yard. Anyhow, it's slow, it's very slow.
6 Worse than watching grass grow.
7 So it takes a long time to grow
8 say, a gem quality diamond. The things
9 that we do are different projects -- some
10 of them require five hours of growth. We
11 have a project we hope we're successful at
12 that's going to require about two months of
13 growth.
14 Q. So you're doing things like
15 diamond bits for drills and stuff like
16 that?
17 A. Yeah. That type of stuff.
18 MR. WEAVER: Off the record.
19 (Off-the-record discussion.)
20 A. The second part to your
21 question, was it a real diamond, and the
22 answer is, yes. These -- what makes a
23 diamond a diamond by definition is the

20

1 structure of the carbon diamond is 100
2 percent carbon, so is graphite and so is
3 coal. So we have made graphite. We
4 haven't made any coal but we've made soot.
5 And the difference between soot and a real
6 diamond is just the way the carbon atoms
7 are structured. So when we do it right,
8 the carbon atom structure -- carbon
9 structure, than that is diamond.
10 Q. Would you say that that's a
11 large percentage of your business, doing
12 that work?
13 A. That -- once again, it depends
14 on the contracts and what work we have
15 going on. But that's -- it turns out we
16 probably -- I'm committed to 50 percent of
17 my time in between two companies. And I
18 have to do that under certain rules.
19 Q. And the name of the two
20 companies are Vista Engineering and
21 Consulting, LLC, and what's the other one?
22 A. Vista Engineering, Inc.
23 Q. And are those the only two

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

21

1  corporations or business entities that
2  you're associated with?
3      A.  Yes.
4      Q.  Are you the president or the
5  managing member of both?
6      A.  That's true.
7      Q.  Okay.  In your -- I want to --
8  your consulting business is why you're here
9  today, correct?
10     A.  That's correct.
11     Q.  How many engineers do you have
12  working with Vista Engineering and
13  Consulting, LLC?
14     A.  We have -- counting myself, we
15  have three engineers, four if you count our
16  part-time person.
17     Q.  One part-time engineer?
18     A.  Yeah.
19     Q.  Has anybody within your company
20  done any work on this case other than you?
21     A.  No, sir.
22     Q.  How many times, Dr. Thompson,
23  have you testified in trial in a civil case

22

1  involving expert witness testimony?
2      A.  At trial, I'm sure that's a hard
3  number for me to come up with.  It's small,
4  probably five times.
5      Q.  On any of those five occasions,
6  have you ever testified in a ladder stand
7  or a hunting tree stand case like this one?
8      A.  No, sir, I don't think I have.
9      Q.  How many times have you given
10  deposition testimony as an expert witness
11  in a civil matter?
12     A.  Deposition -- I've got a list
13  for you with me that you require --
14     Q.  Do you have your list with you?
15     A.  I have.
16     Q.  Okay.
17     A.  But in answer to your question,
18  over the years, I don't know the total, but
19  I've done -- I did some while I was still a
20  faculty member at the university.  I've
21  done more since I've started the business.
22     Q.  I'll tell you one thing, while
23  you're looking for that, do you also have a

23

1  current resume?
2      A.  Yes, sir.
3      Q.  Why don't we mark that as
4  Exhibit Number 1.
5      A.  I've got these tabbed as per
6  your request so if you want to leave them
7  in here tabbed we can, if you want to take
8  them out and --
9      Q.  That may be -- is that something
10  that we can keep here?
11     A.  Yes, sir.
12     Q.  All right.  Why don't we just
13  mark this notebook just collectively as
14  Exhibit 1.  And what I'm understanding is
15  that this notebook consists of everything
16  that we've asked you to bring here today;
17  is that correct?
18         (WHEREUPON, a document was
19  marked as Defendant's Exhibit Number 1 and
20  is attached to the original transcript.)
21     A.  That's correct.
22     Q.  All right.  Under tab one, this
23  is your resume; is that right?

24

1      A.  That's correct.
2      Q.  And you have a list of cases; is
3  that right?
4      A.  That's correct.
5      Q.  And this covers the period
6  January of 2000 to March of 2008, correct?
7      A.  That's correct.
8      Q.  And there's some initials by
9  different things.  Like, you know, I'm just
10  looking at the first one.  It says 2000-D.
11  Does that mean deposition?
12     A.  "D" is for defense and "P" is
13  for plaintiff.
14     Q.  All right.  Now, is there some
15  kind of note on here that tells us where
16  you testified either at trial or by
17  deposition?
18     A.  There may be some -- no, I don't
19  remember if that got into the spread sheet
20  or not.
21     Q.  Let's see, I'll let you look at
22  it a while.
23     A.  I'll take a quick look.  I do

6  (Pages 21 to 24)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

25

1  not believe there's an indication -- I
2  can't find any indication that tells me if
3  it's deposition or trial.
4       Q.  Well, just give me your best
5  estimate as to the number of depositions
6  you've given in a civil case as an expert
7  witness.
8       A.  Since 2000, approximately 31 in
9  the last seven years.
10      Q.  In all the cases there you think
11  you gave a deposition?
12      A.  Yes.  Since we give depositions
13  for trial cases, that would be the correct
14  number of depositions.
15      Q.  To your knowledge, have you ever
16  given a deposition in a ladder stand case?
17      A.  I don't remember specifically a
18  ladder stand case.
19      Q.  Or a tree stand?
20      A.  Or a tree stand.
21      Q.  And, you know, can we use that
22  term today interchangeably, a ladder stand
23  versus a tree stand?

26

1       A.  Yes, today that would be fine
2  with me.  Because when I use it, I'll
3  specifically be referring to the type of
4  stand that we have in this case.
5       Q.  And as I understand it, that's
6  called a ladder stand?
7       A.  That's what I would call it,
8  yes.
9       Q.  Some people call it tree stands,
10  but I think technically it's a ladder
11  stand.  Is that your understanding?
12      A.  Tree stands come in several
13  different kinds.  And so the ladder stand,
14  to me, refers to the type that you climb up
15  like a ladder.
16      Q.  All right.  So is it correct
17  that you have never served as an expert
18  witness either for the plaintiff or for the
19  defendant in a hunting ladder stand case
20  other than this one?
21      A.  I believe that's correct.  I
22  have looked at some tree stands and ladder
23  stands, but I don't remember being

27

1  identified as an expert in the case and
2  having given a deposition.
3       Q.  So you've never testified either
4  by deposition or in court in a ladder or
5  tree stand case; is that correct?
6       A.  My recollection is not -- you
7  know, I've been involved in these things
8  for about 30 years so --
9       Q.  Been involved in what?
10      A.  In providing expert witness --
11      Q.  I understand.
12      A.  -- testimony.
13      Q.  But as we sit here today, you
14  have no recollection of either giving a
15  deposition or testifying in court in a
16  hunting ladder or tree stand case?
17      A.  That's correct.
18      Q.  You've certainly never been
19  qualified as an expert in either a hunting
20  ladder or tree stand case?
21      A.  Not that I recollect.
22      Q.  Have you ever designed a hunting
23  ladder stand in your life?

28

1       A.  No, sir.
2       Q.  Have you ever designed a hunting
3  stand of any kind, whether it be a tree
4  stand or a hunting stand of some other
5  kind, something other than a ladder stand.
6  Have you ever designed any type of hunting
7  stand in your life?
8       A.  No, sir.
9       Q.  Have you ever manufactured a
10  ladder stand, hunting stand or tree stand?
11      A.  Me personally, no, sir.
12      Q.  Have you ever worked for a
13  company that either designed or
14  manufactured a hunting ladder or tree
15  stand?
16      A.  Not to my recollection.
17      Q.  Have you ever consulted with a
18  company that has designed or manufactured a
19  hunting ladder or tree stand?
20      A.  No, sir, I do not believe so.
21      Q.  Have you ever assembled a
22  hunting ladder or tree stand?
23      A.  Yes, sir.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

29

1    Q.   And how many times have you done
2    that?
3    A.   Possibly six.
4    Q.   Did you assemble the stand that
5    is the subject of this litigation?
6    A.   No, sir, I did not.
7    Q.   Tell me about the six occasions
8    that you've assembled a hunting ladder or
9    tree stand.
10   A.   That would have been associated
11   with -- where I was examining or looking at
12   a tree stand or a ladder stand.  I think
13   they were probably all ladder stands.
14   Q.   You know, I get the impression
15   you may have looked at these stands in the
16   past but for whatever reason, was not hired
17   as an expert; is that true?
18   A.   That's true.
19   Q.   Tell me -- so I won't be playing
20   20 questions about this, just tell me what
21   the circumstances were with you looking at
22   these other stands.
23   A.   Well, the -- and it's been a

30

1    while, I haven't done any recently.  But as
2    I remember, the circumstances would be that
3    a lawyer has asked me look at a tree stand
4    and I go out -- and in several cases we've
5    assembled them and looked at them.  And I
6    gave them some opinion or advice but that
7    didn't -- but the case didn't or I wasn't
8    used to carry the case onto a deposition
9    level with me.
10   Q.   Can you tell me the names of any
11   lawyers that have asked you to look at
12   either a hunting stand of any kind --
13   either a ladder stand or a tree stand?
14   A.   No, I can't.
15   Q.   Can you tell me how many years
16   ago it's been since you've, you know,
17   looked at some hunting stands but for
18   whatever reason was not hired as an expert?
19   How long --
20   A.   I think it's been -- I didn't
21   mean to interrupt.  I believe that's been
22   about six years at least.
23   Q.   But you can't think of any

31

1    lawyers that asked you to look at it?
2    A.   No, sir.
3    Q.   Have you ever owned a hunting
4    ladder or tree stand?
5    A.   No, sir.
6    Q.   And I think you told me that
7    you've never testified in a case involving
8    a hunting ladder or tree stand.
9    A.   I believe that's correct, yes.
10   Q.   And I think I know the answer to
11   this, you've never owned a Strongbuilt
12   ladder or tree stand?
13   A.   That's true.
14   Q.   Have you ever done any testing
15   of any ladder or tree stands in the past?
16   A.   No, sir.
17   Q.   Now, I looked at your -- I
18   carefully looked at your report when Will
19   and Rusty sent it to me, and then I looked
20   again yesterday.  As I read that report,
21   you had not done any testing of the ladder
22   stand that is the subject of this
23   litigation, at least as of the time that

32

1    you wrote your report; is that fair to say?
2    A.   Yes, sir.
3    Q.   My question to you is:  Since
4    you wrote your report, have you done any
5    testing on the stand that is the subject of
6    this litigation?
7    A.   When you say testing, I assume
8    you mean some physical testing of applying
9    loads or taking -- as opposed to taking
10   measurements and things like that.
11   Q.   Exactly.
12   A.   No.  We have not -- I have not
13   assembled a tree stand nor have I applied
14   any loads for any testing purposes.
15   Q.   Do you know when the ladder
16   stand that is the subject of this
17   litigation was manufactured?
18   A.   I only know what I've read in
19   the depositions from Mr. Stephens and also
20   from Mr. Killen.
21   Q.   Killen.
22   A.   So I have -- I do not personally
23   know when the tree stand was manufactured.

8  (Pages 29 to 32)

**FREEDOM COURT REPORTING**

33

1    Q.  You've read testimony perhaps
2  from some of Mr. Stephens' family members
3  who have testified that this stand was
4  purchased from the Prattville Wal-Mart in
5  either late November or early December of
6  2004. Have you seen that?
7    A.  Yes, sir, I have.
8    Q.  And then on the other hand,
9  you've seen the deposition testimony of Mr.
10  Ken Killen, who is the president of
11  Strongbuilt, that has testified that this
12  stand would have been manufactured sometime
13  in the mid 1990s. You've seen that as
14  well?
15    A.  Yes, sir, I've seen that.
16    Q.  And your testimony here is that
17  you do not know when the stand was
18  manufactured?
19    A.  That's correct.
20    Q.  Do we agree that the stand that
21  is the subject of this litigation is a
22  15-foot ladder stand?
23    A.  Let me run the numbers back

34

1  through my head. I've been doing it in
2  inches, I haven't been doing it in feet.
3  So I have a number of drawings that are in
4  inches. Let me look and divide by 12.
5    Q.  Well, I think it's called a BLS
6  15, Basic Ladder Stand. BLS stands for
7  Basic Ladder Stand, 15 means 15 feet. I
8  just want to make sure we're talking about
9  the same product.
10    A.  Right, I understand. Let's see,
11  yes, I would agree that the ladder stand is
12  approximately 15 feet.
13    Q.  So if we call it a BLS 15, Basic
14  Ladder Stand 15, 15 feet, you're not going
15  to quarrel with me about that?
16    A.  No, sir.
17    Q.  Are you aware of any rules,
18  regulations, laws or industry standards
19  that were in full force and effect that
20  applied to this particular stand when it
21  was manufactured?
22    A.  Well, that would, I think,
23  depend on when the actual manufacture date

35

1  was. I am aware of both manufacture and
2  ASTM specifications for ladder stands. The
3  history of those would encompass a
4  manufacture date of 2002, 2003, 2004 time
5  frame, but I don't believe they encompassed
6  the 1995 manufacture time frame. I'm not
7  sure what the -- I will preface that by
8  saying, I don't know what the manufacture
9  regulations in 1995 were because I haven't
10  found the history of that.
11    Q.  You say -- let's break this
12  down. ASTM, what does that stand for?
13    A.  American Society of Testing
14  Materials.
15    Q.  All right. And your testimony
16  is that that came into play beginning in
17  2002?
18    A.  Well, the earliest one I found
19  that was -- became a standard was 2001, and
20  I'm not sure what the history prior to 2001
21  was.
22    Q.  And then any other industry
23  standards that you're aware of?

36

1    A.  The Tree Stand Manufacturer's
2  Association -- I forget what the first -- I
3  think it's called Tree Stand Manufacturer's
4  Association, but the manufacturing
5  association for these hunting stands has a
6  set of regulations.
7    Q.  And do you know when those
8  standards came into play in terms of ladder
9  stands?
10    A.  I do not.
11    Q.  You feel pretty confident that
12  if the ladder stand that is the subject of
13  this litigation was manufactured at some
14  time prior to 2001, you're not aware of any
15  ASTM standards that would have applied to
16  that time frame?
17    A.  Well, like I said, what I have
18  from ASTM is the latest versions of the
19  standards, which are 2005 and 2006 and
20  still involving -- and they replaced 2001,
21  but I don't know if 2001 was the original
22  or if it replaced something else.
23    Q.  Well, and you've researched

9 (Pages 33 to 36)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

37

1 that?
2     A.  I've done my best.
3     Q.  And just to close the loop on
4 this, as we sit here today, you're not
5 aware of any ASTM standards that existed
6 for ladder stands that were manufactured
7 prior to 2001?
8     A.  That's correct.
9     Q.  And you don't know when the Tree
10 Stand Manufacturer's Association standards
11 came into play with regard to ladder stand?
12     A.  I do not know which year they
13 began, no.
14     Q.  And would it be correct that if
15 Mr. Killen is correct, that this stand was
16 manufactured sometime in the mid 1990s,
17 that you, as we sit here today, are not
18 aware of any standards that would have
19 applied to that particular stand, if that's
20 the correct manufacturing time frame?
21     A.  If that's the correct
22 manufacturing time frame, then I do not
23 know of any association or national

38

1 standards that apply specifically to tree
2 stands.
3     Q.  All right, sir.  Fair enough.
4 Do you know in which state this stand was
5 manufactured?
6     A.  Just according to what Mr.
7 Killen said, and I was -- see, now, I
8 forget if it was Mississippi or Louisiana.
9 I've got one of those right.  He said one,
10 there was some telltale dye mark that
11 allowed him to rule out his Alabama
12 manufacturing and his -- he had a paint
13 that he used to identify that it wasn't
14 manufactured in China.  So he had put it in
15 the Mississippi or Louisiana -- which one
16 was that?
17     Q.  Louisiana.
18     A.  Thank you.  Louisiana
19 manufacturing facility, but that all comes
20 from his personal testimony.
21     Q.  I think -- and Will may have a
22 better recollection than I do.  I think he
23 testified that certain stands were

39

1 manufactured in Louisiana and then he -- it
2 was then sent, I think, to Opelika, Alabama
3 after a certain time frame.  And then, you
4 know, sometime after the -- in the 2000s,
5 the stands were manufactured in China.  Is
6 that consistent with your recollection of
7 it?
8     A.  That's what I basically remember
9 him saying.
10     Q.  Now, you have definitely
11 reviewed some things since you wrote your
12 report; is that correct?
13     A.  Yes.
14     Q.  And one thing in particular that
15 you have reviewed is the deposition of Mr.
16 Killen, correct?
17     A.  That's correct.
18     Q.  Because when you did your
19 report, the deposition of Mr. Killen had
20 not been taken?
21     A.  That's correct.
22     Q.  Now, having reviewed Mr.
23 Killen's deposition and having re-looked at

40

1 this ladder stand, do you see that this
2 stand has been modified since it was
3 originally manufactured and sold?
4     A.  From Mr. --
5     MR. WEAVER:  Object to the form
6 of the question.
7     A.  From Mr. Killen's deposition --
8 the manufacturers that I've worked with
9 over the years, they know their products
10 very well.  And some things certainly ring
11 true for Mr. Killen's deposition about such
12 things as telltale marks of the kind of
13 paints that he used and who were using
14 those paints as dye marks.  Those are
15 things that manufacturers kind of know
16 about.  And when he's talking about
17 modifications, he notes some changes to the
18 platform area and identifies welding
19 technique, splatter marks, welding after
20 painting, all those things that I would,
21 from my experience, tend to agree with Mr.
22 Killing that that's all -- appears to be
23 post-manufactured.  Who did that, I don't

10  (Pages 37 to 40)

## FREEDOM COURT REPORTING

41

1  know. But certainly those are indications
2  of post-manufactured changes in the
3  platform area.
4      Q. I'm going to call it a homemade
5  shooting rail, for lack of a better term.
6  Having looked at Mr. Killen's deposition
7  testimony and then having re-looked at the
8  stand, do you now see that there has been a
9  homemade shooting rail added to this
10  particular stand since it was manufactured
11  and sold?
12      MR. WEAVER: Object to the form.
13      A. The shooting rail, I'll allow
14  you to inject that. I have not examined
15  the platform area in a good bit of detail
16  that didn't -- that only came into my
17  report just in reference to one of the
18  welds that Mr. Killen said was an
19  after-manufacture weld. So in terms of --
20  the railing, I don't have much to --
21  opinion on the platform area.
22      Q. Have you looked at any video
23  footage or photographs that I took?

42

1      A. There was some video associated
2  with the deposition, I believe.
3      Q. Yeah.
4      A. From where they set the tree
5  stand up and showed that. But as far as
6  pictures, not unless they were included
7  with the deposition or one of the expert
8  reports I haven't seen them.
9      MR. WEAVER: David, can you
10  attach originals or copies of whatever he
11  looks at?
12      MR. LEE: Sure, I'm going to.
13  I'm pretty sure I sent y'all a copy of my
14  video and photographs.
15      MR. HASSINGER: I think most of
16  them are included in the --
17      MR. LEE: How much trouble would
18  it be just to get the platform brought in
19  here?
20      MR. WEAVER: It's right here.
21          11:07 a.m.
22          (Short recess)
23          11:11 a.m.

43

1      Q. (BY MR. LEE) Rather than looking
2  at photographs, let's look at the thing
3  itself. What do you call what we're
4  looking at?
5      A. I call that the platform.
6      Q. And we're actually looking at
7  the platform itself; is that correct?
8      A. That's correct.
9      Q. All right. First of all, do you
10  see two different paint colors?
11      A. I do.
12      Q. And does it appear to you in
13  just looking at this that there have been
14  modifications to the platform from the time
15  it was originally manufactured and sold?
16      A. I would agree that since
17  manufacturing, that there have been add-ons
18  to the original manufactured product.
19      Q. Well, my question was two-part,
20  manufactured and sold. Do you take -- do
21  you think there was some modifications to
22  it prior to the time it was sold?
23      A. Well, I don't know. I would say

44

1  that if this was done -- that the
2  modifications that we're talking about, the
3  stuff in different green color, were done
4  after manufacture, but before selling, that
5  would be unusual, so.
6      Q. Well, let's --
7      A. But you're asking if I know, I
8  don't know.
9      Q. I'm asking does it appear to you
10  is what I'm asking. Based upon these
11  different paint colors, based upon these
12  different welding techniques, does it
13  appear to you that there have been
14  modifications to the platform after this
15  product was manufactured and sold?
16      A. Well, like I said, it's -- I
17  think it was -- to me, it's obvious that
18  it's been done after manufacturing. But
19  the selling point I would say, and it
20  appears to me that was probably done after
21  selling too, but I don't know. But the
22  manufacturing part, I think, is a much
23  easier one to agree with.

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

45

1    Q.   All right.  Do you have any
2  evidence whatsoever that my client,
3  Strongbuilt, added this homemade shooting
4  rail to this platform?
5    A.   I don't have any evidence that
6  they added it, no.
7    Q.   In fact, the undisputed evidence
8  that you've seen is to the contrary, that
9  it had nothing to do with the homemade
10  shooting rail addition; is that correct?
11    A.   Would you rephrase that for me
12  please?
13    Q.   I said the evidence is just the
14  opposite of that, the undisputed evidence
15  is that Strongbuilt had absolutely nothing
16  whatsoever to do with the addition of this
17  shooting rail that we see on this platform?
18    A.   I would agree with Mr. Killen in
19  his deposition that that is not the way he
20  manufactured it.
21    Q.   Have you ever -- I asked you
22  earlier if you've ever assembled a hunting
23  ladder or tree stand and you said "yes" on

46

1  six or so occasions.  My question now is:
2  Have you ever assembled a Strongbuilt
3  ladder or tree stand?
4    A.   To the best of my knowledge, I
5  haven't.
6    Q.   Have not?
7    A.   That's correct.
8    Q.   Do you have any information as
9  to who modified this particular stand or
10  altered this particular stand after it was
11  manufactured?
12    A.   No, I don't.
13    Q.   As an expert, Dr. Thompson, does
14  it appear to you that someone has done some
15  welding work on this particular stand after
16  it was manufactured?
17    A.   What we were just looking at, as
18  we looked at the platform just a moment
19  ago, there -- it's evidenced that
20  associated with those changes from the way
21  it was manufactured, that there are welds
22  associated with those changes.
23    Q.   Which was done after the date of

47

1  manufacture?
2    A.   I would agree with that, yes.
3    Q.   And, Dr. Thompson, look at the
4  welds that you say were done subsequent to
5  the time of manufacture, and tell me as an
6  expert witness, what tells you that these
7  welds were done subsequent to the time of
8  manufacture.
9    A.   In particular, there's a weld
10  that's on the platform that -- let's see if
11  I can find it now.  Well, let's see, the
12  weld as you face the platform, it's the
13  weld on the left-hand side weld to the
14  platform where the weld has been placed
15  over the top of the original paint and then
16  painted back over.  So the fact that the
17  weld is done over the original paint
18  strongly suggests that the weld was made
19  after the original manufacture, which
20  included the painting process.
21    Q.   One of the things that Mr.
22  Killen pointed out, I think in his
23  deposition, was you can see actually heat

48

1  from the subsequent welds that actually
2  burned away some of the original paint.
3  Did you -- first of all, two questions.
4  Did you see that in his deposition
5  testimony?
6    A.   I don't remember that
7  specific --
8    Q.   Well --
9    A.   -- point.
10    Q.   -- do you see that on this
11  stand?
12    A.   But you can see it on the stand.
13    Q.   And can you point that out to me
14  on that stand where you actually see heat
15  marks from the subsequent welding?
16    A.   That was at the weld I just
17  described.
18    Q.   Is it also on this weld on this
19  side too as well?
20    A.   Well, on this side, indeed you
21  can see a line and it's on the right-hand
22  side, so it was opposite that weld we just
23  looked at.  But there's also a line in the

12  (Pages 45 to 48)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

**FREEDOM COURT REPORTING**

49

1 platform tubular steel. And I'll just
2 point to it with my finger so that you can
3 see it. That is consistent with a heat
4 line coming from the weld as placed in it.
5    Q. Is that what you call it, a heat
6 line?
7    A. Well, I call it a heat line.
8 There's -- any time you weld, you're
9 putting in a lot of heat, you're melding
10 metal and so those heat -- the heat leaves
11 characteristic lines. In this case, you
12 see it in the paint but you can also see it
13 in the metal.
14    Q. So based upon your training and
15 experience and based upon your personal
16 observation of this particular stand, it is
17 your opinion that someone has done some
18 additional welding on this stand after it
19 was manufactured, that's your opinion?
20    A. I would agree with that, yes.
21    Q. And would you agree with me that
22 the subsequent welding that was done is
23 defective?

50

1        MR. WEAVER: Object to the form.
2    A. I would agree with you that
3 those welds are defective welds.
4    Q. In fact, you pointed that out in
5 your report?
6    A. I have already pointed that,
7 yes.
8    Q. This is nothing new?
9    A. No, it's not.
10    Q. And the question I have is: Do
11 you have any information from any source as
12 to who did this subsequent welding and this
13 subsequent modification to this stand after
14 it was manufactured and sold?
15    A. No, I don't remember seeing that
16 in the depositions.
17    Q. Would you agree that this stand,
18 and in particular this platform, as it sits
19 now, would not fit in a standard flat box
20 that was used to ship these type of ladder
21 stands?
22    A. I haven't looked at that. I
23 remember that line of discussion from Mr.

51

1 Killen's deposition where he said, well,
2 you can't break it down and put it in a box
3 so how could we ship it. It was that tone
4 of discussion. I haven't looked at that to
5 discern if that's the case, if you're
6 asking me to do that right now.
7    Q. Yeah, go ahead.
8    A. I can take a look.
9    Q. I guess what I'm saying is: You
10 can't break that thing down the way it sits
11 now and put it in a box unless you've got a
12 big old box.
13    A. I would agree with you that the
14 way it's now constructed and welded
15 together it would have to go into -- not a
16 flat box, but a rectangular box that is
17 sized appropriate for the platform like it
18 is now.
19    Q. It would take a rather large box
20 to ship this, wouldn't it?
21    A. Well, that part is large.
22 Quantitative term -- the size of the
23 platform.

52

1    Q. Have you looked at the
2 photographs that were produced by the
3 plaintiffs that depict the tree stand still
4 in place after the accident?
5    A. Yes, I have.
6    Q. Is that part of your file
7 materials?
8    A. Yes, sir. Under tab number
9 eight in the folder.
10        (WHEREUPON, a document was
11 marked as Defendant's Exhibit Number 2 and
12 is attached to the original transcript.)
13    Q. I'm just going to mark this just
14 to make it easy. Here is a photograph that
15 I've marked as Exhibit Number 2. Is that
16 one of the photographs that were produced
17 to you by the plaintiff?
18    A. Yes, sir.
19        (WHEREUPON, a document was
20 marked as Defendant's Exhibit Number 3 and
21 is attached to the original transcript.)
22    Q. Exhibit number 3, is that
23 another photograph that was produced to you

13  (Pages 49 to 52)

# FREEDOM COURT REPORTING

53

1  by the plaintiff?
2      A.  Yes, sir, it is.
3      Q.  Do you agree that in the
4  post-accident photographs produced to you
5  by the plaintiff, that it appears the stand
6  collapsed in towards the tree?
7      A.  Yes, sir.
8      Q.  In other words, there was an
9  inward deflection of the stand towards the
10  tree?
11      A.  Yes, sir, that's correct.
12      Q.  In your work in this case, and
13  in particular your examination and
14  inspection of this tree stand, have you
15  attempted to re-assemble this stand to
16  achieve an inward deflection towards a
17  tree?
18      A.  Can I rephrase it and make my
19  answer a little --
20      Q.  Yeah.  If you don't like my
21  question, you can ask yourself any --
22      A.  Can I make up a new question?
23      Q.  You can ask yourself whatever

54

1  you want to ask and I'll be happy to hear
2  the answer.
3      A.  Yes.  When I first inspected the
4  tree stand, I tried to re-assemble it and
5  look at it.  And so I think the -- if that
6  was the question, the answer is yes.
7      Q.  All right.  Well, the first
8  question I have is:  When did you first
9  look at the tree -- I mean, look at the
10  stand?
11      A.  I believe my first inspection
12  was the first of last year, so in the
13  January '07, February '07 time frame.
14      Q.  Have you ever examined the
15  accident scene itself?
16      A.  No, I haven't.
17      Q.  Do you agree, Dr. Thompson, that
18  if you re-assemble this stand today to
19  achieve an inward deflection of the stand
20  towards the tree, the broken clip for the
21  horizontal brace points away from the tree
22  as opposed to towards the tree?
23      MR. WEAVER:  Object to the form.

55

1      A.  I believe the answer to that
2  question is yes.  And the reason I say yes
3  is because when you put it together with
4  the bend as it is -- as it is now, and the
5  little pieces that stick up through the --
6  that connect the two ladder sections
7  together, that angle now causes the clip to
8  be projected on the outside if you face it
9  in.
10      Q.  As opposed to -- and when you
11  say faces outside, you mean hypothetically
12  away from the tree?
13      A.  Away from the tree, yes.
14      Q.  Would it be true that if there
15  had been no changes to this particular
16  stand since the accident, if you assumed
17  that there had been no changes to this
18  particular stand since the accident, would
19  you agree with me that the horizontal brace
20  would not have been facing the tree at the
21  time of the accident?
22      MR. WEAVER:  Object to the form.
23      A.  If you mean -- I'm getting a

56

1  little confused.  If no changes?
2      Q.  Yeah.  I'm --
3      A.  Mr. Weaver has told me that the
4  tree -- that the stand was straightened out
5  if that's -- to unbuckle it at the
6  accident.  But if you look at it right now,
7  if you assume that that didn't happen, is
8  that what you're asking me?
9      Q.  What I'm asking is:  If you
10  assume that there had been no changes to
11  the evidence since the accident occurred,
12  then the physical evidence would indicate
13  that the horizontal brace was not being
14  used at the time of the accident?
15      MR. WEAVER:  Object to the form.
16      A.  Well, since -- as I said
17  earlier, when you first look at it and you
18  use the angle that it is now, the racket
19  that attaches the horizontal bar points
20  away from the tree.
21      Q.  Correct.
22      A.  So I've --
23      Q.  If you take it --

14  (Pages 53 to 56)

# FREEDOM COURT REPORTING

57

1    A.  I said that.
2    Q.  -- a step further, and can you
3  assume hypothetically that there had been
4  no changes to this evidence since the
5  accident, then would it be your opinion
6  that the horizontal brace was not being
7  used at the time of the accident?
8        MR. WEAVER:  Object to the form.
9    A.  Well, if there had been no
10  changes to the evidence, then we would see
11  it bent in its original position and so it
12  would be pointing to the tree.  But since
13  there was a change to the bending angle of
14  those pass-through things, then you flip
15  the ladder around to make that happen and
16  it points outward.  So that --
17    Q.  I'm going to get into it with
18  you in a minute, what changes had been made
19  and your opinion.  But I'm asking you now
20  to assume that no changes had been made to
21  the physical evidence after the accident
22  and prior to the time you looked at this
23  stand, would it be your opinion that if

58

1  that's the case, then the horizontal brace
2  was not being used at the time of the
3  accident?
4        MR. WEAVER:  Object to the form.
5    A.  I'm saying -- it kind of sounds
6  like a double negative if you assume
7  nothing had happened.  I'm getting a little
8  lost in that since something did happen.
9  But I will stand by my original
10  observation, which is if you take the
11  ladder at face value right now, and put it
12  together so that it appears to be pointing
13  inward, then the horizontal bracket is the
14  part that attaches to the horizontal brace.
15  This pointed away from the tree and not
16  towards the tree.
17    Q.  And if that's the case, then the
18  horizontal brace would be of no value?
19    A.  If it's pointing away from the
20  tree, then it's of no value, that's true.
21    Q.  And that's the physical evidence
22  that we see now?
23        MR. WEAVER:  Object to the form.

59

1    A.  That's the -- that's the way one
2  would assemble it.  Now, if one laid the
3  bend point towards the tree that exists in
4  it now --
5    Q.  As --
6    A.  -- then the bracket for the
7  horizontal bar faces away from the tree.
8    Q.  And we know from looking at the
9  photographs that were produced by the
10  Plaintiff, Exhibits 2 and 3, that the bend
11  was towards the tree, it was an inward
12  deflection towards the tree?
13    A.  The pictures show an inward
14  deflection towards the tree, that's
15  correct.
16    Q.  And if you take this physical
17  evidence that we have now, and cause --
18  and, you know, re-assemble it in such a
19  fashion where you achieve an inward
20  deflection towards the tree, then the
21  broken clip for the horizontal brace points
22  away from the tree?
23        MR. WEAVER:  I'm going to object

60

1  to the form, David.  It's one thing to ask
2  a hypothetical, it's a whole other thing to
3  ask him to assemble the tree stand opposite
4  of what the photographic evidence shows.
5  So, I mean, if you can answer a question
6  about if the thing is assembled backwards,
7  then go ahead.
8    A.  I think I've answered it three
9  times.  And answered the same way every
10  time because it's the way I found my first
11  examination of the tree stand -- is that
12  when you assemble a tree stand as it is
13  now, and account for the bend that you'll
14  find when you put the pieces next to each
15  other, the inward -- the side that bends
16  inward, has the bracket on -- facing away
17  from the tree.
18    Q.  All right.  And do you agree
19  that the horizontal brace is crucial for
20  the overall safety and stability of this
21  stand?
22    A.  For this stand the way it's
23  designed, the horizontal brace is crucial

15  (Pages 57 to 60)

# FREEDOM COURT REPORTING

61

1 to its integrity.
2     Q. Do you agree that if the
3 horizontal brace was not being used at the
4 time of the accident, then the ladder stand
5 was not being used as it was intended by
6 the manufacturer?
7     A. Yes, I agree with that.
8     Q. You started to mention to me
9 earlier that Mr. Weaver has told you
10 something about the crimped ends of this
11 second ladder section being straightened
12 out or something happened to them after the
13 accident. Tell me what you know about
14 that.
15     A. Mr. Weaver told me that the
16 ladder stand couldn't be disassembled or
17 taken down because it was stuck in its bent
18 position. And to disassemble it, they had
19 to pull it out in order to disassemble it.
20     Q. And did he tell you who did
21 that?
22     A. I don't remember if he did.
23     Q. Have you seen any statements to

62

1 that effect?
2     A. No.
3     Q. Have you seen any deposition
4 testimony to that effect?
5     A. I don't recall any of the
6 depositions talking of that, no.
7     Q. So your knowledge of that is
8 simply what Rusty has told you; is that
9 correct?
10     A. That's correct. Plus, that
11 there's photographic evidence that also
12 suggests that's true.
13     Q. Well, there's photographic
14 evidence showing that the crimped end of
15 the second ladder section has been bent in
16 both directions?
17     A. That's true.
18     Q. That's no evidence that tells
19 you when that occurred is there, sir?
20     A. You mean when in time it
21 occurred?
22     Q. Exactly.
23     A. That's true. There's also some

63

1 paint evidence on the side of the ladder
2 that show that the picture that we've
3 identified as Exhibit 3, along with Exhibit
4 2, suggests how that -- which is the second
5 ladder section, was oriented relative to
6 the tree.
7     Q. What is the paint evidence of
8 that?
9     A. If you look at Defendant's
10 Exhibit 2, along with this -- if you take
11 this and look at the paint, which is --
12 that's going to follow it from the top.
13 Here's the -- this ladder -- here's the
14 first rung, which is here, the second rung,
15 what you have your hand on, is there. And
16 just below the second rung, we have this
17 kind of angled rust section right here. It
18 shows up there. And just below that, we
19 have this piece of rust here that shows up
20 there and I didn't find any matching over
21 here.
22     Q. Rust marks on the opposite side?
23     A. Yeah. It was clear over here so

64

1 that evidence suggests that at this point,
2 that was the orientation of the ladder.
3     Q. In any of the photographs that
4 you've seen that were produced of the
5 accident scene itself, have you seen any
6 photographs of a horizontal brace lying on
7 the ground?
8     A. I have not, no.
9     Q. Have you looked for that?
10     A. The image that I have seen -- is
11 this -- the best one I've seen -- look for
12 it on Exhibit 3. In Exhibit 3, I haven't
13 identified the horizontal brace in Exhibit
14 3.
15     Q. Would you expect the horizontal
16 brace to be lying somewhere between the
17 ladder and the tree if it was being used at
18 the time of the accident and if the
19 horizontal brace failed?
20     MR. WEAVER: Object to the form
21 as to when you would expect that.
22     A. I would expect that at the
23 failure time that the horizontal brace --

16 (Pages 61 to 64)

# FREEDOM COURT REPORTING

65

1  and as far as I know, it wasn't -- we have
2  some yellow strapping.
3     Q.  Yeah, racket strapping.
4     A.  Racket straps here.  But it's my
5  understanding that that wasn't attached to
6  the brace.  So I would expect the brace
7  when it broke, to be ejected either
8  downward or left or right.  And I would
9  expect it to be in the vicinity of the base
10  of the tree.
11     Q.  Somewhere between the ladder and
12  the tree?
13     A.  Well, it wouldn't have to be
14  between, it could be off to the side, left
15  or right depending on how it's ejected.
16     Q.  Well, if you assume -- well,
17  it's not going to shoot off like a rocket,
18  is it?  I mean, it's a piece of metal.
19     A.  Well, in this case, some do.  I
20  mean, if you've been around breaking, we
21  break a lot of metal in some metal breaks.
22  But the real loud bang which indicates how
23  much energy is being released -- and so it

66

1  can go flying actually.  But this brace had
2  more of a tearing action to it, so I don't
3  think it would have gone shooting off into
4  the woods.  But it could have fallen, you
5  know, not in between nothing -- not
6  necessarily in between the ladder and the
7  tree itself, it would be off to the --
8  could be off to the left or the right.
9     Q.  Whether it's off to the left or
10  to the right or, you know, in between the
11  ladder and the tree, you have carefully
12  looked at all these photographs as the
13  expert for the plaintiff, and have not seen
14  any photograph showing this horizontal
15  brace lying on the ground?
16     A.  No, I have not identified the
17  brace.  I have not identified the brace in
18  the photographs.
19     Q.  Have you looked for it?
20     A.  I have looked for it.
21     Q.  Do you know how much effort and
22  force it would take to bend these crimped
23  ends of the second ladder section in the

67

1  opposite direction while taking this stand
2  down?  Do you have any opinion about that?
3     A.  I haven't done it exactly in
4  that manner.  But let's see if I can come
5  up with an estimate for you.  To answer
6  your -- depends on -- and you asked how
7  much force it would take to pull it out in
8  the opposite direction?
9     Q.  Yes.
10     A.  And the answer to the question
11  depends on exactly where you pull from and
12  if you get any lever action from where
13  you're pulling from.
14     Q.  In the --
15     A.  The -- so it would take some
16  calculations to do it, but it could --
17  well, I don't want to commit right now
18  because I haven't done the calculations.
19     Q.  Well, and in fairness to you,
20  Dr. Thompson, you don't have sufficient
21  evidence to make calculations, do you?
22     A.  Well, you could bracket it.  You
23  could assume this is from a pull right at

68

1  the bend, and that would be the most force
2  it would take.  And then you could go down
3  some ladder rungs and say, I have some
4  levering action and this would be the least
5  amount I could take.  So you could branch
6  it a little --
7     Q.  But my point is:  You haven't
8  seen any testimony or statements from any
9  witness who took this down that gives you
10  any indication as to how it was done, what
11  force was used to do it, whether they had a
12  lever, there's nothing other than Mr.
13  Weaver's statement to you that they had to
14  use some force to take it down, correct?
15     A.  He didn't mention any force
16  actually one way or the other.
17     Q.  What did he mention?
18     A.  Just that he -- that had to be
19  bent in the opposite direction that it was
20  in in order to get it loose.
21     Q.  And in looking at that
22  photograph, can you see why it would have
23  to be bent to simply take out that section

17  (Pages 65 to 68)

# FREEDOM COURT REPORTING

69

1  -- second lateral section, or in looking at
2  any of the post-accident photographs that
3  were taken on behalf of the plaintiff at
4  the accident scene, can you see any
5  physical reason why the crimped ends on the
6  second ladder section would have to be
7  bent, not straight, but bent completely in
8  the opposite direction to simply remove
9  that ladder section?  Do you see any
10  physical reason why that would be the case?
11      A.  As I understand your question,
12  do I see any reason why the ladder would
13  have to be bent in the opposite
14  direction --
15      Q.  To take it out.
16      A.  -- to take it down, then I would
17  say that, no, I don't see any reason it
18  would have to be bent in the opposite
19  direction.  Although, I do see that there
20  could possibly be the need to bend it, to
21  straighten it at least in order to get it
22  out because I've had many instances where
23  I've tried to take bent stuff out of things

70

1  and it's harder than when it was nice and
2  new and straight.
3      Q.  Well, it's bent now, isn't it?
4      A.  Yes, sir.
5      Q.  And I can promise you because
6  I've done it, it slides into the third
7  ladder section.  Do you have any reason to
8  dispute that?
9      A.  No, sir.
10      Q.  And can you tell me why that
11  second ladder section, as it appears in
12  Exhibits 2 and 3, couldn't just be jerked
13  out of the third ladder section?
14      A.  Once again, having done this
15  many times, I'm sure you could pull it out
16  if you had enough force to put it
17  vertically up.  To straighten it out, to
18  get it out, I assume that the reason was
19  that they couldn't be pulled up and the
20  reason for that -- there could be many
21  reasons.  One is that as it bent, you got
22  too much force of the leg against the -- it
23  would be the outer --

71

1      Q.  You look at your picture and
2  I'll look at this one.
3      A.  Okay.  Now, as it's bent out,
4  the little piece of collapsed tube that
5  goes inside the square tube could be forced
6  against the -- in this case, the outer side
7  of that tube wall and make it hard to get
8  out.  It's certainly -- in my experience,
9  bent things, once they're bent, are harder
10  to get out than when they're straight.
11      Q.  Well, tell me something so that
12  my simple mind can understand this.  And
13  it's simple, I'll give you that.  What I
14  want to know is this:  Do you see that
15  ladder standing up against the tree?
16      A.  When you say --
17      Q.  Or close to the tree?
18      A.  -- up against the tree.
19      Q.  Mounted to the tree.
20      A.  I see the ladder stand.  You are
21  showing me Exhibit 2?
22      Q.  Yes, sir.
23      A.  And the ladder stand still seems

72

1  to be leaning against the tree.
2      Q.  Tell me this:  How is it
3  physically possible to take this second
4  ladder section and bend it in such a
5  fashion that the crimped ends are going to
6  be completely bent in the opposite
7  direction with this stand up against the
8  tree?  How is that earthly physically
9  possible to do with the tree standing in
10  the way?
11      A.  I don't understand.  You mean
12  when it first bent or when it was second --
13  pulled out?
14      Q.  Your testimony to me was that
15  Mr. Weaver told you that the crimped ends
16  on the second ladder section had to be bent
17  in the opposite direction so that the
18  second ladder section can be taken apart
19  and taken down.
20      MR. WEAVER:  I'm going to object
21  to the form.  That's not what he testified
22  to and you can read his testimony back if
23  you want to.  He said I told him it got

18 (Pages 69 to 72)

## FREEDOM COURT REPORTING

73

1  bent when it was taken down. Then he
2  suggested in answer to your question of why
3  it would be bent that it might be easier to
4  take it down. All he testified that I told
5  him was that it had gotten bent in the
6  course of being taken down.
7      Q. Is that what you were told by
8  Mr. Weaver, what he just said?
9      A. What I remember from the
10  conversation was it had to be bent to take
11  it apart.
12      Q. All right. We now know that if
13  it's bent, it's been bent completely in the
14  opposite direction, we can see that
15  physically?
16      A. I agree with that, yes.
17      Q. So you and I are singing off
18  page 100 together, right?
19      A. I agree with the hymnal, I
20  guess.
21      Q. Now, what I want to know is: In
22  looking at this stand against this tree,
23  how is it physically possible for a human

74

1  to take this second ladder section with the
2  tree in the way and completely bend it, not
3  straight, but in the opposite direction?
4  How is that physically humanly possible
5  with the tree standing in the way?
6      A. Okay. You're asking me to come
7  up with a scenario for the tree stand as it
8  sits in Exhibit 2 that we're looking at and
9  straighten it and pull it in the
10  opposite direction?
11      Q. Yeah, with the tree in the way.
12      A. Well, I don't really see how the
13  tree necessarily makes it impossible. If I
14  were to throw a rope or a strap around one
15  rung or two rungs or across the ladder and
16  pull out this way, I think that would do
17  it.
18      Q. Do you think you can get enough
19  force on that with a strap to do that?
20      A. I think so, yeah.
21      Q. Well, you would agree with me
22  that if you took the second ladder section
23  and tried to bend it towards the tree, you

75

1  might be able to straighten it to some
2  extent, but you're certainly not going to
3  bend it in the opposite direction with the
4  tree stand in there?
5          MR. WEAVER: Object to the form.
6      A. You mean if I'm pushing below
7  the bend?
8      Q. Yes.
9      A. On the ground side of the bend?
10      Q. Exactly.
11      A. The platform would have to be
12  loose so it can move up in order to do that
13  because if you're pushing at the base, the
14  top has got to move. Like I say, that's
15  not the way I'd go about it. If it was me,
16  I'd be pulling from -- if it was standing
17  up like that, I'd be pulling from around
18  the middle.
19      Q. Well, the truth is, we don't
20  know, do we?
21      A. I don't know, no.
22      Q. What we can agree to, though, is
23  this: If this second ladder section, if

76

1  these rust marks match up like you've
2  testified to, then we can agree that the
3  crimped ends of the second ladder section
4  had been altered since the time of the
5  accident, since the time of the accident?
6      A. Yes, I would agree with that.
7  When you say "time of the accident," you
8  mean the moment of the accident?
9      Q. The moment of the accident.
10      A. Yes, I agree with that.
11      Q. The evidence has been altered --
12      A. Yes.
13      Q. -- from the moment of the
14  accident?
15      A. Yes.
16      Q. Look at page four of your
17  report. And I'm going to mark this.
18          (WHEREUPON, a document was
19  marked as Defendant's Exhibit Number 4 and
20  is attached to the original transcript.)
21      A. Yes, sir. I've got page four.
22      Q. Page four, picture five of your
23  report, you have a photograph and you've

19 (Pages 73 to 76)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

77

1 labeled it, "Extreme example of defective
2 welding construction found on tree stand,"
3 correct?
4     A.  That's correct.
5     Q.  Can we agree now that that
6 extreme example of defective welding was
7 done after this stand was manufactured by
8 Strongbuilt?
9     A.  I would agree that that was done
10 after the original manufacturer, yes.
11     Q.  And turn to page nine of your
12 report.
13     A.  Yes, sir.
14     Q.  Picture 12, "Example of
15 defective weld on ladder rung that
16 undercuts the metal and has poor weld
17 shape."  Same question to you:  Can we
18 agree that that example of defective
19 welding was done by someone after this
20 product was manufactured by Strongbuilt?
21     A.  Well, that case, no.  I don't
22 believe that to be an original manufacturer
23 weld.

78

1     Q.  Show me where that is.  Let's
2 look at the physical evidence and show me
3 where that is.
4     A.  Okay.  Let's see, I don't have
5 that identified specifically, so we'd have
6 to --
7     Q.  Well --
8     A.  -- find it.  It may take 15
9 minutes.
10     Q.  Sure.  Do you want to take a
11 break?  We can take a lunch break too
12 whenever y'all get ready.
13     MR. WEAVER:  Whatever you want
14 to do is fine with me.
15     Q.  Why don't we just close a loop
16 on this one question and then take a lunch
17 break.
18     A.  Like I said, it may take a few
19 minutes to find that one.  I need to get
20 the other two ladder sections too because I
21 don't know which section it's in.
22     (Off the record discussion.)
23     Q.  (BY MR. LEE)  All right.  In

79

1 looking at page nine of your report,
2 picture 12, it says, "Example of defective
3 weld on ladder rung that undercuts the
4 metal and has poor weld shape."  What
5 picture -- which weld does this picture
6 depict?
7     A.  Well, that's depicting the weld
8 on -- let's see, if you have it correctly,
9 which I believe you have identified the
10 base, the number one ladder set is the one
11 that has all the mud in it.
12     Q.  The dirt?
13     A.  The dirt, if that's --
14     Q.  That's the first ladder section?
15     A.  That's the first ladder section.
16 The second ladder section is the one that
17 has the horizontal brace bracket on it.  So
18 this would be the third ladder section.
19     Q.  Okay.
20     A.  We're looking at the rung that
21 would be the topmost rung.
22     MR. WEAVER:  Actually --
23     Q.  It would be the first rung?

80

1     MR. WEAVER:  It's upside down.
2     A.  Oh, okay.  The first rung on
3 that ladder section.
4     Q.  That's what this picture
5 depicts?
6     A.  Yes, sir.
7     Q.  On the right side or the left
8 side?
9     A.  Let me turn it around.
10     Q.  That's --
11     A.  Do we know which way it goes?
12     Q.  I don't think it matters which
13 way it goes as long as it's not bent.
14     A.  Well, then we have an arbitrary
15 left and right.
16     MR. WEAVER:  Well, you can look
17 at the photo and determine which one is
18 which.
19     Q.  Well, I can tell you this:  The
20 crimped end is going to be the top, Rusty
21 is right about that.
22     A.  So this is actually -- we're
23 talking about this one right here which is

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

81

1 the second rung on that ladder section.
2     Q.   From the bottom?
3     A.   From the bottom of that ladder
4 section.
5     Q.   Of the third ladder section?
6     A.   Third ladder section.
7     Q.   And you say that's a defective
8 weld?
9     A.   Yes.
10    Q.   Did that weld fail?
11    A.   No.
12    Q.   Did that weld have anything to
13 do with the accident involved in this
14 lawsuit?
15    A.   No, it didn't.
16        MR. LEE:  Well, that's a good
17 stopping point.  Do y'all want to take 30
18 or 45 minutes?
19            12:04 p.m.
20        (Lunch recess)
21            12:47 p.m.
22    Q.   (BY MR. LEE) Dr. Thompson, on
23 page seven of your report, you make

82

1 reference to a broken weld in the
2 horizontal brace.
3     A.   Yes.
4     Q.   Well, I say the horizontal
5 brace, what I should say is that clip end
6 of the horizontal brace is still on the
7 second ladder section; is that correct?
8     A.   That's correct.
9     Q.   Now, I'll just tell you in
10 advance, I'm not a metallurgist, but it
11 appears to me that the -- that both welds
12 on this clip are still intact.  It appears
13 to me that what broke was the brace itself
14 and not the weld.  Do you take issue with
15 that?
16    A.   I think I would agree that if
17 you're differentiating between the weld
18 metal and the tube metal, then I would
19 agree with you that the weld metal is still
20 on the clip and not on the tube.  But when
21 we talk about a weld, the weld is composed
22 both of the weld metal that's added as well
23 as the metal or around the weld that's

83

1 attached to the weld.
2     Q.   But what broke was not the weld
3 itself, was it?
4     A.   Well, what broke was not the
5 weld metal.  The weld is composed, as we
6 talked earlier as a matter of fact and as
7 Mr. Killen identified, there's this heat
8 zone around the weld.  So when we
9 technically talk about the weld, we talk
10 about the weld that includes both the weld
11 metal that's added that you're looking at
12 on the clip, as well as the structurally
13 changed metal that's around the weld that
14 has been changed by the welding process.
15 So the welding comes as both the weld metal
16 as well as what we call the base metal that
17 surrounds the weld.  So technically, when I
18 say the weld is broken, I'm correct in that
19 the weld that the metal adjacent to the
20 weld is part of the weld itself.
21    Q.   Have you looked at any other
22 stands, have you looked at any other
23 substantially similar horizontal braces to

84

1 support what you just said?
2     A.   Well, what I said had to do with
3 the welding, it has nothing to do with
4 specifically to braces.
5     Q.   Well, I'm talking about other
6 substantially similar braces that have a
7 welded clip on the end is what I'm talking
8 about.  Have you compared that to -- well,
9 answer that question.
10    A.   Well, if we can separate out the
11 part between -- to substantiate what I just
12 said, and have I looked at other braces.
13    Q.   Yeah.  Have you looked at other
14 horizontal braces that are substantially
15 similar to this one?
16    A.   No, I haven't.
17    Q.   Have you compared any other
18 horizontal braces with clip ends that have
19 been welded to this?
20    A.   That would fall under the same
21 category, I haven't looked at any other
22 braces.
23    Q.   Well, it seems to me that you

21  (Pages 81 to 84)

# FREEDOM COURT REPORTING

85

1  can still see the welds on both the top and
2  bottom of this broken clip?
3      A.  It has nothing to do with
4  whether it's on a brace or a clip or any
5  place else.  A weld by definition includes
6  the weld metal and surrounding base metal.
7  That's how we define technically in
8  engineering defined weld.
9      Q.  Do you see the weld on the top
10  and bottom of this clip?
11      A.  Once again, I see weld metal.
12      Q.  Is the weld metal on the top and
13  bottom of this broken clip still intact?
14      A.  The weld metal is still present.
15  Intact is a -- it's not completely intact,
16  no, there are cracks around the weld metal
17  and the clip.
18      Q.  Well, the weld metal is still
19  there on top and bottom?
20      A.  I would agree the weld metal is
21  still there on the clip.
22      Q.  On both top and bottom?
23      A.  Top and bottom.

86

1      Q.  And what fractured is the metal
2  that was on the horizontal brace itself,
3  you agree or you disagree with that?
4      A.  What fractured was the tube that
5  was connected to the weld at the weld
6  point, yes.
7      Q.  Well, I still see tube, and you
8  tell me if you don't see the tube.  I still
9  see, you know, the remnants of the tube
10  still attached to the weld metal.
11      A.  Well, that's what happens when
12  you weld, you get weld metal and you melt
13  it into the tube.  And so the weld metal is
14  melted into the tube itself, so there
15  should be the tube still -- if there's weld
16  metal there, there should still be tube
17  there.
18      Q.  Right.  Well, I'll tell you
19  what, I'm just going to stop dancing around
20  it and just ask you directly.  You say in
21  your report that the weld broke?
22      A.  Yes.
23      Q.  Do you stand by that?

87

1      A.  Yes, I do.  The weld -- the part
2  of the weld in this case that broke was the
3  heat affected zone and the base metal
4  around the weld metal.
5      Q.  I'm going to write this down.
6  You say that the base metal around the weld
7  site; is that correct?
8      A.  Around the weld metal.
9      Q.  Is what broke?
10      A.  That's correct.
11      Q.  Do you see evidence, physical
12  evidence, that the horizontal brace had
13  been positioned in a different location on
14  the second ladder section?
15      A.  Different positions on the rung?
16      Q.  That and also on different
17  rungs.
18      A.  I think it's obvious to me on
19  the rung where the clip currently is, that
20  it's been in different positions.
21      Q.  Can you hold that end for me?
22      A.  Yes, sir.  And I think there
23  might be argument for the point you just

88

1  pointed to as a position where the -- we're
2  calling this the horizontal clip was placed
3  on the third rung or two rungs up from
4  where it is now.
5      Q.  On the third ladder rung from
6  the bottom on the second ladder section?
7      A.  Yes, it appears something has
8  been clipped there.
9      Q.  All right.  Now, look at the
10  ladder rung.  You can just lay this down if
11  you want to.  Look at the ladder rung where
12  the clip is now and tell me how many
13  different locations on that particular
14  rung, in your opinion, this horizontal
15  brace was positioned.
16      A.  Well, we can see one, it's
17  farthest from me.  And then there appears
18  to be another location down far, which is
19  closest to me, where there are several
20  closely spaced places where we can see the
21  clip bolt has been impressed into the metal
22  of the rung.  So potentially at least two
23  areas where it's been.

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

89

1    Q.  You don't see more than two?
2    A.  Well, you can get into defined
3  points that it's been -- appears to have
4  been moved back and forth between those
5  areas looking at the -- where the paint is
6  most worn.
7    Q.  How many different indentions do
8  you see on that first ladder rung?
9    A.  Separate indentions, one, two,
10  three, four and then a fifth one here.
11    Q.  So you would agree with me that
12  this -- there's physical evidence that this
13  horizontal brace had been positioned in
14  different locations on that particular
15  ladder section?
16    A.  I would agree with that, yes.
17    Q.  And some of those positions are
18  not in the center of the ladder rung
19  itself?
20    A.  I would agree with that, yes.
21    Q.  Then you see other evidence that
22  it was on a different rung at least at some
23  point in time, which on this second ladder

90

1  section, it would be the third one from the
2  bottom, correct?
3    A.  Something appears to have been
4  attached there and I marked some of the
5  ones we see here.
6    Q.  Are you talking about a bolt,
7  for layman's terms, a bolt mark?
8    A.  Yes, that type of mark.
9    Q.  All right.  I notice in your
10  report you don't have any criticisms of the
11  instructions, the written instructions,
12  that came with this particular stand, do
13  you?
14    A.  I have not seen the
15  instructions.
16    Q.  As an expert for the plaintiff,
17  in your report, you have not criticized any
18  of the written instructions or warnings
19  that came with this stand; isn't that true?
20    A.  That's true.
21    Q.  And you don't plan to do that?
22    A.  That's true.
23    Q.  What is your understanding, as

91

1  the expert for the plaintiff, Dr. Thompson,
2  as to what was done with this horizontal
3  brace when it was moved from one tree to
4  another or when it was transported by truck
5  to and from the woods based upon the
6  deposition testimony that you have
7  reviewed?
8    A.  Can we remove this?
9    Q.  Yeah.
10    A.  I've got some -- the notes I
11  take on the depositions, so if you'll let
12  me review those for a second.  In my review
13  of David Stephens' deposition and Larry
14  Stephens' deposition and Matt Stephens'
15  deposition, I don't find where I've made a
16  note to any specific mention about the
17  horizontal brace and how it was
18  transported.
19    Q.  If you assume the testimony is
20  that the horizontal brace was left on the
21  ladder section when it was being
22  transported, do you have an opinion as to
23  whether or not that's a good idea or not?

92

1    A.  If the -- if the testimony is
2  that the horizontal brace was left on the
3  ladder, is that a good idea or not?
4    Q.  Is that good practice?
5    A.  From what I know about the
6  strength of the brace where it's attached
7  to the ladder, I would say that that would
8  be bad practice.
9    Q.  In other words, if you simply --
10  if you just loosened it, for example, and
11  folded it up or if you didn't even loosen
12  it at all, you just stuck it in the back of
13  the truck and transported it and allowed it
14  to flop around, that would be bad practice,
15  in your opinion?
16    A.  In my opinion, like I say,
17  knowing what I know about my strength
18  calculations, I think it's a bad idea to
19  leave the horizontal brace attached to a
20  ladder.
21    Q.  Do you know what the
22  instructions are from Strongbuilt in terms
23  of taking this horizontal brace off during

23  (Pages 89 to 92)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

93

1  transport?
2      A.  I do not.
3      Q.  On page five of your report, you
4  state quote, "Further study will reveal if
5  this design is capable of supporting a
6  300-pound dynamic load in the normal tree
7  stand service environment." That's on page
8  five of your report.  And my question, and
9  I think I know the answer to it, but I want
10  to be sure.  Have you done any such studies
11  or tests to determine if this design is
12  capable of supporting a 300-pound dynamic
13  load in the normal tree stand service
14  environment?
15      A.  I haven't done any testing,
16  haven't done any calculation relative to
17  that.
18      Q.  I missed the second part of your
19  answer.
20      A.  I haven't done any testing where
21  we talked about putting loads on it, that
22  type testing.  I have done a mathematical
23  calculation relative to that.

94

1      Q.  No tests but some calculations;
2  is that right?
3      A.  That's correct.
4      Q.  And tell me about your
5  calculations.  What have you done?
6      A.  Calculation -- I have taken the
7  tree stand with it erected at an 81-degree
8  angle.
9      Q.  At a what degree angle?
10      A.  81-degree angle, which is the
11  angle that you get when you take that stand
12  using the brace which is -- the brace arm,
13  which is 52-inches long.
14      Q.  Did you say eight to one?
15      A.  No, an 81-degree angle.
16      Q.  81?
17      A.  81-degree angle.  That's the
18  angle you get when you put the brace on the
19  fifth rung, which is where it is now.
20      Q.  With all due respect, doesn't
21  that depend on whether the brace -- whether
22  you can extend out the brace?
23      A.  For the brace like it is now,

95

1  it's 50, 52 -- about 51 and a half, 52 and
2  a half inches.
3      Q.  Do you know whether that
4  horizontal brace can extend or retract?
5      A.  I have not opened it up to see.
6  I've used it in that fixed position.
7      Q.  All right.  Well, back to your
8  calculations.  You say it's what length
9  now?
10      A.  Right now it's 51 and a half
11  inches from its end point to the beginning
12  of the curve in the part that butts to the
13  tree.
14      Q.  All right.  So if it's 51 and a
15  half inches from the end point to the
16  beginning of the curve, what does that tell
17  you in terms of angle?
18      A.  Well, it establishes an angle if
19  the platform is against the tree of 81
20  degrees.
21      Q.  81 degrees.  Now, platform was
22  mounted, was assembled incorrectly, was it
23  not?

96

1      A.  I haven't evaluated that.
2      Q.  Have you seen testimony to that
3  effect?
4      A.  I have seen testimony to that
5  effect.
6      Q.  Do you have any evidence to
7  dispute the testimony that that platform
8  was assembled backwards?
9      A.  I don't have any evidence one
10  way or the other.
11      Q.  So you're telling me that with
12  the horizontal brace at 51 and a half
13  inches and with the platform assembled the
14  way it's assembled, that establishes an
15  81-degree angle; is that right?
16      A.  That's correct.
17      Q.  Do you know what angle that --
18  do you know what angle this stand would be
19  if the platform were assembled correctly?
20      A.  I do not.
21      Q.  Would it be different than 81
22  degrees?
23      A.  It would be different, but not

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

97

1  significantly different.
2      Q.  What would be the range of
3  difference?
4      A.  I don't know.  I'd have to
5  evaluate the change.
6      Q.  Is that something that you can
7  do now?
8      A.  No.
9      Q.  Well, let's continue on with
10  your calculations.  You assume 81-degree
11  angle, you assume horizontal brace of 51
12  and a half inches.  What else have you done
13  to determine your calculations?
14      A.  Then I applied a 300-pound load
15  on the eleventh rung, the eleventh rung
16  from the bottom.
17      Q.  Why the eleventh rung?
18      A.  That's a somewhat arbitrary
19  decision based on the deposition testimony
20  that I had, that Mr. Stephens was either at
21  the top or close to the top, which would
22  put his feet somewhere close to the top.
23  And the eleventh rung is close to the top

98

1  and it allowed him to have his hands close
2  to the platform.
3      Q.  Now, let's keep in mind here,
4  you've told me that you didn't do any
5  tests, you've done calculations, correct?
6      A.  Correct.
7      Q.  So you're not saying that you
8  have done any load tests?
9      A.  That's correct.
10      Q.  Go ahead.
11      A.  And by applying a 300-pound load
12  on the eleventh rung, I did both a bending
13  calculation on the ladder and a buckling
14  calculation on the ladder.
15      Q.  All right.  And what were your
16  conclusions?
17      A.  Conclusions are that with the
18  square tubing, the square tubing has
19  sufficient strength to carry that load.
20      Q.  Okay.
21      A.  With the crimped tubing,
22  however, the way they crimp the tubes to
23  put them in the sockets, the crimping

99

1  reduces the strength in that loading by
2  about a factor of two, which makes the
3  ladder unstable on it basically without the
4  brace.  Without the brace arm in place, the
5  ladder is unstable.
6      Q.  What about with the brace in
7  place?
8      A.  With the brace in place so that
9  you don't get the inward rotation, then it
10  apparently is stable because it's been used
11  like that and the calculations would
12  suggest that it's --
13      Q.  Been like that thousands upon
14  thousands of times in the woods by all over
15  the country, do you acknowledge that?
16      A.  I don't know what the numbers
17  are out there or what the, you know,
18  statistics are, but that would make sense.
19      Q.  So your testimony is -- and let
20  me just repeat and be sure I understand
21  what you're saying.  Your testimony is that
22  with this BLS 15 stand, that based upon
23  your calculations, that if the horizontal

100

1  brace is in place, this stand has
2  sufficient strength and stability to
3  withstand a 300-pound load?
4      A.  That's correct.
5      Q.  And your further testimony is
6  that without the horizontal brace, I assume
7  your testimony is that if you apply 300
8  pounds to the ladder stand without the
9  brace, that it's going to bend or buckle in
10  some respect?
11      A.  Yes.
12      Q.  How heavy was Mr. Stephens?
13      A.  In depositions that I have, I
14  think 250 pounds, approximately.  In Mr.
15  Larry Stephens' deposition, I have the
16  weight at 260 pounds.
17      Q.  One more question back to the --
18  about the calculations that you did.  I'm
19  assuming that when you talk about the use
20  of a horizontal brace, you're talking about
21  the use of this horizontal brace that's the
22  subject of this litigation?
23      A.  Yes.  Well, specifically, when I

25  (Pages 97 to 100)

# FREEDOM COURT REPORTING

101

1  talk about the calculations, I'm talking
2  about a device with the tree stand at an
3  angle that prevents deflection inward.
4  And, hence, you get loading onto the brace.
5      Q.  Well, with this brace, if it's
6  being used, it's your opinion that the
7  ladder stand is of sufficient strength and
8  stability to withstand a 300-pound load?
9      A.  Yes, that's what the
10  calculations say.  And that's a static
11  load, we apply everything static, which
12  means there's nothing moving.
13      Q.  Well, did you apply whatever
14  appropriate calculations you felt were
15  necessary?
16      A.  Yes.
17      Q.  All right.  Now, let's assume
18  we're not using the horizontal brace.  Tell
19  me -- and that would be contrary to the way
20  this stand would be designed and
21  manufactured, correct?
22      A.  That's correct.
23      Q.  But just for the sake of

102

1  argument, let's assume that the horizontal
2  brace is not being used.  When you apply a
3  300-pound static -- is that right, static
4  load?
5      A.  Yes.
6      Q.  What type of buckling or
7  deflection or bending are you going to get,
8  assuming an 81-degree angle?
9      A.  Was that with the horizontal
10  brace in place or not in place?
11      Q.  Not in place.
12      A.  With it not in place, the
13  calculations show that in both bending and
14  buckling, the ladder is unstable where the
15  crimped edges are.  So basically the
16  section points are unstable when that
17  horizontal brace is not in place.
18      Q.  And what's going to happen?
19      A.  It will bend or buckle, which is
20  what we saw in this instance.
21      Q.  But you don't see the bending
22  and buckling pursuant to your calculations
23  if the horizontal brace is intact, is in

103

1  place, correct?
2      A.  That's right, if it's in place.
3      Q.  What tab are those calculations?
4      A.  The calculations are under tab
5  13.
6      Q.  All right.  Have you done any
7  other calculations?
8      A.  Done a calculation on the
9  horizontal brace itself where it's welded
10  to the bracket and attached to the ladder
11  rung.
12      Q.  All right.  Tell me about that.
13      A.  In that case, we find out
14  basically what you asked me earlier was
15  whether it was my opinion that the
16  horizontal brace should be taken off the
17  ladder during transport and movement.
18  Because what we find out is with that long
19  lever sticking out behind that small strap,
20  that you reach the plastic flow limit.  And
21  maybe -- terms I used to give to my
22  engineering mechanics classes, you take a
23  paper clip and you bend it just a little

104

1  bit, it comes back to the same shape.  But
2  you can bend it just a little bit as long
3  as you can stand it.  But if you take that
4  paper clip and you bend it a little bit
5  more where it kind of takes a plastic set,
6  then you bend it a few times and the paper
7  clip will break.
8      Well, so what -- as a lead-in to
9  the answer, is that what I find out was
10  that the strength where the brace broke
11  right at the weld, the amount of force it
12  takes on the far end of the lever is
13  approximately 13 pounds to start that
14  plastic flow.  So that point where you can
15  bend that paper clip for a long, long time
16  and nothing happens.  But if you go past
17  that, you start getting in trouble, it
18  turns out to be about 13 pounds for that
19  lever.  Hence, my opinion that with those
20  kind of loads that take the first part of
21  the plastic flow, that should be removed.
22  Otherwise, you're going to see problems.
23      Q.  And if the Strongbuilt

26  (Pages 101 to 104)

# FREEDOM COURT REPORTING

105

1 instructions do say to remove this
2 horizontal brace during transport, either
3 to and from the woods or from one tree to
4 another, you would agree with me that those
5 are good instructions?
6    A.   Yes.  And I would hope they
7 would go a bit further and tell you not to
8 lift the tree stand using the brace or
9 other things that would put significant
10 amounts of load 20, 25, 30, 40 pounds of
11 force on it.
12    Q.   Look at the clip itself, the
13 broken clip itself.  First of all, do you
14 agree with me, Dr. Thompson, that this is
15 something that you can't rotate around now
16 by hand?
17    A.   Finger wise?
18    Q.   Yes, sir.
19    A.   I couldn't.
20    Q.   You may can put a wrench on it
21 and it's -- the bolts are a bit rusted.  I
22 haven't tried to do that.  But in terms of
23 taking your hand and doing whatever you

106

1 want to do, you can't rotate this thing
2 from one position to the other, can you?
3    A.   I can't, no.
4    Q.   And I can't either.  In just
5 looking at this clip, does it appear to you
6 that this clip has received repeated trauma
7 over a period of time, just based on the
8 appearance of it, the formation of it, the
9 way it's been wallowed around because it's
10 no longer straight?
11    A.   Yeah.  Well, not using words
12 like "trauma".
13    Q.   I want to use your words, not
14 mine.
15    A.   In technical terms, that clip
16 has been plastically deformed.  It's been
17 stretched beyond its elastic limit.
18    Q.   And I want to -- when I leave
19 here today, if I don't know anything else,
20 I want to know what plastic deformity
21 means.
22    A.   Plastic deformity, it's a real
23 simple concept.  You have any material,

107

1 metal in this case which you can stretch
2 and it acts like a rubber band, it comes
3 back to its original position after you
4 stretch it.  For metals, that is
5 microscopic stretching.  When you stretch
6 it beyond its elastic limit, the metal --
7 internally, the structure changes to what
8 we call plastic flow.  And so we define the
9 strength of metals and another things in
10 terms of elastic limit.  If you go above
11 that, you get into plastic flow and you
12 have permanent changes in the shape.  So
13 when I say plastic limits, you're going
14 above the point where it returns to its
15 original condition.
16    Q.   So we see plastic deformity on
17 this clip?
18    A.   That's correct.
19    Q.   Beyond what it's intended to be;
20 is that correct?
21    A.   Well, I would assume that the
22 intention was that it would maintain its
23 original shape as long as possible.  But by

108

1 design of this thing, since you've got this
2 long lever arm on it, you apply a lot of
3 load on that clip with very little load out
4 here.  So I've -- just from the way the
5 part is designed, I wouldn't expect that
6 little bend to maintain its original shape
7 very long, no matter how carefully you
8 tried to be with it.
9    Q.   Are you applying a lot of load
10 with it just simply up against the tree?
11    A.   Well, up against a tree, you get
12 a lot of load when you're walking up
13 because there is a lot -- the way this is
14 designed, if you look at this ladder and
15 you think, what about your ladder at home.
16 Your ladder at home has a fairly -- we have
17 -- the two rails are fairly wide.  That
18 created stiffness that keeps the ladder
19 from deflecting back and forth when you go
20 up it.  And you look at the design of these
21 with the one-inch square tubing, they're
22 just -- it's designed to have a lot more
23 flexion as you move up and down.  So, yeah,

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

109

1  you would expect there to be loads applied
2  to that clip as the ladder flexes as you
3  move up and down.
4      Q.   All right.  At what point on the
5  ladder are you applying the most amount of
6  load to the clip?
7      A.   I haven't calculated that, but I
8  would assume it would be up towards the
9  top.  It is up towards the top of the
10 ladder where you have the longest distance
11 where you're applying the load from where
12 the clip is.
13     Q.   Let's assume a 300-pound person.
14 How much load is being applied -- let's use
15 your rung, rung number 11.  How much load
16 is being applied to that clip with a
17 300-pound person standing on the eleventh
18 ladder rung?
19     A.   I haven't done that calculation
20 to tell you that.  The load is going to be
21 not when he's standing there, it's going to
22 be when he's stepping and the force is more
23 dynamic when you have that spring in the

110

1  ladder.
2      Q.   Is it going to be more or less
3  than 13 pounds?
4      A.   It's going to be more than 13
5  pounds.
6      Q.   How much more than 13 pounds?
7      A.   First of all, let's don't
8  confuse the 13 pounds.  The 13 pounds we're
9  talking about being exerted at the piece
10 that's against the tree moving up and
11 down --
12     Q.   You're talking --
13     A.   I just -- and when you do your
14 calculations, you're talking about a
15 vertical stress on it, so it's more
16 dynamic.  It's a more complication
17 calculation.
18     Q.   I see what you're saying.
19     A.   But I don't want to say 13 and
20 you assume that you're talking about 13
21 pounds here as opposed to a static
22 calculation that I've already done, which
23 says there's a force pressing against the

111

1  clip which is going to be 40 or 50 pounds.
2  We're not talking apples and oranges.
3      Q.   When you're using the term 13
4  pounds, you're assuming that this brace is
5  attached to the rung, is not up against the
6  tree, somebody is grabbing a hold of it and
7  exerting 13 pounds of force on the end of
8  the horizontal brace and what you're saying
9  is, that's going to cause some deformity?
10     A.   That's right.
11     Q.   But that's not the way it's
12 designed to be used, is it?
13     A.   Well, by design, it does that
14 because you put the thing on.  And it's one
15 of the first things we teach in engineering
16 design with a mechanical design like this
17 is that, okay, think about -- you're
18 designing, you're building, just think
19 about how it's going to be used.  And if
20 I've got a tree stand, one of the things if
21 I'm moving it up against a tree and I've
22 got this brace here, I'm going to be
23 picking up with the brace and maybe one

112

1  hand on the ladder, maybe inching this to
2  the tree.
3      Q.   Well, if you do that, how much
4  force are you applying to the brace and the
5  clip?
6      A.   Well, the amount of force is
7  doing to be at least equal to the weight of
8  the ladder, which is, I think, somewhere
9  around 50 pounds.
10     Q.   This one section right here?
11     A.   No, that's ten pounds.  But you
12 put it all together.
13     Q.   Well, you're not going to be
14 doing it that way, are you?
15     A.   Well, if I'm getting it up
16 against the tree, now, I have not -- first
17 of all, let me go on record here because
18 I'm not a hunter and I've never assembled
19 one of these in the woods.  I'm just
20 imagining from a designer's standpoint that
21 I've got this ladder and I've got to put it
22 together.  And the arm is a foot away from
23 the tree and I've got to get it a foot

28  (Pages 109 to 112)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

113

1  closer to the tree, then I'm going to grab
2  the arm and I'm going to be lifting it and
3  shoving it up against the tree so it's
4  tight against the tree.
5      Q.  I can tell you, there's one
6  lawyer in this room that's assembled more
7  of these tree stands than any of us, and I
8  can tell you it's Rusty.  And I can promise
9  you, you can sit here all day long until
10  the cows come home and he's not going to
11  tell you that's the way you put a tree
12  stand up against a tree.  He's not going to
13  answer, but if he would answer, he'll tell
14  you that's not the way you assemble a tree
15  stand and put it up against a tree.  He's
16  smiling because he knows I'm right about
17  this.
18      MR. WEAVER:  I'm smiling because
19  I ain't testifying in this case, but you're
20  welcome to put all the testimony you want
21  in.
22      A.  I'm talking about from a design
23  standpoint.  If I'm looking at this, this

114

1  is certainly one way in which load can be
2  applied through the arm, yes, is to scoot
3  the ladder back and forth around the tree.
4      Q.  With all due respect, I know you
5  haven't ever assembled a tree stand in the
6  woods.  With all due respect, that's not
7  how you do it.  You don't put the whole
8  thing together and slap it up against a
9  tree and hang on to the horizontal brace
10  for dear life.  But I want to get to a more
11  realistic hypothetical.  Let's assume that
12  you've got the horizontal brace attached to
13  this second ladder section.  And you've got
14  one hand on the horizontal brace and one
15  hand on this ladder rung and you're just
16  moving it into place.  Now, in that
17  scenario, how much force are you applying
18  to the clip end of the brace, does that
19  make sense?
20      A.  Well, the most you can apply
21  like that since the ladder weighs ten
22  pounds.
23      Q.  Ladder section?

115

1      A.  Ladder section weighs ten pounds
2  and the -- if you're strong enough to kind
3  of maneuver it out all by itself, the brace
4  weighs another three pounds, so you've got
5  basically 13 pounds is the most you can put
6  on it if you just have that one ladder.
7      Q.  And that assumes if you're
8  carrying the ladder section by simply
9  holding onto the brace itself?
10      A.  That's the max.
11      Q.  If you've got one hand on a
12  ladder rung and one hand on the brace, you
13  know, you're using both hands to carry it,
14  then the force is going to be less than 13
15  pounds?
16      A.  That's right.  So we go to
17  minimum.  So let's say I'm carrying it by
18  the ladder and the brace is just hanging
19  out by itself and it's not flopping up and
20  down, it's just sitting still, then that's
21  three pounds.
22      Q.  And you're not going to see any
23  deformity in that situation, are you?

116

1      A.  No.
2      Q.  Would you agree that if you were
3  simply carrying the ladder section by
4  holding onto the brace only, then you have
5  a maximum of 13 pounds, you're going to see
6  very little deformity on the clip, even in
7  that scenario; is that true?
8      A.  Well, I haven't calculated the
9  actual clip.  The clip is going to actually
10  be a lot more.  I calculated the load based
11  on the loading and the plastic flow in the
12  tube, in that three quarters inch of tube.
13  So the clip is a whole different
14  calculation with different guiding
15  principles.  And the amount of load it
16  takes to deform that clip I think you're
17  going to find is a lot smaller than to bend
18  that quarter inch tube.  If you think about
19  the tube, the tube has some rigidity, it's
20  square.  The clip itself is just a linear
21  piece of strap steel.
22      Q.  Have you done any calculation to
23  determine what load it would take to cause

29  (Pages 113 to 116)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

117

1  come permanent deformity in the chip?
2      A.  No, I haven't.
3      Q.  You have no plan at the present
4  time to do that?  This is my one time to
5  talk with you.
6      A.  No.  Well, you know, you bring
7  it up, it's apparently of some interest,
8  it's an easy calculation, I may do it.  I'm
9  sure if I'm allowed to do it, then you'd be
10  the second person to hear about it.
11      Q.  But haven't done it yet?
12      A.  No, I have not done it.
13      MR. WEAVER:  I've got a feeling
14  this ain't your one time if he's got to go
15  at 3:30.
16      MR. LEE:  I'm hustling.
17      Q.  (BY MR. LEE) Do you agree that
18  this horizontal brace took a period of time
19  for this to fail?
20      A.  Yes.  You mean like more than it
21  was perfect one minute and then the next
22  minute it was broken?
23      Q.  Right.  I mean, it was not an

118

1  acute failure, it was something that was
2  chronic in nature, you know, it took some
3  period of time and abuse or use or whatever
4  phrase you want to call it for this to
5  fail?
6      A.  Yes.  It's my opinion that it
7  occurred over a period of time, a number of
8  uses.
9      Q.  Do you have an opinion as to
10  what period of time we're talking about?
11      A.  No, I don't.
12      Q.  Do you have an opinion as to
13  what this clip and what this horizontal
14  brace looked like on the day of the
15  accident ten seconds before Mr. Stephens
16  started to climb this ladder?
17      A.  I haven't thought about that.
18  What was the question again?
19      Q.  Yes.  Based upon your education,
20  training, experience in metallurgy and so
21  forth, do you have an opinion as to what
22  this clip and what this horizontal brace
23  looked like ten seconds before Mr. Stephens

119

1  started to climb this ladder on the day of
2  the accident?
3      A.  I think there's a good
4  probability that it looks much like it does
5  now.
6      Q.  Well, it's broken now.
7      A.  Well, I was thinking of the clip
8  in particular, but with the arm still
9  attached to it.
10      Q.  Would you expect to see some
11  fractures on the clip and/or brace itself
12  prior to the accident, immediately prior to
13  the accident?  That's a bad question.
14  Immediately prior to Mr. Stephens starting
15  to climb this ladder?
16      A.  Well, I would suggest that there
17  were probably some cracks there but not
18  that you could see.  As a matter of fact, a
19  number of people have looked at it and
20  haven't identified any cracks in the
21  welding clip there.  But I've got pictures
22  here that will clearly show there are
23  cracks in both sides of those welds where

120

1  it attached to the clip now.  But if you
2  just looked at them, you don't see them
3  unless you looked carefully.
4      Q.  But the cracks didn't cause the
5  accident?
6      A.  No, but cracks just like them
7  did.
8      Q.  In the metal itself?
9      A.  Yes.
10      Q.  Due to plastic deformity?
11      A.  That's correct.
12      Q.  I'm learning.  Earlier I asked
13  you if you had an opinion whether or not
14  the foot platform was mounted backwards.
15  Do you recall that?
16      A.  Yes, sir.
17      (WHEREUPON, documents were
18  marked as Defendant's Exhibits 6 & 7 and
19  are attached to the original transcript.)
20      Q.  All right.  I'm going to show
21  you two pictures.  Exhibit Number 7 -- I'm
22  sorry, Exhibit Number 6.  Exhibit Number 6
23  shows a foot platform for a BLS 15 as

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

**FREEDOM COURT REPORTING**

121

1  manufactured by Strongbuilt. That's on the
2  left one. And the one on the right is the
3  one that was involved in this accident.
4  And Exhibit Number 7 is the same two
5  platforms just from a different angle. Do
6  you see what I'm talking about?
7      A.  Yes.
8      Q.  All right. And do you see here
9  how the foot platform on the accident stand
10 is mounted differently from the one
11 adjacent to it?
12     A.  Let's see, if you're calling
13 that the foot platform, looks like it's
14 reversed 180 degrees in one as opposed to
15 the other?
16     Q.  Yes, sir.
17     A.  Yes, I see that.
18     Q.  All right. And do you see how
19 on the accident stand, the foot platform
20 actually protrudes out away from the
21 platform itself?
22     A.  Out away from the tree position?
23     Q.  Yes.

122

1      A.  Yes.
2      Q.  And towards the ladder?
3      A.  Yes, I see that.
4      Q.  If that is the case, do you
5  agree that the way the foot platform is
6  mounted on the accident stand causes a
7  person to step out and over the rail on the
8  foot platform to get into the stand?
9      A.  I don't really have an opinion
10 on that. Like I said, I don't hunt and
11 don't use tree stands, so I don't really --
12 also, it looks to me -- for one thing, I
13 don't have an opinion on that. But just a
14 question for you, it looks like on the one
15 that you have, you're identifying as
16 manufactured, it's designed to have
17 something else put on it. Are we missing a
18 piece here?
19     Q.  You can add a shooting rail to
20 it, but that's a different add-on.
21     A.  So there's something else that
22 could go on there?
23     Q.  Yes.

123

1      A.  Okay.
2      Q.  My simple question to you is:
3  You know, looking at the accident stand, do
4  you agree that the hunter would actually
5  have to step over this protruding platform
6  to get into the stand itself as opposed to
7  step into it?
8      A.  Obviously, it's sticking out
9  away from it whether he comes around it or
10 up under it. I don't know how, but he's
11 got to navigate it, yes.
12     Q.  And do you agree that that can
13 change the load dynamics on this particular
14 stand the way that this is assembled?
15     A.  That requires a lot of
16 assumptions about how they're coming up the
17 ladder and what they do right at that
18 point. And for most of us guys my age at
19 least, it kind of depends on where that
20 part between your knees and your chest is,
21 which is where most of the weight is. So I
22 can't answer that with a lot of engineering
23 certainty.

124

1      Q.  Do you agree that it could
2  change the load dynamics?
3      A.  Could change the load dynamics
4  on the ladder, it could change the center
5  -- what it could do is change the center of
6  gravity of the person coming up at the top.
7      Q.  Do you agree that it does not
8  appear that this stand hadn't receive any
9  type of preventative maintenance at all
10 based on the appearance?
11     MR. WEAVER: Object to the form.
12     A.  Preventative maintenance, since
13 I haven't seen any instructions about
14 preventative maintenance, I don't know
15 exactly what you're talking about. Are you
16 talking about painting?
17     Q.  Yes.
18     A.  I don't see where it's been
19 painted, no, except where we identified
20 possible changes to that gun rest rail.
21     Q.  We mentioned the Tree Stand
22 Manufacturer's Association, are you
23 familiar at all with their association or

31 (Pages 121 to 124)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

125

1 are you familiar at all with their
2 standards?
3     A.   I do have some understanding
4 about their standards, not about their
5 association.
6     Q.   What understanding do you have
7 about their standards?
8     A.   The understanding I have about
9 the standards, and I got this off the Tree
10 Stand Manufacturer's website, so my
11 understanding is what they've told me,
12 which is that they established a set of
13 standards.  A number of those now form
14 pretty much the nucleus of the ASTM
15 standards.  There are some standards that
16 the Tree Stand Manufacturer's have that
17 aren't the same as the ASTM standards.  I
18 have not looked at any of the Tree Stand
19 Manufacturer's standards because I didn't
20 have easy access to them, so I assumed the
21 ASTM standards.
22     Q.   Your testimony is you have not
23 looked at or studied the Tree Stand

126

1 Manufacturer's standards?
2     A.   Only to the extent that they're
3 reflected in the ASTM standards that I have
4 that are part of the file here.
5     Q.   And those standards, according
6 to your research, came into play in 2001?
7     A.   Yeah, at least 2001.
8     Q.   In terms of standards that apply
9 to tree stands manufactured today, the only
10 two you're familiar with are the ASTM and
11 the Tree Stand Manufacturer's Association?
12     A.   That's correct.
13     Q.   And you've answered this
14 earlier.  Assuming this stand was
15 manufactured sometime in the 1990s, you're
16 not aware of any standards that would have
17 applied back then?
18     A.   That's my understanding or lack
19 of understanding, I don't know.
20     Q.   Do you have any -- based upon
21 your inspection of this particular stand,
22 do you have any understanding about how you
23 assemble it?  I'm not talking about -- go

127

1 ahead.
2     A.   Other than sticking ladder
3 sections together, that's my basic
4 understanding.
5     Q.   You know how to put the ladder
6 section together, but in terms of
7 assembling this entire stand, you don't
8 know?
9     A.   Well, if you're asking about how
10 to do it by the instructions or --
11     Q.   Well --
12     A.   My understanding -- I'll go back
13 to my understanding is I know how to stick
14 the ladder sections together.
15     Q.   But in terms of assembling the
16 platform together, you have no
17 understanding; is that true?
18     A.   I have not looked at that.
19     Q.   Are you a hunter?
20     A.   No, I'm not.
21     Q.   Have you ever been a hunter?
22     A.   No.
23     Q.   Have you ever hunted out of a

128

1 tree stand?
2     A.   No.  I'm assuming you're
3 separating hunting from fishing.  You're
4 talking about shooting hunting, no, I'm not
5 a shooting hunter.
6     Q.   I'm talking about apples and
7 oranges, fishing and hunting.  Have you
8 ever hunted out of any type of ladder
9 stand, tree stand, climbing stand, you name
10 it?
11     A.   I have never hunted off the
12 ground.
13     Q.   That's a good answer.  Have you
14 ever attended any seminars on hunter
15 safety?
16     A.   No.
17     Q.   I take it you've never attended
18 any type of seminars that deal with tree
19 stands or ladder stands or anything like
20 that?
21     A.   No.
22     Q.   Do you consider yourself to be a
23 human factors expert?

32  (Pages 125 to 128)

# FREEDOM COURT REPORTING

129

1    A.  I don't even know what that is.
2    Q.  So you don't consider yourself
3  to be a human factors expert?
4    A.  I'll rephrase that.  I know what
5  that is, I'm not really sure where you go
6  to study that discipline.
7    Q.  Well, there are people out there
8  that refer to themselves as human factor
9  experts.  And your testimony is you don't
10  consider yourself to be one of those?
11    A.  We call that industrial
12  engineering in engineering curriculums.
13    Q.  Are you a certified welder?
14    A.  Well, good point.  I have never
15  been certified for any particular joint
16  design.  And to be a certified welder, you
17  have to be certified by joint -- by what
18  you're welding, so --
19    Q.  Is the answer to the question
20  no?
21    A.  The answer to the question is
22  I've never been certified for a particular
23  joint design.

130

1    Q.  So you're not a certified
2  welder?
3    A.  Not for any joint design.
4    Q.  Are we talking about joint
5  designs here?
6    A.  For each of those joints, yes,
7  there should be a joint design, a joint
8  procedure and schedule.  And then you
9  certify to that.
10    Q.  When you weld two points
11  together, is that a joint?
12    A.  If you weld two pieces together,
13  that would be a joint.
14    Q.  Have you ever done any welding
15  at all?
16    A.  Yes.
17    Q.  What type of welding have you
18  done?
19    A.  All kinds.  I'm a fellow of the
20  American Welding Society.  I've been
21  involved in welding for pretty much 30
22  years.
23    Q.  Have you done any welding for

131

1  anybody other than yourself?
2    A.  Yes, I've done weld design,
3  bracing design, stick to welding.  I've
4  worked with manufacturers on certain
5  welding designs.
6    Q.  But never a tree stand or a
7  ladder stand manufacturer?
8    A.  No.
9    Q.  You've never performed any
10  welding on a ladder or tree strand; is that
11  correct?
12    A.  That's correct.
13    Q.  The deformity of the crimped
14  ends of the second ladder section, the
15  ladder rails, do you know what I'm talking
16  about?
17    A.  Are we talking specifically
18  about the bent ones?
19    Q.  Yes, this.
20    A.  Yes, sir.
21    Q.  Do you agree that the ladder
22  side rail failure, I'm talking about these
23  crimped ends, appears to be plastic

132

1  buckling overload failure?
2    A.  Buckling is kind of specific to
3  a column, I would say that those are
4  bending overload failures.
5    Q.  What is ductile, what is that?
6    A.  Just like we said, plastic
7  earlier, duct being the same.
8    Q.  Let me ask it again.  Do you
9  agree that the ladder side rail failure
10  appears to be a plastic buckling or ductile
11  overload failure?
12    A.  Ductile overload failure, yeah.
13  Buckling as opposed to bending is a very
14  fine engineering distinction, which I don't
15  know that you can make based on what we see
16  here.
17    Q.  You say it's a ductile overload
18  failure, you agree with that?
19    A.  Yeah, in bending.
20    Q.  Do you see any evidence of a
21  previous partial ductile failure in the
22  opposite direction on the crimped ends of
23  the second ladder section?

33 (Pages 129 to 132)

# FREEDOM COURT REPORTING

133

1    A.  You're talking about those?
2    Q.  Yes.
3    A.  Yes.  I would say that there's
4  obvious evidence that that has been
5  ductilely bent in both directions.
6    Q.  Can you tell how many times that
7  has occurred?
8    A.  It looks to me like just once in
9  each direction.
10    Q.  How can you say -- how can you
11  tell that?
12    A.  You see a crimp, you see one
13  crimp right here.
14    Q.  Right.
15    A.  If you take -- just have a paper
16  clip in my hand.  You bend something and
17  crimp it in one direction, the plastic
18  deforms, that also makes it harder, it's
19  one of the effects of that.  And if you try
20  to bend it back, you see how you get
21  another bend someplace else.  It's hard to
22  bend it in the same point more than one
23  time.  And I really just see one here and

134

1  one over here.  And so I think from the
2  looks of that, it's just been bent back and
3  forth one time.
4    Q.  But you really have no way of
5  knowing when that occurred?
6    A.  No.  Well, I think we know that
7  one occurred when it bent against the tree.
8    Q.  You don't know when the --
9    A.  When the other one occurred, no.
10    Q.  All right.  On the horizontal
11  brace, is it your opinion that the
12  fractures at the juncture of the brace tube
13  and the brace ladder rung clamp?
14    A.  At the juncture between the
15  brace tube and the brace ladder rung clamp.
16  Well, I mean, it's not a matter of
17  contention, we can see that.  Well, maybe
18  we can't.  Yes, it's my opinion that the
19  failure occurred at the junction between
20  the weld metal on the clamp and the
21  three-quarter inch tube, which is on the
22  horizontal brace.
23    Q.  But you also agree that the

135

1  upper and lower welds on the clamp for the
2  horizontal brace are fully intact?
3    A.  Well, metal is on the clamp.
4    Q.  The weld metal is on the clamp?
5    A.  But as we've said earlier, it's
6  also cracked.
7    Q.  But still intact?
8    A.  But still there, still attached.
9    Q.  Do you agree that the multiple
10  points of deformation of the ladder rung --
11  let me repeat that question.  Do you agree
12  that the multiple points of deformation of
13  the ladder rung and the considerable brace
14  clamp deformation are indications of
15  repeated abuse by partially loosening the
16  clamp and rotating the brace by force to
17  lie flat against the ladder section for
18  transport?  Do you agree with that?
19    A.  No, I don't.
20    Q.  Why do you disagree with that?
21    A.  Well, I disagree with that, the
22  whole set of scenario details there.  I
23  don't have any idea how the -- or even any

136

1  reason to suspect that the deformation on
2  the rungs you're talking about, what we've
3  already looked at as the apparent bolt
4  marks on the rung or the clamps attached --
5  is that what we're talking about, to the
6  deformation points?
7    Q.  Right.
8    A.  Yeah, there's no reason to
9  suspect that that has anything to do with
10  intentionally loosening the clamp in order
11  to fold the bar down.  Could it occur like
12  that, possibly, yes.  But it could also
13  occur from the flexion or the movement or
14  loading of the arm while it's fully
15  attached to the ladder.
16    Q.  And attached to the tree?
17    A.  I'm not quite so confident that
18  it could happen while it's attached to the
19  tree just because the angle of that bolt
20  pressing doesn't lend itself to be
21  perpendicular with the tree.
22    Q.  What about the deformations that
23  we see in the brace clamp itself, is that

34  (Pages 133 to 136)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

137

1  indicative of the bolt being loosened and
2  the horizontal brace being left on during
3  transport or could that be an indication?
4      A.  I think that could be true.  The
5  loosening could come from the fact that
6  it's been deformed, which comes from having
7  loads applied to the brace arm, probably
8  during transport or movement and your
9  holding it.  That could cause the looseness
10  as opposed to some intentional loosening of
11  the bolt.  And then the deformation -- it
12  could have been the deformation happened
13  naturally with the movement of the arm and
14  that caused that looseness.
15      Q.  Do you agree that there are
16  multiple non-factory welds and
17  modifications to the original design of the
18  seat platform section of this tree stand?
19      A.  If we're talking about just the
20  platform, just the seat, then I would agree
21  that there are welds that have been made
22  after the original manufacturer.
23      Q.  And modifications to the

138

1  original design of the stand?
2      A.  Once again, we're talking only
3  about the platform itself.  And, yes, there
4  have been changes to that design.  And
5  we're talking specifically here about what
6  we've already pointed out, which is the gun
7  rail section on top.
8      Q.  Do you agree that these
9  modifications include the addition of side
10  rails and a front shooting rest supported
11  by welded vertical square carbon steel
12  tubes and the assembly of the foot platform
13  and a reversed front to back position?  Do
14  you agree with that?
15      A.  I would agree that that's the
16  current status of the platform.
17      Q.  And you've already told me that
18  these modifications to the ladder stand
19  would have prevented the stand from being
20  shipped in a flat box?
21      A.  I would agree with that, yes.
22      Q.  And do you agree that there's
23  evidence of heat artifacts in the original

139

1  factory paint radiating from the
2  non-factory welds?
3      A.  I would agree with that, yes.
4      Q.  Do you also agree that the
5  projection of the foot platform above the
6  top rung of the ladder restricts access to
7  the seat platform -- creates a trip hazard
8  and adversely affects the load dynamics of
9  the ladder stand?
10      A.  Oh, I'm not going to agree with
11  all that.  Because many of those things, I
12  don't have an opinion on.
13      Q.  Do you have an opinion as to
14  whether or not it restricts access to the
15  seat platform?
16      A.  Well, I'm not going to agree
17  with that because "restrict" is not
18  specific enough.  Does it change the
19  precise way you approach the seat, then I
20  think, yes, maybe it does by however many
21  inches we have to change that.
22      Q.  Does it create a trip hazard?
23      A.  I don't have an opinion on that.

140

1      Q.  Can it adversely affect the load
2  dynamics to the ladder stand itself, can
3  it?
4      A.  I won't say that it adversely
5  affects it.  It can change the center of
6  gravity of how you approach the seat.
7      Q.  Tell me this, let's look at this
8  Exhibit Number 3.  Do we have a yard stick?
9  Now, I've got this stand and I've got this
10  eye bolt pointing towards the wall.  I want
11  you to assume that that wall is the tree,
12  okay.  Is that the way this would have been
13  positioned at the time of the accident
14  according to the post-accident photographs?
15      A.  Yes.
16      Q.  So if you assume that you've
17  got, you know, three sections of ladders,
18  you know, going down to the ground.  Then
19  this platform is going to protrude out away
20  from those ladder sections, correct?
21      A.  It protrudes out past the ladder
22  rails, yes.
23      Q.  And it also appears to me that,

35 (Pages 137 to 140)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

**FREEDOM COURT REPORTING**

141

1  you know, I want you to look at this
2  yardstick. It looks to me like that the
3  platform, the foot platform is about 35
4  inches from the top of this homemade
5  shooting rail. Does that also -- do you
6  agree with that?
7      A. Approximately, yes.
8      Q. Do you know how tall Mr.
9  Stephens was or is?
10     A. I do not recall that being in
11 the --
12     Q. He's much taller, certainly much
13 taller than 35 inches, you would agree
14 with?
15     A. I agree with that.
16     Q. Now --
17     A. I agree with that. I don't know
18 why, I'm assuming.
19     Q. Not a midget.
20     A. A 260 midget, I in no way mean
21 any disrespect to Mr. Stephens.
22     Q. And neither do I. You would
23 agree with me that to get into this stand,

142

1  there are only two ways you can do it, the
2  way it's been modified, correct?
3      A. You're asking -- I think I
4  pointed out that I had no clue as to how
5  these things are assembled in the woods.
6  And now you're asking my opinion how those
7  go --
8      Q. I want you to use some common
9  sense, forget the hunter.
10         MR. WEAVER: Object.
11     Q. Forget the lack of hunter --
12         MR. WEAVER: We didn't retain
13 him for that.
14     Q. I want you to forget your
15 expertise -- in your area of expertise,
16 forget that. I want you to forget your
17 lack of hunting experience. I just want
18 you to look at this contraption. Look at
19 it, seriously, look at it. And look at
20 this homemade device that's been put on the
21 top. Now, if you're going to sit your
22 buttocks on this seat platform --
23     A. Yes.

143

1      Q. -- there's only one of two ways
2  that can be established, correct?
3      A. You know, you say two and I'm
4  only thinking one, but go ahead.
5      Q. Well, you can squeeze your 250
6  pound body underneath this top homemade
7  shooting rail, if you can do so within 35
8  inches.
9      A. Uh-huh.
10     Q. That's one way.
11     A. Yeah.
12     Q. Correct?
13     A. That's correct.
14     Q. And the only other way I can see
15 you do it is you've got to somehow climb
16 over the top of this to get in here.
17     A. Okay. I don't see me doing
18 that.
19     Q. Well, that depends on how tall
20 you are.
21     A. I don't know. I'm just -- if it
22 were me -- now, I can't speak for Mr.
23 Stephens or anybody else. If it was me,

144

1  I'm coming in the front door here.
2      Q. All right. You've got to either
3  squeeze in this -- let's just get the width
4  of this while we're talking about it.
5  You've got 18 inches by 35 inches; is that
6  right?
7      A. That sounds good, that's right.
8  I'd agree with that.
9      Q. And for a man that's -- go ahead
10 and put it down. For a man that's, you
11 know, ever how tall he is, and 200 and
12 something pounds, that's a tight fit, isn't
13 it?
14     A. I don't have an opinion on that.
15 Like I said, my route is going through the
16 front door.
17     Q. But you're skinnier than that.
18 How much do you weigh?
19     A. 190.
20     Q. How long --
21         MR. HASSINGER: We're being
22 awfully disparaging at 255 pounds here, I
23 mean, I myself.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

145

1      Q.  I'm not being disparaging, I'm
2  just saying that's not an easy fit, is it?
3      A.  I don't really have an opinion.
4      Q.  All right.  Well, the bottom
5  line is, you do have an opinion about this:
6  Gaining access to that platform as designed
7  and manufactured is not what we see now?
8      A.  As designed and manufactured
9  without the gun rest -- we still don't have
10  that gun rest.  And maybe that's something
11  that once you get on the tree stand and sit
12  down and then you plug it in, I don't know,
13  but I feel like I'm missing part of the
14  puzzle here --
15      Q.  Have you seen --
16      A.  -- to give you an opinion on.
17      Q.  Have you seen the video I took?
18  Because that's one of the things we did.
19  We showed how you can just insert the
20  shooting platform.
21      A.  Was it on one of these?
22      Q.  Well, it was on --
23      A.  These are the two that I've

146

1  seen, that's why I ask.
2      Q.  That's the deposition of Mr.
3  Killen.  And that video -- part of that
4  video was shown in there.  But on this
5  video that I took, we showed how you insert
6  a shooting rest if you want a factory built
7  shooting rest from Strongbuilt, it simply
8  just pops in there and pops out.  That's
9  different than what we have here, you
10  acknowledge that?
11      A.  Yes, it's different.  But you're
12  asking specifically about entering this
13  versus entering that and I felt like maybe
14  I was missing something.  If this had the
15  Strongbuilt gun stand on it, would it be
16  just like entering?
17      Q.  No, I want you to assume that
18  this is a basic ladder stand, 15 foot, does
19  not come with a shooting rail.  That's
20  either a separate stand or a separate item.
21  The platform that we see in this exhibit
22  here is for just a simple basic 15-foot
23  ladder stand.  And my only question is:

147

1  With the addition of this homemade
2  apparatus on top, that changes the manner
3  in which you have to access this platform,
4  does it not?
5      A.  I would -- I'd have to go with
6  my I-don't-have-an-opinion remark.  Because
7  like I said, if it were me, I'd be coming
8  right in the front door.  And I don't know
9  if that's any different than coming right
10  in the front here, coming right up there.
11      Q.  You know, if you're taller than
12  35 inches, you have to bend over to get
13  through the front door with this homemade
14  deal that we have here, isn't it?
15      A.  Once again, I can't opine on
16  that because if I'm coming up the steps,
17  maybe I'm not doing much different because,
18  you know, I'm not standing here and then
19  bending down, I'm coming up a step.
20      Q.  Well, surely you're not just
21  stepping on to the platform, are you?
22      A.  Am I not?
23      Q.  Absolutely not.  With this

148

1  homemade apparatus put on top?
2      A.  But you don't just step right
3  into there?
4      Q.  You're bending over to do it.
5      A.  Well, it's laying down on the
6  floor.
7      Q.  Well, I mean --
8      A.  I'm not an expert on entering
9  the platform.  I have no opinion on that.
10      Q.  Fair enough.  Do you agree that
11  the factory welds that we see on this
12  ladder stand have not broken?
13      A.  Well, as I talked about earlier,
14  the factory weld on the arm bracket is
15  broken.
16      Q.  I thought we went through all
17  that.  Do we need to go through it again?
18      A.  Yes.  That's --
19      Q.  I thought you said the material
20  adjacent to the factory weld.
21      A.  That is part of the weld.  That
22  is part of the weld.  And as a welding
23  engineer, that would be -- that's the base

# FREEDOM COURT REPORTING

149

1  metal that's attached to the weld metal is
2  part of a weld.
3      Q.  Show me any welding material
4  that you see on this broken horizontal
5  brace because I want to see it.
6      A.  I didn't say there was any weld
7  metal in the broken horizontal brace.
8      Q.  Show me any broken weld metal
9  that you see on the --
10     A.  Okay, that's more specific.
11     Q.  On the crook.
12     A.  Look here.  This is weld metal,
13 this is melted metal right there.  And this
14 is the metal just adjacent to the melted
15 metal.  Here on this side, you see almost
16 none of the melted plate, just the weld
17 metal.  The zone between the melted metal
18 and the plate is called the weld heat
19 affected zone.  And that's the zone where
20 the metal, the base metal had significant
21 change to its properties.  That is not only
22 typical, it's inherent in the welding
23 process.  One of the several reasons why

150

1  when you make a weld on any structural
2  steel part, it reduces the strength of the
3  design.
4          If I'm using, just for example,
5  just a tube construction, I've got one
6  strength level associated with the tube.
7  If I put a weld on the tube, I can only use
8  a fraction of that strength because the
9  welding process affects the properties of
10 the tube.  And so what you see there is
11 that that broke exactly where you would
12 expect it to break in this design, which is
13 right at the heat affected zone of the base
14 metal of the tube to the weld metal.  You
15 see the weld metal in there.  You see
16 nothing but the tube which is broken away
17 from it, but it's still broken at the weld.
18     Q.  It also broke, in your opinion,
19 due to repeated deformity to it?
20     A.  That's correct.
21     Q.  And likely because of not being
22 disconnected during transport?
23         MR. WEAVER:  Object to the form.

151

1      A.  Due to the loads, whenever they
2  were applied, they were applied.  They
3  exceeded the strength of that metal.  But
4  from a design standpoint, that's where you
5  would expect it to fail if it gets
6  overloaded, you know, in use a number of
7  times.
8      Q.  You have no evidence that this
9  weld was defective at the time it left the
10 manufacturer, do you?  And I'm talking
11 about the weld on the clip-in for the
12 horizontal brace.
13     A.  That's a bad weld.  It is
14 undercut, it's cracking at the undercut on
15 it right now.  And I would assume and argue
16 to you with high engineering probability
17 that that's exactly how it broke on the
18 side that it broke from.
19     Q.  That wasn't the question that I
20 asked.
21     A.  Well, that was yes, it was a
22 roundabout yes.
23     Q.  Is there any evidence that this

152

1  weld was defective at the time it left the
2  manufacturer?
3      A.  It was defective in weld shape
4  because it was undercut in the strap in the
5  plate.  We can't see it in the plate, but
6  we see it in the strap.
7      Q.  Strap?
8      A.  The little strap of metal that's
9  the bracket that's still on the rung,
10 ladder rung.
11     Q.  Show that to me so I'll know
12 what you're talking about.
13     A.  You can't see it unless you get
14 close to it.
15     Q.  For the record, the wing nut is
16 at the top.
17     A.  You see how the weld metal here
18 laps.  If you look, the weld metal laps
19 over here instead of spreading out.  You
20 see the same thing on the other side.  It
21 laps to a big hump there and it laps
22 around.
23     Q.  And what's wrong with that?

38  (Pages 149 to 152)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

153

1    A.  Well, it's supposed to be a
2  smooth weld transition so that you don't
3  get both accumulation of a stress in there
4  as well as crack formation in that groove
5  in the weld.  So, for example, the American
6  Welding Society has a book called the
7  structural welding handbook.  And it has
8  pictures of acceptable and unacceptable
9  weld profiles.  And that would be an
10  unacceptable weld profile according to the
11  AWS structural welding code.
12    Q.  What does weld profile mean?
13    A.  It's the shape of a weld as it
14  moves from the weld metal into the base
15  metal.
16    Q.  But the shape doesn't
17  necessarily cause failure, does it?
18    A.  Yes, that shape can cause
19  failures.  And that's why they don't allow
20  it.
21    Q.  When I say "failure," I'm
22  talking about breakage, I'm not talking
23  about cracking.

154

1    A.  Well, it leads to the crack
2  which leads to the failure.
3    Q.  When you use the term "failure,"
4  are you talking about a complete breakage?
5    A.  Can be a complete breakage or a
6  crack.
7    Q.  Do you see cracks in those
8  welds?
9    A.  Yes.
10    Q.  And how do you see the cracks,
11  through microscopic examination?
12    A.  No, you can see them here.  Let
13  me show you pictures.  This is behind tab
14  number eight.  This is the weld and strap.
15  You can see here this is -- let's start
16  with this one.  This is the outside, this
17  is the strap, this is the weld nugget and
18  right along the weld nugget, you can see
19  the crack in there.  This is --
20    Q.  Right where?
21    A.  Right through there.
22    Q.  But apparently that crack did
23  not lead to a breakage.

155

1    A.  Here's the crack here running
2  right down along the edge.  It's my opinion
3  that this is the same type of crack that
4  was in the side that did break it and lead
5  to breakage.  You can't see it now because
6  it's already broken.  But this would have
7  been its stage of development and that's --
8    Q.  The physical evidence we had --
9    A.  -- on both sides, that side and
10  that side.
11    Q.  The physical evidence that we
12  have now in terms of crackage in that --
13  you say it's a weld, the crackage that we
14  see in this photograph does not show a
15  breakage, does it?
16    A.  Well, I think maybe you're using
17  breakage maybe different from what I'm
18  using breakage because, yeah, I would say
19  that shows breakage.  There's a crack, it
20  doesn't show a complete breakage all the
21  way through the strap material.  It's
22  partially through the strap.
23    Q.  But hadn't come off?

156

1    A.  Hasn't gone all the way through.
2    Q.  Although it may be cracked, the
3  crack does not go all the way through the
4  weld; is that correct?
5    A.  That's correct.
6    Q.  Does rust cause a crackage in a
7  weld?
8    A.  Can rust cause a crack in the
9  weld, rust can lead to the initiation of a
10  crack, yes.
11    Q.  And can rust lead to the
12  initiation of a crack which can lead to a
13  failure?
14    A.  It can.  It didn't in this case.
15    Q.  It what?
16    A.  It did not in this case.
17    Q.  Why is that, why do you say
18  that?
19    A.  Because the evidence is that
20  these are from stress fractures, they're
21  not from corrosion fractures.
22    Q.  And what is the evidence of
23  stress fractures?

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

157

1  A. In this case, it's the tearing.
2  And basically, if you look at that edge of
3  where that broke, that edge is very thin
4  where the metal thins down and broke.
5  Q. And is that because of bending
6  back and forth?
7  A. That would be from, yes,
8  repeated bending.
9  Q. And that's what led to the
10 failure?
11 A. Yes, that's what led to this
12 failure.
13 Q. What all have you reviewed in
14 this case, Dr. Thompson?
15 A. The documents are all here in
16 the folder. I've reviewed the depositions
17 that have been mentioned, the deposition of
18 the defendant's experts, the expert report,
19 the manufacturer's website, the tree
20 manufacturer's association website, ASTM
21 voluntary standards that are associated
22 with that that are here in the documents.
23 Q. Have you reviewed the expert

158

1  reports of Mr. Sisk and Mr. L.J. Smith?
2  A. I have.
3  Q. And have you reviewed all the
4  depositions that have been taken in the
5  case?
6  A. I don't know that I have all the
7  depositions that have been taken in the
8  case. I have the three of the Stephens'
9  family that I mentioned, plus Mr. Killen's
10 and then Mr. Sisk, that gave the deposition
11 or Smith.
12 Q. Neither one have given a
13 deposition. They both submitted reports.
14 A. Okay. I've read the reports.
15 Q. Is there any additional work
16 that you feel like you need to do?
17 A. At this point, I don't plan to
18 do any additional work.
19 Q. Why don't you tell me, if you
20 will, what your opinions are, what opinions
21 you plan to testify about?
22 A. My opinions are that the weld
23 construction on the ladder is poor. And

159

1  that the weld on the strap from the design
2  point, the strap and three-quarter inch
3  tube is a weak junction to start with
4  because of the long lever arm. And then
5  the weld that's put on it with its poor
6  weld shape leads to a defective condition
7  between the arm and the bracket. And that
8  the use of crimped, I call it crimped, but
9  the collapsed tube to connect the ladder
10 sections reduces both the buckling and the
11 bending strength by a significant amount,
12 by a factor of two or more. And that
13 without the arm in place, this makes the
14 ladder unstable in both bending and
15 buckling.
16 Q. Which does not happen if the arm
17 is in place, the horizontal brace is in
18 place?
19 A. The horizontal arm is in place,
20 then it is not unstable under the 300-pound
21 static loading.
22 Q. Unstable or unsafe with the arm
23 in place, the horizontal brace in place?

160

1  A. With the arm in place, it's
2  stable, but it doesn't have the type safety
3  factors that you find in ladders, for
4  example. But it does meet the 300 pound
5  static load condition of the ASTM and the
6  manufacturer's association standards.
7  Q. Even those standards today?
8  A. Those are minimum standards and
9  it does meet those today.
10 Q. So your testimony is that with
11 the horizontal brace in place, this stand,
12 even though manufactured sometime in the
13 1990s, would meet the ASTM standards today?
14 A. That's correct.
15 Q. And the question really becomes
16 the presence or absence of this horizontal
17 brace, does it not?
18 A. As to whether or not the ladder
19 stand is going to collapse or not?
20 Q. Yes.
21 A. Or bend, I could agree with
22 that, yes.
23 Q. If it was not being used, then

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

161

1  you would expect some buckling or
2  collapsing as we've seen here?
3      A.  If the horizontal brace arm is
4  not in place, then it's susceptible to
5  collapsing like we see, yes.
6      Q.  And if the horizontal brace was
7  being used at the time of the accident, it
8  is your opinion that the horizontal brace
9  failed due to plastic deformity as a result
10  of repeated bending?
11      A.  That's correct.
12      Q.  Have we covered all your
13  opinions?
14      A.  I believe so.
15      Q.  You haven't compared this stand
16  to stands manufactured by other
17  manufacturers, have you?
18      A.  No, I haven't.
19      Q.  You haven't done any comparisons
20  for purposes of coming up with any
21  alternative designs or anything like that,
22  have you?
23      A.  No comparisons, no.

162

1      Q.  You're not in a position to say
2  go out and look at so and so's ladder stand
3  or tree stand and you're going to find a
4  better designed or a better built stand
5  than what we have here, you're not in a
6  position to say that, are you?
7      A.  I have not done that.  I cannot
8  say that at this point.
9      Q.  By no stretch of the imagination
10  do you consider yourself to be an expert in
11  hunting safety?
12      A.  Not in hunting safety, no.
13      Q.  You don't consider yourself an
14  expert in the field of hunting accident
15  reconstruction?
16      A.  That's pretty specific.  Not a
17  hunting accident -- I've never done one,
18  I'll put it that way.
19      Q.  You're a metallurgist, among
20  other things?
21      A.  Yes.
22      Q.  You're not an accident
23  reconstructionist?

163

1      A.  Well, we reconstruct a lot of
2  different kinds of accidents in our product
3  liability work in terms of how the product
4  behaves and fails and what has to happen,
5  this spring goes first and then this thing
6  turns, that type of accident
7  reconstruction, we do often, yes.
8      Q.  But you've never done that in a
9  tree stand case?
10      A.  Not in a tree stand case.
11      Q.  Or a ladder stand case?
12      A.  No, sir.
13      Q.  Have you formed any opinions
14  about how much repeated bending it would
15  take to achieve the plastic deformity that
16  you described in the horizontal brace?
17      A.  No, I haven't.  But it doesn't
18  take -- we talk about repeated failures.
19  Often times, there's one regime of failures
20  that we talk about that requires tens of
21  thousands of cycle type pounds.  In a
22  situation like this, we may be talking tens
23  or hundreds, not thousands.

164

1      Q.  In other words, you haven't
2  gotten a substantially similar horizontal
3  brace just like this one and connected it
4  to a ladder rung and gone through ever how
5  many cycles it would take to cause a
6  failure, have you?
7      A.  No, I haven't.
8      Q.  You don't know whether it's
9  hundreds or thousands or tens of thousands?
10      A.  I'm pretty sure it's not tens of
11  thousands.  I'm pretty sure it's more in
12  the ten to a hundred type range.
13      Q.  Would you say we've covered all
14  your opinions you anticipate giving in this
15  case?
16      A.  I believe so.
17          MR. LEE:  Further Dr. Thompson
18  saith not.
19          MR. WEAVER:  I have a few
20  questions.  Can we take five minutes?
21          MR. LEE:  Yeah.
22              2:34 p.m.
23          (Short recess)

41 (Pages 161 to 164)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

165

1        2:38 p.m.
2    EXAMINATION BY MR. WEAVER:
3        Q.  Dr. Thompson, I just have a few
4    questions because I want to make sure Mr.
5    Lee has gotten all of your opinions before
6    we leave out of here today.  You spoke
7    earlier about from an engineering design
8    standpoint, that is something you consider
9    yourself an expert in?
10       A.  Yes.
11       Q.  And you said that when you're
12   working with your students or a design team
13   of some nature that you try to think about
14   how the product is going to be used,
15   correct?
16       A.  Correct.
17       Q.  And are you talking about in
18   terms of -- do you mean foreseeability,
19   foreseeing the way that the product is
20   going to be used --
21       A.  Correct.
22       Q.  -- by the user?
23       A.  Yes.

166

1        Q.  And we've talked a lot, you and
2    I, you and Mr. Lee, about the way this
3    bracket is designed and the way that the
4    brace attaches to the bracket.  And in your
5    engineering opinion, it's foreseeable that
6    there's going to be bend and flex there in
7    the course of using this stand?
8        A.  That's correct, by the way it's
9    designed.  Because it takes relatively low
10   loads to cause the plastic deformation with
11   that long lever arm on it, you're going to
12   run into many situations, I would think,
13   where that load could be applied, whether
14   you're leaning on it or carrying it or
15   moving it around.  It's very foreseeable
16   with that long lever arm that you're going
17   to have large stresses at the end of it.
18       Q.  And I believe you also testified
19   that in the normal course of climbing this
20   stand when it's attached to the tree as
21   it's supposed to be, it's going to have
22   load as you climb it?
23       A.  That's correct.  The flex -- I

167

1    haven't calculated the flex that could
2    occur in it.  But we're not talking
3    fractions up here, we're talking inches.
4    It's a good bit of movement.
5        Q.  And there's no way to determine
6    today how much load there was at any given
7    time or during any given load application
8    with this particular stand?
9        A.  No, I haven't done that.
10       Q.  And we talked about a lot of
11   hypotheticals and things like that today.
12   I'm going to tell you about a situation
13   that I just witnessed and ask you a
14   question about it afterwards.  A friend of
15   mine who's a very experienced hunter, has a
16   stand very similar to this in design.  It's
17   a ladder stand with a platform at the top
18   and it has a horizontal brace going to the
19   tree, it attaches in a similar fashion to
20   this.  And I was watching him put the stand
21   up.  He asked me to help him and I told
22   him, no, you go ahead and do it because I
23   wanted to see how he did it.

168

1        He got the stand on the tree and
2    then he placed the horizontal brace onto
3    the tree and it was attached to the ladder.
4    And as he walked around the tree to pull
5    the strap from the ladder to the tree, the
6    brace fell.  And in doing so, it bended --
7    it bent, excuse me, at the bracket.  Is
8    that the kind of foreseeable loading that
9    you're talking about with regard to this
10   design?
11       A.  Yeah, that's --
12       Q.  One example?
13       A.  That's one type of loading that
14   you can get, which is the amount of stress
15   that you actually get depends on what the
16   weight of that bracket is.  And when it
17   drops like that, you have an acceleration
18   that you have to calculate.
19       Q.  So with regard to these
20   foreseeable loads and bends, you are
21   critical of that design, the bracket
22   design?
23       A.  Correct, I'm critical of the

## FREEDOM COURT REPORTING

169

1  bracket design.
2      Q.  Mr. Lee also asked you some
3  questions about alternative designs.  And I
4  heard the way he asked the question and
5  your answer was appropriate.  But, for
6  instance, with regard to the X crimps,
7  there is another way to do that, to make
8  these ladders come together?
9      A.  That's right.  This is the first
10 X crimp I've seen like this.  The other
11 ladders that I have seen have square tubes
12 that go inside of the larger tube.  And
13 those are welded or fastened in some way,
14 the ones I've seen have been welded in
15 place so that you have a square tube on a
16 square tube and you don't lose the
17 stiffness.  It's the moment of inertia that
18 changes when it comes together.
19     Q.  So you're talking about at the
20 point of the crimp, you simply step down to
21 a smaller tube?
22     A.  That's correct.
23     Q.  And I think you may have just

170

1  answered my next question.  I was going to
2  ask you why that is stronger than a crimped
3  design?
4      A.  It's the moment inertia that you
5  lose when you crimp these into that X
6  shape.  It's much larger when you have the
7  regular tube shape.
8      Q.  Would you agree, based on your
9  analysis of this stand, that the point
10 where the horizontal brace attaches to the
11 bracket or right along is the weakest part
12 of the stand from a structural standpoint?
13     A.  From a design standpoint, yes.
14 Because as we discussed, if you lose the
15 arm, then the ladder is not stable in
16 bending.  So the arm is critical to be
17 there and the weakness point on the arm is
18 the bracket attachment so that becomes the
19 weakest point on the ladder.
20     Q.  I think we've already
21 established that without the horizontal
22 brace in place, you would expect the
23 failure of the crimp at the beginning of

171

1  the crimp --
2      A.  That's correct.
3      Q.  -- at the base of the crimp.
4  And I think we know, based on the facts of
5  this accident as well as the way you
6  describe how the deformation would occur,
7  that it's likely to be a catastrophic
8  failure?
9          MR. LEE:  Object to the form.
10     A.  You're talking about on the
11 ladder collapsing with the braces not
12 there?
13     Q.  Correct.
14     A.  Yes, sir.  If the brace is not
15 there, then you have an immediate
16 instability and the bending.
17     Q.  When I say "catastrophic
18 failure," I'm not talking about the
19 catastrophic injuries that Mr. Stephens
20 incurred.  I'm talking about a catastrophic
21 failure from an engineering standpoint
22 means it's no longer feasible to use it as
23 it was being used?

172

1      A.  I take it to have meant that if
2  you've got the weight of a person up on the
3  ladder and you pulled the brace out, then
4  it immediately becomes unstable.
5      Q.  And there are also -- from an
6  engineering design standpoint, there are
7  other ways to attach a horizontal brace to
8  the ladder?
9      A.  That's correct.
10     Q.  And have you contemplated any of
11 those?
12     A.  Well, two things come
13 immediately to mind.  One is that you
14 significantly increase the strength by
15 using larger square tubing.  Square tubing
16 is directly related to the strength and how
17 you attach it, what kind of brace
18 attachment you use.  Also if you have a
19 hinge attachment, the hinge would allow it
20 to fold down without the loading associated
21 with not taking it down or moving it with
22 the brace attached to it.
23     Q.  So if I understand your

43  (Pages 169 to 172)

# FREEDOM COURT REPORTING

173

1  testimony, the failure of the bracket which
2  attaches the horizontal brace to the ladder
3  is likely to result in catastrophic
4  failure?
5      A.  By catastrophic failure, you
6  mean that if we have a person on the
7  ladder --
8      Q.  It's going to collapse.
9      A.  If you take the brace out, then
10  it's unstable and will collapse.
11      Q.  That's what I mean.  And
12  therefore, the weakest point of the ladder
13  from a design standpoint is very point
14  that if it fails is going to cause a
15  catastrophic failure?
16      A.  Yes.  At the brackets -- would
17  you restate that for me, Rusty?
18      Q.  What I'm getting to is that the
19  very point that is so -- on the brace where
20  it attaches to the bracket, we've already
21  established that from a design standpoint,
22  that's the weakest point in the ladder?
23      A.  Yes.

174

1      Q.  And going a step further, the
2  weakest point in the ladder is the very
3  point at which failure is going to be
4  catastrophic?
5      A.  Right, failure there causes
6  instability.
7      Q.  And collapse?
8      A.  Collapse.
9      Q.  You said earlier that you did
10  some comparisons on step-down tubular steel
11  versus the crimps from a strength
12  standpoint.  And you said it was a factor
13  of two.  Can you put that in layman's
14  terms?
15      A.  The difference between using
16  square tubing and the crimp tubing comes in
17  what in mechanics is called the second
18  moment of the area or the moment of
19  inertia.  So that when you crimp that tube,
20  you lose the moment of inertia that you
21  have in the square tubing.  And it's
22  basically a factor of decrease in the
23  strength of the tube.  If you keep it all

175

1  square tubing, appropriately sized, then
2  your stability is quite a bit larger.
3      Q.  The changes to the platform that
4  we spent a lot of time talking about, in
5  your opinion, those don't have anything to
6  do with this accident, do they?
7      A.  Not from my analysis, they have
8  nothing to do with the accident.
9      MR. WEAVER:  That's all I've
10  got.
11
12  FURTHER EXAMINATION BY MR. LEE:
13      Q.  Assume all those questions and
14  answers that you gave to Rusty, this stand,
15  according to your testimony, would still
16  meet the applicable standards that apply
17  today, the ASTM standards that you've told
18  me about earlier?
19      A.  With the brace in place, yes.
20      Q.  And what does this brace weigh?
21      A.  3.9 pounds -- I'm sorry, 2.9.
22      Q.  2.9 pounds.  You told me it took
23  13 pounds of pressure static load?

176

1      A.  Yes.
2      Q.  To cause any deformity at all,
3  correct?
4      A.  That's correct.
5      Q.  Going back to Rusty's
6  hypothetical, where you have, you know, the
7  brace just came off the tree, then you're
8  going to apply how much load to this clip
9  if it weighs 2.9 pounds?
10      A.  I don't know.  The reason I
11  don't know it to be calculated -- I haven't
12  tried to do it.  It's like if you lay that
13  brace across your lap and let it sit there,
14  you've got 2.9 pounds in your lap.  If I
15  hold it up above your head and drop it in
16  your lap when it comes to rest, it's still
17  going to weigh 2.9 pounds, but it's going
18  to hurt a lot more when it first hits you.
19  That's the dynamic load that comes from
20  acceleration.  So the answer to your
21  question is that, beating around the bush
22  to come to it, so if you pull it away and
23  that drops, you've got an acceleration load

44  (Pages 173 to 176)

# FREEDOM COURT REPORTING

177

1  here that when it comes to rest, it's more
2  than the 2.9 pounds. But you have to
3  multiply it by the acceleration with the
4  gravity -- the drop it falls and you come
5  up with that --
6      Q. More or less than 13 pounds?
7      A. I don't know.
8      Q. Can you not calculate that?
9      A. Not right now.
10     Q. What is your best opinion as to
11 whether it's more or less than 13 pounds?
12     A. I --
13     Q. What is your best guess estimate
14 whether it's more or less than 13 pounds?
15        MR. WEAVER: You don't have a
16 guess?
17     Q. What is your best opinion as to
18 whether or not it's more or less than 13
19 pounds?
20     A. My best guess is it's more.
21     Q. More than 13 pounds?
22     A. Yeah.
23     Q. And how much more than 13?

178

1      A. I don't know. I can calculate
2  -- your guy can calculate it. It's not a
3  difficult calculation. I just need to have
4  a little more information.
5      Q. Do you agree that a user of a
6  tree stand should inspect it prior to each
7  use?
8      A. Should inspect it?
9      Q. Yes.
10     A. I would say that's a good
11 practice for using any type of device such
12 as ladders or tree stands or other things
13 that you're trusting your health to. It
14 could apply to chairs, but nobody checks a
15 chair before they sit in it. But I would
16 say that the answer to your question, there
17 should be -- I would think that you should
18 look over your tree stand. I should think
19 there's instructions to do that in the
20 manual.
21     Q. And had an inspection been done
22 of this stand ten or fifteen seconds before
23 Mr. Stephens started to climb it, he would

179

1  have likely seen this deformed clip as we
2  see it today?
3      A. The deformed clip like it is now
4  it's quite visible and it's not difficult
5  to see it. So I would think that you would
6  see it, yes.
7      Q. A reasonable inspection of this
8  stand immediately prior to using it on the
9  day of the accident would have revealed
10 that it was rusty?
11     A. I would think that one would see
12 that it has rust, evaluating that that rust
13 was a maintenance issue or not is something
14 else.
15     Q. Don't you think this stand was
16 worn out and old?
17     A. This stand?
18     Q. Yes.
19     A. Well, I don't see tree stands.
20 I don't have an opinion as to what they're
21 like when they get worn out and old.
22     Q. These products are not designed
23 to last forever, are they?

180

1      A. I don't know what the life
2  expectancy is.
3      Q. I know I asked you whether you
4  have compared other ladder stands to this
5  ladder stand and you said that you had not,
6  correct?
7      A. That's correct.
8      Q. And I don't know that I've asked
9  you, I thought I did, but I want to be
10 sure. You haven't compared horizontal
11 braces from one manufacturer to another,
12 have you?
13     A. No, I haven't.
14     Q. You don't know whether this --
15 you don't know whether this horizontal
16 brace is any different, better or worse
17 than any other horizontal brace
18 manufacturer by other tree stand
19 manufacturers, do you?
20     A. I have not inspected any of the
21 tree stand manufacturers so the answer is
22 no.
23     Q. Rusty asked you about these

45 (Pages 177 to 180)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

181

1  crimped ends.  Even with the crimped ends,
2  that would meet or exceed the ASTM
3  standards today?
4      A.  One standard that I do not know
5  about because I haven't tested the -- the
6  standards to get the load rating, 300-pound
7  load rating.  You have to put 600 pounds of
8  static load on the platform and I didn't do
9  that calculation.  I just did it on the
10  300-pound calculation.  So I do know that
11  with the 300-pound, which is one of the
12  methods with the 300-pound static load
13  calculation, it meets that standard.
14      Q.  Well, let me just ask it in a
15  different way.  You're not here telling
16  this federal judge or this federal jury
17  that may hear this case that these crimped
18  ends on these ladder rails falls below any
19  standard that's applicable to this product,
20  are you, you're not saying that?
21      A.  No, I'm not.
22      Q.  In fact, in all fairness and all
23  candor and all honesty, you're not here to

182

1  say that this product had violated any
2  rule, regulation or industry standard, are
3  you?
4          MR. WEAVER:  Object to the form.
5      A.  In terms of the Tree Stand
6  Manufacturer's Association standards, I
7  don't have the standard.  There may be a
8  violation associated with the welding.
9  Because the way I understood the
10  manufacturer's association website, they
11  have a requirement for a certified welder,
12  which ASTM doesn't have in the quality
13  assurance program.  So from that
14  standpoint, as far as I know, the welding
15  code and the welding inspector situation
16  may be the only one that it violated.
17      Q.  Let me ask it also probably in a
18  better and more appropriate way.  You're
19  not suggesting that the time this stand was
20  manufactured -- at the time it was
21  manufactured, that it violated any rule,
22  regulation or industry standard?
23      A.  Relative to what we talked about

183

1  in terms of the welding shape, those welds
2  do not meet the American Welding Society's
3  structural welding code.
4      Q.  Based on shape?
5      A.  Based on weld shape.
6      Q.  Nothing other than weld shape?
7      A.  That's the only criticism I
8  have.
9      Q.  Would you agree with me -- and
10  I'm sure you have looked at lots of welds
11  over the years.  You would agree with me,
12  Dr. Thompson, that you can have a
13  substandard weld shape but the weld remain
14  fully intact and not fail?
15      A.  I would agree that not every bad
16  weld fails, if that was your question.
17  Having a bad weld in a critical location is
18  the problem.
19      Q.  Well, I asked you about weld
20  shape.  I assume there are different
21  reasons for weld failures other than shape.
22      A.  That is true.
23      Q.  Do you agree that not every bad

184

1  weld fails?
2      A.  That's true.
3      Q.  Have you seen good welds that
4  fail?
5      A.  I've seen failure in parts that
6  have good welds, yes.
7      Q.  Have you seen failures in welds
8  that in your opinion would meet the
9  standards applicable to welding?
10      A.  Yes, not because the weld's
11  fault, because of poor design.
12      Q.  You've told me today that the
13  only standards that apply to tree stands
14  today are the ASTM and the Tree Stand
15  Manufacturer's standards, correct?
16      A.  These are the only ones that I
17  have found the Tree Stand Manufacturer's
18  Association to call out.
19      Q.  In terms of those two sets of
20  standards, you're not suggesting that this
21  product violated either one of those
22  standards?
23      A.  Once again, I haven't had the

46  (Pages 181 to 184)

185

1  opportunity to look at it. But if you look
2  at the quality assurance of today's
3  manufacturer tree stand association
4  standard relative to welding and certified
5  welders, I believe Mr. Killen's testimony
6  was that he didn't use certified welders.
7  So that would be a violation of that
8  standard.
9      Q.  Is it your understanding that
10 the Tree Stand Manufacturer's Association
11 requires every weld to be done by a
12 certified welder?
13     A.  Like I said, I haven't read the
14 standard. I've only read the part that
15 said that the Tree Stand Manufacturer's
16 Association standard for quality assurance
17 has a requirement for certified welders.
18 As a matter of fact, AS -- AWS welding
19 society code does not require that every
20 weld be done by a certified welder, but
21 that the procedures be certified and the
22 welders be certified to a certain
23 procedure. So until I read the

186

1  manufacturer's code, I wouldn't know if it
2  was in violation or not.
3      Q.  As we sit here today, you're not
4  -- as we sit here today, you're not
5  suggesting that this product -- this
6  product violated any standard that exists
7  today?
8      A.  When you put "any" in front of
9  it and then we get back to the American
10 Welding Society welding code, which these
11 welds do not meet the American Welding
12 Society structural welding code.
13     Q.  Based on shape?
14     A.  Based on shape.
15     Q.  But other than that, you're not
16 suggesting that it violates any other
17 industry rule or regulation or standard,
18 correct?
19     A.  Well --
20     Q.  As we sit --
21     A.  -- we talked about the certified
22 welding requirement of the quality
23 assurance standard. So from that

187

1  standpoint, I'm pretty sure it does not
2  violate that. Because they weren't -- they
3  didn't have a certified welder.
4      Q.  Well, you can't say that this
5  accident would not have occurred had a
6  certified welder done this weld, are you?
7  You can't say that, that calls for
8  speculation, doesn't it?
9      A.  Well, I think the failure is due
10 to poor design more than it is than not
11 having a certified welder if that answers
12 your question.
13     Q.  And poor design in what
14 perspective?
15     A.  Poor design in respect to the
16 amount of load it takes to deform the tube
17 at the weld relative to the type of device
18 that it is, long lever arm on the end of a
19 welding tube.
20     Q.  And amount of force is 13
21 pounds?
22     A.  That's correct.
23     Q.  To begin deformity?

188

1      A.  That's correct.
2      Q.  But you don't know how much
3  force it takes to cause a failure?
4      A.  Well, it's in the 20-pound
5  load -- 2,000-pound load.
6      Q.  You haven't done any calculation
7  to determine what load it takes to cause a
8  breakage of this horizontal brace, have
9  you?
10     A.  Well, like I said, that's an
11 easier off-the-head estimate to make
12 because the yield strength and the plastic
13 flow limiting, the ultimate tensile
14 strength is where you start to develop
15 cracks and the failure of a part. And the
16 ultimate tensile strength can be --
17 typically it's not twice, but let's say
18 it's twice as strong, it's twice as high as
19 the plastic flow stress. And so that
20 changes 13 pounds to 26 pounds, not the
21 2,000 pounds.
22     Q.  So in layman terms, what does
23 that mean if you're going to have a --

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

189

1    A.  In layman terms, you can break
2 that weld off if you yank around on that
3 arm with 50 pounds of load.
4    Q.  50 pounds of load?
5    A.  Yeah.
6    Q.  And that's bending it back and
7 forth using 50 pounds of load?
8    A.  Yes.  And it can be less than
9 that.
10    Q.  How much less than that?
11    A.  Well, like we said, 13 pounds
12 will get it started.  It will take a lot
13 more cycles at 13 pounds.  It only takes a
14 few cycles at 50 pounds.
15    Q.  Are you aware of any standard on
16 the surface earth that would tell a tree
17 stand manufacturer how many pounds of
18 dynamic load stress a horizontal brace on a
19 tree stand should withstand?
20    A.  The standard?
21    Q.  Yes, sir.
22    A.  Standards usually don't do the
23 design work of a manufacturer, that's not

190

1 what they're for.  The design work of
2 manufacturers is to be done by the design
3 people of the manufacturer.  Standards are
4 to give a minimum way to test a product
5 after it's been manufactured.  There may be
6 a lot of different designs to do that.
7    Q.  Are you aware of any standard
8 that applies to specifically horizontal
9 braces?
10    A.  No, I'm not.
11    Q.  Once again, are you aware of any
12 rule, regulation, standard, anything that
13 would give a manufacturer some guidance
14 about how much strength or how much load a
15 horizontal brace on a tree stand should
16 withstand?
17    A.  That's not the standard --
18 that's not in the standards, that's the
19 design.  It's the manufacturer's job.
20    Q.  And in terms of the
21 manufacturer's job, are you mindful of the
22 fact that Strongbuilt had some of their
23 products actually tested before there was

191

1 even any requirement to have it tested?
2    A.  I'm not familiar with their
3 testing procedure, no, I haven't seen any
4 data.
5    Q.  I'm talking about tested by
6 engineers.
7    A.  Like I said, I haven't seen any
8 data on any of their testing.
9    Q.  You haven't?
10    A.  (Witness nodding head.)
11    Q.  Do you know when the Tree Stand
12 Manufacturer's Association standards came
13 into play with respect to ladder stands?
14    A.  No, I don't.
15    Q.  This welding standard that
16 you're talking about, when did that come
17 into play?
18    A.  Welding standards have been
19 around, I'm not sure what the first year --
20 but I don't speculate too far back.  But
21 I've been familiar with it since the early
22 '70s, late '60s.
23    Q.  And what standards are in the

192

1 welding standards other than that apply to
2 things other than shape?
3    A.  There's the design of the joint,
4 there's the filler metal to use.  There is
5 the allowable stresses for a given joint
6 design, filler metal process combination.
7 There's the standard forms for welding
8 procedure.  There's the methodology for
9 qualifying welds, qualifying welders
10 certifying welders.
11    Q.  The list goes on and on?
12    A.  It's -- it gets a little bit
13 longer every time it comes out.
14    Q.  So when I leave here, am I to
15 understand that your only criticism of the
16 weld -- I'm talking about factory welds, I
17 know you're real critical of these homemade
18 welds, I'm talking about the factory welds.
19 Your only criticism is as to shape, that's
20 what you've told me today?
21    A.  Yeah.  The shape of the welds go
22 to the procedure.  Don't make a bad shape
23 unless you have a bad procedure.  So the

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

193

```
 1   welding shape is indicative of the lack of
 2   welding procedure.
 3       Q.  But in terms of the actual weld
 4   itself, your criticism is of the shape?
 5       A.  Criticizing the shape, yes.
 6       Q.  That's all.
 7           MR. WEAVER:  Do you want to read
 8   and sign or waive it?
 9           THE WITNESS:  I'd like to read
10   and sign.
11
12           3:10 p.m.
13       FURTHER THE DEPONENT SAITH NOT
14
15
16
17
18
19
20
21
22
23
```

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

194

**A**

able 75:1
absence 160:16
absolutely 45:15
  147:23
abuse 118:3
  135:15
acceleration
  168:17 176:20
  176:23 177:3
acceptable
  153:8
access 125:20
  139:6,14 145:6
  147:3
accident 52:4
  54:15 55:16,18
  55:21 56:6,11
  56:14 57:5,7
  57:21 58:3
  61:4,13 64:5
  64:18 69:4
  76:5,5,7,8,9,14
  81:13 118:15
  119:2,12,13
  120:5 121:3,9
  121:19 122:6
  123:3 140:13
  161:7 162:14
  162:17,22
  163:6 171:5
  175:6,8 179:9
  187:5
accidents 163:2
account 60:13
accumulation
  153:3
achieve 53:16
  54:19 59:19
  163:15
acknowledge
  99:15 146:10
acting 6:3
action 1:5 66:2

67:12 68:4
activities 16:4,5
acts 107:2
actual 34:23
  116:9 193:3
acute 118:1
add 18:17
  122:19
added 41:9 45:3
  45:6 82:22
  83:11
addition 45:10
  45:16 138:9
  147:1
additional 49:18
  158:15,18
address 7:16,18
add-on 122:20
add-ons 43:17
adjacent 83:19
  121:11 148:20
  149:14
advance 82:10
adversely 139:8
  140:1,4
advice 30:6
advised 3:5
affect 140:1
after-manufac...
  41:19
age 123:18
agencies 16:10
ago 30:16 46:19
agree 33:20
  34:11 40:21
  43:16 44:23
  45:18 47:2
  49:20,21 50:2
  50:17 51:13
  53:3 54:17
  55:19 60:18
  61:2,7 73:16
  73:19 74:21
  75:22 76:2,6

76:10 77:5,9
  77:18 82:16,19
  85:20 86:3
  89:11,16,20
  105:4,14 116:2
  117:17 122:5
  123:4,12 124:1
  124:7 131:21
  132:9,18
  134:23 135:9
  135:11,18
  137:15,20
  138:8,14,15,21
  138:22 139:3,4
  139:10,16
  141:6,13,15,17
  141:23 144:8
  148:10 160:21
  170:8 178:5
  183:9,11,15,23
AGREED 2:2
  2:13,20
ahead 51:7 60:7
  98:10 127:1
  143:4 144:9
  167:22
ain't 113:19
  117:14
al 1:8
Alabama 1:2 2:7
  2:9 4:9,17 6:2
  6:3,9 7:19 10:5
  14:5 38:11
  39:2
allow 16:10
  41:13 153:19
  172:19
allowable 192:5
allowed 38:11
  92:13 98:1
  117:9
altered 46:10
  76:4,11
alternative

161:21 169:3
aluminum 13:18
American 35:13
  130:20 153:5
  183:2 186:9,11
amount 68:5
  104:11 109:5
  112:6 116:15
  159:11 168:14
  187:16,20
amounts 10:23
  105:10
analysis 170:9
  175:7
and/or 119:11
angle 55:7 56:18
  57:13 94:8,9
  94:10,11,15,17
  94:18 95:17,18
  96:15,17,18
  97:11 101:3
  102:8 121:5
  136:19
angled 63:17
answer 18:12,23
  19:22 22:17
  31:10 53:19
  54:2,6 55:1
  60:5 67:5,10
  73:2 84:9 93:9
  93:19 104:9
  113:13,13
  123:22 128:13
  129:19,21
  169:5 176:20
  178:16 180:21
answered 60:8,9
  126:13 170:1
answers 175:14
  187:11
anticipate
  164:14
anybody 21:19
  131:1 143:23

apart 72:18
  73:11
apparatus 147:2
  148:1
apparent 136:3
apparently
  99:10 117:7
  154:22
appear 43:12
  44:9,13 46:14
  106:5 124:8
appearance
  106:8 124:10
appears 40:22
  44:20 53:5
  58:12 70:11
  82:11,12 88:7
  88:17 89:3
  90:3 131:23
  132:10 140:23
apples 111:2
  128:6
applicable
  175:16 181:19
  184:9
application
  167:7
applied 32:13
  34:20 36:15
  37:19 97:14
  109:1,14,16
  114:2 126:17
  137:7 151:2,2
  166:13
applies 190:8
apply 12:10 38:1
  100:7 101:11
  101:13 102:2
  108:2 114:20
  126:8 175:16
  176:8 178:14
  184:13 192:1
applying 32:8
  98:11 108:9

# FREEDOM COURT REPORTING

195

109:5,11 112:4
114:17
**approach**
139:19 140:6
**appropriate**
51:17 101:14
169:5 182:18
**appropriately**
175:1
**approximately**
2:10 17:14
25:8 34:12
100:14 104:13
141:7
**April** 1:18 2:9
6:9
**arbitrary** 80:14
97:18
**area** 10:20 11:15
40:18 41:3,15
41:21 142:15
174:18
**areas** 88:23 89:5
**argue** 151:15
**argument** 87:23
102:1
**arm** 94:12 99:4
108:2 112:22
113:2 114:2
119:8 136:14
137:7,13
148:14 159:4,7
159:13,16,19
159:22 160:1
161:3 166:11
166:16 170:15
170:16,17
187:18 189:3
**arrangement**
9:19
**artifacts** 138:23
**asked** 23:16
30:3,11 31:1
45:21 67:6

103:14 120:12
151:20 167:21
169:2,4 180:3
180:8,23
183:19
**asking** 7:10 44:7
44:9,10 51:6
56:8,9 57:19
74:6 127:9
142:3,6 146:12
**assemble** 29:4
59:2 60:3,12
113:14 126:23
**assembled** 28:21
29:8 30:5
32:13 45:22
46:2 60:6
95:22 96:8,13
96:14,19
112:18 113:6
114:5 123:14
142:5
**assembling**
127:7,15
**assembly** 138:12
**assign** 3:1
**assistant** 13:4
14:2,7,8
**associate** 14:6
14:20
**associated** 21:2
29:10 42:1
46:20,22 150:6
157:21 172:20
182:8
**association** 36:2
36:4,5 37:10
37:23 124:22
124:23 125:5
126:11 157:20
160:6 182:6,10
184:18 185:3
185:10,16
191:12

**assume** 32:7
56:7,10 57:3
57:20 58:6
65:16 67:23
70:18 91:19
97:10,11 100:6
101:17 102:1
107:21 109:8
109:13 110:20
114:11 140:11
140:16 146:17
151:15 175:13
183:20
**assumed** 55:16
125:20
**assumes** 115:7
**assuming**
100:19 102:8
111:4 126:14
128:2 141:18
**assumptions**
123:16
**assurance**
182:13 185:2
185:16 186:23
**ASTM** 35:2,12
36:15,18 37:5
125:14,17,21
126:3,10
157:20 160:5
160:13 175:17
181:2 182:12
184:14
**atom** 20:8
**atoms** 17:19
20:6
**attach** 42:10
172:7,17
**attached** 23:20
52:12,21 65:5
76:20 83:1
86:10 90:4
92:6,19 103:10
111:5 114:12

119:9 120:1,19
135:8 136:4,15
136:16,18
149:1 166:20
168:3 172:22
**attaches** 56:19
58:14 166:4
167:19 170:10
173:2,20
**attachment**
170:18 172:18
172:19
**attempted** 53:15
**attended** 128:14
128:17
**Avenue** 7:19
**aware** 34:17
35:1,23 36:14
37:5,18 126:16
189:15 190:7
190:11
**awfully** 144:22
**AWS** 153:11
185:18
**a.m** 1:19 2:11
6:10 42:21,23

**B**
**bachelor's** 10:6
**back** 33:23
47:16 72:22
89:4 92:12
95:7 100:17
104:1 107:3
108:19 114:3
126:17 127:12
133:20 134:2
138:13 157:6
176:5 186:9
189:6 191:20
**backwards** 60:6
96:8 120:14
**bad** 92:8,14,18
119:13 151:13

183:15,17,23
192:22,23
**band** 107:2
**bang** 65:22
**bar** 56:19 59:7
136:11
**base** 65:9 75:13
79:10 83:16
85:6 87:3,6
148:23 149:20
150:13 153:14
171:3
**based** 9:4 44:10
44:11 49:14,15
91:5 97:19
99:22 106:7
116:10 118:19
124:10 126:20
132:15 170:8
171:4 183:4,5
186:13,14
**basic** 34:6,7,13
127:3 146:18
146:22
**basically** 17:22
39:8 99:3
102:15 103:14
115:5 157:2
174:22
**beating** 176:21
**began** 37:13
**beginning** 35:16
95:11,16
170:23
**behalf** 69:3
**behaves** 163:4
**believe** 25:1
26:21 28:20
30:21 31:9
35:5 42:2
54:11 55:1
77:22 79:9
161:14 164:16
166:18 185:5

**FREEDOM COURT REPORTING**

196

**bend** 55:4 59:3
　59:10 60:13
　66:22 68:1
　69:20 72:4
　74:2,23 75:3,7
　75:9 100:9
　102:19 103:23
　104:2,4,6,15
　108:6 116:17
　133:16,20,21
　133:22 147:12
　160:21 166:6
**bended** 168:6
**bending** 57:13
　98:12 102:7,13
　102:21 132:4
　132:13,19
　147:19 148:4
　157:5,8 159:11
　159:14 161:10
　163:14 170:16
　171:16 189:6
**bends** 60:15
　168:20
**bent** 57:11 61:17
　62:15 68:19,23
　69:7,7,13,18
　69:23 70:3,21
　71:3,9,9 72:6
　72:12,16 73:1
　73:3,5,10,13
　73:13 80:13
　131:18 133:5
　134:2,7 168:7
**best** 25:4 37:2
　46:4 64:11
　177:10,13,17
　177:20
**better** 38:22
　41:5 162:4,4
　180:16 182:18
**beyond** 10:12
　106:17 107:6
　107:19

**big** 51:12 152:21
**Birmingham** 2:9
　4:9,17 6:2,8
　7:5,19 10:5
　14:5
**bit** 19:3 41:15
　104:1,2,4
　105:7,21 167:4
　175:2 192:12
**bits** 19:15
**BLS** 34:5,6,13
　99:22 120:23
**body** 143:6
**bolt** 88:21 90:6,7
　136:3,19 137:1
　137:11 140:10
**bolts** 105:21
**book** 153:6
**bottom** 81:2,3
　85:2,10,13,19
　85:22,23 88:6
　90:2 97:16
　145:4
**box** 50:19 51:2
　51:11,12,16,16
　51:19 138:20
**brace** 54:21
　55:19 56:13
　57:6 58:1,14
　58:18 59:21
　60:19,23 61:3
　64:6,13,16,19
　64:23 65:6,6
　66:1,15,17,17
　79:17 82:2,5,6
　82:13 85:4
　86:2 87:12
　88:15 89:13
　91:3,17,20
　92:2,6,19,23
　94:12,12,18,21
　94:22,23 95:4
　96:12 97:11
　99:4,4,6,8

**100:**1,6,9,20
　100:21 101:4,5
　101:18 102:2
　102:10,17,23
　103:9,16
　104:10 105:2,8
　111:4,8,22,23
　112:4 114:9,12
　114:14,18
　115:3,9,12,18
　116:4 117:18
　118:14,22
　119:11 134:11
　134:12,13,15
　134:15,22
　135:2,13,16
　136:23 137:2,7
　149:5,7 151:12
　159:17,23
　160:11,17
　161:3,6,8
　163:16 164:3
　166:4 167:18
　168:2,6 170:10
　170:22 171:14
　172:3,7,17,22
　173:2,9,19
　175:19,20
　176:7,13
　180:16,17
　188:8 189:18
　190:15
**braces** 83:23
　84:4,6,12,14
　84:18,22
　171:11 180:11
　190:9
**bracing** 131:3
**bracket** 58:13
　59:6 60:16
　67:22 79:17
　103:10 148:14
　152:9 159:7
　166:3,4 168:7

**168:**16,21
　169:1 170:11
　170:18 173:1
　173:20
**brackets** 173:16
**branch** 68:5
**break** 35:11
　51:2,10 65:21
　78:11,11,17
　104:7 150:12
　155:4 189:1
**breakage** 153:22
　154:4,5,23
　155:5,15,17,18
　155:19,20
　188:8
**breaking** 65:20
**breaks** 17:18
　65:21
**bricks** 13:13
**bring** 23:16
　117:6
**broke** 65:7
　82:13 83:2,4
　86:21 87:2,9
　104:10 150:11
　150:18 151:17
　151:18 157:3,4
**broken** 54:20
　59:21 82:1
　83:18 85:2,13
　105:13 117:22
　119:6 148:12
　148:15 149:4,7
　149:8 150:16
　150:17 155:6
**brought** 42:18
**BS** 10:17 11:5
**buckle** 100:9
　102:19
**buckling** 98:13
　102:6,14,22
　132:1,2,10,13
　159:10,15

　161:1
**building** 111:18
**built** 146:6
　162:4
**burned** 48:2
**bush** 176:21
**business** 7:16,18
　7:21 8:7 20:11
　21:1,8 22:21
**buttocks** 142:22
**butts** 95:12

**C**

**C** 4:1
**Cahaba** 4:7
**calculate** 168:18
　177:8 178:1,2
**calculated** 109:7
　116:8,10 167:1
　176:11
**calculation**
　93:16,23 94:6
　98:13,14 103:8
　109:19 110:17
　110:22 116:14
　116:22 117:8
　178:3 181:9,10
　181:13 188:6
**calculations**
　67:16,18,21
　92:18 94:1,5
　95:8 97:10,13
　98:5 99:11,23
　100:18 101:1
　101:10,14
　102:13,22
　103:3,4,7
　110:14
**call** 26:7,9 34:13
　41:4 43:3,5
　49:5,7 83:16
　107:8 118:4
　129:11 159:8
　184:18

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

called 26:6 34:5 36:3 149:18 153:6 174:17
calling 88:2 121:12
calls 187:7
candor 181:23
capable 18:22 93:5,12
carbon 17:4,12 17:17,18,21 20:1,2,6,8,8 138:11
carefully 31:18 66:11 108:7 120:3
carry 30:8 98:19 115:13
carrying 115:8 115:17 116:3 166:14
case 8:23 9:1,20 11:23 12:1,3 12:12 21:20,23 22:7 25:6,16 25:18 26:4,19 27:1,5,16,20 30:7,8 31:7 49:11 51:5 53:12 58:1,17 65:19 69:10 71:6 77:21 87:2 103:13 107:1 113:19 122:4 156:14 156:16 157:1 157:14 158:5,8 163:9,10,11 164:15 181:17
cases 24:2 25:10 25:13 30:4
catalyst 17:20
catastrophic 171:7,17,19,20

173:3,5,15 174:4
category 84:21
cause 6:12 59:17 111:9 116:23 120:4 137:9 153:17,18 156:6,8 164:5 166:10 173:14 176:2 188:3,7
caused 137:14
causes 55:7 122:6 174:5
CCR 1:23 2:6 6:1
center 4:15 89:18 124:4,5 140:5
ceramic 13:3,7,9 13:11,18
ceramics 13:15
certain 20:18 38:23 39:3 131:4 185:22
certainly 27:18 40:10 41:1 71:8 75:2 114:1 141:12
certainty 123:23
Certificate 5:8
certified 129:13 129:15,16,17 129:22 130:1 182:11 185:4,6 185:12,17,20 185:21,22 186:21 187:3,6 187:11
certify 6:4 130:9
certifying 192:10
chair 178:15
chairs 178:14
change 15:15

16:11 57:13 97:5 123:13 124:2,3,4,5 139:18,21 140:5 149:21
changed 9:19 83:13,14
changes 17:1 40:17 41:2 46:20,22 55:15 55:17 56:1,10 57:4,10,18,20 107:7,12 124:20 138:4 147:2 169:18 175:3 188:20
characteristic 49:11
charcoal 17:4
charge 8:20 9:7 9:15,21
charging 8:22
checks 178:14
chest 123:20
China 38:14 39:5
chip 117:1
chronic 118:2
Circle 4:7
circumstances 29:21 30:2
civil 1:5 6:5 11:1 12:12 21:23 22:11 25:6
clamp 134:13,15 134:20 135:1,3 135:4,14,16 136:10,23
clamps 136:4
classes 103:22
clear 63:23
clearly 119:22
Clemson 13:2 13:12,20

client 45:2
climb 26:14 118:16 119:1 119:15 143:15 166:22 178:23
climbing 128:9 166:19
clip 54:20 55:7 59:21 82:5,12 82:20 83:12 84:7,18 85:2,4 85:10,13,17,21 87:19 88:2,12 88:21 103:23 104:4,7,15 105:12,13 106:5,6,15 107:17 108:3 109:2,6,12,16 111:1 112:5 114:18 116:6,9 116:9,13,16,20 118:13,22 119:7,11,21 120:1 133:16 176:8 179:1,3
clipped 88:8
clip-in 151:11
close 37:3 71:17 78:15 97:21,22 97:23 98:1 152:14
closely 88:20
closer 113:1
closest 88:19
clue 142:4
coal 17:6 20:3,4
code 153:11 182:15 183:3 185:19 186:1 186:10,12
collapse 160:19 173:8,10 174:7 174:8

collapsed 53:6 71:4 159:9
collapsing 161:2 161:5 171:11
collectively 23:13
color 44:3
colors 43:10 44:11
column 132:3
combination 13:19 192:6
come 16:12 22:3 26:12 67:4 74:6 113:10 117:1 137:5 146:19 155:23 169:8 172:12 176:22 177:4 191:16
comes 17:10,21 38:19 83:15 104:1 107:2 123:9 137:6 169:18 174:16 176:16,19 177:1 192:13
coming 49:4 123:16 124:6 144:1 147:7,9 147:10,16,19 161:20
commencing 2:10 6:10
Commissioner 6:4
commit 67:17
committed 20:16
common 142:8
companies 8:6 16:13 20:17,20
company 8:1,2 15:19 16:2,8

16:12,15 21:19
28:13,18
**compared** 84:8
84:17 161:15
180:4,10
**comparisons**
161:19,23
174:10
**complete** 154:4
154:5 155:20
**completely** 69:7
72:6 73:13
74:2 85:15
**compliance** 2:16
**complication**
110:16
**composed** 82:21
83:5
**compound** 18:7
**concept** 106:23
**conclusions**
98:16,17
**concrete** 13:13
**condition**
107:15 159:6
160:5
**conditions** 17:17
**confident** 36:11
136:17
**confuse** 110:8
**confused** 56:1
**connect** 55:6
159:9
**connected** 86:5
164:3
**consider** 128:22
129:2,10
162:10,13
165:8
**considerable**
135:13
**consistent** 39:6
49:3
**consists** 23:15

**constructed**
51:14
**construction**
13:14 77:2
150:5 158:23
**consulted** 28:17
**consulting** 7:23
8:2 15:17 16:3
16:17,17 20:21
21:8,13
**contemplated**
172:10
**contention**
134:17
**continue** 97:9
**contract** 16:11
**contracts** 8:5
16:9 20:14
**contraption**
142:18
**contrary** 45:8
101:19
**conversation**
73:10
**convert** 17:6
**copies** 42:10
**copy** 42:13
**corporations**
21:1
**correct** 9:17
21:9,10 23:17
23:21 24:1,4,6
24:7 25:13
26:16,21 27:5
27:17 31:9
33:19 37:8,14
37:15,20,21
39:12,16,17,21
43:7,8 45:10
46:7 53:11
56:21 59:15
62:9,10 68:14
77:3,4 82:7,8
83:18 87:7,10

90:2 94:3
96:16 98:5,6,9
100:4 101:21
101:22 103:1
107:18,20
120:11 126:12
131:11,12
140:20 142:2
143:2,12,13
150:20 156:4,5
160:14 161:11
165:15,16,21
166:8,23
168:23 169:22
171:2,13 172:9
176:3,4 180:6
180:7 184:15
186:18 187:22
188:1
**correctly** 79:8
96:19
**corrosion**
156:21
**counsel** 2:4,21
2:23 6:7
**count** 21:15
**counting** 21:14
**country** 99:15
**course** 73:6
166:7,19
**court** 1:1,22
2:17 3:6,7 6:20
9:14 27:4,15
**covered** 161:12
164:13
**covers** 24:5
**cows** 17:10
113:10
**crack** 153:4
154:1,6,19,22
155:1,3,19
156:3,8,10,12
**crackage** 155:12
155:13 156:6

**cracked** 135:6
156:2
**cracking** 151:14
153:23
**cracks** 85:16
119:17,20,23
120:4,6 154:7
154:10 188:15
**create** 139:22
**created** 108:18
**creates** 139:7
**crimp** 98:22
133:12,13,17
169:10,20
170:5,23 171:1
171:3 174:16
174:19
**crimped** 61:10
62:14 66:22
69:5 72:5,15
76:3 80:20
98:21 102:15
131:13,23
132:22 159:8,8
170:2 181:1,1
181:17
**crimping** 98:23
**crimps** 169:6
174:11
**critical** 168:21
168:23 170:16
183:17 192:17
**criticism** 183:7
192:15,19
193:4
**criticisms** 90:10
**criticized** 90:17
**Criticizing**
193:5
**crook** 149:11
**crucial** 60:19,23
**cup** 18:14
**curiosity** 16:19
**current** 15:12

23:1 138:16
**currently** 87:19
**curriculums**
12:19 129:12
**curve** 95:12,16
**cycle** 163:21
**cycles** 164:5
189:13,14

**D**

**D** 5:1 24:12
**dancing** 86:19
**data** 191:4,8
**date** 6:4 34:23
35:4 46:23
**David** 4:13 7:4
42:9 60:1
91:13
**day** 6:9 113:9
118:14 119:1
179:9
**deal** 128:18
147:14
**deals** 13:10
**dealt** 13:12
**dear** 114:10
**Debora** 7:8
**December** 33:5
**decision** 97:19
**decrease** 174:22
**defective** 49:23
50:3 77:1,6,15
77:18 79:2
81:7 151:9
152:1,3 159:6
**defendant** 1:12
4:12 8:17
26:19
**defendants** 8:13
**defendant's**
5:13,14,15,16
5:17,18 23:19
52:11,20 63:9
76:19 120:18

157:18
defense 24:12
define 12:14
85:7 107:8
defined 12:15
85:8 89:2
definitely 39:10
definition 19:23
85:5
deflecting
108:19
deflection 53:9
53:16 54:19
59:12,14,20
101:3 102:7
deform 116:16
187:16
deformation
135:10,12,14
136:1,6 137:11
137:12 166:10
171:6
deformations
136:22
deformed
106:16 137:6
179:1,3
deformity
106:20,22
107:16 111:9
115:23 116:6
117:1 120:10
131:13 150:19
161:9 163:15
176:2 187:23
deforms 133:18
degree 10:5,7,13
10:18,22,23
11:9,13 94:9
degrees 17:16
95:20,21 96:22
121:14
Dennis 4:4
department

13:3,12 14:10
14:12,14
depend 34:23
94:21
depending
65:15
depends 12:13
20:13 67:6,11
123:19 143:19
168:15
depict 52:3 79:6
depicting 79:7
depicts 80:5
DEPONENT
193:13
deposition 1:15
2:4,14,15 3:3
9:12 22:10,12
24:11,17 25:3
25:11,16 27:2
27:4,15 30:8
33:9 39:15,19
39:23 40:7,11
41:6 42:2,7
45:19 47:23
48:4 51:1 62:3
91:6,13,14,15
97:19 100:15
146:2 157:17
158:10,13
depositions 2:18
25:5,12,14
32:19 50:16
62:6 91:11
100:13 157:16
158:4,7
deposits 17:21
describe 171:6
described 48:17
163:16
design 93:5,11
108:1,20
111:13,16,16
113:22 129:16

129:23 130:3,7
131:2,3 137:17
138:1,4 150:3
150:12 151:4
159:1 165:7,12
167:16 168:10
168:21,22
169:1 170:3,13
172:6 173:13
173:21 184:11
187:10,13,15
189:23 190:1,2
190:19 192:3,6
designed 27:22
28:2,6,13,18
60:23 101:20
108:5,14,22
111:12 122:16
145:6,8 162:4
166:3,9 179:22
designer's
112:20
designing
111:18
designs 130:5
131:5 161:21
169:3 190:6
detail 41:15
details 135:22
determine 80:17
93:11 97:13
116:23 167:5
188:7
develop 188:14
development 8:4
15:20 155:7
device 101:2
142:20 178:11
187:17
devices 18:20
diamond 16:5,8
16:14,21 17:22
18:5,9,9 19:8
19:15,21,23,23

20:1,6,9
diamonds 15:21
16:22 17:3,7,9
17:23 18:13,15
18:17,21
difference 15:12
20:5 97:3
174:15
different 16:11
18:18 19:9
24:9 26:13
43:10 44:3,11
44:12 87:13,15
87:16,20 88:13
89:7,14,22
96:21,23 97:1
116:13,14
121:5 122:20
146:9,11 147:9
147:17 155:17
163:2 180:16
181:15 183:20
190:6
differentiating
82:17
differently
121:10
difficult 178:3
179:4
direction 67:1,8
68:19 69:8,14
69:19 72:7,17
73:14 74:3,10
75:3 132:22
133:9,17
directions 62:16
133:5
directly 86:20
172:16
dirt 79:12,13
disagree 86:3
135:20,21
disassemble
61:18,19

disassembled
61:16
discern 51:5
discipline 129:6
disconnected
150:22
discussed
170:14
discussion 19:19
50:23 51:4
78:22
disparaging
144:22 145:1
dispute 70:8
96:7
disrespect
141:21
distance 109:10
distinction
132:14
DISTRICT 1:1
1:2
divide 34:4
divided 12:17
DIVISION 1:3
document 23:18
52:10,19 76:18
documents
120:17 157:15
157:22
doing 9:7,10,16
15:9 18:23
19:14 20:11
34:1,2 105:23
112:7,14
143:17 147:17
168:6
door 144:1,16
147:8,13
double 58:6
downward 65:8
Dr 7:4 18:2
21:22 46:13
47:3 54:17

# FREEDOM COURT REPORTING

200

67:20 81:22 91:1 105:14 157:14 164:17 165:3 183:12
**drawings** 34:3
**drills** 19:15
**drop** 176:15 177:4
**drops** 168:17 176:23
**duct** 132:7
**ductile** 132:5,10 132:12,17,21
**ductilely** 133:5
**due** 94:20 114:4 114:6 120:10 150:19 151:1 161:9 187:9
**duly** 6:17
**dye** 38:10 40:14
**dynamic** 93:6,12 109:23 110:16 176:19 189:18
**dynamics** 123:13 124:2,3 139:8 140:2

**E**

**E** 4:1,1 5:1
**earlier** 45:22 56:17 61:9 83:6 103:14 120:12 126:14 132:7 135:5 148:13 165:7 174:9 175:18
**earliest** 35:18
**early** 33:5 191:21
**earned** 10:10
**earth** 189:16
**earthly** 17:5 72:8
**easier** 17:8

44:23 73:3 188:11
**easy** 52:14 117:8 125:20 145:2
**edge** 155:2 157:2,3
**edges** 102:15
**education** 10:1 10:12,13,14 118:19
**effect** 2:16 34:19 62:1,4 96:3,5
**effects** 133:19
**effort** 66:21
**eight** 52:9 94:14 154:14
**either** 24:16 26:18 27:3,14 27:19 28:13 30:12,13 33:5 65:7 97:20 105:2 106:4 144:2 146:20 184:21
**ejected** 65:7,15
**elastic** 106:17 107:6,10
**electrical** 11:1
**electronic** 13:17 18:20
**eleventh** 97:15 97:15,17,23 98:12 109:17
**employees** 9:4
**employment** 12:22 15:13
**encompass** 35:3
**encompassed** 35:5
**ends** 61:10 66:23 69:5 72:5,15 76:3 84:18 131:14 131:23 132:22

181:1,1,18
**energy** 65:23
**engineer** 21:17 148:23
**engineering** 7:22 10:6,7,11 10:17,18,21 11:14,16,22 12:2,4,9,18,19 13:3,7,9,11,12 14:11,13,15 15:2,6,16,17 16:7,13,15,16 20:20,22 21:12 85:8 103:22 111:15 123:22 129:12,12 132:14 151:16 165:7 166:5 171:21 172:6
**engineers** 21:11 21:15 191:6
**entering** 146:12 146:13,16 148:8
**entire** 127:7
**entities** 21:1
**environment** 93:7,14
**equal** 10:23 112:7
**eleventh** 94:7
**Esq** 4:4,5,13
**established** 125:12 143:2 170:21 173:21
**establishes** 95:18 96:14
**estimate** 25:5 67:5 177:13 188:11
**et** 1:8
**evaluate** 97:5
**evaluated** 96:1

**evaluating** 179:12
**evidence** 3:3 45:2,5,7,13,14 56:11,12 57:4 57:10,21 58:21 59:17 60:4 62:11,14,18 63:1,7 64:1 67:21 76:11 78:2 87:11,12 89:12,21 96:6 96:9 132:20 133:4 138:23 151:8,23 155:8 155:11 156:19 156:22
**evidenced** 46:19
**exactly** 32:11 62:22 67:3,11 75:10 124:15 150:11 151:17
**examination** 5:4 6:12 7:1 53:13 60:11 154:11 165:2 175:12
**examined** 6:17 41:14 54:14
**examining** 29:11
**example** 17:11 77:1,6,14,18 79:2 92:10 150:4 153:5 160:4 168:12
**exceed** 181:2
**exceeded** 151:3
**excuse** 168:7
**exerted** 110:9
**exerting** 111:7
**exhibit** 23:4,14 23:19 52:11,15 52:20,22 63:3 63:3,10 64:12 64:12,13 71:21

74:8 76:19 120:21,22,22 121:4 140:8 146:21
**Exhibits** 5:11,12 59:10 70:12 120:18
**existed** 37:5
**exists** 59:3 186:6
**expect** 64:15,21 64:22 65:6,9 108:5 109:1 119:10 150:12 151:5 161:1 170:22
**expectancy** 180:2
**experience** 9:4 40:21 49:15 71:8 118:20 142:17
**experienced** 167:15
**expert** 7:9 8:5,8 8:21 22:1,10 25:6 26:17 27:1,10,19 29:17 30:18 42:7 46:13 47:6 66:13 90:16 91:1 128:23 129:3 148:8 157:18 157:23 162:10 162:14 165:9
**expertise** 142:15 142:15
**experts** 9:9 129:9 157:18
**extend** 94:22 95:4
**extent** 75:2 126:2
**extreme** 77:1,6

# FREEDOM COURT REPORTING

eye 140:10

**F**

face 47:12 55:8
58:11
faces 55:11 59:7
facility 38:19
facing 55:20
60:16
fact 45:7 47:16
50:4 83:6
119:18 137:5
181:22 185:18
190:22
factor 99:2
129:8 159:12
174:12,22
factors 128:23
129:3 160:3
factory 139:1
146:6 148:11
148:14,20
192:16,18
facts 171:4
faculty 12:16
22:20
Fahrenheit
17:16
fail 81:10 117:19
118:5 151:5
183:14 184:4
failed 64:19
161:9
fails 163:4
173:14 183:16
184:1
failure 64:23
118:1 131:22
132:1,9,11,12
132:18,21
134:19 153:17
153:21 154:2,3
156:13 157:10
157:12 164:6

170:23 171:8
171:18,21
173:1,4,5,15
174:3,5 184:5
187:9 188:3,15
failures 132:4
153:19 163:18
163:19 183:21
184:7
fair 32:1 38:3
148:10
fairly 108:16,17
fairness 67:19
181:22
fall 12:17 84:20
fallen 66:4
falls 177:4
181:18
familiar 124:23
125:1 126:10
191:2,21
family 33:2
158:9
far 42:5 65:1
88:18 104:12
182:14 191:20
farthest 88:17
fashion 59:19
72:5 167:19
fastened 169:13
fault 184:11
feasible 171:22
February 54:13
federal 6:5
181:16,16
fee 9:3,19,22
feel 36:11
145:13 158:16
feeling 117:13
feet 34:2,7,12,14
97:22
fell 168:6
fellow 130:19
felt 101:14

146:13
field 162:14
fifteen 178:22
fifth 89:10 94:19
file 52:6 126:4
filed 3:7 7:7
filler 192:4,6
find 25:2 47:11
60:14 63:20
78:8,19 91:15
103:13,18
104:9 116:17
160:3 162:3
fine 26:1 78:14
132:14
finger 49:2
105:17
first 6:17 19:1
24:10 36:2
43:9 48:3 54:3
54:7,8,11,12
56:17 60:10
63:14 72:12
79:14,15,23
80:2 89:8
104:20 105:13
110:7 111:15
112:16 163:5
169:9 176:18
191:19
fishing 128:3,7
fit 50:19 144:12
145:2
five 19:10 22:4,5
76:22 93:3,8
164:20
fixed 95:6
flat 50:19 51:16
135:17 138:20
flex 166:6,23
167:1
flexes 109:2
flexion 108:23
136:13

flip 57:14
floor 148:6
flop 92:14
flopping 115:19
flow 103:20
104:14,21
107:8,11
116:11 188:13
188:19
flying 66:1
fold 136:11
172:20
folded 92:11
folder 52:9
157:16
follow 63:12
following 6:13
follows 6:18
foot 19:4 112:22
112:23 120:14
120:23 121:9
121:13,19
122:5,8 138:12
139:5 141:3
146:18
footage 41:23
force 2:16 34:19
66:22 67:7
68:1,11,14,15
70:16,22 74:19
104:11 105:11
109:22 110:23
111:7 112:4,6
114:17 115:14
135:16 187:20
188:3
forced 71:5
forces 17:5
foregoing 6:6
foreseeability
165:18
foreseeable
166:5,15 168:8
168:20

foreseeing
165:19
forever 179:23
forget 36:2 38:8
142:9,11,14,16
142:16
form 2:22 40:5
41:12 50:1
54:23 55:22
56:15 57:8
58:4,23 60:1
64:20 72:21
75:5 124:11
125:13 150:23
171:9 182:4
formation 106:8
153:4
formed 16:16
163:13
forms 192:7
forth 89:4
108:19 114:3
118:21 134:3
157:6 189:7
found 35:10,18
60:10 77:2
184:17
four 21:15 76:16
76:21,22 89:10
fraction 150:8
fractions 167:3
fractured 86:1,4
fractures 119:11
134:12 156:20
156:21,23
frame 35:5,6
36:16 37:20,22
39:3 54:13
friend 167:14
front 138:10,13
144:1,16 147:8
147:10,13
186:8
full 2:16 14:21

# FREEDOM COURT REPORTING

| | | | | |
|---|---|---|---|---|
| 15:6,9 18:3 | 112:17 115:16 | 81:16 91:23 | **H** 4:5 | **help** 167:21 |
| 34:19 | 117:14 122:22 | 92:3,4 105:5 | **half** 95:1,2,10,15 | **he'll** 113:13 |
| **fully** 135:2 | 126:23 127:12 | 119:3 128:13 | 96:12 97:12 | **high** 10:3 17:5 |
| 136:14 183:14 | 129:5 142:7 | 129:14 144:7 | **hand** 33:8 63:15 | 151:16 188:18 |
| **full-time** 15:5 | 143:4 144:9 | 167:4 178:10 | 105:16,23 | **Highway** 4:16 |
| **functionality** | 147:5 148:17 | 184:3,6 | 112:1 114:14 | **hinge** 172:19,19 |
| 18:18 | 156:3 162:2 | **gotten** 73:5 | 114:15 115:11 | **hired** 13:5 29:16 |
| **further** 2:12,19 | 167:22 169:12 | 164:2 165:5 | 115:12 133:16 | 30:18 |
| 57:2 93:4 | 192:21 | **government** 8:4 | **handbook** 153:7 | **history** 12:22 |
| 100:5 105:7 | **goes** 71:5 80:11 | 16:10 | **hands** 18:3 98:1 | 35:3,10,20 |
| 164:17 174:1 | 80:13 163:5 | **grab** 113:1 | 115:13 | **hits** 176:18 |
| 175:12 193:13 | 192:11 | **grabbing** 111:6 | **hang** 114:9 | **hold** 87:21 111:6 |
| | **going** 7:10 18:3 | **graduate** 11:4 | **hanging** 115:18 | 176:15 |
| **G** | 18:6 19:12 | **granted** 11:21 | **happen** 56:7 | **holder** 18:15 |
| **G** 1:16 2:5 6:11 | 20:15 34:14 | **graphite** 20:2,3 | 57:15 58:8 | **holding** 115:9 |
| 6:16 | 41:4 42:12 | **grass** 19:6 | 102:18 136:18 | 116:4 137:9 |
| **Gaining** 145:6 | 52:13 57:17 | **gravity** 124:6 | 159:16 163:4 | **home** 108:15,16 |
| **gas** 17:9,10 18:1 | 59:23 63:12 | 140:6 177:4 | **happened** 14:23 | 113:10 |
| **gem** 18:21 19:8 | 65:17 72:5,20 | **green** 44:3 | 58:7 61:12 | **homemade** 41:4 |
| **general** 10:18,21 | 75:2 76:17 | **grilled** 9:12 | 137:12 | 41:9 45:3,9 |
| 10:23 | 80:20 86:19 | **groove** 153:4 | **happens** 86:11 | 141:4 142:20 |
| **George** 7:3 | 87:5 100:9 | **ground** 64:7 | 104:16 | 143:6 147:1,13 |
| **getting** 9:12 | 102:7,18 | 66:15 75:9 | **happy** 54:1 | 148:1 192:17 |
| 55:23 58:7 | 104:22 107:13 | 128:12 140:18 | **hard** 12:14 22:2 | **honesty** 181:23 |
| 104:17 112:15 | 109:20,21 | **grounds** 3:1 | 71:7 133:21 | **hope** 19:11 |
| 173:18 | 110:2,4 111:1 | **groups** 13:10 | **harder** 70:1 | 105:6 |
| **give** 25:4,12 | 111:9,19,22 | **grow** 15:21 | 71:9 133:18 | **horizontal** 54:21 |
| 71:13 103:21 | 112:13 113:1,2 | 16:20,22 17:8 | **Hassinger** 4:5 | 55:19 56:13,19 |
| 145:16 190:4 | 113:10,12 | 17:23 18:5,9 | 42:15 144:21 | 57:6 58:1,13 |
| 190:13 | 115:14,22 | 18:13,15,17,17 | **hate** 13:16 | 58:14,18 59:7 |
| **given** 22:9 25:6 | 116:5,9,17 | 18:21,23 19:1 | **hazard** 139:7,22 | 59:21 60:19,23 |
| 25:16 27:2 | 120:20 139:10 | 19:6,7 | **head** 34:1 | 61:3 64:6,13 |
| 158:12 167:6,7 | 139:16 140:18 | **growth** 19:10,13 | 176:15 191:10 | 64:15,19,23 |
| 192:5 | 140:19 142:21 | **guess** 51:9 73:20 | **health** 178:13 | 66:14 79:17 |
| **gives** 68:9 | 144:15 160:19 | 177:13,16,20 | **hear** 54:1 | 82:2,4,6 83:23 |
| **giving** 27:14 | 162:3 165:14 | **guidance** 190:13 | 117:10 181:17 | 84:14,18 86:2 |
| 164:14 | 165:20 166:6 | **guiding** 116:14 | **heard** 13:7 | 87:12 88:2,14 |
| **glad** 7:14 | 166:11,16,21 | **gun** 124:20 | 169:4 | 89:13 91:2,17 |
| **go** 10:9 12:16 | 167:12,18 | 138:6 145:9,10 | **heat** 47:23 48:14 | 91:20 92:2,19 |
| 30:4 51:7,15 | 170:1 173:8,14 | 146:15 | 49:3,5,7,9,10 | 92:23 95:4 |
| 60:7 66:1 68:2 | 174:1,3 176:5 | **guy** 178:2 | 49:10 83:7 | 96:12 97:11 |
| 75:15 98:10 | 176:8,17,17 | **guys** 123:18 | 87:3 138:23 | 99:23 100:6,20 |
| 104:16 105:7 | 188:23 | | 149:18 150:13 | 100:21 101:18 |
| 107:10 108:19 | **good** 41:15 | **H** | **heavy** 100:12 | 102:1,9,17,23 |

# FREEDOM COURT REPORTING

203

103:9,16 105:2
111:8 114:9,12
114:14 117:18
118:13,22
134:10,22
135:2 137:2
149:4,7 151:12
159:17,19,23
160:11,16
161:3,6,8
163:16 164:2
167:18 168:2
170:10,21
172:7 173:2
180:10,15,17
188:8 189:18
190:8,15
**hour** 9:2,7,11,13
9:15,23 19:2
**hours** 19:10
**human** 73:23
128:23 129:3,8
**humanly** 74:4
**hump** 152:21
**hundred** 164:12
**hundreds**
163:23 164:9
**hunt** 122:10
**hunted** 127:23
128:8,11
**hunter** 112:18
123:4 127:19
127:21 128:5
128:14 142:9
142:11 167:15
**hunting** 22:7
26:19 27:16,19
27:22 28:2,4,6
28:10,14,19,22
29:8 30:12,17
31:3,8 36:5
45:22 128:3,4
128:7 142:17
162:11,12,14

162:17
**hurt** 176:18
**hustling** 117:16
**hydrogen** 17:12
17:18
**hymnal** 73:19
**hypothetical**
60:2 114:11
176:6
**hypothetically**
55:11 57:3
**hypotheticals**
167:11

**I**
**idea** 91:23 92:3
92:18 135:23
**identified** 7:9
27:1 63:3
64:13 66:16,17
78:5 79:9 83:7
119:20 124:19
**identifies** 40:18
**identify** 38:13
**identifying**
122:15
**image** 64:10
**imagination**
162:9
**imagining**
112:20
**immediate**
171:15
**immediately**
119:12,14
172:4,13 179:8
**impossible**
74:13
**impressed** 88:21
**impression**
29:14
**inch** 116:12,18
134:21 159:2
**inches** 34:2,4

95:2,11,15
96:13 97:12
139:21 141:4
141:13 143:8
144:5,5 147:12
167:3
**inching** 112:1
**include** 138:9
**included** 42:6,16
47:20
**includes** 83:10
85:5
**Incorporated**
7:6
**incorrectly**
95:22
**increase** 17:15
172:14
**incurred** 171:20
**indentions** 89:7
89:9
**INDEX** 5:11
**indicate** 56:12
**indicates** 65:22
**indication** 25:1
25:2 68:10
137:3
**indications** 41:1
135:14
**indicative** 137:1
193:1
**industrial**
129:11
**industries** 8:3
**industry** 8:3
34:18 35:22
182:2,22
186:17
**inertia** 169:17
170:4 174:19
174:20
**information**
46:8 50:11
178:4

**ingenious** 16:23
**inherent** 149:22
**initials** 24:8
**initiation** 156:9
156:12
**inject** 41:14
**injuries** 171:19
**insert** 145:19
146:5
**inside** 71:5
169:12
**inspect** 178:6,8
**inspected** 54:3
180:20
**inspection** 53:14
54:11 126:21
178:21 179:7
**inspector** 182:15
**instability**
171:16 174:6
**instance** 102:20
169:6
**instances** 69:22
**instructions**
90:11,11,15,18
92:22 105:1,5
124:13 127:10
178:19
**intact** 82:12
85:13,15,15
102:23 135:2,7
183:14
**integrity** 61:1
**intended** 61:5
107:19
**intention** 107:22
**intentional**
137:10
**intentionally**
136:10
**interchangeably**
25:22
**interest** 117:7
**interested** 16:3

**internally** 107:7
**interrupt** 30:21
**invest** 16:4
**investing** 16:3
**investment** 16:2
**investors** 16:1
**involved** 27:7,9
81:13 121:3
130:21
**involves** 8:8
**involving** 22:1
31:7 36:20
**inward** 53:9,16
54:19 58:13
59:11,13,19
60:15,16 99:9
101:3
**issue** 82:14
179:13
**item** 146:20
**IV** 4:5
**I-don't-have-a...**
147:6

**J**
**January** 24:6
54:13
**jerked** 70:12
**job** 15:5 190:19
190:21
**joint** 129:15,17
129:23 130:3,4
130:7,7,11,13
192:3,5
**joints** 130:6
**judge** 181:16
**judgment** 8:15
**JULIANO** 4:14
**junction** 134:19
159:3
**juncture** 134:12
134:14
**jury** 181:16

**K**

# FREEDOM COURT REPORTING

| | | | | |
|---|---|---|---|---|
| **keep** 16:6,7 | 80:11 86:9 | 26:19,22 27:4 | 116:3 118:16 | **lawsuit** 7:7 |
| 23:10 98:3 | 92:5,17,21 | 27:16,20,23 | 119:1,15 122:2 | 81:14 |
| 174:23 | 93:9 95:3 | 28:5,10,14,19 | 123:17 124:4 | **lawyer** 7:5 30:3 |
| **keeps** 108:18 | 96:17,18 97:4 | 28:22 29:8,12 | 127:2,5,14 | 113:6 |
| **Ken** 33:10 | 99:16,17 | 29:13 30:13 | 128:8,19 131:7 | **lawyers** 30:11 |
| **Killen** 32:20,21 | 106:19,20 | 31:4,8,12,15 | 131:10,14,15 | 31:1 |
| 33:10 37:15 | 114:4 115:13 | 31:21 32:15 | 131:21 132:9 | **lay** 88:10 176:12 |
| 38:7 39:16,19 | 117:6 118:2 | 33:22 34:6,7 | 132:23 134:13 | **laying** 148:5 |
| 41:18 45:18 | 123:3,10 | 34:11,14 35:2 | 134:15 135:10 | **layman** 188:22 |
| 47:22 83:7 | 124:14 126:19 | 36:8,12 37:6 | 135:13,17 | 189:1 |
| 146:3 | 127:5,8,13 | 37:11 40:1 | 136:15 138:18 | **layman's** 90:7 |
| **Killen's** 39:23 | 129:1,4 131:15 | 45:23 46:3 | 139:6,9 140:2 | 174:13 |
| 40:7,11 41:6 | 132:15 134:6,8 | 50:20 55:6 | 140:20,21 | **lead** 154:23 |
| 51:1 158:9 | 140:17,18 | 57:15 58:11 | 146:18,23 | 155:4 156:9,11 |
| 185:5 | 141:1,8,17 | 61:4,11,16 | 148:12 152:10 | 156:12 |
| **Killing** 40:22 | 143:3,21 | 62:15 63:1,5 | 158:23 159:9 | **leading** 2:22 |
| **kind** 17:19 | 144:11 145:12 | 63:13 64:2,17 | 159:14 160:18 | **leads** 154:1,2 |
| 24:15 28:3,5 | 147:8,11,18 | 65:11 66:6,11 | 162:2 163:11 | 159:6 |
| 30:12 40:12,15 | 151:6 152:11 | 66:23 68:3 | 164:4 167:17 | **lead-in** 104:8 |
| 58:5 63:17 | 158:6 164:8 | 69:6,9,12 70:7 | 168:3,5 170:15 | **leaning** 72:1 |
| 104:5,20 115:2 | 171:4 176:6,10 | 70:11,13 71:15 | 170:19 171:11 | 166:14 |
| 123:19 132:2 | 176:11 177:7 | 71:20,23 72:4 | 172:3,8 173:2 | **learning** 120:12 |
| 168:8 172:17 | 178:1 180:1,3 | 72:16,18 74:1 | 173:7,12,22 | **leave** 23:6 92:19 |
| **kinds** 26:13 | 180:8,14,15 | 74:15,22 75:23 | 174:2 180:4,5 | 106:18 165:6 |
| 130:19 163:2 | 181:4,10 | 76:3 77:15 | 181:18 191:13 | 192:14 |
| **knees** 123:20 | 182:14 186:1 | 78:20 79:3,10 | **ladders** 140:17 | **leaves** 49:10 |
| **know** 8:21 9:10 | 188:2 191:11 | 79:14,15,16,18 | 160:3 169:8,11 | **led** 157:9,11 |
| 9:13 12:9,14 | 192:17 | 80:3 81:1,3,5,6 | 178:12 | **Lee** 4:13,14 5:5 |
| 17:5 18:12 | **knowing** 92:17 | 82:7 87:14 | **laid** 59:2 | 5:7 6:22 7:1,5 |
| 22:18 24:9 | 134:5 | 88:5,6,10,11 | **lap** 176:13,14,16 | 42:12,17 43:1 |
| 25:21 27:7 | **knowledge** | 89:8,15,18,23 | **laps** 152:18,18 | 78:23 81:16,22 |
| 29:14 30:16 | 25:15 46:4 | 91:21 92:3,7 | 152:21,21 | 117:16,17 |
| 31:10 32:15,18 | 62:7 | 92:20 98:13,14 | **large** 2:8 6:3 | 164:17,21 |
| 32:23 33:17 | **knows** 113:16 | 99:3,5 100:8 | 20:11 51:19,21 | 165:5 166:2 |
| 35:8 36:7,21 | | 101:7 102:14 | 166:17 | 169:2 171:9 |
| 37:9,12,23 | **L** | 103:10,17 | **larger** 169:12 | 175:12 |
| 38:4 39:4 40:9 | **L** 2:1 | 108:14,15,16 | 170:6 172:15 | **left** 14:19 15:5 |
| 40:15 41:1 | **labeled** 77:1 | 108:18 109:2,5 | 175:2 | 65:8,14 66:8,9 |
| 43:23 44:7,8 | **lack** 41:5 126:18 | 109:10,18 | **Larry** 1:8 7:7 | 80:7,15 91:20 |
| 44:21 59:8,18 | 142:11,17 | 110:1 112:1,8 | 91:13 100:15 | 92:2 121:2 |
| 61:13 65:1 | 193:1 | 112:21 114:3 | **late** 33:5 191:22 | 137:2 151:9 |
| 66:5,10,21 | **ladder** 12:5 22:6 | 114:13,15,21 | **lateral** 69:1 | 152:1 |
| 71:14 73:12,21 | 25:16,18,22 | 114:23 115:1,6 | **latest** 36:18 | **left-hand** 47:13 |
| 75:20,21 78:21 | 26:6,10,13,15 | 115:8,12,18 | **laws** 2:17 34:18 | **leg** 70:22 |

legal 8:6
lend 136:20
length 95:8
let's 12:22 24:21
  34:10 35:11
  43:2 44:6
  47:10,11 67:4
  78:1,4 79:8
  97:9 98:3
  101:17 102:1
  109:13,14
  110:7 114:11
  115:17 121:12
  140:7 144:3
  154:15 188:17
level 30:9 150:6
lever 67:12
  68:12 103:19
  104:12,19
  108:2 159:4
  166:11,16
  187:18
levering 68:4
liability 163:3
license 15:22
lie 135:17
life 27:23 28:7
  114:10 180:1
lift 105:8
lifting 113:2
limit 103:20
  106:17 107:6
  107:10
limiting 188:13
limits 107:13
line 48:21,23
  49:4,6,7 50:23
  145:5
linear 116:20
lines 49:11
list 22:12,14
  24:2 192:11
litigation 29:5
  31:23 32:6,17

33:21 36:13
  100:22
little 15:11 19:3
  53:19 55:5
  56:1 58:7 68:6
  71:4 103:23
  104:2,4 108:3
  108:6 116:6
  152:8 178:4
  192:12
LLC 7:23 16:17
  20:21 21:13
load 93:6,13
  97:14 98:8,11
  98:19 100:3
  101:8,11 102:4
  105:10 108:3,3
  108:9,12 109:6
  109:11,14,15
  109:20 114:1
  116:10,15,23
  123:13 124:2,3
  139:8 140:1
  160:5 166:13
  166:22 167:6,7
  175:23 176:8
  176:19,23
  181:6,7,8,12
  187:16 188:5,5
  188:7 189:3,4
  189:7,18
  190:14
loading 99:1
  101:4 116:11
  136:14 159:21
  168:8,13
  172:20
loads 12:4 32:9
  32:14 93:21
  104:20 109:1
  137:7 151:1
  166:10 168:20
location 87:13
  88:18 183:17

locations 88:13
  89:14
long 18:5,8 19:7
  30:19 80:13
  94:13 103:18
  104:2,15,15
  107:23 108:2,7
  113:9 144:20
  159:4 166:11
  166:16 187:18
longer 106:10
  171:22 192:13
longest 109:10
look 24:21,23
  30:3,11 31:1
  34:4 43:2 47:3
  51:8 54:5,9,9
  56:6,17 63:9
  63:11 64:11
  71:1,2 76:16
  78:2 80:16
  88:9,11 105:12
  108:14,20
  140:7 141:1
  142:18,18,19
  142:19 149:12
  152:18 157:2
  162:2 178:18
  185:1,1
looked 12:3
  26:22 29:15
  30:5,17 31:17
  31:18,19 41:6
  41:22 46:18
  48:23 50:22
  51:4 52:1
  57:22 64:9
  66:12,19,20
  83:21,22 84:12
  84:13,21
  118:14,23
  119:19 120:2,3
  125:18,23
  127:18 136:3

183:10
looking 22:23
  24:10 29:11,21
  43:1,4,6,13
  46:17 59:8
  68:21 69:1
  73:22 74:8
  79:1,20 83:11
  89:5 106:5
  113:23 123:3
looks 42:11
  119:4 121:13
  122:12,14
  133:8 134:2
  141:2
loop 37:3 78:15
loose 68:20
  75:12
loosen 92:11
loosened 92:10
  137:1
looseness 137:9
  137:14
loosening
  135:15 136:10
  137:5,10
lose 169:16
  170:5,14
  174:20
lost 58:8
lot 17:11 18:4
  49:9 65:21
  108:2,9,12,13
  108:22 116:10
  116:17 123:15
  123:22 163:1
  166:1 167:10
  175:4 176:18
  189:12 190:6
lots 12:15
  183:10
loud 65:22
Louis 16:2
Louisiana 38:8

38:15,17,18
  39:1
low 166:9
lower 135:1
lunch 78:11,16
  81:20
lying 64:6,16
  66:15
L.J 158:1

**M**

maintain 107:22
  108:6
maintenance
  124:9,12,14
  179:13
man 144:9,10
managing 21:5
maneuver 115:3
manner 67:4
  147:2
manual 178:20
manufacture
  34:23 35:1,4,6
  35:8 44:4 47:1
  47:5,8,19
manufactured
  28:9,14,18
  32:17,23 33:12
  33:18 34:21
  36:13 37:6,16
  38:5,14 39:1,5
  40:3 41:10
  43:15,18,20
  44:15 45:20
  46:11,16,21
  49:19 50:14
  77:7,20 101:21
  121:1 122:16
  126:9,15 145:7
  145:8 160:12
  161:16 182:20
  182:21 190:5
manufacturer

# FREEDOM COURT REPORTING

61:6 77:10,22
131:7 137:22
151:10 152:2
180:11,18
185:3 189:17
189:23 190:3
190:13
**manufacturers**
40:8,15 131:4
161:17 180:19
180:21 190:2
**manufacturer's**
36:1,3 37:10
124:22 125:10
125:16,19
126:1,11
157:19,20
160:6 182:6,10
184:15,17
185:10,15
186:1 190:19
190:21 191:12
**manufacturing**
8:3 36:4 37:20
37:22 38:12,19
43:17 44:18,22
**March** 24:6
**mark** 23:3,13
38:10 52:13
76:17 90:7,8
**marked** 23:19
52:11,15,20
76:19 90:4
120:18
**marks** 40:12,14
40:19 48:15
63:22 76:1
136:4
**master's** 10:7
11:8,14
**match** 76:1
**matching** 63:20
**material** 10:8,10
11:9,12,15

12:18 14:11,14
17:20 106:23
148:19 149:3
155:21
**materials** 11:2
12:6 13:11,14
13:15,17 14:13
18:19 35:14
52:7
**mathematical**
93:22
**Matt** 91:14
**matter** 9:6,15
22:11 83:6
108:7 119:18
134:16 185:18
**matters** 80:12
**max** 115:10
**maximum** 116:5
**McLane** 1:23
2:6 6:1
**mean** 10:13
24:11 30:21
32:8 54:9
55:11,23 60:5
62:20 65:18,20
72:11 75:6
76:8 117:20,23
134:16 141:20
144:23 148:7
153:12 165:18
173:6,11
188:23
**means** 34:7
101:12 106:21
171:22
**meant** 172:1
**measurements**
32:10
**mechanical** 11:1
12:12,18 14:12
111:16
**mechanics** 12:4
103:22 174:17

**meet** 160:4,9,13
175:16 181:2
183:2 184:8
186:11
**meets** 181:13
**melding** 49:9
**melt** 86:12
**melted** 86:14
149:13,14,16
149:17
**member** 21:5
22:20
**members** 33:2
**mention** 61:8
68:15,17 91:16
**mentioned**
124:21 157:17
158:9
**metal** 49:10,13
65:18,21,21
77:16 79:4
82:18,18,19,22
82:23 83:5,11
83:13,15,16,19
85:6,6,11,12
85:14,16,18,20
86:1,10,12,13
86:16 87:3,4,6
87:8 88:21
107:1,6 120:8
134:20 135:3,4
149:1,1,7,8,12
149:13,14,15
149:17,17,20
149:20 150:14
150:14,15
151:3 152:8,17
152:18 153:14
153:15 157:4
192:4,6
**metallurgist**
82:10 162:19
**metallurgy** 12:5
118:20

**metals** 107:4,9
**meter** 19:3
**methane** 17:9,10
**methodology**
192:8
**methods** 181:12
**micron** 19:2
**microns** 19:1
**microscopic**
107:5 154:11
**mid** 33:13 37:16
**middle** 1:2
75:18
**midget** 141:19
141:20
**millionth** 19:2
**millionths** 19:4
19:4
**mind** 71:12 98:3
172:13
**mindful** 190:21
**mine** 106:14
167:15
**miniature** 18:20
**minimum**
115:17 160:8
190:4
**minute** 57:18
117:21,22
**minutes** 78:9,19
81:18 164:20
**missed** 93:18
**missing** 122:17
145:13 146:14
**Mississippi** 38:8
38:15
**modification**
50:13
**modifications**
40:17 43:14,21
44:2,14 137:17
137:23 138:9
138:18
**modified** 40:2

46:9 142:2
**moment** 46:18
76:8,9,13
169:17 170:4
174:18,18,20
**months** 19:12
**mortar** 13:13
**mounted** 71:19
95:22 120:14
121:10 122:6
**move** 75:12,14
108:23 109:3
**moved** 89:4 91:3
**movement**
103:17 136:13
137:8,13 167:4
**moves** 153:14
**moving** 101:12
110:10 111:21
114:16 166:15
172:21
**mud** 79:11
**multiple** 135:9
135:12 137:16
**multiply** 177:3

## N

**N** 2:1 4:1 5:1
**name** 7:2,4,20
15:11,12 16:6
16:6 20:19
128:9
**names** 30:10
**national** 37:23
**naturally** 137:13
**nature** 13:18
118:2 165:13
**navigate** 123:11
**necessarily** 66:6
74:13 153:17
**necessary** 2:20
101:15
**need** 69:20
78:19 148:17

negative 58:6
neither 141:22
  158:12
never 13:7 26:17
  27:3,18 31:7
  31:11 112:18
  128:11,17
  129:14,22
  131:6,9 162:17
  163:8
new 50:8 53:22
  70:2
nice 70:1
nine 77:11 79:1
nodding 191:10
non-factory
  137:16 139:2
normal 93:6,13
  166:19
North 7:19
NORTHERN
  1:3
Notary 2:7 6:2
note 24:15 91:16
notebook 23:13
  23:15
notes 40:17
  91:10
notice 15:11
  90:9
November 33:5
nucleus 125:14
nugget 154:17
  154:18
number 1:5 22:3
  23:4,19 25:5
  25:14 34:3
  52:8,11,15,20
  52:22 76:19
  79:10 109:15
  118:7 119:19
  120:21,22,22
  121:4 125:13
  140:8 151:6

154:14
numbers 33:23
  99:16
nut 152:15

**O**

O 2:1
object 18:7 40:5
  41:12 50:1
  54:23 55:22
  56:15 57:8
  58:4,23 59:23
  64:20 72:20
  75:5 124:11
  142:10 150:23
  171:9 182:4
objection 18:11
objections 2:21
  3:1
observation
  49:16 58:10
obvious 44:17
  87:18 133:4
Obviously 123:8
occasions 22:5
  29:7 46:1
occur 136:11,13
  167:2 171:6
occurred 56:11
  62:19,21 118:7
  133:7 134:5,7
  134:9,19 187:5
offered 3:3
offices 2:8 6:8
off-the-head
  188:11
Off-the-record
  19:19
Oh 80:2 139:10
okay 7:14 21:7
  22:16 71:3
  74:6 78:4
  79:19 80:2
  98:20 111:17

123:1 140:12
  143:17 149:10
  158:14
old 51:12 179:16
  179:21
once 20:13
  70:14 71:9
  85:11 133:8
  138:2 145:11
  147:15 184:23
  190:11
ones 90:5 131:18
  169:14 184:16
one-inch 108:21
Opelika 39:2
opened 95:5
opine 147:15
opinion 30:6
  41:21 49:17,19
  57:5,19,23
  67:2 88:14
  91:22 92:15,16
  101:6 103:15
  104:19 118:6,9
  118:12,21
  120:13 122:9
  122:13 134:11
  134:18 139:12
  139:13,23
  142:6 144:14
  145:3,5,16
  148:9 150:18
  155:2 161:8
  166:5 175:5
  177:10,17
  179:20 184:8
opinions 158:20
  158:20,22
  161:13 163:13
  164:14 165:5
opportunity
  185:1
opposed 32:9
  54:22 55:10

110:21 121:14
  123:6 132:13
  137:10
opposite 45:14
  48:22 60:3
  63:22 67:1,8
  68:19 69:8,13
  69:18 72:6,17
  73:14 74:3,10
  75:3 132:22
oral 6:12
oranges 111:2
  128:7
order 61:19
  68:20 69:21
  75:12 136:10
orientation 64:2
oriented 63:5
original 23:20
  36:21 43:18
  47:15,17,19
  48:2 52:12,21
  57:11 58:9
  76:20 77:10,22
  107:3,15,23
  108:6 120:19
  137:17,22
  138:1,23
originally 40:3
  43:15
originals 42:10
outer 70:23 71:6
outside 55:8,11
  154:16
outward 57:16
overall 60:20
overload 132:1
  132:4,11,12,17
overloaded
  151:6
owned 31:3,11
oxides 13:19,19

**P**

P 2:1 4:1,1 24:12
page 5:4,12
  73:18 76:16,21
  76:22 77:11
  79:1 81:23
  93:3,7
paint 38:12
  43:10 44:11
  47:15,17 48:2
  49:12 63:1,7
  63:11 89:5
  139:1
painted 47:16
  124:19
painting 40:20
  47:20 124:16
paints 40:13,14
paper 103:23
  104:4,6,15
  133:15
Park 4:7
PARSONS 4:14
part 19:20 44:22
  51:21 52:6
  58:14 83:20
  84:11 87:1
  93:18 95:12
  104:20 108:5
  123:20 126:4
  145:13 146:3
  148:21,22
  149:2 150:2
  170:11 185:14
  188:15
partial 132:21
partially 135:15
  155:22
particular 8:22
  8:23 10:19
  12:11 34:20
  37:19 39:14
  41:10 46:9,10
  46:15 47:9
  49:16 50:18

53:13 55:15,18 88:13 89:14 90:12 119:8 123:13 126:21 129:15,22 167:8

**parties** 2:3,23
**parts** 184:5
**part-time** 21:16 21:17
**pass-through** 57:14
**patent** 15:22
**people** 18:22 26:9 119:19 129:7 190:3
**percent** 8:9,11 20:2,16
**percentage** 8:7 8:16 20:11
**perfect** 117:21
**performed** 131:9
**period** 24:5 106:7 117:18 118:3,7,10
**permanent** 107:12 117:1
**perpendicular** 136:21
**person** 21:16 109:13,17 117:10 122:7 173:6
**personal** 38:20 49:15
**personally** 28:11 32:22
**perspective** 187:14
**photo** 80:17
**photograph** 52:14,23 66:14

68:22 76:23 155:14

**photographic** 60:4 62:11,13
**photographs** 41:23 42:14 43:2 52:2,16 53:4 59:9 64:3 64:6 66:12,18 69:2 140:14
**phrase** 118:4
**physical** 32:8 56:12 57:21 58:21 59:16 69:5,10 78:2 87:11 89:12 155:8,11
**physically** 72:3 72:8 73:15,23 74:4
**Ph.D** 1:16 2:5 6:11,16 10:10 11:19 12:23 13:1
**picking** 111:23
**picture** 63:2 71:1 76:22 77:14 79:2,5,5 80:4
**pictures** 42:6 59:13 119:21 120:21 153:8 154:13
**piece** 63:19 65:18 71:4 110:9 116:21 122:18
**pieces** 55:5 60:14 130:12
**place** 32:4 85:5 99:4,7,8 100:1 102:10,10,11 102:12,17 103:1,2 114:16

159:13,17,18 159:19,23,23 160:1,11 161:4 169:15 170:22 175:19

**placed** 47:14 49:4 88:2 168:2
**places** 12:20 17:10 88:20
**plaintiff** 1:9 8:17 24:13 26:18 52:17 53:1,5 59:10 66:13 69:3 90:16 91:1
**plaintiffs** 4:3 7:10 8:13 52:3
**plaintiff's** 8:19
**plan** 90:21 117:3 158:17,21
**plastic** 103:20 104:5,14,21 106:20,22 107:8,11,13,16 116:11 120:10 131:23 132:6 132:10 133:17 161:9 163:15 166:10 188:12 188:19
**plastically** 106:16
**plate** 149:16,18 152:5,5
**platform** 40:18 41:3,15,21 42:18 43:5,7 43:14 44:14 45:4,17 46:18 47:10,12,14 49:1 50:18 51:17,23 75:11 95:19,21 96:7

96:13,19 98:2 120:14,23 121:9,13,19,21 122:5,8 123:5 127:16 137:18 137:20 138:3 138:12,16 139:5,7,15 140:19 141:3,3 142:22 145:6 145:20 146:21 147:3,21 148:9 167:17 175:3 181:8

**platforms** 121:5
**play** 35:16 36:8 37:11 126:6 191:13,17
**playing** 29:19
**please** 3:5 7:2,17 10:2 45:12
**plug** 145:12
**plus** 62:10 158:9
**point** 16:1 44:19 48:9,13 49:2 59:3 64:1 68:7 81:17 86:6 87:23 89:23 95:11,15 104:14 107:14 109:4 123:18 129:14 133:22 158:17 159:2 162:8 169:20 170:9,17,19 173:12,13,19 173:22 174:2,3
**pointed** 47:22 50:4,6 58:15 88:1 138:6 142:4
**pointing** 57:12 58:12,19 140:10

**points** 54:21 56:19 57:16 59:21 89:3 102:16 130:10 135:10,12 136:6
**poor** 77:16 79:4 158:23 159:5 184:11 187:10 187:13,15
**pops** 146:8,8
**position** 13:2 14:4 57:11 61:18 88:1 95:6 106:2 107:3 121:22 138:13 162:1,6
**positioned** 87:13 88:15 89:13 140:13
**positions** 87:15 87:20 89:17
**possible** 72:3,9 73:23 74:4 107:23 124:20
**possibly** 29:3 69:20 136:12
**post-accident** 53:4 69:2 140:14
**post-manufact...** 40:23 41:2
**potentially** 88:22
**pottery** 13:16
**pound** 143:6 160:4
**pounds** 100:8,14 100:16 104:13 104:18 105:10 110:3,5,6,8,8 110:21 111:1,4 111:7 112:9,11 114:22 115:1,4

| | | | | |
|---|---|---|---|---|
| 115:5,15,21 | 119:4 151:16 | 15:19 19:9 | 93:21 | 164:20 165:4 |
| 116:5 144:12 | **probably** 20:16 | **promise** 70:5 | **puzzle** 145:14 | 169:3 175:13 |
| 144:22 163:21 | 22:4 29:13 | 113:8 | **P.E** 1:16 2:5 | **quick** 24:23 |
| 175:21,22,23 | 44:20 119:17 | **properties** | 6:11,16 | **quite** 18:22 |
| 176:9,14,17 | 137:7 182:17 | 149:21 150:9 | **p.m** 81:19,21 | 136:17 175:2 |
| 177:2,6,11,14 | **problem** 183:18 | **Protective** 4:15 | 164:22 165:1 | 179:4 |
| 177:19,21 | **problems** | **protrude** 140:19 | 193:12 | **quote** 93:4 |
| 181:7 187:21 | 104:22 | **protrudes** | | |
| 188:20,20,21 | **procedure** 6:6 | 121:20 140:21 | **Q** | **R** |
| 189:3,4,7,11 | 130:8 185:23 | **protruding** | **qualified** 27:19 | **R** 4:1,4 |
| 189:13,14,17 | 191:3 192:8,22 | 123:5 | **qualifying** 192:9 | **racket** 56:18 |
| **practice** 92:4,8 | 192:23 193:2 | **provided** 6:5 | 192:9 | 65:3,4 |
| 92:14 178:11 | **procedures** | **providing** 27:10 | **quality** 18:21 | **radiating** 139:1 |
| **Prattville** 33:4 | 185:21 | **Public** 2:7 6:2 | 19:8 182:12 | **rail** 41:5,9,13 |
| **precise** 139:19 | **proceeded** 10:9 | **pull** 61:19 67:7 | 185:2,16 | 45:4,10,17 |
| **preface** 35:7 | **proceedings** | 67:11,23 70:15 | 186:22 | 122:7,19 |
| **presence** 160:16 | 6:13 | 74:9,16 168:4 | **Quantitative** | 124:20 131:22 |
| **present** 85:14 | **process** 47:20 | 176:22 | 51:22 | 132:9 138:7 |
| 117:3 | 83:14 149:23 | **pulled** 70:19 | **quarrel** 34:15 | 141:5 143:7 |
| **president** 21:4 | 150:9 192:6 | 72:13 172:3 | **quarter** 116:18 | 146:19 |
| 33:10 | **produced** 52:2 | **pulling** 67:13 | **quarters** 116:12 | **railing** 41:20 |
| **pressing** 110:23 | 52:16,23 53:4 | 75:16,17 | **question** 7:14 | **rails** 108:17 |
| 136:20 | 59:9 64:4 | **purchased** 33:4 | 18:7 19:1,21 | 131:15 138:10 |
| **pressure** 17:14 | **product** 18:18 | **purposes** 32:14 | 22:17 32:3 | 140:22 181:18 |
| 175:23 | 34:9 43:18 | 161:20 | 40:6 43:19 | **range** 8:11 97:2 |
| **pretty** 36:11 | 44:15 77:20 | **pursuant** 102:22 | 46:1 50:10 | 164:12 |
| 42:13 125:14 | 163:2,3 165:14 | **pushing** 75:6,13 | 53:21,22 54:6 | **rate** 18:13 |
| 130:21 162:16 | 165:19 181:19 | **put** 18:14 38:14 | 54:8 55:2 60:5 | **rating** 181:6,7 |
| 164:10,11 | 182:1 184:21 | 51:2,11 55:3 | 67:10 69:11 | **Raymond** 1:16 |
| 187:1 | 186:5,6 190:4 | 58:11 60:14 | 73:2 77:17 | 2:5 6:10,16 7:3 |
| **preventative** | **products** 40:9 | 70:16 94:18 | 78:16 84:9 | **reach** 103:20 |
| 124:9,12,14 | 179:22 190:23 | 97:22 98:23 | 93:8 100:17 | **reactor** 17:14,20 |
| **prevented** | **professor** 13:4 | 105:9,20 | 118:18 119:13 | **read** 31:20 |
| 138:19 | 14:1,2,6,7,8,20 | 111:14 112:12 | 122:14 123:2 | 32:18 33:1 |
| **prevents** 101:3 | 14:21 | 112:21 113:11 | 129:19,21 | 72:22 158:14 |
| **previous** 132:21 | **profile** 153:10 | 113:15,20 | 135:11 146:23 | 185:13,14,23 |
| **principles** 12:2 | 153:12 | 114:7 115:5 | 151:19 160:15 | 193:7,9 |
| 116:15 | **profiles** 153:9 | 122:17 127:5 | 167:14 169:4 | **reading** 2:14 |
| **prior** 3:3 35:20 | **program** 182:13 | 142:20 144:10 | 170:1 176:21 | **reads** 11:14 |
| 36:14 37:7 | **project** 15:20,23 | 148:1 150:7 | 178:16 183:16 | **ready** 78:12 |
| 43:22 57:22 | 19:11 | 159:5 162:18 | 187:12 | **real** 18:9 19:21 |
| 119:12,12,14 | **projected** 55:8 | 167:20 174:13 | **questions** 2:22 | 20:5 65:22 |
| 178:6 179:8 | **projection** 139:5 | 181:7 186:8 | 2:23 7:11 | 106:22 192:17 |
| **probability** | **projects** 15:18 | **putting** 49:9 | 29:20 48:3 | **realistic** 114:11 |

# FREEDOM COURT REPORTING

**really** 74:12
122:9,11 129:5
133:23 134:4
145:3 160:15
**reason** 29:16
30:18 55:2
69:5,10,12,17
70:7,18,20
136:1,8 176:10
**reasonable**
179:7
**reasons** 70:21
149:23 183:21
**recall** 62:5
120:15 141:10
**receive** 11:5,20
124:8
**received** 10:7
12:23 13:1
106:6
**recess** 42:22
81:20 164:23
**recollect** 27:21
**recollection** 27:6
27:14 28:16
38:22 39:6
**reconstruct**
163:1
**reconstruction**
162:15 163:7
**reconstructio...**
162:23
**record** 19:18
78:22 112:17
152:15
**rectangular**
51:16
**reduces** 99:1
150:2 159:10
**refer** 129:8
**reference** 41:17
82:1
**referring** 26:3
**refers** 26:14

**reflected** 126:3
**regard** 37:11
168:9,19 169:6
**regime** 163:19
**regular** 170:7
**regulation** 182:2
182:22 186:17
190:12
**regulations**
34:18 35:9
36:6
**related** 172:16
**relating** 2:18
**relative** 63:5
93:16,23
182:23 185:4
187:17
**relatively** 166:9
**released** 65:23
**remain** 183:13
**remark** 147:6
**remember** 24:19
25:17 26:23
30:2 39:8 48:6
50:15,23 61:22
73:9
**remnants** 86:9
**remove** 69:8
91:8 105:1
**removed** 104:21
**repeat** 99:20
135:11
**repeated** 106:6
135:15 150:19
157:8 161:10
163:14,18
**rephrase** 45:11
53:18 129:4
**replaced** 36:20
36:22
**report** 31:18,20
32:1,4 39:12
39:19 41:17
50:5 76:17,23

77:12 79:1
81:23 86:21
90:10,17 93:3
93:8 157:18
**Reporter** 1:22
3:7 6:20
**reports** 42:8
158:1,13,14
**represent** 7:6
**request** 23:6
**require** 19:10,12
22:13 185:19
**requirement**
182:11 185:17
186:22 191:1
**requires** 123:15
163:20 185:11
**research** 8:4
9:11 15:20
126:6
**researched**
36:23
**respect** 94:20
100:10 114:4,6
187:15 191:13
**respective** 2:4
**rest** 124:20
138:10 145:9
145:10 146:6,7
176:16 177:1
**restate** 173:17
**restrict** 139:17
**restricts** 139:6
139:14
**result** 161:9
173:3
**resume** 23:1,23
**retain** 142:12
**retained** 3:6
**retract** 95:4
**returns** 107:14
**reveal** 93:4
**revealed** 179:9
**reversed** 121:14

138:13
**review** 91:12,12
**reviewed** 39:11
39:15,22 91:7
157:13,16,23
158:3
**re-ask** 7:14
**re-assemble**
53:15 54:4,18
59:18
**re-looked** 39:23
41:7
**right** 12:21
14:22 17:17,19
20:7 23:12,22
23:23 24:3,14
26:16 34:10
35:15 38:3,9
42:20 43:9
45:1 51:6 54:7
56:6 58:11
60:18 63:17
65:8,15 66:8
66:10 67:17,23
73:12,18 78:23
80:7,15,21,23
86:18 88:9
90:9 94:2 95:7
95:10,14 96:15
98:15 101:17
102:3 103:2,6
103:12 104:11
109:4 111:10
112:10 113:16
115:16 117:23
120:20 121:2,8
121:18 123:17
133:13,14
134:10 136:7
144:2,6,7
145:4 147:8,9
147:10 148:2
149:13 150:13
151:15 154:18

154:20,21
155:2 169:9
170:11 174:5
177:9
**right-hand**
48:21
**rigidity** 116:19
**ring** 40:10
**rocket** 65:17
**room** 17:14
113:6
**rope** 74:14
**rotate** 105:15
106:1
**rotating** 135:16
**rotation** 99:9
**roundabout**
151:22
**route** 144:15
**rubber** 107:2
**rule** 38:11 182:2
182:21 186:17
190:12
**rules** 2:17 6:5
20:18 34:17
**run** 15:5 33:23
166:12
**rung** 63:14,14
63:16 74:15
77:15 79:3,20
79:21,23 80:2
81:1 87:15,19
88:3,5,10,11
88:14,22 89:8
89:18,22 94:19
97:15,15,17,23
98:12 103:11
109:15,15,18
111:5 114:15
115:12 134:13
134:15 135:10
135:13 136:4
139:6 152:9,10
164:4

# FREEDOM COURT REPORTING

**rungs** 68:3
74:15 87:17
88:3 136:2
**running** 155:1
**rust** 63:17,19,22
76:1 156:6,8,9
156:11 179:12
179:12
**rusted** 105:21
**rusty** 18:7 31:19
62:8 80:20
113:8 173:17
175:14 179:10
180:23
**Rusty's** 176:5

**S**

**S** 2:1,1 4:1
**safety** 60:20
128:15 160:2
162:11,12
**saith** 164:18
193:13
**sake** 101:23
**saw** 102:20
**saying** 35:8 39:9
51:9 58:5 98:7
99:21 110:18
111:8 145:2
181:20
**says** 24:10 79:2
110:23
**scenario** 74:7
114:17 116:7
135:22
**scene** 54:15 64:5
69:4
**schedule** 130:8
**schedules** 9:3
**school** 10:3
12:16
**science** 10:8,10
11:9,13,15
12:19 14:11,14

**scoot** 114:2
**seal** 18:19
**seat** 137:18,20
139:7,15,19
140:6 142:22
**second** 19:20
61:11 62:15
63:4,14,16
66:23 69:1,6
70:11 72:3,12
72:16,18 74:1
74:22 75:23
76:3 79:16
81:1 82:7
87:14 88:6
89:23 91:12
93:18 114:13
117:10 131:14
132:23 174:17
**seconds** 118:15
118:23 178:22
**section** 61:11
62:15 63:5,17
66:23 68:23
69:1,6,9 70:7
70:11,13 72:4
72:16,18 74:1
74:22 75:23
76:3 78:21
79:14,15,16,18
80:3 81:1,4,5,6
82:7 87:14
88:6 89:15
90:1 91:21
102:16 112:10
114:13,23
115:1,8 116:3
127:6 131:14
132:23 135:17
137:18 138:7
**sections** 55:6
78:20 127:3,14
140:17,20
159:10

**see** 24:21 34:10
38:7 40:1 41:8
43:10 45:17
47:10,11,23
48:4,10,12,14
48:21 49:3,12
49:12 57:10
58:22 67:4
68:22 69:4,9
69:12,17,19
71:14,20 73:14
74:12 78:4
79:8 85:1,9,11
86:7,8,9 87:11
88:16,20 89:1
89:8,21 90:5
95:5 102:21
104:22 107:16
110:18 115:22
116:5 119:10
119:18 120:2
121:6,8,12,17
121:18 122:3
124:18 132:15
132:20 133:12
133:12,20,23
134:17 136:23
143:14,17
145:7 146:21
148:11 149:4,5
149:9,15
150:10,15,15
152:5,6,13,17
152:20 154:7
154:10,12,15
154:18 155:5
155:14 161:5
167:23 179:2,5
179:6,11,19
**seeing** 50:15
**seen** 9:9 33:6,9
33:13,15 42:8
45:8 61:23
62:3 64:4,5,10

64:11 66:13
68:8 90:14
96:2,4 124:13
145:15,17
146:1 161:2
169:10,11,14
179:1 184:3,5
184:7 191:3,7
**selling** 44:4,19
44:21
**seminars** 128:14
128:18
**sense** 7:12 99:18
114:19 142:9
**sent** 31:19 39:2
42:13
**separate** 84:10
89:9 146:20,20
**separating**
128:3
**seriously** 142:19
**served** 26:17
**service** 93:7,13
**set** 36:6 42:4
79:10 104:5
125:12 135:22
**sets** 184:19
**seven** 25:9 81:23
**shape** 77:17
79:4 104:1
107:12,23
108:6 152:3
153:13,16,18
159:6 170:6,7
183:1,4,5,6,13
183:20,21
186:13,14
192:2,19,21,22
193:1,4,5
**sheet** 24:19
**ship** 50:20 51:3
51:20
**shipped** 138:20
**shoot** 65:17

**shooting** 41:5,9
41:13 45:3,10
45:17 66:3
122:19 128:4,5
138:10 141:5
143:7 145:20
146:6,7,19
**Short** 42:22
164:23
**shoving** 113:3
**show** 59:13 63:2
78:1,2 102:13
119:22 120:20
149:3,8 152:11
154:13 155:14
155:20
**showed** 42:5
145:19 146:5
**showing** 62:14
66:14 71:21
**shown** 146:4
**shows** 17:1 60:4
63:18,19
120:23 155:19
**side** 8:19 47:13
48:19,20,22
60:15 63:1,22
65:14 71:6
75:9 80:7,8
131:22 132:9
138:9 149:15
151:18 152:20
155:4,9,10
**sides** 119:23
155:9
**sign** 193:8,10
**signature** 2:13
**significant**
105:9 149:20
159:11
**significantly**
97:1 172:14
**similar** 83:23
84:6,15 164:2

# FREEDOM COURT REPORTING

167:16,19
simple 71:12,13
  106:23 123:2
  146:22
simply 62:8
  68:23 69:8
  92:9 108:10
  115:8 116:3
  146:7 169:20
singing 73:17
sir 7:2,15,17
  8:14 9:8 10:2
  10:15,16 11:10
  15:11 21:21
  22:8 23:2,11
  28:1,8,11,20
  28:23 29:6
  31:2,5,16 32:2
  33:7,15 34:16
  38:3 52:8,18
  53:2,7,11
  62:19 70:4,9
  71:22 76:21
  77:13 80:6
  87:22 105:18
  120:16 121:16
  131:20 163:12
  171:14 189:21
Sisk 158:1,10
sit 17:23 27:13
  37:4,17 113:9
  142:21 145:11
  176:13 178:15
  186:3,4,20
site 87:7
sits 50:18 51:10
  74:8
sitting 9:10,12
  115:20
situation 115:23
  163:22 167:12
  182:15
situations
  166:12

six 29:3,7 30:22
  46:1
size 51:22
sized 51:17
  175:1
skinnier 144:17
slap 114:8
slides 70:6
slow 19:5,5
small 22:3
  103:19
smaller 116:17
  169:21
smarter 18:4
smiling 113:16
  113:18
Smith 158:1,11
smooth 153:2
society 35:13
  130:20 153:6
  185:19 186:10
  186:12
Society's 183:2
sockets 98:23
sold 40:3 41:11
  43:15,20,22
  44:15 50:14
somebody 111:6
someplace
  133:21
somewhat 97:18
soot 20:4,5
sorry 120:22
  175:21
sounds 58:5
  144:7
source 50:11
South 4:16
so's 162:2
spaced 88:20
speak 143:22
specialize 10:19
specializing 10:8
  11:12

specialty 11:15
specific 48:7
  91:16 132:2
  139:18 149:10
  162:16
specifically
  25:17 26:3
  38:1 78:5 84:4
  100:23 131:17
  138:5 146:12
  190:8
specifications
  35:2
speculate 191:20
speculation
  187:8
spent 175:4
splatter 40:19
spoke 165:6
spread 24:19
spreading
  152:19
spring 109:23
  163:5
square 71:5
  98:18,18
  108:21 116:20
  138:11 169:11
  169:15,16
  172:15,15
  174:16,21
  175:1
squeeze 17:4
  143:5 144:3
St 16:1
stability 60:20
  100:2 101:8
  175:2
stable 99:10
  160:2 170:15
stage 155:7
stand 22:6,7
  25:16,18,19,20
  25:22,23 26:4

26:6,11,13,19
27:5,16,20,23
28:3,4,4,5,7,10
28:10,10,15,19
28:22 29:4,9
29:12,12 30:3
30:12,13,13
31:4,8,12,22
32:5,13,16,23
33:3,12,17,20
33:22 34:6,7
34:11,14,20
35:12 36:1,3
36:12 37:10,11
37:15,19 38:4
40:1,2 41:8,10
42:5 45:23
46:3,9,10,15
48:11,12,14
49:16,18 50:13
50:17 52:3
53:5,9,14,15
54:4,10,18,19
55:16,18 56:4
57:23 58:9
60:3,11,12,21
60:22 61:4,16
67:1 71:20,23
72:7 73:22
74:7 75:4 77:2
77:7 86:23
90:12,19 93:7
93:13 94:7,11
96:18 99:22
100:1,8 101:2
101:7,20 104:3
105:8 111:20
113:12,15
114:5 121:9,19
122:6,8 123:3
123:6,14 124:8
124:21 125:10
125:16,18,23
126:11,14,21

127:7 128:1,9
128:9,9 131:6
131:7 137:18
138:1,18,19
139:9 140:2,9
141:23 145:11
146:15,18,20
146:23 148:12
160:11,19
161:15 162:2,3
162:4 163:9,10
163:11 166:7
166:20 167:8
167:16,17,20
168:1 170:9,12
175:14 178:6
178:18,22
179:8,15,17
180:5,18,21
182:5,19
184:14,17
185:3,10,15
189:17,19
190:15 191:11
standard 35:19
  50:19 181:4,13
  181:19 182:2,7
  182:22 185:4,8
  185:14,16
  186:6,17,23
  189:15,20
  190:7,12,17
  191:15 192:7
standards 34:18
  35:23 36:8,15
  36:19 37:5,10
  37:18 38:1
  125:2,4,7,9,13
  125:15,15,17
  125:19,21
  126:1,3,5,8,16
  157:21 160:6,7
  160:8,13
  175:16,17

# FREEDOM COURT REPORTING

213

181:3,6 182:6
184:9,13,15,20
184:22 189:22
190:3,18
191:12,18,23
192:1
standing 71:15
72:9 74:5
75:16 109:17
109:21 147:18
standpoint
112:20 113:23
151:4 165:8
170:12,13
171:21 172:6
173:13,21
174:12 182:14
187:1
stands 26:9,12
26:22,23 29:13
29:15,22 30:17
31:15 34:6
35:2 36:5,9
37:6 38:2,23
39:5 50:21
83:22 113:7
122:11 126:9
128:19,19
161:16 178:12
179:19 180:4
184:13 191:13
start 12:22
104:13,17
154:15 159:3
188:14
started 9:2,20
14:7,8 15:1,7
15:19,21 22:21
61:8 118:16
119:1 178:23
189:12
starting 119:14
state 2:7 6:3
38:4 93:4

statement 68:13
statements
61:23 68:8
STATES 1:1
static 101:10,11
102:3,3 110:21
159:21 160:5
175:23 181:8
181:12
statistics 99:18
status 138:16
steel 49:1 116:21
138:11 150:2
174:10
step 57:2 122:7
123:5,7 147:19
148:2 169:20
174:1
Stephens 1:8 7:8
32:19 33:2
91:13,14,14
97:20 100:12
100:15 118:15
118:23 119:14
141:9,21
143:23 158:8
171:19 178:23
stepping 109:22
147:21
steps 147:16
step-down
174:10
stick 55:5
127:13 131:3
140:8
sticking 103:19
123:8 127:2
stiffness 108:18
169:17
STIPULATED
2:2,12,19
stipulations 6:6
6:21
stop 86:19

stopping 81:17
straight 69:7
70:2 71:10
74:3 106:10
straighten 69:21
70:17 74:9
75:1
straightened
56:4 61:11
strand 131:10
strap 74:14,19
103:19 116:21
152:4,6,7,8
154:14,17
155:21,22
159:1,2 168:5
strapping 65:2,3
straps 65:4
strength 92:6,17
98:19 99:1
100:2 101:7
104:10 107:9
150:2,6,8
151:3 159:11
172:14,16
174:11,23
188:12,14,16
190:14
stress 110:15
153:3 156:20
156:23 168:14
188:19 189:18
stresses 166:17
192:5
stretch 107:1,4,5
162:9
stretched 106:17
stretching 107:5
strictly 16:14
strong 115:2
188:18
Strongbuilt 1:11
7:6 31:11
33:11 45:3,15

46:2 77:8,20
92:22 104:23
121:1 146:7,15
190:22
stronger 170:2
strongly 13:13
47:18
structural 150:1
153:7,11
170:12 183:3
186:12
structurally
83:12
structure 17:22
20:1,8,9 107:7
structured 20:7
stuck 61:17
92:12
student 16:23
17:2
students 165:12
studied 125:23
studies 93:10
study 93:4 129:6
stuff 18:21
19:15,17 44:3
69:23
subject 29:5
31:22 32:5,16
33:21 36:12
100:22
submitted
158:13
subsequent 47:4
47:7 48:1,15
49:22 50:12,13
subspecialties
12:14
subspecialty
12:9,10
substandard
183:13
substantially
83:23 84:6,14

164:2
substantiate
84:11
successful 15:23
19:11
sufficient 67:20
98:19 100:2
101:7
suggest 99:12
119:16
suggested 73:2
suggesting
182:19 184:20
186:5,16
suggests 47:18
62:12 63:4
64:1
Suite 4:8
support 84:1
supported
138:10
supporting 93:5
93:12
supposed 153:1
166:21
sure 16:20 22:2
34:8 35:7,20
42:12,13 70:15
78:10 93:10
99:20 117:9
129:5 164:10
164:11 165:4
180:10 183:10
187:1 191:19
surely 147:20
surface 18:14,16
189:16
surrounding
85:6
surrounds 83:17
Susan 1:23 2:6
6:1
susceptible
161:4

# FREEDOM COURT REPORTING

214

suspect 136:1,9
sworn 6:17

___

**T**

T 2:1,1
tab 23:22 52:8
  103:3,4 154:13
tabbed 23:5,7
take 17:4,9,11
  17:13 18:5,8
  23:7 24:23
  43:20 51:8,19
  56:23 58:10
  59:16 63:10
  66:22 67:7,15
  68:2,5,14,23
  69:15,16,23
  72:3 73:4,10
  74:1 78:8,10
  78:11,16,18
  81:17 82:14
  91:11 94:11
  103:22 104:3
  104:20 116:23
  128:17 133:15
  163:15,18
  164:5,20 172:1
  173:9 189:12
taken 2:6 39:20
  61:17 69:3
  72:18,19 73:1
  73:6 94:6
  103:16 158:4,7
takes 19:7 104:5
  104:12 116:16
  166:9 187:16
  188:3,7 189:13
talk 82:21 83:9,9
  100:19 101:1
  117:5 163:18
  163:20
talked 83:6
  93:21 148:13
  166:1 167:10

182:23 186:21
talking 11:23
  34:8 40:16
  44:2 62:6
  80:23 84:5,7
  90:6 100:20
  101:1 110:9,12
  110:14,20
  111:2 113:22
  118:10 121:6
  124:15,16
  126:23 128:4,6
  130:4 131:15
  131:17,22
  133:1 136:2,5
  137:19 138:2,5
  144:4 151:10
  152:12 153:22
  153:22 154:4
  163:22 165:17
  167:2,3 168:9
  169:19 171:10
  171:18,20
  175:4 191:5,16
  192:16,18
tall 141:8 143:19
  144:11
taller 141:12,13
  147:11
taught 13:20
  14:10
teach 14:9
  111:15
team 165:12
tearing 66:2
  157:1
technical 13:15
  106:15
technically
  26:10 83:9,17
  85:7
technique 40:19
techniques
  44:12

technology
  16:14 17:1
tell 7:2,13 10:1
  12:21 15:14
  18:2 22:22
  29:7,19,20
  30:10,15 47:5
  61:13,20 70:10
  71:11 72:2
  80:19 82:9
  86:8,18 88:12
  94:4 95:16
  101:18 103:12
  105:7 109:20
  113:5,8,11,13
  133:6,11 140:7
  158:19 167:12
  189:16
telling 9:14
  96:11 181:15
tells 24:15 25:2
  47:6 62:18
telltale 38:10
  40:12
temperature
  17:15
temperatures
  17:6
ten 112:11
  114:21 115:1
  118:15,23
  164:12 178:22
tend 40:21
tens 163:20,22
  164:9,10
tensile 188:13
  188:16
term 25:22 41:5
  51:22 111:3
  154:3
terms 9:7 12:8
  13:6 36:8
  41:19 90:7
  92:22 95:17

103:21 105:22
  106:15 107:10
  126:8 127:6,15
  155:12 163:3
  165:18 174:14
  182:5 183:1
  184:19 188:22
  189:1 190:20
  193:3
test 190:4
tested 181:5
  190:23 191:1,5
testified 6:18
  21:23 22:6
  24:16 27:3
  31:7 33:3,11
  38:23 72:21
  73:4 76:2
  166:18
testify 158:21
testifying 27:15
  113:19
testimony 1:15
  22:1,10 27:12
  33:1,9,16
  35:15 38:20
  41:7 48:5 62:4
  68:8 72:14,22
  91:6,19 92:1
  96:2,4,7 97:19
  99:19,21 100:5
  100:7 113:20
  125:22 129:9
  160:10 173:1
  175:15 185:5
testing 31:14,21
  32:5,7,8,14
  35:13 93:15,20
  93:22 191:3,8
tests 93:11 94:1
  98:5,8
Thank 38:18
thereto 3:4
thin 157:3

thing 22:22
  39:14 43:2
  51:10 60:1,2,6
  106:1 108:1
  111:14 114:8
  122:12 152:20
  163:5
things 13:10,16
  18:19 19:8,14
  24:9 27:7
  32:10 39:11
  40:10,12,15,20
  47:21 57:14
  69:23 71:9
  105:9 107:9
  111:15,20
  139:11 142:5
  145:18 162:20
  167:11 172:12
  178:12 192:2
think 11:2,13
  13:17 14:7
  22:8 25:10
  26:10 29:12
  30:20,23 31:6
  31:10 34:5,22
  36:3 38:21,22
  39:2 42:15
  43:21 44:17,22
  47:22 54:5
  60:8 66:3
  74:16,18,20
  80:12 82:16
  87:18,22 92:18
  93:9 100:14
  108:15 111:17
  111:18 112:8
  116:16,18
  119:3 134:1,6
  137:4 139:20
  142:3 155:16
  165:13 166:12
  169:23 170:20
  171:4 178:17

# FREEDOM COURT REPORTING

178:18 179:5
179:11,15
187:9
**thinking** 119:7
143:4
**thins** 157:4
**third** 70:6,13
79:18 81:5,6
88:3,5 90:1
**Thompson** 1:16
2:5 6:11,16 7:3
7:4 18:2 21:22
46:13 47:3
54:17 67:20
81:22 91:1
105:14 157:14
164:17 165:3
183:12
**thought** 118:17
148:16,19
180:9
**thousands** 99:13
99:14 163:21
163:23 164:9,9
164:11
**three** 19:3,4
21:15 60:8
89:10 115:4,21
116:12 140:17
158:8
**three-quarter**
134:21 159:2
**throw** 74:14
**TIDMORE** 2:8
4:6 6:8
**tight** 113:4
144:12
**time** 3:2,2 9:3
15:6,10 19:7
20:17 31:23
35:4,6 36:14
36:16 37:20,22
39:3 43:14,22
47:5,7 49:8

54:13 55:21
56:14 57:7,22
58:2 60:10
61:4 62:20
64:18,23 76:4
76:5,7 89:23
104:15 106:7
117:4,4,14,18
118:3,7,10
133:23 134:3
140:13 151:9
152:1 161:7
167:7 175:4
182:19,20
192:13
**times** 21:22 22:4
22:9 29:1 60:9
70:15 99:14
104:6 133:6
151:7 163:19
**title** 13:23
**today** 7:11 15:13
18:3 21:9
23:16 25:22
26:1 27:13
37:4,17 54:18
106:19 126:9
160:7,9,13
165:6 167:6,11
175:17 179:2
181:3 184:12
184:14 186:3,4
186:7 192:20
**today's** 185:2
**told** 31:6 56:3
61:9,15 62:8
72:15,23 73:4
73:7 98:4
125:11 138:17
167:21 175:17
175:22 184:12
192:20
**tone** 51:3
**tools** 18:19

**top** 47:15 63:12
75:14 80:20
85:1,9,12,19
85:22,23 97:21
97:21,22,23
109:9,9 124:6
138:7 139:6
141:4 142:21
143:6,16 147:2
148:1 152:16
167:17
**topmost** 79:21
**total** 22:18
**town** 10:4
**training** 49:14
118:20
**transcript** 23:20
52:12,21 76:20
120:19
**transition** 153:2
**transport** 93:1
103:17 105:2
135:18 137:3,8
150:22
**transported**
91:4,18,22
92:13
**trauma** 106:6,12
**tree** 22:7 25:19
25:20,23 26:9
26:12,22 27:5
27:16,20 28:3
28:10,14,19,22
29:9,12 30:3
30:13 31:4,8
31:12,15 32:13
32:23 36:1,3
37:9 38:1 42:4
45:23 46:3
52:3 53:6,10
53:14,17 54:4
54:9,20,21,22
55:12,13,20
56:4,20 57:12

58:15,16,20
59:3,7,11,12
59:14,20,22
60:3,11,12,17
63:6 64:17
65:10,12 66:7
66:11 71:15,17
71:18,19 72:1
72:8,9 73:22
74:2,5,7,11,13
74:23 75:4
77:2 91:3 93:6
93:13 94:7
95:13,19 101:2
105:3,8 108:10
108:11 110:10
111:6,20,21
112:2,16,23
113:1,3,4,7,11
113:12,14,15
114:3,5,9
121:22 122:11
124:21 125:9
125:16,18,23
126:9,11 128:1
128:9,18 131:6
131:10 134:7
136:16,19,21
137:18 140:11
145:11 157:19
162:3 163:9,10
166:20 167:19
168:1,3,4,5
176:7 178:6,12
178:18 179:19
180:18,21
182:5 184:13
184:14,17
185:3,10,15
189:16,19
190:15 191:11
**trial** 3:2 21:23
22:2 24:16
25:3,13

**tried** 54:4 69:23
74:23 105:22
108:8 176:12
**trip** 139:7,22
**trouble** 42:17
104:17
**truck** 91:4 92:13
**true** 21:6 29:17
29:18 31:13
40:11 55:14
58:20 62:12,17
62:23 90:19,20
90:22 116:7
127:17 137:4
183:22 184:2
**trusting** 178:13
**truth** 75:19
**try** 133:19
165:13
**trying** 13:17
**tube** 71:4,5,7
82:18,20 86:4
86:7,8,9,13,14
86:15,16
116:12,12,18
116:19,19
134:12,15,21
150:5,6,7,10
150:14,16
159:3,9 169:12
169:15,16,21
170:7 174:19
174:23 187:16
187:19
**tubes** 98:22
138:12 169:11
**tubing** 98:18,18
98:21 108:21
172:15,15
174:16,16,21
175:1
**tubular** 49:1
174:10
**turn** 77:11 80:9

turns 17:8 20:15
104:18 163:6
twice 188:17,18
188:18
two 16:12 19:1
19:12 20:17,19
20:23 43:10
48:3 55:6
74:15 78:20
88:3,22 89:1,9
99:2 108:17
120:21 121:4
126:10 130:10
130:12 142:1
143:1,3 145:23
159:12 172:12
174:13 184:19
two-part 43:19
type 10:14 11:22
17:5 19:17
26:3,14 28:6
50:20 90:8
93:22 102:6
124:9 128:8,18
130:17 155:3
160:2 163:6,21
164:12 168:13
178:11 187:17
typical 149:22
typically 188:17

**U**

U 2:1
UAB 10:8,17
11:6 14:16
15:5,22
Uh-huh 143:9
ultimate 188:13
188:16
unacceptable
153:8,10
unbuckle 56:5
undercut 151:14
151:14 152:4

undercuts 77:16
79:3
underneath
143:6
understand 7:13
26:5 27:11
34:10 69:11
71:12 72:11
99:20 172:23
192:15
understanding
23:14 26:11
65:5 90:23
125:3,6,8,11
126:18,19,22
127:4,12,13,17
185:9
understood
182:9
undisputed 45:7
45:14
UNITED 1:1
university 10:4
10:9 13:2 14:5
22:20
unsafe 159:22
unstable 99:3,5
102:14,16
159:14,20,22
172:4 173:10
unusual 44:5
upper 135:1
upside 80:1
use 25:21 26:2
56:18 68:14
100:19,21
106:13 109:14
118:3 122:11
142:8 150:7
151:6 154:3
159:8 171:22
172:18 178:7
185:6 192:4
user 165:22

178:5
uses 118:8
Usual 6:20
usually 8:10
189:22

**V**

value 58:11,18
58:20
Vanderbilt 10:9
varies 8:9
versions 36:18
versus 8:17
25:23 146:13
174:11
vertical 110:15
138:11
vertically 70:17
vicinity 65:9
video 41:22 42:1
42:14 145:17
146:3,4,5
violate 187:2
violated 182:1
182:16,21
184:21 186:6
violates 186:16
violation 182:8
185:7 186:2
visible 179:4
Vista 7:22 15:2
15:5,16,17
16:7,13,15,16
20:20,22 21:12
voluntary
157:21
vs 1:10

**W**

waive 193:8
waived 2:15
walked 168:4
walking 108:12
wall 71:7 140:10
140:11

wallowed 106:9
Wal-Mart 33:4
want 18:12 21:7
23:6,7 34:8
54:1 67:17
71:14 72:23
73:21 78:10,13
81:17 88:11
93:9 106:1,13
106:18,20
110:19 113:20
114:10 118:4
140:10 141:1
142:8,14,16,17
146:6,17 149:5
165:4 180:9
193:7
wanted 16:4,5
167:23
wants 18:8
warnings 90:18
wasn't 16:2 30:7
38:13 65:1,5
151:19
watching 19:6
167:20
way 11:13 17:7
17:8 20:6
45:19 46:20
51:10,14 59:1
60:9,10,22
68:16 72:10
74:2,5,11,16
75:15 80:11,13
96:10,14 98:22
101:19 106:9
108:4,13
111:11 112:14
113:11,14
114:1 122:5
123:14 134:4
139:19 140:12
141:20 142:2
143:10,14

155:21 156:1,3
162:18 165:19
166:2,3,8
167:5 169:4,7
169:13 171:5
181:15 182:9
182:18 190:4
ways 142:1
143:1 172:7
weak 159:3
weakest 170:11
170:19 173:12
173:22 174:2
weakness
170:17
Weaver 2:8 4:4
4:6 5:6 6:8
9:18 18:11
19:18 40:5
41:12 42:9,20
50:1 54:23
55:22 56:3,15
57:8 58:4,23
59:23 61:9,15
64:20 72:15,20
73:8 75:5
78:13 79:22
80:1,16 113:18
117:13 124:11
142:10,12
150:23 164:19
165:2 175:9
177:15 182:4
193:7
Weaver's 68:13
website 125:10
157:19,20
182:10
weigh 144:18
175:20 176:17
weighs 114:21
115:1,4 176:9
weight 100:16
112:7 123:21

168:16 172:2
**welcome** 113:20
**weld** 41:19 47:9
47:12,13,13,14
47:17,18 48:16
48:18,22 49:4
49:8 77:15,16
77:23 79:3,4,5
79:7 81:8,10
81:12 82:1,14
82:17,19,21,21
82:22,23 83:1
83:2,5,5,8,9,10
83:10,13,15,17
83:18,19,20,20
85:5,6,8,9,11
85:12,14,16,18
85:20 86:5,5
86:10,12,12,13
86:15,21 87:1
87:2,4,6,8
104:11 130:10
130:12 131:2
134:20 135:4
148:14,20,21
148:22 149:1,2
149:6,8,12,16
149:18 150:1,7
150:14,15,17
151:9,11,13
152:1,3,17,18
153:2,5,9,10
153:12,13,14
154:14,17,18
155:13 156:4,7
156:9 158:22
159:1,5,6
183:5,6,13,13
183:16,17,19
183:21 184:1
185:11,20
187:6,17 189:2
192:16 193:3
**welded** 51:14

84:7,19 103:9
138:11 169:13
169:14
**welder** 129:13
129:16 130:2
182:11 185:12
185:20 187:3,6
187:11
**welders** 185:5,6
185:17,22
192:9,10
**welding** 12:6
40:18,19 44:12
46:15 48:15
49:18,22 50:12
77:2,6,19
83:14,15 84:3
119:21 129:18
130:14,17,20
130:21,23
131:3,5,10
148:22 149:3
149:22 150:9
153:6,7,11
182:8,14,15
183:1,2,3
184:9 185:4,18
186:10,10,11
186:12,22
187:19 191:15
191:18 192:1,7
193:1,2
**welds** 41:18
46:21 47:4,7
48:1 50:3,3
82:11 85:1
119:23 135:1
137:16,21
139:2 148:11
154:8 183:1,10
184:3,6,7
186:11 192:9
192:16,18,18
192:21

**weld's** 184:10
**went** 10:3 16:14
148:16
**weren't** 187:2
**West** 10:3
**we're** 19:11 34:8
43:3,6 44:2
74:8 79:20
80:22 88:1
101:18 110:8
111:2 118:10
136:5 137:19
138:2,5 144:4
144:21 167:2,3
**we've** 20:4 23:16
30:4 63:2
135:5 136:2
138:6 161:2
164:13 166:1
170:20 173:20
**whatsoever** 45:2
45:16
**wide** 108:17
**width** 144:3
**wife** 7:8
**William** 4:5
**wing** 152:15
**wise** 105:17
**wish** 18:16
**withstand** 100:3
101:8 189:19
190:16
**witness** 2:14
6:11 7:9 8:5,8
8:21 22:1,10
25:7 26:18
27:10 47:6
68:9 191:10
193:9
**witnessed**
167:13
**woods** 66:4 91:5
99:14 105:3
112:19 114:6

142:5
**words** 53:8 92:9
106:11,13
164:1
**work** 8:5,8,12
8:16,21 9:5
12:11 16:18
20:12,14 21:20
46:15 53:12
158:15,18
163:3 189:23
190:1
**worked** 28:12
40:8 131:4
**working** 21:12
165:12
**worn** 89:6
179:16,21
**worse** 19:6
180:16
**wouldn't** 16:10
51:20 65:13
108:5 186:1
**wrench** 105:20
**write** 87:5
**written** 90:11,18
**wrong** 152:23
**wrote** 32:1,4
39:11

**X**

**X** 5:1 169:6,10
170:5

**Y**

**yank** 189:2
**yard** 19:5 140:8
**yardstick** 141:2
**yeah** 6:22 19:17
21:18 42:3
51:7 53:20
56:2 63:23
65:3 74:11,20
84:13 91:9
106:11 108:23

126:7 132:12
132:19 136:8
143:11 155:18
164:21 168:11
177:22 189:5
192:21
**year** 8:10,10 9:2
9:20,22 11:4,5
11:17 37:12
54:12 191:19
**years** 10:22
14:15 17:2
22:18 25:9
27:8 30:15,22
40:9 130:22
183:11
**yellow** 65:2
**yesterday** 31:20
**yield** 188:12
**y'all** 42:13 78:12
81:17

**Z**

**zone** 83:8 87:3
149:17,19,19
150:13

**$**

**$255** 9:2,11,15
**$265** 9:22
**$300** 9:13
**$350** 9:13

**0**

**07** 54:13,13

**1**

**1** 5:13 23:4,14
23:19
**1st** 7:18
**10:00** 1:19 2:10
6:10
**100** 20:1 73:18
**11** 109:15
**11:07** 42:21

# FREEDOM COURT REPORTING

**11:11** 42:23
**12** 34:4 77:14
  79:2
**12:04** 81:19
**12:47** 81:21
**120** 5:17,18
**13** 103:5 104:13
  104:18 110:3,4
  110:6,8,8,19
  110:20 111:3,7
  115:5,14 116:5
  175:23 177:6
  177:11,14,18
  177:21,23
  187:20 188:20
  189:11,13
**15** 34:6,7,7,12
  34:13,14,14
  78:8 99:22
  120:23 146:18
**15-foot** 33:22
  146:22
**1500** 7:18
**1600** 17:16
**165** 5:6
**17** 1:18
**17th** 2:9 6:9
**175** 5:7
**18** 144:5
**180** 121:14
**1800** 17:16
**19** 13:4
**190** 144:19
**194** 5:8
**1974** 11:7
**1975** 11:18
**1978** 13:5,21
**1979** 11:21
**1981** 13:22 14:6
  14:16,18
**1990s** 33:13
  37:16 126:15
  160:13
**1995** 35:6,9

**1998** 15:1,3,4

**2**

**2** 5:14 52:11,15
  59:10 63:4,10
  70:12 71:21
  74:8
**2,000** 188:21
**2,000-pound**
  188:5
**2.9** 175:21,22
  176:9,14,17
  177:2
**2:07-CV-128-ID**
  1:6
**2:34** 164:22
**2:38** 165:1
**20** 29:20 105:10
**20-pound** 188:4
**200** 4:8 144:11
**2000** 14:18,19
  14:22 15:1,8
  15:10 24:6
  25:8
**2000s** 39:4
**2000-D** 24:10
**2001** 35:19,20
  36:14,20,21
  37:7 126:6,7
**2002** 35:4,17
**2003** 35:4
**2004** 33:6 35:4
**2005** 36:19
**2006** 36:19
**2008** 1:18 2:10
  6:9 24:6
**23** 5:13
**25** 105:10
**250** 100:14
  143:5
**255** 144:22
**26** 188:20
**260** 100:16
  141:20

**280** 4:16
**2801** 4:16

**3**

**3** 5:15 52:20,22
  59:10 63:3
  64:12,12,14
  70:12 140:8
**3.9** 175:21
**3:10** 193:12
**3:30** 117:15
**30** 8:9,10 27:8
  81:17 105:10
  130:21
**300** 4:7,15 100:7
  160:4
**300-pound** 93:6
  93:12 97:14
  98:11 100:3
  101:8 102:3
  109:13,17
  159:20 181:6
  181:10,11,12
**31** 25:8
**35** 141:3,13
  143:7 144:5
  147:12
**35203** 7:19
**35223** 4:17
**35242** 4:9

**4**

**4** 5:16 76:19
**40** 105:10 111:1
**45** 81:18

**5**

**50** 8:11 20:16
  95:1 111:1
  112:9 189:3,4
  189:7,14
**51** 95:1,10,14
  96:12 97:11
**52** 5:14,15 95:1
  95:1

**52-inches** 94:13

**6**

**6** 5:17 120:18,22
  120:22
**60s** 191:22
**60/40** 8:18
**600** 181:7

**7**

**7** 5:5,18 120:18
  120:21 121:4
**70s** 191:22
**76** 5:16

**8**

**81** 14:8 94:16
  95:19,21 96:21
**81-degree** 94:7
  94:10,15,17
  96:15 97:10
  102:8

# ORIGINAL TRANSCRIPT

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

LARRY STEPHENS, et al.,          )
                                 )
            Plaintiffs,          )
                                 )        CIVIL ACTION NO.
vs.                              )        2:07CV128-ID
                                 )
STRONGBUILT, INC.,               )
                                 )
            Defendant.           )
_____  )

### DEPOSITION OF MICHAEL L. McFADDEN, JUNIOR

Taken at 1116 South Walton Boulevard, Suite 155, Bentonville, Arkansas, on May 1, 2008, at 2:00 p.m.

### APPEARANCES

**MR. WILLIAM HASSINGER**   (VIA TELEPHONE)   FOR THE PLAINTIFFS
Weaver Tidmore, LLC
300 Cahaba Park Circle, Suite 200
Birmingham, Alabama   35242
(205) 980-6065
(205) 980-6165 Fax

**MR. DAVID A. LEE**        (VIA TELEPHONE)   FOR THE DEFENDANT
Parsons, Lee & Juliano, P.C.
300 Protective Center
2801 Highway 280 South
Birmingham, Alabama   35223-2480
(205) 326-6600
(205) 324-7097 Fax

**MR. ANDREW GOTTMAN**                        FOR THE WITNESS
Assistant General Counsel
Wal-Mart Stores, Inc.
702 Southwest Eighth Street
Bentonville, Arkansas   72716-0215
(479) 204-9136

## Donald Court Reporting, Inc.

*Court Reporting Excellence Since 1981*

P.O. Box 1733, Springdale, Arkansas 72765-1733

479.756.2256
888.438.7836
FAX 479.751.9153

www.getsteno.com

```
 1                        I N D E X

 2   TESTIMONY BY MICHAEL L. McFADDEN, JUNIOR              Page

 3        Examination by Mr. Lee--------------------------3

 4

 5

 6

 7                      E X H I B I T S

 8   Deposition
     Exhibit                                            Marked
 9
     1 (Notice of Taking Telephone Deposition)-------------3
10   2 (Sales Report)---------------------------------------3

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    (Wherein, Deposition Exhibits 1 and 2 were marked.)

2              MICHAEL L. McFADDEN, JUNIOR, having been called

3    upon to testify in the form of a deposition, and having

4    been duly sworn, testified as follows, to wit:

5                            EXAMINATION

6    BY MR. LEE:

7    Q.    Would you tell us your name, please, sir?

8    A.    It's Michael L. McFadden, Junior.

9    Q.    Mr. McFadden, my name is David Lee.  I'm a lawyer in

10   Birmingham, Alabama.  And I'm with the law firm of

11   Parsons, Lee and Juliano; and I'm representing the

12   defendant, Strongbuilt, Incorporated, in a civil lawsuit

13   that is pending in federal court in Birmingham that has

14   been filed by Mr. Larry Stephens and his wife, Deborah

15   Stephens.

16        I'm going to be asking you some questions today.  If

17   I ask you anything that you do not understand, just tell

18   me, and I'll be happy to reask the question again.  Is

19   that fair enough?

20   A.    Yes.

21   Q.    All right.

22              MR. LEE:  Also, I guess before we get

23   started, I want to just put on the record this is a

24   telephone deposition.  This is being taken by telephone by

25   agreement.  Is that correct, Will?

```
1              MR. HASSINGER:  That's correct.

2              MR. LEE:  Okay.  Also, the court reporter is

3   with -- with the witness.  I want to put that on the

4   record, as well.

5   Q.   (Mr. Lee continued.)  Mr. McFadden, what is your

6   home address, please, sir?

7   A.   8266 Titleist Lane in Rogers, Arkansas, 72756.

8   Q.   Is that in close proximity to Bentonville, Arkansas?

9   A.   It is.

10  Q.   And who do you work for, please, sir?

11  A.   I work for Wal-Mart Stores, Incorporated, Wal-Mart

12  U.S. division.

13  Q.   Okay.  How long have you been employed by Wal-Mart?

14  A.   I've been employed with Wal-Mart for 14 years.

15  Q.   Can you tell me what your current position with

16  Wal-Mart is?

17  A.   I've recently taken a position as a finan --

18  merchandise financial planning.

19  Q.   Before that, what did you do, please, sir?

20  A.   Before that, I was a -- Prior to taking my new

21  position, I was a buyer with the sporting goods division.

22  Q.   And for what -- Tell me, from when to when were you

23  a buyer for the sporting goods division?

24  A.   It would be -- I'm sorry.  The two years prior to --

25  to this March.
```

1   Q.    Okay.   And -- and before that, what did you do?

2   A.    Before that, I was a household chemicals buyer in

3   Department 13, home -- home household cleaning.

4   Q.    Okay.  Have you received and reviewed a copy of a

5   deposition notice and subpoena that I issued to Wal-Mart?

6   I think the court reporter has marked that as Exhibit

7   Number 1 to your deposition.  Have you seen that document

8   before?

9   A.    Yes, I have.

10  Q.    Okay.  Are you the person with Wal-Mart that is

11  being put up for this deposition in response to the

12  deposition notice and subpoena?

13           MR. GOTTMAN:  And Mr. Lee, subject to our

14  objections, I just want that noted on the record; but you

15  can answer, Mr. McFadden.

16  A.    Yes.  Yes, I am.

17  Q.    (Mr. Lee continued.)  All right.  In response to our

18  deposition notice and subpoena and prior subpoena,

19  Wal-Mart has produced a -- a document which we have marked

20  as Exhibit Number 2.

21       First of all, take a look at Exhibit Number 2 and

22  tell me what that document is, please, sir.

23  A.    It looks like a sales report that was pulled for

24  Store 483 with a time range of 1/1/2000 to 4/4/2008, and

25  it just simply shows the sales for a given item by -- for

```
 1   that time period.
 2   Q.    Okay.  And is that a true and correct copy of the
 3   sales report that Wal-Mart has produced in response to our
 4   deposition notice and subpoena?
 5   A.    Yes.
 6   Q.    All right.  What I'd like to do is -- is go through
 7   this report, if we can, talk about a few things.  First of
 8   all, this -- I'm looking at the report, and it says that
 9   this pertains to Store Number 483; is that correct?
10   A.    The report does reflect 483, yes.
11   Q.    Okay.  And for the record, what is Wal-Mart Store
12   Number 483?
13   A.    It's Location 483, Store 483.  Prattville, Alabama.
14   Q.    Okay.  So this is the Prattville Wal-Mart store?
15   A.    Yes, sir.
16   Q.    Okay.  And then in looking at this report, it says
17   "Vendor Number 383104."  What does that mean, please, sir?
18   A.    That is the six-digit vendor number assigned to the
19   supplier.  It's how we identify the supplier at Wal-Mart.
20   Q.    Okay.  And who -- who was the supplier in this case?
21   A.    The report does not reflect who 383104 is.  I -- I
22   make the assumption it's Strongbuilt, but the report
23   doesn't have Strongbuilt's name on it.
24   Q.    Okay.  Well, we -- the subpoena that we sent to
25   Wal-Mart, you know, requests sales information pertaining
```

1  to Strongbuilt basic ladder stands, 15 foot in length, and

2  this is the document that was produced in response to

3  that; is that correct?

4  A.    Yes.

5  Q.    All right.  And then looking further at the chart,

6  it has, you know, a given year, and then it has a week; is

7  that correct?

8  A.    Yes, sir, that's correct.

9  Q.    Okay.  Just looking at the first item here, it says

10  start date of July 15th through July the 21st.  Is that

11  a -- is that a sales week for Wal-Mart?

12  A.    I -- I would have to look at the calendar to see.  A

13  Wal-Mart week runs Saturday through the following Friday,

14  so if those dates line up with a Saturday through Friday,

15  then yes.

16  Q.    Okay.  And then again, Store Number 483 would be the

17  Prattville, Alabama, Wal-Mart store; correct?

18  A.    Yes, sir.

19  Q.    Then an item number.  Tell me what item number

20  means.

21  A.    Item number is the number assigned in the Wal-Mart

22  system.  It would be how the merchants and the buyers

23  identify the item at Wal-Mart.  And item numbers are

24  specific to the merchandise.  UPC, actual merchandise, and

25  then it's assigned an item number.

1    Q.    Okay.  Then it has "Primary DESC."  I assume that

2    means primary description; is that correct?

3    A.    That's correct.

4    Q.    It says "Basic ladder 15"; is that right?

5    A.    Yes, sir.

6    Q.    Is that a Wal-Mart description?

7    A.    Yes, sir.

8    Q.    And then it has a UPC number.  And tell me what the

9    UPC number means.

10   A.    The UPC is the universal product code.  The supplier

11   would get that assigned from the Universal Product Code

12   Commission, and then it would be assigned and then entered

13   into the Wal-Mart system to assign an item number.

14   Q.    I understand.

15         Then you have a vendor stock number.  And I assume

16   that that pertains to whatever vendor that Wal-Mart is

17   dealing with.  In this particular case, Strongbuilt;

18   correct?

19   A.    It is correct.  The stock number would have been

20   assigned by the -- by the supplier, and it's used for

21   their purpose to identify their merchandise, but Wal-Mart

22   enters it into their system for our identification

23   purposes, as well.

24   Q.    Okay.  And in this case, the vendor stock number

25   would be BLS15; correct?

1    A.    That's correct.

2    Q.    Okay.  Now, in response to my deposition notice and

3    subpoena, I asked Wal-Mart to search for any sales records

4    for the Strongbuilt BLS15 stand for a time range of

5    January 1, 2000, to April 4, 2008; is that correct?

6    A.    Yes, it is.

7    Q.    And this is the report that was produced in response

8    to that request; correct?

9    A.    Yes, sir.

10   Q.    Now, the next question I have is this.  According to

11   Wal-Mart's sales information for the Prattville store,

12   when was the last time a Strongbuilt BLS15 ladder stand

13   was sold at that particular store?

14   A.    From -- from the report I have in front of me, it

15   would appear that it would have been in 2001.  In sales

16   Week 12/1 to 12/7, there was one unit sold, and that was

17   the last registry on the report.

18   Q.    Okay.  Let me ask you specifically this.  Based upon

19   Wal-Mart's search of its sales records for the Prattville

20   store for the time range of January 1, 2000, to April 4,

21   2008, was there any record of sale for this BLS15 ladder

22   stand either in the months of November or December 2004?

23   A.    No, sir.

24   Q.    In other words, Wal-Mart's sales records do not

25   reflect any sales of Strongbuilt 15-foot basic ladder

1    stands during the months of November or December 2004; is

2    that correct?

3    A.    According to the report, the last sale was made on

4    12/1 -- between 12/1 and 12/7.  That is the last entry on

5    the report.

6    Q.    Of the year 2001.

7    A.    That's correct.

8    Q.    Not 2004.

9    A.    Correct.

10                MR. LEE:  I think that's all the questions I

11    have.

12                MR. HASSINGER:  I don't have any questions.

13                MR. LEE:  Mr. McFadden, thank you.

14                Listen, what I'd like to do is offer

15    Exhibits 1 and 2, one being the deposition notice and two

16    being the sales report, as exhibits to the deposition.

17    Any objection to that?

18                MR. HASSINGER:  No objection.

19                MR. LEE:  All right.  Thank you,

20    Mr. McFadden.  I appreciate your time today.

21                MR. GOTTMAN:  We'll waive signature.

22    (Wherein, at 2:10 p.m., the deposition was concluded.)

23

24

25

# FREEDOM COURT REPORTING

**1**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

LARRY STEPHENS, et al.,
    Plaintiffs,
versus                2:07-CV-128-10
STRONG BUILT, INC.,
    Defendant.

* * * * * * * * * * * *

VIDEOTAPED DEPOSITION OF JAITON STEPHENS,
taken pursuant to stipulation and agreement
before Jackie Parham, Certified Court Reporter
and Commissioner for the State of Alabama at
Large, in the law offices of Morris, Haynes &
Hornsby, 131 Main Street, Alexander City, Alabama,
on Thursday, the 21st day of February, 2008,
commencing at approximately 10:18 a.m.

**2**

APPEARANCES
APPEARING ON BEHALF OF THE PLAINTIFFS:
WILLIAM HASSINGER, ESQUIRE
Weaver, Tidmore, LLC
Suite 214
200 Cahaba Park Circle
Birmingham, Alabama  35242

Also present:  Roger Wood

APPEARING ON BEHALF OF THE DEFENDANT:
DAVID A. LEE, ESQUIRE
Parsons, Lee & Juliano
Suite 300
2801 Highway 280 South
Birmingham, Alabama  35223
* * * * * * * * * * * *
STIPULATION
It is hereby stipulated and agreed by and
between counsel representing the parties that
the deposition of
JAITON STEPHENS
is taken pursuant to the Federal Rules of

**3**

Procedure, and that said deposition may
be taken before Jackie Parham, Certified
Court Reporter and Commissioner for the State
of Alabama at Large, without the formality of
a commission; that objections to questions
other than objections as to the form of the
question need not be made at this time but
may be reserved for a ruling at such time as
the said deposition may be offered in
evidence or used for any other purpose, by
either party, as provided for by the Statute.
    It is further stipulated and agreed by
and between counsel representing the parties
in this case that the filing of said
deposition is hereby waived, and that said
deposition may be introduced at the trial of
this case or used in any other manner by
either party hereto as provided for by the
Statute, regardless of the waiving of the
filing of the same.  It is further stipulated
and agreed by and between the parties hereto and
the witness that the signature of the witness to
this deposition is hereby waived.

**4**

(Introduction read by videographer)
        JAITON STEPHENS,
    The witness, after having first been
duly sworn to speak the truth, the whole truth,
and nothing but the truth, testified as
follows:
        EXAMINATION
BY MR. LEE:
Q.  Can you tell us your name?
A.  Jaiton Stephens.
Q.  Spell Jaiton.
A.  J-a-i-t-o-n.
Q.  Okay.  Jaiton, how old are you?
A.  Eighteen.
Q.  I'm David Lee.  I'm a lawyer in Birmingham.
    And I'm representing Strong Built in this
    lawsuit that Larry Stephens has filed.  I'm
    going to be asking you some questions today.
    If I ask you anything that you don't understand
    or doesn't make sense, just tell me --
A.  All right.
Q.  -- and I'll be happy to reask it.  If you need
    to take a break for any reason, tell me that

1 (Pages 1 to 4)

# FREEDOM COURT REPORTING

**5**

1    and we'll take a break.
2    A.  (Witness nods head in the affirmative).
3    Q.  Jaiton, how are you related to Larry?
4    A.  My father.
5    Q.  Okay.  He's your dad?
6    A.  (Witness nods head in the affirmative).
7    Q.  And what is your home address?
8    A.  309 Central Boulevard.
9    Q.  309 --
10   A.  Central Boulevard.
11   Q.  And what city is that?
12   A.  Tallassee.
13   Q.  And the zip code?
14   A.  36078.
15   Q.  And do you live with your mom and dad now?
16   A.  Yes.
17   Q.  Okay.  Have you ever not lived with them?
18   A.  Not really.
19   Q.  Tell me, do you have any brothers or sisters?
20   A.  I've got a brother.
21   Q.  And what's his name?
22   A.  Brett.
23   Q.  Okay.  How old is he?

**6**

1    A.  Sixteen, I think.
2    Q.  Does he live at home with y'all, too?
3    A.  No.  He lives with my aunt.
4    Q.  Okay.  Why does he live with your aunt?
5    A.  Just -- I think it bothered him with Daddy
6        falling and stuff.
7    Q.  Okay.  Does he live with y'all some?
8    A.  Yeah, every -- He'll come --
9    Q.  How often does he come home?
10   A.  He'll come stay, you know, a week or two, and
11       then he'll go back, you know, three or four
12       nights.  Just different -- different times.
13   Q.  Okay.  Do you go to school, or what do you do?
14   A.  I work.
15   Q.  Where do you work, Jaiton?
16   A.  Auburn Electric.
17   Q.  And what do you do for Auburn Electric?
18   A.  Apprentice, I guess you'd call it.
19   Q.  Okay.  You know, we're talking about a ladder
20       stand here today.  Do you understand that?
21   A.  Yes, sir.
22   Q.  What is your recollection of this particular
23       stand and when you-all got possession of it?

**7**

1    A.  It was David's stand, I think.  But all I done
2        was went out there and -- cause I was the first
3        person he called.  Cause Matt, my cousin, went
4        with him.  And his phone didn't have service,
5        so he called me.  So I was the first one he got
6        in touch with.  And me and Mama went out there.
7    Q.  Really I want to kind of go before that.  Terry
8        Stephens testified that he gave this stand to
9        your father as a Christmas gift.  Is that not
10       correct?
11   A.  I don't know.  I don't know.
12   Q.  Okay.  And I think your dad said no, that's not
13       right; that Terry gave it to David, I guess,
14       who would be your dad's uncle; is that
15       correct --
16   A.  Yes.
17   Q.  -- as a Christmas gift?  Is that --
18   A.  I --
19   Q.  You don't know?
20   A.  I don't know nothing.
21   Q.  A minute ago you said it was David's stand.  Is
22       it your belief that this stand that this
23       accident --

**8**

1    A.  I thought this particular stand was David's, is
2        what my understanding of it is.  But, I mean, I
3        don't know exactly which stand, you know --
4    Q.  Do y'all have any other ladder stands that look
5        like this one?
6    A.  No, sir.  We use climbers, is what we use, or
7        ground blinds.
8    Q.  Do you know Daniel Slocomb?
9    A.  No, sir.  Never heard of him.
10   Q.  Did you have any involvement in putting this
11       stand together?
12   A.  No, sir, not putting it together.
13   Q.  Have you ever had any involvement in helping
14       take the stand down?
15   A.  Yes, sir.  I took the stand down.
16   Q.  You're talking about after the accident?
17   A.  Yes, sir.
18   Q.  All right.  I'm talking about before that.
19   A.  (Witness shakes head in a negative response).
20   Q.  Did you ever have any involvement in taking the
21       stand down, you know, while it was in the woods
22       at the end of the hunting season?
23   A.  No, sir.

2  (Pages 5 to 8)

## 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

**9**

1  Q.  Had you ever climbed up in this particular
2      stand before this accident?
3  A.  I've been hunting out there, but I don't think
4      I've been in this particular stand.
5  Q.  Did you ever go and look at or inspect this
6      stand before the accident?
7  A.  No, sir.
8  Q.  Okay.  Did you ever help put this stand up in
9      the woods prior to any hunting season?
10 A.  No, sir.
11 Q.  Did you ever help take the stands down and
12     store them in the barn or store them in the
13     shed or do anything with these stands before
14     this accident occurred?
15 A.  Just -- just my climber.  That's the only stand
16     I ever dealt with.
17 Q.  That's different than what we're talking about
18     here?
19 A.  Yes, sir.  That's a different stand.
20 Q.  All right.  To your knowledge, you never looked
21     at or climbed up this stand in your life; is
22     that right?
23 A.  Yes, sir.

**10**

1  Q.  Okay.  All right.  Well, take me through the
2      day of the accident.  Tell me what your
3      involvement was that day.
4  A.  Daddy called me about -- it was a little before
5      6 that morning and told me he had fell.
6  Q.  Called you on --
7  A.  That the stand broke.
8  Q.  -- your cell phone?
9  A.  Yes, sir.  He beeped me.  And I said -- I asked
10     him where he was at, and he told me what stand
11     it was and told me where he was at and all, and
12     told me Matt was with him.  And he said, I
13     can't get in touch with him.  His phone ain't
14     got service.  So I beeped my cousin, Matt.  His
15     phone finally got service.  And he went over
16     there to him.  And while all that was
17     happening, I went in there and woke Mama up,
18     and we was on the way out there.  And my little
19     brother called Rah-Rah and he met us out there,
20     and that's how Rah-Rah got out there.  But
21     that's, you know -- Anything else --
22 Q.  We're looking at a picture that was given to me
23     by, you know, your dad's lawyer.  Do you

**11**

1      recognize that -- that to be the stand that was
2      involved in this accident?
3  A.  Yes.  I went out there to take the pictures.
4  Q.  Okay.  And when did you take that picture?
5  A.  It was after -- maybe two, three days after the
6      fall maybe.
7  Q.  Okay.
8  A.  I can't really remember.  It was just --
9  Q.  Y'all certainly didn't fool with it that day?
10 A.  No, sir.
11 Q.  Your main concern was your dad?
12 A.  Yes, sir.
13 Q.  All right.  Now, did you change anything or
14     move anything around before you took the
15     pictures?
16 A.  No, sir.  Everything was just like it was.  We
17     just went out there and took the pictures.
18 Q.  Okay.  Who was with you when you did that?
19 A.  My uncle, Dwight.
20 Q.  What's Dwight's last name?
21 A.  Jones.
22 Q.  Where is he now?
23 A.  He works at BellSouth in Tallassee.

**12**

1  Q.  Just the two of you go out there?
2  A.  Yes, sir.
3  Q.  And I've got several -- Look at all these
4      pictures here, and just tell me if y'all took
5      all those.
6  A.  Yes, sir.  Every one of them.
7  Q.  Looks like there are five pictures there
8      that -- you know, of the area where the
9      accident occurred.  Y'all took all those?
10 A.  Yes, sir.
11 Q.  Did you do that yourself?
12 A.  Well, Dwight had the camera.  We just both took
13     pictures, both of us.
14 Q.  Okay.  All right.  And then what did you do
15     after you took the photographs?
16 A.  Just went back home and got ready and went to
17     the hospital.
18 Q.  Did y'all take the stand down that day?
19 A.  No, sir.
20 Q.  Did you help take the stand down?
21 A.  Yes, sir.
22 Q.  When did you do that?
23 A.  I don't know.  It was after Daddy was home from

3  (Pages 9 to 12)

# FREEDOM COURT REPORTING

**13**

1  the first trip to the hospital. I'd say about
2  two -- two weeks, three weeks later maybe. It
3  wasn't that long.
4  Q.  Who went with you to take the stand down?
5  A.  Matt.
6  Q.  Is that your --
7  A.  My cousin.
8  Q.  -- your cousin?
9      Did y'all -- did you-all get everything
10     that was there with the tree stand?
11  A.  Yes, sir.
12  Q.  Did you leave anything out in the woods that
13     pertained to this stand?
14  A.  No, sir.
15  Q.  Okay.  Whatever straps or ropes or anything
16     that had anything to do with this stand, did
17     y'all pick it up and bring it back?
18  A.  Yes, sir.
19  Q.  What did you do with it when you got it back?
20  A.  We put it in the shed, like we do all the rest
21     of the stands.  And I, you know, let Mama know
22     we got it down and all.
23  Q.  Okay.  Did you put all the stuff in a box or

**14**

1  something on this stand, or what did you do
2  with it?
3  A.  Yeah.  Like the strap and stuff, you know, was
4  right there with it.
5  Q.  Okay.  And did you store it there until your
6  mom got a lawyer?
7  A.  Yes, sir.
8  Q.  And whatever -- whatever was out in the woods,
9  did you give that to your mother's lawyer?
10  A.  Yes, sir.
11  Q.  So whatever your lawyer -- or your mom's lawyer
12  has and your dad's lawyer has, that's what
13  y'all retrieved from the woods; is that
14  correct?
15  A.  Yes, sir.
16  Q.  Didn't forget anything or leave anything at
17  all?
18  A.  No, sir.
19  Q.  Based upon your looking at this stand and so
20  forth, could you figure out what happened?
21  A.  Just looked like the weld broke on the safety
22  bar in the middle right there, is what it
23  looked like to me by the pictures we took and

**15**

1  all.
2  Q.  Do you have any idea what caused the weld to
3  break?
4  A.  No, sir.
5  Q.  Now, there's been some testimony that this
6  stand was taken down every season and stored in
7  the shed.  Is that --
8  A.  Yes, sir.
9  Q.  You said you had no involvement with that?
10  A.  No, sir.
11  Q.  Who did take these stands down?
12  A.  Most the time it was my daddy and David that
13  goes to take the stands down and all.  I mean,
14  sometimes it could have been, you know,
15  somebody different went out there.  I don't --
16  I don't know.
17  Q.  Okay.  But you never had any involvement with
18  that?
19  A.  No, sir.
20  Q.  And they were stacked in some shed; is that
21  right?
22  A.  Yes, sir.
23  Q.  In whose shed were they stacked in?

**16**

1  A.  Just sometimes David's, ours.  Just, you know,
2  whichever one had room.
3  Q.  Are there any stands stacked now?
4  A.  Not really.  You know, we got our climbers.
5  But Daddy got rid of his.  He can't use it no
6  more.  So I've got mine.
7  Q.  Okay.  Did you ever see them take these stands
8  down and put them in the shed?
9  A.  No, sir.
10  Q.  The safety bar that we're talking about, I
11  can't remember who it was, but one of the
12  persons who we've taken the deposition of said
13  that that safety bar was usually left attached
14  to the stand itself when it was taken down and
15  taken to the shed.  And my question to you is,
16  did you ever see that yourself with the safety
17  bar still attached?
18  A.  No, sir.
19  Q.  You don't know one way or the other whether it
20  was taken off?
21  A.  No.
22  Q.  Did you ever see it stacked in the shed?
23  A.  I mean, I really -- I did, but I didn't really

4  (Pages 13 to 16)

# FREEDOM COURT REPORTING

| 17 |
|---|

1  pay no attention, you know, when I went in
2  there.
3  Q.  Okay.  Did your dad or David do any kind of
4  maintenance work on any of these stands at all?
5  A.  Not that I know of.
6  Q.  Like paint them every now and then?
7  A.  Not that I know of.  I don't have no idea.
8  Q.  You're saying you don't know one way or the
9  other?
10  A.  Yeah.  I don't have no idea.
11  Q.  Did your dad ever tell you what happened in
12  terms of the accident itself?
13  A.  I really didn't ask him.  You know, I didn't
14  need to ask him, I didn't think.
15  Q.  Okay.  Y'all have never had any conversations
16  about that at all?
17  A.  No.  Didn't think I need to bring no memory up
18  about it.
19  Q.  Right.  You call him Rah-Rah?
20  A.  (Witness nods head in the affirmative.)
21  Q.  He was just telling us that he had -- your dad
22  just had had some -- Is that what you call your
23  granddaddy?

| 18 |
|---|

1  A.  Yes.
2  Q.  My kids call my dad Paw-Paw.  He said your dad
3  just had some surgery; is that true?
4  A.  Yes, sir.
5  Q.  Tell me about that surgery.
6  A.  It was just two screws, and I can't remember
7  which leg it was, they just took out cause it
8  wasn't holding or something.  They was backing
9  out or something.  I don't know.  And they
10  scheduled another one.  He's got to go redo his
11  left leg where it's done come apart.
12  Q.  Okay.  Where was his last surgery done at?
13  A.  I don't know.  I think -- I would think it
14  would be at Baptist South where all the rest of
15  them's been.
16  Q.  Is that in Montgomery?
17  A.  Yes, sir.
18  Q.  Okay.  Tell me about your dad.  How is he
19  getting around now?
20  A.  Just with a little motorized scooter, a little
21  wheelchair.
22  Q.  What does he do mostly during the day?
23  A.  Watch TV.  I mean, go out in the yard.

| 19 |
|---|

1  Q.  Does he have any animals he takes care of?
2  A.  Yeah.  We've got a Dachshund.
3  Q.  Got a what?
4  A.  A Dachshund, a little dog.
5  Q.  Oh, a dog.
6  A.  A Shih Tzu and a cat.  That's about it.
7  Q.  He was telling me he used to have some other
8  kind of pets or --
9  A.  Pigs.
10  Q.  Or maybe it was pigs.
11  A.  Chickens.  Sold the chickens.
12  Q.  Do y'all still have those?
13  A.  No.  We sold the chickens.  Trying to sell the
14  pigs, too.
15  Q.  Okay.  So he pretty much watches TV and goes
16  outside on his motorized scooter?
17  A.  Yes, sir.
18  Q.  Can he get up and walk around any at all?
19  A.  Not really.  Just from standing up and moving
20  to the chair right beside him.  That's it.
21  Q.  How is his attitude?  Is it pretty good or --
22  A.  Yeah.  He's, you know -- he's good, you know,
23  as far as attitude ways.  But he tries to make

| 20 |
|---|

1  like he's better than he is.
2  Q.  Yeah.  What about your mom, how is she doing?
3  A.  She took it rougher than he did.  She ain't --
4  she ain't doing as good as he is about the
5  whole attitude part.
6  Q.  Does she work any at all?
7  A.  Yes.
8  Q.  Where does she work?
9  A.  The Community Hospital in medical records.
10  Q.  Okay.  So it's the two of them, plus you, and
11  then periodically your brother that live at the
12  house; is that right?
13  A.  Yes, sir.
14  Q.  Anybody else?
15  A.  No, sir.
16  Q.  All right.  Appreciate you coming, Jaiton.
17
18       * * * * * * * * * * * * *
19       FURTHER DEPONENT SAITH NOT
20       * * * * * * * * * * * * *
21
22       REPORTER'S CERTIFICATE
23       STATE OF ALABAMA,

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

21

```
 1      MONTGOMERY COUNTY,
 2          I, Jackie Parham, Certified Court
 3      Reporter and Commissioner for the State of
 4      Alabama at Large, do hereby certify that I
 5      reported the deposition of
 6          JAITON STEPHENS,
 7      who was first duly sworn by me to speak the
 8      truth, the whole truth, and nothing but the
 9      truth, in the matter of:
10
11      STEPHENS, ET AL. -V- STRONG BUILT, INC.
12
13      on the 21st day of February, 2008.
14          The foregoing 20 computer-printed
15      pages contain a true and correct transcript
16      of the examination of said witness by
17      counsel for the parties set out herein.
18      The reading and signing is hereby waived.
19          I further certify that I am neither of
20      kin nor of counsel to the parties to said
21      cause, nor in any manner interested in the
22      results thereof.
23
```

22

```
 1
 2
 3          _____
 4          Jackie Parham, Certified
 5          Court Reporter and
 6          Commissioner for the State
 7          of Alabama at Large
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
```

6 (Pages 21 to 22)

# FREEDOM COURT REPORTING

23

| A | B | | | D | E |
|---|---|---|---|---|---|
| **accident** 7:23 8:16 9:2,6,14 10:2 11:2 12:9 17:12 | **back** 6:11 12:16 13:17,19 | **cause** 7:2,3 18:7 21:21 | 3:13 21:17,20 | **Dachshund** 19:2 19:4 | **Eighteen** 4:14 |

**A**

**accident** 7:23
  8:16 9:2,6,14
  10:2 11:2 12:9
  17:12
**address** 5:7
**affirmative** 5:2
  5:6 17:20
**ago** 7:21
**agreed** 2:19 3:12
  3:21
**agreement** 1:16
**ain't** 10:13 20:3
  20:4
**al** 1:5 21:11
**Alabama** 1:2,18
  1:20 2:7,16 3:4
  20:23 21:4
  22:6
**Alexander** 1:20
**animals** 19:1
**Anybody** 20:14
**apart** 18:11
**APPEARAN...**
  2:1
**APPEARING**
  2:2,11
**Appreciate**
  20:16
**Apprentice** 6:18
**approximately**
  1:22
**area** 12:8
**asked** 10:9
**asking** 4:18
**attached** 16:13
  16:17
**attention** 17:1
**attitude** 19:21
  19:23 20:5
**Auburn** 6:16,17
**aunt** 6:3,4
**a.m** 1:22

**B**

**back** 6:11 12:16
  13:17,19
**backing** 18:8
**Baptist** 18:14
**bar** 14:22 16:10
  16:13,17
**barn** 9:12
**Based** 14:19
**beeped** 10:9,14
**BEHALF** 2:2,11
**belief** 7:22
**BellSouth** 11:23
**better** 20:1
**Birmingham** 2:7
  2:16 4:15
**blinds** 8:7
**bothered** 6:5
**Boulevard** 5:8
  5:10
**box** 13:23
**break** 4:23 5:1
  15:3
**Brett** 5:22
**bring** 13:17
  17:17
**broke** 10:7
  14:21
**brother** 5:20
  10:19 20:11
**brothers** 5:19
**Built** 1:8 4:16
  21:11

**C**

**Cahaba** 2:6
**call** 6:18 17:19
  17:22 18:2
**called** 7:3,5 10:4
  10:6,19
**camera** 12:12
**care** 19:1
**case** 3:14,17
**cat** 19:6

**cause** 7:2,3 18:7
  21:21
**caused** 15:2
**cell** 10:8
**Central** 5:8,10
**certainly** 11:9
**CERTIFICA...**
  20:22
**Certified** 1:17
  3:2 21:2 22:3
**certify** 21:4,19
**chair** 19:20
**change** 11:13
**chickens** 19:11
  19:11,13
**Christmas** 7:9
  7:17
**Circle** 2:6
**city** 1:20 5:11
**climbed** 9:1,21
**climber** 9:15
**climbers** 8:6
  16:4
**code** 5:13
**come** 6:8,9,10
  18:11
**coming** 20:16
**commencing**
  1:22
**commission** 3:5
**Commissioner**
  1:18 3:3 21:3
  22:5
**Community**
  20:9
**computer-pri...**
  21:14
**concern** 11:11
**contain** 21:15
**conversations**
  17:15
**correct** 7:10,15
  14:14 21:15
**counsel** 2:20

3:13 21:17,20
**COUNTY** 21:1
**Court** 1:1,17 3:3
  21:2 22:4
**cousin** 7:3 10:14
  13:7,8

**D**

**Dachshund** 19:2
  19:4
**dad** 5:5,15 7:12
  11:11 17:3,11
  17:21 18:2,2
  18:18
**daddy** 6:5 10:4
  12:23 15:12
  16:5
**dad's** 7:14 10:23
  14:12
**Daniel** 8:8
**David** 2:12 4:15
  7:13 15:12
  17:3
**David's** 7:1,21
  8:1 16:1
**day** 1:21 10:2,3
  11:9 12:18
  18:22 21:13
**days** 11:5
**dealt** 9:16
**Defendant** 1:9
  2:11
**DEPONENT**
  20:19
**deposition** 1:15
  2:21 3:1,9,15
  3:16,23 16:12
  21:5
**different** 6:12
  6:12 9:17,19
  15:15
**DISTRICT** 1:1
  1:2
**DIVISION** 1:3

**dog** 19:4,5
**doing** 20:2,4
**duly** 4:4 21:7
**Dwight** 11:19
  12:12
**Dwight's** 11:20

**E**

**Eighteen** 4:14
**either** 3:11,18
**Electric** 6:16,17
**ESQUIRE** 2:3
  2:12
**et** 1:5 21:11
**evidence** 3:10
**exactly** 8:3
**examination** 4:7
  21:16

**F**

**fall** 11:6
**falling** 6:6
**far** 19:23
**father** 5:4 7:9
**February** 1:21
  21:13
**Federal** 2:23
**fell** 10:5
**figure** 14:20
**filed** 4:17
**filing** 3:14,20
**finally** 10:15
**first** 4:3 7:2,5
  13:1 21:7
**five** 12:7
**follows** 4:6
**fool** 11:9
**foregoing** 21:14
**forget** 14:16
**form** 3:6
**formality** 3:4
**forth** 14:20
**four** 6:11
**further** 3:12,20
  20:19 21:19

**G**

getting 18:19
gift 7:9,17
give 14:9
given 10:22
go 6:11,13 7:7
  9:5 12:1 18:10
  18:23
goes 15:13 19:15
going 4:18
good 19:21,22
  20:4
granddaddy
  17:23
ground 8:7
guess 6:18 7:13

**H**

happened 14:20
  17:11
happening
  10:17
happy 4:22
HASSINGER
  2:3
Haynes 1:19
head 5:2,6 8:19
  17:20
heard 8:9
help 9:8,11
  12:20
helping 8:13
hereto 3:18,21
he'll 6:8,10,11
Highway 2:15
holding 18:8
home 5:7 6:2,9
  12:16,23
Hornsby 1:20
hospital 12:17
  13:1 20:9
house 20:12
hunting 8:22 9:3
  9:9

**I**

idea 15:2 17:7
  17:10
inspect 9:5
interested 21:21
introduced 3:16
Introduction 4:1
involved 11:2
involvement
  8:10,13,20
  10:3 15:9,17

**J**

Jackie 1:17 3:2
  21:2 22:3
Jaiton 1:15 2:22
  4:2,10,11,13
  5:3 6:15 20:16
  21:6
Jones 11:21
Juliano 2:13
J-a-i-t-o-n 4:12

**K**

kids 18:2
kin 21:20
kind 7:7 17:3
  19:8
know 6:10,11,19
  7:11,11,19,20
  8:3,3,8,21
  10:21,23 12:8
  12:23 13:21,21
  14:3 15:14,16
  16:1,4,19 17:1
  17:5,7,8,13
  18:9,13 19:22
  19:22
knowledge 9:20

**L**

ladder 6:19 8:4
Large 1:19 3:4
  21:4 22:6

**Larry** 1:5 4:17
  5:3
law 1:19
lawsuit 4:17
lawyer 4:15
  10:23 14:6,9
  14:11,11,12
leave 13:12
  14:16
Lee 2:12,13 4:8
  4:15
left 16:13 18:11
leg 18:7,11
life 9:21
little 10:4,18
  18:20,20 19:4
live 5:15 6:2,4,7
  20:11
lived 5:17
lives 6:3
LLC 2:4
long 13:3
look 8:4 9:5 12:3
looked 9:20
  14:21,23
looking 10:22
  14:19
Looks 12:7

**M**

main 1:20 11:11
maintenance
  17:4
Mama 7:6 10:17
  13:21
manner 3:17
  21:21
Matt 7:3 10:12
  10:14 13:5
matter 21:9
mean 8:2 15:13
  16:23 18:23
medical 20:9
memory 17:17

met 10:19
middle 1:2
  14:22
mine 16:6
minute 7:21
mom 5:15 14:6
  20:2
mom's 14:11
Montgomery
  18:16 21:1
morning 10:5
Morris 1:19
mother's 14:9
motorized 18:20
  19:16
move 11:14
moving 19:19

**N**

name 4:9 5:21
  11:20
need 3:7 4:22
  17:14,17
negative 8:19
neither 21:19
never 8:9 9:20
  15:17 17:15
nights 6:12
nods 5:2,6 17:20
NORTHERN
  1:3

**O**

objections 3:5,6
occurred 9:14
  12:9
offered 3:9
offices 1:19
Oh 19:5
Okay 4:13 5:5
  5:17,23 6:4,7
  6:13,19 7:12
  9:8 10:1 11:4,7
  11:18 12:14
  13:15,23 14:5

15:17 16:7
  17:3,15 18:12
  18:18 19:15
  20:10
old 4:13 5:23
outside 19:16

**P**

pages 21:15
paint 17:6
Parham 1:17 3:2
  21:2 22:3
Park 2:6
Parsons 2:13
part 20:5
particular 6:22
  8:1 9:1,4
parties 2:20
  3:13,21 21:17
  21:20
party 3:11,18
Paw-Paw 18:2
pay 17:1
periodically
  20:11
person 7:3
persons 16:12
pertained 13:13
pets 19:8
phone 7:4 10:8
  10:13,15
photographs
  12:15
pick 13:17
picture 10:22
  11:4
pictures 11:3,15
  11:17 12:4,7
  12:13 14:23
pigs 19:9,10,14
Plaintiffs 1:6 2:2
plus 20:10
possession 6:23
present 2:9

pretty 19:15,21
prior 9:9
Procedure 3:1
provided 3:11
   3:18
purpose 3:10
pursuant 1:16
   2:23
put 9:8 13:20,23
   16:8
putting 8:10,12

**Q**

question 3:7
   16:15
questions 3:5
   4:18

**R**

Rah-Rah 10:19
   10:20 17:19
read 4:1
reading 21:18
ready 12:16
really 5:18 7:7
   11:8 16:4,23
   16:23 17:13
   19:19
reask 4:22
reason 4:23
recognize 11:1
recollection 6:22
records 20:9
redo 18:10
regardless 3:19
related 5:3
remember 11:8
   16:11 18:6
reported 21:5
Reporter 1:17
   3:3 21:3 22:4
REPORTER'S
   20:22
representing
   2:20 3:13 4:16

reserved 3:8
response 8:19
rest 13:20 18:14
results 21:22
retrieved 14:13
rid 16:5
right 4:21 7:13
   8:18 9:20,22
   10:1 11:13
   12:14 14:4,22
   15:21 17:19
   19:20 20:12,16
Roger 2:9
room 16:2
ropes 13:15
rougher 20:3
Rules 2:23
ruling 3:8

**S**

safety 14:21
   16:10,13,16
SAITH 20:19
saying 17:8
scheduled 18:10
school 6:13
scooter 18:20
   19:16
screws 18:6
season 8:22 9:9
   15:6
see 16:7,16,22
sell 19:13
sense 4:20
service 7:4
   10:14,15
set 21:17
shakes 8:19
shed 9:13 13:20
   15:7,20,23
   16:8,15,22
Shih 19:6
signature 3:22
signing 21:18

sir 6:21 8:6,9,12
   8:15,17,23 9:7
   9:10,19,23
   10:9 11:10,12
   11:16 12:2,6
   12:10,19,21
   13:11,14,18
   14:7,10,15,18
   15:4,8,10,19
   15:22 16:9,18
   18:4,17 19:17
   20:13,15
sisters 5:19
Sixteen 6:1
Slocomb 8:8
sold 19:11,13
somebody 15:15
South 2:15
   18:14
speak 4:4 21:7
Spell 4:11
stacked 15:20
   15:23 16:3,22
stand 6:20,23
   7:1,8,21,22 8:1
   8:3,11,14,15
   8:21 9:2,4,6,8
   9:15,19,21
   10:7,10 11:1
   12:18,20 13:4
   13:10,13,16
   14:1,19 15:6
   16:14
standing 19:19
stands 8:4 9:11
   9:13 13:21
   15:11,13 16:3
   16:7 17:4
State 1:18 3:3
   20:23 21:3
   22:5
STATES 1:1
Statute 3:11,19
stay 6:10

Stephens 1:5,15
   2:22 4:2,10,17
   7:8 21:6,11
stipulated 2:19
   3:12,20
stipulation 1:16
   2:18
store 9:12,12
   14:5
stored 15:6
strap 14:3
straps 13:15
Street 1:20
Strong 1:8 4:16
   21:11
stuff 6:6 13:23
   14:3
Suite 2:5,14
surgery 18:3,5
   18:12
sworn 4:4 21:7

**T**

take 4:23 5:1
   8:14 9:11 10:1
   11:3,4 12:18
   12:20 13:4
   15:11,13 16:7
taken 1:16 2:23
   3:2 15:6 16:12
   16:14,15,20
takes 19:1
talking 6:19
   8:16,18 9:17
   16:10
Tallassee 5:12
   11:23
tell 4:9,20,23
   5:19 10:2 12:4
   17:11 18:5,18
telling 17:21
   19:7
terms 17:12
Terry 7:7,13

testified 4:5 7:8
testimony 15:5
them's 18:15
thereof 21:22
think 6:1,5 7:1
   7:12 9:3 17:14
   17:17 18:13,13
thought 8:1
three 6:11 11:5
   13:2
Thursday 1:21
Tidmore 2:4
time 3:7,8 15:12
times 6:12
today 4:18 6:20
told 10:5,10,11
   10:12
touch 7:6 10:13
transcript 21:15
tree 13:10
trial 3:16
tries 19:23
trip 13:1
true 18:3 21:15
truth 4:4,4,5
   21:8,8,9
Trying 19:13
TV 18:23 19:15
two 6:10 11:5
   12:1 13:2,2
   18:6 20:10
Tzu 19:6

**U**

uncle 7:14 11:19
understand 4:19
   6:20
understanding
   8:2
UNITED 1:1
use 8:6,6 16:5
usually 16:13

**V**

V 21:11

# FREEDOM COURT REPORTING

versus 1:7
videographer
  4:1
**VIDEOTAPED**
  1:15

**W**

waived 3:15,23
  21:18
waiving 3:19
walk 19:18
want 7:7
wasn't 13:3 18:8
Watch 18:23
watches 19:15
way 10:18 16:19
  17:8
ways 19:23
Weaver 2:4
week 6:10
weeks 13:2,2
weld 14:21 15:2
went 7:2,3,6
  10:15,17 11:3
  11:17 12:16,16
  13:4 15:15
  17:1
we'll 5:1
we're 6:19 9:17
  10:22 16:10
we've 16:12 19:2
wheelchair
  18:21
whichever 16:2
**WILLIAM** 2:3
witness 3:22,22
  4:3 5:2,6 8:19
  17:20 21:16
woke 10:17
**Wood** 2:9
woods 8:21 9:9
  13:12 14:8,13
work 6:14,15
  17:4 20:6,8

works 11:23

**Y**

yard 18:23
Yeah 6:8 14:3
  17:10 19:2,22
  20:2
you-all 6:23
  13:9
y'all 6:2,7 8:4
  11:9 12:4,9,18
  13:9,17 14:13
  17:15 19:12

**Z**

zip 5:13

**1**

**10:18** 1:22
**131** 1:20

**2**

**2:07-CV-128-10**
  1:7
**20** 21:14
**200** 2:6
**2008** 1:21 21:13
**21st** 1:21 21:13
**214** 2:5
**280** 2:15
**2801** 2:15

**3**

**300** 2:14
**309** 5:8,9
**35223** 2:16
**35242** 2:7
**36078** 5:14

**6**

**6** 10:5

Page 1

```
 1      IN THE UNITED STATES DISTRICT COURT
 2         MIDDLE DISTRICT OF ALABAMA
 3            NORTHERN DIVISION
 4
 5   CASE NUMBER: 2:07-cv-128-10
 6   LARRY STEPHENS, ET AL.,
 7         Plaintiffs,
 8         VS.
 9   STRONG BUILT, INC.,
10         Defendant.
11
12        S T I P U L A T I O N
13        IT IS STIPULATED AND AGREED by
14   and between the parties through their
15   respective counsel, that the video
16   deposition of MATT STEPHENS may be taken
17   before RENA' MESSICK LANIER, Certified
18   Court Reporter and Notary Public for the
19   State of Alabama at Large, at the offices
20   of Morris, Haynes & Hornsby at 131 Main
21   Street, Alexander City, Alabama  35010, on
22   the 17th day of December, 2007.
23        IT IS FURTHER STIPULATED AND
```

Page 2

```
 1   AGREED that the signature to and the
 2   reading of the deposition by the witness
 3   is waived, the deposition to have the same
 4   force and effect as if full compliance had
 5   been had with all laws and rules of Court
 6   relating to the taking of depositions.
 7        IT IS FURTHER STIPULATED AND
 8   AGREED that it shall not be necessary for
 9   any objections to be made by counsel to
10   any questions except as to form or leading
11   questions, and that counsel for the
12   parties may make objections and assign
13   grounds at the time of the trial, or at
14   the time said deposition is offered in
15   evidence, or prior thereto.
16        IT IS FURTHER STIPULATED AND
17   AGREED that the notice of filing of the
18   deposition by the Commissioner is waived.
19
20
21
22
23
```

Page 3

```
 1           I N D E X
 2   EXAMINATION BY:              PAGE
 3   MR. LEE              6
 4   EXHIBITS             MARKED
 5      None marked to this deposition
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
```

Page 4

```
 1      IN THE UNITED STATES DISTRICT COURT
 2         MIDDLE DISTRICT OF ALABAMA
 3            NORTHERN DIVISION
 4
 5   CASE NUMBER: 2:07-cv-128-10
 6   LARRY STEPHENS, ET AL.,
 7         Plaintiffs,
 8         VS.
 9   STRONG BUILT, INC.,
10         Defendant.
11   BEFORE:
12        RENA' M. LANIER, Commissioner
13   APPEARANCES:
14        WEAVER & TIDMORE, by WILLIAM
15   HASSINGER, 300 Cahaba Park Circle, Suite
16   200, Birmingham, Alabama  35242, (205)
17   980-6065, appearing for the Plaintiffs.
18        PARSONS, LEE & JULIANO, by DAVID
19   LEE, 300 Protective Center, 2801 Highway
20   280 South, Birmingham, Alabama  35223,
21   (205) 326-6600, appearing for the
22   Defendant.
23        ALSO PRESENT:  Patrick Sheehan
```

1 (Pages 1 to 4)

# FREEDOM COURT REPORTING

Page 5

1    I, RENA' MESSICK LANIER, a
2 Certified Court Reporter of Elmore County,
3 Alabama, acting as Commissioner, certify
4 that on this date, as provided by the
5 Federal Rules of Civil Procedure and the
6 foregoing stipulation of counsel, there
7 came before me at the offices of Morris,
8 Haynes & Hornsby, 131 Main Street,
9 Alexander City, Alabama 35010, beginning
10 at 11:52 a.m., a MATT STEPHENS, witness in
11 the above cause, for oral examination,
12 whereupon the following proceedings were
13 had:
14    THE VIDEO SPECIALIST: This
15 begins Videotape No. 1 in the deposition
16 of Matt Stephens in the matter of Larry
17 Stephens, et al., versus Strong Built,
18 Incorporated, Case No. 2:07-cv-128-10.  On
19 the Record at 11:52 a.m., Monday, December
20 17th, 2007.
21    This deposition is taking
22 place at 131 Main Street, Alexander City,
23 Alabama.  Videographer is Patrick Sheehan.

Page 6

1    Counsel, please identify
2 yourselves and state whom you represent.
3    MR. HASSINGER: I'm William
4 Hassinger.  I'm co-counsel for the
5 plaintiff, Larry Stephens and Deborah
6 Stephens.
7    MR. LEE:  And I'm David Lee,
8 and I represent Strong Built.
9    THE VIDEO SPECIALIST:  Okay.
10 Court Reporter, please swear in the
11 witness.
12    MATT STEPHENS,
13 the witness, after having first been duly
14 sworn, was examined and testified as
15 follows:
16    THE COURT REPORTER:  Do we
17 have usual stipulations?
18    MR. LEE:  That's fine.
19    MR. HASSINGER:  That's fine.
20    EXAMINATION
21 BY MR. LEE:
22    Q.    Would you tell us your name,
23 please?

Page 7

1    A.    Matt Stephens.
2    Q.    Matt, I'm David Lee.  I'm a
3 lawyer in Birmingham, and I represent
4 Strong Built in a lawsuit that's been
5 filed by Mr. Larry Stephens and his wife,
6 Deborah.
7    I'm going to be asking you
8 some questions today.  If I ask you a
9 question that you don't understand, just
10 tell me and I'll be happy to reask the
11 question.
12    If you need to take a break
13 for any reason, tell me that, and we'll be
14 happy to take a break.
15    And, also, it's very
16 important that you answer out when I ask
17 you a question.  Because the court
18 reporter has got to take down, you know,
19 what questions I'm asking and also take
20 down your answers, okay?
21    A.    All right.
22    Q.    What is your home address,
23 Matt?

Page 8

1    A.    127 Manning Circle.
2    Q.    Tallassee?
3    A.    Yes, sir.
4    Q.    And the zip code is what?
5    A.    36078.
6    Q.    How old are you, Matt?
7    A.    Eighteen.
8    Q.    Your date of birth?
9    A.    12/5/89.
10    Q.    You go to school?
11    A.    No, sir.
12    Q.    Are you out of -- did you
13 graduate from high school?
14    A.    (Nodding head.)  I went to a
15 private school called Chapman.
16    Q.    Chapman?  C-H-A-T --
17    A.    C -- C-A -- M-A-N I think,
18 Chapman.  Yeah.
19    Q.    Spell the whole school.
20    A.    C-H-A-P-M-A-N.
21    Q.    Chapman.  Okay.  Where is
22 that located?
23    A.    Millbrook.

2    (Pages 5 to 8)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 9

1     Q.    In Millbrook, Alabama?
2     A.    Yes, sir.
3     Q.    Did you graduate?
4     A.    (Nodding head.)
5     Q.    You need to answer. That's
6 what I'm talking about, answering out.
7     A.    Yes, sir.
8     Q.    Because she's got to take it
9 down.
10    A.    Yeah, I graduated.
11    Q.    What year did you graduate?
12    A.    Last year.
13    Q.    2006?
14    A.    (Nodding head.)
15    Q.    That's a yes?
16    A.    Yes.
17    Q.    Okay. What have you done
18 since graduating from high school?
19    A.    I just got a job in -- not
20 too long ago.
21    Q.    Where are you working now?
22    A.    Auburn Electric.
23    Q.    In Auburn, Alabama?

Page 10

1     A.    Yeah. That's where it was.
2 It's -- where I'm working, at Victoryland
3 in Shorter. That's where it is.
4     Q.    Okay. What do you do for
5 them?
6     A.    Electrical work.
7     Q.    Are you an electrician?
8     A.    I'm just a helper.
9     Q.    Okay. Studying to be an
10 electrician, I guess?
11    A.    Yes, sir.
12    Q.    Is that right? Now, let's
13 talk about -- you know we are here today
14 to talk about a ladder stand that was
15 involved in an accident.
16       You understand that?
17    A.    Yes, sir.
18    Q.    All right. Now, were you
19 hunting with Mr. Larry Stephens on the day
20 of the accident?
21    A.    Yes, sir.
22    Q.    Tell me the circumstances
23 surrounding that. When did y'all decide

Page 11

1 to go hunting? And who picked up who?
2 And just take me through that day.
3     A.    We decided to go hunting the
4 night before. And I picked him up that
5 morning, I did, and we went out there.
6     Q.    Where did -- where did you
7 go? Which prop -- whose property did you
8 go to?
9     A.    It's a -- some friend's. I
10 don't know whose property is. I think
11 it's Trey Taylor's property.
12    Q.    Trey Taylor's property?
13    A.    Yes, sir.
14    Q.    And did y'all decide which
15 stand you were going to go to, like --
16    A.    Yeah, we decided.
17    Q.    How did y'all decide that?
18    A.    I just -- he wanted to sit
19 right there. And I went on down to my
20 shooting house. I did. Because I sat in
21 the shooting house.
22    Q.    How many different stands
23 did y'all have on that property?

Page 12

1     A.    Like four or five.
2     Q.    How many ladder stands?
3     A.    Like three.
4     Q.    Three ladder stands. And
5 what else did you have out there?
6     A.    And a shooting house.
7     Q.    One shooting house?
8     A.    Yes, sir.
9     Q.    Anything else?
10    A.    And I think like -- I think
11 a climber. I think one or two climbers.
12    Q.    All right. So y'all had
13 anywhere from five to six different
14 hunting stands out there; is that correct?
15    A.    Yes, sir.
16    Q.    All right. Now, of those
17 four to five different stands, how many of
18 them were manufactured by Strong Built?
19    A.    I think two.
20    Q.    Okay. And describe those
21 two different stands. Were those both
22 ladder stands?
23    A.    Yes, sir.

3 (Pages 9 to 12)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

Page 13

1    Q.    Were they different heights?
2    A.    (Nodding head.) One of them
3    was a twelve, and one of them was like
4    sixteen.
5    Q.    Okay. And the one that's
6    involved in this accident was which one?
7    A.    The sixteen-foot one.
8    Q.    Okay. So it was decided
9    that Larry was going to go to the sixteen-
10   foot ladder stand, and you were going to
11   go to your shooting house?
12   A.    (Nodding head.)
13   Q.    Is that right?
14   A.    (Nodding head.) Yes, sir.
15   Q.    Okay. All right. Now, how
16   long were you out there that day?
17         Now, the accident occurred on
18   December the 2nd of 2006. How long were
19   you out there that day before you realized
20   something was wrong?
21   A.    He -- I was out there about
22   five to ten minutes. Then he called me.
23         Well, his son called me and

Page 14

1    told me something -- because he didn't
2    have no service on his phone. And he said
3    his daddy fell out of the tree stand.
4    Q.    Which son called you?
5    A.    Jaiton.
6    Q.    Is he the older one?
7    A.    Yes, sir.
8    Q.    Did you have a cell phone on
9    you?
10   A.    Yes, sir.
11   Q.    What type of phone do you
12   have? What type of service?
13   A.    It was a Nextel.
14   Q.    Nextel. How far was your
15   shooting house from -- from the area where
16   the accident occurred distance-wise?
17   A.    About -- I'd say about four
18   hundred, four-fifty yards between us.
19   Q.    Were you the first one
20   there?
21   A.    Yes, sir.
22   Q.    And tell me what you saw
23   when you first got there.

Page 15

1    A.    Well, I seen him on the
2    ground, and the tree stand was all bent in
3    and was broke.
4    Q.    Tell me about Mr. Stephens.
5    What was his condition, Larry?
6    A.    He was -- he was on the
7    ground telling me his both legs was broke
8    and everything.
9    Q.    Did you look at him, look at
10   his leg?
11   A.    No. I didn't look at them.
12   He had his camouflage.
13   Q.    Yeah. What was he wearing
14   that day?
15   A.    Camouflage.
16   Q.    Hunting camouflage?
17   A.    Yes, sir.
18   Q.    Did he have on blue jeans
19   underneath that?
20   A.    I think, yeah. He did.
21   Q.    Okay. What about, what type
22   of jacket did he have on?
23   A.    A thick camouflage jacket.

Page 16

1    Q.    What was he wearing
2    underneath that?
3    A.    His hunting shirt.
4    Q.    What else did he have with
5    him that day? Gun maybe?
6    A.    (Nodding head.) His gun.
7    Q.    What kind of gun did he
8    have?
9    A.    A .300.
10   Q.    Made by who?
11   A.    I think Remington.
12   Q.    All right. Anything else he
13   had with him that day?
14   A.    He had his safety harness
15   and it was on.
16   Q.    Was it on?
17   A.    Yes, sir. I mean, he --
18   he -- he didn't have it wrapped around the
19   tree because he wasn't all the way in the
20   tree stand.
21   Q.    But his safety harness was
22   on his body?
23   A.    Yes, sir.

4  (Pages 13 to 16)

# FREEDOM COURT REPORTING

Page 17

1  Q.    Anything else on him?
2  A.    That's about it.
3  Q.    And you say you didn't look
4  at his leg?
5  A.    Huh-uh.
6  Q.    How would you describe his
7  condition?  Was he in pain?  Or --
8  A.    He was in pain and like in
9  shock is what I would say.
10  Q.    All right.  So what did you
11  do?
12  A.    I called his wife, and she
13  called the hospital.  And they come on out
14  there.
15        And I rode up there beside
16  him in my truck.  And his daddy come out
17  there with a cot.  And we all like -- and
18  his son was there.
19        We all put him on the cot and
20  put him in the truck and drove him to the
21  hospital.
22  Q.    All right.  Who all came out
23  to the accident scene?

Page 18

1  A.    It was me, his daddy and
2  wife and his son, Jaiton.
3  Q.    All right.  Matt and
4  Deborah, right?
5  A.    Yes, sir.
6  Q.    Jaiton?
7  A.    And his daddy, Roger.
8  Q.    Roger Stephens?
9  A.    Roger Wood.
10  Q.    Is that his stepdaddy?
11  A.    Yes, sir.
12  Q.    Anybody else?
13  A.    That was it.
14  Q.    What did you do when they
15  took him to the hospital?
16  A.    I just waited outside and
17  waited to see what his conditions were and
18  everything.
19        And they said he had a broke
20  foot -- I mean legs and stuff and
21  everything.
22  Q.    When you -- when you were
23  out there right after the accident

Page 19

1  occurred, did you go over there and look
2  at the tree stand to see if you could
3  figure out what happened?
4  A.    No, I didn't really look at
5  it.  I was more concerned on him.
6  Q.    Yeah.  I can understand.
7  After -- any time after he left the scene
8  and went to the hospital, did you ever go
9  back and look at the stand?
10  A.    No.  I didn't go out there.
11  I didn't go hunting no more after that.
12  Q.    Did you go retrieve the
13  stand out of the woods?
14  A.    No, sir.
15  Q.    Who did that?
16  A.    Jaiton, his older son.
17  Q.    Jaiton got it out of the
18  woods?
19  A.    Yes, sir.
20  Q.    Did anybody go with him to
21  help take it out of the woods?
22  A.    I don't really know.
23  Q.    Do you know a guy named

Page 20

1  Dwight?
2  A.    Yeah.  Dwight Jones?
3  Q.    Yeah.
4  A.    Yes, sir.
5  Q.    Do you know if he went with
6  Jaiton to help get it out of the woods?
7  A.    I don't know.
8  Q.    Do you know if Mr. Jones
9  took any pictures out there at the scene?
10  A.    No.  I don't know.
11  Q.    Have you ever looked at the
12  stand again after the accident to see it
13  in its damaged condition?
14  A.    Not really.  I ain't never
15  looked at it after that.
16  Q.    Okay.  Did you ever talk to
17  Larry to ask him what happened?
18  A.    He said the tree stand just
19  broke when he was climbing.
20  Q.    When did he tell you that?
21  While you were out there that day?
22  A.    No.
23  Q.    Or sometime --

5 (Pages 17 to 20)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 21

1    A.    When he got out of the
2 hospital at his house.
3    Q.    Tell me what -- I guess you
4 said, well, what happened, Larry?
5    A.    Yeah. I said what happened.
6 He said he was climbing up the tree stand,
7 and, you know, he said it was broke. It
8 just broke, and he fell back.
9    Q.    He said the stand broke, and
10 he fell back?
11    A.    Yes, sir. Because it went
12 in.
13    Q.    Do you know what caused it
14 to go in?
15    A.    I -- I don't know.
16    Q.    Do you know what caused it
17 to break?
18    A.    I guess because that brace
19 broke, I guess.
20    Q.    Now, how do you know the
21 brace broke?
22    A.    I -- they -- they said the
23 weld or something come out. I don't know.

Page 22

1    Q.    Who said that?
2    A.    Peanut. Well, Larry.
3    Q.    Larry. Anybody else say
4 that?
5    A.    I ain't hear no -- no.
6    Q.    But you never saw that?
7    A.    No.
8    Q.    Okay.
9    A.    I never looked at it.
10    Q.    Now, I understand from
11 taking the deposition of your dad -- David
12 Stephens is your dad; is that correct?
13    A.    (Nodding head.)
14    Q.    -- that the two of y'all put
15 this stand together; is that correct?
16    A.    Yes, sir.
17    Q.    All right. I want to go
18 back -- I want to go back to that. When
19 did your dad get this as a gift?
20    A.    It was in '04 around
21 Christmas time. I don't know what --
22    Q.    And who gave him that gift?
23    A.    His brother, Terry.

Page 23

1    Q.    Do you know when Terry
2 purchased the stand?
3    A.    No.
4    Q.    Do you know where he got it
5 from?
6    A.    Not -- no. I don't know
7 where he got it from.
8    Q.    And did he give this as a
9 Christmas gift in '04?
10    A.    Yes, sir.
11    Q.    Was it new in the box?
12    A.    Yes, sir.
13    Q.    Was it wrapped up in
14 Christmas paper when your dad got it?
15    A.    Yes, sir.
16    Q.    Does Terry live close to
17 y'all now?
18    A.    He lives in Millbrook.
19    Q.    He lives in Millbrook?
20    A.    Yes, sir.
21    Q.    What does he do for a
22 living?
23    A.    Construction work.

Page 24

1    Q.    Is he older or younger than
2 your dad?
3    A.    He's younger than my daddy.
4    Q.    Had you all ever owned a
5 Strong Built tree stand before this one?
6    A.    Huh-uh.
7    Q.    This was the first one y'all
8 got?
9    A.    (Nodding head.)
10    A.    He's got two of them now?
11    A.    Yeah.
12    Q.    When did you get the other
13 one?
14    A.    We had -- we got it
15 around -- he got his, and then I got mine.
16 And then we put them --
17    Q.    Is the twelve-footer yours?
18    A.    Yeah.
19    Q.    Where did you get yours?
20    A.    I got it from my uncle. He
21 gave it to me. He had it up. I didn't
22 put that one together or nothing. He
23 already had it together.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 25

1    Q.    The twelve-footer?
2    A.    Yeah.
3    Q.    Do you know what year model
4  that one is?  Or what year it was made?
5    A.    I'd say it's about three or
6  four years old now.  Somewhere in there.
7    Q.    Do you know what year the
8  stand that was involved in this accident,
9  what year it was made?
10   A.    No.
11   Q.    Okay.  All you can say is
12 your dad got it the Christmas of '04,
13 correct?
14   A.    Yes, sir.
15   Q.    But when your uncle, Terry,
16 got it you don't know, correct?
17   A.    Yes, sir.
18   Q.    Or how long it had been
19 sitting in a box somewhere you have no
20 idea?
21   A.    Don't know.
22   Q.    Okay.  When did y'all put it
23 together?

Page 26

1    A.    That same day he got it.  I
2  don't know what day it was.  It was in
3  December sometime.
4         He got it for -- it's -- it
5  was probably like the 24th he got it
6  before Christmas.  It was the day before
7  Christmas he got it.  And that's when we
8  put it together.
9    Q.    Okay.  Where did y'all put
10 it together at?
11   A.    Outside in the yard.
12   Q.    At your house?
13   A.    (Nodding head.)
14   Q.    Is that a yes?
15   A.    Yes, sir.
16   Q.    And was the box sealed?  Did
17 y'all have to cut into the box?
18   A.    Yeah.  It had tape all the
19 way around it, like clear tape.
20   Q.    Had you ever put a ladder
21 stand together before this one?
22   A.    No, sir.
23   Q.    What about your dad?  Had he

Page 27

1  ever put one together before?
2    A.    I think.  I don't know.
3    Q.    Now, how did y'all do it?
4    A.    Went by the instructions.
5    Q.    Can you read and write?
6    A.    Yes, sir.
7    Q.    Did you have any difficulty
8  reading the instructions?
9    A.    No.
10   Q.    Okay.  Did you have any
11 problems understanding what you were
12 supposed to do in terms of putting the
13 stand together?
14   A.    Huh-uh.  We put it right
15 together.
16   Q.    Okay.  Did the -- what else
17 came with the stand besides written
18 instructions?
19   A.    It was just showing --
20 showing you how to put it together.  Like,
21 you know what I'm saying?  Like examples
22 of the stand.
23   Q.    It had diagrams?

Page 28

1    A.    Yeah.
2    Q.    Okay.
3    A.    Had that.
4    Q.    What about a video?  Was
5  there any kind of instructional video in
6  the box?
7    A.    Huh-uh.
8    Q.    Now, I understand they had
9  warning labels on the stand?
10   A.    Uh-huh.
11   Q.    Did y'all have to put the
12 warning labels on it?  Or was it already
13 on there?
14   A.    We had to put them on there.
15   Q.    You had to -- the labels
16 come in a -- well, how did the labels
17 come?
18   A.    They come in like a clear
19 bag with the instructions.
20   Q.    And y'all put the labels on?
21   A.    Yes, sir.
22   Q.    Okay.  And do you remember
23 any of the specific warnings?

7 (Pages 25 to 28)

# FREEDOM COURT REPORTING

Page 29

1    A.    Not really.
2    Q.    Okay.  Did you read the
3  warnings?
4    A.    Huh-uh.  I just stuck them
5  on there where he told me to put them.
6    Q.    Okay.  All right.  Now, some
7  people -- and we're at Christmas time now.
8  And I've got children.
9          Some people refuse to use
10  instructions.  I mean, you may have been
11  around people like that --
12    A.    Uh-huh.
13    Q.    -- who say I don't need
14  instructions.  I can put this together
15  myself.
16          And then other people like
17  me, you know, I'm going to go step by step
18  with the instructions.
19    A.    Uh-huh.
20    Q.    And, now, what I want to
21  know is how y'all did it.  Did y'all --
22  did your dad say I've put hundreds of
23  these things together and I know how to do

Page 30

1  it?
2          Or did y'all go by the
3  instructions step by step?
4    A.    Step by step.
5    Q.    With the instructions?
6    A.    Yes, sir.
7    Q.    Okay.  As far as you know,
8  did all of the -- were all the parts with
9  the tree stand in the box?
10    A.    Yes, sir.
11    Q.    You weren't missing anything
12  as far as you know?
13    A.    No.
14    Q.    Okay.
15    A.    It had all the bolts and
16  everything.
17    Q.    Now, what happened to the
18  instructions that came with the stand?
19    A.    I threw them away I guess.
20  Or he did one after we -- we put them back
21  in the box and I guess threw -- threw them
22  away.
23    Q.    And did y'all use the

Page 31

1  instructions when you went out to the
2  woods to put them up in the woods for the
3  first time or not?
4    A.    No.  We just -- huh-uh.  We
5  didn't -- we didn't use no instructions to
6  put them up in the woods.
7    Q.    Okay.  You're saying that
8  you just used the instructions to assemble
9  it at the house?
10    A.    Yes, sir.
11    Q.    Okay.  All right.  Now, when
12  was it put up for the first time?
13    A.    Like the couple of days
14  before -- after we got it.  After he got
15  it.
16    Q.    So it would have been put up
17  for the first time in either December of
18  '04 or January of '05?
19    A.    Yeah.
20    Q.    And whose property did it go
21  on the first time?
22    A.    Same people.
23    Q.    Mr. Taylor?  Is it Taylor?

Page 32

1  Or Traylor?
2    A.    Taylor.
3    Q.    T-A-Y-L-O-R?
4    A.    (Nodding head.)
5    Q.    So that was the first
6  hunting season -- your dad and I talked
7  about this a little earlier today -- was
8  in January of '05.  Is that right?
9    A.    Yes, sir.
10    Q.    Do you know anything about
11  the type of tree it went up against in
12  January of '05?
13    A.    It was a pine tree.  Healthy
14  one.  A healthy pine tree.  Pretty good
15  size one.
16    Q.    Do you know what size the
17  pine tree was?
18    A.    It was about -- it was
19  probably about that big around
20  (indicating).
21    Q.    Hold your hands up so the
22  camera can see.
23    A.    About that big around

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 33

1  (indicating).
2      Q.   Okay.  Do you know what
3  diameter that would be?  What size
4  diameter that would be?
5      A.   I don't know.  It was -- it
6  was, you know, the V of the tree stand
7  where it goes, that goes in the tree,
8  that's -- it fit pretty good.
9      Q.   All right.  Now, did you
10 help your dad put it up for the first
11 time?
12     A.   Huh-uh.  Well --
13     Q.   Were you with him when he
14 did it?
15     A.   Yeah, I was with him.
16 And --
17     Q.   Tell me, who helped him?
18     A.   Larry.
19     Q.   This was the first hunting
20 season?
21     A.   Yes, sir.
22     Q.   All right.  Tell me how they
23 put the stand up against the tree.

Page 34

1      A.   They got another ladder,
2  like a ladder from the house, like a
3  construction ladder.
4      Q.   Uh-huh.
5      A.   And we -- well, Peanut held
6  it up against the tree.  And daddy went up
7  there and strapped it on with a ratchet
8  strap behind it with a ladder.
9      Q.   Now, this is the first
10 hunting season, right?
11     A.   Yes, sir.
12     Q.   And where did he ratchet it?
13 Where did he put the ratchets?
14     A.   Around it.
15     Q.   Around where?
16     A.   Like where, you know,
17 where -- like where it's supposed to go on
18 the tree, like the V, go around the tree?
19     Q.   You talking about the brace
20 at the bottom?
21     A.   Yeah.  You put that on, and
22 it goes around the tree.  It's supposed --
23 it straps right there and ratchet strap it

Page 35

1  on and around the top.
2      Q.   Where at the top was it
3  ratcheted?
4      A.   In the V.  Where the V was
5  and around it.
6      Q.   That's up top?
7      A.   Yes, sir.
8      Q.   Okay.  Anything else that
9  was used to help secure the tree?
10     A.   No.  Not that I know of.
11     Q.   All right.  During that
12 first hunting season, which was not very
13 long, I guess maybe a month, how many
14 times was that stand used?
15     A.   I didn't go in it none.  I
16 think he probably went in it probably once
17 or twice.
18     Q.   Who is he?
19     A.   Daddy.
20     Q.   Okay.  Anybody else use it
21 that year?
22     A.   No.
23     Q.   All right.  What did you do

Page 36

1  after that first hunting season?
2      Did y'all leave it up in the
3  woods?  Or take it down?
4      A.   Took it down and put it in a
5  little shed.
6      Q.   I was trying to get your dad
7  to describe his shed to me.  Is it an open
8  shed?
9      A.   No.  It's an enclosed shed.
10 That's where we keep all of our tools and
11 everything.
12     Q.   It's got doors to it?
13     A.   Yes, sir.
14     Q.   Can you lock it up?
15     A.   Uh-huh.
16     Q.   Does it get wet in there or
17 not?
18     A.   Huh-uh.
19     Q.   What kind of floor has it
20 got?
21     A.   Like cement.
22     Q.   You stack them up in there
23 at the end of year?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 37

1    A.    Yeah.  We put them in there.
2    Q.    All right.  And then did
3    y'all do any type of work to that stand
4    during the off-season after you took it
5    out of the woods and before the next
6    season?
7    A.    The only thing we put on
8    there was the foam around the top so that
9    your gun wouldn't get scratched up.
10    That's the only thing we did.
11    Q.    Okay.  All right.  So let's
12    talk about the next hunting season.  I was
13    talking to your dad earlier today, and he
14    said that it went back up in the woods in
15    like November of 2005 and stayed there
16    until like January of 2006, which would be
17    the second hunting season he had it,
18    correct?
19    A.    Uh-huh.
20    Q.    Does that sound right to
21    you?
22    A.    Yes, sir.
23    Q.    Did y'all make any --

Page 38

1    besides putting the foam around the top,
2    did y'all do anything else to the stand
3    that season?
4    A.    No, I didn't.  I don't know
5    if they did or not.
6    Q.    All right.  Did y'all have
7    to replace anything?
8    A.    No.
9    Q.    What about the webbing for
10    the ratchet?  Was that replaced that year?
11    A.    We were like -- we replace
12    them like at half -- half of hunting
13    season, we replace them.  We do.
14    Q.    After hunting season?
15    A.    No.  It's like one hunt --
16    like the first of the year we put new ones
17    on.  And half of that year before hunting
18    season goes out, like the half, like
19    middleways of hunting season, we put new
20    ones on.
21    Q.    Do you remember what color
22    the webbing was with the original
23    equipment that came with this ratchet

Page 39

1    stand?
2    A.    You talking about the
3    ratchets?
4    Q.    Yes.
5    A.    I think green.
6    Q.    Green?
7    A.    Yes, sir.
8    Q.    That was the original
9    equipment was green colored webbing?
10    A.    Yes, sir.  I think.
11    Q.    All right.  Did you help put
12    the stand up in the woods for the second
13    hunting season, November of '05 to January
14    of '06?
15    A.    No.
16    Q.    Who did that?
17    A.    Pea -- daddy and Larry.
18    Q.    All right.  Did you help
19    take it down that year?
20    A.    No, sir.
21    Q.    Did you hunt in that stand
22    any that season?
23    A.    No, sir.

Page 40

1    Q.    Now, your dad said he had
2    been up in it a bunch of times?
3    A.    Uh-huh.
4    Q.    Maybe twenty or twenty-five
5    times.  Does that sound about right to
6    you?
7    A.    Yes, sir.
8    Q.    Did you hunt out of some
9    other stand or shooting house?
10    A.    I hunted out of a shooting
11    house.
12    Q.    Okay.  Did you go up in that
13    stand any during the second hunting
14    season, November of '05 to January of '06?
15    A.    I think I'd been in it twice
16    that year.  About twice.
17    Q.    Did you have any problems
18    with it?
19    A.    No.
20    Q.    Did it feel safe and secure
21    when you went up it?
22    A.    (Nodding head).
23    Q.    Is that a yes?

# FREEDOM COURT REPORTING

Page 41

1    A.    Yes, sir.
2    Q.    Okay.  Did you help take it
3  down?
4    A.    Huh-uh.
5    Q.    Who took it down?
6    A.    I think him and Larry.
7    Q.    Your dad and Larry?
8    A.    (Nodding head.)
9    Q.    All right.  Now, was any
10  type of maintenance work done on the stand
11  after it was taken down for the second
12  hunting season?
13    A.    No.  Nope.
14    Q.    All right.  Did you help put
15  it up before this accident occurred?
16    A.    Huh-uh.
17    Q.    Did you do any work on the
18  stand before it was put up?
19    A.    No.
20    Q.    Now, your dad told me before
21  the third hunting season some new webbing
22  was put on the ratchet stands -- ratchets;
23  is that correct?

Page 42

1    A.    Every year.
2    Q.    And what color webbing was
3  put on it?
4    A.    I think it was green or
5  blue.  Somewhere in there.  One of them
6  two.
7    Q.    Where did your dad get that
8  webbing?  Do you know?
9    A.    I think Wal-Mart.
10    Q.    Your dad also told me that
11  he replaced a bolt on the brace at the
12  bottom.  Do you know anything about that?
13    A.    Huh-uh.
14    THE COURT REPORTER:  No?
15    Q.    (BY MR. LEE)  Is that a no?
16    A.    Yes, sir.
17    Q.    Did you see him replace that
18  bolt?
19    A.    Huh-uh.  No.
20    Q.    Do you know where he got
21  that bolt from?
22    A.    No.
23    Q.    Did you ever see the bolt?

Page 43

1    A.    No, sir.
2    Q.    You don't know anything
3  about the size of the bolt?
4    A.    Huh-uh.
5    Q.    Or the strength of the bolt?
6    A.    I don't know about it.
7    Q.    Sir?
8    A.    I don't know about the bolt
9  or nothing.
10    Q.    Okay.
11    A.    Because I only hunted up
12  there like about four times that year.
13    Q.    And that's the third hunting
14  season, and that's the season that
15  Mr. Stephens he fell?
16    A.    He fell out.
17    Q.    On the four occasions that
18  you went up and down the stand -- did you
19  go up it you say four times that year?
20    A.    No.  I went out there four
21  times.  But I only went up in it like once
22  or twice.
23    Q.    The other times you were in

Page 44

1  your shooting house?
2    A.    Yes, sir.
3    Q.    On the one or two occasions
4  that you went up the ladder stand for the
5  third hunting season, did you ever have
6  any trouble with it?
7    A.    It climbed fine to me.
8    Q.    Did you ever look at the
9  stand before the third hunting season?
10    A.    No.
11    Q.    Did you see any rust on it?
12    A.    It was like surface rust
13  like weather, like mildew rust.  And that
14  was it.
15    Q.    Do you see surface rust on
16  most all tree stands?
17    A.    Yes, sir.
18    Q.    Regardless of who makes
19  them?
20    A.    Yes, sir.
21    Q.    Did you see any damage to
22  the stand at all?
23    A.    No, sir.

11  (Pages 41 to 44)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 45

1    Q.    Do you have any personal
2 knowledge of how or why this accident
3 occurred?
4    A.    No. Huh-uh. I don't know.
5    Q.    How many different trees
6 would you say this stand had been attached
7 to from the time your dad first got it
8 until the time of the accident?
9    A.    How many different trees?
10    Q.    Yeah.
11    A.    I'd say -- because it's in a
12 pine thicket, I'd say just pine trees.
13    Q.    How many different pine
14 trees is what I'm asking.
15    A.    Oh, how many?
16    Q.    Yes, sir.
17    A.    About three or four.
18    Q.    Do you know if any
19 additional rails were added to this stand
20 from the time your dad got it until the
21 time of the accident?
22    A.    No.
23    Q.    Are you saying no, they

Page 46

1 weren't? Or no, you don't know?
2    A.    I don't know.
3    Q.    If some additional rails
4 were added to the stand, you don't know
5 who did it?
6    A.    Huh-uh.
7    Q.    Do you know of anybody who
8 did any welding to this stand after your
9 dad got it?
10    A.    No. I don't -- didn't
11 nobody touch it besides him and Larry.
12    Q.    The only -- the only two
13 people who touched it after it was put
14 together was --
15    A.    Him. And I've touched it,
16 helped him put it up the first time.
17    Q.    Right.
18    A.    And that was it.
19    Q.    So it would have been only
20 Larry and your dad?
21    A.    (Nodding head.)
22    Q.    Is that right?
23    A.    Yes, sir.

Page 47

1    Q.    Do you know whether all of
2 the bolts that are presently holding this
3 tree stand together are, or that were on
4 the tree stand, do you know if all of
5 those bolts are original Strong Built
6 equipment? Or --
7    A.    I think it's the ones
8 that -- it was -- because I put it
9 together. Well, I read the instructions,
10 and he put it together. And all the
11 screws and bolts come in the bag and
12 everything.
13    Q.    Okay. Did y'all use any of
14 your own screws and bolts?
15    A.    No, sir.
16    Q.    What preventative
17 maintenance was performed on this
18 particular stand to your knowledge?
19    A.    I don't -- I don't know.
20    Q.    Do you know if any kind of
21 lubricant or WD-40 or anything like that
22 was sprayed on it?
23    A.    No, sir.

Page 48

1    Q.    When the -- when y'all
2 opened up the tree stand out of the box
3 originally, how many straps came with the
4 stand?
5    A.    How many straps came with
6 the stand?
7    Q.    Yes.
8    A.    I don't think none come with
9 it, like the straps.
10    Q.    The strap that you ratcheted
11 to the tree, you say it didn't come with
12 any straps?
13    A.    Huh-uh. We had -- you had
14 to buy them separate.
15    Q.    To your knowledge, have any
16 of the warning labels been removed from
17 the stand?
18    A.    No, sir.
19    Q.    Did y'all put on the stand
20 all of the warning labels that came with
21 the product?
22    A.    Yes, sir.
23    Q.    You didn't leave any of them

12  (Pages 45 to 48)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 49

1  in the box?
2      A.   No, sir.
3      Q.   You understand from putting
4  the stand together and also putting it out
5  in the woods together with your dad the
6  first time that there's a brace at the
7  bottom?
8      A.   Yes, sir.
9      Q.   Is that the brace that's got
10 the V to it?
11     A.   Yeah.  It goes to a tree.
12     Q.   Goes to a tree.  Now, my
13 question to you is this:  That brace, is
14 it adjustable?
15          In other words, can you make
16 it longer or shorter?  Is it adjustable?
17     A.   No.  It's just one that's --
18 like you got to move the stand up.  It
19 ain't adjustable or nothing.  It just goes
20 up against the tree.
21     Q.   Okay.  In other words, it
22 won't lengthen?
23     A.   Huh-uh.

Page 50

1      Q.   And how is that brace
2  attached to the stand itself?
3      A.   It's got a bolt going
4  through it and a weld.  It does.  And you
5  got to strap it to the tree.
6      Q.   Do you know which step
7  that --
8      A.   It's like the fourth or
9  fifth one up.
10     Q.   Okay.  Can you take it off?
11     A.   You can -- I mean, it's got
12 a thing made on the step where it's
13 supposed to go.  And that's the only where
14 it's -- I think it's supposed to go.
15     Q.   But can you take it off?
16 Can you take --
17     A.   Yeah.  You can unscrew the
18 bolt and take it out.
19     Q.   And take the brace off?
20     A.   Yes, sir.
21     Q.   When y'all took the stands
22 down during the off-season and stored the
23 stand in the shed, did you leave the brace

Page 51

1  on or take it off?
2      A.   They take it off, I think.
3      Q.   If your dad said that he
4  never took it off, that he just folded it
5  backwards, would you have any reason to
6  disagree with that?
7      A.   I -- I mean, he might have
8  did that.  I don't know.  I -- I don't --
9  I don't -- I didn't take them down or
10 nothing.
11     Q.   Okay.
12     A.   Because most of the time he
13 takes the steps and everything apart and
14 everything because they slide.  So --
15     Q.   Do you know what was shipped
16 with the tree stand to attach this brace
17 to the tree?
18     A.   You talking about like -- it
19 was just a bolt to put it on the tree
20 stand.  It didn't have nothing to put
21 against the tree.
22     Q.   You're saying the ratchet
23 strap was something that you had to buy

Page 52

1  separate?
2      A.   Yeah.
3      Q.   Did the ratchets come with
4  it?  Or did you have to buy the webbing
5  separately?
6      A.   You had to buy the
7  ratchet -- I mean, the -- it's like, you
8  know you have to buy the webbing and the
9  strap.  It's like it comes in one thing.
10     Q.   And where did y'all get
11 that?
12     A.   Wal-Mart.
13     Q.   Okay.  Do you know if this
14 brace was ever placed on any step other
15 than the fifth step?
16     A.   No, sir.
17     Q.   You don't know one way or
18 the other?
19     A.   Huh-uh.
20     Q.   And you don't know whether
21 the bolt that's on the horizontal brace
22 now is original equipment?
23     A.   No, sir.

13 (Pages 49 to 52)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 53

1  Q.  Do you recall what the
2  instructions have to say about the size of
3  the tree that this particular tree stand
4  was made to fit?
5  A.  It didn't -- I didn't -- no.
6  I didn't see that or nothing.
7  Q.  And your testimony is you
8  did not assist in placing the stand up
9  against the tree where this accident
10  occurred; is that true?
11  A.  Yes, sir.
12  Q.  Did you ever participate in
13  moving the stand from one location to
14  another?
15  A.  No, sir.
16  Q.  And when the stand was taken
17  down or moved from one occasion to
18  another, what is your best memory as to
19  what happened to the horizontal brace?
20  Was it completely removed
21  from the ladder rung?  Or was it left
22  intact?
23  A.  I don't know.

Page 54

1  Q.  Left attached?
2  A.  I don't know.
3  Q.  You don't know.  Do you know
4  when your dad and Mr. Stephens, Larry
5  Stephens, put the stand up the last time
6  before this accident?
7  Do you know what month and
8  day?
9  A.  About a week before hunting
10  season come in.
11  Q.  In November of '06?
12  A.  Yes, sir.
13  Q.  Did you have anything to do
14  with the selection of the tree where this
15  stand would go?
16  A.  No, sir.
17  Q.  Do you know who selected the
18  tree?
19  A.  (Shaking head.) No, sir.
20  Q.  Do you know anything about
21  the diameter of the tree where the
22  accident occurred?
23  A.  What you mean?  Like --

Page 55

1  Q.  How big the tree was?
2  A.  About that big (indicating).
3  Q.  Okay.  Was it a pine tree?
4  A.  Yes, sir.
5  Q.  When was the last time you
6  had seen the tree stand before the
7  accident?
8  A.  I seen it that -- that day
9  when he had -- that's the last time I seen
10  it, when he fell.
11  Q.  You said before he fell?
12  A.  Yes, sir.
13  Q.  How did it look to you?
14  A.  You talking about before he
15  fell and before it broke?
16  Q.  Yes.
17  A.  It was fine.
18  Q.  How would you -- I want you
19  to pretend like that my note pad here is
20  the tree.
21  A.  Uh-huh.
22  Q.  And I want you to use your
23  arm to show me how -- what angle the stand

Page 56

1  was up against the tree.
2  A.  You talking about when it
3  broke?
4  Q.  No.  Before it broke.
5  A.  It was like, you know what
6  I'm saying?  Like, there's the tree, and
7  it was like that (indicating).
8  Q.  Okay.  Put your arm up there
9  and show me the angle that it was located.
10  A.  About right there.  But it
11  was like straight down.  You know what I'm
12  saying?
13  Q.  Well, use your arm and show
14  me how it was.
15  A.  Like -- like that
16  (indicating).
17  Q.  Okay.
18  A.  It was straight up and down
19  though.
20  Q.  All right.  In other words,
21  the tree stand was straight up and down?
22  A.  Yes, sir.
23  Q.  It was vertical?

# FREEDOM COURT REPORTING

Page 57

1  A.  (Nodding head)
2  Q.  Correct?
3  A.  Yes, sir.
4  Q.  It didn't have an angle to
5  it?
6  A.  Huh-uh.
7  THE COURT REPORTER:  No?
8  A.  No, sir.
9  Q.  Okay.  And that's the way it
10 looked just moments before the accident
11 occurred?
12 A.  Yes, sir.
13 Q.  Did you see anything unusual
14 about it at all?
15 A.  No, sir.
16 Q.  You said that you had seen
17 some surface rust on the stand before?
18 A.  Yes, sir.
19 Q.  Did you ever do a close
20 inspection of it to see if the surface
21 rust had gotten into the welds or the
22 bolts?
23 A.  I never did pay attention to

Page 58

1  it.
2  Q.  Okay.  You do know that from
3  your experience that rust can weaken a
4  product?
5  A.  Yes, sir.
6  Q.  Okay.  Did you ever read any
7  of the warnings or instructions to
8  Mr. Larry Stephens?
9  A.  No, sir.
10 Q.  Have you ever taken any type
11 of hunting safety course?
12 A.  Yes, sir.
13 Q.  Where did you do that?
14 A.  At school.
15 Q.  Which school?
16 A.  When I went to Tallassee.
17 Q.  What was the name of the
18 school?
19 A.  Tallassee High School.
20 Q.  What did they teach you?
21 A.  It's a safety course you got
22 to go through before hunting.  They tell
23 you -- talking about -- talking about

Page 59

1  certain kinds of tree stands and
2  everything.  Talking about can't hunt with
3  corn, you know, stuff like that.
4  Q.  Have you ever had any
5  instructions on safety harnesses?
6  A.  Yes, sir.
7  Q.  The instruction you received
8  on safety harnesses, is it your
9  understanding that you can -- that you
10 have to wait until you get to the top of
11 the ladder stand before you connect the
12 harness?
13 Or can you connect it before
14 you get to the top?
15 A.  You got to get up there --
16 you got to get up there first from my
17 understanding.
18 Q.  And who taught you that?
19 A.  The teacher.
20 Q.  At Tallassee High School?
21 A.  It's a video we watched.
22 Q.  Okay.  Do you know who
23 produced that video, who made the video?

Page 60

1  A.  It's something, I think
2  Alabama Safety Course or something.
3  Q.  You ever worked for any
4  company that made tree stands?
5  A.  No, sir.
6  Q.  Have you ever had any
7  discussions with anybody at Strong Built
8  about this accident?
9  A.  No, sir.
10 Q.  Or their tree stand?
11 A.  No, sir.
12 Q.  Have you -- do you know
13 anybody else that owns a Strong Built
14 ladder stand or tree stand?
15 A.  No, sir.
16 Q.  Have you ever heard anybody
17 make any complaints about a Strong Built
18 stand?
19 A.  Not that I know of.
20 Q.  Okay.  How many times have
21 you talked with Mr. Larry Stephens about
22 this accident and how -- and determined
23 how it happened?

15  (Pages 57 to 60)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 61

1    A.    The -- probably like once or
2    twice. That's about it.
3        Q.    And so I'm clear about it,
4    he told you he was walking up the ladder?
5        A.    He was climbing up the
6    ladder and everything. And -- and he
7    was -- okay. You know, he put his gun on
8    the rope. You know, attached to the tree
9    stand. And his gun was on the ground.
10        He was going up it. And he
11    said -- the -- what's it called, the brace
12    broke and the tree stand caved in and he
13    fell back.
14        Q.    What was the weather like
15    that morning?
16        A.    It was fair.
17        Q.    It wasn't raining?
18        A.    No, sir.
19        Q.    The weather was clear?
20        A.    Yes, sir.
21        Q.    Have you ever had any more
22    discussions with him about this accident
23    other than that?

Page 62

1    A.    No, sir.
2        Q.    Okay.
3        MR. HASSINGER:  I don't have
4    anything.
5        MR. LEE:  Thank you.
6    Appreciate you coming, Matt.
7        THE VIDEO SPECIALIST:  All
8    right. This marks the end of Tape No. 1
9    and concludes the deposition of Matt
10    Stephens. Going off the Record. The time
11    is 12:36 p.m.
12
13
14
15
16        * * * * * * * * * * * * * *
17        FURTHER DEPONENT SAITH NOT
18        * * * * * * * * * * * * * *
19
20
21
22
23

Page 63

1        REPORTER'S CERTIFICATE
2    STATE OF ALABAMA:
3    TALLAPOOSA COUNTY:
4        I, Rena' Messick Lanier,
5    Certified Court Reporter and Commissioner
6    for the State of Alabama at Large, do
7    hereby certify that the above and
8    foregoing transcript of the proceedings in
9    this matter was reported by me.
10        I further certify that the
11    foregoing computer-printed pages contain a
12    true and correct transcript of the
13    proceedings held in this matter.
14        I further certify that I am
15    neither of kin nor of counsel to the
16    parties to said cause, nor in any manner
17    interested in the results thereof.
18
19
20        _____
21        Rena' M. Lanier, Certified
22        Court Reporter (ABCR No. 0031)
23

16 (Pages 61 to 63)

# FREEDOM COURT REPORTING

| | |
|---|---|
| **A** | |

**ABCR** 63:22
**accident** 10:15
  10:20 13:6,17
  14:16 17:23
  18:23 20:12
  25:8 41:15
  45:2,8,21 53:9
  54:6,22 55:7
  57:10 60:8,22
  61:22
**acting** 5:3
**added** 45:19
  46:4
**additional** 45:19
  46:3
**address** 7:22
**adjustable** 49:14
  49:16,19
**ago** 9:20
**AGREED** 1:13
  2:1,8,17
**ain't** 20:14 22:5
  49:19
**al** 1:6 4:6 5:17
**Alabama** 1:2,19
  1:21 4:2,16,20
  5:3,9,23 9:1,23
  60:2 63:2,6
**Alexander** 1:21
  5:9,22
**angle** 55:23 56:9
  57:4
**answer** 7:16 9:5
**answering** 9:6
**answers** 7:20
**anybody** 18:12
  19:20 22:3
  35:20 46:7
  60:7,13,16
**apart** 51:13
**APPEARAN...**
  4:13
**appearing** 4:17

4:21
**Appreciate** 62:6
**area** 14:15
**arm** 55:23 56:8
  56:13
**asking** 7:7,19
  45:14
**assemble** 31:8
**assign** 2:12
**assist** 53:8
**attach** 51:16
**attached** 45:6
  50:2 54:1 61:8
**attention** 57:23
**Auburn** 9:22,23
**a.m** 5:10,19

| | |
|---|---|
| **B** | |

**back** 19:9 21:8
  21:10 22:18,18
  30:20 37:14
  61:13
**backwards** 51:5
**bag** 28:19 47:11
**beginning** 5:9
**begins** 5:15
**bent** 15:2
**best** 53:18
**big** 32:19,23
  55:1,2
**Birmingham**
  4:16,20 7:3
**birth** 8:8
**blue** 15:18 42:5
**body** 16:22
**bolt** 42:11,18,21
  42:23 43:3,5,8
  50:3,18 51:19
  52:21
**bolts** 30:15 47:2
  47:5,11,14
  57:22
**bottom** 34:20
  42:12 49:7

**box** 23:11 25:19
  26:16,17 28:6
  30:9,21 48:2
  49:1
**brace** 21:18,21
  34:19 42:11
  49:6,9,13 50:1
  50:19,23 51:16
  52:14,21 53:19
  61:11
**break** 7:12,14
  21:17
**broke** 15:3,7
  18:19 20:19
  21:7,8,9,19,21
  55:15 56:3,4
  61:12
**brother** 22:23
**Built** 1:9 4:9
  5:17 6:8 7:4
  12:18 24:5
  47:5 60:7,13
  60:17
**bunch** 40:2
**buy** 48:14 51:23
  52:4,6,8

| | |
|---|---|
| **C** | |

**C** 8:17
**Cahaba** 4:15
**called** 8:15
  13:22,23 14:4
  17:12,13 61:11
**camera** 32:22
**camouflage**
  15:12,15,16,23
**Case** 1:5 4:5
  5:18
**cause** 5:11 63:16
**caused** 21:13,16
**caved** 61:12
**cell** 14:8
**cement** 36:21
**Center** 4:19

**certain** 59:1
**CERTIFICA...**
  63:1
**Certified** 1:17
  5:2 63:5,21
**certify** 5:3 63:7
  63:10,14
**Chapman** 8:15
  8:16,18,21
**children** 29:8
**Christmas** 22:21
  23:9,14 25:12
  26:6,7 29:7
**Circle** 4:15 8:1
**circumstances**
  10:22
**City** 1:21 5:9,22
**Civil** 5:5
**clear** 26:19
  28:18 61:3,19
**climbed** 44:7
**climber** 12:11
**climbers** 12:11
**climbing** 20:19
  21:6 61:5
**close** 23:16
  57:19
**code** 8:4
**color** 38:21 42:2
**colored** 39:9
**come** 17:13,16
  21:23 28:16,17
  28:18 47:11
  48:8,11 52:3
  54:10
**comes** 52:9
**coming** 62:6
**Commissioner**
  2:18 4:12 5:3
  63:5
**company** 60:4
**complaints**
  60:17
**completely**

53:20
**compliance** 2:4
**computer-pri...**
  63:11
**concerned** 19:5
**concludes** 62:9
**condition** 15:5
  17:7 20:13
**conditions** 18:17
**connect** 59:11
  59:13
**construction**
  23:23 34:3
**contain** 63:11
**corn** 59:3
**correct** 12:14
  22:12,15 25:13
  25:16 37:18
  41:23 57:2
  63:12
**cot** 17:17,19
**counsel** 1:15 2:9
  2:11 5:6 6:1
  63:15
**County** 5:2 63:3
**couple** 31:13
**course** 58:11,21
  60:2
**court** 1:1,18 2:5
  4:1 5:2 6:10,16
  7:17 42:14
  57:7 63:5,22
**co-counsel** 6:4
**cut** 26:17
**C-A** 8:17
**C-H-A-P-M-A...**
  8:20
**C-H-A-T** 8:16

| | |
|---|---|
| **D** | |

**D** 3:1
**dad** 22:11,12,19
  23:14 24:2
  25:12 26:23

29:22 32:6
33:10 36:6
37:13 40:1
41:7,20 42:7
42:10 45:7,20
46:9,20 49:5
51:3 54:4
**daddy** 14:3
17:16 18:1,7
24:3 34:6
35:19 39:17
**damage** 44:21
**damaged** 20:13
**date** 5:4 8:8
**David** 4:18 6:7
7:2 22:11
**day** 1:22 10:19
11:2 13:16,19
15:14 16:5,13
20:21 26:1,2,6
54:8 55:8
**days** 31:13
**Deborah** 6:5 7:6
18:4
**December** 1:22
5:19 13:18
26:3 31:17
**decide** 10:23
11:14,17
**decided** 11:3,16
13:8
**Defendant** 1:10
4:10,22
**DEPONENT**
62:17
**deposition** 1:16
2:2,3,14,18 3:5
5:15,21 22:11
62:9
**depositions** 2:6
**describe** 12:20
17:6 36:7
**determined**
60:22

**diagrams** 27:23
**diameter** 33:3,4
54:21
**different** 11:22
12:13,17,21
13:1 45:5,9,13
**difficulty** 27:7
**disagree** 51:6
**discussions** 60:7
61:22
**distance-wise**
14:16
**DISTRICT** 1:1
1:2 4:1,2
**DIVISION** 1:3
4:3
**doors** 36:12
**drove** 17:20
**duly** 6:13
**Dwight** 20:1,2

**E**

**E** 3:1
**earlier** 32:7
37:13
**effect** 2:4
**Eighteen** 8:7
**either** 31:17
**Electric** 9:22
**Electrical** 10:6
**electrician** 10:7
10:10
**Elmore** 5:2
**enclosed** 36:9
**equipment**
38:23 39:9
47:6 52:22
**et** 1:6 4:6 5:17
**evidence** 2:15
**examination** 3:2
5:11 6:20
**examined** 6:14
**examples** 27:21
**EXHIBITS** 3:4

**experience** 58:3

**F**

**fair** 61:16
**far** 14:14 30:7
30:12
**Federal** 5:5
**feel** 40:20
**fell** 14:3 21:8,10
43:15,16 55:10
55:11,15 61:13
**fifth** 50:9 52:15
**figure** 19:3
**filed** 7:5
**filing** 2:17
**fine** 6:18,19 44:7
55:17
**first** 6:13 14:19
14:23 24:7
31:3,12,17,21
32:5 33:10,19
34:9 35:12
36:1 38:16
45:7 46:16
49:6 59:16
**fit** 33:8 53:4
**five** 12:1,13,17
13:22
**floor** 36:19
**foam** 37:8 38:1
**folded** 51:4
**following** 5:12
**follows** 6:15
**foot** 13:10 18:20
**force** 2:4
**foregoing** 5:6
63:8,11
**form** 2:10
**four** 12:1,17
14:17 25:6
43:12,17,19,20
45:17
**fourth** 50:8
**four-fifty** 14:18

**friend's** 11:9
**full** 2:4
**further** 1:23 2:7
2:16 62:17
63:10,14

**G**

**gift** 22:19,22
23:9
**give** 23:8
**go** 8:10 11:1,3,7
11:8,15 13:9
13:11 19:1,8
19:10,11,12,20
21:14 22:17,18
29:17 30:2
31:20 34:17,18
35:15 40:12
43:19 50:13,14
54:15 58:22
**goes** 33:7,7
34:22 38:18
49:11,12,19
**going** 7:7 11:15
13:9,10 29:17
50:3 61:10
62:10
**good** 32:14 33:8
**gotten** 57:21
**graduate** 8:13
9:3,11
**graduated** 9:10
**graduating** 9:18
**green** 39:5,6,9
42:4
**ground** 15:2,7
61:9
**grounds** 2:13
**guess** 10:10 21:3
21:18,19 30:19
30:21 35:13
**gun** 16:5,6,7
37:9 61:7,9
**guy** 19:23

**H**

**half** 38:12,12,17
38:18
**hands** 32:21
**happened** 19:3
20:17 21:4,5
30:17 53:19
60:23
**happy** 7:10,14
**harness** 16:14
16:21 59:12
**harnesses** 59:5,8
**Hassinger** 4:15
6:3,4,19 62:3
**Haynes** 1:20 5:8
**head** 8:14 9:4,14
13:2,12,14
16:6 22:13
24:9 26:13
32:4 40:22
41:8 46:21
54:19 57:1
**healthy** 32:13,14
**hear** 22:5
**heard** 60:16
**heights** 13:1
**held** 34:5 63:13
**help** 19:21 20:6
33:10 35:9
39:11,18 41:2
41:14
**helped** 33:17
46:16
**helper** 10:8
**high** 8:13 9:18
58:19 59:20
**Highway** 4:19
**Hold** 32:21
**holding** 47:2
**home** 7:22
**horizontal** 52:21
53:19
**Hornsby** 1:20
5:8

# FREEDOM COURT REPORTING

hospital 17:13
17:21 18:15
19:8 21:2
house 11:20,21
12:6,7 13:11
14:15 21:2
26:12 31:9
34:2 40:9,11
44:1
huh-uh 17:5
24:6 27:14
28:7 29:4 31:4
33:12 36:18
41:4,16 42:13
42:19 43:4
45:4 46:6
48:13 49:23
52:19 57:6
hundred 14:18
hundreds 29:22
hunt 38:15
39:21 40:8
59:2
hunted 40:10
43:11
hunting 10:19
11:1,3 12:14
15:16 16:3
19:11 32:6
33:19 34:10
35:12 36:1
37:12,17 38:12
38:14,17,19
39:13 40:13
41:12,21 43:13
44:5,9 54:9
58:11,22

**I**

idea 25:20
identify 6:1
important 7:16
Incorporated
5:18

indicating 32:20
33:1 55:2 56:7
56:16
inspection 57:20
instruction 59:7
instructional
28:5
instructions
27:4,8,18
28:19 29:10,14
29:18 30:3,5
30:18 31:1,5,8
47:9 53:2 58:7
59:5
intact 53:22
interested 63:17
involved 10:15
13:6 25:8

**J**

jacket 15:22,23
Jaiton 14:5 18:2
18:6 19:16,17
20:6
January 31:18
32:8,12 37:16
39:13 40:14
jeans 15:18
job 9:19
Jones 20:2,8
JULIANO 4:18

**K**

keep 36:10
kin 63:15
kind 16:7 28:5
36:19 47:20
kinds 59:1
know 7:18 10:13
11:10 19:22,23
20:5,7,8,10
21:7,13,15,16
21:20,23 22:21
23:1,4,6 25:3,7
25:16,21 26:2

27:2,21 29:17
29:21,23 30:7
30:12 32:10,16
33:2,5,6 34:16
35:10 38:4
42:8,12,20
43:2,6,8 45:4
45:18 46:1,2,4
46:7 47:1,4,19
47:20 50:6
51:8,15 52:8
52:13,17,20
53:23 54:2,3,3
54:7,17,20
56:5,11 58:2
59:3,22 60:12
60:19 61:7,8
knowledge 45:2
47:18 48:15

**L**

L 1:12
labels 28:9,12,15
28:16,20 48:16
48:20
ladder 10:14
12:2,4,22
13:10 26:20
34:1,2,3,8 44:4
53:21 59:11
60:14 61:4,6
Lanier 1:17 4:12
5:1 63:4,21
Large 1:19 63:6
Larry 1:6 4:6
5:16 6:5 7:5
10:19 13:9
15:5 20:17
21:4 22:2,3
33:18 39:17
41:6,7 46:11
46:20 54:4
58:8 60:21
laws 2:5

lawsuit 7:4
lawyer 7:3
leading 2:10
leave 36:2 48:23
50:23
Lee 3:3 4:18,19
6:7,7,18,21 7:2
42:15 62:5
left 19:7 53:21
54:1
leg 15:10 17:4
legs 15:7 18:20
lengthen 49:22
let's 10:12 37:11
little 32:7 36:5
live 23:16
lives 23:18,19
living 23:22
located 8:22
56:9
location 53:13
lock 36:14
long 9:20 13:16
13:18 25:18
35:13
longer 49:16
look 15:9,9,11
17:3 19:1,4,9
44:8 55:13
looked 20:11,15
22:9 57:10
lubricant 47:21

**M**

M 4:12 63:21
Main 1:20 5:8
5:22
maintenance
41:10 47:17
manner 63:16
Manning 8:1
manufactured
12:18
marked 3:4,5

marks 62:8
Matt 1:16 5:10
5:16 6:12 7:1,2
7:23 8:6 18:3
62:6,9
matter 5:16 63:9
63:13
mean 16:17
18:20 29:10
50:11 51:7
52:7 54:23
memory 53:18
Messick 1:17
5:1 63:4
MIDDLE 1:2
4:2
middleways
38:19
mildew 44:13
Millbrook 8:23
9:1 23:18,19
mine 24:15
minutes 13:22
missing 30:11
model 25:3
moments 57:10
Monday 5:19
month 35:13
54:7
morning 11:5
61:15
Morris 1:20 5:7
move 49:18
moved 53:17
moving 53:13
M-A-N 8:17

**N**

N 1:12 3:1
name 6:22 58:17
named 19:23
necessary 2:8
need 7:12 9:5
29:13

neither 63:15
never 20:14 22:6
22:9 51:4
57:23
new 23:11 38:16
38:19 41:21
Nextel 14:13,14
night 11:4
Nodding 8:14
9:4,14 13:2,12
13:14 16:6
22:13 24:9
26:13 32:4
40:22 41:8
46:21 57:1
Nope 41:13
NORTHERN
1:3 4:3
Notary 1:18
note 55:19
notice 2:17
November 37:15
39:13 40:14
54:11
NUMBER 1:5
4:5

**O**

O 1:12
objections 2:9
2:12
occasion 53:17
occasions 43:17
44:3
occurred 13:17
14:16 19:1
41:15 45:3
53:10 54:22
57:11
offered 2:14
offices 1:19 5:7
off-season 37:4
50:22
Oh 45:15

okay 6:9 7:20
8:21 9:17 10:4
10:9 12:20
13:5,8,15
15:21 20:16
22:8 25:11,22
26:9 27:10,16
28:2,22 29:2,6
30:7,14 31:7
31:11 33:2
35:8,20 37:11
40:12 41:2
43:10 47:13
49:21 50:10
51:11 52:13
55:3 56:8,17
57:9 58:2,6
59:22 60:20
61:7 62:2
old 8:6 25:6
older 14:6 19:16
24:1
once 35:16
43:21 61:1
ones 38:16,20
47:7
open 36:7
opened 48:2
oral 5:11
original 38:22
39:8 47:5
52:22
originally 48:3
outside 18:16
26:11
owned 24:4
owns 60:13

**P**

P 1:12
pad 55:19
PAGE 3:2
pages 63:11
pain 17:7,8

paper 23:14
Park 4:15
PARSONS 4:18
participate
53:12
particular 47:18
53:3
parties 1:14
2:12 63:16
parts 30:8
Patrick 4:23
5:23
pay 57:23
Pea 39:17
Peanut 22:2
34:5
people 29:7,9,11
29:16 31:22
46:13
performed
47:17
personal 45:1
phone 14:2,8,11
picked 11:1,4
pictures 20:9
pine 32:13,14,17
45:12,12,13
55:3
place 5:22
placed 52:14
placing 53:8
plaintiff 6:5
Plaintiffs 1:7 4:7
4:17
please 6:1,10,23
PRESENT 4:23
presently 47:2
pretend 55:19
pretty 32:14
33:8
preventative
47:16
prior 2:15
private 8:15

probably 26:5
32:19 35:16,16
61:1
problems 27:11
40:17
Procedure 5:5
proceedings
5:12 63:8,13
produced 59:23
product 48:21
58:4
prop 11:7
property 11:7
11:10,11,12,23
31:20
Protective 4:19
provided 5:4
Public 1:18
purchased 23:2
put 17:19,20
22:14 24:16,22
25:22 26:8,9
26:20 27:1,14
27:20 28:11,14
28:20 29:5,14
29:22 30:20
31:2,6,12,16
33:10,23 34:13
34:21 36:4
37:1,7 38:16
38:19 39:11
41:14,18,22
42:3 46:13,16
47:8,10 48:19
51:19,20 54:5
56:8 61:7
putting 27:12
38:1 49:3,4
p.m 62:11

**Q**

question 7:9,11
7:17 49:13
questions 2:10

2:11 7:8,19

**R**

rails 45:19 46:3
raining 61:17
ratchet 34:7,12
34:23 38:10,23
41:22 51:22
52:7
ratcheted 35:3
48:10
ratchets 34:13
39:3 41:22
52:3
read 27:5 29:2
47:9 58:6
reading 2:2 27:8
realized 13:19
really 19:4,22
20:14 29:1
reask 7:10
reason 7:13 51:5
recall 53:1
received 59:7
Record 5:19
62:10
refuse 29:9
Regardless
44:18
relating 2:6
remember 28:22
38:21
Remington
16:11
removed 48:16
53:20
Rena 1:17 4:12
5:1 63:4,21
replace 38:7,11
38:13 42:17
replaced 38:10
42:11
reported 63:9
reporter 1:18

# FREEDOM COURT REPORTING

5:2 6:10,16
7:18 42:14
57:7 63:5,22
**REPORTER'S**
63:1
**represent** 6:2,8
7:3
**respective** 1:15
**results** 63:17
**retrieve** 19:12
**right** 7:21 10:12
10:18 11:19
12:12,16 13:13
13:15 16:12
17:10,22 18:3
18:4,23 22:17
27:14 29:6
31:11 32:8
33:9,22 34:10
34:23 35:11,23
37:2,11,20
38:6 39:11,18
40:5 41:9,14
46:17,22 56:10
56:20 62:8
**rode** 17:15
**Roger** 18:7,8,9
**rope** 61:8
**rules** 2:5 5:5
**rung** 53:21
**rust** 44:11,12,13
44:15 57:17,21
58:3

───── **S** ─────

**S** 1:12
**safe** 40:20
**safety** 16:14,21
58:11,21 59:5
59:8 60:2
**SAITH** 62:17
**sat** 11:20
**saw** 14:22 22:6
**saying** 27:21

31:7 45:23
51:22 56:6,12
**scene** 17:23 19:7
20:9
**school** 8:10,13
8:15,19 9:18
58:14,15,18,19
59:20
**scratched** 37:9
**screws** 47:11,14
**sealed** 26:16
**season** 32:6
33:20 34:10
35:12 36:1
37:6,12,17
38:3,13,14,18
38:19 39:13,22
40:14 41:12,21
43:14,14 44:5
44:9 54:10
**second** 37:17
39:12 40:13
41:11
**secure** 35:9
40:20
**see** 18:17 19:2
20:12 32:22
42:17,23 44:11
44:15,21 53:6
57:13,20
**seen** 15:1 55:6,8
55:9 57:16
**selected** 54:17
**selection** 54:14
**separate** 48:14
52:1
**separately** 52:5
**service** 14:2,12
**Shaking** 54:19
**shed** 36:5,7,8,9
50:23
**Sheehan** 4:23
5:23
**shipped** 51:15

**shirt** 16:3
**shock** 17:9
**shooting** 11:20
11:21 12:6,7
13:11 14:15
40:9,10 44:1
**shorter** 10:3
49:16
**show** 55:23 56:9
56:13
**showing** 27:19
27:20
**signature** 2:1
**sir** 8:3,11 9:2,7
10:11,17,21
11:13 12:8,15
12:23 13:14
14:7,10,21
15:17 16:17,23
18:5,11 19:14
19:19 20:4
21:11 22:16
23:10,12,15,20
25:14,17 26:15
26:22 27:6
28:21 30:6,10
31:10 32:9
33:21 34:11
35:7 36:13
37:22 39:7,10
39:20,23 40:7
41:1 42:16
43:1,7 44:2,17
44:20,23 45:16
46:23 47:15,23
48:18,22 49:2
49:8 50:20
52:16,23 53:11
53:15 54:12,16
54:19 55:4,12
56:22 57:3,8
57:12,15,18
58:5,9,12 59:6
60:5,9,11,15

61:18,20 62:1
**sit** 11:18
**sitting** 25:19
**six** 12:13
**sixteen** 13:4,9
**sixteen-foot** 13:7
**size** 32:15,16
33:3 43:3 53:2
**slide** 51:14
**son** 13:23 14:4
17:18 18:2
19:16
**sound** 37:20
40:5
**South** 4:20
**SPECIALIST**
5:14 6:9 62:7
**specific** 28:23
**Spell** 8:19
**sprayed** 47:22
**stack** 36:22
**stand** 10:14
11:15 13:10
14:3 15:2
16:20 19:2,9
19:13 20:12,18
21:6,9 22:15
23:2 24:5 25:8
26:21 27:13,17
27:22 28:9
30:9,18 33:6
33:23 35:14
37:3 38:2 39:1
39:12,21 40:9
40:13 41:10,18
43:18 44:4,9
44:22 45:6,19
46:4,8 47:3,4
47:18 48:2,4,6
48:17,19 49:4
49:18 50:2,23
51:16,20 53:3
53:8,13,16
54:5,15 55:6

55:23 56:21
57:17 59:11
60:10,14,14,18
61:9,12
**stands** 11:22
12:2,4,14,17
12:21,22 41:22
44:16 50:21
59:1 60:4
**state** 1:19 6:2
63:2,6
**STATES** 1:1 4:1
**stayed** 37:15
**step** 29:17,17
30:3,3,4,4 50:6
50:12 52:14,15
**stepdaddy** 18:10
**Stephens** 1:6,16
4:6 5:10,16,17
6:5,6,12 7:1,5
10:19 15:4
18:8 22:12
43:15 54:4,5
58:8 60:21
62:10
**steps** 51:13
**STIPULATED**
1:13,23 2:7,16
**stipulation** 5:6
**stipulations**
6:17
**stored** 50:22
**straight** 56:11
56:18,21
**strap** 34:8,23
48:10 50:5
51:23 52:9
**strapped** 34:7
**straps** 34:23
48:3,5,9,12
**Street** 1:21 5:8
5:22
**strength** 43:5
**Strong** 1:9 4:9

5:17 6:8 7:4
12:18 24:5
47:5 60:7,13
60:17
**stuck** 29:4
**Studying** 10:9
**stuff** 18:20 59:3
**Suite** 4:15
**supposed** 27:12
34:17,22 50:13
50:14
**surface** 44:12,15
57:17,20
**surrounding**
10:23
**swear** 6:10
**sworn** 6:14

**T**

**T** 1:12,12
**take** 7:12,14,18
7:19 9:8 11:2
19:21 36:3
39:19 41:2
50:10,15,16,18
50:19 51:1,2,9
**taken** 1:16 41:11
53:16 58:10
**takes** 51:13
**talk** 10:13,14
20:16 37:12
**talked** 32:6
60:21
**talking** 9:6
34:19 37:13
39:2 51:18
55:14 56:2
58:23,23 59:2
**TALLAPOOSA**
63:3
**Tallassee** 8:2
58:16,19 59:20
**tape** 26:18,19
62:8

**taught** 59:18
**Taylor** 31:23,23
32:2
**Taylor's** 11:11
11:12
**teach** 58:20
**teacher** 59:19
**tell** 6:22 7:10,13
10:22 14:22
15:4 20:20
21:3 33:17,22
58:22
**telling** 15:7
**ten** 13:22
**terms** 27:12
**Terry** 22:23
23:1,16 25:15
**testified** 6:14
**testimony** 53:7
**Thank** 62:5
**thereof** 63:17
**thereto** 2:15
**thick** 15:23
**thicket** 45:12
**thing** 37:7,10
50:12 52:9
**things** 29:23
**think** 8:17 11:10
12:10,10,11,19
15:20 16:11
27:2 35:16
39:5,10 40:15
41:6 42:4,9
47:7 48:8
50:14 51:2
60:1
**third** 41:21
43:13 44:5,9
**three** 12:3,4
25:5 45:17
**threw** 30:19,21
30:21
**TIDMORE** 4:14
**time** 2:13,14

19:7 22:21
29:7 31:3,12
31:17,21 33:11
45:7,8,20,21
46:16 49:6
51:12 54:5
55:5,9 62:10
**times** 35:14 40:2
40:5 43:12,19
43:21,23 60:20
**today** 7:8 10:13
32:7 37:13
**told** 14:1 29:5
41:20 42:10
61:4
**tools** 36:10
**top** 35:1,2,6 37:8
38:1 59:10,14
**touch** 46:11
**touched** 46:13
46:15
**transcript** 63:8
63:12
**Traylor** 32:1
**tree** 14:3 15:2
16:19,20 19:2
20:18 21:6
24:5 30:9
32:11,13,14,17
33:6,7,23 34:6
34:18,18,22
35:9 44:16
47:3,4 48:2,11
49:11,12,20
50:5 51:16,17
51:19,21 53:3
53:3,9 54:14
54:18,21 55:1
55:3,6,20 56:1
56:6,21 59:1
60:4,10,14
61:8,12
**trees** 45:5,9,12
45:14

**Trey** 11:11,12
**trial** 2:13
**trouble** 44:6
**truck** 17:16,20
**true** 53:10 63:12
**trying** 36:6
**twelve** 13:3
**twelve-footer**
24:17 25:1
**twenty** 40:4
**twenty-five** 40:4
**twice** 35:17
40:15,16 43:22
61:2
**two** 12:11,19,21
22:14 24:10
42:6 44:3
46:12
**type** 14:11,12
15:21 32:11
37:3 41:10
58:10
**T-A-Y-L-O-R**
32:3

**U**

**U** 1:12
**Uh-huh** 28:10
29:12,19 34:4
36:15 37:19
40:3 55:21
**uncle** 24:20
25:15
**underneath**
15:19 16:2
**understand** 7:9
10:16 19:6
22:10 28:8
49:3
**understanding**
27:11 59:9,17
**UNITED** 1:1 4:1
**unscrew** 50:17
**unusual** 57:13

**use** 29:9 30:23
31:5 35:20
47:13 55:22
56:13
**usual** 6:17

**V**

**V** 33:6 34:18
35:4,4 49:10
**versus** 5:17
**vertical** 56:23
**Victoryland**
10:2
**video** 1:15 5:14
6:9 28:4,5
59:21,23,23
62:7
**Videographer**
5:23
**Videotape** 5:15
**VS** 1:8 4:8

**W**

**wait** 59:10
**waited** 18:16,17
**waived** 2:3,18
**walking** 61:4
**Wal-Mart** 42:9
52:12
**want** 22:17,18
29:20 55:18,22
**wanted** 11:18
**warning** 28:9,12
48:16,20
**warnings** 28:23
29:3 58:7
**wasn't** 16:19
61:17
**watched** 59:21
**way** 16:19 26:19
52:17 57:9
**WD-40** 47:21
**weaken** 58:3
**wearing** 15:13
16:1

weather 44:13
  61:14,19
**WEAVER** 4:14
**webbing** 38:9,22
  39:9 41:21
  42:2,8 52:4,8
**week** 54:9
**weld** 21:23 50:4
**welding** 46:8
**welds** 57:21
**went** 8:14 11:5
  11:19 19:8
  20:5 21:11
  27:4 31:1
  32:11 34:6
  35:16 37:14
  40:21 43:18,20
  43:21 44:4
  58:16
**weren't** 30:11
  46:1
**wet** 36:16
**we'll** 7:13
**we're** 29:7
**wife** 7:5 17:12
  18:2
**William** 4:14
  6:3
**witness** 2:2 5:10
  6:11,13
**Wood** 18:9
**woods** 19:13,18
  19:21 20:6
  31:2,2,6 36:3
  37:5,14 39:12
  49:5
**words** 49:15,21
  56:20
**work** 10:6 23:23
  37:3 41:10,17
**worked** 60:3
**working** 9:21
  10:2
**wouldn't** 37:9

**wrapped** 16:18
  23:13
**write** 27:5
**written** 27:17
**wrong** 13:20

**X**

**X** 3:1

**Y**

**yard** 26:11
**yards** 14:18
**yeah** 8:18 9:10
  10:1 11:16
  15:13,20 19:6
  20:2,3 21:5
  24:11,18 25:2
  26:18 28:1
  31:19 33:15
  34:21 37:1
  45:10 49:11
  50:17 52:2
**year** 9:11,12
  25:3,4,7,9
  35:21 36:23
  38:10,16,17
  39:19 40:16
  42:1 43:12,19
**years** 25:6
**younger** 24:1,3
**y'all** 10:23 11:14
  11:17,23 12:12
  22:14 23:17
  24:7 25:22
  26:9,17 27:3
  28:11,20 29:21
  29:21 30:2,23
  36:2 37:3,23
  38:2,6 47:13
  48:1,19 50:21
  52:10

**Z**

**zip** 8:4

**0**

**0031** 63:22
**04** 22:20 23:9
  25:12 31:18
**05** 31:18 32:8,12
  39:13 40:14
**06** 39:14 40:14
  54:11

**1**

**1** 5:15 62:8
**11:52** 5:10,19
**12/5/89** 8:9
**12:36** 62:11
**127** 8:1
**131** 1:20 5:8,22
**17th** 1:22 5:20

**2**

**2nd** 13:18
**2:07-cv-128-10**
  1:5 4:5 5:18
**200** 4:16
**2005** 37:15
**2006** 9:13 13:18
  37:16
**2007** 1:22 5:20
**205** 4:16,21
**24th** 26:5
**280** 4:20
**2801** 4:19

**3**

**300** 4:15,19 16:9
**326-6600** 4:21
**35010** 1:21 5:9
**35223** 4:20
**35242** 4:16
**36078** 8:5

**6**

**6** 3:3

**9**

**980-6065** 4:17

# FREEDOM COURT REPORTING

**1**

1    IN THE UNITED STATES DISTRICT COURT
2    FOR THE MIDDLE DISTRICT OF ALABAMA
3    NORTHERN DIVISION
4
5    CASE NUMBER:  2:07-CV-128-1D
6    LARRY STEPHENS, ET AL.,
7        Plaintiffs,
8        vs.
9    STRONGBUILT, INC.,
10        Defendant.
11
12        S T I P U L A T I O N
13        IT IS STIPULATED AND AGREED by and
14    between the parties through their respective
15    counsel, that the video deposition of Jaiton
16    Stephens may be taken before Sara Mahler,
17    CCR, at the offices of Morris, Haynes &
18    Hornsby, at 131 Main Street, Alexander City,
19    Alabama 35010, on the 19th day of May, 2008.
20
21    DEPOSITION OF JAITON STEPHENS
22
23

**2**

1        IT IS FURTHER STIPULATED AND
2    AGREED that the signature to and the reading
3    of the deposition by the witness is waived,
4    the deposition to have the same force and
5    effect as if full compliance had been had
6    with all laws and rules of Court relating to
7    the taking of depositions.
8        IT IS FURTHER STIPULATED AND
9    AGREED that it shall not be necessary for
10    any objections to be made by counsel to any
11    questions except as to form or leading
12    questions, and that counsel for the parties
13    may make objections and assign grounds at
14    the time of the trial, or at the time said
15    deposition is offered in evidence, or prior
16    thereto.
17        IT IS FURTHER STIPULATED AND
18    AGREED that the notice of filing of the
19    deposition by the Commissioner is waived.
20
21        * * * * * * * * * * * * *
22
23

**3**

1        * * * * * * * * * * * * *
2        I N D E X
3        EXAMINATION
4            PAGE
5    By Mr. Lee ........................ 6
6    By Mr. Hassinger ................... 50
7        EXAMINATION CONTINUED
8            PAGE
9    By Mr. Lee ........................ 50
10        DEFENDANT'S EXHIBITS
11            PAGE
12    Exhibit 6 - Photograph ............ 10
13    Exhibit 7 - Drawing ............... 42
14        * * * * * * * * * * * * *
15
16
17
18
19
20
21
22
23

**4**

1    IN THE UNITED STATES DISTRICT COURT
2    FOR THE MIDDLE DISTRICT OF ALABAMA
3        NORTHERN DIVISION
4    CASE NUMBER:  2:07-CV-128-1D
5    LARRY STEPHENS, ET AL.,
6        Plaintiffs,
7        vs.
8    STRONGBUILT, INC.,
9        Defendant.
10
11    BEFORE:
12        SARA MAHLER, Commissioner.
13    APPEARANCES:
14        WILLIAM H. HASSINGER, ESQUIRE, of
15    WEAVER & TIDMORE, 300 Cahaba Park Circle,
16    Suite 200, Birmingham, Alabama 35242,
17    appearing on behalf of the Plaintiffs.
18        DAVID A. LEE, ESQUIRE, of PARSONS,
19    LEE & JULIANO, 2801 Highway 280 South, Suite
20    300, Birmingham, Alabama 35223, appearing on
21    behalf of the Defendant.
22        ALSO PRESENT:  TIM FAULK
23            TAMMY LEE

1  (Pages 1 to 4)

5

1 I, SARA MAHLER, CCR, a Court
2 Reporter of Wetumpka, Alabama, acting as
3 Commissioner, certify that on this date, as
4 provided by the Federal Rules of Civil
5 Procedure and the foregoing stipulation of
6 counsel, there came before me at the offices
7 of Morris, Haynes & Hornsby, 131 Main
8 Street, Alexander City, Alabama 35010,
9 beginning at 10:22 a.m., Jaiton Stephens,
10 witness in the above cause, for oral
11 examination, whereupon the following
12 proceedings were had:
13 VIDEOGRAPHER: This begins
14 videotape number one in the deposition of
15 Jaiton Stephens in the matter of Larry
16 Stephens, et al., versus Strongbuilt,
17 Incorporated; Case Number 2:07-CV-128-1D, in
18 the United States District Court, Middle
19 District of Alabama, Northern Division.
20 We are on the Record at 10:23
21 a.m. on Monday, May 19th, 2008. This
22 deposition is taking place in Alexander
23 City, Alabama. My name is Tim Faulk

6

1 representing Freedom Court Reporting.
2 Would counsel identify
3 yourself and state whom you represent,
4 please.
5 MR. HASSINGER: My name is
6 Will Hassinger, I'm cocounsel for the
7 plaintiffs in this case, Larry and Deborah
8 Stephens
9 MR. LEE: David Lee here on
10 behalf of the Defendant Strongbuilt,
11 Incorporated.
12 VIDEOGRAPHER: Would the
13 reporter please swear in the witness.
14 JAITON STEPHENS,
15 being first duly sworn, was examined and
16 testified as follows:
17 COURT REPORTER: Usual
18 stipulations?
19 MR. LEE: Yes.
20 MR. HASSINGER: That's fine.
21 EXAMINATION
22 BY MR. LEE:
23 Q. Tell us your name.

7

1 A. Jaiton Stephens.
2 Q. Jaiton, I met you before; I'm
3 David Lee, I'm a lawyer, and I represent
4 Strongbuilt in this lawsuit that your dad
5 has filed -- your mom and your dad.
6 We've taken your deposition
7 one time before; is that true?
8 A. Yes, sir.
9 Q. I want to go over a couple of
10 points with you today and that is, remind
11 me, did you go out to the scene on the day
12 of the accident?
13 A. Yes, sir.
14 Q. Okay. Did you pay -- I know
15 you were focused on your dad primarily,
16 taking care of him and getting him to the
17 hospital, and so forth. But the question I
18 have about the tree stand is this: Did you
19 look at the tree stand on the day of the
20 accident, pay any attention to it at all?
21 A. Glanced. I didn't pay no
22 attention. That was the last of my worries.
23 Q. I can certainly appreciate and

8

1 understand that. Do you -- When we talk
2 about the horizontal brace, do you know what
3 we're talking about?
4 A. Yes, sir.
5 Q. Tell me, so I'll know you
6 know.
7 A. The safety brace.
8 Q. You call it --
9 A. I call it a safety bar. Just
10 different names.
11 Q. That's what I'm going to call
12 it, a safety bar, if that's what you call
13 it.
14 Did you pay any attention to
15 it on the day of the accident, where it was
16 located?
17 A. No, sir.
18 Q. Did you see it?
19 A. No, sir.
20 Q. You weren't looking --
21 A. I mean, I just wasn't paying
22 no attention to it.
23 Q. You weren't looking for it?

2 (Pages 5 to 8)

## FREEDOM COURT REPORTING

Page 9

1  A.  No.
2  Q.  All right.  You just saw that
3  the stand had collapsed in; correct?
4  A.  Yes.
5  Q.  And that was it?
6  A.  Uh-huh.
7  Q.  Is that right?
8  A.  Yes, sir.
9  Q.  And the rest of your time was
10  -- and attention was focused on your dad; is
11  that true?
12  A.  Yes, sir.
13  Q.  All right.  Now, did you go
14  out there with Mr. Dwight Jones to take some
15  pictures?
16  A.  Yes, sir.
17  Q.  Okay.  And these pictures
18  are -- Let me mark this one too, here as an
19  exhibit.
20  MR. LEE:  Are we on 6?  We'll
21  have the same exhibits for both depositions.
22  (Whereupon, Defendant's
23  Exhibit No. 6 was marked

Page 11

1  years ago, I can't remember.
2  Q.  Did y'all shoot the whole
3  roll?
4  A.  No, I don't think so.
5  Q.  Do you know how many pictures
6  were in this disposable camera?
7  A.  No.
8  Q.  Or how many you could take
9  with that one disposable camera?
10  A.  No.  Whatever the average one
11  is, I don't know.  I'm pretty sure it wasn't
12  no expensive camera.  I don't know.
13  Q.  Was that something that your
14  mama gave to you to take out there and take
15  pictures with?
16  A.  I believe she gave it to
17  Dwight to take out there.
18  Q.  All right.  Where was the film
19  developed?
20  A.  It's going to be the CVS or
21  Rite-Aid in Tallassee, right there.
22  Q.  And you don't know how many
23  pictures you took?

Page 10

1  for identification.)
2  Q.  (BY MR. HASSINGER):  Look at
3  these pictures right here and let me know if
4  those are the pictures that Mr. Jones took
5  that day.
6  A.  Yes.  There's me right there
7  (indicating).
8  Q.  Is that your boots?
9  A.  Yes, sir.  That would be mine.
10  Q.  Did you take any pictures or
11  did he take the pictures?
12  A.  I can't remember.  I might
13  have took some.  We was both there.
14  Q.  How many -- What -- First of
15  all, what type of camera did y'all have?
16  A.  It was a disposable camera, I
17  think.  Digital or something, I don't know.
18  I ain't real big into cameras, I don't know
19  which one was which.
20  Q.  How many pictures did y'all
21  take, approximately?
22  A.  We took a few.  I don't
23  remember.  It's been, you know, almost two

Page 12

1  A.  We just took probably about
2  ten, maybe.
3  Q.  Okay.
4  A.  Eight, nine, ten, something
5  like that.  I don't know.
6  Q.  Your recollection is eight to
7  ten?
8  A.  Something like that.
9  Q.  Did you ever see the pictures
10  that y'all took?
11  A.  Yeah, I seen them.
12  Q.  When did you see them for the
13  first time?  Where were you when you saw the
14  pictures for the first time?
15  A.  At my house.
16  Q.  Who was with you?
17  A.  Me and my mom, my dad, because
18  he wanted to see the stand.
19  Q.  Did any pictures not take?
20  A.  No.  All of them went through.
21  I'm pretty sure.
22  Q.  Did you see some pictures that
23  y'all took that are not laying on this table

3  (Pages 9 to 12)

# FREEDOM COURT REPORTING

**13**

1  today?
2      A.    I don't know.
3      Q.    Because there are five
4  Mr. Jones told us about that were taken
5  there that day. But he seemed to recall
6  that y'all took more than five pictures,
7  that was his testimony, that's his
8  recollection. And you're telling me you
9  thought y'all took something like eight to
10  ten pictures?
11      A.    No. I like I said, I can't
12  give you a number because it's been almost
13  two years ago.
14      Q.    Okay. Let me go back to my
15  other question. Do you remember seeing any
16  pictures that y'all took that are not here
17  today?
18      A.    No, not really. We took, you
19  know, pictures of the stand. We took a
20  couple pictures of the stand, you know --
21  you know -- you know -- We took two or three
22  pictures just like that (indicating), just
23  sitting there like that, you know. We might

**14**

1  have had some pictures that looked similar,
2  you know, just alike.
3      Q.    You might have had what?
4      A.    Pictures that look like -- He
5  might have took two pictures of this part
6  right here (indicating); and then I took two
7  of this one, something like that, you know.
8      Q.    Okay. Where are those
9  original pictures? Does your mom still have
10  them?
11      A.    I don't know.
12      Q.    You don't have them?
13      A.    No, I don't have them.
14      Q.    Do y'all have a computer at
15  home?
16      A.    Yes, sir.
17      Q.    Are those pictures on y'all's
18  computer at home?
19      A.    I doubt it. I don't know. I
20  never get on it.
21      Q.    Okay. All right. On the day
22  of the accident, did you take anything away
23  from the scene of the accident other than

**15**

1  your dad?
2      A.    No, sir.
3      Q.    Anything to do with the stand,
4  it was left out there in the woods, is that
5  right, on the day of the accident?
6      A.    All we took was my daddy out
7  of the woods that day.
8      Q.    Okay. When you and Mr. Jones
9  went back there to take these pictures, did
10  y'all take anything back with you?
11      A.    No, sir.
12      Q.    What about the horizontal
13  brace?
14      A.    No, sir.
15      Q.    Where was -- Where,
16  specifically -- Now you -- Let's set this
17  up.
18          You told me that you were not
19  concerned about the stand on the day of the
20  accident. You were concerned about your
21  daddy?
22      A.    Yes, sir.
23      Q.    And you weren't looking for

**16**

1  it, didn't pay any attention to the
2  horizontal -- the safety bar; correct?
3      A.    Yes, sir.
4      Q.    Now, when you went back with
5  Mr. Jones after your dad had already been
6  gone to the hospital, and it's just you and
7  Mr. Jones out there taking some pictures,
8  did you find the horizontal brace or safety
9  bar, then?
10      A.    Yes, sir.
11      Q.    Where was it?
12      A.    It was in between -- It was
13  right there (indicating) in between the
14  stand and the tree. In that area right
15  there (indicating).
16      Q.    Okay. Did y'all take a
17  picture of it laying on the ground?
18      A.    I can't -- I can't remember if
19  we picked it up.
20      Q.    Look at that picture there and
21  tell me if you see it in that photograph.
22  We haven't marked that as an exhibit yet.
23  See if you see that -- See if you see the

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

17

1  safety bar in that picture.
2      A.   I can't tell.  There's limbs
3  and everything else.  It might be blended in
4  down there.
5      Q.   Yeah.  You don't see it in
6  that photograph?
7      A.   No, sir.
8      Q.   Your recollection is it was
9  somewhere between the tree and the ladder?
10     A.   Yes.  It was like right in
11  there somewhere (indicating).  That's what I
12  was saying about us might have been taking
13  two pictures.  When we took this picture of
14  the safety bar --
15     Q.   You're looking at Exhibit
16  Number 4.
17     A.   -- like I said we might not
18  have moved it.  We might not could have took
19  a clear picture right there.  Like I say, I
20  know we took one of me holding the brace.  I
21  might have had it over here (indicating)
22  still looking at it and he took that picture
23  right there.

18

1      Q.   Show me -- Show me the one
2  with -- Show me a picture of you holding the
3  brace.
4          And we've identified five
5  pictures that you and Mr. Jones took.  And
6  you said that you took one with you holding
7  the brace.  Now, show me which one -- Which
8  picture are you holding the brace?
9      A.   It's going to be either these
10  two right here (indicating).
11     Q.   You're looking at Exhibits 3
12  and 4; is that right?
13     A.   Yes, sir.
14     Q.   Which one are you -- What is
15  3?  What is that picture of right there?
16     A.   That looks like the brace to
17  me.
18     Q.   All right.  And what is 4?
19  What does that look like to you?
20     A.   That looks like the brace to
21  me too.
22     Q.   Is that brace laying on the
23  ground or are you holding it?

19

1      A.   I can't -- I can't tell.  It's
2  hard to judge that.
3      Q.   And what is Exhibit Number 5?
4      A.   That's going to be the -- this
5  is behind -- in between the tree and the
6  stand.  This is where the bar was attached
7  to the stand facing towards the tree right
8  here, shining out towards the woods; taking
9  the picture out towards the wood.
10     Q.   Does this clip (indicating)
11  look like it's completely rusted over to
12  you?
13     A.   I mean, yeah, in a way.  But
14  still, it's kind of blurry, so you really
15  can't tell.
16     Q.   Do you see rust on that clip?
17     A.   It just depends on what you
18  say is rust.  I mean, it's kind of blurry,
19  so it's all going to, you know, look the
20  same.
21     Q.   Okay.  So you don't know
22  whether that's rust or not?
23     A.   No, sir.  I mean, rust to me

20

1  is, you know, you can touch it and it will
2  fall off, that's rust.  I don't know what
3  this is, you know, just --
4      Q.   Well, rust is rust, and rust
5  is a rusty color.  Kind of a reddish-orange
6  looking color.  Does that look like a rust
7  to you?
8      A.   Yeah.  But rust is like --
9  Rust to me is darker, older is what I call
10  rust.  That's just -- You can take -- That's
11  just new.  You can take that and wipe it off
12  from the color of it.
13     Q.   What do you call that?
14     A.   There was a word we used for
15  it in shop class.  Something with an O,
16  oxidation or something like that.
17     Q.   All right.  You're looking at
18  Exhibit Number 5, you call that oxidation as
19  opposed to rust?
20     A.   Yes, sir.
21     Q.   All right.  Now, when did
22  y'all go take these pictures?
23     A.   I can't tell you the exact

5  (Pages 17 to 20)

# FREEDOM COURT REPORTING

**21**

1  date because I don't remember.
2      Q.    How long after the accident?
3  How many days or weeks?
4      A.    There was so much going on
5  then.  Probably a week or two after, maybe,
6  something like that.
7      Q.    Okay.  All right.  When y'all
8  went out and took those pictures, did you
9  take anything back with you that day?
10      A.    No, sir.
11      Q.    Okay.  All right.  And then
12  you went back a second time after the
13  accident to take the stand down; correct?
14      A.    Yes, sir.
15      Q.    Now, I have just taken the
16  deposition of Matt, your cousin.
17      A.    Yes, sir.
18      Q.    And I have heard Matt tell us
19  how this stand was taken down.
20      A.    Yes.
21      Q.    Have you talked to Matt
22  about -- Have y'all talked to each other
23  about how the stand was taken down?

**22**

1      A.    No, sir, not really.
2      Q.    Did you meet with
3  Mr. Hassinger today?
4      A.    Yes.  This morning.  We ate
5  breakfast at Huddle House.
6      Q.    Was Matt with you?
7      A.    Yes, sir.
8      Q.    And y'all talked about how the
9  stand was disassembled at the Huddle House,
10  didn't you?
11      A.    Not really.
12      Q.    Are you sure about that?
13      A.    It was mentioned, but, you
14  know, we didn't get into detail about it.
15      Q.    What did y'all talk about?
16      A.    Just nothing really about -- I
17  mean, we talked about the stand, but . . .
18      Q.    What did you talk about?
19      A.    He just asked -- He just asked
20  different questions, you know, asking
21  questions about it.
22      Q.    What did he ask you?
23      A.    He mentioned -- asked us how

**23**

1  did we take it down.
2      Q.    And did y'all tell him?
3      A.    Yes.
4      Q.    Did you tell him?
5      A.    Yes.
6      Q.    Did Matt tell him?
7      A.    Yes, sir.
8      Q.    Y'all both told him; correct?
9      A.    Yeah.  In a way.  Matt really
10  didn't speak that much.  He's kind of a shy
11  person.  He really didn't.
12      Q.    Was he sitting there listening
13  to what you were saying?
14      A.    I reckon.  He might have been
15  off in his own little world, you never know
16  about him.
17      Q.    Were y'all sitting at a booth?
18      A.    Yes, sir.
19      Q.    As opposed to a table?
20      A.    Yes, sir.
21      Q.    Okay.  At the Huddle House?
22      A.    Yes, sir.
23      Q.    Who was sitting next to you?

**24**

1      A.    Matt.
2      Q.    To your right?
3      A.    Yes, sir.
4      Q.    And who was sitting across the
5  table?
6      A.    (Witness indicates.)
7      Q.    Mr. Hassinger?
8      A.    Yes.
9      Q.    And y'all were all talking
10  about the disassembly of this stand;
11  correct?
12      A.    Yes, sir.
13      Q.    How it was done; correct?
14      A.    Yes, sir.
15      Q.    So y'all are close to each
16  other?
17      A.    Pretty much.
18      Q.    Okay.  All right.  Well, let's
19  hear how you say you took it down.
20          Because I've heard how Matt
21  said it was taken down, and I want to hear
22  how you say it was taken down.
23      A.    We got out there, we used a

6 (Pages 21 to 24)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

25

1 climbing stand to climb up and take the top
2 loose and lowered it down with a stand -- I
3 mean, lowered it down with a rope down to
4 Matt, but --
5    Q.    Did you take this yellow strap
6 off first?
7    A.    Yes, sir.
8    Q.    Because you can't climb that
9 with that in the way, can you?
10    A.    No. No, sir.
11    Q.    All right. Before we get too
12 far on this, if that horizontal brace was
13 attached from the stand to the ladder -- I'm
14 not talking about on the day of the
15 accident, I'm just talking on about on any
16 day. If the horizontal brace or the safety
17 bar is attached from the ladder to the
18 tree -- are you with me?
19    A.    Yes.
20    Q.    -- you can't climb up a tree
21 with a climber either, can you?
22    A.    No, sir.
23    Q.    No way?

26

1    A.    No way.
2        Unless you get -- Unless you
3 put your stand on above the safety bar --
4 above the brace.
5    Q.    And if that -- If that safety
6 bar was on the fourth or fifth ladder rung,
7 unless you are Shaquille O'Neal, you
8 couldn't get it above that, could you, and
9 start climbing? You'd have to be a real
10 tall person, wouldn't you?
11    A.    Yeah, in a way.
12    Q.    All right. I didn't mean to
13 get us off track.
14        All right. So you took the
15 yellow strap off; correct?
16    A.    Yes.
17    Q.    Who climbed with the climber?
18    A.    Me.
19    Q.    All right. You skinnied up
20 the tree; correct?
21    A.    Yes, sir.
22    Q.    And what did you do at the
23 top?

27

1    A.    Took the strap loose that's
2 right there at the top of the tree, and tied
3 a rope on and lowered it down.
4    Q.    Did you drop it?
5    A.    No, sir, I didn't drop it.
6    Q.    Did you lower it carefully?
7    A.    Yes, sir. I'll rephrase
8 myself. I got a step right ahead.
9        This right here (indicating)
10 was bent in so far I couldn't get up in the
11 climber. So down there at the bottom of the
12 stand, there's about that much (indicating)
13 bar on the bottom of the stand, if you see
14 the stand. We had to -- It's pushed in the
15 ground for extra support. So we had to, you
16 know, pull it out so I could get by with the
17 climber.
18    Q.    Are you talking about -- I
19 hear what you're saying.
20    A.    The bottom of the legs.
21    Q.    Let me repeat what I think
22 you're saying. The first ladder section
23 sticks into the ground; correct?

28

1    A.    Yes.
2    Q.    And what you're saying is you
3 took that loose from the ground?
4    A.    Yes, sir.
5    Q.    And backed it out a little
6 bit?
7    A.    Yes, sir.
8    Q.    To get a little bit --
9    A.    To get up.
10    Q.    To get a little further away
11 from the tree?
12    A.    Yes, sir.
13    Q.    Okay. So that you could go up
14 with the ladder?
15    A.    Yes, sir.
16    Q.    How far back did you move
17 the --
18    A.    It's -- I'd say about -- It
19 wasn't very far, because that strap wouldn't
20 let us move it very far. We had to kind of
21 just move it a little bit, just enough to
22 ease up through there.
23    Q.    All right. But that's the

7 (Pages 25 to 28)

# FREEDOM COURT REPORTING

29

1  first ladder section you're talking about?
2  　　A.　Yes. At the bottom.
3  　　Q.　In the bottom.
4  　　A.　Yes.
5  　　Q.　You're on TV right there.
6  Hold your hand up and show the cameraman how
7  far you moved the stand back away from the
8  tree.
9  　　A.　Well, it's a pretty good
10  ways -- From where it was in the ground, we
11  probably moved it about that far right there
12  (indicating), about two foot probably.
13  　　Q.　All right.
14  　　A.　Foot and a half, two foot.
15  　　Q.　Okay.
16  　　A.　And after we got it on the
17  ground, the only sections --
18  　　Q.　Hold on a second, let's don't
19  get ahead of ourselves.
20  　　　　So you just moved it back --
21  the bottom section back a foot or two, a
22  couple of feet away from the tree, so you
23  could get the climber up there; correct?

30

1  　　A.　Yes.
2  　　Q.　And then you went up there
3  with the climber, and you took the strap off
4  at the top; correct?
5  　　A.　Yes.
6  　　Q.　And you tied a rope to it;
7  right?
8  　　A.　Yes, sir.
9  　　Q.　And you carefully lowered it
10  to the ground?
11  　　A.　Yes, sir.
12  　　Q.　All right. Now, looking at
13  Exhibit Number 1, which way did you lower it
14  to the ground, to the right or to the left?
15  　　A.　To the right, over here
16  (indicating).
17  　　Q.　Okay. And you're sure you
18  would have lowered it to the right side?
19  　　A.　Yes, sir.
20  　　Q.　Okay. You didn't lower it to
21  the left side?
22  　　A.　No, sir.
23  　　Q.　And you didn't let it fall

31

1  backwards --
2  　　A.　No, sir.
3  　　Q.　-- away from the tree?
4  　　A.　No, sir.
5  　　Q.　And you didn't let it fall
6  anyway, did -- in any direction?
7  　　A.　No, sir.
8  　　Q.　You lowered it very carefully
9  to the bottom?
10  　　A.　Yes, sir.
11  　　Q.　Once you got it to the bottom,
12  once you got it to the ground, what was the
13  next thing to do?
14  　　A.　We took -- This part right
15  here (indicating) was kind of stuck
16  together, and we didn't want to move it too
17  much, so we pulled the bottom part and the
18  top part loose.
19  　　Q.　So I understand what you're
20  saying, you took --
21  　　A.　The bottom section.
22  　　Q.　Let me repeat what I think
23  you're saying. Once it's on the ground, you

32

1  took the first ladder section loose from the
2  second ladder section; correct?
3  　　A.　Yes, sir.
4  　　Q.　And then you went to the other
5  end, and you took the third ladder section
6  loose from the upper part of the second
7  ladder section --
8  　　A.　Yes.
9  　　Q.　-- so that you have all three
10  sessions apart; correct?
11  　　A.　Yes.
12  　　Q.　All right. Then what did you
13  do?
14  　　A.　We put the bottom section --
15  the bottom section -- the first section in
16  the truck first, then we put that part right
17  there (indicating).
18  　　Q.　The second --
19  　　A.　The second and the third part
20  right there, we put it in the truck. And
21  then we put the stand on the top side.
22  　　Q.　You're talking about you put
23  the platform on the top?

8 (Pages 29 to 32)

# FREEDOM COURT REPORTING

33

1    A.    Yes, sir. That way the weight
2 of it will hold it down.
3    Q.    All right. So by the time you
4 got it into the truck, all three ladder
5 sections were apart; correct?
6    A.    No, sir. The only part -- The
7 only parts that was, you know, disassembled
8 is the bottom and the top. The bend right
9 there was still together.
10    Q.    Okay. Are you telling me you
11 took the platform off, is that what you're
12 saying?
13    A.    Yes, sir. If you look right
14 there, you can see somewhere right in there
15 (indicating) that part right there comes
16 off, it's its own little section. And then
17 there's a section (indicating), and then
18 there's a section (indicating), and there's
19 the bottom section.
20    Q.    Are you saying that you left
21 the second and third ladder section
22 together?
23    A.    Yes, sir.

34

1    Q.    Now, that's not what Matt had
2 to say a few minutes ago.
3    A.    Well, that's what happened.
4    Q.    Matt said you took all three
5 ladder sections apart.
6    A.    No, sir. Unless when he said
7 three -- he might have said one, two, three,
8 like thinking that's one. He might have
9 misunderstood what you were saying was
10 three, he might have thought you was talking
11 about was one part. I don't know.
12    Q.    All right. Well, you're
13 telling me that you took off the top
14 platform and you took off the first ladder
15 section?
16    A.    Yes, sir.
17    Q.    And you left the second and
18 the third ladder section together; correct?
19    A.    Yes, sir.
20    Q.    And why did you do that?
21    A.    Because we didn't want to mess
22 with that bend too much. It was kind of --
23 We didn't -- We couldn't pull it apart right

35

1 there right then; we didn't want to. So we
2 took them parts apart and stuck it in the
3 truck.
4    Q.    Okay. So you left the bend
5 together?
6    A.    Yes, sir.
7    Q.    You didn't try to pull them
8 out?
9    A.    No, sir.
10    Q.    Now, he said y'all just tugged
11 on it and it came loose.
12    A.    No, sir. We didn't -- The
13 only time that part right there come apart
14 was when we stuck it in -- I don't know his
15 last name -- Darrell's SUV when he come and
16 picked the stand up and carried it to
17 Birmingham. That's the only time that part
18 come aloose, then we had to tug on it to get
19 it aloose. And we put it in his SUV thing.
20    Q.    All right. So you're saying
21 that when y'all left the woods, you and -- I
22 get the two of you confused -- Matt --
23    A.    Yes, sir.

36

1    Q.    -- the second and third ladder
2 sections were still together; correct?
3    A.    Yes, sir.
4    Q.    And y'all put them in the back
5 of the truck?
6    A.    Yes, sir.
7    Q.    You didn't bend it in any way?
8    A.    No, sir. Unless when the
9 top -- unless the ride from -- because, see,
10 you've got to go down a dirt road, got to
11 come out of the woods and everything else in
12 the truck. Less the weight of the top part
13 pushed it down, that's the only time it
14 would have got --
15    Q.    Well, the top part is off.
16    A.    That's what I'm saying. When
17 we put it in the truck, though, it was all
18 on top of each other, like that
19 (indicating). So the second -- The bottom
20 part was already in, you've got the second
21 and third part; and then the top part, we
22 put it on top of it.
23    Q.    Okay. All right. You can't

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 37

1 control what's going on during the ride?
2      A.    No, sir.
3      Q.    You know, what I'm asking you
4 now is, did you physically bend anything --
5      A.    No, sir.
6      Q.    -- at any time --
7      A.    No, sir.
8      Q.    -- to take anything apart?
9      A.    No, sir.
10      Q.    Okay.  Your testimony is you
11 left the second and the third ladder
12 sections together?
13      A.    Yes, sir.
14      Q.    Put the first ladder section
15 in the truck, put the second and third
16 ladder sections still together in the truck,
17 and put the platform in there?
18      A.    Yes.
19      Q.    What about -- What about the
20 safety bar?  What did you do with it?
21      A.    We laid it to the side of the
22 truck over here (indicating), you know, in
23 the bed still, but it's in there.

Page 38

1      Q.    What kind of pickup truck were
2 y'all in?
3      A.    A Chevrolet.
4      Q.    A long base or short?
5      A.    Short-wheel base, two-wheel
6 drive.
7      Q.    Did y'all have a tool box in
8 the back?
9      A.    No, sir.
10      Q.    Anything else back there
11 besides this?
12      A.    No, sir.  And it was a
13 stepside.  It had the straight-in side beds
14 on it, you know what I'm saying?
15      Q.    Yeah.
16      A.    It's got the two little humps
17 in it, and the straight -- the stepside has
18 got just the inside of the bed, the flare's
19 on the outside.
20      Q.    So it's sort of caved in a
21 little bit, is that what you're saying, for
22 the steps?
23      A.    No, sir -- I mean, yeah, the

Page 39

1 bed of the truck is smaller on the --
2      Q.    It's a Chevy -- Whose truck is
3 it?
4      A.    It was my mama's.  She had to
5 get rid of it to get a van to get my dad
6 back and forth to the hospital.
7      Q.    Chevy -- What year model was
8 it?
9      A.    '96, I want to say.
10      Q.    Two-wheel drive, short-wheel
11 base.  And you tell me how you're describing
12 this bed.
13      A.    Just a regular old stepside
14 bed.  You know, just any stepside bed I've
15 ever seen has been like it.
16      Q.    But there was nothing else
17 back there other than this ladder?
18      A.    Yes, sir.
19      Q.    And y'all are able to get it
20 all in there?
21      A.    Yes, sir.
22      Q.    Were you able to close the
23 bed, the tailgate?

Page 40

1      A.    No, sir.  Not with the second
2 and third part on because it was longer than
3 the bed, you know.
4      Q.    So you left the tailgate open?
5      A.    Yes, sir.
6      Q.    How did you lay it in there?
7      A.    Just flat, just bottom
8 section, then that section, and the top
9 section was up here (indicating).  And we
10 tied the back -- from the strap to strap
11 right there on the back with a rope to keep
12 them from sliding out.
13      Q.    What's on the bottom?
14      A.    The bottom section right there
15 (indicating).
16      Q.    All right.  And then how did
17 you put the second and third section on
18 there?
19      A.    Just laid it in there on --
20      Q.    On it's side?
21      A.    Yes, sir.
22      Q.    In other words, you didn't lay
23 it -- What I'm envisioning, you've got a

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

41

1  bend, you didn't lay the bend on the bed of
2  the truck, did you?  You laid it on the
3  side?
4      A.    Let me draw it out for you.
5      Q.    Why don't you draw it out so
6  we're not all guessing. --
7      A.    Like here is the bed of the
8  truck (indicating).  We put the bottom
9  section in first, here's the bottom section
10  (indicating); then over here on the side, we
11  put the second and third section in with the
12  bend, so it's kind of in there, you know,
13  kind of crooked like that on its side like
14  that (indicating); and then we put the top
15  section on top of all of them, like that
16  (indicating).  The safety bar is over here
17  (indicating), that way the weight of the
18  platform would hold it down.
19      Q.    All right.  In other words,
20  the bend -- the way you've drawn this, the
21  bend would be -- if you're facing -- if
22  you're standing at the back of the truck --
23      A.    Yes, sir.

42

1      Q.    -- the bend would be towards
2  the right side of the truck?
3      A.    Yes, sir.
4      Q.    Any confusion about that at
5  all?
6      A.    No, sir.
7          (Whereupon, Defendant's
8          Exhibit No. 7 was marked
9          for identification.)
10      Q.    And so what you're trying to
11  do, if I'm understanding you, is you're
12  trying to preserve the bend --
13      A.    Yes.
14      Q.    -- without it being damaged --
15      A.    Yes.
16      Q.    -- by the weight of anything?
17      A.    Yes.  If you had put it in
18  there -- You know, if you had put it in
19  there with the bend sticking up like that
20  (indicating), you know, it's already damaged
21  metal, it bends easy anyway, so it would
22  have just went on and bent it back.  And we
23  kind of put it on the side like that.

43

1      Q.    All right.  So you're trying
2  to protect it --
3      A.    Yes, sir.
4      Q.    -- so it would not be rebent?
5      A.    Yes, sir.
6      Q.    Okay.  All right.  And so
7  y'all take all this where?
8      A.    To my house.
9      Q.    And where do you store it?
10      A.    In the shed.
11      Q.    Do you stack it in there where
12  nothing's going to get damaged?
13      A.    Yes, sir.
14      Q.    How long did it stay there?
15      A.    Probably -- I don't know.  I
16  couldn't tell you.  I don't know exact time.
17      Q.    How was it stacked at the
18  house?
19      A.    Just -- It's a wide shed, so
20  we put each section individually like that
21  right there (indicating).
22      Q.    So you're trying to protect
23  the evidence?

44

1      A.    Yes, sir.
2      Q.    All right.  Then what happens
3  next?  What goes -- What happens next in
4  terms of this stand?
5      A.    We put it in Darrell -- like I
6  said, I don't know his last name, come and
7  got it -- picked the stand up.  Then we had
8  to --
9      Q.    Who's Darrell?
10      A.    I don't know.  The --
11      Q.    Is he an investigator for the
12  plaintiff's lawyers?
13      A.    I don't know what he was, just
14  a lawyer is all I know.
15          MR. LEE:  Darrell, is he an
16  investigator?
17          MR. HASSINGER:  No.  He's an
18  attorney at Shunnarah's office.
19      Q.    So Darrell comes.  What
20  happens -- Were you there when Darrell was
21  there?
22      A.    Yes, sir.  I helped him load
23  it up in his vehicle.

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

45

1    Q.    All right. What did y'all do
2    then?
3    A.    We had to take this part
4    (indicating) and pull on it -- we loaded all
5    of it up, but the second and the third part
6    had to come apart to get it in his little
7    SUV thing.
8    Q.    Right. How did you take it
9    apart?
10   A.    We pulled on it and pulled on
11   it and it finally come loose.
12   Q.    How did you pull on it?
13   A.    He was on this end
14   (indicating), and I was on this end
15   (indicating), and we kind of pulled it.
16   Q.    How much force did you have to
17   use to get it out?
18   A.    A pretty good bit.
19   Q.    Did you just kind of jerk it
20   and pull it together?
21   A.    It wasn't all that jerking,
22   but we had to pull on it.
23   Q.    Did you bend anything?

46

1    A.    Not that I know of. I mean --
2    Q.    Did it look the same at the
3    house as it did when you put it in the back
4    of the truck --
5    A.    Yes.
6    Q.    -- from the woods?
7    A.    Yes.
8    Q.    Okay. So you didn't have to
9    straighten it to get it in there?
10   A.    No, sir.
11   Q.    You're not telling us that?
12   A.    No, sir.
13   Q.    And you certainly did not have
14   to take the second and third ladder sections
15   and bend it completely in the opposite
16   direction to get it out?
17   A.    No, sir.
18   Q.    Didn't do anything like that?
19   A.    No, sir.
20   Q.    What you're saying under oath
21   is that Darrell got on one end, and you got
22   on the other end, and you both tugged and
23   pulled, and it came loose?

47

1    A.    Yes.
2    Q.    Right?
3    A.    Yes.
4    Q.    And that's the truth, the
5    whole truth, and nothing but the truth;
6    right?
7    A.    Yes, sir.
8    Q.    Did you see the stand again
9    after that?
10   A.    No, sir.
11   Q.    And your testimony is that
12   unless this stand somehow was bent during
13   the ride from the woods to your house --
14   A.    Yes.
15   Q.    -- you don't know of any other
16   occasion that it's been bent, either
17   straightened or bent, in the opposite
18   direction; correct?
19   A.    No, sir.
20   Q.    Is that right?
21   A.    Yes, sir. To the best of my
22   knowledge, I don't.
23   Q.    Okay. And, Jaiton, what I

48

1    also hear you saying is you did your
2    dead-level best to make sure that this
3    section would not be bent by the way you
4    stacked it in your mama's truck; correct?
5    A.    Yes.
6    Q.    Because you wanted it to stay
7    the same?
8    A.    Yes, sir.
9    Q.    And you feel like you did
10   that?
11   A.    Yes, sir.
12   Q.    Because once it was in the
13   woods, and once it was in the shed at home,
14   to your knowledge, it all looked the same to
15   you?
16   A.    Yes, sir.
17   Q.    So, if -- If this stand has
18   been completely bent in the opposite
19   direction from what it was at the time of
20   the accident, then that happened at some
21   point in time after it left your possession;
22   correct?
23   A.    Yes, sir.

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

49

1    Q.    And the person who took it
2    from you was a man named Darrell?
3    A.    Yes.
4    Q.    He was a lawyer in this case,
5    at one point in time; is that right?
6    A.    Yes, sir.
7    Q.    Do you know anything else
8    about this at all?
9    A.    No, sir.
10   Q.    And this is the last time I'm
11   going to ask you, and we're getting ready to
12   quit: You didn't bend anything?
13   A.    No, sir.
14   Q.    You didn't see Matt bend
15   anything?
16   A.    No, sir.
17   Q.    You didn't see anybody else
18   bend anything --
19   A.    No, sir.
20   Q.    -- bend anything or straighten
21   anything; correct?
22   A.    No, sir.
23   Q.    Is that right?

50

1    A.    Yes, sir, that's correct.
2    MR. LEE:  Okay.
3    EXAMINATION
4    BY MR. HASSINGER:
5    Q.    Jaiton, will you hand me
6    Defendant's Exhibit Number 6, please.
7    A.    (Witness complies.)
8    Q.    I just want to clarify
9    something.  When you disassembled the tree
10   stand, how did you get your climber past
11   where this bend is flush against the tree?
12   A.    That's where we picked it up
13   and slid it -- slid it out.  When we picked
14   that stand up out of the ground to slide it
15   out, that's where we -- that's how.
16   Q.    Was the bend intact when you
17   slid it out?
18   A.    Yes, sir.
19   MR. HASSINGER:  Okay.  That's
20   all I have.
21   EXAMINATION CONTINUED
22   BY MR. LEE:
23   Q.    When you did that, though, so

51

1    that there's no mistake about this, and
2    we're looking at Exhibit Number 6, the
3    bend -- if you're taking the first ladder
4    section that's in the ground --
5    A.    Yes, sir.
6    Q.    -- and you're simply moving it
7    out, that bend is still pointing towards the
8    tree; is it not?
9    A.    Yes, sir.
10   Q.    No doubt about that?
11   A.    No.
12   Q.    It's not going to be bent in
13   the other direction?
14   A.    No.
15   Q.    That's stupid, isn't it?
16   A.    Yes, sir.
17   MR. LEE:  Okay.
18   VIDEOGRAPHER:  This ends
19   videotape number one and concludes the
20   deposition --
21   MR. LEE:  Hold on one second.
22   Hold on one second.
23   Back on the Record for just a

52

1    second.
2    Q.    (BY MR. LEE):  We know now
3    that there was a homemade shooting rail
4    added to the top of this stand that did not
5    come from the manufacturer.
6    Do you know anything about
7    that?
8    A.    No, sir.
9    Q.    You don't know who did that
10   work?
11   A.    No, sir.
12   Q.    Who did the welding work to
13   it, added the rails or anything like that?
14   A.    No, sir.
15   Q.    You didn't do it?
16   A.    No, sir.
17   Q.    If it was done, you just don't
18   have any clue as to who did it?
19   A.    No, sir.
20   MR. LEE:  All right.  Thank
21   you, sir.
22   VIDEOGRAPHER:  This ends
23   videotape number one and concludes the

13  (Pages 49 to 52)

# FREEDOM COURT REPORTING

53

1   deposition; we are off the Record at 11
2   o'clock a.m.
3   (The deposition was concluded at 11:00 a.m.,
4   May 19th, 2008.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

54

1           REPORTER'S CERTIFICATE
2   STATE OF ALABAMA,
3   ELMORE COUNTY,
4           I, Sara Mahler, Certified Court
5   Reporter and Commissioner for the State of
6   Alabama at Large, do hereby certify that the
7   above and foregoing proceeding was taken
8   down by me by stenographic means, and that
9   the content herein was produced in
10  transcript form by computer aid under my
11  supervision, and that the foregoing
12  represents, to the best of my ability, a
13  true and correct transcript of the
14  proceedings occurring on said date and at
15  said time.
16          I further certify that I am neither
17  of kin nor of counsel to the parties to the
18  action; nor in any manner interested in the
19  result of said case.
20
21
22
    _____
    Sara Mahler, CCR
23      ACCR #420

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

**A**

ability 54:12
able 39:19,22
accident 7:12,20
  8:15 14:22,23
  15:5,20 21:2
  21:13 25:15
  48:20
ACCR 54:23
acting 5:2
action 54:18
added 52:4,13
ago 11:1 13:13
  34:2
AGREED 1:13
  2:2,9,18
ahead 27:8
  29:19
aid 54:10
ain't 10:18
al 1:6 4:5 5:16
Alabama 1:2,19
  4:2,16,20 5:2,8
  5:19,23 54:2,6
Alexander 1:18
  5:8,22
alike 14:2
aloose 35:18,19
anybody 49:17
anyway 31:6
  42:21
apart 32:10 33:5
  34:5,23 35:2
  35:13 37:8
  45:6,9
APPEARAN...
  4:13
appearing 4:17
  4:20
appreciate 7:23
approximately
  10:21
area 16:14
asked 22:19,19

22:23
asking 22:20
  37:3
assign 2:13
ate 22:4
attached 19:6
  25:13,17
attention 7:20
  7:22 8:14,22
  9:10 16:1
attorney 44:18
average 11:10
a.m 5:9,21 53:2
  53:3

**B**

back 13:14 15:9
  15:10 16:4
  21:9,12 28:16
  29:7,20,21
  36:4 38:8,10
  39:6,17 40:10
  40:11 41:22
  42:22 46:3
  51:23
backed 28:5
backwards 31:1
bar 8:9,12 16:2
  16:9 17:1,14
  19:6 25:17
  26:3,6 27:13
  37:20 41:16
base 38:4,5
  39:11
bed 37:23 38:18
  39:1,12,14,14
  39:23 40:3
  41:1,7
beds 38:13
beginning 5:9
begins 5:13
behalf 4:17,21
  6:10
believe 11:16

bend 33:8 34:22
  35:4 36:7 37:4
  41:1,1,12,20
  41:21 42:1,12
  42:19 45:23
  46:15 49:12,14
  49:18,20 50:11
  50:16 51:3,7
bends 42:21
bent 27:10 42:22
  47:12,16,17
  48:3,18 51:12
best 47:21 48:2
  54:12
big 10:18
Birmingham
  4:16,20 35:17
bit 28:6,8,21
  38:21 45:18
blended 17:3
blurry 19:14,18
booth 23:17
boots 10:8
bottom 27:11,13
  27:20 29:2,3
  29:21 31:9,11
  31:17,21 32:14
  32:15 33:8,19
  36:19 40:7,13
  40:14 41:8,9
box 38:7
brace 8:2,7
  15:13 16:8
  17:20 18:3,7,8
  18:16,20,22
  25:12,16 26:4
breakfast 22:5

**C**

Cahaba 4:15
call 8:8,9,11,12
  20:9,13,18
camera 10:15,16
  11:6,9,12

cameraman
  29:6
cameras 10:18
care 7:16
carefully 27:6
  30:9 31:8
carried 35:16
case 1:5 4:4 5:17
  6:7 49:4 54:19
cause 5:10
caved 38:20
CCR 1:17 5:1
  54:22
certainly 7:23
  46:13
CERTIFICA...
  54:1
Certified 54:4
certify 5:3 54:6
  54:16
Chevrolet 38:3
Chevy 39:2,7
Circle 4:15
City 1:18 5:8,23
Civil 5:4
clarify 50:8
class 20:15
clear 17:19
climb 25:1,8,20
climbed 26:17
climber 25:21
  26:17 27:11,17
  29:23 30:3
  50:10
climbing 25:1
  26:9
clip 19:10,16
close 24:15
  39:22
clue 52:18
cocounsel 6:6
collapsed 9:3
color 20:5,6,12
come 35:13,15

35:18 36:11
  44:6 45:6,11
  52:5
comes 33:15
  44:19
Commissioner
  2:19 4:12 5:3
  54:5
completely
  19:11 46:15
  48:18
compliance 2:5
complies 50:7
computer 14:14
  14:18 54:10
concerned 15:19
  15:20
concluded 53:3
concludes 51:19
  52:23
confused 35:22
confusion 42:4
content 54:9
CONTINUED
  3:7 50:21
control 37:1
correct 9:3 16:2
  21:13 23:8
  24:11,13 26:15
  26:20 27:23
  29:23 30:4
  32:2,10 33:5
  34:18 36:2
  47:18 48:4,22
  49:21 50:1
  54:13
counsel 1:15
  2:10,12 5:6 6:2
  54:17
COUNTY 54:3
couple 7:9 13:20
  29:22
Court 1:1 2:6
  4:1 5:1,18 6:1

# FREEDOM COURT REPORTING

6:17 54:4
**cousin** 21:16
**crooked** 41:13
**CVS** 11:20

## D

**D** 3:2
**dad** 7:4,5,15
9:10 12:17
15:1 16:5 39:5
**daddy** 15:6,21
**damaged** 42:14
42:20 43:12
**darker** 20:9
**Darrell** 44:5,9
44:15,19,20
46:21 49:2
**Darrell's** 35:15
**date** 5:3 21:1
54:14
**David** 4:18 6:9
7:3
**day** 1:19 7:11,19
8:15 10:5 13:5
14:21 15:5,7
15:19 21:9
25:14,16
**days** 21:3
**dead-level** 48:2
**Deborah** 6:7
**Defendant** 1:10
4:9,21 6:10
**Defendant's**
3:10 9:22 42:7
50:6
**depends** 19:17
**deposition** 1:15
1:21 2:3,4,15
2:19 5:14,22
7:6 21:16
51:20 53:1,3
**depositions** 2:7
9:21
**describing** 39:11

**detail** 22:14
**developed** 11:19
**different** 8:10
22:20
**Digital** 10:17
**direction** 31:6
46:16 47:18
48:19 51:13
**dirt** 36:10
**disassembled**
22:9 33:7 50:9
**disassembly**
24:10
**disposable**
10:16 11:6,9
**District** 1:1,2
4:1,2 5:18,19
**Division** 1:3 4:3
5:19
**doubt** 14:19
51:10
**draw** 41:4,5
**Drawing** 3:13
**drawn** 41:20
**drive** 38:6 39:10
**drop** 27:4,5
**duly** 6:15
**Dwight** 9:14
11:17

## E

**E** 3:2
**ease** 28:22
**easy** 42:21
**effect** 2:5
**eight** 12:4,6 13:9
**either** 18:9
25:21 47:16
**ELMORE** 54:3
**ends** 51:18
52:22
**envisioning**
40:23
**ESQUIRE** 4:14

4:18
**et** 1:6 4:5 5:16
**evidence** 2:15
43:23
**exact** 20:23
43:16
**examination** 3:3
3:7 5:11 6:21
50:3,21
**examined** 6:15
**exhibit** 3:12,13
9:19,23 16:22
17:15 19:3
20:18 30:13
42:8 50:6 51:2
**exhibits** 3:10
9:21 18:11
**expensive** 11:12
**extra** 27:15

## F

**facing** 19:7
41:21
**fall** 20:2 30:23
31:5
**far** 25:12 27:10
28:16,19,20
29:7,11
**Faulk** 4:22 5:23
**Federal** 5:4
**feel** 48:9
**feet** 29:22
**fifth** 26:6
**filed** 7:5
**filing** 2:18
**film** 11:18
**finally** 45:11
**find** 16:8
**fine** 6:20
**first** 6:15 10:14
12:13,14 25:6
27:22 29:1
32:1,15,16
34:14 37:14

41:9 51:3
**five** 13:3,6 18:4
**flare's** 38:18
**flat** 40:7
**flush** 50:11
**focused** 7:15
9:10
**following** 5:11
**follows** 6:16
**foot** 29:12,14,14
29:21
**force** 2:4 45:16
**foregoing** 5:5
54:7,11
**form** 2:11 54:10
**forth** 7:17 39:6
**fourth** 26:6
**Freedom** 6:1
**full** 2:5
**further** 2:1,8,17
28:10 54:16

## G

**getting** 7:16
49:11
**give** 13:12
**Glanced** 7:21
**go** 7:9,11 9:13
13:14 20:22
28:13 36:10
**goes** 44:3
**going** 8:11 11:20
18:9 19:4,19
21:4 37:1
43:12 49:11
51:12
**good** 29:9 45:18
**ground** 16:17
18:23 27:15,23
28:3 29:10,17
30:10,14 31:12
31:23 50:14
51:4
**grounds** 2:13

**guessing** 41:6

## H

**H** 4:14
**half** 29:14
**hand** 29:6 50:5
**happened** 34:3
48:20
**happens** 44:2,3
44:20
**hard** 19:2
**Hassinger** 3:6
4:14 6:5,6,20
10:2 22:3 24:7
44:17 50:4,19
**Haynes** 1:17 5:7
**hear** 24:19,21
27:19 48:1
**heard** 21:18
24:20
**helped** 44:22
**Highway** 4:19
**hold** 29:6,18
33:2 41:18
51:21,22
**holding** 17:20
18:2,6,8,23
**home** 14:15,18
48:13
**homemade** 52:3
**horizontal** 8:2
15:12 16:2,8
25:12,16
**Hornsby** 1:18
5:7
**hospital** 7:17
16:6 39:6
**house** 12:15
22:5,9 23:21
43:8,18 46:3
47:13
**Huddle** 22:5,9
23:21
**humps** 38:16

# FREEDOM COURT REPORTING

57

**I**

identification 10:1 42:9
identified 18:4
identify 6:2
Incorporated 5:17 6:11
indicates 24:6
indicating 10:7 13:22 14:6 16:13,15 17:11 17:21 18:10 19:10 27:9,12 29:12 30:16 31:15 32:17 33:15,17,18 36:19 37:22 40:9,15 41:8 41:10,14,16,17 42:20 43:21 45:4,14,15
individually 43:20
inside 38:18
intact 50:16
interested 54:18
investigator 44:11,16

**J**

Jaiton 1:15,21 5:9,15 6:14 7:1 7:2 47:23 50:5
jerk 45:19
jerking 45:21
Jones 9:14 10:4 13:4 15:8 16:5 16:7 18:5
judge 19:2
JULIANO 4:19

**K**

keep 40:11
kin 54:17

kind 19:14,18 20:5 23:10 28:20 31:15 34:22 38:1 41:12,13 42:23 45:15,19
know 7:14 8:2,5 8:6 10:3,17,18 10:23 11:5,11 11:12,22 12:5 13:2,19,20,21 13:21,23 14:2 14:7,11,19 17:20 19:19,21 20:1,2,3 22:14 22:20 23:15 27:16 33:7 34:11 35:14 37:3,22 38:14 39:14 40:3 41:12 42:18,20 43:15,16 44:6 44:10,13,14 46:1 47:15 49:7 52:2,6,9
knowledge 47:22 48:14

**L**

L 1:12
ladder 17:9 25:13,17 26:6 27:22 28:14 29:1 32:1,2,5,7 33:4,21 34:5 34:14,18 36:1 37:11,14,16 39:17 46:14 51:3
laid 37:21 40:19 41:2
Large 54:6
Larry 1:6 4:5 5:15 6:7

laws 2:6
lawsuit 7:4
lawyer 7:3 44:14 49:4
lawyers 44:12
lay 40:6,22 41:1
laying 12:23 16:17 18:22
leading 2:11
Lee 3:5,9 4:18 4:19,23 6:9,9 6:19,22 7:3 9:20 44:15 50:2,22 51:17 51:21 52:2,20
left 15:4 30:14 30:21 33:20 34:17 35:4,21 37:11 40:4 48:21
legs 27:20
let's 15:16 24:18 29:18
limbs 17:2
listening 23:12
little 23:15 28:5 28:8,10,21 33:16 38:16,21 45:6
load 44:22
loaded 45:4
located 8:16
long 21:2 38:4 43:14
longer 40:2
look 7:19 10:2 14:4 16:20 18:19 19:11,19 20:6 33:13 46:2
looked 14:1 48:14
looking 8:20,23 15:23 17:15,22

18:11 20:6,17 30:12 51:2
looks 18:16,20
loose 25:2 27:1 28:3 31:18 32:1,6 35:11 45:11 46:23
lower 27:6 30:13 30:20
lowered 25:2,3 27:3 30:9,18 31:8

**M**

Mahler 1:16 4:12 5:1 54:4 54:22
Main 1:18 5:7
mama 11:14
mama's 39:4 48:4
man 49:2
manner 54:18
manufacturer 52:5
mark 9:18
marked 9:23 16:22 42:8
Matt 21:16,18 21:21 22:6 23:6,9 24:1,20 25:4 34:1,4 35:22 49:14
matter 5:15
mean 8:21 19:13 19:18,23 22:17 25:3 26:12 38:23 46:1
means 54:8
meet 22:2
mentioned 22:13,23
mess 34:21
met 7:2

metal 42:21
Middle 1:2 4:2 5:18
mine 10:9
minutes 34:2
mistake 51:1
misunderstood 34:9
model 39:7
mom 7:5 12:17 14:9
Monday 5:21
morning 22:4
Morris 1:17 5:7
move 28:16,20 28:21 31:16
moved 17:18 29:7,11,20
moving 51:6

**N**

N 1:12 3:2
name 5:23 6:5 6:23 35:15 44:6
named 49:2
names 8:10
necessary 2:9
neither 54:16
never 14:20 23:15
new 20:11
nine 12:4
Northern 1:3 4:3 5:19
nothing's 43:12
notice 2:18
number 1:5 4:4 5:14,17 13:12 17:16 19:3 20:18 30:13 50:6 51:2,19 52:23

**O**

# FREEDOM COURT REPORTING

**O** 1:12 20:15
**oath** 46:20
**objections** 2:10
  2:13
**occasion** 47:16
**occurring** 54:14
**offered** 2:15
**office** 44:18
**offices** 1:17 5:6
**Okay** 7:14 9:17
  12:3 13:14
  14:8,21 15:8
  16:16 19:21
  21:7,11 23:21
  24:18 28:13
  29:15 30:17,20
  33:10 35:4
  36:23 37:10
  43:6 46:8
  47:23 50:2,19
  51:17
**old** 39:13
**older** 20:9
**once** 31:11,12,23
  48:12,13
**open** 40:4
**opposed** 20:19
  23:19
**opposite** 46:15
  47:17 48:18
**oral** 5:10
**original** 14:9
**outside** 38:19
**oxidation** 20:16
  20:18
**o'clock** 53:2
**O'Neal** 26:7

**P**
**P** 1:12
**PAGE** 3:4,8,11
**Park** 4:15
**PARSONS** 4:18
**part** 14:5 31:14

31:17,18 32:6
32:16,19 33:6
33:15 34:11
35:13,17 36:12
36:15,20,21,21
40:2 45:3,5
**parties** 1:14
  2:12 54:17
**parts** 33:7 35:2
**pay** 7:14,20,21
  8:14 16:1
**paying** 8:21
**person** 23:11
  26:10 49:1
**photograph**
  3:12 16:21
  17:6
**physically** 37:4
**picked** 16:19
  35:16 44:7
  50:12,13
**pickup** 38:1
**picture** 16:17,20
  17:1,13,19,22
  18:2,8,15 19:9
**pictures** 9:15,17
  10:3,4,10,11
  10:20 11:5,15
  11:23 12:9,14
  12:19,22 13:6
  13:10,16,19,20
  13:22 14:1,4,5
  14:9,17 15:9
  16:7 17:13
  18:5 20:22
  21:8
**place** 5:22
**plaintiffs** 1:7 4:6
  4:17 6:7
**plaintiff's** 44:12
**platform** 32:23
  33:11 34:14
  37:17 41:18
**please** 6:4,13

50:6
**point** 48:21 49:5
**pointing** 51:7
**points** 7:10
**possession** 48:21
**PRESENT** 4:22
**preserve** 42:12
**pretty** 11:11
  12:21 24:17
  29:9 45:18
**primarily** 7:15
**prior** 2:15
**probably** 12:1
  21:5 29:11,12
  43:15
**Procedure** 5:5
**procceding** 54:7
**proceedings**
  5:12 54:14
**produced** 54:9
**protect** 43:2,22
**provided** 5:4
**pull** 27:16 34:23
  35:7 45:4,12
  45:20,22
**pulled** 31:17
  45:10,10,15
  46:23
**pushed** 27:14
  36:13
**put** 26:3 32:14
  32:16,20,21,22
  35:19 36:4,17
  36:22 37:14,15
  37:17 40:17
  41:8,11,14
  42:17,18,23
  43:20 44:5
  46:3

**Q**
**question** 7:17
  13:15
**questions** 2:11

2:12 22:20,21
**quit** 49:12

**R**
**rail** 52:3
**rails** 52:13
**reading** 2:2
**ready** 49:11
**real** 10:18 26:9
**really** 13:18
  19:14 22:1,11
  22:16 23:9,11
**rebent** 43:4
**recall** 13:5
**reckon** 23:14
**recollection** 12:6
  13:8 17:8
**Record** 5:20
  51:23 53:1
**reddish-orange**
  20:5
**regular** 39:13
**relating** 2:6
**remember** 10:12
  10:23 11:1
  13:15 16:18
  21:1
**remind** 7:10
**repeat** 27:21
  31:22
**rephrase** 27:7
**reporter** 5:2
  6:13,17 54:5
**REPORTER'S**
  54:1
**Reporting** 6:1
**represent** 6:3
  7:3
**representing** 6:1
**represents** 54:12
**respective** 1:14
**rest** 9:9
**result** 54:19
**rid** 39:5

**ride** 36:9 37:1
  47:13
**right** 9:2,7,13
  10:3,6 11:18
  11:21 14:6,21
  15:5 16:13,14
  17:10,19,23
  18:10,12,15,18
  19:7 20:17,21
  21:7,11 24:2
  24:18 25:11
  26:12,14,19
  27:2,8,9 28:23
  29:5,11,13
  30:7,12,14,15
  30:18 31:14
  32:12,16,20
  33:3,8,13,14
  33:15 34:12,23
  35:1,13,20
  36:23 40:11,14
  40:16 41:19
  42:2 43:1,6,21
  44:2 45:1,8
  47:2,6,20 49:5
  49:23 52:20
**Rite-Aid** 11:21
**road** 36:10
**roll** 11:3
**rope** 25:3 27:3
  30:6 40:11
**rules** 2:6 5:4
**rung** 26:6
**rust** 19:16,18,22
  19:23 20:2,4,4
  20:4,6,8,9,10
  20:19
**rusted** 19:11
**rusty** 20:5

**S**
**S** 1:12
**safety** 8:7,9,12
  16:2,8 17:1,14

# FREEDOM COURT REPORTING

25:16 26:3,5
37:20 41:16
**Sara** 1:16 4:12
5:1 54:4,22
**saw** 9:2 12:13
**saying** 17:12
23:13 27:19,22
28:2 31:20,23
33:12,20 34:9
35:20 36:16
38:14,21 46:20
48:1
**scene** 7:11 14:23
**second** 21:12
29:18 32:2,6
32:18,19 33:21
34:17 36:1,19
36:20 37:11,15
40:1,17 41:11
45:5 46:14
51:21,22 52:1
**section** 27:22
29:1,21 31:21
32:1,2,5,7,14
32:15,15 33:16
33:17,18,19,21
34:15,18 37:14
40:8,8,9,14,17
41:9,9,11,15
43:20 48:3
51:4
**sections** 29:17
33:5 34:5 36:2
37:12,16 46:14
**see** 8:18 12:9,12
12:18,22 16:21
16:23,23,23,23
17:5 19:16
27:13 33:14
36:9 47:8
49:14,17
**seeing** 13:15
**seen** 12:11 39:15
**sessions** 32:10

**set** 15:16
**Shaquille** 26:7
**shed** 43:10,19
48:13
**shining** 19:8
**shoot** 11:2
**shooting** 52:3
**shop** 20:15
**short** 38:4
**short-wheel**
38:5 39:10
**show** 18:1,1,2,7
29:6
**Shunnarah's**
44:18
**shy** 23:10
**side** 30:18,21
32:21 37:21
38:13 40:20
41:3,10,13
42:2,23
**signature** 2:2
**similar** 14:1
**simply** 51:6
**sir** 7:8,13 8:4,17
8:19 9:8,12,16
10:9 14:16
15:2,11,14,22
16:3,10 17:7
18:13 19:23
20:20 21:10,14
21:17 22:1,7
23:7,18,20,22
24:3,12,14
25:7,10,22
26:21 27:5,7
28:4,7,12,15
30:8,11,19,22
31:2,4,7,10
32:3 33:1,6,13
33:23 34:6,16
34:19 35:6,9
35:12,23 36:3
36:6,8 37:2,5,7

37:9,13 38:9
38:12,23 39:18
39:21 40:1,5
40:21 41:23
42:3,6 43:3,5
43:13 44:1,22
46:10,12,17,19
47:7,10,19,21
48:8,11,16,23
49:6,9,13,16
49:19,22 50:1
50:18 51:5,9
51:16 52:8,11
52:14,16,19,21
**sitting** 13:23
23:12,17,23
24:4
**skinnied** 26:19
**slid** 50:13,13,17
**slide** 50:14
**sliding** 40:12
**smaller** 39:1
**sort** 38:20
**South** 4:19
**speak** 23:10
**specifically**
15:16
**stack** 43:11
**stacked** 43:17
48:4
**stand** 7:18,19
9:3 12:18
13:19,20 15:3
15:19 16:14
19:6,7 21:13
21:19,23 22:9
22:17 24:10
25:1,2,13 26:3
27:12,13,14
29:7 32:21
35:16 44:4,7
47:8,12 48:17
50:10,14 52:4
**standing** 41:22

**start** 26:9
**state** 6:3 54:2,5
**States** 1:1 4:1
5:18
**stay** 43:14 48:6
**stenographic**
54:8
**step** 27:8
**Stephens** 1:6,16
1:21 4:5 5:9,15
5:16 6:8,14 7:1
**steps** 38:22
**stepside** 38:13
38:17 39:13,14
**sticking** 42:19
**sticks** 27:23
**STIPULATED**
1:13 2:1,8,17
**stipulation** 5:5
**stipulations**
6:18
**store** 43:9
**straight** 38:17
**straighten** 46:9
49:20
**straightened**
47:17
**straight-in**
38:13
**strap** 25:5 26:15
27:1 28:19
30:3 40:10,10
**Street** 1:18 5:8
**Strongbuilt** 1:9
4:8 5:16 6:10
7:4
**stuck** 31:15 35:2
35:14
**stupid** 51:15
**Suite** 4:16,19
**supervision**
54:11
**support** 27:15
**sure** 11:11 12:21

22:12 30:17
48:2
**SUV** 35:15,19
45:7
**swear** 6:13
**sworn** 6:15

### T

**T** 1:12,12
**table** 12:23
23:19 24:5
**tailgate** 39:23
40:4
**take** 9:14 10:10
10:11,21 11:8
11:14,14,17
12:19 14:22
15:9,10 16:16
20:10,11,22
21:9,13 23:1
25:1,5 37:8
43:7 45:3,8
46:14
**taken** 1:16 7:6
13:4 21:15,19
21:23 24:21,22
54:7
**talk** 8:1 22:15,18
**talked** 21:21,22
22:8,17
**talking** 8:3 24:9
25:14,15 27:18
29:1 32:22
34:10
**tall** 26:10
**Tallassee** 11:21
**TAMMY** 4:23
**tell** 6:23 8:5
16:21 17:2
19:1,15 20:23
21:18 23:2,4,6
39:11 43:16
**telling** 13:8
33:10 34:13

# FREEDOM COURT REPORTING

46:11
ten 12:2,4,7
13:10
terms 44:4
testified 6:16
testimony 13:7
37:10 47:11
Thank 52:20
thereto 2:16
thing 31:13
35:19 45:7
think 10:17 11:4
27:21 31:22
thinking 34:8
third 32:5,19
33:21 34:18
36:1,21 37:11
37:15 40:2,17
41:11 45:5
46:14
thought 13:9
34:10
three 13:21 32:9
33:4 34:4,7,7
34:10
TIDMORE 4:15
tied 27:2 30:6
40:10
Tim 4:22 5:23
time 2:14,14 7:7
9:9 12:13,14
21:12 33:3
35:13,17 36:13
37:6 43:16
48:19,21 49:5
49:10 54:15
today 7:10 13:1
13:17 22:3
told 13:4 15:18
23:8
tool 38:7
top 25:1 26:23
27:2 30:4
31:18 32:21,23

33:8 34:13
36:9,12,15,18
36:21,22 40:8
41:14,15 52:4
touch 20:1
track 26:13
transcript 54:10
54:13
tree 7:18,19
16:14 17:9
19:5,7 25:18
25:20 26:20
27:2 28:11
29:8,22 31:3
50:9,11 51:8
trial 2:14
truck 32:16,20
33:4 35:3 36:5
36:12,17 37:15
37:16,22 38:1
39:1,2 41:2,8
41:22 42:2
46:4 48:4
true 7:7 9:11
54:13
truth 47:4,5,5
try 35:7
trying 42:10,12
43:1,22
tug 35:18
tugged 35:10
46:22
TV 29:5
two 10:23 13:13
13:21 14:5,6
17:13 18:10
21:5 29:12,14
29:21 34:7
35:22 38:16
two-wheel 38:5
39:10
type 10:15

___

U

U 1:12
Uh-huh 9:6
understand 8:1
31:19
understanding
42:11
United 1:1 4:1
5:18
upper 32:6
use 45:17
Usual 6:17

___

V

van 39:5
vehicle 44:23
versus 5:16
video 1:15
VIDEOGRAP...
5:13 6:12
51:18 52:22
videotape 5:14
51:19 52:23
vs 1:8 4:7

___

W

waived 2:3,19
want 7:9 24:21
31:16 34:21
35:1 39:9 50:8
wanted 12:18
48:6
wasn't 8:21
11:11 28:19
45:21
way 19:13 23:9
25:9,23 26:1
26:11 30:13
33:1 36:7
41:17,20 48:3
ways 29:10
WEAVER 4:15
week 21:5
weeks 21:3
weight 33:1
36:12 41:17

42:16
welding 52:12
went 12:20 15:9
16:4 21:8,12
30:2 32:4
42:22
weren't 8:20,23
15:23
Wetumpka 5:2
We'll 9:20
we're 8:3 41:6
49:11 51:2
we've 7:6 18:4
wide 43:19
WILLIAM 4:14
wipe 20:11
witness 2:3 5:10
6:13 24:6 50:7
wood 19:9
woods 15:4,7
19:8 35:21
36:11 46:6
47:13 48:13
word 20:14
words 40:22
41:19
work 52:10,12
world 23:1
worries 7:22
wouldn't 26:10
28:19

___

X

X 3:2

___

Y

yeah 12:11 17:5
19:13 20:8
23:9 26:11
38:15,23
year 39:7
years 11:1 13:13
yellow 25:5
26:15
y'all 10:15,20

11:2 12:10,23
13:6,9,16
14:14 15:10
16:16 20:22
21:7,22 22:8
22:15 23:2,8
23:17 24:9,15
35:10,21 36:4
38:2,7 39:19
43:7 45:1
y'all's 14:17

___

#

#420 54:23

___

1

1 30:13
10 3:12
10:22 5:9
10:23 5:20
11 53:1
11:00 53:3
131 1:18 5:7
19th 1:19 5:21
53:4

___

2

2:07-CV-128-...
1:5 4:4 5:17
200 4:16
2008 1:19 5:21
53:4
280 4:19
2801 4:19

___

3

3 18:11,15
300 4:15,20
35010 1:19 5:8
35223 4:20
35242 4:16

___

4

4 17:16 18:12,18
42 3:13

| **5** | | | | |
|---|---|---|---|---|
| **5** 19:3 20:18 | | | | |
| **50** 3:6,9 | | | | |
| **6** | | | | |
| **6** 3:5,12 9:20,23 | | | | |
| 50:6 51:2 | | | | |
| **7** | | | | |
| **7** 3:13 42:8 | | | | |
| **9** | | | | |
| **96** 39:9 | | | | |

**1**

1    IN THE UNITED STATES DISTRICT COURT
2    FOR THE MIDDLE DISTRICT OF ALABAMA
3    NORTHERN DIVISION
4
5    CASE NUMBER: 2:07-CV-128-1D
6    LARRY STEPHENS, ET AL.,
7        Plaintiffs,
8        vs.
9    STRONGBUILT, INC.,
10        Defendant.
11
12        S T I P U L A T I O N
13        IT IS STIPULATED AND AGREED by and
14    between the parties through their respective
15    counsel, that the video deposition of Matt
16    Stephens may be taken before Sara Mahler,
17    CCR, at the offices of Morris, Haynes &
18    Hornsby, at 131 Main Street, Alexander City,
19    Alabama 35010, on the 19th day of May, 2008.
20
21    DEPOSITION OF MATT STEPHENS
22
23

**2**

1        IT IS FURTHER STIPULATED AND
2    AGREED that the signature to and the reading
3    of the deposition by the witness is waived,
4    the deposition to have the same force and
5    effect as if full compliance had been had
6    with all laws and rules of Court relating to
7    the taking of depositions.
8        IT IS FURTHER STIPULATED AND
9    AGREED that it shall not be necessary for
10    any objections to be made by counsel to any
11    questions except as to form or leading
12    questions, and that counsel for the parties
13    may make objections and assign grounds at
14    the time of the trial, or at the time said
15    deposition is offered in evidence, or prior
16    thereto.
17        IT IS FURTHER STIPULATED AND
18    AGREED that the notice of filing of the
19    deposition by the Commissioner is waived.
20
21        * * * * * * * * * * * * *
22
23

**3**

1        * * * * * * * * * * * *
2        I N D E X
3        EXAMINATION
4            PAGE
5    By Mr. Lee ........................... 6
6    By Mr. Hassinger ................... 55
7        EXAMINATION CONTINUED
8            PAGE
9    By Mr. Lee ......................... 55
10        DEFENDANT'S EXHIBITS
11            PAGE
12    Exhibit 1 - Photograph ............ 16
13    Exhibit 2 - Drawing ................ 27
14    Exhibit 3 - Photograph ............ 52
15    Exhibit 4 - Photograph ............ 53
16    Exhibit 5 - Photograph ............ 53
17        * * * * * * * * * * * *
18
19
20
21
22
23

**4**

1    IN THE UNITED STATES DISTRICT COURT
2    FOR THE MIDDLE DISTRICT OF ALABAMA
3    NORTHERN DIVISION
4    CASE NUMBER: 2:07-CV-128-1D
5    LARRY STEPHENS, ET AL.,
6        Plaintiffs,
7        vs.
8    STRONGBUILT, INC.,
9        Defendant.
10
11    BEFORE:
12        SARA MAHLER, Commissioner.
13    APPEARANCES:
14        WILLIAM H. HASSINGER, ESQUIRE, of
15    WEAVER & TIDMORE, 300 Cahaba Park Circle,
16    Suite 200, Birmingham, Alabama 35242,
17    appearing on behalf of the Plaintiffs.
18        DAVID A. LEE, ESQUIRE, of PARSONS,
19    LEE & JULIANO, 2801 Highway 280 South, Suite
20    300, Birmingham, Alabama 35223, appearing on
21    behalf of the Defendant.
22        ALSO PRESENT: TIM FAULK
23            TAMMY LEE

1 (Pages 1 to 4)

# FREEDOM COURT REPORTING

**5**

1    I, SARA MAHLER, CCR, a Court
2  Reporter of Wetumpka, Alabama, acting as
3  Commissioner, certify that on this date, as
4  provided by the Federal Rules of Civil
5  Procedure and the foregoing stipulation of
6  counsel, there came before me at the offices
7  of Morris, Haynes & Hornsby, 131 Main
8  Street, Alexander City, Alabama 35010,
9  beginning at 9:00 a.m., Matt Stephens,
10  witness in the above cause, for oral
11  examination, whereupon the following
12  proceedings were had:
13    VIDEOGRAPHER: This begins
14  videotape number one in the deposition of
15  Matt Stephens in the matter of Larry
16  Stephens, et al., versus Strongbuilt,
17  Incorporated; Case Number 2:07-CV-128-ID in
18  the United States District Court, Middle
19  District of Alabama, Northern Division.
20    We are on the Record at 9:34
21  a.m. on Monday, May 19th, 2008. This
22  deposition is taking place in Alexander
23  City, Alabama. My name is Tim Faulk

**6**

1  representing Freedom Court Reporting.
2    Would counsel identify
3  yourself and state whom you represent,
4  please.
5    MR. HASSINGER: My name is
6  Will Hassinger, I'm cocounsel for the
7  plaintiffs, Larry and Deborah Stephens.
8    MR. LEE: David Lee here on
9  behalf of the Defendant Strongbuilt,
10  Incorporated.
11    VIDEOGRAPHER: Would the
12  reporter please swear in the witness.
13    MATTHEW STEPHENS,
14  being first duly sworn, was examined and
15  testified as follows:
16    COURT REPORTER: Usual
17  stipulations?
18    MR. LEE: That's fine.
19    MR. HASSINGER: That's fine.
20    EXAMINATION
21  BY MR. LEE:
22    Q.   Matt, I'm David Lee; you've
23  met me one time before when we took your

**7**

1  deposition earlier. We are taking it again
2  pursuant to a court order. Just reminding
3  you you are still under oath. Okay?
4    A.   All righty.
5    Q.   I want to ask you, again, did
6  you have anything whatsoever to do with the
7  disassembly of this stand after the
8  accident?
9    A.   Yes, sir.
10    Q.   Okay. Did I ask you that one
11  time before?
12    A.   Yes, sir.
13    Q.   What was your answer then?
14    A.   I said no.
15    Q.   Why did you tell me that you
16  had nothing to do?
17    A.   I got mixed up. I don't
18  really know.
19    Q.   Okay. Was there anything
20  unclear about the questions I was asking you
21  earlier?
22    You know we were talking about
23  what was done after the accident and who

**8**

1  took the stand down and so forth, and you
2  told me you had nothing to do with it; is
3  that right?
4    A.   Yes, sir.
5    Q.   And that's not true?
6    A.   No, sir.
7    Q.   Okay. All right. You're
8  telling me that you did have something to do
9  with taking the stand down?
10    A.   Yes, sir.
11    Q.   All right. Let's talk about
12  it.
13    When did you go out there to
14  take this tree stand down?
15    A.   A couple of weeks after it
16  happened.
17    Q.   Two weeks after it happened?
18    A.   A couple. I don't really know
19  when.
20    Q.   Okay. Do you know what day it
21  was?
22    A.   Not right offhand.
23    Q.   Okay. And who went with you?

2  (Pages 5 to 8)

# FREEDOM COURT REPORTING

9

1 A. Jaiton.
2 Q. Jaiton Stephens?
3 A. Yes, sir.
4 Q. Is that your cousin?
5 A. Yes, sir.
6 Q. Okay. Anybody else go with
7 you?
8 A. No.
9 Q. Now, when was the first time
10 you told somebody that you'd been -- you'd
11 gotten confused about the questions I asked
12 you earlier?
13 A. The first time I talked to him
14 (indicating), I told him I got confused
15 about it and everything.
16 Q. Are you talking about
17 Mr. Hassinger?
18 A. Yes, sir.
19 Q. And when did you talk to him?
20 A. One day when he come over to
21 Peanut's.
22 Q. When did he come over to
23 Peanut's?

10

1 A. About a week ago. Last
2 Thursday -- No. I forgot when it -- Last
3 week. I don't know.
4 Q. About a week ago?
5 A. (Witness nods head in the
6 affirmative.)
7 Q. You have to answer out because
8 this court reporter has to take down your
9 answer.
10 A. About a week ago.
11 Q. And what did Mr. Hassinger say
12 to you and what did you say to him?
13 A. He just asked me about the
14 question, and I told him I got confused.
15 Q. What did -- Tell me what he
16 said to you.
17 A. He just told me about the
18 question -- Like what happened to the tree
19 stand, told me about I said no. I said --
20 And he just read it off, and I said I got
21 confused. And I told him me and Jaiton went
22 out there and got it.
23 Q. Well, you know, Jaiton said

11

1 that you went with him, that you went with
2 him. Are you aware of that?
3 A. Yes, sir.
4 Q. Okay. And was this down in --
5 Did Mr. Hassinger come to your house in
6 Dadeville; is that where it was?
7 A. No.
8 Q. Where did you meet with him?
9 A. At Peanut's in Tallassee.
10 Q. Yeah, in Tallassee. Are you
11 living down there now?
12 A. Yes, sir. That's where I've
13 been living for -- all my life.
14 Q. Okay. Are you still working
15 for Auburn Electric?
16 A. No, sir.
17 Q. What happened to that job?
18 A. I quit. I'm fixing to go to
19 GKN, is a aerospace, as with helicopter
20 parts.
21 Q. Are you working anywhere now?
22 A. No, sir.
23 Q. Not working at all?

12

1 A. No, sir.
2 Q. When do you start this other
3 job?
4 A. They supposed to call me in a
5 week. They -- My application been in
6 processing, everything come back all right.
7 Q. Okay. Were you out there when
8 these pictures were made?
9 A. No, sir.
10 Q. When was -- Remind me of this:
11 Who was hunting with your dad, Jaiton; is
12 that right?
13 A. No, sir.
14 Q. You weren't out there that
15 day?
16 A. No.
17 Q. Did you go out there on the
18 day of the accident at all?
19 A. Yeah.
20 Q. To help get your dad --
21 A. No. I was the one that was
22 with him.
23 Q. You were hunting with -- You

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

**13**

1  were hunting --
2      A.    I was hunting with Peanut.
3      Q.    Okay.
4      A.    And he's -- Jaiton was the one
5  that come out there.
6      Q.    All right.  So you were
7  hunting with Larry --
8      A.    Yes, sir.
9      Q.    -- on the day of the accident;
10  correct?
11      A.    Yes, sir.
12      Q.    Okay.  That's where I want to
13  start.  When you were notified of this
14  accident, did you pay any attention at all
15  to the stand?
16      A.    No.
17      Q.    Did not?
18      A.    (Witness shakes head in the
19  negative.)
20      Q.    Is there any confusion about
21  that question?
22      A.    No.
23      Q.    Okay.  You're telling me that

**14**

1  you didn't pay any attention to that stand
2  on the date of the accident?
3      A.    I was really concerned about
4  him.  I mean, I looked at the stand, but I
5  didn't pay no really -- I looked at the
6  bend, but that's -- I looked at it, just
7  glanced.  I didn't look it up and down.
8      Q.    Okay.  Did you look for the --
9  Do you know what the horizontal brace is?
10      A.    Yeah, I know what it is.
11      Q.    So there's no confusion about
12  that question, you tell me what horizontal
13  brace is?
14      A.    Ain't that the one that goes
15  to the tree?
16      Q.    Right.  That's the brace that
17  goes from the stand to the tree; correct?
18      A.    Yes.
19      Q.    You understand that?
20      A.    Yes, sir.
21      Q.    All right.  And did you see it
22  anywhere out there on the day of the
23  accident?

**15**

1      A.    It was right in between the --
2  When I glanced at it, it was right in
3  between the tree and the stand on the
4  ground.
5      Q.    Was it attached to anything?
6      A.    Huh-uh.
7      Q.    Laying on the ground?
8      A.    Laying on the ground.
9      Q.    Show me in any of these
10  pictures that were taken after the accident
11  where it shows the tree and the stand.  See
12  if you see a picture of it laying on the
13  ground.
14      A.    Of it laying on the ground?
15      Q.    Yes, sir.  Laying on the
16  ground.
17      A.    It looks like it right there
18  (indicating).  I mean, I'm just -- It looks
19  like it to me.
20      Q.    What are you pointing to?
21      A.    Right there (indicating).  It
22  might be just a -- what you call it.  It
23  might be just a tree.

**16**

1      Q.    That looks like a stick.
2      A.    It might be.
3      Q.    Okay.  Are you pointing to
4  this thing here to the left of the stand
5  (indicating)?
6      A.    Right there (indicating).
7  That's what it looks like to me.  I don't
8  know.
9          MR. LEE:  Let's mark this.
10          (Whereupon, Defendant's
11          Exhibit No. 1 was marked
12          for identification.)
13      Q.    All right.  I'll tell you what
14  let's do:  I want you to circle what you say
15  the horizontal brace is so we're not
16  confused about it.
17      A.    I mean, it looks like it right
18  there (indicating).  I really don't know.
19      Q.    Are you guessing?
20      A.    It looks like it.  I mean, it
21  could be a stick, could be, but that's what
22  it's looking like to the picture.
23      Q.    Okay.  Look at any of these

4  (Pages 13 to 16)

# FREEDOM COURT REPORTING

17

1 other pictures and see --
2           MR. LEE: This may be the same
3 one, Will. I think that's the same picture
4 (indicating)?
5     Q.    Of course there's no picture
6 there of the ground, so you can't see it
7 there.
8           Well, let me just ask you this
9 question: Looking at Exhibit Number 1, the
10 thing that you have circled, is that your
11 recollection of where the brace was when you
12 saw it on the ground?
13    A.    Somewhere right in there.
14    Q.    Okay. Well, that would be to
15 the left of the -- That would be to the left
16 of the tree stand, wouldn't it?
17    A.    From right here, it would.
18    Q.    Okay. Where was Peanut
19 laying?
20    A.    He was over this way
21 (indicating).
22    Q.    Can you see in the picture
23 where he was?

18

1     A.    It was right over in there
2 (indicating).
3     Q.    Put an X where he was.
4     A.    Let's see. Right in there
5 (indicating).
6     Q.    I'm going to write Larry; I'm
7 not going to call him Peanut.
8           That's where you say he was
9 laying --
10    A.    Yes, sir.
11    Q.    -- when you found him?
12    A.    Yeah. Because I parked my
13 truck on the dirt road, and I had to walk up
14 there.
15    Q.    That's where he was laying,
16 right there?
17    A.    Yeah.
18    Q.    Was he laying on the ground?
19    A.    (Witness nods head in the
20 affirmative.)
21    Q.    You need to answer out.
22    A.    He was laying on the ground.
23    Q.    He wasn't moving, was he?

19

1     A.    Huh-uh. No, sir.
2     Q.    Okay. Did you move this
3 horizontal brace wherever it was? Did you
4 touch it?
5     A.    When we took it down.
6     Q.    I'm talking about on the day
7 of the accident.
8     A.    Huh-uh.
9     Q.    You didn't move it?
10    A.    Huh-uh.
11    Q.    Didn't touch it?
12    A.    I was just more concerned of
13 him.
14    Q.    I know you were concerned
15 about him. And I'm, at the moment,
16 concerned about this brace.
17    A.    I didn't touch it.
18    Q.    You didn't touch it?
19    A.    No.
20    Q.    Did you touch the ladder stand
21 at all that day?
22    A.    No.
23    Q.    Did you touch anything out

20

1 there at all other than Larry?
2     A.    No, sir.
3     Q.    Okay. All right. So did you
4 go back to the accident scene after you left
5 there that day and before you took it down?
6     A.    Huh-uh.
7     Q.    Did not?
8     A.    No.
9     Q.    Did y'all take anything away
10 from the accident scene on the day of the
11 accident?
12    A.    No.
13    Q.    Did you take the horizontal
14 brace away?
15    A.    No. It was all right there.
16    Q.    Just left it on the ground?
17    A.    I just left everything like it
18 was and got him and took him to the
19 hospital.
20    Q.    Did anybody pick up anything
21 and take it --
22    A.    Not that I know of.
23           MR. HASSINGER: Object to the

5 (Pages 17 to 20)

# FREEDOM COURT REPORTING

21

1  form.
2  Q.    Listen, don't anticipate what
3  I'm asking you, because she's got to take
4  this question down and got to take down your
5  answer. Okay?
6      My question is: Did anybody
7  take anything away from this accident scene
8  other than Larry on the day of the accident?
9      MR. HASSINGER: Object to the
10  form.
11  A.    No.
12  Q.    Don't pay any attention to
13  him.
14      Did anybody take this
15  horizontal brace away that day, on the day
16  of the accident?
17      MR. HASSINGER: Same
18  objection.
19  A.    No.
20  Q.    All right. Anything that has
21  to do with this ladder stand, anybody take
22  any part of it away on the day of the
23  accident?

22

1  A.    No.
2  Q.    Okay. So everything that had
3  anything to do with this ladder stand stayed
4  there on the day of the accident; correct?
5  A.    Yes, sir.
6  Q.    And as far as you know, it all
7  stayed there for the next two weeks?
8  A.    Yes, sir.
9  Q.    When you and Matt -- or you
10  and --
11  A.    Jaiton.
12  Q.    -- Jaiton went out there to
13  get it; is that right?
14  A.    Yes, sir.
15  Q.    Okay. All right. And you're
16  saying that nobody else went out there with
17  you?
18  A.    No, sir.
19  Q.    Okay. Earlier you've said
20  that maybe Dwight Jones went out there to
21  help take this thing down.
22  A.    I think -- I think I got
23  confused on that. I think him and Jaiton

23

1  took the pictures, that's what I think.
2  Q.    Okay. But you're saying
3  nobody other than you and Jaiton took the
4  stand down?
5  A.    Just me and him.
6  Q.    Is that right?
7  A.    Yes, sir.
8  Q.    Okay. All right. Now, where
9  was the horizontal brace when you went back
10  two weeks later?
11  A.    In the same spot.
12  Q.    You're saying it's this spot
13  where you made a circle?
14  A.    It looks like.
15  Q.    Did you help put -- Remind me
16  of this: Did you help put this stand up?
17  A.    I didn't help put it up. I
18  helped put it together.
19  Q.    I'm talking about the last --
20  up against this tree is what I'm talking
21  about.
22  A.    No, I didn't help put it up.
23  Peanut and my daddy put it up.

24

1  Q.    Did you ever see it up?
2      MR. HASSINGER: I'm going to
3  object to any question outside the scope of
4  disassembly of the tree stand for the
5  Record.
6      MR. LEE: Well, let me say
7  this to you: That was my offer, to do that,
8  you know, before y'all objected to these
9  depositions again. But when I had to file
10  my motion with the Court to order these
11  depositions, there was no limit on the scope
12  of it.
13      MR. HASSINGER: Okay.
14  Q.    Now, he got me off track.
15      I think I was going to ask
16  you, did you ever see the ladder stand up --
17  A.    Yes, sir.
18  Q.    No. You're jumping. Let me
19  get my question out.
20      Did you ever see the ladder
21  stand up from the time it was last installed
22  up until the time of the accident?
23  A.    Yes, sir.

6 (Pages 21 to 24)

# FREEDOM COURT REPORTING

**25**

1   Q.   Okay. When did you see it up?
2   A.   Like a couple weeks before
3 that happened.
4   Q.   And what were the
5 circumstances surrounding that?
6   A.   I was sitting -- I sat in that
7 tree stand before, in the same spot.
8   Q.   Did you go hunting a couple of
9 weeks before the accident --
10   A.   Yes.
11   Q.   -- in this stand?
12   A.   Yes, sir.
13   Q.   And was the horizontal brace
14 on it at that time?
15   A.   Yes, sir.
16   Q.   Did you look to see if it was
17 on it?
18   A.   Yes, sir.
19   Q.   Why did you look to see if it
20 was on it?
21   A.   Because my gun -- The rope
22 that come up the tree stand that was on
23 there, come down right beside it. And I

**26**

1 always prop my gun right up against the tree
2 and pull the rope.
3   Q.   And the horizontal brace was
4 there?
5   A.   Yes.
6   Q.   All right. How was it
7 attached?
8   A.   It was attached from the
9 ladder to the tree and it was holding on
10 with a strap.
11   Q.   Which strap was it being held
12 on by?
13   A.   That yellow one right there
14 (indicating).
15   Q.   Okay. And how was the yellow
16 strap attached to the horizontal brace?
17   A.   It's got like forks in it,
18 it's got holes, and you tighten it up. And
19 it went up against the tree.
20   Q.   Was it -- Was it strapped --
21 Was the V part of the horizontal brace
22 strapped to the tree?
23   A.   It was like up against the

**27**

1 tree, the forks were, and I strapped it
2 around the tree.
3      (Whereupon, Defendant's
4      Exhibit 2 was marked for
5      identification purposes.)
6   Q.   Draw me a picture of how it
7 was.
8   A.   (Witness complies.)
9      Right there is the tree right
10 there (indicating), and then that part --
11   Q.   And then draw the -- Draw the
12 ladder.
13   A.   (Witness complies.) It was up
14 against, and the ropes were holding it up --
15 I mean the straps.
16   Q.   All right. Is this the ladder
17 right here (indicating)?
18   A.   Yes, sir.
19   Q.   Let's make it look like a
20 ladder.
21   A.   (Witness complies.)
22   Q.   Now, have I got all that
23 labeled right? That's the ladder

**28**

1 (indicating), this is the brace
2 (indicating), and these two things here
3 right here are straps (indicating); right?
4   A.   Yes, sir.
5   Q.   And you're saying this yellow
6 strap was connected to the V part of the --
7   A.   Of the forks on the --
8   Q.   Of the brace?
9   A.   Yeah.
10   Q.   We're sure about that now?
11   A.   (Witness nods head in the
12 affirmative.)
13   Q.   Is that right?
14   A.   Uh-huh. Yes, sir.
15   Q.   Okay. It looks to me like
16 that strap on Exhibit Number 1 is still
17 strapped to the tree, isn't it?
18   A.   Yeah. That's what it's hooked
19 to.
20   Q.   Okay. Well, explain this to
21 me now: Why would the horizontal brace not
22 still be connected to the strap? Why would
23 it be just hanging off the side of the tree

7   (Pages 25 to 28)

# FREEDOM COURT REPORTING

**29**

1  as opposed to laying on the ground?
2      A.    I really don't know.
3      Q.    Well, that makes sense,
4  doesn't it?  You're telling me that --
5      A.    You --
6      Q.    Listen to my question.  You're
7  telling me that this brace was strapped to
8  the tree; correct?
9      A.    Yes, sir.
10     Q.    No question about that; right?
11     A.    That's right.
12     Q.    No confusion about that
13 question?
14     A.    (Witness shakes head in the
15 negative.)
16     Q.    We're all singing off page a
17 hundred of the hymn book; right?
18     A.    Yeah.
19     Q.    All right.  And we still see
20 the strap connected to the tree; is that
21 right?
22     A.    Yes, sir.
23     Q.    But I don't see a brace

**30**

1  hanging down from that strap, do you?
2      A.    No.
3      Q.    The strap appears to be still
4  wrapped around the tree, doesn't it?
5      A.    To me, yeah.
6      Q.    And you don't see -- You don't
7  see a brace still strapped to the strap, do
8  you?
9      A.    No.
10     Q.    Okay.  And then the other end
11 of that strap is hooked onto the ladder,
12 isn't it?  Is that true?
13     A.    It looks like it.
14     Q.    Okay.  Were y'all using this
15 yellow strap in place of the horizontal
16 brace?
17     A.    No.
18     Q.    Are you sure about that?
19     A.    It was on there, I know.
20     Q.    Well, tell me this now:  Did
21 you monkey with this strap on the day of the
22 accident?
23     A.    No.

**31**

1      Q.    Okay.  So it was still hooked?
2      A.    I mean -- I didn't mess with
3  it.  Somebody else could have.  I --
4      Q.    Did you see anybody else mess
5  with it?
6      A.    No.  I mean, I wasn't out
7  there.
8      Q.    You were --
9      A.    I mean, I was out there then.
10 I'm just saying, I don't know if anybody
11 else went out there after.
12     Q.    I'm not asking you what may
13 have happened when you weren't there.
14     A.    Yeah.
15     Q.    What I'm asking you is on the
16 day of this accident when you went out to
17 see about Peanut, Larry, did you mess with
18 this yellow strap in any way?
19     A.    I didn't.
20     Q.    Did you see anybody else mess
21 with it?
22     A.    No.
23     Q.    So as far as you know, this

**32**

1  yellow strap that's depicted in Exhibit
2  Number 1 is the same on -- it's the same in
3  this picture as it was on the day of the
4  accident, as far as you know?
5      A.    Uh-huh.
6      Q.    Huh?
7      A.    As far as I know.
8      Q.    Okay.  Is that the way it
9  looked when y'all went out there to take the
10 stand off?  Huh?
11     A.    This part (indicating) was.
12 It's -- I can't -- It's been so far back, I
13 really couldn't --
14     Q.    You don't remember?
15     A.    Not really.
16     Q.    Okay.  Here is something else
17 I want to ask you about, Matt.  Your dad is
18 David; is that right?
19     A.    Yes, sir.
20     Q.    Now, I asked your dad in his
21 deposition if anybody had done any
22 modifications to this stand, made any
23 changes to it, done any welding to it.  Do

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

**33**

1 you know what his answer was? No.
2     A.    All right.
3     Q.    Now, I'm going to ask you the
4 same question: Did anybody make any
5 modifications to this platform of this
6 stand, added any welding to it, added any
7 shooting rails to it, made a homemade
8 shooting rail?
9     A.    The only part that I -- when I
10 sat up in this stand, it had the foam go
11 around it.
12     Q.    I know about that.
13     A.    That's the only --
14     Q.    I know about the foam. I'm
15 talking about adding a shooting rail to the
16 top, you know, some additional piping, some
17 additional welding up top.
18     A.    Not that I know of.
19     Q.    Well, I can tell you, we're
20 all in agreement now that this stand has
21 been modified: Somebody has added a
22 homemade shooting rail to the top. So
23 rather than me play Twenty Questions with

**34**

1 you, I'm just going to ask you: Do you know
2 who added that homemade shooting rail to the
3 top of this stand?
4     A.    No.
5     Q.    You don't know?
6     A.    I don't know.
7     Q.    You didn't do it?
8     A.    I didn't do it.
9     Q.    And your dad owned the stand;
10 right?
11     A.    Yes, sir.
12     Q.    Okay. All right. Let's talk
13 about how this stand was taken down. And
14 you just tell me how y'all did it.
15     A.    We got a -- Climbed in the
16 tree stand and went up the tree right behind
17 it. And Jaiton, he's the one that went up,
18 and he had a rope with him, and he went up,
19 undid that (indicating), and lowered it
20 down.
21     Q.    Undid what?
22     A.    Undid that up there
23 (indicating) where it was attached to the

**35**

1 tree.
2     Q.    Okay. Was it attached by a
3 strap up at the top somewhere?
4     A.    A strap.
5     Q.    I don't see that in the
6 picture. Do you see it in there?
7     A.    It looks like right there
8 (indicating). Right there (indicating).
9     Q.    All right. You want to circle
10 that while we're doing some circling?
11     A.    (Witness complies.)
12     Q.    Put a strap -- Write the word
13 strap out there.
14     A.    (Witness complies.)
15     Q.    Okay. You're telling me that
16 Jaiton took a climbing tree stand and
17 skinnied up this tree (indicating); is that
18 right?
19     A.    Yes, sir.
20     Q.    And then he undid the strap at
21 the top; correct?
22     A.    (Witness nods head in the
23 affirmative.) And lowered it down with a

**36**

1 rope.
2     Q.    Lowered what down with a rope?
3     A.    This (indicating). And
4 lowered it down when he undid it.
5     Q.    Did y'all take the -- Did
6 y'all take the ladder sections apart before
7 you took it down?
8     A.    Huh-uh.
9     Q.    Did not?
10     A.    Huh-uh.
11     Q.    Did you tie a rope to the top
12 of the stand?
13     A.    Right up there (indicating)
14 where he was. And lowered it down with a
15 rope.
16     Q.    How did y'all lower it down?
17     A.    He had a rope and just let it
18 ease down.
19     Q.    Y'all eased it down, is that
20 what you're saying?
21     A.    Yes, sir.
22     Q.    Were y'all trying to be
23 careful with it --

9  (Pages 33 to 36)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

**37**

1    A.    Yes, sir.
2    Q.    -- so you wouldn't mess it up?
3    A.    Yes, sir.
4    Q.    All right.  And did you ease
5  it off to the side or -- how did y'all lower
6  it?
7    A.    Ease it off to the side and
8  just lowered it down to the ground.
9    Q.    All right.  So y'all connected
10  a rope to the top, and you're being careful;
11  correct?
12    A.    Yes, sir.
13    Q.    And you eased it down onto the
14  side; is that right?
15    A.    Yes, sir.
16    Q.    And is it off to the right
17  side, is that what we're hearing?
18    A.    Yes, sir.
19    Q.    Are you sure about that?
20    A.    Yes, sir.
21    Q.    Okay.  Did you let it
22  collapse?  Did it fall or collapse?
23    A.    No.

**38**

1    Q.    Y'all eased it down; correct?
2    A.    Yes, sir.
3    Q.    Didn't bend, didn't break,
4  didn't fall apart, didn't do anything but
5  just ease it down; is that right?
6    A.    Yes, sir.
7    Q.    And y'all were careful and
8  laid it carefully on the ground; true?
9    A.    Yes, sir.
10    Q.    Was it all still together when
11  you laid it off -- If we're looking at this
12  picture, Exhibit Number 1, if we're facing
13  the tree stand, what you're telling me is
14  you lowered it to the right side; correct?
15    A.    Yes, sir.
16    Q.    Were you holding onto it too?
17    A.    Yes, sir.  When he got it
18  closer to the ground.
19    Q.    And it didn't fall apart?
20    A.    No, sir.
21    Q.    Once it got to the ground, was
22  everything still intact?
23    A.    Yes, sir.

**39**

1    Q.    Then what did you do?
2    A.    Put it on the truck.
3    I mean, we took it apart then
4  and put it on the truck.
5    Q.    Okay.  Did you have any
6  trouble taking it apart?
7    A.    A little bit because them
8  things were bent.
9    Q.    Okay.  What did y'all do to
10  take it apart?
11    A.    We had trouble with them
12  taking this part off (indicating).  And
13  after we got it off, and it slid off, and we
14  put it on the back of the truck.  Then we
15  rode to the house with it.
16    Q.    The part that was bent, how
17  did you get it out?
18    A.    Are you talking about this
19  part right here (indicating)?
20    Q.    Yeah.
21    A.    It slid off.  It was like
22  rusted a little bit to it, and it slid off.
23    Q.    Did you have to just jerk it

**40**

1  out?
2    A.    Yes, sir.
3    Q.    Is that a good description of
4  what I'm saying?
5    A.    Yes, sir.
6    Q.    Just grab ahold of it and jerk
7  it out; right?
8    A.    Yes, sir.
9    Q.    Did you rebend anything?
10    A.    Yes, sir.
11    Q.    You're positive of that?  Sir?
12    A.    Yes, sir.
13    Q.    You're one hundred percent
14  sure that you didn't rebend anything;
15  correct?
16    A.    Yes, sir.
17    Q.    Is there any confusion about
18  that question?
19    A.    No, sir.
20    Q.    None?
21    A.    (Witness shakes head in the
22  negative.)
23    Q.    So if we have to try this

10  (Pages 37 to 40)

# FREEDOM COURT REPORTING

41

1  case, and we're in court looking at a judge
2  and looking at a jury, and if I ask you did
3  you have to bend anything to get this ladder
4  apart, your answer is going to be the same
5  then as it is today, and the answer is no?
6      A.    Yes, sir.
7      Q.    N-O; right?
8      A.    I mean, after we put it on the
9  back of the truck, that's where it stayed,
10  then --
11      Q.    I'm talking about once it's on
12  the ground, you just jerked it out; correct?
13      A.    (Witness nods head in the
14  affirmative.)
15      Q.    And it came loose?
16      A.    (Witness nods head in the
17  affirmative.)
18      Q.    You need to answer.
19      A.    Yes, sir.
20      Q.    And you didn't bend anything?
21      A.    No, sir.
22      Q.    Didn't disturb the evidence?
23      A.    No.

42

1      Q.    Tried to keep it just the way
2  it was; right?
3      A.    Yes, sir.
4      Q.    Intact?
5      A.    Yes, sir.
6      Q.    Okay.  And you're there the
7  whole time that Jaiton is there doing --
8  helping him with this process; correct?
9      A.    Yes, sir.
10      Q.    Okay.  And you took the three
11  ladder sections apart, and you put that plus
12  the top and the straps in the back of the
13  truck and went on your business?
14      A.    Yes, sir.
15      Q.    Is that right?
16      A.    Yes, sir.
17      Q.    When y'all were lowering this
18  ladder stand to the ground, did y'all bend
19  it lowering it in any way or did you just
20  lay it over easy?
21      A.    Laid it over easy.
22      Q.    Okay.  And I guess what you
23  were trying to do is make sure that whatever

43

1  y'all brought home was the way it was at the
2  time of the accident; is that right?
3      A.    Yes, sir.
4      Q.    Okay.  Now, have you done
5  anything to the stand since then?
6      A.    No, sir.  I mean, as soon as
7  we got it home, we took it off the truck and
8  everything.
9      Q.    Tell me what y'all did then.
10      A.    Put it in the shed.
11      Q.    Did you bend anything when you
12  got home?
13      A.    Not that I know of.  It was in
14  the back of the truck for about thirty
15  minutes.  Not that I know of it bent; it
16  could have, I don't know.
17      Q.    You laid it down carefully in
18  the back of the truck, didn't you?
19      A.    We just threw it back there.
20      Q.    Okay.  But you didn't take any
21  of these ladder sections and bend it in in
22  any way, you just placed it in the back of
23  the truck; right?

44

1      A.    Just placed it back there.
2      Q.    And then you drove to where?
3      A.    To our house.
4      Q.    And then put it where?
5      A.    And it stayed in the back of
6  there for about a couple of hours, then they
7  said put it in the shed.  Then we put it in
8  the shed.
9      Q.    Okay.  And when -- Did you
10  ever see it again?
11      A.    No.
12      Q.    You did not?
13      A.    No.
14      Q.    How did y'all get it to the
15  lawyer?
16      A.    To the lawyer?
17      Q.    Yeah.
18      A.    I don't know how -- I don't
19  know.
20      Q.    You don't know how it got to
21  the lawyer's office?
22      A.    Huh-uh.
23      Q.    Okay.

11  (Pages 41 to 44)

# FREEDOM COURT REPORTING

45

1    MR. LEE: Let's just take a
2  break for a second.
3    VIDEOGRAPHER: We are off the
4  Record at 10:06 a.m.
5    (Recess was taken.)
6    VIDEOGRAPHER: We are back on
7  the Record at 10:09 a.m.
8    Q.    (BY MR. LEE): Matt, do you
9  know when Mr. Jones took these pictures?
10   A.    No, I don't.
11   Q.    Okay. When Jaiton took the
12  climber and climbed up the tree to
13  disconnect the strap at the top, was the
14  yellow rope still attached -- the yellow
15  strap still attached?
16   A.    Not that I know of.
17   Q.    Did he take the strap off?
18   A.    Are you talking about this
19  strap right here (indicating)?
20   Q.    Yeah.
21   A.    I think he did. I think.
22   Q.    Okay.
23   A.    I think he did. Yeah.

46

1    Q.    Okay. When he disconnected
2  the stand at the top, from the strap, y'all
3  didn't let this stand fall to the ground,
4  did you?
5    A.    No, sir.
6    Q.    You're certain of that?
7    A.    Yeah.
8    Q.    And there's no way it could
9  have fallen forward -- or there's no way you
10  could have lowered it forward because the
11  tree's in the way; right?
12   A.    Yes, sir.
13   Q.    Okay. And you told us that
14  you didn't lay it straight back onto the
15  ground; correct?
16   A.    We just laid it to the side.
17   Q.    Off to the right?
18   A.    Yes, sir.
19   Q.    Okay. Your testimony is in
20  terms of taking out this -- This second
21  ladder section is the one that's bent;
22  correct?
23   A.    Yes, sir.

47

1    Q.    Y'all didn't have to bend that
2  to take it out; you just tugged on it,
3  jerked on it, and pulled it out; is that
4  right?
5    A.    Jerked on it a couple of times
6  and --
7    Q.    It came loose?
8    A.    Yes, sir.
9    Q.    Okay.
10   A.    Then we put it in the back of
11  the truck and rode it home, and it was
12  bouncing around.
13   Q.    Was it a pickup truck that
14  y'all carried it home in?
15   A.    Yes, sir.
16   Q.    Anything else back there in
17  the back with the stand, or was that pretty
18  much it?
19   A.    I think that was about it.
20   Q.    Okay. All right. Before we
21  took a break I was asking you how did the
22  stand get to the lawyer's office. Do you
23  know how that happened?

48

1    A.    I don't.
2    Q.    Have you seen this stand
3  again?
4    A.    One time.
5    Q.    When?
6    A.    That one day he was showing me
7  about that part.
8    Q.    Showing you about what now?
9    A.    He was just showing about that
10  bent part right there (indicating).
11   Q.    Who was showing you the bent
12  part there?
13   A.    (Witness indicates.)
14   Q.    Mr. Hassinger?
15   A.    Yes, sir.
16   Q.    So he had the stand with him?
17   A.    He just had the ladder.
18   Q.    What was he showing you about
19  the bent part there?
20   A.    He said it was bent the
21  opposite way or something.
22   Q.    Do you know how that happened?
23   A.    I don't. It could have been

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

49

1  bouncing around in the back of the truck
2  or --
3      Q.    You told him the same thing
4  you're telling me today, that is, you don't
5  know how it got bent in the opposite
6  direction; is that right?
7      A.    Yes, sir.
8      Q.    Okay.  What you are telling
9  me, for sure, is that you didn't bend it in
10  the opposite direction?
11      A.    I didn't.
12      Q.    Okay.  And do you know of
13  anybody else who may have bent it in the
14  opposite direction?
15      A.    Not that I know of unless
16  Jaiton.  I don't know.
17      Q.    Okay.  He didn't do that when
18  you were there; correct?
19      A.    Not -- No.
20      Q.    Okay.
21      A.    But he was the one that -- I
22  mean, we got it there, and it stayed in the
23  back of the truck a couple of hours, and he

50

1  got it off, he did, and he put it in the
2  shed.
3      Q.    But it was already
4  disconnected when y'all left the woods with
5  it; right?
6      A.    Yes, sir.
7      Q.    In other words, you'd already
8  taken the ladder sections apart to put it in
9  the back of the truck?
10      A.    Yes, sir.
11      Q.    Is that right?
12      A.    (Witness nods head in the
13  affirmative.)
14      Q.    So if this second ladder
15  section, these rails had been bent in the
16  opposite direction, your testimony under
17  oath is you have no idea how that occurred
18  or when that occurred or who did it; is that
19  true?
20      A.    Yes, sir.
21      Q.    Okay.  But you know you didn't
22  do it and you know you didn't see anybody
23  else do it; correct?

51

1      A.    No, sir.
2      Q.    Is that right?
3      A.    Yes, sir.  Not that I know of
4  that anybody did it.  I mean, not in my
5  eyes, I didn't see it.
6      Q.    Okay.  And the only person you
7  would have been laying eyes on when this
8  stand was taken off was Jaiton; right?
9      A.    Yes, sir.
10      Q.    Because that was the only two
11  people out in the woods that day; right?
12      A.    Yes, sir.  After we got to the
13  house, all I know, they put it in the shed.
14  That's what they said.  I didn't touch it
15  out there.  It went in the back of the
16  truck.
17      Q.    Well, have you talked to
18  anybody about how this -- these rails may
19  have been bent?
20      A.    No.
21      Q.    No?
22      A.    (Witness shakes head in the
23  negative.)

52

1          (Whereupon, Defendant's
2          Exhibit No. 3 was marked
3          for identification.)
4      Q.    Okay.  Look at this right
5  here, this picture here (indicating).
6          I know those are boots; I'm
7  looking at that right there (indicating).
8  What is that?
9      A.    (Witness mumbled.)  It looks
10  like a piece of the brace to me, where
11  the -- where it's welded on.  That's what it
12  looks like.
13      Q.    Does it not look like a ladder
14  section to you?
15      A.    You really can't tell because
16  of that.
17      Q.    It's not a very good picture,
18  I'll grant you that.
19      A.    I don't -- That right there
20  (indicating) don't.  Because that's brown,
21  this is green, and like a rusty color right
22  here (indicating), and that's like a beige
23  color.

13  (Pages 49 to 52)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

53

1 (Whereupon, Defendant's
2 Exhibit No. 4 was marked
3 for identification.)
4 Q. Okay. Look at this picture
5 there (indicating). Don't smudge my number.
6 Okay. Do you know what that
7 is?
8 A. Hum? It's a close-up picture
9 of that (indicating) is what it looks like.
10 A close-up.
11 (Whereupon, Defendant's
12 Exhibit No. 5 was marked
13 for identification.)
14 Q. All right. Look at Exhibit
15 Number 5 and tell me what that is.
16 A. I don't know what that is.
17 Q. Did you see anything --
18 A. It looks like a piece that
19 broke off. I don't know. I don't know what
20 that is.
21 Q. Did you see anything like
22 that, either on the day of the accident or
23 when y'all went out there to take the stand

54

1 down? And I'm talking about Exhibit Number
2 5.
3 A. You talking about that piece
4 right there (indicating)?
5 Q. Yes.
6 A. I don't really remember.
7 Q. Okay. Does it look like it's
8 completely rusted over to you?
9 A. It looks like from this
10 picture.
11 Q. All right. All right. Do you
12 know anything else about how this stand was
13 taken down?
14 A. That's all we did.
15 Q. Okay. Are you -- Do you want
16 me to clarify any of the questions that I've
17 asked you? Is there any confusion about
18 anything I asked you today?
19 A. I understood every one of them
20 you asked.
21 MR. LEE: All right. I think
22 that's all.
23 MR. HASSINGER: I have one

55

1 question. Could I see Defendant's Exhibit
2 Number 1, please?
3 EXAMINATION
4 BY MR. HASSINGER:
5 Q. Matt, when you put this tree
6 stand in the back of the pickup truck, were
7 these two sections still connected that I'm
8 pointing to right here (indicating)?
9 MR. LEE: Objection. I think
10 he's already testified that they took it all
11 apart.
12 MR. HASSINGER: All right.
13 A. I don't really know. I don't
14 think they were. I don't --
15 Q. You don't know, is that your
16 testimony?
17 A. Yeah.
18 MR. HASSINGER: I don't have
19 anything else.
20 EXAMINATION CONTINUED
21 BY MR. LEE:
22 Q. Well, you told me a few
23 minutes ago that y'all took everything apart

56

1 and put it in the back of the truck. Is
2 that still your testimony?
3 A. Yeah. From what I remember.
4 Q. That's all we can work on is
5 your memory -- work from is your memory.
6 Your memory is that the stand
7 was disassembled, taken apart, all three
8 ladder sections, plus the top platform, and
9 put in the back of the truck and carried
10 back to the house; is that right?
11 A. Yeah.
12 Q. You need to answer out. Yes?
13 A. Yes.
14 MR. LEE: All right. That's
15 all.
16 MR. HASSINGER: That's all I
17 have.
18 VIDEOGRAPHER: This ends
19 videotape number one and concludes the
20 deposition; we are off the Record at 10:20
21 a.m.
22 (The deposition was concluded at 10:20 a.m.
23 on May 19th, 2008.)

14 (Pages 53 to 56)

# FREEDOM COURT REPORTING

57

```
 1        REPORTER'S CERTIFICATE
 2    STATE OF ALABAMA,
 3    ELMORE COUNTY,
 4        I, Sara Mahler, Certified Court
 5    Reporter and Commissioner for the State of
 6    Alabama at Large, do hereby certify that the
 7    above and foregoing proceeding was taken
 8    down by me by stenographic means, and that
 9    the content herein was produced in
10    transcript form by computer aid under my
11    supervision, and that the foregoing
12    represents, to the best of my ability, a
13    true and correct transcript of the
14    proceedings occurring on said date and at
15    said time.
16        I further certify that I am neither
17    of kin nor of counsel to the parties to the
18    action; nor in any manner interested in the
19    result of said case.
20
21
22    _____
          Sara Mahler, CCR
23          ACCR #420
```

15  (Page 57)

# FREEDOM COURT REPORTING

58

## A

**ability** 57:12
**accident** 7:8,23
12:18 13:9,14
14:2,23 15:10
19:7 20:4,10
20:11 21:7,8
21:16,23 22:4
24:22 25:9
30:22 31:16
32:4 43:2
53:22
**ACCR** 57:23
**acting** 5:2
**action** 57:18
**added** 33:6,6,21
34:2
**adding** 33:15
**additional** 33:16
33:17
**aerospace** 11:19
**affirmative** 10:6
18:20 28:12
35:23 41:14,17
50:13
**ago** 10:1,4,10
55:23
**AGREED** 1:13
2:2,9,18
**agreement**
33:20
**ahold** 40:6
**aid** 57:10
**Ain't** 14:14
**al** 1:6 4:5 5:16
**Alabama** 1:2,19
4:2,16,20 5:2,8
5:19,23 57:2,6
**Alexander** 1:18
5:8,22
**answer** 7:13
10:7,9 18:21
21:5 33:1 41:4
41:5,18 56:12

## B

**back** 12:6 20:4
23:9 32:12
39:14 41:9
42:12 43:14,18
43:19,22 44:1
44:5 45:6
46:14 47:10,16
47:17 49:1,23

**anticipate** 21:2
**anybody** 9:6
20:20 21:6,14
21:21 31:4,10
31:20 32:21
33:4 49:13
50:22 51:4,18
**apart** 36:6 38:4
38:19 39:3,6
39:10 41:4
42:11 50:8
55:11,23 56:7
**APPEARAN...**
4:13
**appearing** 4:17
4:20
**appears** 30:3
**application** 12:5
**asked** 9:11
10:13 32:20
54:17,18,20
**asking** 7:20 21:3
31:12,15 47:21
**assign** 2:13
**attached** 15:5
26:7,8,16
34:23 35:2
45:14,15
**attention** 13:14
14:1 21:12
**Auburn** 11:15
**aware** 11:2
**a.m** 5:9,21 45:4
45:7 56:21,22

## C

**Cahaba** 4:15
**call** 12:4 15:22
18:7
**careful** 36:23

50:9 51:15
55:6 56:1,9,10
**beginning** 5:9
**begins** 5:13
**behalf** 4:17,21
6:9
**beige** 52:22
**bend** 14:6 38:3
41:3,20 42:18
43:11,21 47:1
49:9
**bent** 39:8,16
43:15 46:21
48:10,11,19,20
49:5,13 50:15
51:19
**best** 57:12
**Birmingham**
4:16,20
**bit** 39:7,22
**book** 29:17
**boots** 52:6
**bouncing** 47:12
49:1
**brace** 14:9,13,16
16:15 17:11
19:3,16 20:14
21:15 23:9
25:13 26:3,16
26:21 28:1,8
28:21 29:7,23
30:7,16 52:10
**break** 38:3 45:2
47:21
**broke** 53:19
**brought** 43:1
**brown** 52:20
**business** 42:13

**37:10 38:7
carefully** 38:8
43:17
**carried** 47:14
56:9
**case** 1:5 4:4 5:17
41:1 57:19
**cause** 5:10
**CCR** 1:17 5:1
57:22
**certain** 46:6
**CERTIFICA...**
57:1
**Certified** 57:4
**certify** 5:3 57:6
57:16
**changes** 32:23
**circle** 4:15 16:14
23:13 35:9
**circled** 17:10
**circling** 35:10
**circumstances**
25:5
**City** 1:18 5:8,23
**Civil** 5:4
**clarify** 54:16
**climbed** 34:15
45:12
**climber** 45:12
**climbing** 35:16
**closer** 38:18
**close-up** 53:8,10
**cocounsel** 6:6
**collapse** 37:22
37:22
**color** 52:21,23
**come** 9:20,22
11:5 12:6 13:5
25:22,23
**Commissioner**
2:19 4:12 5:3
57:5
**completely** 54:8
**compliance** 2:5

**complies** 27:8
27:13,21 35:11
35:14
**computer** 57:10
**concerned** 14:3
19:12,14,16
**concluded** 56:22
**concludes** 56:19
**confused** 9:11
9:14 10:14,21
16:16 22:23
**confusion** 13:20
14:11 29:12
40:17 54:17
**connected** 28:6
28:22 29:20
37:9 55:7
**content** 57:9
**CONTINUED**
3:7 55:20
**correct** 13:10
14:17 22:4
29:8 35:21
37:11 38:1,14
40:15 41:12
42:8 46:15,22
49:18 50:23
57:13
**counsel** 1:15
2:10,12 5:6 6:2
57:17
**COUNTY** 57:3
**couple** 8:15,18
25:2,8 44:6
47:5 49:23
**course** 17:5
**court** 1:1 2:6 4:1
5:1,18 6:1,16
7:2 10:8 24:10
41:1 57:4
**cousin** 9:4

## D

**D** 3:2

**FREEDOM COURT REPORTING**

dad 12:11,20
32:17,20 34:9
daddy 23:23
Dadeville 11:6
date 5:3 14:2
57:14
David 4:18 6:8
6:22 32:18
day 1:19 8:20
9:20 12:15,18
13:9 14:22
19:6,21 20:5
20:10 21:8,15
21:15,22 22:4
30:21 31:16
32:3 48:6
51:11 53:22
Deborah 6:7
Defendant 1:10
4:9,21 6:9
Defendant's
3:10 16:10
27:3 52:1 53:1
53:11 55:1
depicted 32:1
deposition 1:15
1:21 2:3,4,15
2:19 5:14,22
7:1 32:21
56:20,22
depositions 2:7
24:9,11
description 40:3
direction 49:6
49:10,14 50:16
dirt 18:13
disassembled
56:7
disassembly 7:7
24:4
disconnect
45:13
disconnected
46:1 50:4

District 1:1,2
4:1,2 5:18,19
disturb 41:22
Division 1:3 4:3
5:19
doing 35:10 42:7
draw 27:6,11,11
Drawing 3:13
drove 44:2
duly 6:14
Dwight 22:20

**E**

E 3:2
earlier 7:1,21
9:12 22:19
case 36:18 37:4
37:7 38:5
eased 36:19
37:13 38:1
easy 42:20,21
effect 2:5
either 53:22
Electric 11:15
ELMORE 57:3
ends 56:18
ESQUIRE 4:14
4:18
et 1:6 4:5 5:16
evidence 2:15
41:22
examination 3:3
3:7 5:11 6:20
55:3,20
examined 6:14
Exhibit 3:12,13
3:14,15,16
16:11 17:9
27:4 28:16
32:1 38:12
52:2 53:2,12
53:14 54:1
55:1
EXHIBITS 3:10

explain 28:20
eyes 51:5,7

**F**

facing 38:12
fall 37:22 38:4
38:19 46:3
fallen 46:9
far 22:6 31:23
32:4,7,12
Faulk 4:22 5:23
Federal 5:4
file 24:9
filing 2:18
fine 6:18,19
first 6:14 9:9,13
fixing 11:18
foam 33:10,14
following 5:11
follows 6:15
force 2:4
foregoing 5:5
57:7,11
forgot 10:2
forks 26:17 27:1
28:7
form 2:11 21:1
21:10 57:10
forth 8:1
forward 46:9,10
found 18:11
Freedom 6:1
full 2:5
further 2:1,8,17
57:16

**G**

GKN 11:19
glanced 14:7
15:2
go 8:13 9:6
11:18 12:17
20:4 25:8
33:10
goes 14:14,17

going 18:6,7
24:2,15 33:3
34:1 41:4
good 40:3 52:17
gotten 9:11
grab 40:6
grant 52:18
green 52:21
ground 15:4,7,8
15:13,14,16
17:6,12 18:18
18:22 20:16
29:1 37:8 38:8
38:18,21 41:12
42:18 46:3,15
grounds 2:13
guess 42:22
guessing 16:19
gun 25:5 26:1

**H**

H 4:14
hanging 28:23
30:1
happened 8:16
8:17 10:18
11:17 25:3
31:13 47:23
48:22
Hassinger 3:6
4:14 6:5,6,19
9:17 10:11
11:5 20:23
21:9,17 24:2
24:13 48:14
54:23 55:4,12
55:18 56:16
Haynes 1:17 5:7
head 10:5 13:18
18:19 28:11
29:14 35:22
40:21 41:13,16
50:12 51:22
hearing 37:17

held 26:11
helicopter 11:19
help 12:20 22:21
23:15,16,17,22
helped 23:18
helping 42:8
Highway 4:19
holding 26:9
27:14 38:16
holes 26:18
home 43:1,7,12
47:11,14
homemade 33:7
33:22 34:2
hooked 28:18
30:11 31:1
horizontal 14:9
14:12 16:15
19:3 20:13
21:15 23:9
25:13 26:3,16
26:21 28:21
30:15
Hornsby 1:18
5:7
hospital 20:19
hours 44:6
49:23
house 11:5
39:15 44:3
51:13 56:10
Huh 32:6,10
Huh-uh 15:6
19:1,8,10 20:6
36:8,10 44:22
Hum 53:8
hundred 29:17
40:13
hunting 12:11
12:23 13:1,2,7
25:8
hymn 29:17

**I**

# FREEDOM COURT REPORTING

60

idea 50:17
identification
16:12 27:5
52:3 53:3,13
identify 6:2
Incorporated
5:17 6:10
indicates 48:13
indicating 9:14
15:18,21 16:5
16:6,18 17:4
17:21 18:2,5
26:14 27:10,17
28:1,2,3 32:11
34:19,23 35:8
35:8,17 36:3
36:13 39:12,19
45:19 48:10
52:5,7,20,22
53:5,9 54:4
55:8
installed 24:21
intact 38:22
42:4
interested 57:18

**J**

Jaiton 9:1,2
10:21,23 12:11
13:4 22:11,12
22:23 23:3
34:17 35:16
42:7 45:11
49:16 51:8
jerk 39:23 40:6
jerked 41:12
47:3,5
job 11:17 12:3
Jones 22:20 45:9
judge 41:1
JULIANO 4:19
jumping 24:18
jury 41:2

**K**

keep 42:1
kin 57:17
know 7:18,22
8:18,20 10:3
10:23 14:9,10
16:8,18 19:14
20:22 22:6
24:8 29:2
30:19 31:10,23
32:4,7 33:1,12
33:14,16,18
34:1,5,6 43:13
43:15,16 44:18
44:19,20 45:9
45:16 47:23
48:22 49:5,12
49:15,16 50:21
50:22 51:3,13
52:6 53:6,16
53:19,19 54:12
55:13,15

**L**

L 1:12
labeled 27:23
ladder 19:20
21:21 22:3
24:16,20 26:9
27:12,16,20,23
30:11 36:6
41:3 42:11,18
43:21 46:21
48:17 50:8,14
52:13 56:8
laid 38:8,11
42:21 43:17
46:16
Large 57:6
Larry 1:6 4:5
5:15 6:7 13:7
18:6 20:1 21:8
31:17
laws 2:6
lawyer 44:15,16

lawyer's 44:21
47:22
lay 42:20 46:14
laying 15:7,8,12
15:14,15 17:19
18:9,15,18,22
29:1 51:7
leading 2:11
Lee 3:5,9 4:18
4:19,23 6:8,8
6:18,21,22
16:9 17:2 24:6
45:1,8 54:21
55:9,21 56:14
left 16:4 17:15
17:15 20:4,16
20:17 50:4
let's 8:11 16:9
16:14 18:4
27:19 34:12
45:1
life 11:13
limit 24:11
Listen 21:2 29:6
little 39:7,22
living 11:11,13
look 14:7,8
16:23 25:16,19
27:19 52:4,13
53:4,14 54:7
looked 14:4,5,6
32:9
looking 16:22
17:9 38:11
41:1,2 52:7
looks 15:17,18
16:1,7,17,20
23:14 28:15
30:13 35:7
52:9,12 53:9
53:18 54:9
loose 41:15 47:7
lower 36:16 37:5
lowered 34:19

35:23 36:2,4
36:14 37:8
38:14 46:10
lowering 42:17
42:19

**M**

Mahler 1:16
4:12 5:1 57:4
57:22
Main 1:18 5:7
manner 57:18
mark 16:9
marked 16:11
27:4 52:2 53:2
53:12
Matt 1:15,21 5:9
5:15 6:22 22:9
32:17 45:8
55:5
matter 5:15
MATTHEW
6:13
mean 14:4 15:18
16:17,20 27:15
31:2,6,9 39:3
41:8 43:6
49:22 51:4
means 57:8
meet 11:8
memory 56:5,5
56:6
mess 31:2,4,17
31:20 37:2
met 6:23
Middle 1:2 4:2
5:18
minutes 43:15
55:23
mixed 7:17
modifications
32:22 33:5
modified 33:21
moment 19:15

Monday 5:21
monkey 30:21
Morris 1:17 5:7
motion 24:10
move 19:2,9
moving 18:23
mumbled 52:9

**N**

N 1:12 3:2
name 5:23 6:5
necessary 2:9
need 18:21
41:18 56:12
negative 13:19
29:15 40:22
51:23
neither 57:16
nods 10:5 18:19
28:11 35:22
41:13,16 50:12
Northern 1:3
4:3 5:19
notice 2:18
notified 13:13
number 1:5 4:4
5:14,17 17:9
28:16 32:2
38:12 53:5,15
54:1 55:2
56:19
N-O 41:7

**O**

O 1:12
oath 7:3 50:17
object 20:23
21:9 24:3
objected 24:8
objection 21:18
55:9
objections 2:10
2:13
occurred 50:17
50:18

# FREEDOM COURT REPORTING

occurring 57:14
offer 24:7
offered 2:15
offhand 8:22
office 44:21
  47:22
offices 1:17 5:6
Okay 7:3,10,19
  8:7,20,23 9:6
  11:4,14 12:7
  13:3,12,23
  14:8 16:3,23
  17:14,18 19:2
  20:3 21:5 22:2
  22:15,19 23:2
  23:8 24:13
  25:1 26:15
  28:15,20 30:10
  30:14 31:1
  32:8,16 34:12
  35:2,15 37:21
  39:5,9 42:6,10
  42:22 43:4,20
  44:9,23 45:11
  45:22 46:1,13
  46:19 47:9,20
  49:8,12,17,20
  50:21 51:6
  52:4 53:4,6
  54:7,15
once 38:21
  41:11
opposed 29:1
opposite 48:21
  49:5,10,14
  50:16
oral 5:10
order 7:2 24:10
outside 24:3
owned 34:9

**P**

P 1:12
page 3:4,8,11

29:16
Park 4:15
parked 18:12
PARSONS 4:18
part 21:22 26:21
  27:10 28:6
  32:11 33:9
  39:12,16,19
  48:7,10,12,19
parties 1:14
  2:12 57:17
parts 11:20
pay 13:14 14:1,5
  21:12
Peanut 13:2
  17:18 18:7
  23:23 31:17
Peanut's 9:21,23
  11:9
people 51:11
percent 40:13
person 51:6
Photograph
  3:12,14,15,16
pick 20:20
pickup 47:13
  55:6
picture 15:12
  16:22 17:3,5
  17:22 27:6
  32:3 35:6
  38:12 52:5,17
  53:4,8 54:10
pictures 12:8
  15:10 17:1
  23:1 45:9
piece 52:10
  53:18 54:3
piping 33:16
place 5:22 30:15
placed 43:22
  44:1
plaintiffs 1:7 4:6
  4:17 6:7

platform 33:5
  56:8
play 33:23
please 6:4,12
  55:2
plus 42:11 56:8
pointing 15:20
  16:3 55:8
positive 40:11
PRESENT 4:22
pretty 47:17
prior 2:15
Procedure 5:5
proceeding 57:7
proceedings
  5:12 57:14
process 42:8
processing 12:6
produced 57:9
prop 26:1
provided 5:4
pull 26:2
pulled 47:3
purposes 27:5
pursuant 7:2
put 18:3 23:15
  23:16,17,18,22
  23:23 35:12
  39:2,4,14 41:8
  42:11 43:10
  44:4,7,7 47:10
  50:1,8 51:13
  55:5 56:1,9

**Q**

question 10:14
  10:18 13:21
  14:12 17:9
  21:4,6 24:3,19
  29:6,10,13
  33:4 40:18
  55:1
questions 2:11
  2:12 7:20 9:11

33:23 54:16
quit 11:18

**R**

rail 33:8,15,22
  34:2
rails 33:7 50:15
  51:18
read 10:20
reading 2:2
really 7:18 8:18
  14:3,5 16:18
  29:2 32:13,15
  52:15 54:6
  55:13
rebend 40:9,14
Recess 45:5
recollection
  17:11
Record 5:20
  24:5 45:4,7
  56:20
relating 2:6
remember 32:14
  54:6 56:3
Remind 12:10
  23:15
reminding 7:2
reporter 5:2
  6:12,16 10:8
  57:5
REPORTER'S
  57:1
Reporting 6:1
represent 6:3
representing 6:1
represents 57:12
respective 1:14
result 57:19
right 8:3,7,11,22
  12:6,12 13:6
  14:16,21 15:1
  15:2,17,21
  16:6,13,17

17:13,17 18:1
  18:4,16 20:3
  20:15 21:20
  22:13,15 23:6
  23:8 25:23
  26:1,6,13 27:9
  27:9,16,17,23
  28:3,3,13
  29:10,11,17,19
  29:21 32:18
  33:2 34:10,12
  34:16 35:7,8,9
  35:18 36:13
  37:4,9,14,16
  38:5,14 39:19
  40:7 41:7 42:2
  42:15 43:2,23
  45:19 46:11,17
  47:4,20 48:10
  49:6 50:5,11
  51:2,8,11 52:4
  52:7,19,21
  53:14 54:4,11
  54:11,21 55:8
  55:12 56:10,14
righty 7:4
road 18:13
rode 39:15
  47:11
rope 25:21 26:2
  34:18 36:1,2
  36:11,15,17
  37:10 45:14
ropes 27:14
rules 2:6 5:4
rusted 39:22
  54:8
rusty 52:21

**S**

S 1:12
Sara 1:16 4:12
  5:1 57:4,22
sat 25:6 33:10

saw 17:12
saying 22:16
  23:2,12 28:5
  31:10 36:20
  40:4
scene 20:4,10
  21:7
scope 24:3,11
second 45:2
  46:20 50:14
section 46:21
  50:15 52:14
sections 36:6
  42:11 43:21
  50:8 55:7 56:8
see 14:21 15:11
  15:12 17:1,6
  17:22 18:4
  24:1,16,20
  25:1,16,19
  29:19,23 30:6
  30:7 31:4,17
  31:20 35:5,6
  44:10 50:22
  51:5 53:17,21
  55:1
seen 48:2
sense 29:3
shakes 13:18
  29:14 40:21
  51:22
shed 43:10 44:7
  44:8 50:2
  51:13
shooting 33:7,8
  33:15,22 34:2
Show 15:9
showing 48:6,8
  48:9,11,18
shows 15:11
side 28:23 37:5,7
  37:14,17 38:14
  46:16
signature 2:2

singing 29:16
sir 7:9,12 8:4,6
  8:10 9:3,5,18
  11:3,12,16,22
  12:1,9,13 13:8
  13:11 14:20
  15:15 18:10
  19:1 20:2 22:5
  22:8,14,18
  23:7 24:17,23
  25:12,15,18
  27:18 28:4,14
  29:9,22 32:19
  34:11 35:19
  36:21 37:1,3
  37:12,15,18,20
  38:2,6,9,15,17
  38:20,23 40:2
  40:5,8,10,11
  40:12,16,19
  41:6,19,21
  42:3,5,9,14,16
  43:3,6 46:5,12
  46:18,23 47:8
  47:15 48:15
  49:7 50:6,10
  50:20 51:1,3,9
  51:12
sitting 25:6
skinnied 35:17
slid 39:13,21,22
smudge 53:5
somebody 9:10
  31:3 33:21
soon 43:6
South 4:19
spot 23:11,12
  25:7
stand 7:7 8:1,9
  8:14 10:19
  13:15 14:1,4
  14:17 15:3,11
  16:4 17:16
  19:20 21:21

22:3 23:4,16
24:4,16,21
25:7,11,22
32:10,22 33:6
33:10,20 34:3
34:9,13,16
35:16 36:12
38:13 42:18
43:5 46:2,3
47:17,22 48:2
48:16 51:8
53:23 54:12
55:6 56:6
start 12:2 13:13
state 6:3 57:2,5
States 1:1 4:1
  5:18
stayed 22:3,7
  41:9 44:5
  49:22
stenographic
  57:8
Stephens 1:6,16
  1:21 4:5 5:9,15
  5:16 6:7,13 9:2
stick 16:1,21
STIPULATED
  1:13 2:1,8,17
stipulation 5:5
stipulations
  6:17
straight 46:14
strap 26:10,11
  26:16 28:6,16
  28:22 29:20
  30:1,3,7,11,15
  30:21 31:18
  32:1 35:3,4,12
  35:13,20 45:13
  45:15,17,19
  46:2
strapped 26:20
  26:22 27:1
  28:17 29:7

30:7
straps 27:15
  28:3 42:12
Street 1:18 5:8
Strongbuilt 1:9
  4:8 5:16 6:9
Suite 4:16,19
supervision
  57:11
supposed 12:4
sure 28:10 30:18
  37:19 40:14
  42:23 49:9
surrounding
  25:5
swear 6:12
sworn 6:14

**T**

T 1:12,12
take 8:14 10:8
  20:9,13,21
  21:3,4,7,14,21
  22:21 32:9
  36:5,6 39:10
  43:20 45:1,17
  47:2 53:23
taken 1:16 15:10
  34:13 45:5
  50:8 51:8
  54:13 56:7
  57:7
talk 8:11 9:19
  34:12
talked 9:13
  51:17
talking 7:22
  9:16 19:6
  23:19,20 33:15
  39:18 41:11
  45:18 54:1,3
Tallassee 11:9
  11:10
TAMMY 4:23

tell 7:15 10:15
  14:12 16:13
  30:20 33:19
  34:14 43:9
  52:15 53:15
telling 8:8 13:23
  29:4,7 35:15
  38:13 49:4,8
terms 46:20
testified 6:15
  55:10
testimony 46:19
  50:16 55:16
  56:2
thereto 2:16
thing 16:4 17:10
  22:21 49:3
things 28:2 39:8
think 17:3 22:22
  22:22,23 23:1
  24:15 45:21,21
  45:23 47:19
  54:21 55:9,14
thirty 43:14
three 42:10 56:7
threw 43:19
Thursday 10:2
TIDMORE 4:15
tie 36:11
tighten 26:18
Tim 4:22 5:23
time 2:14,14
  6:23 7:11 9:9
  9:13 24:21,22
  25:14 42:7
  43:2 48:4
  57:15
times 47:5
today 41:5 49:4
  54:18
told 8:2 9:10,14
  10:14,17,19,21
  46:13 49:3
  55:22

# FREEDOM COURT REPORTING

**top** 33:16,17,22 34:3 35:3,21 36:11 37:10 42:12 45:13 46:2 56:8
**touch** 19:4,11,17 19:18,20,23 51:14
**track** 24:14
**transcript** 57:10 57:13
**tree** 8:14 10:18 14:15,17 15:3 15:11,23 17:16 23:20 24:4 25:7,22 26:1,9 26:19,22 27:1 27:2,9 28:17 28:23 29:8,20 30:4 34:16,16 35:1,16,17 38:13 45:12 55:5
**tree's** 46:11
**trial** 2:14
**Tried** 42:1
**trouble** 39:6,11
**truck** 18:13 39:2 39:4,14 41:9 42:13 43:7,14 43:18,23 47:11 47:13 49:1,23 50:9 51:16 55:6 56:1,9
**true** 8:5 30:12 38:8 50:19 57:13
**try** 40:23
**trying** 36:22 42:23
**tugged** 47:2
**Twenty** 33:23
**two** 8:17 22:7 23:10 28:2

51:10 55:7

**U**

**U** 1:12
**Uh-huh** 28:14 32:5
**unclear** 7:20
**understand** 14:19
**understood** 54:19
**undid** 34:19,21 34:22 35:20 36:4
**United** 1:1 4:1 5:18
**Usual** 6:16

**V**

**V** 26:21 28:6
**versus** 5:16
**video** 1:15
**VIDEOGRAP...** 5:13 6:11 45:3 45:6 56:18
**videotape** 5:14 56:19
**vs** 1:8 4:7

**W**

**waived** 2:3,19
**walk** 18:13
**want** 7:5 13:12 16:14 32:17 35:9 54:15
**wasn't** 18:23 31:6
**way** 17:20 31:18 32:8 42:1,19 43:1,22 46:8,9 46:11 48:21
**WEAVER** 4:15
**week** 10:1,3,4,10 12:5
**weeks** 8:15,17

22:7 23:10 25:2,9
**welded** 52:11
**welding** 32:23 33:6,17
**went** 8:23 10:21 11:1,1 22:12 22:16,20 23:9 26:19 31:11,16 32:9 34:16,17 34:18 42:13 51:15 53:23
**weren't** 12:14 31:13
**Wetumpka** 5:2
**we're** 16:15 28:10 29:16 33:19 35:10 37:17 38:11,12 41:1
**whatsoever** 7:6
**WILLIAM** 4:14
**witness** 2:3 5:10 6:12 10:5 13:18 18:19 27:8,13,21 28:11 29:14 35:11,14,22 40:21 41:13,16 48:13 50:12 51:22 52:9
**woods** 50:4 51:11
**word** 35:12
**words** 50:7
**work** 56:4,5
**working** 11:14 11:21,23
**wouldn't** 17:16 37:2
**wrapped** 30:4
**write** 18:6 35:12

**X**

**X** 3:2 18:3

**Y**

**yeah** 11:10 12:19 14:10 18:12,17 28:9 28:18 29:18 30:5 31:14 39:20 44:17 45:20,23 46:7 55:17 56:3,11
**yellow** 26:13,15 28:5 30:15 31:18 32:1 45:14,14
**y'all** 20:9 24:8 30:14 32:9 34:14 36:5,6 36:16,19,22 37:5,9 38:1,7 39:9 42:17,18 43:1,9 44:14 46:2 47:1,14 50:4 53:23 55:23

**#**

**#420** 57:23

**1**

**1** 3:12 16:11 17:9 28:16 32:2 38:12 55:2
**10:06** 45:4
**10:09** 45:7
**10:20** 56:20,22
**131** 1:18 5:7
**16** 3:12
**19th** 1:19 5:21 56:23

**2**

**2** 3:13 27:4
**2:07-CV-128-...**

1:5 4:4 5:17
**200** 4:16
**2008** 1:19 5:21 56:23
**27** 3:13
**280** 4:19
**2801** 4:19

**3**

**3** 3:14 52:2
**300** 4:15,20
**35010** 1:19 5:8
**35223** 4:20
**35242** 4:16

**4**

**4** 3:15 53:2

**5**

**5** 3:16 53:12,15 54:2
**52** 3:14
**53** 3:15,16
**55** 3:6,9

**6**

**6** 3:5

**9**

**9:00** 5:9
**9:34** 5:20

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# STRONGBUILT

## BASIC LADDER-STAND

### Models: BLS15, BLS15SR, BLS15SR-RT, HBLS15SR-RT



## StrongBuilt, Inc.

P.O. Box 157

Waterproof, Louisiana 71375

**(318) 749-3303**

Copyright 2004

# STRONGBUILT
## BASIC LADDER-STAND
### Models BLS15, BLS15SR

## YOUR SAFETY USING LADDER-STAND

Using a ladder-stand is dangerous! Safety rules and instructions must be strictly followed. It is important to read and understand instructions for safe use.

### ⚠ WARNING

If these instructions are not followed, you could be seriously injured or killed.

If you need Customer Assistance, call

### 318-749-3303

**YOU MUST:**

1. Read and understand these instructions.

2. Retain these instructions for future use.

3. Heed all warnings and cautions on the stand and in these instructions.

4. Never hurry when climbing or hunting from stand.

5. Always use certified safety harness such as worn by rock climbers, when installing or hunting from basic ladder stand.

6. Never exceed 300-pound weight limit including you and your equipment.

7. Always have two people available to assemble ladder-stand and install on or remove from tree.

8. Master technique to fasten or unfasten top of ladder-stand to tree at level close to ground (use only one section of ladder for practice) before using to hunt.

9. Be fit, well rested and have full use of hands/legs.

10. Never climb with anything in your hands.

11. Never use this product in inclement weather.

12. Avoid sudden or abrupt movements while on the hang-on stand.

13. Never install, climb or hunt from ladder-stand under influence of alcohol or drugs.

14. Never climb up or down ladder with exposed arrowheads or loaded gun.

15. Always raise and lower hunting articles or other articles with a pull-up rope.

16. Check off each step as you read and understand the instructions of this manual.



### ⚠ WARNING

• You can fall and be seriously injured or killed using this product.

• Never use or allow anyone else to use ladder-stand without reading and understanding instructions.

This manual is divided into the following parts:

| Part | Page |
|---|---|
| • Your safety using ladder-stand | 1 |
| • Inspection and identification of parts | 1 |
| • Assembling top and bottom platforms | 5 |
| • Selecting tree for ladder-stand | 7 |
| • Assembling ladder-stand for installation | 7 |
| • Installing ladder-stand to tree | 7 |
| • Climbing ladder and positioning on stand to hunt | 10 |
| • Hunting from ladder-stand | 11 |
| • Exiting ladder-stand and descending ladder | 11 |
| • Removing ladder-stand from tree | 11 |
| • Storage and transportation | 12 |
| • Reporting potentially injurious incident | 13 |

## INSPECTION AND IDENTIFICATION OF PARTS

1. This manual covers three models of basic ladder-stand consisting of ladder and platform-assembly:

   ❑ BLS15 – base model.

   ❑ BLS15SR – same as BLS15 with shooting rest.

Copyright 2004



NOTE:  Refer to detailed instructions.

**Figure 1**

Copyright 2004

2. Refer to Figures 1 and 2, which identify parts and show a general arrangement of ladder-stand including how to attach to tree.

3. Identify and familiarize yourself with the following parts:

   ❑ This instruction manual for the basic ladder-stand.

⚠ **CAUTION:** Always have manual available for reference. Call 318-749-3303 to request a replacement.

❑ **A-***Ladder section* (3) – All ladder sections regardless of model are 20 inches wide and 5 feet in length with side rails of 1-inch square metal tubing. Rungs (steps) are of 3/4-inch square metal tubing and spaced so that rungs of assembled ladder are on 15-inch centers. Top is identified by crimp in side rails.

   The Top Ladder Section will have 2 holes drilled in the sides of the ladder.

❑ **B-***Top platform* – consists of 14-inch by 22-inch wide seat of expanded on 1-inch square metal tubing frame with 3/4-inch square metal tubing lateral braces. Sides extend forward 18¾ inches and have 11/32-inch diameter holes near front to connect *handrail* (**D**) and 11/32-inch diameter hole near center of frame on each side to connect *vertical brace* (**F**) and *cross brace* (**E**). A 4-inch extension at rear of seat has "V-shaped" bar that fastens to tree with *ratchet strap* (**H**).

❑ **C-***Bottom platform* – consists of 21¼-inch by 18-inch wide expanded metal (footrest) on 1-inch square metal tubing frame with 3/4-inch square metal tubing lateral braces. Sides extend forward 2½ inches and have 11/32-inch diameter hole near end to connect *handrail* (**D**) and *cross brace* (**E**) and 11/32-inch diameter hole near rear of frame on each side to connect *vertical brace* (**F**) and (**I**) Brace.

❑ **D-***Handrail* (2) – consists of 27-inch length of 1-inch square metal 18-gauge tubing with 11/32-inch diameter holes for connecting to frame extensions from front of *top platform* (**B**) and *bottom platform* (**C**). Bottom end of handrail slips onto crimped end at top of assembled ladder. Additionally for model BLS15SR, top end of *handrail* (**D**) slips onto crimped end of *shooting rest* (**K**) from bottom.

❑ **E-***Cross brace* (2)– consists of 27-inch length of 3/16-inch x 3/4-inch metal bar. Connects to *top platform* (**B**) at front of seat, to *bottom platform* (**C**) at front of footrest, and to *handrail* (**D**) near base.

❑ **F-***Vertical brace* (2)– consists of 17½ -inch length of 3/16-inch x 3/4-inch metal bar. Connects *top platform* (**B**) at front of seat to *bottom platform* (**C**) near rear of footrest.

❑ **G-***Horizontal brace* – consists of telescoping 3/4-inch and 1-inch square metal tubing. Length adjusts from 52 inches to 62 inches in 1½-inch increments by inserting bolt in matching 9/32-inch diameter holes. One end has 4-inch wide cleat. Opposite end has 2-pronged clip with 9/32-inch holes.

NOTE:  *Horizontal brace* (**G**) is critical structural member of installed ladder-stand and is essential for safe use.

❑ **H-***Ratchet strap* – consists of ratchet mechanism with 6-foot length of 1-inch wide polypropylene webbing connected to take-up spindle and 5-inch fixed-length of webbing, both with installed S-hook

❑ **I-***Braces* – (2) 3/4 inch square tubing 62 inches long,.

❑ **J-***Rope* – consists of six-foot polypropylene rope used to tie cleat end of *horizontal brace* (**G**) to tree.

❑ **K-***Shooting rest* (model BLS15SR only) –consists of 1-inch square metal tubing formed into U-shape of overall size 20 inches by 27 inches. Open end of "U" inserts into top of the two *handrails* (**D**).

❑ **L-***Rope*  consists of 15 foot polypropylene rope use to hold stand to tree during installation of stand.

Copyright 2004

❑ Fasteners consist of bolt and matching lock nut (except as noted) for assembly and installation of basic ladder-stand per following table:

| Connecting Points | | | | Bolt Size (in.) | Qty |
|---|---|---|---|---|---|
| **From** | | | **To** | **Dia. x Length** | |
| E<br>F | *Cross brace*<br>*Vertical brace* | B | *Top platform* | 5/16 x 1¾ | 2 |
| B | *Top platform* | D | *Handrail* | 5/16 x 2½ | 2 |
| F | *Vertical Brace* | C | *Bottom platform* | 5/16 x 2 1/4 | 2 |
| D<br>E | *Handrail*<br>*Cross brace* | C | *Bottom platform* | 5/16 x 2½ | 2 |
| G | *Horizontal brace* | A | *Ladder section* | 1/4 x 1½ * | 1 |
| G | Telescoping length of:<br>*Horizontal brace* | G | Telescoping length of:<br>*Horizontal brace* | 1/4 x 1½ * | 1 |
| I | Side braces<br>*Bottom platform* | A | *Top Ladder Section* | 5/16 x 2 1/4 | 2 |

* Uses wing nut in place of lock nut.

4. Decals attached to ladder-stand with following information:

   a. Front and back of one side rail above top rung of each *ladder section* (**A**):

⚠ **WARNING**

• Never use ladder-stand without reading and understanding instructions. You could be seriously injured or killed.

• Call 318-749-3303 to replace lost manual or illegible decal.

StrongBuilt, Inc. · P.O. Box 157 · Hwy 568
Waterproof, LA 71375

   b. Front and back of one side rail about the center of each *ladder section* (**A**):

⚠ **WARNING**

Do not use unless horizontal brace in place.
Ladder-stand may collapse and you could be seriously injured or killed.

   c. Front and back of one side rail next to "b" above of each *ladder section* (**A**):

⚠ **WARNING**

Do not install, remove, or use this product in inclement weather such as high winds, lightning, or icing conditions.

You could fall and be seriously injured or killed.

   d. Front of *bottom platform* (**C**) in center of frame:

⚠ **WARNING**

Never install or use this ladder-stand without wearing a safety harness.

You could fall and be permanently injured or killed.

   e. Front of *bottom platform* (**C**) adjacent to "d" above.

⚠ **WARNING**

Verify integrity of tree where you intend to install this product. It should be a strong live tree, free of dead limbs and rotted sections. Avoid any tree of questionable integrity.

You could fall and be seriously injured or killed.

   f. Top surface of left extension in front of seat of *top platform* (**B**):

⚠ **WARNING**

Never attempt to install ratchet strap or move from ladder-to-seat or seat-to-ladder without wearing safety harness.

Ladder-stand may shift and you could be seriously injured or killed.

   g. Adjacent to "f" above.

Copyright 2004

⚠ **WARNING**

Under no circumstances should you sit on seat unless ladder fastened to tree with ratchet strap. The ladder may collapse and you could be seriously injured or killed.

h. Top surface of right extension in front of seat of *top platform* (**B**):

| | ⚠ **WARNING** |
|---|---|
| **300 LB** | • Never exceed 300-pound weight limit (you and your equipment).<br>• Never climb up to or down with loaded gun or exposed arrowheads.<br>You could be seriously injured or killed. |

5. Safety harness – mandatory when hunting from ladder-stand.

6. Tools (not included) needed for assembly and installation:

   ❑ 1/2 -inch wrench (2) – for tightening 5/16-inch bolts and lock nuts.

   ❑ 7/16-inch wrench – for holding 1/4-incb bolt while tightening wing nuts.

   ❑ Flat-head screwdriver – to aid in possible minor alignment needs when connecting ladder sections.

7. Inspect parts each time you use ladder-stand as follows.

⚠ **CAUTION:** Never use damaged or defective ladder-stand.

   ❑ Check each item for worn, broken, bent or otherwise damaged parts.

   ❑ Check that connecting joints between *ladder sections* (**A**) are not bent or clogged with dirt or debris, which can prevent proper connection.

   ❑ Replace damaged or broken part in its entirety.

   ❑ Clean joints that are clogged with dirt or debris.

   ❑ Replace *ratchet strap* (**H**) every hunting season.

NOTE: Required due to deterioration caused by weathering, rodents and tree bark abrasion.

   ❑ Replace *rope* (**J**) and (**L**)that is broken, worn or degraded in any manner.

   ❑ Replace illegible decals.

⚠ **CAUTION:** Use only Strongbuilt parts and decals for replacement. Call 318-749-3303 to order replacements.

## ASSEMBLING TOP AND BOTTOM PLATFORMS

1. Refer to Figure 2 for identity of parts during assembly of *top platform* (**B**) (seat) and *bottom platform* (**C**) (footrest).

2. Locate and identify parts that comprise assembly and separate bolts and lock nuts and understand where they go.

   HINT:    It is suggested that you identify each part with letters as shown in Figures 1 and 2 using masking tape and a marker. It will assist you in assembly.

3. Partially assemble connecting hardware to *bottom platform* (**C**) as follows:

   ❑ Place *bottom platform* (**C**) on flat surface with expanded metal side on top.

   ❑ Place *handrail* (**D**) along outside of *bottom platform* (**C**).



**Figure 2**

   ❑ Align one hole of *handrail* (**D**) with hole at front of *bottom platform* (**C**).

- Position *cross brace* (**E**) along outside of *handrail* (**D**) and align hole on one end with hole in front of *bottom platform* (**C**).

- Insert 5/16-inch x 2½-inch bolt first through *bottom platform* (**C**) from inside and continue through matching holes in *handrail* (**D**) and *cross brace* (**E**).

- Install lock nut on outside and loosely tighten.

- Repeat preceding steps to similarly install *handrail* (**D**) and *cross brace* (**E**) on other side of *bottom platform* (**C**).

- Place *vertical brace* (**F**) along outside of *bottom platform* (**C**).

- Align hole of one end of *vertical brace* (**F**) with hole near rear and along the side of *bottom platform* (**C**).

- Insert 5/16-inch x 1½-inch bolt first through *vertical brace* (**F**) and continue through matching hole in *bottom platform* (**C**). Hand tighten only as you must add (**I**) Brace later.

---

### ⚠ WARNING

Verify integrity of tree where you intend to install this product. It should be a strong live tree, free of dead limbs and rotted sections. Avoid any tree of questionable integrity.

You could fall and be seriously injured or killed.

---

- Install lock nut on inside and loosely tighten.

- Repeat preceding steps to similarly install *vertical brace* (**F**) on other side of *bottom platform* (**C**).

- Place *top platform* (**B**) on top of *bottom platform* (**C**) with expanded metal side on top and with fronts of *top platform* (**B**) and *bottom platform* (**C**) pointing in same direction.

- Align remaining hole in *handrail* (**D**) with hole near front of *top platform* (**B**) and with *handrail* (**D**) on inside.

- Insert bolt (5/16-inch x 2½-inch) first through *handrail* (**D**) from inside and then through matching hole in *top platform* (**B**).

- Install lock nut on outside and loosely tighten.

- Repeat preceding steps to similarly connect *handrail* (**D**) to other side of *top platform* (**B**).

- Position *top platform* (**B**) above *bottom platform* (**C**) so that free end of a *vertical brace* (**F**) and *cross brace* (**E**) can be aligned with hole about midway of *top platform* (**B**) with *vertical brace* (**F**) in middle and *cross brace* (**E**) on outside.

- Insert bolt (5/16-inch x 1¾-inch) first through *top platform* (**B**) from inside, then through *vertical brace* (**F**), and finally through *cross brace* (**E**).

- Install lock nut on outside and loosely tighten.

- Repeat preceding steps to similarly connect other side of *top platform* (**B**) to matching *cross brace* (**E**) and *vertical brace* (**F**).

- Now tighten all bolts and nuts (8 total) of the platform-assembly using 1/2-inch wrenches.

- This completes assembly of platform-assembly and you are ready to install it in tree.

---

## SELECTING TREE FOR LADDER-STAND

Select straight tree 12-18 inches in diameter for ladder-stand.

- Ensure tree sufficiently free of limbs and large knots to allow installation of ladder-stand to side of tree.

- Ensure enough room between tree and other trees/brush for installing and climbing ladder-stand.

---

## ASSEMBLING LADDER-STAND FOR INSTALLATION

1. Ensure that you have all parts that comprise your ladder-stand and the tools to assemble as follows:

   - See previous listing.

   - Verify all bolts and nuts of platform-assembly are tight.

   - Ensure parts in good shape.

NOTE:  *Ladder sections* (**A**) are identical except that the top ladder section has 2 holes in the sides of the ladder .

2. Assemble ladder [3 *ladder sections* (**A**)] as follows:

   ❑ Lay bottom (non-crimped end of side rail) of a *ladder section* (**A**) at base of tree, three feet out, on side you intend to hunt from.

NOTE:  Side rail (tubing) of each *ladder section* (**A**) is crimped at top to fit above section or *handrail* (**D**). (Bottom is non-crimped).

NOTE:  Avoid roots or rocks that may hinder stable footing for ladder.

   ❑ Point top of section away from base of tree.

---

### ⚠ WARNING

Do not extend ladder-stand higher than its intended height (3 ladder sections).
You could fall and be seriously injured or killed.

---

   ❑ Connect remaining two *ladder sections* (**A**) of ladder end-to-end with first *ladder section* (**A**). Make sure that the top ladder section has holes in the side of the ladder to attach (**I**) Brace.

NOTE:  Non-crimped ends at bottom of *ladder section* (**A**) insert over crimped ends at top of connecting section.

NOTE:  Use flat-head screwdriver to aid in any minor alignment needs to connect joints.

3. Connect bottom of *handrail* (**D**) at front of platform-assembly to top of assembled ladder as follows:

   ❑ Position platform-assembly at top of assembled ladder (on ground) with *handrails* (**D**) on ground and rear of platform-assembly pointing up.

   ❑ Insert ends of the two *handrails* (**D**) over crimped ends of side rails at top of assembled ladder.

NOTE:  If necessary loosen lower bolts connecting *handrail* (**D**) to *bottom platform* (**C**) to ease connecting but be sure to retighten afterwards.

4. Ensure that connecting points [*ladder sections* (**A**) and *handrails* (**B**)] are fully engaged. Attach the 2 (**I**)-Braces to the Top Ladder section and to the Back of

the Foot Platform on the same bolt as the F- vertical braces. Tighten all Bolts.

5. For model BLS15SR insert crimped open ends of *shooting rest* (**K**) into matching holes at the top of the *handrail* (**D**).

6. Insert 6-foot strap onto *ratchet strap* (**H**) as follows:

   ❑ Move handle of ratchet back and forth until you clearly see slot in take-up spindle (see Figure 1).

   ❑ Insert bare end of 6-foot strap into slot of take-up spindle from bottom and pull at least 3 feet of strap through spindle.

7. Tie one end of the (**L**) Rope to the Top Ladder Section on One Side.

---

### INSTALLING LADDER-STAND TO TREE

1. Raise ladder-stand assembly and lean against tree as shown in Figure 1 and as follows:

---

### ⚠ WARNING

Be sure to avoid any overhead power lines when raising ladder-stand to vertical position.
You can be electrocuted if it comes in contact with electrical line.

---

   ❑ Position one person to hold bottom of ladder-stand to ground.

⚠ **CAUTION:** Always use two people when installing ladder-stand to tree. Ladder may slip or otherwise move and partially disconnect one or more joints with you unaware of unsafe condition.

   ❑ Have one person lift platform-assembly of ladder-stand off of ground while bottom end of assembled *ladder sections* (**A**) held stationary by second person.

   ❑ Have person lifting platform-assembly walk toward bottom while moving hands along side rails of ladder as ladder continues to rise.

   ❑ Continue to vertical position of ladder and beyond until V-shaped bar at rear of *top platform* (**B**) rests against tree.

- Adjust distance from bottom of ladder to base of tree so platform-assembly appears level.

NOTE:   Requires two people each lifting one side of ladder and moving while keeping V-shaped bar against tree.

- Verify that bottom of ladder is on level ground.

- Push bottom ends of ladder side rails into ground until bottom rung rests firmly on ground.

NOTE:   If problem with performing above step, move ladder to different location.

⚠ **CAUTION:** Be sure that ladder is not leaning to either side and that bottom rung rests on ground.

2. Install telescoping *horizontal brace* (**G**) as follows:

- Slip open end of 1-inch square tubing (cleat on other end) over open end of 3/4-inch square tubing (clip on other end).

NOTE:   Be sure the adjustment holes in the two sections of the brace are in the same plane.

- Tie knot on one end of *rope* (**J**) and then tie to brace on cleat end using slipknot (see Figure 1).

- Insert clip of other end over center of 5th rung from bottom of assembled ladder.

NOTE:   If prongs of clip are slightly bent, straighten so they will fit over rung of ladder.

- Attach clip over 5th rung of ladder with bolt (1/4-inch x 1½-inch) inserted from top of clip and fasten on bottom with wing nut.

- Extend telescoping assembly enough to place cleat end of *horizontal brace* (**G**) against tree.

- Align two closest pairs of 9/32-inch diameter holes in two telescoping members of *horizontal brace* (**G**).

- Insert bolt (1/4-inch x 1½-inch) into aligned holes and fasten with wing nut.

⚠ **CAUTION:** Ensure brace about level (horizontal).

NOTE:   If tree has a bow in or out, you may have to adjust horizontal brace (**G**) up or down one rung.

- Take free end of *rope* (**J**) around tree and tie to brace with slipknot (adjacent to knot on opposite end of rope).

- Take free end of (**L**) Rope and bring around the tree and tie it to the ladder on the other side of the tree. This will help hold the stand to the tree while installing the Ratchet strap.

---

⚠ **WARNING**

It is essential that length of horizontal telescoping brace be fixed with bolt and wing nut. Failure to do so may cause ladder to fall.
You could be seriously injured or killed.

---

3. Climb ladder and fasten ladder-stand to tree as follows:

---

⚠ **WARNING**

Never climb ladder without horizontal brace installed and secure.
The ladder may collapse and you could be seriously injured or killed.

---

- Ensure that about 3 feet of 6-foot strap pulled through slot in spindle of *ratchet strap* (**H**).

- Place *ratchet strap* (**H**) in your pocket.

NOTE:   Locate so that it is readily accessible while you stand on ladder.

- Place safety harness in another pocket.

NOTE:   Ensure ends of *ratchet strap* (**H**) and safety harness are completely in your pockets otherwise creates potential catch/trip hazard as you climb up or down ladder.

- Have someone hold ladder against tree to keep it from moving while you climb.

---

⚠ **WARNING**

Never climb ladder to connect or disconnect ratchet strap from around tree unless someone is holding the ladder for you.
Ladder may fall and you could be seriously injured or killed.

---

❑ Verify connections between sections of *ladder* (**A**) and *handrails* (**D**) of platform-assembly fully engaged.

❑ Slowly climb ladder keeping your body as close as possible to ladder.

NOTE:   Be careful climbing up/down ladder not to hang clothing article (e.g., boot lace, pants leg, etc.) on wing nut, bolt or clip that fasten horizontal brace to 5th rung of ladder.

❑ Inspect each joint for completeness between individual *ladder sections* (**A**) of ladder and between top section and *handrail* (**D**) of platform-assembly as you climb ladder.

❑ Position your feet on 4th rung down (not counting platform as rung) from top of ladder.

---

### ⚠ WARNING

Under no circumstances should you sit on seat unless ladder secured to tree with ratchet strap.
The ladder may collapse and you could be seriously injured or killed.

---

❑ Remove strap of safety harness from pocket.

⚠ **CAUTION:** Be careful ladder does not move out away from tree as you perform next steps.

❑ Move up to 2nd step from top to install strap.

❑ Attach safety harness to you and tree per manufacturer's instructions.

❑ Adjust loop of strap around tree high enough so you only have 2 feet of slack in strap between loop of strap around tree and where it attaches to your safety harness.

❑ Grasp rail in front of seat of *top platform* (**B**) with your hands.

❑ Position one knee on footrest of *bottom platform* (**C**) and lean forward (other foot remains on 2nd rung down).

❑ Adjust your position so you see tree over seat of *top platform* (**B**) and have clear view of V-shaped bar against tree at rear of seat.

❑ Remove *ratchet strap* (**H**) from pocket and hook S-hook of short strap over one side of V-shaped bar at rear of seat (see Figure 1).

⚠ **CAUTION:** Connect S-hook only to V-shaped bar. Do not connect to expanded metal of seat.

❑ Take S-hook of other end of strap around backside of tree and hook to other side of V-shaped bar.

NOTE:   Be sure that both S-hooks fully engage V-shaped bar and strap is not twisted.

❑ Pull free end of six-foot strap that goes through slot in spindle of *ratchet strap* (**H**) until slack is out of ratchet strap.

❑ Let excess strap hang down backside of tree.

❑ Open and close ratchet handle (ratcheting motion) to tighten strap securely around tree.

NOTE:   Be sure that V-shaped bar at rear of seat of *top platform* (**B**) presses firmly against tree.

❑ After tightening, check connection of S-hooks to V-shaped bar to ensure that S-hooks fully engage and that "false lock" does not exist.

---

### ⚠ WARNING

False lock of S-hook can cause stand to fall. You could be seriously injured or killed.
False lock occurs when S-hook fails to hook completely over V-shaped bar.

---

❑ Check once more to ensure that strap is tight around tree and if not tighten with ratchet.

❑ Prepare to descend ladder.

❑ Remove safety harness per manufacturer's instructions and put in your pocket.

NOTE:   Be sure that ends of safety harness are completely in pocket; otherwise creates potential catch/trip hazard as you climb up or down ladder.

❑ You are now ready to descend ladder.

❑ Ensure that your feet are secure on ladder rungs as you progressively shift your weight to next rung to descend ladder-stand to ground level.

- ❏ Verify bolt and wing nut attaching clip of *horizontal brace* (**G**) to rung of ladder is tight and if not tighten.

- ❏ Verify *rope* (**J**) tying end of *horizontal brace* (**G**) and cleat to tree is tight and if not tighten.

- ❏ You are now ready to climb ladder and hunt from stand.

## CLIMBING LADDER AND POSITIONING ON STAND TO HUNT

### ⚠ WARNING

- • **Never exceed 300-pound weight limit of ladder-stand (you and your equipment).**
- • **Never climb up or down with exposed arrowheads or loaded gun.**
- • **Never climb ladder without horizontal brace installed and secure.**

**You could be seriously injured or killed.**

### ⚠ WARNING

**Do not install, remove, or use this product in inclement weather such as high winds, lightning, or icing conditions.**

**You could fall and be seriously injured or killed.**

1. Put safety harness (not included) in your pocket in preparation for climb.

⚠ **CAUTION:** Always raise and lower hunting articles with a pull-up rope. Ensures hands free for climbing.

NOTE: Always use safety harness. If fall off ladder-stand, strap limits your fall distance.

NOTE: Be sure that ends of safety harness are completely in your pocket; otherwise they create potential catch or trip point as you climb up or down ladder.

2. Firmly grip side rails of ladder with both hands.

⚠ **CAUTION:** Be sure that ladder-stand is free of water and ice (including frost) or any other material that could cause rungs to be slick. If rungs are slick you could be seriously injured or killed.

3. Ensure that your feet are secure on ladder rungs as you progressively shift your weight to next rung.

NOTE: Be careful while ascending or descending ladder that you do not hang a clothing article (e.g., boot lace, pants leg, etc.) on wing nut, bolt or clip that fasten horizontal brace to 5th rung of ladder.

4. As you climb ladder inspect each joint for completeness between individual *ladder sections* (**A**) and between top ladder section and *handrails* (**D**) of platform-assembly.

5. Position your feet on 2nd rung below footrest of *bottom platform* (**C**) so you look at tree over seat of *top platform* (**B**).

### ⚠ WARNING

**Never install or use this ladder-stand without wearing a safety harness.**

**You could fall and be permanently injured or killed.**

6. Attach safety harness to tree and yourself according to safety harness manufacturer's instructions.

⚠ **CAUTION:** Install according to manufacturer's instructions.

7. Adjust connection of safety harness between you and tree so there is only 2 feet of slack.

8. Climb up to where your feet are on 1st rung below footrest and you are holding onto rails at front of seat.

9. For model BLS15SR you must stoop under the *shooting rest* (**K**).

### ⚠ WARNING

**Be extremely careful during next maneuver. You could be seriously injured or killed.**

- • **Keep your body's vertical centerline along vertical centerline of ladder to avoid undesired side loads on ladder that may cause ladder-stand to shift sideways and topple.**
- • **It is essential to wear safety harness during maneuver.**

10. Slowly turn your body around and position yourself on seat with your back to tree and place feet up on footrest while continuing to hold side rails.

Copyright 2004

11. Verify only 2 feet of slack exists in safety harness between you and the tree and adjust if needed.

12. You are now ready to hunt.

## HUNTING FROM LADDER-STAND

Observe safe practices while on stand.

- ❑ Continue to wear safety harness.

- ❑ Continue to have no more than 2 feet of slack in safety harness between you and tree.

NOTE: This limits distance you can potentially fall.

## EXITING LADDER-STAND AND DESCENDING LADDER

Exit from stand to ladder as follows:

### ⚠ WARNING

Be extremely careful during this maneuver because it is very dangerous.
- Keep your body's vertical centerline along vertical centerline of ladder to avoid undesired side loads on ladder that may cause ladder-stand to shift sideways and topple.
- It is essential to wear safety harness during maneuver.

- ❑ While holding rails in front of seat with hands, move feet down to 1st rung below *bottom platform* (C) and sit down on footrest.

- ❑ Continue to hold side rails and move your feet down to 2nd rung below footrest and stand with back to tree.

- ❑ Continue to hold side rails and slowly turn your body around so that you are facing tree and still on 2nd rung below footrest.

- ❑ Remove safety harness from you and tree and place in your pocket.

- ❑ You are now ready to descend ladder.

- ❑ Ensure that your feet are secure on ladder rungs as you progressively shift your weight to next rung to descend ladder-stand to ground level.

## REMOVING LADDER-STAND FROM TREE

1. Repeat section entitled, "Climbing ladder and positioning on stand to hunt," steps 1-7.

2. You should now be on 2nd rung below footrest of *bottom platform* (C) and have safety harness on.

3. Proceed to disconnect ladder-stand from tree as follows:

⚠ **CAUTION:** Be sure a 2nd person holds ladder on ground during this process. The ladder could slip or fall and you could be seriously injured or killed.

- ❑ Place one knee on footrest of *bottom platform* (C) while continuing to keep one foot on 2nd rung below footrest.

- ❑ Reach over seat of *top platform* (B) and grasp ratchet handle of *ratchet strap* (H).

- ❑ Unlock handle of *ratchet* strap (H) by pulling back on release pawl located in handle with two fingers of one hand (see Figure 1).

- ❑ Release locking pawl of spindle by opening handle to fully open position (keep handle pawl released during this movement).

- ❑ NOTE: Fully open, unlocked handle is about 180 degrees from closed position and back toward tree.

- ❑ Spindle is now unlocked even when you release pawl of handle.

- ❑ Pull out slack in *ratchet strap* (H) by pulling on S-hook opposite ratchet mechanism.

- ❑ Disconnect S-hook from V-shaped bar at rear of seat of *top platform* (B) and let end swing down.

- ❑ Disconnect remaining S-hook from other side of V-shaped bar.

- ❑ Close handle of ratchet and place *ratchet strap* (H) completely in your pocket.

- ❑ Remove safety harness from you and tree and place completely in your pocket.

NOTE: Be sure that ends of *ratchet strap* (H) and safety harness are completely in your pocket; otherwise they create potential catch or trip point as you climb up or down ladder.

You are now ready to descend ladder.

4. Ensure that your feet are secure on ladder rungs as you progressively shift your weight to next rung to descend ladder-stand to ground level.

5. Remove *horizontal brace* (**G**) as follows.

   ❑ Remove wing nut and bolt from clip thus disconnecting *horizontal brace* (**G**) from ladder.

   ❑ Untie *rope* (**J**) from brace that keeps cleat of brace tight against tree.

   ❑ Untie Rope (**L**) from around the tree.

   ❑ Remove *horizontal brace* (**G**).

6. Lower ladder to ground as follows:

   ❑ Position one person to brace bottom of ladder.

---

⚠ **WARNING**

Be sure to avoid any overhead power lines when lowering ladder from vertical position.
You can be electrocuted if ladder comes in contact with an electrical line.

---

❑ Second person face ladder and grasp side rails of ladder with hands as high as possible.

❑ Carefully pull ladder top away from tree using bottom of ladder on ground as pivot point.

❑ Continue to lower ladder by moving hands up side of ladder while backing away from tree.

⚠ **CAUTION:** Be sure that other person on ground holds bottom of ladder stationary. Ladder-stand is top heavy and if bottom is not kept stationary, ladder-stand could fall quickly once it gets over center and you could be seriously injured.

❑ Lay ladder-stand on ground.

❑ Pull *handrails* (**D**) of platform-assembly from top of ladder assembly.

❑ Once platform-assembly is removed, pull *ladder sections* (**A**) apart.

❑ This completes removal of ladder-stand from tree and disassembly.

## STORAGE AND TRANSPORTATION

Practice the following rules to avoid damage affecting the safety of this product during storage and transportation:

1. Store in a location free of moisture such as rain, pooled water, or high humidity.

2. Avoid temperature extremes.

3. Avoid spilled liquids.

4. Avoid storage near chemicals, liquids, or gases that might corrode or damage.

5. Store out of direct sunlight.

6. Keep free of oil and grease.

7. Avoid hard impact.

8. Do not stack objects on this product.

9. Clean product before use following a storage period.

## REPORTING POTENTIALLY INJURIOUS INCIDENT

We want your hunting to be safe. For that reason we ask that you please report any potentially injurious incident to StrongBuilt, Inc. at (318-749-3303). We will study and take appropriate action.

# ALWAYS PRACTICE SAFE HUNTING!

### StrongBuilt, Inc.
P.O. Box 157
Waterproof, LA 71375
(318) 749-3303

020304

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

LARRY STEPHENS, et al.,                    )
                                           )
    Plaintiffs,                            )
                                           )
vs.                                        )
                                           )    CIVIL ACTION NO. 2:07CV128-10
STRONG BUILT, INC.,                        )
                                           )
    Defendant.                             )
                                           )

## ANSWERS TO PLAINTIFFS' FIRST INTERROGATORIES

Comes now the defendant, **STRONG BUILT, INC.**, and answers the plaintiffs' first interrogatories as follows:

1.    Please identify each person who has knowledge, personal or otherwise, of facts, or evidence concerning or pertaining to this case or the incident referred to in plaintiffs' complaint, including but not limited to the names and addresses of all individuals with defendants who have personal knowledge concerning the subject product setting forth their names, addresses, telephone numbers and whereabouts.

**ANSWER:    No one with Strong Built, Inc. has any personal knowledge concerning the accident involved in this lawsuit because no employee of Strong Built, Inc. witnessed the subject accident. However, the person most familiar with the products manufactured by Strong Built, Inc. is Mr. Ken Killen, P.O. Box 157, Waterproof, LA. 71375, (318) 749-3303.**

2.    With regard to expert witnesses who you intend to call or to give opinion testimony at the trial of this cause, please state:

a.   the name, address and telephone number together with the expert's qualifications in his field;

b.   the subject matter to which he is expected to testify and the substance of the facts and opinions to which the expert is expected to testify;

c.   a summary of the grounds for each opinion;

d.   the style and location of cases and courts where said expert has previously given testimony either live or by deposition; and

e.   set for the identity of all journals, textbooks, treaties, studies or other literature relied upon by said expert.

**ANSWER:    Mr. L. J. Smith, 1027 Wakefield Place, Brandon, Mississippi 39047, has inspected the subject treestand. Mr. Smith is a treestand expert and has had many years of experience in treestand and hunter safety. Mr. Smith also has education, training and experience in investigating all types of hunting accidents, including accidents involving treestands, and has expertise in determining the causes of hunting accidents, including treestand accidents. Mr. Smith is also familiar with the design and manufacturing process of many different types of treestands, including the treestands manufactured by Strong Built, Inc. It is anticipated that Mr. Smith will express opinions regarding the cause of the subject accident and whether the subject treestand met or exceeded the applicable standards at the time the stand was manufactured. Mr. Smith has not yet finalized his opinions because this case is still in the early stages of discovery. We will supplement this response later.**

2

**Mr. Ken Killen, president of Strong Built, Inc., will likely provide testimony regarding the design, manufacture, and sale of the subject treestand. Mr. Killen may be called upon to express expert opinions with regard to the design and safety of the subject product.**

3.    Please identify the person(s) who formulated the subject product as to the design and configuration of the Strong Built ladder tree stand.

**ANSWER:    Mr. Ken Killen.**

4.    Have there been any lawsuits filed against you or any predecessor or successor in interest since 1990, or are any such lawsuits currently pending in which a claim was made and there is a defect in the design of any Strong Built ladder tree stand giving it a propensity to cause the user to fall or otherwise be injured?  If you answer is in the affirmative, with regard to each action, please state:

      a.    The county and state in which such action was brought or is pending;

      b.    The name of each party to each such lawsuit together with the name of each such party's attorney, together with their address and telephone number;

      c.    The disposition, if any, of each such lawsuit; and

      d.    The date and place of the occurrence complained of in each such lawsuit.

**ANSWER:    Objection on the grounds that this interrogatory is overly broad and seeks information regarding claims or lawsuits that are not substantially similar to the accident involved in this litigation. Objection on the further ground that this**

information is a matter of public record and is equally available to the attorneys for the plaintiff. However, without waiving these objections, there have been other lawsuits and/or claims filed against our company over the years. To the best of our knowledge, we have received lawsuits and/or claims from Kenneth Jordan, Alabama; Ken Stoner, North Carolina; Edward Harrell, Louisiana; Lester McPherson; Tom Ashley, West Virginia; Dean Hokanson, Missouri; Robert Shaw, South Carolina; Michael Cook, Louisiana; Randy Smith, Oklahoma; Terry Byrd, Florida; William Anderson, Tennessee; Kenneth Kurpat, Louisiana; John Stolysiak, Missouri; and Larry Stephens, Alabama.

The only case that has been tried was the lawsuit filed by Mr. Kenneth Jordan. This case was tried in federal court in Birmingham before Judge William Acker. The jury returned a verdict in our favor. The other claims have either been resolved, dismissed, or are still pending.

5.      Other than this litigation, do you have any knowledge of any other ladder tree stands manufactured by Strong Built, Inc. that have resulted in a fall or injury to the user thereof? If your answer is in the affirmative, with regard to each such occurrence, please state:

   a.      The name, address and telephone number of the owner and/or user of each such tree stand;

   b.      The date and place of each such occurrence;

   c.      The circumstances surrounding each such occurrence; and

4

d.    Was any investigation of any such occurrence conducted by you or anyone acting on your behalf or at your direction, and if so, with regard to each such investigation, the date made the name, address and telephone number of the person making such investigation.

**ANSWER:    Objection on the grounds that this interrogatory is overly broad and seeks information regarding claims that are not substantially similar to the accident involved in this litigation. Objection on the further grounds that this interrogatory is not limited in time or scope.**

6.    State the identify including name, current address and phone number and position then and now of the individual having primary responsibility for the safe design of the ladder tree stands

**ANSWER:    Mr. Ken Killen, P.O. Box 157, Waterproof, LA. 71375, (318) 749-3303.**

7.    State the identify including name, current address and phone number and position then and now of the individual having primary responsibility for the safe design of the ladder tree stands manufactured by this defendant in the five (5) year period immediately preceding the date of the incident made the basis of the plaintiffs' complaint.

**ANSWER:    Mr. Ken Killen, P.O. Box 157, Waterproof, LA. 71375, (318) 749-3303.**

8.    What is the name, last known address, present whereabouts, telephone number and place of employment of each person known or believed by you or anyone acting on your behalf to:

a.    Have been an eyewitness to the incident in this case;

b.    Have been within sight or hearing of the incident;

5

  c.  Have firsthand knowledge of the facts and circumstances of the accident or of the events leading up to or following it;

  d.  Have any knowledge of relevant conditions at the scene of the incident existing prior to and/or after the same;

  e.  Have any other knowledge of discoverable facts.

**ANSWER:** **At the present time, we are not aware of any eyewitnesses to the subject accident.**

  9.  Have you or anybody acting on your behalf or at your direction, conducted any test, safety, capacity or otherwise on ladder tree stands produced by this defendant during the five (5) year period immediately preceding the incident made the basis of the plaintiffs' complaint?  If your answer is in the affirmative with regard to each such test, please state:

  a.  When such test was performed;

  b.  Who conducted such test;

  c.  Where such test was conducted;

  d.  What year and model tree stands were used;

  e.  What modifications, if any, were made to such tree stands for purposes of or as a result of thee tests;

  f.  The names of all persons present at such test, together with their titles, addresses and telephone numbers;

  g.  Whether such tests were recorded on film and if so, the name, address and telephone number of each person who took such films

and the name, title, address and telephone number of the person or persons who have custody, possession or control of each such film;

h.    Whether any reports, documents, or writings of any nature were made regarding and/or referring to any such test, and if so, with regard to each such report, document or writing, state the title and date thereof, the name, address and telephone number of the person making such report, documents, or writings and the name, title and address of the person presently having custody and control of any such report, document or writing;

i.    List any and all standards which were utilized in performing such test;

j.    Describe in detail how each such tree-stand differed from the Strong Built ladder tree stand involved in this litigation.

**ANSWER:    Objection on the grounds that this interrogatory seeks information regarding treestands other than the treestand that is the subject of this litigation. Objection on the further grounds that this interrogatory seeks information that is privileged and proprietary. Without waiving these objections, the product involved in this litigation is a 15 foot Basic Ladder Stand ("BLS 15") that was reportedly manufactured in the 1990's. During that time frame, there were no written standards that specifically applied to that class of equipment. However, StrongBuilt's basic ladder stands have been tested over the years by independent laboratories. For example, Scientific Testing Laboratories, Inc., Baton Rogue, Louisiana, tested and approved the BLS 12. A copy of their report dated March 18, 1999 is enclosed. In**

7

addition, Scientific Testing Laboratories, Inc., Baton Rogue, Louisiana, tested and approved the DL 15 EL. A copy of their report dated August 15, 1997 is enclosed. MACTEC Engineering and Consulting, Inc., Jacksonville, Florida, tested and approved the BLS 15. Copies of their reports dated December 5 & 6, 2002 are enclosed. The 16 Foot TA Basic Ladder Stand was tested and approved by Kmart. A copy of their report dated September 15, 1995 is enclosed. The BLS 15 has also been certified by the Treestand Manufacturer's Association ("TMA"). A listing of their certified products can be found at www.tmastands.com.

10.    Since the date of the incident made the basis of the plaintiffs' complaint, has there been any change, alteration or modification made in the design of Strong Built ladder tree stands manufactured and/or sold by this defendant?  If your answer is in the affirmative, describe in detail any such change, alteration, modification, also setting forth the name of the individual primarily responsible for making such change, alteration or modification, the reason for the change, alteration or modification and identify any and all documents which relate to or refer to each such change, alteration or modification.

ANSWER:    Objection on the grounds that this interrogatory seeks information regarding treestands other than the treestand that is the subject of this litigation. Objection on the further grounds that this interrogatory seeks information that is privileged and proprietary.

11.    State when ladder tree stands of the type involved herein were first manufactured for sale or distribution in the United States and the number sold to date as well as the number believed to be in use as of the date of this incident.

**ANSWER:**    We have manufactured treestands for over 20 years. Our first stand was manufactured in the mid-1980's.

12.    Please state the location/address of the manufacturer of the ladder tree stand involved in the accident made the basis of the plaintiff's complaint.

**ANSWER:**    Based upon Mr. L. J. Smith's inspection of the subject product, it is believed that the subject stand was manufactured in the 1990's. If this is correct, the stand would have been manufactured in Waterproof, Louisiana.

Honda Killen
Strong Built, Inc.

STATE OF LOUISIANA    )

PARISH OF TENSAS    )

Subscribed and sworn to before me this _____ day of _____, 2007.

Notary Public

My commission expires: _____

9

David A. Lee
Attorney for Defendant

OF COUNSEL:
PARSONS, LEE & JULIANO, P.C.
300 Protective Center
2801 Highway 280 South
Birmingham, AL 35223
(205) 326-6600 - Telephone
(205) 324-7097 - Facsimile

---

## CERTIFICATE OF SERVICE

---

I hereby certify that on the 9th day of November, 2007, I have served a copy of the foregoing pleading via United States mail, postage prepaid and properly addressed on counsel for all parties as follows:

Dennis R. Weaver, Esq.
Weaver Tidmore, LLC
200 Cahaba Park Circle, Suite 214
Birmingham, Alabama 35242

OF COUNSEL

10

# SMITH INVESTIGATION & SUPPORT SERVICES, LLC

---

*Private Investigations, Accident Reconstruction and Legal Support Services*

Post Office Box 4007
Brandon, Mississippi 39047
Telephone (601)919-0596
Facsimile (601)919-0968
lsmithinvest@aol.com

*Lorne Smith, Jr. ("L. J.")*
*Linda Smith*

March 1, 2008

David A. Lee, Esq.
Parsons, Lee & Juliano, P.C.
300 Protective Center
2801 Highway 280 South
Birmingham, AL 35223

Re:    *Larry Stephens v. StrongBuilt*
       Your File No.: 2304-00112

Dear David:

You have asked that I provide you with my opinions in the above captioned case. Materials reviewed in forming my opinion are:

1.    The deposition of David Stephens;

2.    The deposition of Matt Stephens;

3.    The deposition of Larry Stephens;

4.    The deposition of Deborah Stephens;

5.    The deposition of Terry Stephens;

6.    The report of Dr. Robert Thompson, expert witness for the Plaintiff; and,

7.    Warnings and Instructions which would have accompanied the subject treestand.

In addition to a review of the above-referenced materials, I made a personal inspection of the treestand and accident site on May 15, 2007. I met with Ellis Sisk, Defendant's engineering expert on February 27, 2008. I also met with Ken Killen on February 28, 2008, and sat in on his deposition taken by the Plaintiff on February 29, 2008.

David A. Lee, Esq.
March 1, 2008
Page Number 2

   After a review of the provided materials and the above referenced inspections and meetings with parties herein, it is my opinion that misuse of the stand over several years was the cause of this accident. The evidence to support this finding is as follows:

1.    This treestand was manufactured in the 1993-1996 time period. This is evidenced by the paint and several features pointed out by Ken Killen. There is no way this stand was purchased at Wal-Mart in 2004.

2.    The horizontal brace which Plaintiff and his expert state failed and caused this accident, was not even on the product at the time of the accident. The inward bend of the ladder of the stand is defined. The ladder will only fit together one way due to this bend. The clip of the horizontal brace which is located on the fifth rung is pointing outward away from the tree. There is no way the brace could have been used with it pointing this direction.

3.    The photographs taken by the Plaintiff's party a few days after the accident shows the clip of the brace, and it is completely rusted at this time. This indicates that the brace had broken off the clip at a much earlier time.

4.    The Plaintiff and his witnesses testified that this stand has only been put up a total of four times over three years. There are at least five bolt marks on the fifth rung and two additional bolt marks on the seventh rung where this stand has been put on a tree and left for a length of time. In addition, the "U"-clip which fits over the rung is no longer a "U" but is closer to an "O".

5.    The Plaintiff and others, including his expert, stated the horizontal brace is a non-adjustable brace where in fact it can be adjusted. This fact should have been known since the bolt holding the brace together has been replaced.

6.    The foot platform of the treestand is on the stand backwards. This creates two dangerous situations. First, the person climbing the stand must step out over the front of the brace to access the stand, and second, this creates a hole in the rear of the standing area through which someone could fall. The instructions clearly state how to put this platform on the stand. In addition the two side angle braces are in the wrong location and the legs of the platform had to be bent outward ½ inch to get them to fit.

7.    A additional shooting and arm rest has been added to the top of the stand. It is very easy to determine that this was done after it left the factory because the welding burned the paint. It is also a different color paint than came from the factory. StrongBuilt did not add this top to the stand. The two major welds of complaint by the Plaintiff's expert are the welds not made by StrongBuilt.

David A. Lee, Esq.
March 1, 2008
Page Number 3

8.   The welds the Plaintiff's expert is stating failed is in fact intact. The metal fatigued and failed from misuse and bending over several years.

9.   There is so much rust on this stand that it is evident that it has not gone through preventative maintenance and been repainted since it left the factory.

10.  Several of the bolts holding the platform were either put in the wrong location when the stand was put together or they had been replaced with the wrong length bolts.

Due to the above listed reasons, it is my opinion that the treestand was misused over a period of several years and this and not using the brace was the cause of this accident.

It is also my opinion that this treestand was safe, properly designed and manufactured when it left the StrongBuilt factory in the mid-1990's. I have personally hunted out of this design of treestand since the mid-1980's. There are more of this type of treestand in the woods today than all other type of stands.

I reserve the right to amend my opinion if additional information is obtained through the discovery process.

Sincerely yours,

SMITH INVESTIGATION & SUPPORT SERVICES, LLC

By: _____

Lorne Smith, Jr. ("L. J.")

LS,JR/ls

Report by: Ellis R. Sisk

RE:    Larry Stevens, et al v. Strong Built, Inc.

<u>Work performed</u>

On February 27, 2008 a visual examination was performed on a one-man ladder type tree stand shown in figure 1. The examined one-man tree stand was represented to me as being of Strong Built manufacture and involved in a legal proceeding identified as Larry Stevens, et al v. Strong Built, Inc. The visual examination was performed at the request of Mr. David Lee of Parsons, Lee & Juliano, P.C. The examination was performed at my residence in the presence of Mr. Lee and Mr. L. J. Smith.



Figure 1: A photograph of the tree stand components submitted by Mr. David Lee for my examination.

<u>Visual Examination of Tree Stand Components</u>

**Ladder Sections**

The ladder sections are constructed of welded square carbon steel tube as shown in figures 2 thru 4. The welds of the ladder sections were examined and found to be free of visible discontinuities, of uniform profile with adequate fusion.


Figure 2: A photograph of a typical ladder weld


Figure 3: A photograph of a typical ladder weld


Figure 4: A photograph of a typical ladder weld

The examination of the tree stand ladder sections showed a partial failure of the middle of three ladder sections. The partial failure had occurred in the ladder side rails at the joint between the middle and top ladder sections.

The ladder side rail failure appears to be a plastic buckling (ductile) overload failure. Overload failures occur when stresses exceed the load limit of a given member. Plastic buckling is indicated by the lack of evident tearing or cracking in the immediate area of the deformed regions as shown in figures 5 and 6. There are also present artifacts of permanent plastic deformation on the side opposite the primary failure of the joint shown in figures 7 and 8. These artifacts indicate a previous partial buckling failure less severe and in the opposite direction. These areas of permanent deformation reduce the strength of the joint


Figure 5: A photograph showing the ductile nature of the left ladder side rail ladder failure.


Figure 6: a photograph showing the ductile nature of the right ladder side rail failure.


Figure 7: A photograph showing the permanent plastic deformation on the rear side of the left ladder side rail.


Figure 8: A photograph showing the permanent plastic deformation on the rear side of the right ladder side rail..

Note: All left and right references are made facing the ladder stand as if it were positioned on a tree in front of the observer.

The ladder side rail failures are equilateral in nature. An equilateral side rail failure is consistent with a ladder failing in a plane perpendicular to the ladder rungs. The direction of the ladder side rail deformation indicates a failure inward toward the tree as shown in figure 9[1].



[1] Photo provided by Mr. David Lee.

**Ladder Brace**

The ladder brace is constructed of welded and bolted 1" and ¾" carbon steel square tube. The ladder brace was examined and found to have a fracture at the juncture of the brace tube and brace ladder rung clamp. The fracture is located in the ¾" carbon steel square tube of the ladder brace as shown in figures 10 and 11. The failure is located in the tubing material adjacent to the brace clamp to tube weld and is ductile in nature. The ductile nature of the fracture is evidenced by a slight reduction in the thickness of the tube wall at the fracture edges. The attachment weld was of adequate strength as the failure occurred in the brace tube leaving the complete upper and lower weld bead attached to the clamp as shown in figures 12 and 13.

The ladder rung and the ladder brace attachment clamp exhibit considerable permanent deformation as shown in figures 10, 11, 14 and 15. The multiple points of deformation of the ladder rung and considerable brace clamp deformation are an indication of repeated abuse by partially loosening the clamp and rotating the brace by force to lie flat against the ladder section for transport.



Figure 10: A photograph of the failed tree brace and rung clamp.



Figure 11: A photograph of the brace showing deformation of the attachment clamp.



Figure 12: A photograph of weld beads attached to clamp.



Figure 13: A photograph of weld beads attached to clamp



Figure 14: A photograph showing deformed ladder rung at tree brace attachment point.



Figure 15: A photograph showing deformed ladder rung at tree brace attachment point.

**Brace Clamp**

A close visual examination of the brace clamp shown in figure 16 shows both corroded and bright areas along the fracture face. The fracture faces have the visual appearance of a high stress low cycle failure. High stress low cycle failures occur when high stresses results in a partial failure which progresses under repeated loading to a point of final failure after a relatively few number of cycles.



Figure 16: A photo macrograph of the clamp fracture

**Ratchet Strap**

The tree stand ratchet strap shown in figures 17 and 18 was visually examined and found to be in a weathered but serviceable condition. There were no visible cuts or tears in the strap webbing, no visible safety threads, no visible permanent deformation of the strap hooks and no visible damage to the ratchet mechanism.



Figure 17: A photograph of the tree stand ratchet strap.



Figure 18: A photograph of ratchet strap hooks and ratchet mechanism.

No strap or rope necessary to attach the ladder brace to the tree was made available for examination.

**Platform Section**

The top platform section of the ladder stand shown in figure 19 and 20 is constructed of bolted and welded carbon steel square tube, flat bar and expanded metal.



Figure 19: A photograph of the platform section of the ladder stand.



Figure 20: A photograph of the platform section of the ladder stand.

The visual examination of the platform section of the ladder stand revealed several non-factory welds and modifications to the original design of the seat platform section of the tree stand. The modifications Include the addition of side rails and a front shooting rest supported by welded vertical square carbon steel tubes and the assembly of the foot platform in a reversed front to back position.

Figure 21 and 22 show two of the non-factory welds used to attach the added vertical shooting rail.



Figure 21: A photograph of the front left weld of the added shooting/side rail support tube.



Figure 22: A photograph of the front right weld of the added shooting/side rail support tube.

Figures 23 thru 26 show the non-factory side rail support tube welds. The indications that the vertical tubes were welded subsequent to manufacture include; non-matching paint on the added sections, heat artifacts in the original factory paint radiating from the welds (all factory welds are painted after welding), placement of the tube on top of the expanded metal seat welded in place during production, the configuration of the stand after modification precludes shipment in a flat box. Extremely poor quality of welds when compared to factory welds present on the rest of the stand.



Figure 23: A photograph of one of the non-factory welds.



Figure 24: A photograph of one of the non-factory welds.



Figure 25: A photograph of one of the non-factory welds.



Figure 26: A photograph of one of the non-factory welds..

**Assembled stand**

The submitted stand components were assembled with the ductile failure positioned in the direction of the tree (rear of the platforms) and are shown in figure 27. The visual examination of the assembled stand showed the tree brace clamp in a position facing away from the tree as shown in figures 27 and 28.



Figure 27: A photograph of the assembled ladder stand.



Figure 28: A photograph showing position of the tree brace in relation to the tree.

**Platform**

Figure 29 shows the submitted assembled stand in position on a tree. The projection of the foot platform above the top rung restricts access to the seat platform, creates a tripping hazard and adversely affects the load dynamics of the treestand.

The addition of the side and shooting rails above the seat platform tree contact point (arrow) when used to aid ingress into the tree stand seat adversely affects the load dynamics of the treestand.



Figure 29: A photograph showing the modified stand against a tree.

**Conclusions**

The following conclusions are the author's opinions based upon the visual examination of the one-man tree stand as submitted for examination.

1.  The factory welds were free of visible discontinuities, of uniform profile with adequate fusion.

2.  There were no visible defects in the original materials of manufacture.

3.  There were no obvious flaws in the original design configuration of the stand.

4.  The ladder side rail failure appears to be a plastic buckling (ductile) overload failure.

5.  The ladder side rail failures are equilateral in nature.

6.  The ladder side rails failed inward towards the tree.

7.  The ladder side rails were weakened by a previous partial failure.

8.  The previous partial failure was in the opposite direction as the primary failure.

9.  The tree stand seat platform was modified after manufacture by the welded attachment of side rails and a shooting rail.

10. The non-factory welded modifications adversely affect the load dynamics of the tree stand.

11. The non-factory welded seat platform modifications restrict access to the tree stand seat platform.

12. The tree stand foot platform was incorrectly assembled.

13. The improper assembly of the foot platform restricts access to the seat platform.

14. The improper assembly of the foot platform adversely affects the load dynamics of the tree stand.

15. The improper assembly of the foot platform creates a tripping hazard.

16.    The ladder brace fracture appears to be a high stress low cycle failure.

17.    The as submitted configuration of the ladder suggests the ladder brace was not in place at the time of the ladder failure.

18.    The ladder side rail failures were the result of either.

   a) Climbing the modified ladder stand with no ladder brace in place.

   b) Climbing the modified ladder stand with a ladder brace damaged by abuse.

19.    The ladder failure can be directly related to improper assembly, improper use, unauthorized modifications and lack of maintenance.

Ellis R Sisk

