# FREEDOM COURT REPORTING

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2             MIDDLE DISTRICT OF ALABAMA

3                  NORTHERN DISTRICT

4

5   LARRY AND DEBORA STEPHENS,

6                  Plaintiffs,

7

8      VS.                    CIVIL ACTION

9                        NO. 2:07 CV 128-10

10

11  STRONG BUILT INC.,

12           Defendant. COPY

13

14      VIDEO DEPOSITION OF LARRY STEPHENS

15

16                 STIPULATIONS

17          IT IS STIPULATED AND AGREED, by and

18  between the parties, through their

19  respective counsel, that the video

20  deposition of LARRY STEPHENS may be taken

21  before Scott Wilmeth, CCR, State of Alabama

22  at Large, at 200 Cahaba Park Circle, Suite

23  214, Birmingham, Alabama, on November 29,

PLAINTIFF'S
EXHIBIT
1

## FREEDOM COURT REPORTING

Page 37

1    Q.            And concluded that you had

2    migraine headaches?

3    A.            Yes, sir.

4    Q.            All right.  Well, let's talk

5    about this tree stand.  First of all, who --

6    who was the owner of the tree stand?

7    A.            My uncle.

8    Q.            Okay.  What -- what -- what's his

9    name?

10   A.            David Stephens.

11   Q.            Where did he buy the tree stand?

12   A.            His -- my other uncle bought a

13   couple of them for Christmas and gave it to

14   them for Christmas presents.

15   Q.            Okay, all right.  So who bought

16   the tree stands?

17   A.            Terry Stephens.

18   Q.            Are Terry and David brothers?

19   A.            Yes, sir.

20   Q.            Did he buy two tree stands and

21   distribute them for Christmas?

22   A.            Yes, sir.

23   Q.            All right.  Where did -- where

Page 89

1    A.          Yeah, it was tight.  I mean, when

2    I got to the -- right when I got up to the

3    top was when it collapsed on me.

4    Q.          How did it collapse?

5    A.          The brace on it broke.

6    Q.          The brace broke?

7    A.          Yes, sir.

8    Q.          When you say the -- and when you

9    say, "brace," are you talking about the

10   brace that is -- that was on the fourth --

11   A.          Right.

12   Q.          -- ladder?

13   A.          Yeah, yes, sir.

14   Q.          How -- how do you know that the

15   brace broke?

16   A.          Because that was the only reason

17   why it had to collapse.  And when I was

18   laying on the ground, I looked and the brace

19   was down and it broke from the stand, so --

20   Q.          Okay.  Is the -- is the brace

21   itself -- how -- how was it connected to the

22   stand?

23   A.          It was welded to a bracket and

1    the bracket goes over the stand and bolts

2    down.

3    Q.        Okay.

4    A.        And the bracket was still on the

5    step.

6    Q.        All right.  Did you hear the --

7    hear or see the brace break?

8    A.        No, sir, I didn't.  I was above

9    it.

10   Q.        Okay, all right.  So you're --

11   how far up the stand were you?

12   A.        I was all the way at the top,

13   fixing to climb -- climb in it.

14   Q.        And tell me what -- what

15   physically happened.

16   A.        Just when I hit the ground, I hit

17   the last step and I went to the right and --

18   and I've been hurting ever since.

19   Q.        Well, but I'm talking about when

20   you say it collapsed, how did it collapse?

21   Did it go backwards?

22   A.        No, it went into the tree.

23   Q.        Collapsed into the tree?

**FREEDOM COURT REPORTING**

Page 91

1    A.          Yes, sir.

2    Q.          Well, what -- what went into the

3    tree?

4    A.          The stand.

5    Q.          The -- the ladder itself?

6    A.          Yes, sir.

7    Q.          So the ladder itself went in

8    towards the tree?

9    A.          Yeah, it went in -- went in

10   towards the tree.

11   Q.          Okay.  And what happened when it

12   went in towards the tree?

13   A.          That's when I fell.

14   Q.          Did you fall backwards?

15   A.          It kind of jarred and I -- I just

16   fell straight down.  It just --

17   Q.          Before you started climbing

18   the -- the tree stand that day, did you look

19   at the brace?

20   A.          No.

21   Q.          Okay.  Did you look at the brace

22   when y'all installed the tree stand on or

23   about November the 3rd of 2006?

**FREEDOM COURT REPORTING**

1

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE MIDDLE DISTRICT OF ALABAMA

3    NORTHERN DIVISION

4

5    CIVIL ACTION NUMBER:  2:07CV128-1D

6    LARRY STEPHENS, et al.,

7        Plaintiffs,

8    vs.                          COPY

9    STRONG BUILT, INC.,

10       Defendant.

11

12       DEPOSITION OF DWIGHT JONES

13       In accordance with Rule 5(d) of

14   The Alabama Rules of Civil Procedure as

15   Amended, effective May 15, 1988, I,

16   Virginia Denese Barrett, am hereby

17   delivering to Mr. David A. Lee, the

18   original transcript of the oral testimony

19   taken on the 14th day of May, 2008, along

20   with exhibits.

21       Please be advised that this is

22   the same and not retained by the Court

23   Reporter, nor filed with the Court.

PLAINTIFF'S
EXHIBIT
2

FREEDOM COURT REPORTING

36

1  Q.  Yeah.

2  A.  The best that I can remember,

3 it was laying between the tree and the

4 ladder.

5  Q.  Okay.  But you're not certain.

6 That's the best of your memory?

7  A.  The best of my memory, it was

8 right here.

9  Q.  Now, I don't see that safety

10 bar in that picture.

11  A.  Uh-huh.

12  Q.  Do you?

13  A.  No.

14  Q.  Okay.

15  A.  Unh-unh.

16  Q.  You don't see it there?

17  A.  No.

18  Q.  Do you know if the safety bar

19 had been moved before you took that

20 picture?

21  A.  Oh, no.  No.  No.  Unh-unh.

22 Well, now, to take the picture, I picked it

23 up to take the picture.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

53

1          A.        This was between the step and

2    the tree.  So however you want to call

3    that.  This piece right here, if I had my

4    back to the tree, I'd be looking at it.

5          Q.        Okay.  So your testimony is

6    that the broken part of the clip was facing

7    towards the tree?

8          A.        Yes.

9          Q.        Okay.

10          A.        Because if you've got your back

11    to the tree, you're looking at that piece

12    right there.  The tree that this stand is

13    on, if you've got your back to that tree,

14    you're looking at this piece right here.

15          Q.        Okay.  And that's the picture

16    -- that's the angle that you took this

17    picture?

18          A.        Took it from not all the way up

19    under.  You know, I wasn't between the tree

20    and the -- the full stand and the tree.  I

21    was just standing just a little bit to the

22    left.

23          Q.        Okay.

ORIGINAL

1    IN THE UNITED STATES DISTRICT COURT

2    MIDDLE DISTRICT OF ALABAMA

3    NORTHERN DIVISION

4

5

6    LARRY STEPHENS and

7    DEBORA STEPHENS

8

9    VERSUS                        NO.   2:07cv128-10

10

11   STRONG BUILT, INC.

12

13   ****************************************************************

14                       DEPOSITION OF MR. KENNETH KILLEN was

15   taken in the above-entitled cause, pursuant to the following

16   stipulations, before MARY ALICE FOUNTAIN, Certified Court

17   Reporter for the State of Louisiana, at the law office of James

18   E. Paxton, 124 Hancock Street, St. Joseph, Louisiana 71366,

19   February 29, 2008.

20

21

22

23

24

25

PLAINTIFF'S
EXHIBIT
3

Page 8

1   Q.   What year was that?

2   A.   1973.

3   Q.   Did you go to college?

4   A.   I went three years to LSU.

5   Q.   Did you receive a degree from LSU?

6   A.   No.

7   Q.   Did you have any  - after you went to LSU did you have

8   any further vocational school or anything of that nature?

9   A.   No.

10  Q.   Tell me a little bit about your work history Mr.

11  Killen, starting with either your first job going forward

12  or your most recent job going backward, whichever one is

13  easier for you?

14  A.   After ah, well, I started farming in about  76, I

15  guess.  And farmed till probably 1987.

16  Q.   What did you farm?

17  A.   Cotton, soybeans, wheat, rice.  Then I started Strong

18  Built in  85.  And it been there until, you know,

19  throughout.

20  Q.   Did you own the farm that you worked on?

21  A.   No, I didn't.

22  Q.   Who did own the farm you worked on?

23  A.   Some was family farm, and some was property I rented.

24  Q.   Why did you get out of farming?

25  A.   Well, I started the business.  And it just kind of

Page 16

1   whom are you referring?

2   A.   Strong Built.

3   Q.   Who within the Strong Built, Incorporated helped you

4   design the tree stand though?

5   A.   Oh, I did most of it.

6   Q.   Okay.

7   A.   It ah,

8   Q.   Anybody else other than you?

9   A.   Well, whoever was employed then that was out in the fab

10  shop, you know.  Workers, just workers.  Nobody  – nobody

11  in design.

12  Q.   Nobody, no engineers?

13  A.   No.

14  Q.   Tell me a little bit more about it.  You said it was

15  just you and some workers out in the fab shop.  You just

16  trial and error, trying to put together just a one-man tree

17  stand?

18  A.   Well, yeah.  And there are a lot of factors.  It was a

19  one-man tree stand.  It was  – we produced one piece for a

20  few years.  We produced it  – then we wanted a stand that

21  would come apart that you could assemble.  We produced it

22  for several years with a top that was all welded.  Pelletize

23  it wasn't molted together.  It just, the ladders were swaged

24  and stabbed together, stabbed into the top.  And then

25  because of freight reasons and warehouse reasons, we wanted

1   a stand that would take apart, palletize easier, and ship.

2   You know, just really take up less room.  So that's when we

3   designed the basic ladder that bolts together.

4   Q.   About what year was the tree stand that made the basis

5   of this litigation designed?  It sounds to me like you're

6   saying that's not the, you know, that's not the first one;

7   you had played around with it a little while, is that

8   correct?

9   A.   Um—hum (yes).

10  Q.   Okay.  Well, about what year did you design that tree

11  stand?

12  A.   That tree stand somewhere around  92 to  94.  I mean,

13   93, but I'm not positive.  It would be  93, so there's a

14  range.

15  Q.   And you would say that even though there were no

16  engineers, there wasn't even really a design team; you were

17  in charge of the design?

18  A.   Correct.

19  Q.   How long did it take to design that tree stand?

20  A.   I don't remember.

21  Q.   Well, I mean, would you say  – I mean, did you start

22  off with a, you know, fabrication spec?

23  A.   Ah, no, we worked with  – we worked with some

24  measurements trying to, you know, produce a stand that was,

25   that would ship UPS, with UPS.  And I forget what their,

1    a stand that would take apart, palletize easier, and ship.

2    You know, just really take up less room.  So that's when we

3    designed the basic ladder that bolts together.

4    Q.    About what year was the tree stand that made the basis

5    of this litigation designed?  It sounds to me like you're

6    saying that's not the, you know, that's not the first one;

7    you had played around with it a little while, is that

8    correct?

9    A.    Um-hum (yes).

10   Q.    Okay.  Well, about what year did you design that tree

11   stand?

12   A.    That tree stand somewhere around  92 to  94.  I mean,

13    93, but I'm not positive.  It would be  93, so there's a

14   range.

15   Q.    And you would say that even though there were no

16   engineers, there wasn't even really a design team; you were

17   in charge of the design?

18   A.    Correct.

19   Q.    How long did it take to design that tree stand?

20   A.    I don't remember.

21   Q.    Well, I mean, would you say  - I mean, did you start

22   off with a, you know, fabrication spec?

23   A.    Ah, no, we worked with  - we worked with some

24   measurements trying to, you know, produce a stand that was,

25   that would ship UPS, with UPS.  And I forget what their,

Page 19

```
 1              MR. LEE:

 2                   Now let me just get some clarification.  He's

 3              talked to you a little bit about the evolution of

 4              the stand.

 5              MR. HASSINGER:

 6                   Um-hum.

 7              MR. LEE:

 8                   And that stand, I guess changes from the

 9              original manufacturer.  Are you talking about the

10              stand now that is the subject of this litigation,

11              how that particular stand was designed?

12              MR. HASSINGER:

13                   I am.

14              MR. LEE:

15                   Okay.  You understand what he's asking.

16              MR. KILLEN:

17                   Um-hum (yes).

18              MR. LEE:

19                   Okay, go ahead.

20    A.   Well, that particular was kind of evolved from years of

21    previous ladder stands.  I mean, like I said there was some

22    one piece ladder stands that were completely, you know, ten

23    feet long, fifteen feet long.  And then when we started with

24    a stand that would take apart, it consisted of the ladders

25    and the brace and the top.  But the top was welded.  The top
```

Page 21

1    Q.    Who was in charge of doing the welding itself?

2    A.    There was  – at times, you know, as many as twenty

3    welders.  There was, as I said earlier, there was contract

4    welders.  There was  – there was a complete fab shop in

5    Alabama that did a lot of welding during some of that time

6    frame.

7    Q.    The contract labor that you used, the contract welders,

8    were they all certified welders?

9    A.    No.

10    Q.    They were not all certified welders?

11    A.    No.

12    Q.    And they weren't provided with any specific weld

13    design?

14    A.    No.  They were provided with the jigs.

15    Q.    Could you elaborate on jigs for me a little bit?

16    A.    Well, it's a piece of metal that's got metal stops in

17    different places, so tubing or angle or whatever the

18    product, the channel or whatever the product, the type of

19    steel might be, fit into it.  And then they're captured.

20    They can't move right or left or up or down.  And then your

21    other component parts are placed in it, on it, inside it,

22    wherever they went.  It's like a puzzle.  And then it's

23    welded.

24    Q.    Up until about what time did you fabricate and produce

25    the tree stands and your other products here in the United

Page 36

1   a certified product.

2   Q.   And your product is certified?

3   A.   Yes.

4   Q.   But as we sit here today, you don't have any documents

5   for product specifications for the tree stand that made the

6   basis of that litigation – for this litigation or the

7   current tree stands that you have?

8   A.   No.

9   Q.   And you don't have any specification – you don't have

10  a weld design, you don't have a weld's specification?

11  A.   No.

12  Q.   Who's responsible for keeping track of reports or

13  injuries or damages caused by alleged defects in Strong

14  Built tree stands?

15  A.   My wife does most of  em.

16  Q.   So if I were – so you've obtained your knowledge or

17  reports of injuries and damages caused by alleged defects

18  in Strong Built stands just through your wife?

19  A.   Yes, unless I'm served.  Yes, I learn it from her.

20  Q.   All right.  Has Strong Built previously been the

21  subject of tree stand failure litigation?

22  A.   It has.

23  Q.   Approximately how many times?

24  A.   Oh, I don't know.

25  Q.   More than ten?

Case 2:07-cv-00128-ID-TFM    Document 48-2    Filed 06/10/2008    Page 17 of 53
Kenneth Killen
02/29/08

1          MR. LEE:

2               Let's talk

3    A.   They gon' make it  – it's not gon' be their fault.

4    Q.   Um-hum.

5    A.   If they gon' bring litigation about, they're assuming

6    it's somebody else's fault.

7    Q.   Oh, I mean, I, you know, I won't get into  – I don't

8    want to get into any discourse with you.  You're, you know,

9    you're somewhat right.  Sometimes it is, you know,

10   somebody's fault.  Sometimes it isn't.  I'd like to know,

11   Mr. Killen, I'd like to know first, talk to me about why

12   you're certain that that tree stand was manufactured in

13   Alabama, Louisiana or before you outsourced your labor to

14   China?

15   A.   Well, I know it wasn't produced in Alabama because of

16   a dye.  A dye that was produced to make a bend.  And I know

17   it wasn't produced in China because of the paint.  So that

18   takes it back, which we hadn't even gotten into how long I

19   produced in Alabama.  But that takes it back probably before

20    96.  So it could be in that range,  93 to  96, without a

21   doubt.

22   Q.   Why was there a different  – why was there a different

23   dye used in Louisiana and Alabama?

24   A.   Well, if you gon' make a dye, and a dye is a piece of

25   equipment that's harder than the steel you're working on.

Page 48

1    A.    It's the top of the stand.

2    Q.    Okay.  Now at the very top, there has been something

3    that has been added to this stand, is that correct?

4    A.    That's correct.

5    Q.    Okay.  And tell us what that is?

6    A.    Well, it's a arm rest/gun rest.  You know, something to

7    rest your rifle on to shoot off of.  But it wasn't  - it

8    wasn't produced by Strong Built.  And in his deposition, I

9    don't  - I think it was David ah, he said nobody  - no one

10   had ever welded on any that he couldn't weld, and this and

11   that.  That was welded with a welding rod.  That was not

12   welded with a wire welding machine that we use.  Ah, it

13   burned the paint off of it.  It burned the paint off where

14   it was welded.

15   Q.    Okay.  There's  - the very top of this there's some

16   additional rails that have been added, there's some

17   additional welding that's been added that was not done by

18   Strong Built, is that correct?

19   A.    That's correct.

20   Q.    Okay.  You can also see a different color paint.

21   Whatever they added to this particular stand has been

22   painted, is that correct?

23   A.    Painted green.

24   Q.    And it's a different color green than the paint that

25   was used

Page 73

1    personal inspection of this ladder stand, based upon the

2    inward deflection that we show on that ah, section of

3    ladder; also, based upon the position that the clip is

4    located and based upon your education, training and

5    experience, is it your opinion that the  – that at the time

6    of the accident the horizontal brace was not in place?

7              MR. HASSINGER:

8                   Object to the form.

9              MR. LEE:

10                  You can answer.

11   A.    It was not even  – it was not there at all.  It's

12   obvious.  It was not there at all.

13   Q.    Okay.  Now, do your instructions say, and do your

14   instructions warn the consumer that the horizontal brace is

15   an integral of the overall safety of this particular part?

16   A.    Yes.

17   Q.    Do your instructions ah, tell the consumer they're not

18   to use this stand without the horizontal brace in place?

19   A.    I think it says

20                  "You could be seriously injured or killed."

21   Q.    Okay.  All right, Mr. Killen, as designed and as

22   manufactured ah, this particular stand, do you have a  –

23   have an opinion ah, based upon your education, training and

24   experience, as to whether or not this stand was  – was

25   reasonably safe when you manufactured and sold it?

Page 74

1              MR. HASSINGER:

2                   Object to the form.

3              MR. LEE:

4                   You can answer.

5     A.    Absolutely!

6     Q.    Now, and we've gone through this, but your testimony is

7     that this stand was not used as intended?'

8     A.    Absolutely!

9     Q.    Okay.  Is it your testimony that this stand has

10    received substantial modifications to it?

11    A.    It has.

12    Q.    Is it your testimony that this stand been abused and

13    misused over time?

14             MR. HASSINGER:

15                   Object to the form.

16             MR. LEE:

17                   You can answer.

18    A.    It has.

19    Q.    The tearing of this horizontal brace ah, do your

20    instructions tell the consumer, your written instructions,

21    do they tell  - does it tell the  - the ah, consumer that

22    when this stand is to be moved or transported or stored,

23    that this horizontal brace is suppose to be taken off?

24    A.    I believe so.

25    Q.    And if your instructions say that, and if this hor -if

# FREEDOM COURT REPORTING

1

1    IN THE UNITED STATES DISTRICT COURT

2   FOR THE MIDDLE DISTRICT OF ALABAMA

3      NORTHERN DIVISION

4

5  CASE NUMBER:  2:07-CV-128-1D

6  LARRY STEPHENS, ET AL.,

7     Plaintiffs,

8     vs.

9  STRONGBUILT, INC.,   COPY

10     Defendant.

11

12    S T I P U L A T I O N

13    IT IS STIPULATED AND AGREED by and

14 between the parties through their respective

15 counsel, that the video deposition of Jaiton

16 Stephens may be taken before Sara Mahler,

17 CCR, at the offices of Morris, Haynes &

18 Hornsby, at 131 Main Street, Alexander City,

19 Alabama 35010, on the 19th day of May, 2008.

20

21   DEPOSITION OF JAITON STEPHENS

22

23

PLAINTIFF'S EXHIBIT 4

## FREEDOM COURT REPORTING

16

1   it, didn't pay any attention to the

2   horizontal -- the safety bar; correct?

3           A.      Yes, sir.

4           Q.      Now, when you went back with

5   Mr. Jones after your dad had already been

6   gone to the hospital, and it's just you and

7   Mr. Jones out there taking some pictures,

8   did you find the horizontal brace or safety

9   bar, then?

10          A.      Yes, sir.

11          Q.      Where was it?

12          A.      It was in between -- It was

13  right there (indicating) in between the

14  stand and the tree.  In that area right

15  there (indicating).

16          Q.      Okay.  Did y'all take a

17  picture of it laying on the ground?

18          A.      I can't -- I can't remember if

19  we picked it up.

20          Q.      Look at that picture there and

21  tell me if you see it in that photograph.

22  We haven't marked that as an exhibit yet.

23  See if you see that -- See if you see the

17

1    safety bar in that picture.

2        A.      I can't tell.  There's limbs

3    and everything else.  It might be blended in

4    down there.

5        Q.      Yeah.  You don't see it in

6    that photograph?

7        A.      No, sir.

8        Q.      Your recollection is it was

9    somewhere between the tree and the ladder?

10       A.      Yes.  It was like right in

11   there somewhere (indicating).  That's what I

12   was saying about us might have been taking

13   two pictures.  When we took this picture of

14   the safety bar --

15       Q.      You're looking at Exhibit

16   Number 4.

17       A.      -- like I said we might not

18   have moved it.  We might not could have took

19   a clear picture right there.  Like I say, I

20   know we took one of me holding the brace.  I

21   might have had it over here (indicating)

22   still looking at it and he took that picture

23   right there.

## Page 1

1  IN THE UNITED STATES DISTRICT COURT
2      MIDDLE DISTRICT OF ALABAMA
3          NORTHERN DIVISION
4
5  CASE NUMBER: 2:07-cv-128-10
6  LARRY STEPHENS, ET AL.,
7      Plaintiffs,
8      VS.
9  STRONG BUILT, INC.,
10      Defendant.
11
12      S T I P U L A T I O N
13      IT IS STIPULATED AND AGREED by
14 and between the parties through their
15 respective counsel, that the video
16 deposition of DAVID STEPHENS may be taken
17 before RENA' MESSICK LANIER, Certified
18 Court Reporter and Notary Public for the
19 State of Alabama at Large, at the offices
20 of Morris, Haynes & Hornsby at 131 Main
21 Street, Alexander City, Alabama 35010, on
22 the 17th day of December, 2007.
23      IT IS FURTHER STIPULATED AND

## Page 2

1  AGREED that the signature to and the
2  reading of the deposition by the witness
3  is waived, the deposition to have the same
4  force and effect as if full compliance had
5  been had with all laws and rules of Court
6  relating to the taking of depositions.
7      IT IS FURTHER STIPULATED AND
8  AGREED that it shall not be necessary for
9  any objections to be made by counsel to
10 any questions except as to form or leading
11 questions, and that counsel for the
12 parties may make objections and assign
13 grounds at the time of the trial, or at
14 the time said deposition is offered in
15 evidence, or prior thereto.
16      IT IS FURTHER STIPULATED AND
17 AGREED that the notice of filing of the
18 deposition by the Commissioner is waived.
19
20
21
22
23

## Page 3

1          I N D E X
2  EXAMINATION BY:              PAGE
3  MR. LEE              6
4  EXHIBITS              MARKED
5      (None marked to this deposition)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

## Page 4

1  IN THE UNITED STATES DISTRICT COURT
2      MIDDLE DISTRICT OF ALABAMA
3          NORTHERN DIVISION
4
5  CASE NUMBER: 2:07-cv-128-10
6  LARRY STEPHENS, ET AL.,
7      Plaintiffs,
8      VS.
9  STRONG BUILT, INC.,
10      Defendant.
11 BEFORE:
12      RENA' M. LANIER, Commissioner
13 APPEARANCES:
14      WEAVER & TIDMORE, by WILLIAM
15 HASSINGER, 300 Cahaba Park Circle, Suite
16 200, Birmingham, Alabama 35242, (205)
17 980-6065, appearing for the Plaintiffs.
18      PARSONS, LEE & JULIANO, by DAVID
19 LEE, 300 Protective Center, 2801 Highway
20 280 South, Birmingham, Alabama 35223,
21 (205) 326-6600, appearing for the
22 Defendant.
23      ALSO PRESENT: Patrick Sheehan

1  (P.



PLAINTIFF'S
EXHIBIT
5

Page 97

1    that particular area.
2         Do you know how or when that
3    occurred?
4         A.    In the brace area?
5         Q.    Yes.
6         A.    I reckon it happened after
7    they got it down. I don't know about the
8    bending and stuff. Or bent when he was up
9    on it with him.
10        Q.    There also appears to be
11   some dents in the metal along the fifth
12   and sixth ladder rungs, you know, the
13   ladder steps.
14        Do you know if there was any
15   dents in that area? Or how they got
16   there?
17        A.    I don't know.
18        Q.    How long have you been
19   putting up tree stands, Mr. Stephens?
20        About how many years? What's
21   your background in putting up tree stands?
22        A.    Several years. A bunch.
23        Q.    Approximately how many

Page 98

1    years?
2         A.    I'll say about thirteen or
3    fourteen years.
4         Q.    How many different tree
5    stands do you own now?
6         A.    How many I own now?
7         Q.    Yes, sir.
8         A.    Two now. That was my third
9    one. I got -- we got shooting houses and
10   stuff now.
11        Q.    Other than the other -- you
12   said it was a twelve-foot Strong Built.
13        Do you have any other Strong
14   Built products besides --
15        A.    Huh-uh.
16        Q.    -- besides those two ladder
17   stands?
18        A.    That's it.
19        Q.    All the tree stands that you
20   own, have all of them come with written
21   instructions and warning labels?
22        A.    Yeah.
23        Q.    And you said that because

Page 99

1    you can't read you have not been able to
2    read the instructions yourself?
3         A.    Huh-uh.
4         Q.    Is that correct?
5         A.    Correct.
6         Q.    You've relied on other
7    people --
8         A.    Matt --
9         Q.    -- to --
10        A.    -- read them to me.
11        Q.    I understand. You relied on
12   other people to read them?
13        A.    Yes, sir.
14        Q.    But you don't have any
15   criticism of the written instructions, do
16   you?
17        A.    What you mean?
18        Q.    You're not critical, you
19   don't say the instructions are not clear,
20   do you?
21        A.    No.
22        Q.    Okay. Do you know
23   whether -- well, I think your brother,

Page 100

1    Larry Stephens, he can't read either; is
2    that true?
3         A.    Nephew.
4         Q.    I'm sorry. Your nephew. I
5    keep saying your brother. Your nephew,
6    Larry Stephens, he can't read either, can
7    he?
8         A.    Huh-uh. (Shaking head.)
9         Q.    Do you know if he ever
10   looked at the written instructions that
11   came with this particular stand or not?
12        A.    I don't think he did.
13   Because me and Matt was the only ones out
14   there.
15        Q.    That put it together?
16        A.    Yes, sir.
17        Q.    And you don't -- you do not
18   still have the written instructions that
19   came with this --
20        A.    No.
21        Q.    -- particular stand?
22        Have you ever taken any type
23   of hunting safety course?

25  (Pages 97 to 100)

# ORIGINAL TRANSCRIPT

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

LARRY STEPHENS AND DEBORA STEPHENS         PLAINTIFFS

VERSUS                  CIVIL ACTION NO. 2:07CV128-10

STRONG BUILT, INC.                 DEFENDANT

---

## *DEPOSITION OF LJ SMITH*

---

*APPEARANCES*:

> WILLIAM H. HASSINGER, ESQUIRE
> DAVID TIDMORE, ESQUIRE
> Weaver Tidmore
> 300 Hahaba Park Circle, Suite 200
> Birmingham, Alabama 35242
>
> *REPRESENTING THE PLAINTIFFS*
>
> DAVID LEE, ESQUIRE
> MILES GRESHAM, JR., ESQUIRE
> Parsons Lee & Juliano
> 2801 Highway 280 South, 300 Protective Center
> Birmingham, Alabama 35223
>
> *REPRESENTING THE DEFENDANT*

*ALSO PRESENT*: Ellis Sisk

Taken at the instance of the Plaintiffs
In the Offices of Sharron Allen & Associates
105 Office Park Drive
Brandon, Mississippi 39042
On May 9, 2008, at 9:46 a.m.

*REPORTED BY*: ABBY JULIAN, CSR, RPR
CSR NO. 1706



(601) 825-6339   Fax (601) 825-1154
P. O. Box 1731, Jackson, MS 39215
www.sharronallen.com

PLAINTIFF'S EXHIBIT 6

1    A.    Yes.   Bachelor of science degree.

2    Q.    You graduated from Southern Miss in '81; and

3    previous to that, you had two years of community

4    college studying police science.  Is that fair to say?

5    A.    Yes.

6    Q.    After you graduated from Southern Miss in

7    1981, did you go on to any graduate studies?

8    A.    No, I have not.

9    Q.    So as far as your formal education:  Two

10    years of community college for police science and two

11    more years of criminal justice.  You have a BS from

12    University of Southern Mississippi.

13    A.    Correct.

14    Q.    In criminal justice, you said.

15    A.    That's correct.

16    Q.    All right.  No -- well, let's move on from

17    your formal education.  Did -- well, no.  Let's go back

18    to that for a second.  You haven't had any classes in

19    your formal education as to mechanical engineering?

20    A.    No.

21    Q.    Civil engineering?

22    A.    No.

23    Q.    Physics?

24    A.    No.

25    Q.    Since the conclusion of your formal

1    education, have you been to any vocational or technical
2    college that would train you in mechanical or even
3    civil engineering at all?
4         A.   No.
5         Q.   What was the first job you took after you got
6    out of college in '81?
7         A.   Actually, I was working for the State of
8    Mississippi while I was in college.  My college
9    consisted of five years of night school while I was
10   working with the Mississippi Department of Wildlife,
11   Fisheries, and Parks.  Well, actually, part of the time
12   I was there was with the Boat and Water Safety
13   Commission and then the Department of Wildlife,
14   Fisheries, and Parks from 1979 on.  So I was actually
15   working for the State of Mississippi full-time at the
16   time that I was going to college.
17        Q.   Okay.  You retired from Mississippi
18   Department of Wildlife, Fisheries, and Parks in '93?
19        A.   That's correct.
20        Q.   While you were doing that, did you -- tell me
21   about your job capacity.  Tell me about what you did in
22   your job capacity with the Mississippi Department of
23   Wildlife.
24        A.   I started out as a conservation officer in
25   the field.  Well, actually, the first several years, I

1     A.    I think it's '92 or '93.  You have in the

2  list of supplied products, you have a list of all the

3  cases that I have ever given a deposition in involving

4  tree stands.

5     Q.    I'll go through them, but if I were to do it

6  now, we'd be here until tomorrow.  So just let me know

7  about how many of those were for the plaintiff and how

8  many were for the defendant.

9     A.    All of my tree stand cases are for the

10 defendant.  I have taken plaintiff's cases in gun

11 cases.

12    Q.    But as related to your expert testimony in

13 tree stand cases, 100 percent of them have been for the

14 defendant.

15    A.    That I have given depositions in, yes.

16 Primarily because I've only been contacted by three

17 plaintiffs' attorneys in all the years that I've been

18 doing this.

19    Q.    You said you have given about 55 depos, but

20 there have probably been cases you've been retained as

21 an expert which ultimately you haven't given

22 depositions in.  Correct?

23    A.    Yes.

24    Q.    Were all of those for the defendant also?

25    A.    In tree stand cases, yes.

1      *Q.*   Okay.

2      *A.*   As I just stated, I've only been contacted by

3      three plaintiffs' attorneys in the whole time that I've

4      been doing this, and I was already hired by the defense

5      in two of the cases that they called on; and the third

6      case, the attorney didn't like what I told him.

7      *Q.*   So you kind of just answered my next

8      question, which was:  Have you ever turned down an

9      opportunity to work as an expert for the defense in

10     litigation?  In other words, have you ever been

11     contacted by a defendant tree stand company and said,

12     "No, I'm not interested in that"?

13     *A.*   I don't think so because I'll give you an

14     opinion on anything.

15     *Q.*   Well, have you ever reviewed the facts of a

16     case for a defendant or plaintiff and then decided to

17     turn it down?

18     *A.*   No.

19     *Q.*   How do your clients typically find you?

20     *A.*   Word of mouth.

21     *Q.*   I imagine it's pretty specialized, so that

22     doesn't surprise me.

23     *A.*   I've been in this for so many years, and my

24     expertise is well known by the people that need my

25     services; so...

Q.   Well known by defendants?

A.   (No audible response)

Q.   And that wasn't glib.  It's just that I know
that your area of expertise is very specialized, so I'm
wondering why all defendants contact you and no
plaintiffs.

A.   I think I'm well known by ATLA as well.  It's
just that they choose not to call me for some reason.
So...

Q.   Have you ever -- well, let me back up.  You
were familiar with StrongBuilt well before this case.

A.   I have been aware of StrongBuilt since they
went into business in the mid 1980s, 1984, '85.

Q.   Have you ever worked for StrongBuilt before?

A.   Worked for StrongBuilt?

Q.   Yes.

A.   No.

Q.   Have you -- let me rephrase that.  Have you
had any professional relationship with StrongBuilt in
the past?

A.   I have investigated accidents for
StrongBuilt.

Q.   Okay.  Again, because you just said they
were -- all your deposition testimony had been for the
department in tree stand cases, I assume that every

1    time you've investigated a case for StrongBuilt, you
2    found no defects in manufacturer design or otherwise in
3    any of their tree stands.
4        A.    I have not found any manufacturing defects in
5    any of their tree stands, no.
6        Q.    How many times have you been contacted by
7    either StrongBuilt or counsel for StrongBuilt and asked
8    to investigate a case?
9        A.    I would say somewhere in the neighborhood of
10    eight to ten times over fifteen years.
11        Q.    Just before I leave this line of questioning,
12    I just want to clarify:  In all the times that you've
13    been contacted by a defendant tree stand company, have
14    you ever once looked at the tree stand and said, "This
15    is not a good design.  This is a faulty tree stand"?
16        A.    Yes.
17        Q.    Okay.  When was that?
18        A.    1990-- trying to remember the year -- '2 or
19    '3.
20        Q.    Okay.  Did you give testimony to that effect,
21    or was that one of those that you investigated and
22    ultimately didn't give testimony in?
23        A.    Neither one.  I walked with into a booth at
24    the show and looked at the owner of tree stand and told
25    him that he was trying to put himself out of business.

1   on the stand that is there and --

2      Q.   I just -- and again, it wasn't a trick

3   question.  I just didn't know if you thought that --

4   I'm not an expert on tree stands, so I didn't know if

5   you thought that the -- you know, that outward

6   half-inch bend had anything to do with this accident,

7   and that's what I was trying to clarify.

8      A.   No, I don't think it had anything to do with

9   this accident.  It forced the stand legs to be bent

10  outwards to go into those, and it created a -- really

11  a -- probably a tighter bind in getting it in and out.

12     Q.   Same question for your Conclusion No. 7, L.J.

13  The nonfactory shooting rail added to the top of the

14  stand, do you feel like that contributed in any way to

15  this accident?

16     A.   It added additional weight to the top of the

17  stand that could have been a factor in causing this

18  stand to fall.  It could have had something to do with

19  the way Mr. Stevens was gripping, if he was holding on

20  to that at that time, in trying to move his body out

21  over the foot platform that was put on backwards that

22  was sticking 6 inches out in front of the stand instead

23  of inverted in.  Then if he were holding on to that in

24  trying to maneuver his body around it, then, yes, it

25  possibly could have been something to do with this

1    in this case.

2              I guess what I need to do really to phrase it

3    as a question is:  Are you referring to the weld

4    illustrated in our expert's disclosure that showed

5    where the shooting rail was welded to the platform?

6         A.   Yes.

7         Q.   Okay.  That's what you're referring to when

8    you say, "The two major welds of complaint by the

9    plaintiffs' expert are welds not made by StrongBuilt."

10        A.   Yes.  Those are the ones that he had

11   photographs of that I saw.

12        Q.   Well, there were other photographs also in

13   addition to that.  And I just wanted to make it clear

14   that, while that is an example of defective welding,

15   those aren't -- that's not the major weld of complaint

16   illustrated by our expert.  But I just wanted to get

17   that clear.

18        A.   Welding is not my expertise anyhow.  I'm

19   going to defer to Mr. Sisk on that, and that will be

20   his job to handle that part.

21        Q.   Okay.  Number 8, "The welds the plaintiffs'

22   expert is stating failed is, in fact, intact.  The

23   metal fatigued and failed from misuse and bending over

24   several years."

25              Now, you just stated about 30 seconds ago

1    that welding is not your expertise.  Is that fair to

2    say?

3         A.   Yes.

4         Q.   So what leads you to believe the metal

5    fatigued and failed from misuse and bending over

6    several years?

7         A.   The fact that if you look at the welds where

8    this failed, those welds are intact.  The metal in

9    itself actually bent and broke or tore or came apart or

10   whatever.  And this happened because, as Mr. Stevens

11   Stephens stated in his deposition, I believe it was --

12   David Stevens stated in his deposition that when they

13   took the stand down, they didn't take the horizontal

14   brace off.  They simply loosened it and folded it over

15   in one direction or the other to carry it in and out of

16   the woods.  And through several years of this being

17   folded over back and forth and back and forth, then the

18   meal fatigued, and it broke.

19        Q.   Well, the term "fatigue" in welding is a

20   really specific mechanism of failure.  Can you give me

21   a definition of the term "fatigue" as applied to

22   welding?

23        A.   No.

24        Q.   Okay.  So you're kind of using "fatigue" as

25   just synonymous with the welding getting worn out over

1    contributed to this accident?

2        A.    No.   I don't think it had anything to do with

3    the accident.

4        Q.    Okay.   I know that you have personal

5    knowledge of StrongBuilt tree stands.   Assuming that

6    this tree stand was manufactured in 1993-1996 range,

7    are there differences between the way this tree stand

8    was manufactured and -- strike that.

9             Are there differences in the design of this

10   tree stand and the current basic ladder stand model

11   StrongBuilt products, specifically -- and this is a

12   compound question, but it's just the easiest way to do

13   it -- specifically, does StrongBuilt still use these X

14   crimps?

15       A.    Yes.

16       Q.    Does StrongBuilt still use this type of

17   steel, or do they use stainless or galvanized?

18       A.    As far as I'm aware, they still use the same

19   steel.

20       Q.    Is it your opinion that these tree stands

21   would be safer if they used stainless or galvanized

22   steel?

23       A.    No.

24       Q.    Okay.   Well, stainless steel and galvanized

25   steel don't rust.   And so it's your opinion even a

# CONDENSED TRANSCRIPT

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

LARRY STEPHENS AND DEBORA STEPHENS                      PLAINTIFFS

VERSUS                                    CIVIL ACTION NO. 2:07CV128-10

STRONG BUILT, INC.                                      DEFENDANT

---

## *DEPOSITION OF ELLIS SISK*

---

*APPEARANCES*:

> *WILLIAM H. HASSINGER, ESQUIRE*
> *DAVID TIDMORE, ESQUIRE*
> Weaver Tidmore
> 300 Hahaba Park Circle, Suite 200
> Birmingham, Alabama  35242

> *REPRESENTING THE PLAINTIFFS*

> *DAVID LEE, ESQUIRE*
> *MILES GRESHAM, JR., ESQUIRE*
> Parsons Lee & Juliano
> 2801 Highway 280 South, 300 Protective Center
> Birmingham, Alabama  35223

> *REPRESENTING THE DEFENDANT*

*ALSO PRESENT*:  LJ Smith

Taken at the instance of the Plaintiffs
In the Offices of Sharron Allen & Associates
105 Office Park Drive
Brandon, Mississippi  39042
On May 9, 2008, at 12:30 p.m.

*REPORTED BY:   ABBY JULIAN, CSR, RPR*
*CSR NO. 1706*





(601) 825-6339    Fax (601) 825-1
P. O. Box 1731, Jackson, MS 3921
www.sharronallen.com

PLAINTIFF'S
EXHIBIT
7

1  all the welds are the same profile?

2      A.  Yes.  There -- when I say that, I'm saying in

3  reference to a specific standard.

4      Q.  What is that standard?

5      A.  These are structural welds, so the closest

6  applicable standard would be AWSD 1.1 Structural

7  Welding Code for carbon steel.

8      Q.  Would you indulge me and just show me, show

9  me what you mean on this section of the ladder by the

10  uniform welds, Mr. Sisk?  Are you saying that this weld

11  is uniform?

12      A.  If you look at the weld profile, the weld has

13  an equal leg length.  It doesn't have more of weld

14  metal on this member than on this member.  It's smooth.

15  It has a relatively straight profile on this Phillip

16  weld.  This is a modified Phillip weld, and it has a

17  relatively good profile also.  When you look at this

18  weld on this single section of ladder here, we're

19  looking at eight welds total.  Each weld wraps around a

20  3/4-inch tube.

21      Q.  So is it fairly commonplace to have this type

22  of modified weld on this part of the ladder?

23      A.  Yes, because of the juncture of the 3/4-inch

24  tube with the 1-inch tube.

25      Q.  There's no visible discontinuities with that?

1      A.  Not that would be excess of what the code

2  would require, I don't believe.

3      Q.  Okay.  As to your second conclusion that

4  there were no visible defects in the original materials

5  of manufacture, tell me what kind of defects you were

6  looking for.

7      A.  Was the metal twisted or straight.  Were

8  there dings and dents in it.  Was it of uniform shape.

9      Q.  Are there defects that could be nonvisible?

10      A.  Certainly.

11      Q.  How did you check for those?

12      A.  I didn't.

13      Q.  Okay.  As to your third conclusion that there

14  were no obvious flaws in the original design

15  configuration of the stand, what constitutes an obvious

16  flaw in design?

17      A.  (No audible response)

18      Q.  Probably a very broad question.  If you

19  could, give me a couple of examples that could

20  constitute a flaw in design.

21      A.  Spacing of the ladder rungs, spacing of the

22  ladder vertical braces, configuration of the foot

23  platform and the seat platform, attachment method to

24  the tree.

25      Q.  Is it possible that there could be an obvious

1  flaw in design, and yet the tree stand would still meet

2  the minimum industry standard?

3      A.  If it's an obvious flaw in design, it may or

4  may not meet the minimum industry standard.

5      Q.  So your answer is yes, that it's possible

6  there could be a tree stand with an obvious flaw in

7  design that would still meet the minimum industry

8  standard.

9      A.  Yes.

10      Q.  Did you x-ray these welds?

11      A.  No.

12      Q.  Is that commonplace to do to try to determine

13  whether or not there's adequate fusion in a weld?

14      A.  Not in this type of weld, no.

15      Q.  Okay.  In what type of weld would it be

16  commonplace to use an x-ray to determine fusion?

17      A.  Butt wells in pipe.

18      Q.  How is that different from this type of

19  welding?  And I just -- I don't know the answer.

20      A.  These are Phillip welds.

21      Q.  Okay.  Your fourth conclusion is that the

22  ladder side rail failure appears to be a plastic

23  buckling overload failure.  Well, we agree on that.

24      Would you explain your fifth conclusion, that

25  the ladder side rail failures are equilateral in

1  nature?

2      A.  They're both the same angle.  The failure

3  occurred on a plane --

4      Q.  Okay.

5      A.  -- perpendicular to the ladder rungs.

6      Q.  Can you identify the previous -- in

7  Conclusion No. 7, can you identify the previous partial

8  failure that you're referring to?

9      A.  Okay.  This is the primary failure that

10  occurred during the incident, and you can see some

11  deformation here around on the tube where there's

12  permanent plastic deformation (indicating).

13      Q.  So you see two failures, in essence.

14  Correct?

15      A.  This is --

16      Q.  In other words, it's bent twice.

17      A.  Yes.

18      Q.  Okay.  Your ninth conclusion is that the tree

19  stand seat platform was modified after manufacture by

20  the welded attachment of side rails and a shooting

21  rail.

22      Can you tell me if you think -- I'll combine

23  your ninth and tenth conclusion.  Tell me if you think

24  that modification contributed to the failure of the

25  tree stand.

1    A.    Repeat the question.

2    Q.    Your ninth and tenth conclusions are there

3 were modifications made to the platform of the tree

4 stand.

5    A.    Yes.

6    Q.    And I'm asking you if those modifications, in

7 your opinion, caused or contributed to the failure of

8 the tree stand.

9    A.    Yes, they could contribute to it.

10    Q.    Okay.  Tell me how.  Is it a question of load

11 dynamics?

12    A.    Yes.

13    Q.    Okay.  Tell me how the load dynamics are

14 adversely affected by modifications to the platform?

15    A.    The modifications change your access to the

16 foot and seat platform.

17    Q.    Okay.  Did you perform a stress analysis?

18    A.    No.

19    Q.    Tell me what you mean by high stress/low

20 cycle failure.  I've seen a graph before that indicates

21 the relationship between time and stress.  Is that what

22 you're referring to?

23    A.    No.

24    Q.    Okay.  Well, can you dumb it down for me and

25 explain what you mean in Conclusion 16?

1    A.    The failure occurred over more than one

2 cycle, but not over an extended period of cycles like a

3 fatigue failure.  Typically, a fatigue failure on a

4 shaft, for example, might go through hundreds of

5 thousands or millions of cycles as the shaft rotates

6 before it fails.

7    Q.    Okay.

8    A.    And the stress on the shaft might not be very

9 high.  But the repeated load over continued cycles

10 eventually leads to a failure.

11        In this case, the stress is high, but not

12 enough to cause complete failure on the initial

13 loading.  It took a few cycles for the complete failure

14 to occur.

15    Q.    Can you tell me -- can you give me an

16 estimate as to the length of those cycles?

17    A.    Length?

18    Q.    As in -- I know it's not measured in, you

19 know, days, but perhaps number of uses?

20    A.    Number of cycles?

21    Q.    Are you saying that it's -- because it's a

22 high stress/low cycle failure, it is a failure related

23 to fatigue or not?

24    A.    No.

25    Q.    Okay.  If there was expert testimony that the

1 specific mechanism of failure was fatigue in this case,

2 you would disagree with that?

3    A.    It depends on what type of fatigue failure

4 you refer to.

5    Q.    I'm asking you how do you reconcile your

6 tenth -- excuse me, your sixteenth conclusion by saying

7 it's high stress/low cycle with you saying that it

8 could still possibly be some type of fatigue failure?

9    A.    By definition, you can -- a fatigue failure

10 occurs over repeated cycles.  There's low cycle and

11 high stress and high cycle/low stress.

12        So in this case, you have high stresses.  The

13 failure occurred in a relatively few cycles.  It could

14 possibly be classified as fatigue, but the cycles are

15 so low that I would hesitate to actually call it a

16 fatigue failure.

17    Q.    Seventeen, it says -- states, "The

18 as-submitted configuration of the ladder suggests the

19 ladder brace was not in place at the time of the ladder

20 failure."  I read that accurately, didn't I?

21    A.    On 17?

22    Q.    Um-hum.  (Affirmative)

23    A.    Could you read that again?

24    Q.    "The as-submitted configuration of the ladder

25 suggests the ladder brace was not in place at the time

1 of the ladder failure."  Is that not --

2    A.    Yes, that's correct.

3    Q.    Okay.  Now, you testified that it looks like

4 there were two failures.  Correct?

5    A.    Yes.  There's indications of the ladder side

6 rails being bent or plastically deformed prior to this

7 failure.

8    Q.    Is it possible that the second bend came

9 after this failure?  Excuse me, that was a poor

10 question.  Strike that.

11        Is it possible that when the tree stand

12 failed, the X crimps were bent in one direction; and

13 then on disassembly of the tree stand, the X crimps

14 were bent back explaining the second failure?

15    A.    Repeat that question again.

16    Q.    There are two failures of this -- there are

17 two failures here.  Right?

18    A.    Yes.

19    Q.    Okay.  What I'm saying is:  Is it possible

20 the first failure occurred when the tree stand

21 initially failed, and the second failure occurred on

22 disassembly of the tree stand; and these were bent

23 again?

24    A.    That could have happened.  You're asking

25 whether it's possible that it happened --

**33**

```
1    Q.   Yes.
2    A.   -- before or after the failure?
3    Q.   Yes.  I'm asking you if it's possible --
4    A.   Yes, it's possible.
5    Q.   Okay.  The sum of your conclusions is in 19,
6  that the ladder failure can be directly related to
7  improper assembly, improper use, unauthorized
8  modifications, and lack of maintenance.
9         My question to you is:  How did the plaintiff
10 in this case, in your opinion, contribute to or cause
11 this accident?
12   A.   Well, the tree stand was poorly maintained
13 because there's considerable corrosion evident on the
14 stand.  There were -- doesn't appear to be any attempts
15 to even spot paint small areas of rust.
16        Unauthorized modifications:  Obviously, it
17 was welded on subsequent to shipping from the
18 manufacturer.  And improper use would be covered under
19 failure to follow the instructions that were supplied
20 to the stand -- with the stand.  Improper assembly
21 again relates to back to the modifications and how the
22 stand was used.
23   Q.   It's undisputed at this point that there were
24 some shooting rails made to the platform of the stand.
25 But assuming that the brace was in place, how do you
```

**34**

```
1  think this accident happened?
2    A.   If the brace was in place, the tube where it
3  attaches to the ladder rung failed.
4    Q.   Would you agree with me that if the brace was
5  in place, that weld failed?
6    A.   No.
7    Q.   Why not?
8    A.   The weld was still intact.
9    Q.   Isn't the metal around the weld part of the
10 weld itself?
11   A.   No.
12   Q.   Okay.  Can you make that distinction for me?
13   A.   You have weld metal which is added during the
14 welding process; that's considered the weld.  There's a
15 distinct line, if you look at a photo micrograph that's
16 had been etched under light microscopy, called a fusion
17 line; and that's the juncture between base metal and
18 weld.
19   Q.   Did you look at the fusion line on this
20 brace?
21   A.   I visually examined both ends of the brace.
22   Q.   You didn't perform any tests on the actual
23 brace?
24   A.   I was only asked to perform a visual
25 examination and prepare a report.
```

**35**

```
1    Q.   So you didn't perform any load tests on this
2  tree stand.
3    A.   This particular tree stand, no.
4    Q.   Have you done a load test on the StrongBuilt
5  basic 15-foot ladder stand?
6    A.   Yes.
7    Q.   To your knowledge, are the StrongBuilt basic
8  15-foot ladder stands still designed the same way as
9  this tree stand?
10   A.   To the best of my knowledge, I would have to
11 answer yes.
12   Q.   In your opinion, would it be -- in your
13 opinion, would it be safer if StrongBuilt used
14 stainless or galvanized steel for at least the -- for
15 at least the brace on the tree stand?
16        MR. LEE:  Objection to form.  I'm
17     objecting.  You can answer.
18        THE WITNESS:  I can answer?
19        MR. LEE:  Yes.
20   A.   No, not necessarily.
21 BY MR. HASSINGER:
22   Q.   Okay.  Stainless steel doesn't rust.
23 Correct?
24   A.   Stainless steel does corrode.
25   Q.   If you have regular average garden variety
```

**36**

```
1  steel and stainless steel, which would corrode faster?
2    A.   It depends on the conditions.
3    Q.   Okay.  Let's use the climate of the
4  Southeast.
5    A.   Again, it would depend on the conditions.
6    Q.   Is your testimony that stainless or
7  galvanized steel does not -- corrodes just as fast as
8  regular steel?
9    A.   No.
10   Q.   Which one corrodes faster?
11   A.   It depends on the specific conditions of the
12 two or three pieces you're talking about.
13   Q.   Let's say that you have a piece of garden
14 variety steel and a piece of stainless or galvanized
15 steel that are in the exact same conditions.  It's July
16 in Mississippi, Louisiana, or Alabama; and it's out in
17 the woods.  Which one is going to corrode faster?
18   A.   Again, I can't answer that.  Is the carbon
19 steel painted or is it bare steel?
20        MR. LEE:  Well, let me ask you this
21     question.  This is the second time you've been
22     asking questions about stainless steel, and I
23     don't remember your expert ever suggesting
24     anything about the use of stainless steel.  I'm
25     just wondering why we're going down this road.
```

37

1         MR. HASSINGER:  I'll move off it.
2         MR. LEE:  I'm not telling you to move off
3     of it.  I'm just -- this just sounds like
4     something new that's coming up.
5         MR. HASSINGER:  No, it's not something
6     new.  I don't remember Raymond...
7         MR. LEE:  I don't remember seeing that in
8     his report, nor do I remember him talking about
9     stainless steel in ever how long we took his
10    deposition.
11        MR. HASSINGER:  He didn't.  I just -- I
12    wanted to get an opinion from your expert on how
13    safety of a tree stand will --
14        MR. LEE:  If you're fishing, that's fine.
15    Say you're fishing and go ahead and ask.  That's
16    what it sounds like to me, you're fishing.
17 BY MR. HASSINGER:
18    Q.    Other than spots of surface rust, do you see
19 -- what do you see that evidences the plaintiff not
20 maintaining this tree stand adequately?
21    A.    Well, he didn't -- well, that's obvious that
22 it wasn't maintained very well because of the extent of
23 the corrosion over the entire stand.
24    Q.    Just so -- in other words, just your visual
25 evaluation of it just tells you that.

38

1    A.    I was asked to do a visual evaluation.
2 That's all.
3    Q.    All right.
4         MR. HASSINGER:  Give me about two minutes,
5     and I'll wrap it up.  Okay.
6              (OFF THE RECORD)
7 BY MR. HASSINGER:
8    Q.    You said that you visually inspected the
9 stand, and I just wanted to clarify this.
10        Did you do any testing to arrive at these
11 conclusions that you submitted in your expert report?
12    A.    No physical testing, no.
13    Q.    Any calculations to arrive at your
14 conclusions about load dynamics or type of --
15    A.    I did a few basic calculations.
16    Q.    What kinds of calculations?
17    A.    I believe just to verify the calculations by
18 your expert witness.
19    Q.    So you just checked our expert witness's
20 math, essentially?
21    A.    Well, a little more than just check the math.
22    Q.    Made sure they were accurate formulas as well
23 as making sure all the numbers worked out.
24    A.    Yeah.
25    Q.    You're a certified welding inspector.  Are

39

1 you a licensed professional engineer?
2    A.    No.
3    Q.    What welding process was used in the brace in
4 the arm of the subject tree stand?  Can you tell me?
5 Is it like something MIG or TIG or something like that?
6    A.    The welds appear to be GMAW welds.
7    Q.    Okay.  What filling metal was used to fuse
8 those welds?
9    A.    From visual examination, the only
10 determination you can make is that they are carbon
11 steel.
12    Q.    What form does that carbon steel metal filler
13 take when they actually -- when fusion is attempted?
14 Is it -- in other words, what -- well, in what form is
15 that carbon steel?  Is it like some sort of fine powder
16 or wiring or...
17    A.    The fill metal is a wire.
18    Q.    Are there any opinions that you plan to give
19 at the trial of this matter that you haven't disclosed
20 during this deposition?
21    A.    Only if I'm asked.
22    Q.    I'm asking you if you're going to give any
23 other testimony at trial different than what you've
24 said today.
25    A.    No.

40

1    Q.    Okay.  And all the opinions that you plan to
2 give at the trial of this matter will be included in
3 the transcript of this deposition.  Correct?
4         MR. LEE:  And his report.
5 BY MR. HASSINGER:
6    Q.    And your report?
7    A.    And the report.
8         MR. HASSINGER:  That's all I have.
9              (OFF THE RECORD)
10        MR. HASSINGER:  For the record, at the
11    conclusion of this deposition, we'll mark in as
12    exhibits the items that Mr. Sisk has provided in
13    his request for production issued with the
14    deposition notice.
15        MR. LEE:  Let me say this:  Some of this
16    stuff may not be necessary to copy.  Like, for
17    example, he's got deposition transcripts that I
18    sent him.  Seems like that's overkill.
19        MR. HASSINGER:  Absolutely.  I have no
20    problem with that.
21        MR. LEE:  His report, his rÉsumÉ.  If you
22    want a copy of his welding certificates and so
23    forth.
24        MR. HASSINGER:  I would like to get those
25    in.

FREEDOM COURT REPORTING

1

1        IN THE UNITED STATES DISTRICT COURT

2           MIDDLE DISTRICT OF ALABAMA

3                NORTHERN DIVISION

4

5    CIVIL ACTION NUMBER:

6    2:07-CV-128-ID

7                                   COPY

8    LARRY STEPHENS, et al.,

9           Plaintiff,

10   vs.

11   STRONGBUILT, INC.,

12          Defendant.

13

14

15          DEPOSITION TESTIMONY OF:

16       RAYMOND G. THOMPSON, Ph.D., P.E.

17

18   April 17, 2008

19   10:00 a.m.

20

21

22   COURT REPORTER:

23   Susan A. McLane, CCR


PLAINTIFF'S
EXHIBIT
8

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-87

161

1    you would expect some buckling or

2    collapsing as we've seen here?

3         A.    If the horizontal brace arm is

4    not in place, then it's susceptible to

5    collapsing like we see, yes.

6         Q.    And if the horizontal brace was

7    being used at the time of the accident, it

8    is your opinion that the horizontal brace

9    failed due to plastic deformity as a result

10   of repeated bending?

11        A.    That's correct.

12        Q.    Have we covered all your

13   opinions?

14        A.    I believe so.

15        Q.    You haven't compared this stand

16   to stands manufactured by other

17   manufacturers, have you?

18        A.    No, I haven't.

19        Q.    You haven't done any comparisons

20   for purposes of coming up with any

21   alternative designs or anything like that,

22   have you?

23        A.    No comparisons, no.

165

1                    2:38 p.m.

2    EXAMINATION BY MR. WEAVER:

3         Q.    Dr. Thompson, I just have a few

4    questions because I want to make sure Mr.

5    Lee has gotten all of your opinions before

6    we leave out of here today.  You spoke

7    earlier about from an engineering design

8    standpoint, that is something you consider

9    yourself an expert in?

10        A.    Yes.

11        Q.    And you said that when you're

12   working with your students or a design team

13   of some nature that you try to think about

14   how the product is going to be used,

15   correct?

16        A.    Correct.

17        Q.    And are you talking about in

18   terms of -- do you mean foreseeability,

19   foreseeing the way that the product is

20   going to be used --

21        A.    Correct.

22        Q.    -- by the user?

23        A.    Yes.

166

1    Q.   And we've talked a lot, you and

2    I, you and Mr. Lee, about the way this

3    bracket is designed and the way that the

4    brace attaches to the bracket.  And in your

5    engineering opinion, it's foreseeable that

6    there's going to be bend and flex there in

7    the course of using this stand?

8    A.   That's correct, by the way it's

9    designed.  Because it takes relatively low

10   loads to cause the plastic deformation with

11   that long lever arm on it, you're going to

12   run into many situations, I would think,

13   where that load could be applied, whether

14   you're leaning on it or carrying it or

15   moving it around.  It's very foreseeable

16   with that long lever arm that you're going

17   to have large stresses at the end of it.

18   Q.   And I believe you also testified

19   that in the normal course of climbing this

20   stand when it's attached to the tree as

21   it's supposed to be, it's going to have

22   load as you climb it?

23   A.   That's correct.  The flex -- I

FREEDOM COURT REPORTING

169

1    bracket design.

2        Q.    Mr. Lee also asked you some

3    questions about alternative designs.  And I

4    heard the way he asked the question and

5    your answer was appropriate.  But, for

6    instance, with regard to the X crimps,

7    there is another way to do that, to make

8    these ladders come together?

9        A.    That's right.  This is the first

10   X crimp I've seen like this.  The other

11   ladders that I have seen have square tubes

12   that go inside of the larger tube.  And

13   those are welded or fastened in some way,

14   the ones I've seen have been welded in

15   place so that you have a square tube on a

16   square tube and you don't lose the

17   stiffness.  It's the moment of inertia that

18   changes when it comes together.

19       Q.    So you're talking about at the

20   point of the crimp, you simply step down to

21   a smaller tube?

22       A.    That's correct.

23       Q.    And I think you may have just

170

1    answered my next question.  I was going to

2    ask you why that is stronger than a crimped

3    design?

4         A.    It's the moment inertia that you

5    lose when you crimp these into that X

6    shape.  It's much larger when you have the

7    regular tube shape.

8         Q.    Would you agree, based on your

9    analysis of this stand, that the point

10   where the horizontal brace attaches to the

11   bracket or right along is the weakest part

12   of the stand from a structural standpoint?

13        A.    From a design standpoint, yes.

14   Because as we discussed, if you lose the

15   arm, then the ladder is not stable in

16   bending.  So the arm is critical to be

17   there and the weakness point on the arm is

18   the bracket attachment so that becomes the

19   weakest point on the ladder.

20        Q.    I think we've already

21   established that without the horizontal

22   brace in place, you would expect the

23   failure of the crimp at the beginning of

172

1    A.    I take it to have meant that if

2    you've got the weight of a person up on the

3    ladder and you pulled the brace out, then

4    it immediately becomes unstable.

5        Q.    And there are also -- from an

6    engineering design standpoint, there are

7    other ways to attach a horizontal brace to

8    the ladder?

9        A.    That's correct.

10       Q.    And have you contemplated any of

11   those?

12       A.    Well, two things come

13   immediately to mind.  One is that you

14   significantly increase the strength by

15   using larger square tubing.  Square tubing

16   is directly related to the strength and how

17   you attach it, what kind of brace

18   attachment you use.  Also if you have a

19   hinge attachment, the hinge would allow it

20   to fold down without the loading associated

21   with not taking it down or moving it with

22   the brace attached to it.

23       Q.    So if I understand your

174

1      Q.    And going a step further, the

2   weakest point in the ladder is the very

3   point at which failure is going to be

4   catastrophic?

5      A.    Right, failure there causes

6   instability.

7      Q.    And collapse?

8      A.    Collapse.

9      Q.    You said earlier that you did

10  some comparisons on step-down tubular steel

11  versus the crimps from a strength

12  standpoint.  And you said it was a factor

13  of two.  Can you put that in layman's

14  terms?

15     A.    The difference between using

16  square tubing and the crimp tubing comes in

17  what in mechanics is called the second

18  moment of the area or the moment of

19  inertia.  So that when you crimp that tube,

20  you lose the moment of inertia that you

21  have in the square tubing.  And it's

22  basically a factor of decrease in the

23  strength of the tube.  If you keep it all

175

1    square tubing, appropriately sized, then

2    your stability is quite a bit larger.

3        Q.    The changes to the platform that

4    we spent a lot of time talking about, in

5    your opinion, those don't have anything to

6    do with this accident, do they?

7        A.    Not from my analysis, they have

8    nothing to do with the accident.

9            MR. WEAVER:    That's all I've

10   got.

11

12   FURTHER EXAMINATION BY MR. LEE:

13       Q.    Assume all those questions and

14   answers that you gave to Rusty, this stand,

15   according to your testimony, would still

16   meet the applicable standards that apply

17   today, the ASTM standards that you've told

18   me about earlier?

19       A.    With the brace in place, yes.

20       Q.    And what does this brace weigh?

21       A.    3.9 pounds -- I'm sorry, 2.9.

22       Q.    2.9 pounds.  You told me it took

23   13 pounds of pressure static load?

187

1  standpoint, I'm pretty sure it does not

2  violate that.  Because they weren't -- they

3  didn't have a certified welder.

4      Q.   Well, you can't say that this

5  accident would not have occurred had a

6  certified welder done this weld, are you?

7  You can't say that, that calls for

8  speculation, doesn't it?

9      A.   Well, I think the failure is due

10 to poor design more than it is than not

11 having a certified welder if that answers

12 your question.

13     Q.   And poor design in what

14 perspective?

15     A.   Poor design in respect to the

16 amount of load it takes to deform the tube

17 at the weld relative to the type of device

18 that it is, long lever arm on the end of a

19 welding tube.

20     Q.   And amount of force is 13

21 pounds?

22     A.   That's correct.

23     Q.   To begin deformity?

192

1   welding standards other than that apply to

2   things other than shape?

3         A.    There's the design of the joint,

4   there's the filler metal to use.  There is

5   the allowable stresses for a given joint

6   design, filler metal process combination.

7   There's the standard forms for welding

8   procedure.  There's the methodology for

9   qualifying welds, qualifying welders

10  certifying welders.

11        Q.    The list goes on and on?

12        A.    It's -- it gets a little bit

13  longer every time it comes out.

14        Q.    So when I leave here, am I to

15  understand that your only criticism of the

16  weld -- I'm talking about factory welds, I

17  know you're real critical of these homemade

18  welds, I'm talking about the factory welds.

19  Your only criticism is as to shape, that's

20  what you've told me today?

21        A.    Yeah.  The shape of the welds go

22  to the procedure.  Don't make a bad shape

23  unless you have a bad procedure.  So the

193

1    welding shape is indicative of the lack of

2    welding procedure.

3         Q.    But in terms of the actual weld

4    itself, your criticism is of the shape?

5         A.    Criticizing the shape, yes.

6         Q.    That's all.

7              MR. WEAVER:  Do you want to read

8    and sign or waive it?

9              THE WITNESS:  I'd like to read

10   and sign.

11

12                    3:10 p.m.

13         FURTHER THE DEPONENT SAITH NOT

14

15

16

17

18

19

20

21

22

23

Engineering simple solutions®

# Stephens v. Strong Built

Prepared For:
Dennis (Rusty) Weaver
Weaver and Tidmore
200 Cahaba Park Circle
Suite 214
Birmingham, AL 35242

Prepared By:
Raymond Thompson, PhD, PE
Vista Engineering and Consulting LLC
1500 1st Ave. N. B117
Birmingham, Al 35203

Table of Contents
**Summary** ........................................................................................................................ 1
**Depositions Read** ........................................................................................................... 1
**Visual Examination and Analysis** ................................................................................ 2
**Opinions** ......................................................................................................................... 9
**Signature & seal** ........................................................................................................... 9
**Qualifications** ............................................................................................................... 10

## Summary

On January 4, 2007 I examined a tree stand in the offices of Weaver and Tidmore. The tree stand had suffered a bending failure of the connection between the second and third ladder sections. It had also suffered a failure of the weld connecting the lower tree brace to the ladder.

## Depositions Read

Deposition of Larry Stephens taken Nov. 29, 2007
Deposition of David Stephens taken Nov. 29, 2007
Deposition of Matt Stephens taken Nov. 29, 2007


DEFENDANT'S EXHIBIT
4  Thompson

PLAINTIFF'S EXHIBIT
9

VAS ENGINEERING
Engineering simple solutions®

## Visual Examination and Analysis

The tree stand that was examined is shown in part in picture 1. These are the ladder sections of the tree stand and consist of three sections and a brace. The sections were approximately 62 inches in length. They had 4 rungs or steps which were approximately 15 inches apart. One rung had a bracket attached to it that had at one time been the attachment point for the lower brace.



Picture 1. Ladder section components examined.

The construction of the ladder sections was from 1 inch square tube as shown in picture 2. The female end was the normal opened square tube end.



Picture 2. Female end condition on ladder section side rails.

The male end of the tube is shown in picture 3. It was formed by crushing the square box into an X shaped geometry that could be slide into the square opening of the female end.

Engineering simple solutions®



Picture 3. Male end condition on ladder section side rails.

The rating for the tree stand was found on a label attached to the stand as shown in picture 4. The rating was 300 pounds.



Picture 4. Load limit label found on tree stand.

VISTA ENGINEERING

*Engineering simple solutions®*

The construction of the rungs to the side rails of the ladder was by welding. The welding was of poor quality as seen in picture 5 on a weld from the top perch of the stand.



Picture 5. Extreme example of defective welding construction found on tree stand.

The bending failure of the stand occurred between the second and third section of the ladder as seen in picture 6.

VISTA ENGINEERING
Engineering simple solutions



Picture 6. Picture provided by Mr. Weaver depicting tree stand after accident.

The bending failure occurred at the point on the ladder rail where the square tubing is crushed down into the X geometry as shown in picture 7. This is the weakest point on the rail due to the reduced stiffness of the X shape compared to the square tube. This weakness is a critical point of concern in the design of the ladder sections found on the Strong Built tree stand. Further study will reveal if this design is capable of supporting a 300 pound dynamic load in the normal tree stand service environment.

VISTA ENGINEERING
Engineering simple solutions®



Picture 7. Bending failure point on side rail of ladder. Male end condition on ladder section side rails is an X geometry that has a suspect stiffness compared to the rated load of the tree stand.

VISTA ENGINEERING

Engineering simple solutions

The brace was constructed of a 1 inch square tube with a ¾ inch square tube extention. The tubes were fixed with a bolt to establish the full length of the brace as shown in picture 8. The brace measured approximately 52 inches.



Picture 8. Fixed connection that defines the length of the brace.

The brace was connected to the ladder at the rung. The connection was made by attaching a bracket around the rung and securing it with a bolt. The bracket was welded to the end of the ¾ inch square tube. The end of the ¾ inch tube that was welded to the bracket is shown in picture 9.



Picture 9. Failed weld on small tube section of brace.

The bracket, attached to the ladder rung with the other end of the broken weld is seen in picture 10. The weld has broken at the point where the weld metal meets the tube. The failure produced a chiseled look as seen in picture 11.



Picture 10. Failed weld on bracket that attaches brace to ladder at rung.



Picture 11. View showing sharp chiseled edge of broken weld metal.

The chiseled edge is indicative of a low strength ductile shear fracture and/or an undercut weld that reduced the cross-section of the tubing. Picture 12 shows a weld from one of the ladder rungs. The right side of the side rail tube is undercut at the top edge of the weld metal. The weld on the rung is beaded over causing a stress concentration and possible undercutting.

The poor welding procedures found on the tree stand and the characteristics of the broken weld on the brace show that the brace most probably failed at a strength well below its intended and potential level.

VISTA ENGINEERING

Engineering simple solutions°



Picture 12. Example of defective weld on ladder rung that under cuts the metal and has poor weld shape.

## Opinions

Based on testimony read in the depositions of Larry Stephens, Matt Stephens and David Stephens and the visual examination of the above described tree stand, it is my opinion that:

The tree stand examined in the office of Mr. Weaver failed due to the breakage of the lower brace that acts to prevent the inward deflection of the ladder. The failure of the lower brace, coupled with the questionable design of the X geometry of the male connection on the side rail caused the ladder to bend and buckle well below its designed load limit of 300 pounds.

Failure of the brace was facilitated by defective welds between the brace and its bracket that attaches to the ladder rung. Evidence for the defective weld was found in the shape of the broken welds on the brace and defective welds at other locations on the tree stand.

## Signature & seal



## Qualifications

Relevant Experience of Dr. Thompson

Dr. Thompson is qualified by education in engineering design, engineering mechanics, failure analysis, materials specifications, materials analysis and materials testing. He received a BSE in engineering in 1974 and a MSE in materials engineering in 1975 from the University of Alabama in Birmingham. He received a Ph.D. in materials science and engineering from Vanderbilt University in 1979.

Dr. Thompson is a registered engineer in Alabama, Arkansas and South Carolina and is a Fellow and a member in good standing with the American Society of Materials and the American Welding Society.

Dr. Thompson taught in the Ceramics Engineering Department at Clemson University from 1978 – 1981 and taught at UAB in the Department of Materials Engineering from 1981 – 2002. While in these positions he taught undergraduate and graduate level courses in engineering design, fracture mechanics, strength of materials, materials testing, and manufacturing practice. He also conducts award winning research in metal science and metal processing and has led various national and international committees in these areas.

In Dr. Thompson's private professional practice, he has acted as a consultant for industry in the selection and use of metals, the fabrication of products and the processing of materials. Dr. Thompson continues to be active in research through contracts with the Department of Defense and the National Science Foundation. He participates in national committees in engineering and reviews articles for technical publications in science and engineering. He has also served both plaintiff and defense lawyers as an expert in matters of engineering design, failure analysis and manufacturing methods.

**Vista Engineering reserves the right to make addendums and changes to these findings and opinions based on new information and further investigation.**

Bending loads on brace-arm weld at 3/4" tube



3/4" tube, wall thickness (t) = 0.048 inch

brace-arm wght = 2.9 lb

**\*** Stress in bending at 3/4" tube – weld to ladder rung strap

$$\sigma = \frac{mc}{I}$$

$\sigma_{bend}$

51 1/2" |weld

tree bracket

↓ wght

$$\sigma_{bend} = \frac{Mc}{I}$$

$M = 51 \tfrac{1}{2}" \times wght ($

$I = \frac{1}{3} t a^3$

$c = \frac{1}{2} a$

$$= \frac{51.5 \text{ in} \times wght (lb) \times 0.375 \text{ in}}{\frac{1}{3} \times 0.048 \text{ in} \times (\cancel{0.375}\, 0.750)^3 \text{ in}^3}$$

$$= \frac{19.3 \times wght}{0.00675} = \frac{2861}{\cancel{2838}} \times wght \ (psi)$$

PLAINTIFF'S EXHIBIT 10

Wght on end of brace-arm needed
to fail    3/4" tube at weld

assume A36 steel ; yield strength = 36,000ps

$\sigma_{bend}$ at fail = 3/4" pipe yield = 36,000 psi

$\sigma_{bend}$ = 36,000 psi = $\dfrac{MC}{I}$ = wght$^{(fail)}_{(end)}$ x 2861

wght$_{(fail)}$ = $\dfrac{36,000\ psi}{2861\ (1/in^2)}$ = 12.6 lbf

(note: not including wght of brace-arm)

Note: failure defined here as stress exceeding
the permanent deformation (plastic flow)
strength of the 3/4" tube





Nylon strap and ratchet appear to be
functional on top of tree stand

☆ Support welded on two sides, both
weld connections tear through 3/4" tube
wall thickness @ tear is 0.043"

☆ Wall thickness on opposite walls of tears
is 0.058"



58 mil wall → 43 mil wall
weld / weld

☆ generally poor construction
welds are poor quality

☆ reconstructed ladder assembly from
bending connections and direction of
support strap on ladder step

☆ rusting may be problem at weld
? galvanized or not welding removes galvanizing

RGT loading analysis                                                    1





$$\angle = 90 - \tan^{-1}\left(\frac{20}{126}\right) = 81°$$

Assume

* Top platform wgh = 50 lb
* load = 300 lbs applied to ladder at 156" from ground (at step 11, 2 steps from platform)
* load is distributed equally on each leg/rail of ladder: 150 lb per leg
* brace is not attached to ladder



Possible failure modes

(1) bending stress due to transverse loads

$$\sigma = \frac{M C}{I}$$

Possible failure Mode

2

(2) buckling by compressive load



24.7 lb

148.2 lb

156"

194"

Top

ground

$$P_{cr} = \frac{C \cdot \pi^2 E I}{\ell^2}$$

(allowable load)

assume for approximation



148.2 lb     156"     ground

11th step

Calculate "I" second moment of area



square tube

$$I \approx \frac{1}{3} t a^3$$

$$I \approx \frac{bh^3}{12} \approx \frac{4 a t \, a^2}{12} \approx \frac{1}{3} t a^3$$

Note: $I \sim 0.4 \, t a^3$
Standard Tables
Tube Assoc.

2t

collapsed tube

$$I \approx \frac{1}{6} t a^3$$

$$I = \frac{bh^3}{12} \quad b \approx 2t \quad h \approx a \quad I \approx \frac{2t \, a^3}{12} \sim \frac{1}{6} t a^3$$

Note: $I_{\square} \approx \frac{6}{3} I_{X} \approx 2 \, I_{X}$

✱ thus square tube at least twice as strong
in bending and buckling than tube crimped
into X shape

3

# (1) Bending Stress

ground

$\sin(9°) = \frac{X}{150}$, $X = 23.5$

$\sin(9°) = \frac{X}{50/2}$, $X = 3.9$



Top 3.9 lb    23.5 lb

38"    156"

194"

3.9 lb    23.5 lb

$R_B = (38/194) \times 23.5 = 4.6\,lb$

$R_A = (23.5 - 4.6) + 3.9 = 22.8\,lb$

V    18.9    38    156    4.6

M    -718.0

$M_{max} = 718\ lb_f\text{-}in$

with square tube □    $\sigma_{max} = \dfrac{718\ lbs\text{-}in \times \frac{1}{2}\ in}{\frac{1}{3} \times 0.06 \times (1.0)^3\ in^4} = 17,940\ psi$

with collapsed tube    $\sigma_{max} = \dfrac{718 \times \frac{1}{2}}{\frac{1}{6} \times 0.06 \times (1.0)^3} = 35,880\ psi$

yield strength of A36 steel is 36,000 psi

4

(2) buckling failure

simplify section
() ignor ladder section above 11th step

148.2 lb ⟶ ○──────── 156" ────────○

11th step                          ground

$$\cos(9°) = \frac{X}{150}$$

$$X = 148.15 \text{ lb}$$

for square tube □

$$P_{cr} = \frac{1 \times \pi^2 \times 30 \times 10^6 \times \frac{1}{3} \times 0.06 \times (1.0)^3}{(156)^2} = 243 \text{ lb}$$

$$243 \text{ lb} > 148 \text{ lb} \rightarrow \text{stable}$$

for collapsed tube ▨

$$P_{cr} = \frac{1 \times \pi^2 \times 30 \times 10^6 \times \frac{1}{6} \times 0.06 \times (1.0)^3}{156^2}$$

$$= 121.5 \text{ lb}$$

$$121.5 \text{ lb} < 148 \text{ lb} \longrightarrow \text{unstable}$$

Note: assume constant cross-section with both ends pivoted; (C = 1)

**V Vista Engineering** is dedicated to excellence in materials research & testing and engineering services. Our services include:

Industrial Services

- Failure Analysis
- Metallurgy
- Engineering Design
- Welding/Brazing
- Product Design
- Material Testing
- Advanced Photography/Imaging
- Expert Opinions & Testimony
- Computer Modeling/Simulation

Our goal is to provide clients with timely, cost effective solutions and expert opinions. Quality of work and client satisfaction are paramount. We provide these things by understanding your needs and providing services with uncompromising professional ethics and integrity. From heavy industry to attorneys, Vista serves a wide range of clients. Contact us to discuss your materials and manufacturing testing and research needs at (205) 307-5810.

**Engineering simple scientific solutions.**



VISTA ENGINEERING

1500 first avenue no. ste. b117
birmingham, alabama 35203 | Engineering simple solutions©



VISTA ENGINEERING
Engineering simple solutions©

**V Industrial Strength Solutions**
To Solve Your Toughest
Manufacturing and Materials
Engineering Problems.

**CASE STUDY** | NO. 47 | VISTA ENG.
*analysis:* INDUSTRIAL PRODUCT FAILURE




PROBLEM: Industrial Product Failure
The machined threads and dynamic loading lead to serious fatigue failure of the eyebolt.

Damaged Sample Eyebolt        Stress Cracks

SOLUTION: New eyebolt specification requiring heat-treated steel with resistance to dynamic loads.

**CASE STUDY** | NO. 05 | VISTA ENG.
*analysis:* PRODUCT SPOT WELD FAILURE






PROBLEM: Product Spot Welding Failure
Intergranular cracks caused by welding procedure was the basis of failure in a product assembly in this successfully diagnosed case.

SOLUTION: Revised product weld and process to reduce heat input to prevent cracking.

---

worked in both academic and industrial settings. He has extensive research experience and solved many applied manufacturing problems.

***Resources*** Vista's onsite metallurgical laboratory has the capabilities to meet a wide range of material analysis and testing needs. In addition, we have formed strategic partnerships with various national and international labs, providing access to an array of unique instruments and equipment. This allows Vista to provide solutions to almost any material related problem.

## PAST SUCCESSES

***Clients*** Vista has worked with an impressive array of clients, including government agencies, major corporations, industry, manufacturing, and legal firms. Our client base includes:

Manufacturing conglomerates

Oil Refineries

Regional utility companies

Defense sector corporations

Small businesses

Insurance companies

Patent Law firms

Attorneys

Steel producers

Wire producers

Cutting tool manufacturers

National Science Foundation

---



*The **Vista Engineering** staff of engineers is dedicated to providing practical solutions to your materials related problems. Let us make your difficult material and processing challenges simple. We provide you accurate and timely answers to your complex questions.*

## WE PROVIDE SIMPLE SOLUTIONS

The Vista team is experienced in gathering critical information required to solve challenging technical problems. Once compiled, our engineers scrutinize the critical data to provide you the root cause of problems from failure analysis to materials processing. We strive to provide our customers with the most practical and cost effective solutions to their materials problems based on sound scientific principles.

## HOW WE SOLVE PROBLEMS

***Professional People*** Vista's staff of Ph.D., Master level engineers, and support personnel is headed by Dr. Raymond Thompson. With 30 years of metallurgical experience, Dr. Thompson has

**V** Vista Engineering stands for excellence in materials research, testing and analysis for law firms requiring expert legal opinions, research or testimony.

Litigation Services

PRODUCT

| | Advanced Photography/Imaging | Computer Modeling/Simulation | Materials Properties Testing | Welding/Brazing | Failure Analysis | Metallurgy |
|---|---|---|---|---|---|---|
| ● | | | | | | |
| ● | | | | | | |
| ● | | | | | | |
| ● | | | | ● | | |
| ● | | | ● | | | |
| ● | | ● | | | | |
| ● | ● | | | | | |

Complicated technical cases may require participation of several science and engineering disciplines. Experts in chemistry, civil engineering, metallurgy, and biomedical engineering may contribute to a single case. We have a range of experience and extensive contracts with leading public and private technical institutions. With these resources, Vista can assist you in determining the best technical approach for your case and in assembling the optimum technical team. Call us!

VISTA ENGINEERING

1500 first avenue no. ste. b117
birmingham, alabama 35203 | Engineering simple solutions©



VISTA ENGINEERING
Engineering simple solutions.©

**V** Vista Engineering Can
Make The Case With
Simple Scientific Solutions
In Legal Matters.

## SMALL DETAILS ARE OFTEN CRITICAL IN SOLVING BIG INVESTIGATIONS

**CASE STUDY** | NO. 97 | VISTA ENG.
*analysis:* FAILURE ANALYSIS TESTING



PROBLEM: Failure Analysis Testing of Product. SEM photos of metal fracture surfaces.

- Bad Metal:
  intergranular failure
  caused by impurities
  or poor processing

Good Metal →
Note the true
granular cleavage
fracture

SOLUTION: Determining the product's integrity and root cause of failure by analysis and testing.

**CASE STUDY** | NO. 901 | VISTA ENG.
*analysis:* DESIGN/MANUFACTURING ERROR



Ambulance



SUV

PROBLEM: Design/Manufacturing Error. Determining crash worthiness in vehicle manufacturing and design litigation.

- Roof design/
  workmanship
  reduced crash
  worthiness of
  ambulance

- Bad design/
  weak doors
  SUV structural
  components

SOLUTION: Early discovery and identification of the evidence in litigation to serve the best interests of both parties.

---

### ENGINEERING SIMPLE SOLUTIONS

The Vista Engineering team is experienced in gathering critical information to solve challenging technical problems. Our engineers scrutinize critical data to provide the root cause of problems from failure analysis to material processing. We strive to provide our clients with expert opinions based on sound scientific principles.

### HOW WE SOLVE PROBLEMS

**Experienced Professional People:** Our staff of engineers and support personnel is headed by Dr. Raymond Thompson, PE, with 30+ years of engineering and expert witness experience. He has served both plaintiff and defense lawyers in Alabama, Georgia, South Carolina, Mississippi, Louisiana, Arkansas, Texas, Florida, Kentucky, Missouri, Tennessee and North Dakota.

Dr. Thompson is assisted by a team of qualified engineers with more than 70 years combined experience.

**Resources:** Vista's on-site metallurgical laboratory has the ability to meet a wide range of material analysis and testing needs using the latest advanced





instruments such as a variable pressure scanning electron microscope. Additionally, strategic partnerships with national and international labs give access to unique instruments and equipment. This allows us to provide solutions to most materials related problems.

### SUCCESSFUL PARTNERSHIPS

**Clients:** Our client base includes: • The National Science Foundation • Regional utility companies • Defense sector corporations • Manufacturing conglomerates • Small businesses • Insurance companies • Universities • Cutting tool manufacturers • Patent law firms • Litigation firms • Steel producers • Wire producers

### OUR LITIGATION SERVICES

When it comes to using laws to make a case, we rely on those that stand up in the lab. Our unbiased hard evidence enables you to test the soundness of your theories and discover the strengths of your case.

**Product Liability:** Expert opinions and testimony on Design, Materials, Manufacturing, Processes, Failure Analysis, Forensic Engineering, Warnings, Ethics and Patent Infringement.

**Science & Technical Case Management:** Complicated technical cases can require participation from multiple scientific and engineering disciplines. Our contracts with leading public and private technical institutions allow us to determine the best technical approach and assemble the optimum technical team.

**Scientific Testing & Analysis On-Site:** Evaluation of metals, ceramics, plastics and composites, mechanical testing of materials, non-destructive evaluations, engineering mechanics, and manufacturing processes analysis and design.

• 205.307.6550 • f 205.307.6551 • www.vistaeng.com

**Key Words:** allowable stress; bridges; buildings; inspection; qualification; structural details; stud welding; tubular structures; welded joint details; workmanship

**ANSI/AWS D1.1-86**

An American National Standard
Approved by
American National Standards Institute
December 13, 1985

# Structural Welding Code— Steel

Tenth Edition

Superseding
AWS D1.1-85

Prepared by
AWS Structural Welding Committee

Under the Direction of
AWS Technical Activities Committee

Approved by
AWS Board of Directors

Effective February 1, 1986

## Abstract

This Code covers the welding requirements for any type of welded structure made from the commonly used carbon and low-alloy constructional steels. Sections 1 through 7 and 11 constitute a body of rules for the regulation of welding in steel construction. Sections 8, 9, and 10 contain additional rules applicable to specific types of structures; i.e., buildings, bridges, and tubular structures, respectively, and supplement the first seven sections. A Commentary on the Code is bound in the document after the Code.

**AMERICAN WELDING SOCIETY, INC.**
550 N.W. LeJeune Road, P.O. Box 351040, Miami, FL 33135



38/WORKMANSHIP



Note: Convexity, C, of a weld or individual surface bead shall not exceed 0.07 times the actual face width of the weld or individual bead, respectively, plus 0.06 in. (1.5 mm).

(A)  Desirable fillet weld profiles          (B)  Acceptable fillet weld profiles



| Insufficient throat | Excessive convexity | Excessive undercut | Overlap | Insufficient leg | Incomplete fusion |

(C)  Unacceptable fillet weld profiles



Note:  Reinforcement R shall not exceed 1/8 in. (3.2 mm). See 3.6.2.

(D)  Acceptable groove weld profile in butt joint



| Excessive convexity See 3.6.2 | Insufficient throat See 3.6.3 | Excessive undercut See 8.15.1.5, 9.25.1.5, or 10.17.1.5 | Overlap See 3.6.4 |

(E)  Unacceptable groove weld profiles in butt joints

## Fig. 3.6—Acceptable and unacceptable weld profiles

**3.6.1.1** Except at outside welds in corner joints, the convexity C of a weld or individual surface bead shall not exceed 0.07 times the actual face width of the weld or individual bead, respectively, plus 0.06 in. (1.5 mm). See Fig. 3.6(B).

**3.6.1.2** Except for undercut, as permitted by the Code, these profile requirements do not apply to the ends of intermittent fillet welds outside their effective length.

**3.6.2** Groove welds shall preferably be made with slight or minimum face reinforcement except as may be otherwise provided. In the case of butt and corner joints, the face reinforcement shall not exceed 1/8 in. (3.2 mm) in height and shall have gradual transition to the plane of the base metal surface. See Fig. 3.6(D). They shall be free of the discontinuities shown for butt joints in Fig. 3.6(E).

**3.6.3** Surfaces of butt joint welds required to be flush shall be finished so as not to reduce the thickness of the thinner base metal or weld metal by more than 1/32 in.

# 5. Qualification

## Part A
## General Requirements

### 5.1 Approved Procedures

**5.1.1** Welding procedures which conform in all respects to the provisions of Section 2, Design of Welded Connections, Section 3, Workmanship, Section 4, Technique, as well as pertinent provisions of Section 8, Design of New Buildings, Section 9, Design of Bridges, or Section 10, Tubular Structures, whichever is applicable, shall be deemed as prequalified and shall be exempt from tests or qualification, except that all groove and fillet weld procedures for weld metal and base metal with a minimum specified yield strength of 90,000 psi (620 MPa) or higher shall be qualified prior to use by tests as prescribed in 5.2 of this Section to the satisfaction of the Engineer. Prequalified joint welding procedures shall meet all of the requirements listed in Appendix E, Table E1—Mandatory Code Requirements for Prequalified Joint Welding Procedures.[15]

Note: The use of a prequalified joint welding procedure is not intended as a substitute for engineering judgment in the suitability of application of these joint welding procedures to a welded assembly or connection.

**5.1.2 Limitation of Variables for Prequalified Procedures.** All prequalified joint welding procedures to be used shall be prepared by the manufacturer, fabricator, or contractor as written prequalified welding procedure specifications, and shall be available to those authorized to use or examine them. Mandatory code requirements, which apply to the written procedure specifications, are shown in Appendix E, Table E-1. The written procedure specification may follow any convenient format, provided all of the information shown in Table E-1 is included. The welding parameters set forth in (1) through (4) below shall be specified on the written procedure specifications within the limitation of variables prescribed in 5.5 for each applicable process. Changes in these parameters, beyond those specified on the written welding procedure specification, shall be considered essential changes, and shall require a new or revised prequalified written procedure specification.

    (1) Amperage (wire feed speed)
    (2) Voltage
    (3) Travel Speed
    (4) Shielding Gas Flow Rate

**5.1.3** A combination of qualified or prequalified joint welding procedures may be used without qualification provided the limitation of essential variables applicable to each process is observed.

### 5.2 Other Procedures

Except for the procedures exempted in 5.1, joint welding procedures which are to be employed in executing contract work under this Code shall be qualified prior to use to the satisfaction of the Engineer, by tests as prescribed in Part B of this Section. The Engineer, at his discretion, may accept evidence of previous qualification of the joint welding procedures to be employed.[16, 17]

### 5.3 Welders, Welding Operators, and Tackers

**5.3.1** Welders, welding operators, and tackers to be employed under this Code, and using the shielded metal arc, submerged arc, gas metal arc, flux cored arc, electroslag, or electrogas welding processes, shall have been qualified by the applicable tests as prescribed in Parts C,

---

15. All of the provisions listed in Appendix E, Table E1, must be observed for a joint welding procedure to be deemed prequalified. All other provisions of the Code, although they do not relate to joint welding procedures, are also mandatory.

16. The Engineer should accept properly documented evidence of previous qualification tests.

17. Only those requirements listed in Appendix E, Table E2, Code Requirements That May Be Changed by Procedure Qualification Tests, may be varied when the procedure is qualified by tests. No other code requirement may be changed by procedure qualification.

58/QUALIFICATION

D, or E of this Section. See Commentary.

**5.3.2** Except for joints welded by gas metal arc welding (short circuiting transfer), radiographic examination of a welder or welding operator qualification test plate or test pipe may be made in lieu of guided-bend tests prescribed in Parts C and D of this section.

## 5.4 Qualification Responsibility

**5.4.1** Each manufacturer or contractor shall conduct the tests required by this Code to qualify the welding procedures.

**5.4.2** The Engineer, at his discretion, may accept evidence of previous qualification of welders, welding operators, and tackers to be employed.[16]

## Part B
## Procedure Qualification[18]

## 5.5 Limitation of Variables

**5.5.1** When necessary to establish a welding procedure by qualification as required by 5.2 or by contract specifications, the following rules apply and the procedure shall be recorded by the manufacturer or contractor as a procedure specification.

**5.5.1.1** Qualification of a welding procedure established with a base metal included in Group 1 of Table 4.1.1 shall qualify the procedure for welding any other base metal or combination of base metals included in this group.

**5.5.1.2** Qualification of a welding procedure established with a base metal included in Group II of Table 4.1.1 shall be considered as procedure qualification for welding any other steel in this group, combinations within this group, or any other steel included in Group I.

**5.5.1.3** Qualification of a welding procedure established with a base metal included in Groups III, IV, or V of Table 4.1.1 shall qualify the procedure for welding only base metals of the same material specification and grade or type having the same minimum specified yield strength as the base metal tested, reduction in yield strength for increase in material thickness excepted. For example, a procedure qualified with a 1 in. (25.4 mm)

thick 100,000 psi (690 MPa) yield strength base metal also qualifies for a 3 in. (76.2 mm) thick 90,000 psi (620 MPa) yield strength base metal of the same material specification.

**5.5.1.4** Qualification of a welding procedure established with a combination of base metals included in Table 4.1.1, one of which is in Group III, IV, or V, shall qualify the procedure for welding that high yield strength base metal to any other of those base metals in Table 4.1.1 having a minimum specified yield strength equal to or less than that of the lower strength base metal in the test.

**5.5.1.5** In preparing the procedure specification, the manufacturer or contractor shall report the specific values for the essential variables that are specified in 5.5. The suggested form for showing the information required in the procedure specification is given in Appendix E.

**5.5.2** The changes set forth in 5.5.2.1 through 5.5.2.5 shall be considered essential changes in a welding procedure and shall require establishing a new procedure by qualification. When a combination of welding processes is used, the variables applicable to each process shall apply.

**5.5.2.1 Shielded Metal Arc Welding**

(1) A change increasing filler metal strength level (a change from E70XX to E80XX, for example, but not vice versa).

(2) A change from a low hydrogen type electrode to a non-low hydrogen type of electrode, but not vice versa.

(3) An increase of electrode diameter by more than 1/32 in. (1 mm) over that used in the procedure qualification.

(4) A change of electrode amperage and voltage values that is not within the ranges recommended by the electrode manufacturer.[19]

(5) For a specified groove, a change of more than ±25% in the specified number of passes. If the area of the groove is changed, it is permissible to change the number of passes in proportion to the area.

(6) A change in position in which welding is done as defined in 5.8.

(7) A change in the type of groove (a change from a V- to a U-groove, for example).

(8) A change exceeding tolerances of 2.9, 2.10, or 10.13 in the shape of any one type of groove involving:

(a) A decrease in the included angle of the groove

(b) A decrease in the root opening of the groove

(c) An increase in the root face of the groove

(d) The omission, but not inclusion, of backing material

(9) A decrease of more than 25° F (13.9° C) in the

---

18. Welding procedures for processes listed in 1.3 and qualified in accordance with the requirements of previous editions of this Code shall be considered to have qualified under the tests prescribed herein subject to the limitation of variables in 5.5. Any requalifications or new qualifications shall be made in accordance with the requirements of this edition.

19. When welding quenched and tempered steel, any change within the limitation of variables shall not increase the heat input beyond the steel producer's recommendations.

minimum specified preheat or interpass temperature.[20]

(10)  In vertical welding, a change in the progression specified for any pass from upward to downward or vice versa

(11)  The omission, but not the inclusion, of back gouging

(12)  The addition of or deletion of postweld heat treatment.

### 5.5.2.2 Submerged Arc Welding

(1)  A change in electrode and flux combination not covered by AWS A5.17 or A5.23

(2)  A change increasing filler metal strength level (from Grade F80 to F90, for example, but not vice versa)

(3)  A change in electrode diameter when using an alloy flux[21]

(4)  A change in the number of electrodes used

(5)  A change in the type of current (ac or dc) or polarity when welding quenched and tempered steel or when using an alloy flux

(6)  A change of more than 10% above or below specified mean amperage for each electrode diameter used[19]

(7)  A change of more than 7% above or below the specified mean arc voltage for each diameter electrode used[19]

(8)  A change of more than 15% above or below the specified mean travel speed[19]

(9)  A change of more than 10%, or 1/8 in. (3.2 mm), whichever is greater, in the longitudinal spacing of the arcs

(10)  A change of more than 10%, or 1/16 in. (1.6 mm) whichever is greater, in the lateral spacing of the arcs

(11)  A change of more than ± 10 deg in the angular position of any parallel electrode

(12)  A change in the angle of electrodes in machine or automatic welding of more than:

    (a)  ± 3 deg in the direction of travel

    (b)  ± 5 deg normal to the direction of travel

(13)  For a specified groove, a change of more than ± 25% in the specified number of passes. If the area of the groove is changed, it is permissible to change the number of passes in proportion to the area.

(14)  A change in position in which welding is done as defined in 5.8

(15)  A change in the type of groove (a change from a V- to a U-groove, for example)

(16)  A change, exceeding tolerances of 2.9, 2.10, and 3.3.4, in the shape of any one type of groove involving:

    (a)  A decrease in the included angle of the groove

    (b)  A decrease in the root opening of the groove

    (c)  An increase in the root face of the groove

    (d)  The omission, but not inclusion, of backing material

(17)  A decrease of more than 25° F (13.9° C) in the minimum specified preheat or interpass temperature[20]

(18)  An increase in the diameter of the electrode used over that called for in the procedure specification

(19)  The addition or deletion of supplemental powdered or granular filler metal or cut wire

(20)  An increase in the amount of supplemental powdered or granular filler metal metal or cut wire

(21)  If the alloy content of the weld metal is largely dependent on the composition of supplemental powdered filler metal, any change in any part of the joint welding procedure which would result in important alloying elements in the weld metal not meeting the chemical requirements given in the welding procedure specification

(22)  The omission, but not the inclusion, of back gouging

(23)  The addition of or deletion of postweld heat treatment

### 5.5.2.3 Gas Metal Arc Welding

(1)  A change in the electrode and method of shielding not covered by AWS A5.18 or A5.28

(2)  A change increasing filler metal strength level (from E70S to E80S, for example, but not vice versa)

(3)  A change in electrode diameter

(4)  A change in the number of electrodes used

(5)  A change from a single gas to any other single gas or to a mixture of gases or a change in the specified percentage composition of gas mixture not covered by AWS A5.18 or A5.28

(6)  A change of more than 10% above or below the specified mean amperage for each diameter electrode used[19]

(7)  A change of more than 7% above or below the specified mean arc voltage for each diameter electrode used[19]

(8)  A change of more than 10% above or below the specified mean travel speed[19]

(9)  An increase of 25% or more or a decrease of 10% or more in the rate of flow of shielding gas or mixture

(10)  For a specified groove, a change of more than ± 25% in the specified number of passes. If the area of the groove is changed, it is permissible to change the number of passes in proportion to the area

(11)  A change in the position in which welding is done, as defined in 5.8

(12)  A change in the type of groove (a change from a V- to a U-groove, for example)

(13)  A change, exceeding tolerances in 2.9, 2.10, or 10.13; and 3.3.4, or 10.14.3, in the shape of any one type of groove involving:

    (a)  A decrease in the included angle of the groove

    (b)  A decrease in the root opening of the groove

    (c)  An increase in the root face of the groove

    (d)  The omission, but not inclusion, of backing

---

20. The temperature may fall more than 25° F (13.9° C) below the minimum specified, provided (1) the provisions of 3.4.7 and Table 4.2 are complied with, and (2) the work shall be at the specified minimum temperature at the time of subsequent welding.

21. An alloy flux is defined as a flux upon which the alloy content of the weld metal is largely dependent.

material

(14) A decrease of more than 25° F (13.9° C) in the minimum specified preheat or interpass temperature[20]

(15) In vertical welding, a change in the progression specified for any pass from upward to downward, or vice versa

(16) A change in type of welding current (ac or dc), polarity, or mode of metal transfer across the arc

(17) The omission, but not the inclusion, of back gouging

(18) The addition of or deletion of postweld heat treatment.

### 5.5.2.4 Flux Cored Arc Welding

(1) A change in electrode and method of shielding not covered by AWS A5.20 or A5.29

(2) A change increasing filler metal strength level (from E70T to E80T, for example, but not vice versa)

(3) An increase in the diameter of electrode used over that called for in the procedure specification

(4) A change in the number of electrodes used

(5) A change from a single gas to any other single gas or to a mixture of gases, or a change in specified percentage composition of gas mixture not covered by AWS A5.20 or A5.29

(6) A change of more than 10% above or below the specified mean amperage for each size electrode used[19]

(7) A change of more than 7% above or below the specified mean arc voltage for each size electrode used[19]

(8) A change of more than 10% above or below the specified mean travel speed[19]

(9) An increase of 25% or more or a decrease of 10% or more in the rate of flow of shielding gas or mixture

(10) For a specified groove, a change of more than ±25% in the specified number of passes. If the area of the groove is changed, it is permissible to change the number of passes in proportion to the area

(11) A change in the position in which welding is done as defined in 5.8

(12) A change in the type of groove (a change from a V- to a U-groove, for example)

(13) A change, exceeding tolerances in 2.9, 2.10, or 10.13; and 3.3.4 or 10.14.3, in the shape of any one type of groove involving:

(a) A decrease in the included angle of the groove

(b) A decrease in the root opening of the groove

(c) An increase in the root face of the groove

(d) The omission, but not inclusion, of backing material

(14) A decrease of more than 25° F (13.9° C) in the minimum specified preheat or interpass temperature[20]

(15) In vertical welding, a change in the progression specified for any pass from upward to downward or vice versa

(16) A change in type of welding current (ac or dc), or polarity

(17) The omission, but not the inclusion, of back gouging

(18) The addition of or deletion of postweld heat

treatment.

### 5.5.2.5 Electroslag and Electrogas Welding

(1) A significant change in filler metal or consumable guide metal composition

(2) A change in consumable guide metal core cross-sectional area exceeding 30%

(3) A change in flux system (cored, magnetic electrode, external flux, etc.)

(4) A change in flux composition including consumable guide coating

(5) A change in shielding gas composition of any one constituent of more than 5% of the total flow

(6) A change either in welding current exceeding 20% or a change in wire feed speed (rate) exceeding 40%

(7) A change in groove design, other than square groove, increasing groove cross-sectional area

(8) A change in joint thickness (T) outside the limits of 0.5 T to 1.1 T, where T is the thickness used for the procedure qualification

(9) A change in number of electrodes

(10) A change from single-pass to multiple-pass or vice versa

(11) A change to a combination with any other welding process or method

(12) A change in postweld heat treatment

(13) A change in design of molding shoes, either fixed or movable, from nonfusing solid to water-cooled or vice versa.

5.5.3 The following changes in a qualified electroslag or electrogas procedure shall require requalification of the procedure by radiographic or ultrasonic testing only, in accordance with the requirements of Part B or C of Section 6.

5.5.3.1 A change exceeding 1/32 in. (0.8 mm) in filler metal diameter

5.5.3.2 A change exceeding 10 ipm (4.2 mm/s) in filler metal oscillation traverse speed

5.5.3.3 A change in filler metal oscillation traverse dwell time exceeding 2 seconds except as necessary to compensate for variation in joint opening

5.5.3.4 A change in filler metal oscillation traverse length which effects, by more than 1/8 in. (3.2 mm), the proximity of filler metal to the molding shoes

5.5.3.5 A change in flux burden exceeding 30%

5.5.3.6 A change in shielding gas flow rate exceeding 25%

5.5.3.7 A change in design of molding shoes, either fixed or movable, as follows:

(1) Metallic to nonmetallic or vice versa

(2) Nonfusing to fusing or vice versa

(3) A reduction in any cross-sectional dimension or area of solid nonfusing shoe exceeding 25%

5.5.3.8 A change in welding position from vertical by more than 10 deg

5.5.3.9 A change from ac to dc or vice versa, or a change in polarity for direct current

5.5.3.10 A change in welding power volt-ampere

## 5.8 Position of Test Welds

**5.8.1** All welds that will be encountered in actual construction shall be classified as: (1) flat, (2) horizontal, (3), vertical, or (4) overhead in accordance with the definitions of welding positions given in Figs. 5.8.1A and 5.8.1B. Each procedure shall be tested in the manner stated below for each position for which it is to be qualified. Welding position limitations for procedure qualification are shown in Table 5.10.5.

**5.8.1.1 Groove Plate Test Welds** (illustrated in Fig. 5.8.1.1). In making the tests to qualify groove welds, test plates shall be welded in the following positions:

(1) Position 1G (Flat)—The test plate shall be placed in an approximately horizontal plane and the weld metal deposited from the upper side. See Fig. 5.8.1.1(A).

(2) Position 2G (Horizontal)—The test plates shall be placed in an approximately vertical plane with the groove approximately horizontal. See Fig. 5.8.1(B).

(3) Position 3G (Vertical)—The test plates shall be placed in approximately vertical plane with the groove approximately vertical. See Fig. 5.8.1.1(C).

(4) Position 4G (Overhead)—The test plates shall be placed in an approximately horizontal plane and the weld metal deposited from the under side. See Fig. 5.8.1.1(D).

**5.8.1.2 Groove Pipe Test Welds** (illustrated in Fig. 5.8.1.2). In making the tests to qualify groove welds, test pipe shall be welded in the following positions:

(1) Position 1G (Pipe Horizontal Rolled)—The test pipe shall be placed with its axis horizontal and the groove approximately vertical. The pipe shall be rotated during welding so the weld metal is deposited from the upper side. See Fig. 5.8.1.2(A).

(2) Position 2G (Pipe Vertical)—The test pipe shall be placed with its axis vertical and the welding groove approximately horizontal. The pipe shall not be rotated during welding. See Fig. 5.8.1.2(B).

(3) Position 5G (Pipe Horizontal Fixed)—The test pipe shall be placed with its axis horizontal and the groove approximately vertical. The pipe is not rotated during welding. See Fig. 5.8.1.2(C).

(4) Position 6G (Pipe Inclined Fixed)—The test pipe shall be inclined at 45 deg with the horizontal. The pipe is not rotated during welding. See Fig. 5.8.1.2(D).

(5) Position 6GR (Test for complete joint penetration groove welds of tubular T-, Y-, and K-connections)—The test pipe shall be inclined at 45 deg with the horizontal. The pipe or tube is not rotated during welding. See Fig. 5.8.1.2(E).

**5.8.1.3 Fillet Welds** (illustrated in Fig. 5.8.1.3). In making the tests to qualify fillet welds, test plates shall be welded in the positions outlined below:

(1) Position 1F (Flat)—The test plates shall be so placed that each fillet weld is deposited with its axis approximately horizontal and its throat approximately vertical. See Fig. 5.8.1.3(A).



Plates horizontal

Plates vertical; axis of weld horizontal

**(A)  Test position 1G**

**(B)  Test position 2G**

Plates vertical; axis of weld vertical

Plates horizontal

**(C)  Test position 3G**

**(D)  Test position 4G**

**Fig. 5.8.1.1—Positions of test plates for groove welds**

64/QUALIFICATION



(A)  Test position 1G

15°  Pipe horizontal and rotated.
     Weld flat (±15°). Deposit
15°  filler metal at or near the top.

Pipe or tube vertical and
not rotated during welding.
Weld horizontal (±15°).

15°  15°

15°  15°

(B)  Test position 2G

15°

15°

15°

15°

Pipe or tube horizontal fixed (±15°) and not rotated during welding.  Weld flat, vertical, overhead.

(C)  Test position 5G



45° ± 5°

Pipe inclined fixed (45° ±5°) and not rotated during welding.

(D)  Test position 6G

Restriction ring

Test weld

45° ±5°

(E) Test position 6GR (T, Y, or K connections)

Fig. 5.8.1.2—Positions of test pipe or tubing for groove welds

66/QUALIFICATION



(A) Test position 1F
for flat position
(rotated)

(B) Test position 2F
for horizontal position
(fixed)

(C) Test position 2F
rolled for horizontal
position (rotated)

(D) Test position 4F
for overhead position
(fixed)

(E) Test position 5F
for multiple position
(fixed)

Fig. 5.8.1.4—Positions of test pipes for fillet welds

**5.9.2** Weld cleaning shall be done with the test weld in the same position as the welding position being qualified.

# 5.10 Weld Specimens: Number, Type, and Preparation

## 5.10.1 Complete Joint Penetration Groove Welds

**5.10.1.1** The type and number of specimens that must be tested to qualify a welding procedure are shown in Table 5.10.1, together with the range of thickness that is qualified for use in construction. The range is based on the thickness of the test plate, pipe, or tubing used in making the qualification.

**5.10.1.2** Test specimens for groove welds in corner or T-joints shall be butt joints having the same groove configuration as the corner or T-joint to be used on construction, except the depth of groove need not exceed 1 in. (25.4 mm).

**5.10.1.3 Nondestructive Testing.** Before preparing mechanical test specimens, the qualification test plate, pipe, or tubing shall be nondestructively tested for soundness as follows:

(1) Either radiographic or ultrasonic testing shall be used. The entire length of the weld in test plates, except the discard lengths at each end, shall be examined in accordance with Section 6, Parts B or C. For tubulars, the full circumference of the completed weld shall be examined in accordance with Section 10, Parts E and F.

(2) For acceptable qualification, the weld, as revealed by radiographic or ultrasonic testing, shall conform to the requirements of 5.12.5.

**5.10.1.4 Mechanical Testing.** The welded test assemblies conforming to 5.10.1.3 shall have test specimens prepared by cutting the test plate, pipe, or tubing as shown in Figs. 5.10.1.3A through 5.10.1.3E, whichever is applicable. The test specimens shall be prepared for testing in accordance with Figs. 5.10.1.3F through 5.10.1.3J, as applicable.

**5.10.1.5** When material combinations differ markedly in mechanical bending properties, as between two base

materials or between the weld metal and the base metal, longitudinal bend tests (face and root) may be used in lieu of the transverse face and root bend tests. The welded test assemblies conforming to 5.10.1.3 shall have test specimens prepared by cutting the test plate as shown in Figs. 5.10.1.3D, or 5.10.1.3E, whichever is applicable. The test specimens for the longitudinal bend test shall be prepared for testing as shown in Fig. 5.10.1.3J.

**5.10.2 Partial Joint Penetration Groove Welds.** The type and number of specimens that must be tested to qualify a welding procedure are shown in Table 5.10.2. A sample weld shall be made using the type of groove design and joint welding procedure to be used in construction, except the depth of groove need not exceed 1 in. (25.4 mm). If the partial joint penetration groove weld is to be used for corner or T-joints, the butt joint shall have a temporary restrictive plate in the plane of the square face to simulate the T-joint configuration. The sample welds shall be tested as follows:

**5.10.2.1** For joint welding procedures which conform in all respects to Sections 3 and 4, three macroetch cross-section specimens shall be prepared to demonstrate that the designated effective throat (obtained from the requirements of the procedure specification) are met.

**5.10.2.2** When a joint welding procedure has been qualified for a complete joint penetration groove weld and is applied to the welding conditions of a partial joint penetration groove weld, three macroetch cross-section tests specimens are required.

**5.10.2.3** If a joint welding procedure is not covered by either 5.10.2.1 or 5.10.2.2, or if the welding conditions do not meet a prequalified status, or if they have not been used and tested for a complete joint penetration weld in a butt joint, then a sample joint must be prepared and the first operation is to make a macroetch test specimen to determine the effective throat of the joint. Then, the excess material is machined off on the bottom side of the joint to the thickness of the effective throat. Tension and bend test specimens shall be prepared and tests

**Table 5.10.1**
**Number and type of test specimens and range of thickness qualified—procedure qualification;
complete joint penetration groove welds**

**1. Tests on plate**

| Plate thickness (T) tested, in. | Number of sample welds per position | NDT (see 5.10.1.3) (see Note 1) | Reduced-section tension (see Fig. 5.10.1.3F) | Root-bend (see Fig. 5.10.1.3J) | Face-bend (see Fig. 5.10.1.3J) | Side-bend (see Fig. 5.10.1.3H) | Plate thickness qualified, T in., maximum (Note 2) |
|---|---|---|---|---|---|---|---|
| $1/8 \leq T < 3/8$ | 1 | Yes | 2 | 2 | 2 | — | 1/8 to 2T |
| 3/8 | 1 | Yes | 2 | 2 | 2 | — | 3/4 |
| $3/8 < T < 1$ | 1 | Yes | 2 | — | — | 4 | 2T |
| 1 and over | 1 | Yes | 2 | — | — | 4 | Unlimited |

Note 1: All welded test plates shall be visually inspected (see 5.12.7).
Note 2: For square groove welds, the maximum thickness qualified shall be limited to thickness tested.

**2. Tests on pipe or tubing**

| Pipe size of sample weld Diam. | Wall thickness, T | Number of sample welds per position | NDT (see Notes 3 and 4) | Reduced-section tension (see Fig. 5.10.1.3F) | Root-bend (see Fig. 5.10.1.3J) | Face-bend (see Fig. 5.10.1.3J) | Side-bend (see Fig. 5.10.1.3H) | Pipe or tube size qualified Diameter, in. | Wall thickness, in. min | max |
|---|---|---|---|---|---|---|---|---|---|---|
| 2 in. or 3 in. | Sch. 80 / Sch. 40 | 2 | Yes | 2 | 2 | 2 | — | 3/4 through 4 | 0.125 | 0.674 |
| 6 in. or 8 in. | Sch. 120 / Sch. 80 | 1 | Yes | 2 | — | — | 4 | 4 and over | 0.187 | Any |

Job size pipe or tubing

| Diam. | Wall thickness, T | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| <24 in. | $1/8 \leq T \leq 3/8$ in. | 1 | Yes | 2 | 2 | 2 | — | Test diam. and over | 1/8 | 2T |
|  | $3/8 < T < 3/4$ in. | 1 | Yes | 2 | — | — | 4 | Test diam and over | T/2 | 2T |
|  | $T \geq 3/4$ in. | 1 | Yes | 2 | — | — | 4 | Test diam and over | 0.375 | Any |
| $\geq$24 in. | $1/8 \leq T \leq 3/8$ in. | 1 | Yes | 2 | 2 | 2 | — | Test diam and over | 1/8 | 2T |
|  | $3/8 < T < 3/4$ in. | 1 | Yes | 2 | — | — | 4 | 24 and over | T/2 | 2T |
|  | $T \geq 3/4$ in. | 1 | Yes | 2 | — | — | 4 | 24 and over | 0.375 | Any |

Note 3: All welded test pipes or tubing shall be visually inspected (see 5.12.6).
Note 4: For pipe or tubing, the full circumference of the completed weld shall be tested by RT or UT prior to mechanical testing (5.10.1.3).

performed, as required for complete joint penetration groove welds (see 5.10.1).

**5.10.3 Fillet Welds.** The type and number of specimens that must be tested to qualify a welding procedure are shown in Table 5.10.3.

**5.10.3.1 Fillet Welds.** A fillet welded T-joint, as shown in Fig. 5.10.3A for plate or Fig. 5.10.3B for pipe (Detail A or Detail B), shall be made for each procedure and position to be used in construction. One test weld shall be the maximum size single-pass fillet weld and one test weld shall be the minimum size multiple-pass fillet weld used in construction. These two fillet weld tests may be

examined for surface discontinuities. For acceptance, the surface shall contain no discontinuities exceeding the following dimensions:

(1) 1/8 in. (3.2 mm) measured in any direction on the surface.

(2) 3/8 in (9.5 mm) - the sum of the greatest dimensions of all discontinuities exceeding 1/32 in. (0.8 mm), but less than or equal to 1/8 in. (3.2 mm).

(3) 1/4 in. (6.4 mm) - the maximum corner crack, except when that corner crack resulted from visible slag inclusion or other fusion type discontinuities, then the 1/8 in. (3.2 mm) maximum shall apply.

Specimens with corner cracks exceeding 1/4 in. (6.4 mm) with no evidence of slag inclusions or other fusion type discontinuities shall be disregarded and a replacement test specimen from the original weldment shall be tested.

**5.12.3 Macroetch Test.** For acceptable qualification, the macroetch test specimen, when inspected visually, shall conform to the following requirements:

(1) Partial joint penetration groove welds shall have the designated effective throat.

(2) Fillet welds shall have fusion to the root of the joint, but not necessarily beyond.

(3) Minimum leg size shall meet the specified fillet weld size.

(4) The partial joint penetration groove welds and fillet welds shall:

(a) have no cracks.

(b) have thorough fusion between adjacent layers of weld metals and between weld metal and base metal.

(c) have weld profiles conforming to intended detail, but with none of the variations prohibited in 3.6.

(d) have no undercut exceeding the values permitted in 9.25.1.5.

**5.12.4 All-Weld-Metal Tension Test (electroslag and electrogas).** The mechanical properties shall be no less than those specified in 4.16.

**5.12.5 Nondestructive Testing.** For acceptable qualification, the weld, as revealed by radiographic or ultrasonic testing, shall conform to the requirements of 8.15, 9.25, or 10.17, whichever is applicable.

**5.12.6 Visual Inspection—Pipe and Tubing.** For acceptable qualification, a pipe weld, when inspected visually, shall conform to the following requirements:

(1) The weld shall be free of cracks.

(2) All craters shall be filled to the full cross section of the weld.

(3) The face of the weld shall be at least flush with the outside surface of the pipe, and the weld shall merge smoothly with the base metal. Undercut shall not exceed 1/64 in. (0.4 mm). Weld reinforcement shall not exceed the following:

| Pipe wall thickness, in. (mm) | Reinforcement, max, in. | mm |
|---|---|---|
| 3/8 (9.5 or less) | 3/32 | 2.4 |
| Over 3/8 to 3/4 (19.0) incl. | 1/8 | 3.2 |
| Over 3/4 | 3/16 | 4.8 |

(4) The root of the weld shall be inspected, and there shall be no evidence of cracks, incomplete fusion, or inadequate joint penetration. A concave root surface is permitted within the limits shown below, provided the total weld thickness is equal to or greater than that of the base metal.

(5) The maximum root surface concavity shall be 1/16 in. (1.6 mm) and the maximum melt-thru shall be 1/8 in. (3.2 mm).

**5.12.7 Visual Inspection—Plate.** For acceptable qualification, the welded test plate, when inspected visually, shall conform to the requirements for visual inspection in 9.25.1.

## 5.13 Records

Records of the test results shall be kept by the manufacturer or contractor and shall be available to those authorized to examine them.

## 5.14 Retests

If any one specimen of all those tested fails to meet the test requirements, two retests for that particular type of test specimen may be performed with specimens cut from the same procedure qualification material. The results of both test specimens must meet the test requirements. For material over 1-1/2 in. (38.1 mm) thick, failure of a specimen shall require testing of all specimens of the same type from two additional locations in the test material.

## Part C
## Welder Qualification

## 5.15 General

The qualification tests described in Part C are specially devised tests to determine the welder's ability to produce sound welds. The qualification tests are not intended to be used as a guide for welding during actual construction. The latter shall be performed in accordance with the requirements of the procedure specification.

## 5.16 Limitation of Variables

For the qualification of a welder the following rules shall apply:

**5.16.1** Qualification established with any one of the steels permitted by this Code shall be considered as qualification to weld or tack weld any of the other steels.

**5.16.2** A welder shall be qualified for each process used.

**5.16.3** A welder qualified for shielded metal arc welding with an electrode identified in the following table shall be considered qualified to weld or tack weld with any other electrode in the same group designation and with any electrode listed in a numerically lower group designation.

| Group designation | AWS electrode classification* |
|---|---|
| F4 | EXX15, EXX16, EXX18 |
| F3 | EXX10, EXX11 |
| F2 | EXX12, EXX13, EXX14 |
| F1 | EXX20, EXX24, EXX27, EXX28 |

*The letters "XX" used in the classification designation in this table stand for the various strength levels (60, 70, 80, 90, 100, 110, and 120) of deposited weld metal.

**5.16.4** A welder qualified with an approved electrode and shielding medium combination shall be considered qualified to weld or tack weld with any other approved electrode and shielding medium combination for the process used in the qualification test.

**5.16.5** A change in the position of welding to one for which the welder is not already qualified shall require requalification.

**5.16.6** A change from one diameter wall pipe grouping shown in Table 5.26.1 to another shall require requalification.

**5.16.7** When the plate is in the vertical position, or the pipe or tubing is in the 5G or 6G position, a change in the direction of welding shall require requalification.

**5.16.8** The omission of backing material in complete joint penetration welds welded from one side shall require requalification.

## 5.17 Qualification Tests Required

### 5.17.1 Plate and Rolled Structural Shapes
**5.17.1.1** The welder qualification test for manual and semiautomatic welding shall be as follows:

(1) Groove weld qualification tests for plate of unlimited thickness in accordance with 5.18

(2) Groove weld qualification tests for plate of limited thickness in accordance with 5.19

(3) Fillet weld qualification tests (only) in accordance with 5.22.1.

(4) Plug weld qualification tests for plug welds only in accordance with 5.22.2

**5.17.1.2 Procedure Qualification for Plate and Rolled Structural Shapes.** A welder may also be qualified by welding a satisfactory procedure qualification test plate, as specified in 5.10.1, that meets the requirements of 5.12. The welder is thereby qualified to weld plate and square or rectangular tubing with the process and in the test position used for procedure qualification. The welder is also qualified for slot welding for the process and position tested. The thickness range qualified for is specified in Table 5.26.1-1, Tests on Plate.

### 5.17.2 Pipe or Tubing
**5.17.2.1** Welder qualification tests for manual and semiautomatic welding shall be as follows:

(1) Groove weld qualification tests for butt joints on pipe or square or rectangular tubing in accordance with 5.20

(2) Groove weld qualification tests for T-, Y-, or K-connections on pipe or square or rectangular tubing in accordance with 5.21.1 or 5.21.2

(3) Groove weld qualification tests for butt joints on square or rectangular tubing on flat plate in accordance with 5.18 or 5.19

(4) Fillet weld qualification tests for fillet welds, in accordance with 5.22.1.2.

**5.17.2.2 Procedure Qualification for Pipe and Tubing.** A welder may also be qualified by welding a satisfactory procedure qualification test pipe, without backing, as specified in 5.10.1, that meets the requirements of 5.12. The welder is thereby qualified to weld pipe and tubing with the process and in the test position used for procedure qualification. The welder is also qualified for slot welding for the process and position tested. The diameter and wall thickness ranges qualified for shall be as specified in Table 5.26.1-2, Tests on Pipe and Tubing.

## 5.18 Groove Weld Plate Qualification Test for Plate of Unlimited Thickness

The joint details shall be as follows: 1 in. (25.4 mm) plate, single-V-groove, 45 deg included angle, 1/4 in. (6.4 mm) root opening with backing (see Fig. 5.18A). For horizontal position qualification, the joint detail may, at the contractor's option, be as follows: single-bevel-groove, 45 deg groove angle, 1/4 in. root opening with backing (see Fig. 5.18B). Backing shall be 1/4 in. min to 3/8 in. (9.5 mm) by 3 in. (76.2 mm) if radiographic testing is used without removal of backing. For mechanical testing or for radiographic testing after the backing is removed, the backing shall be 1/4 in. min to 3/8 in. max by 1 in. min. The minimum length of the welding groove shall be 5 in. (127 mm).

# 6. Inspection

## Part A
## General Requirements

### 6.1 General

**6.1.1** For the purpose of this Code, fabrication/erection inspection and testing and verification inspection and testing are separate functions. Fabrication/erection inspection and tests shall be performed as necessary prior to assembly, during assembly, during welding, and after welding to ensure that materials and workmanship meet the requirements of the contract documents. Verification inspection and testing shall be performed and their results reported to the owner and contractor in a timely manner to avoid delays in the work.

Fabrication/erection inspection and testing are the responsibilities of the contractor unless otherwise provided in the contract documents. Verification inspection and testing are the prerogatives of the owner who may perform this function or, when provided in the contract, waive independent verification, or stipulate that both inspection and verification shall be performed by the contractor.

**6.1.2** The verification Inspector is the duly designated person who acts for and in behalf of the owner or Engineer on all inspection and quality matters within the scope of the contract documents. The fabrication/erection Inspector is the duly designated person who acts for and in behalf of the contractor on all inspection and quality matters within the scope of the contract documents. When the term Inspector(s) is used without further qualification, it applies equally to inspection and verification within the limits of responsibility designated in 6.1.1.

**6.1.3 Certified Welding Inspectors.** When AWS Certified Welding Inspectors (CWI) are to be required, it shall be so stated in information furnished to the bidders and specified in the contract documents. When so specified, the following requirements shall apply:

**6.1.3.1** The Inspector(s) shall be an AWS Certified Welding Inspector (CWI) qualified and certified in accordance with the provisions of AWS QC1, Standard for Qualification and Certification of Welding Inspectors. Except as provided in 6.1.3.2, only individuals so quali-

fied shall be authorized to perform fabrication/erection or verification inspection under the provisions of the Code.[22]

Note: The Code does not require that all personnel engaged in inspection must be qualified to QC1. Provision is made for assistant welding inspectors (6.1.3.2) who are not necessarily qualified to AWS QC1.

**6.1.3.2** The Inspector may be supported by assistant welding inspectors who may perform specific inspection functions under the supervision of the Inspector.

**6.1.3.3** Personnel performing nondestructive tests under the provisions of 6.7.7 need not be qualified and certified under the provisions of AWS QC1.

**6.1.4** The Inspector shall ascertain that all fabrication and erection by welding is performed in accordance with the requirements of the contract documents.

**6.1.5** The Inspector shall be furnished complete detailed drawings showing the size, length, type, and location of all welds to be made. He shall be furnished the portion of the contract documents that describes material and quality requirements for the products to be fabricated or erected, or both.

**6.1.6** The Inspector shall be notified in advance of the start of operations subject to inspection and verification.

### 6.2 Inspection of Materials

The Inspector shall make certain that only materials conforming to the requirements of this Code are used.

---

22. Welding inspectors qualified by the Canadian Welding Bureau (to the Level II or the Level III requirements of the Canadian Standards Association Standard W178.2, Certification of Welding Inspectors) are acknowledged by AWS as being qualified under the provisions of AWS QC1. It is the policy of the Structural Welding Committee to recognize welding inspector certification programs that are substantially the same as offered by AWS and CWB. Such programs, public or private, must be competently administered, be reasonably specified, and be open to the public. When so constituted, such certification programs will be considered equivalent to AWS and CWB programs.

**10.3.1** For circular sections having $D/t$ greater than $3300/F_y$,[38] the possibility of local buckling at axial compressive stresses less than the yield strength shall be considered.

**10.3.2** Moments caused by significant deviation from concentric connections shall be provided for in analysis and design. See Fig. 10.1.2(H).

## 10.4 Unit Stresses in Welds

**10.4.1** Except as modified in 10.5, 10.6, and 10.7, the allowable stresses in welds shall be as shown in Table 10.4.1.

**10.4.2** Fiber stresses due to bending shall not exceed the values prescribed for tension and compression, unless the weld is proportioned to develop fully the strength of sections joined.

**10.4.3** Plug or slot welds shall not be ascribed any value in resistance to stress other than shear in the plane of the faying surfaces.

## 10.5 Limitations of the Strength of Welded Tubular Connections

**10.5.1 Local Failure.** Where a STEPPED BOX or CIRCULAR T-, Y-, or K-connection is made by simply welding the branch member to the main member, local stresses at a potential failure surface through the main member wall may limit the usable strength of the welded joint. The shear stress at which such failure occurs depends not only upon the strength of the main member steel, but also on the geometry of the connection. Such connections shall be proportioned so that the acting punching shear stress on the potential failure surface (see Fig. 10.5.1) does not exceed the allowable punching shear stress.

The acting punching shear is given by

$$\text{acting } V_p = \tau f_n \sin \theta$$

The allowable punching shear stress is given by

$$\text{allow } V_p = Q_q \cdot Q_f \cdot (\text{basic } V_p)$$

The allowable $V_p$ shall not exceed the allowable shear stress specified in the applicable design specification (e.g. $0.4 F_y$).

Terms used in the foregoing equations are defined as follows:

$\tau$, $\theta$ and other parameters of connection geometry are defined in Fig. 10.1.2(M).
$f_n$ is the nominal axial or bending stress[39] in the branch member (punching shear for each kept separate)

(Basic $V_p$) = basic allowable punching shear as given in Table 10.5.1.

$Q_q$, $Q_f$ are geometry modifier and stress interaction terms, respectively, also given in Table 10.5.1.

For combined axial and bending stresses, the following inequality shall be satisfied:

$$\left(\frac{\text{acting } V_p}{\text{allow } V_p}\right)^{1.75}_{\text{axial}} + \left(\frac{\text{acting } V_p}{\text{allow } V_p}\right)_{\text{bending}} \leq 1.0$$

**10.5.1.1** For MATCHED CONNECTIONS of BOX SECTIONS as defined in Fig. 10.1.2(L), allowable static capacity for loads normal to the main member shall be taken as the sum of $F_1$ and $F_2$ as follows:

(1) Along the sides, web crippling capacity of the main member

$$F_1 = 2t_c a_x (0.60 \, Q_f \, F_y)$$

(2) Along the heel and toe, punching shear (taken as single shear) in accordance with 10.5.1, except

$$Q_\beta = 1.25 (1 + \eta) \text{ for } \eta < 1$$

$$Q_\beta = 2.5 \text{ for } \eta \geq 1$$

where $\eta = a_x/D$ (see Fig. 10.1.2B)

thus $F_2 = 2t_c b \left[ Q_\beta \cdot Q_f \cdot \dfrac{F_y}{0.6 \, \gamma} \right]$

Note: $Q_f$ shall be as shown in Table 10.5.1

**10.5.1.2** For MATCHED CONNECTIONS of BOX SECTIONS conforming to all of the requirements given in (1) through (4), the full static load capacity of the branch members shall be applicable:

(1) Complete joint penetration groove weld conforming to Fig. 10.13.1(B) and matching weld metal (Table 4.1.1)

(2) For main member, $D/t < 22$, and $F_y$ not less than that of branch member

(3) $\tau \leq 0.72$ (or $\tau \leq 1.0$ and main member $U \leq 0.44$)

(4) $\eta \geq 1.0$

**10.5.1.3** For STEPPED BOX CONNECTIONS having $\beta > 0.8$ or $\beta > \eta$, or both, the allowable static capacity for loads normal to the main member shall be computed in accordance with 10.5.1, but shall not exceed the sum of $F_1 + F_2$, as follows:

---

38. $F_y$ is the yield strength (ksi) of the base metal.

39. For bending about two axes (e.g., y and z), the effective resultant bending stress in CIRCULAR and SQUARE BOX SECTIONS may be taken as $f_b = \sqrt{f_{by}^2 + f_{bz}^2}$

**Table 10.4.1 (continued)**
**Allowable stresses in welds**

| Type of weld | Tubular application | Kind of stress | | Permissible unit stress | Required weld metal strength level[1] |
|---|---|---|---|---|---|
| Partial joint penetration groove weld | Longitudinal seam of tubular members | Tension or compression parallel to axis of the weld[2] | | Same as for base metal[3] | Weld metal with a strength level equal to or less than matching weld metal may be used. |
| | Butt splices of tubular members | Compression normal to the effective throat[2] | Joint not designed to bear | 0.50 × specified minimum tensile strength of weld, except that stress on adjoining base metal shall not exceed 0.60 $F_y$. | Weld metal with a strength level equal to or less than matching weld metal may be used. |
| | | | Joint designed to bear | Same as for base metal | |
| | | Tension or shear on effective throat | | 0.30 × specified minimum tensile strength of weld metal, except that stress on adjoining base metal shall not exceed 0.50 $F_y$ for tension, nor 0.40 $F_y$ for shear. | Weld metal with a strength level equal to or less than matching weld metal may be used. |
| | Structural T-, Y-, or K-connection in ordinary structures | Load transfer across the weld as stress on the effective throat | | 0.30 × specified minimum tensile strength of weld metal, or as limited by connection geometry (see 10.5), except that stress on an adjoining base metal shall not exceed 0.60 $F_y$ for tension and compression, nor 0.40 $F_y$ for shear. | Matching weld metal must be used. See Table 4.1.1. |
| Fillet weld | Longitudinal seam of tubular members | Tension or compression parallel to axis of the weld | | Same as for base metal[3] | Weld metal with a strength level equal to less than matching weld metal may be used. |
| | Structural T-, Y-, or K-connection in ordinary structures; lap splice of tubular members. | Shear stress on effective throat regardless of direction of loading. | | 0.30 × specified minimum tensile strength of weld metal, or as limited by connection geometry (see 10.5), except that shear stress on adjoining base metal shall not exceed 0.40 $F_y$. | Weld metal with a strength level equal to or less than matching weld metal may be used.[4] |

1. For matching weld metal see Table 4.1.1.
2. Beam or torsional shear up to 0.30 minimum specified tensile strength of weld is permitted, except that shear on adjoining base metal shall not exceed 0.40 $F_y$.
3. Groove and fillet welds parallel to the longitudinal axis of tension or compression members, except in connection areas, are not considered as transferring stress and hence may take the same stress as that in the base metal, regardless of electrode (filler metal) classification. Where the provisions of 10.5.1 are applied, seams in the main member within the connection area shall be complete joint penetration groove welds with matching filler metal, as defined in Table 4.1.1.
4. See 10.5.3.

# Mechanical Engineering Design

## Sixth Edition

**Joseph E. Shigley**

Professor Emeritus, The University of Michigan

**Charles R. Mischke**

Professor of Mechanical Engineering Emeritus, Iowa State University



Boston    Burr Ridge, IL    Dubuque, IA    Madison, WI    New York    San Francisco
St. Louis    Bangkok    Bogotá    Caracas    Lisbon    London    Madrid    Mexico City
Milan    New Delhi    Seoul    Singapore    Sydney    Taipei    Toronto

PLAINTIFF'S
EXHIBIT
12

**2** The material is isotropic and homogeneous.

**3** The material obeys Hooke's law.

**4** The beam is initially straight with a cross section that is constant throughout the beam length.

**5** The beam has an axis of symmetry in the plane of bending.

**6** The proportions of the beam are such that it would fail by bending rather than by crushing, wrinkling, or sidewise buckling.

**7** Cross sections of the beam remain plane during bending.

In Fig. 3–12a we visualize a portion of a beam acted upon by the positive bending moment $M$. The $y$ axis is the axis of symmetry. The $x$ axis is coincident with the *neutral axis* of the section, and the $xz$ plane, which contains the neutral axes of all cross sections, is called the *neutral plane*. Elements of the beam coincident with this plane have zero strain. The location of the neutral axis with respect to the cross section has not yet been defined.

Application of the positive moment will cause the upper surface of the beam to bend downward, and the neutral axis will then be curved, as shown in Fig. 3–12b. Because of the curvature, a section $AB$ originally parallel to $CD$, since the beam was straight, will rotate through the angle $d\phi$ to $A'B'$. Since $AB$ and $A'B'$ are both straight lines, we have utilized the assumption that plane sections remain plane during bending. If we now specify the radius of curvature of the neutral axis as $\rho$, the length of a differential element of the neutral axis as $ds$, and the angle subtended by the two adjacent sides $CD$ and $A'B'$ as $d\phi$, then, from the definition of curvature, we have

$$\frac{1}{\rho} = \frac{d\phi}{ds} \tag{a}$$

As shown in Fig. 3–12b, the elongation of a "fiber" at distance $y$ from the neutral axis is

$$dx = y\,d\phi \tag{b}$$

The strain is the elongation divided by the original length, or

$$\epsilon = -\frac{dx}{ds} \tag{c}$$

**Figure 3–12**



(a)

(b)

where the negative sign indicates compression. Solving Eqs. $(a)$, $(b)$, and $(c)$ simultaneously gives

$$\epsilon = -\frac{y}{\rho} \qquad (d)$$

Thus the strain is proportional to the distance $y$ from the neutral axis. Now, since $\sigma = E\epsilon$, we have for the stress

$$\sigma = -\frac{Ey}{\rho} \qquad (e)$$

We are now dealing with pure bending, which means that there are no axial forces acting on the beam. We can state this in mathematical form by summing all the horizontal forces acting on the cross section and equating this sum to zero. The force acting on an element of area $dA$ is $\sigma\, dA$; therefore

$$\int \sigma\, dA = -\frac{E}{\rho} \int y\, dA = 0 \qquad (f)$$

Equation $(f)$ defines the location of the neutral axis. The moment of the area about the neutral axis is zero, and hence the neutral axis passes through the centroid of the cross-sectional area.

Next we observe that equilibrium requires that the internal bending moment created by the stress $\sigma$ be the same as the external moment $M$. In other words,

$$M = \int y\sigma\, dA = \frac{E}{\rho} \int y^2\, dA \qquad (g)$$

The second integral in Eq. $(g)$ is the *second moment of area* about the $z$ axis. This is

$$I = \int y^2\, dA \qquad (3\text{–}26)$$

If we next solve Eqs. $(g)$ and $(3\text{–}26)$ and rearrange them, we have

$$\frac{1}{\rho} = \frac{M}{EI} \qquad (3\text{–}27)$$

This is an important equation in the determination of the deflection of beams, and we shall employ it in Chap. 4. Finally, we eliminate $\rho$ from Eqs. $(e)$ and $(3\text{–}27)$ and obtain

$$\sigma = -\frac{My}{I} \qquad (3\text{–}28)$$

Equation $(3\text{–}28)$ states that the bending stress $\sigma$ is directly proportional to the distance $y$ from the neutral axis and the bending moment $M$, as shown in Fig. 3–13. It is customary to designate $c = y_{max}$, to omit the negative sign, and to write

$$\sigma = \frac{Mc}{I} \qquad (3\text{–}29)$$

using the first two terms of the cosine series. The increase in strain energy of the spring, $E_{strain}$, is

$$E_{strain} = \frac{k(l\theta)^2}{2}$$

The strain energy of the bar is zero if rigid and small if not. For neutral equilibrium $E_{strain} = E_p$, or

$$\frac{k(l\theta)^2}{2} = \frac{Pl\theta^2}{2}$$

from which

$$P_{crit} = kl \qquad (4\text{--}43)$$

The strength of the column material does not control. The stresses in the column are not involved in Eq. (4–43). The failure to carry the load is due to a condition of elastic instability. The years of experience which engineers accumulate guarding against and monitoring stress-controlled failures dulls alertness to instability. General experience with "heft," proportions, and what works and does not work is not a reliable guide to column action. Such failure can be a surprise.

## 4–12  Long Columns with Central Loading

The relationship between the critical load and the column material and geometry is developed with reference to Fig. 4–16a. We assume a bar of length $l$ loaded by a force $P$ acting along the centroidal axis on rounded or pinned ends. The figure shows that the bar is bent in the positive $y$ direction. This requires a negative moment, and hence

$$M = -Py \qquad (a)$$

If the bar should happen to bend in the negative $y$ direction, a positive moment would result, and so $M = -Py$, as before. Using Eq. (4–12), we write

$$\frac{d^2y}{dx^2} = -\frac{P}{EI}y \qquad (b)$$

### Figure 4–16

(a) Both ends rounded or pivoted; (b) both ends fixed; (c) one end free, one end fixed; (d) one end rounded and pivoted, and one end fixed.



$$\frac{d^2y}{dx^2} + \frac{P}{EI}y = 0 \tag{4-44}$$

This resembles the well-known differential equation for simple harmonic motion. The solution is

$$y = A\sin\sqrt{\frac{P}{EI}}x + B\cos\sqrt{\frac{P}{EI}}x \tag{c}$$

where $A$ and $B$ are constants of integration and must be determined from the boundary conditions of the problem. We evaluate them using the conditions that $y = 0$ at $x = 0$ and at $x = l$. This gives $B = 0$, and

$$0 = A\sin\sqrt{\frac{P}{EI}}l \tag{d}$$

The trivial solution of no buckling occurs with $A = 0$. However, if $A \neq 0$, then

$$\sin\sqrt{\frac{P}{EI}}l = 0 \tag{e}$$

Equation ($e$) is satisfied by $\sqrt{P/EI}\,l = n\pi$, where $n = 1, 2, 3, \ldots$. Solving for $P$ when $n = 1$ gives the first critical load

$$P_{cr} = \frac{\pi^2 EI}{l^2} \tag{4-45}$$

which is called the *Euler column formula;* it applies only to rounded-end columns. If we substitute these results back in Eq. ($c$), we get the equation of the deflection curve as

$$y = A\sin\frac{\pi x}{l} \tag{f}$$

which indicates that the deflection curve is a half-wave sine. We are interested only in the minimum critical load, which occurs with $n = 1$. However, though it is not of any importance here, values of $n$ greater than 1 result in deflection curves which cross the axis at points of inflection and are multiples of half-wave sines.

Using the relation $I = Ak^2$, where $A$ is the area and $k$ the radius of gyration, enables us to rearrange Eq. (4–45) into the more convenient form

$$\frac{P_{cr}}{A} = \frac{\pi^2 E}{(l/k)^2} \tag{4-46}$$

where $l/k$ is called the *slenderness ratio.* This ratio, rather than the actual column length, will be used in classifying columns according to length categories.

The quantity $P_{cr}/A$ in Eq. (4–46) is the *critical unit load.* It is the load per unit area necessary to place the column in a condition of *unstable equilibrium.* In this state any small crookedness of the member, or slight movement of the support or load, will cause the column to collapse. The unit load has the same units as strength, but this is the strength of a specific column, not of the column material. Doubling the length of a member, for example, will have a drastic effect on the value of $P_{cr}/A$ but no effect at all on, say, the yield strength $S_y$ of the column material itself.

Equation (4–46) shows that the critical unit load depends only upon the modulus of elasticity and the slenderness ratio. Thus a column obeying the Euler formula made of

high-strength alloy steel is no stronger than one made of low-carbon steel, since $E$ is the same for both.

The critical loads for columns with different end conditions can be obtained by solving the differential equation or by comparison. Figure 4–16b shows a column with both ends fixed. The inflection points are at $A$ and $B$, a distance $l/4$ from the ends. The distance $AB$ is the same curve as a rounded-end column. Substituting the length $l/2$ for $l$ in Eq. (4–45), we obtain

$$P_{cr} = \frac{\pi^2 EI}{(l/2)^2} = \frac{4\pi^2 EI}{l^2} \tag{4-47}$$

In Fig. 4–16c is shown a column with one end free and one end fixed. This curve is equivalent to half the curve for columns with rounded ends, so that if a length of $2l$ is substituted in Eq. (4–45), the critical load becomes

$$P_{cr} = \frac{\pi^2 EI}{(2l)^2} = \frac{\pi^2 EI}{4l^2} \tag{4-48}$$

A column with one end fixed and one end rounded, as in Fig. 4–16d, occurs frequently. The inflection point is at $A$, a distance of $0.707l$ from the rounded end. Therefore

$$P_{cr} = \frac{\pi^2 EI}{(0.707l)^2} = \frac{2\pi^2 EI}{l^2} \tag{4-49}$$

We can account for these various end conditions by writing the Euler equation in the two following forms:

$$P_{cr} = \frac{C\pi^2 EI}{l^2}, \qquad \frac{P_{cr}}{A} = \frac{C\pi^2 E}{(l/k)^2} \tag{4-50}$$

Here, the factor $C$ is called the *end-condition constant*, and it may have any one of the theoretical values $\frac{1}{4}$, 1, 2, and 4, depending upon the manner in which the load is applied. In practice it is difficult, if not impossible, to fix the column ends so that the factor $C = 2$ or $C = 4$ would apply. Even if the ends are welded, some deflection will occur. Because of this, some designers never use a value of $C$ greater than unity. However, if liberal factors of safety are employed, and if the column load is accurately known, then a value of $C$ not exceeding 1.2 for both ends fixed, or for one end rounded and one end fixed, is not unreasonable, since it supposes only partial fixation. Of course, the value $C = \frac{1}{4}$ must always be used for a column having one end fixed and one end free. These recommendations are summarized in Table 4–6.

Figure
Euler curv
(4–50) wi

**Table 4–6**

End-Condition Constants for Euler Columns [to Be Used with Eq. (4–50)]

| Column End Conditions | End-Condition Constant $C$ | | |
|---|---|---|---|
| | Theoretical Value | Conservative Value | Recommended Value* |
| Fixed-free | $\frac{1}{4}$ | $\frac{1}{4}$ | $\frac{1}{4}$ |
| Rounded-rounded | 1 | 1 | 1 |
| Fixed-rounded | 2 | 1 | 1.2 |
| Fixed-fixed | 4 | 1 | 1.2 |

*To be used only with liberal factors of safety when the column load is accurately known.

# HOLLOW STRUCTURAL SECTIONS
## DIMENSIONS AND SECTION PROPERTIES



**Steel Tube Institute**
OF NORTH AMERICA



PLAINTIFF'S
EXHIBIT
13

# HSS Manufacturing Methods

The transformation of steel strip into hollow structural sections (HSS) is the result of a series of operations including forming, welding and sizing. Currently three methods are being used in North America for the manufacture of HSS. These methods are described below. Each method meets ASTM A-500 and CSA G-40.21-92 requirements for the the manufacture of HSS, and the sizes listed in this brochure may be produced to either standard.

## Electric Resistance Welding (ERW) Process

In the tube mill, flat steel strip (1) is formed continuously around its longitudinal axis to produce a round tube. This is done by moving the strip through a progressive set of rolls (2-6). The strip edges (7) are heated by either high frequency induction or contact welding and then forged together by weld rolls to create a continuous longitudinal weld without the addition of filler metal. The weld seam (8) is then cooled and processed through a set of sizing/shaping rolls which cold form it into a round (9), square (10) or rectangular (11) section.



## Form Square Weld Square (ERW) Process

In the weld mill, driven forming dies progressively shape the flat strip (1) by forming the top two corners (2) of the square or rectangular tube in the initial forming station. Subsequent stations form the bottom two corners (3) of the shape. No cold working of the sides of the shape is performed, and the shape's seam is welded by high frequency contacts when the tube is near its final shape and size. The welded tube (4) is cooled and then driven through a series of sizing stations which qualifies the tube's final dimensions.



## Submerged Arc Weld (SAW) Process

Two identical pieces of flat strip (1) are placed in a press brake and formed into two identical halves (2) of a finished tube size. A backup bar is tack welded to each leg of one of the half sections (3). The two half sections are fitted together toe-to-toe (4) and welded by the submerged arc process to complete the square or rectangular section (5).



# STI/HSS Member Companies

**Bull Moose Tube Company**
1819 Clarkson Road, Suite 100
Chesterfield, MO 63017
Telephone: (636) 537-2600
          (800) 325-4467
Fax: (636) 537-5848

**Columbia Structural Tubing**
8735 N Harborgate ST
Portland, OR 97203
Telephone: (503) 737-1200
          (877) 737-1202
Fax: (503) 737-1202

**IPSCO Tubulars Inc.**
P.O. Box 18, 2011 7th Avenue
Camanche, IA 52730
Telephone: (563) 242-0000
          (800) 945-8936
Fax: (563) 242-9137

**Maruichi American Corp.**
P.O. Box 3187
11529 Greenstone Ave.
Santa Fe Springs, CA 90670
Telephone: (562) 903-8600
          (800) 654-5495
Fax: (562) 903-8601

**Prolamsa**
*(Mexico Headquarters)*
Carretera a Colombia Km. 5.75
Escobedo, N.L.,
Mexico C.P. 45560
Tel +52 (81) 8154-0200
Fax +52 (81) 8901-1709

**Prolamsa USA, Inc.**
*(U.S. Headquarters)*
770 South Post Oak Lane
Suite 200, Houston, TX 77056
Tel (281) 494-0900
Fax (281) 494-0990

**Southland Tube Inc.**
P.O. Box 2425
Birmingham, AL 35201-2425
Telephone: (205) 251-1884
          (800) 543-9024
FAX: (205) 251-1553

**Valmont Industries**
(Structural Tube Division)
HWY 275, P.O. Box 358
Valley, NB 68064
Telephone: (800) 345-6825
Fax: (402) 359-4481

**Vest, Incorporated**
6023 Alcoa Avenue
Los Angeles, CA 90058
Telephone: (323) 581-8823
          (800) 421-6370
Fax: (323) 581-3465

**Welded Tube**
111 Rayette Road
Concord, Ontario,
Canada L4K 2E9
Telephone: (905) 669-1111
          (800) 565-8823
Fax: (905) 669-8570

**Please Note:**
*We've tried to make this brochure as comprehensive and factual as possible.
However, some information may have been updated since the time of printing.
Your HSS producer is your best source for up-to-date information.*





## FOREWORD

*This publication presents tables of dimensions and section properties for rectangular, square, and round Hollow Structural Sections (HSS). HSS with a maximum periphery of 64 inches are manufactured by the electric-resistance welding (ERW) process. HSS with peripheries greater than 64 inches are manufactured by the submerged arc welding (SAW) process. See HSS Manufacturing Methods inside front cover in this publication.*

*The dimensions, including nominal width, nominal depth, nominal diameter and nominal wall thickness are subject to the permissible variations stipulated in ASTM A500 "Standard Specification for Cold-Formed Welded and Seamless Carbon Steel Structural Tubing in Rounds and Shapes".*

*With today's manufacturing methods, HSS are produced with more precision than in the past. The strip used to produce HSS is now ordered to thicknesses with tighter tolerances. As a result, ERW HSS manufactured to A500 will often have a wall thickness close to the Specification allowable value.*

*In a change from past practice, section property data is now based upon the design wall thickness. The design wall thickness, t, for ERW HSS is less than the specified nominal wall thickness. For SAW HSS, the design wall thickness, t, is equal to the specified nominal wall thickness. The design wall thickness for each HSS size is included in the tabulated data.*

*The section property data based upon the design wall thickness, t, results in variations in the published area data that do not exceed 3.50% of the data based upon the minimum permissible wall thickness stipulated in ASTM A500. This is consistent with the similar section property data published for hot rolled structural shapes and the manufacturing tolerances associated with those products.*

*The section property data for rectangular and square ERW HSS are based upon outside corner radii equal to 2.0 times the design wall thickness. The section property data for rectangular and square SAW HSS are based upon outside corner radii equal to 3.6 times the design wall thickness for SAW sections with 5/8 inch nominal wall thicknesses; and 3.0 times the design wall thickness for SAW sections with nominal wall thicknesses equal to 1/2 inch and 3/8 inch.*

*General availability information for each size of HSS manufactured to ASTM A500 Grade B is contained in The Steel Tube Institute's companion publication "Principal Producers and Capabilities". Tables, summarizing the capabilities of principal producers by specific size and wall thickness, are included for rectangular, square and round HSS.*

*NOTE: The more universal terms "Hollow Structural Section" and "HSS" are used in this publication to designate rectangular, square and round structural steel tubing. These terms replace "structural tubing" and "pipe", which had been used previously. The round Hollow Structural Sections include typical "pipe" size diameters and wall thicknesses, as well as typical HSS sizes.*

The information presented in this publication has been prepared in accordance with recognized engineering principles and is for general information only. While it is believed to be accurate, this information should not be used or relied upon for any specific application without competent professional examination and verification of its accuracy, suitability, and applicability by a licensed professional engineer, designer, or architect. The publication of the material contained herein is not intended as a representation or warranty on the part of The Steel Tube Institute of North America or of any other person named herein, that this information is suitable for any general or particular use or of freedom from infringement of any patent or patents. Anyone making use of this information assumes all liability arising from such use.

Caution must be exercised when relying upon other specifications and codes developed by other bodies and incorporated by reference herein since such material may be modified or amended from time to time subsequent to the printing of this edition. The Institute bears no responsibility for such material other than to refer to it and incorporate it by reference at the time of the initial publication of this edition.

# "Designs for the 21st Century"







TABLE OF CONTENTS

PAGE

Dimensions and Section Properties of Rectangular HSS .................................................................................2
Dimensions and Section Properties of Square HSS .....................................................................................14
Dimensions and Section Properties of Round HSS ......................................................................................18

NOMENCLATURE

| | |
|---|---|
| b | Nominal width minus 3 times the design wall thickness, t (in.) |
| C | Torsional shear constant of cross-section (in.$^3$) |
| D | Outside diameter of round HSS (in.) |
| h | Nominal depth minus 3 times the design wall thickness, t (in.) |
| I | Moment of inertia of cross-section (in.$^4$) |
| $I_x$ | Moment of inertia of cross-section about the X-X axis (in.$^4$) |
| $I_y$ | Moment of inertia of cross-section about the Y-Y axis (in.$^4$) |
| J | Torsional stiffness constant of cross-section (in.$^4$) |
| r | Governing radius of gyration (in.) |
| $r_x$ | Radius of gyration with respect to the X-X axis (in.) |
| $r_y$ | Radius of gyration with respect to the Y-Y axis (in.) |
| S | Elastic section modulus (in.$^3$) |
| $S_x$ | Elastic section modulus about the X-X axis (in.$^3$) |
| $S_y$ | Elastic section modulus about the Y-Y axis (in.$^3$) |
| t | Design wall thickness (in.)... "units added" |
| Z | Plastic section modulus (in.$^3$) |
| $Z_x$ | Plastic section modulus about the X-X axis (in.$^3$) |
| $Z_y$ | Plastic section modulus about the Y-Y axis (in.$^3$) |













# DIMENSIONS AND SECTION PROPERTIES OF *SQUARE HSS*



| Nominal Size | | | Weight per Foot | Wall Thickness t | b/t | h/t | Cross Sectional Area | I | S | r | Z | Torsional Stiffness Constant J | Torsional Shear Constant C | Surface Area Per Foot |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| in. | in. | in. | lb. | in. | | | in.² | in.⁴ | in.³ | in. | in.³ | in.⁴ | in.³ | ft.² |
| 3 1/2 × 3 1/2 × | | 3/8 | 14.72 | 0.349 | 7.0 | 7.0 | 4.09 | 6.48 | 3.70 | 1.26 | 4.69 | 11.2 | 6.77 | 1.07 |
| | | 5/16 | 12.70 | 0.291 | 9.0 | 9.0 | 3.52 | 5.84 | 3.34 | 1.29 | 4.14 | 9.89 | 5.90 | 1.08 |
| | | 1/4 | 10.51 | 0.233 | 12.0 | 12.0 | 2.91 | 5.04 | 2.88 | 1.32 | 3.50 | 8.35 | 4.92 | 1.10 |
| | | 3/16 | 8.15 | 0.174 | 17.1 | 17.1 | 2.24 | 4.05 | 2.31 | 1.35 | 2.76 | 6.56 | 3.83 | 1.13 |
| | | 1/8 | 5.61 | 0.116 | 27.2 | 27.2 | 1.54 | 2.90 | 1.66 | 1.37 | 1.93 | 4.58 | 2.65 | 1.13 |
| 3 × 3 × | | 3/8 | 12.17 | 0.349 | 5.6 | 5.6 | 3.39 | 3.77 | 2.51 | 1.05 | 3.25 | 6.64 | 4.74 | 0.90 |
| | | 5/16 | 10.58 | 0.291 | 7.3 | 7.3 | 2.94 | 3.45 | 2.30 | 1.08 | 2.90 | 5.94 | 4.18 | 0.92 |
| | | 1/4 | 8.81 | 0.233 | 9.9 | 9.9 | 2.44 | 3.02 | 2.01 | 1.11 | 2.48 | 5.08 | 3.52 | 0.93 |
| | | 3/16 | 6.87 | 0.174 | 14.2 | 14.2 | 1.89 | 2.46 | 1.64 | 1.14 | 1.97 | 4.03 | 2.76 | 0.95 |
| | | 1/8 | 4.75 | 0.116 | 22.9 | 22.9 | 1.30 | 1.78 | 1.19 | 1.17 | 1.40 | 2.84 | 1.92 | 0.97 |
| 2 1/2 × 2 1/2 × | | 5/16 | 8.45 | 0.291 | 5.6 | 5.6 | 2.35 | 1.82 | 1.45 | 0.879 | 1.88 | 3.20 | 2.74 | 0.75 |
| | | 1/4 | 7.11 | 0.233 | 7.7 | 7.7 | 1.97 | 1.63 | 1.30 | 0.908 | 1.63 | 2.79 | 2.35 | 0.77 |
| | | 3/16 | 5.59 | 0.174 | 11.4 | 11.4 | 1.54 | 1.35 | 1.08 | 0.937 | 1.32 | 2.25 | 1.88 | 0.78 |
| | | 1/8 | 3.90 | 0.116 | 18.6 | 18.6 | 1.07 | 0.998 | 0.798 | 0.965 | 0.947 | 1.61 | 1.31 | 0.80 |
| 2 1/4 × 2 1/4 × | | 1/4 | 6.26 | 0.233 | 6.7 | 6.7 | 1.74 | 1.13 | 1.00 | 0.805 | 1.28 | 1.96 | 1.85 | 0.68 |
| | | 3/16 | 4.96 | 0.174 | 9.9 | 9.9 | 1.37 | 0.952 | 0.847 | 0.835 | 1.04 | 1.60 | 1.48 | 0.70 |
| | | 1/8 | 3.48 | 0.116 | 16.4 | 16.4 | 0.96 | 0.712 | 0.633 | 0.863 | 0.755 | 1.15 | 1.05 | 0.72 |
| 2 × 2 × | | 1/4 | 5.41 | 0.233 | 5.6 | 5.6 | 1.51 | 0.745 | 0.745 | 0.703 | 0.964 | 1.31 | 1.41 | 0.60 |
| | | 3/16 | 4.32 | 0.174 | 8.5 | 8.5 | 1.19 | 0.640 | 0.640 | 0.732 | 0.797 | 1.09 | 1.14 | 0.62 |
| | | 1/8 | 3.05 | 0.116 | 14.2 | 14.2 | 0.84 | 0.486 | 0.486 | 0.761 | 0.584 | 0.796 | 0.817 | 0.63 |
| 1 3/4 × 1 3/4 × | | 3/16 | 3.68 | 0.174 | 7.1 | 7.1 | 1.02 | 0.405 | 0.462 | 0.630 | 0.585 | 0.699 | 0.844 | 0.53 |
| 1 5/8 × 1 5/8 × | | 3/16 | 3.36 | 0.174 | 6.3 | 6.3 | 0.93 | 0.312 | 0.384 | 0.579 | 0.491 | 0.544 | 0.712 | 0.49 |
| | | 1/8 | 2.42 | 0.116 | 11.0 | 11.0 | 0.67 | 0.246 | 0.302 | 0.608 | 0.370 | 0.410 | 0.522 | 0.51 |
| 1 1/2 × 1 1/2 × | | 3/16 | 3.04 | 0.174 | 5.6 | 5.6 | 0.84 | 0.235 | 0.314 | 0.528 | 0.406 | 0.414 | 0.592 | 0.45 |
| | | 1/8 | 2.20 | 0.116 | 9.9 | 9.9 | 0.61 | 0.188 | 0.251 | 0.556 | 0.309 | 0.316 | 0.438 | 0.47 |
| 1 1/4 × 1 1/4 × | | 3/16 | 2.40 | 0.174 | 4.2 | 4.2 | 0.67 | 0.121 | 0.194 | 0.425 | 0.259 | 0.218 | 0.383 | 0.37 |
| | | 1/8 | 1.78 | 0.116 | 7.8 | 7.8 | 0.49 | 0.101 | 0.162 | 0.454 | 0.204 | 0.174 | 0.292 | 0.38 |

17

**Designation: F 2128 – 05**

An American National Standard

# Standard Test Method for
# Treestand Repetitive Loading Capability[1]

This standard is issued under the fixed designation F 2128; the number immediately following the designation indicates the year of original adoption or, in the case of revision, the year of last revision. A number in parentheses indicates the year of last reapproval. A superscript epsilon (ε) indicates an editorial change since the last revision or reapproval.

## 1. Scope

1.1 This test method covers the procedures for determining the capability of climbing treestands to withstand repeated loading relative to the manufacturer's rated capacity.

1.2 The values stated in inch-pound units are to be regarded as standard. The values given in parentheses are mathematical conversions to SI units that are provided for information only and are not considered standard.

1.3 *This standard does not purport to address all of the safety concerns, if any, associated with its use. It is the responsibility of the user of this standard to establish appropriate safety and health practices and determine the applicability of regulatory limitations prior to use.*

## 2. Referenced Documents

2.1 *ASTM Standards:* [2]
F 2124 Practice for Testing Ladder Treestand, Tripod Treestand and Climbing Stick Load Capacity

## 3. Terminology

3.1 The terminology and definitions in the referenced documents are applicable to this practice.

3.2 *Definitions:*

3.2.1 *backbar or V-bar*—the adjustable component of a climbing treestand or handclimber that engages the tree to provide support. The backbar may be rigid or flexible.

3.2.2 *climbing treestand*—a treestand that provides both the means to ascend the tree, and allow the user to remain at a desired elevation.

3.2.3 *handclimber, or climbing aid*—a device to assist climbing with a climbing treestand. A structure that allows the user to support his weight when lifting a climbing treestand with his legs.

3.2.4 *ladder treestand*—a treestand that is secured to the tree at the elevation where the platform is located. (The ladder treestand can be secured to the tree at other locations and has steps that are used to reach the platform or hunting position.)

3.2.5 *non-climbing, fixed position or hang-on treestand*—a treestand that is secured to the tree at the elevation where it is used. (The user usually ascends the tree by some means and then lifts the treestand to the desired position and secures it for use.)

3.2.6 *platform*—the horizontal structural area of a treestand on which the user stands or places his feet, or both.

3.2.7 *treestand*—a device designed to be affixed to a tree or its branches so as to permit an individual to sit or stand thereon for the purpose of attaining an elevated position from which to observe, photograph or hunt.

3.2.8 *two person treestand*—a ladder or hang-on treestand designed and marketed for use by two persons simultaneously.

## 4. Summary of Test Method

4.1 A treestand is mounted so that its platform is perpendicular to a rigid wood or metal pole when the rate load capacity is applied parallel to the mounting pole. The load is applied vertically and is guided so that it is applied at the locations applied when ascending or descending a tree on the treestand. The test subject is noted after a certain number of loading cycles, by means of a thorough visual inspection, to determine if any structural damage such as yielding or cracking, or both, has occurred. In the case of a ladder treestand, the load is applied to the rungs of the ladder. The test subject is noted after a certain number of loading cycles, by means of a thorough visual inspection, to determine if any structural damage such as yielding or cracking, or both, has occurred.

4.2 Stand up-sit down two-piece climbers—both seat and foot sections may be tested at the same time.

---

[1] This test method is under the jurisdiction of ASTM Committee F08 on Sports Equipment and Facilities and is the direct responsibility of Subcommittee F08.16 on Archery Products.

Current edition approved Oct. 1, 2005. Published October 2005. Originally approved in 2001. Last previous edition approved in 2001 as F 2128 – 01.

[2] For referenced ASTM standards, visit the ASTM website, www.astm.org, or contact ASTM Customer Service at service@astm.org. For *Annual Book of ASTM Standards* volume information, refer to the standard's Document Summary page on the ASTM website.

Copyright © ASTM International, 100 Barr Harbor Drive, PO Box C700, West Conshohocken, PA 19428-2959, United States.



PLAINTIFF'S EXHIBIT 74


Copyright by ASTM Int'l (all rights reserved); Tue Apr 15 09:51:18 EDT 2008
Downloaded/printed by
Raymond Thompson () pursuant to License Agreement. No further reproductions authorized.

F 2128 – 05

## 5. Significance and Use

5.1 This test method is intended for quality assurance and production control purposes with recognition that individual usage will vary considerably. This test method is not intended to be an independent material or product-acceptance test.

## 6. Apparatus

6.1 A rigid, round wood or metal pole, preferably vertical, is used to mount the subject product such that pole deflection is minimized.

6.1.1 The mounting pole diameter shall be 10 in. (254 mm), ±1 in. (25.4 mm).

6.2 The load shall be applied using either calibrated weights or a mechanical device in conjunction with a calibrated load cell.

6.2.1 The use of calibrated weights requires that weight placement be accurate to assure that the load application centroid is coincident with the boundaries defined and meets the requirements as given in 6.3. Caution should be exercised for operator protection with the use of weights in case of slippage or premature failure.

6.2.2 The use of a mechanical device such as a tensile testing machine or hydraulic power, in combination with pulleys, fulcrums or bearing to redirect forces, requires the use of a calibrated load cell attached adjacent to the test subject to account for friction losses.

6.3 The application of the load shall be at a point on the platform area that is the geometric centroid of the test subjects load placement area while ascending or descending a tree. The application of the load on a ladder treestand shall be at a point on the rung area which is the geometric center.

6.3.1 The load shall be applied to the test subject over a 100 in.$^2$ (0.065 m$^2$) area for climbing treestands and over a 25 in.$^2$ (0.016 m$^2$) area for ladder treestands by either: (J) controlled application of calibrated weights, or (2) as described in 6.2.2, to a flat rectangular steel plate 10 in. (254 mm) wide by 10 in. (254 mm) long and a minimum of ½ in. (12.7 mm) thick for climbing treestands and 5 in. (127 mm) wide by 5 in. (127 mm) long for ladder treestands and a minimum of ½ in. (12.7 mm) thick on top of the test subject. The edges of the load plate adjacent to the test subject shall be deburred with 0.015/0.030 in. (0.381/0.762 mm) radius to reduce damage to the test subject by sharp corners. The load shall be applied at a velocity no more than ½ ft/s (9.144 m/min).

6.3.2 A ¼ –in. (6.350–mm) thick 90 durometer rubber sheet may be placed between the test subject and the load plate and shall be, at a minimum, at least equal in size and symmetrical to the load plate (to prevent the metal load plate from directly contacting the test subject).

NOTE 1—If load guidance is required, fabrication and attachment of any necessary guide bars to this load plate by welding must assure that the plate remain flat and free of distortion.

6.3.3 The load plate shall be positioned on the test subject with its center as close to the point as given in 6.3 as possible, yet maintaining the 100 in.$^2$ (0.065 m$^2$) or 25 in.$^2$ (0.016 m$^2$) respective contact area. A centerline of the load plate must be parallel to the major axis (axis of symmetry) of the test subject.

## 7. Procedure

7.1 Read instructions accompanying the test subject to ascertain the proper procedure for use and mounting and secure the test subject to the mounting pole such that the platform (plane of the platform) is perpendicular to the mounting pole. If necessary, use minimum auxiliary temporary means to maintain the subject in the correct position during set-up. (Frictional forces, without a load on the subject, may not be sufficient in some cases for the subject to remain in position). A small band on the mounting pole may by necessary.

7.2 By geometric means, determine the location of the load application points as given in 6.3 and mark accordingly.

7.3 Determine if the test subject will deflect sufficiently during the test to allow the load plate or weight to slip or shift. If so, provide auxiliary means such as clamps or stops to eliminate sideways movement of the load plate to protect operators.

7.4 The load (calibrated weight) shall be equal to the test subject's rated capacity (except as noted within Section 6.1.6 of Practice F 2124). For example, a test subject with a rated capacity of 300 lbs (136.1 kg) shall be tested using a load of 300 lbs (136.1 kg).

7.5 The load shall be applied for a minimum time of one second and then removed completely. The repetitive frequency of load application and removal shall be no more than 30 cycles/min, that is, the load is applied and then removed within no less than 2 s (to avoid heating).

7.6 The repetitive loading shall be 10 000 cycles for climbing treestands. This testing based on a person using a stand two times a day (10 cycles up, 10 cycles down each time) for 25 days each year for 10 years. The number of repetitive loading cycles for ladder and tripod stands shall be the number of steps multiplied by 500 (based on usage of cycles up and down with each use, 25 days per year for 10 years). Testing on ladder and tripod stands shall be performed on one step with the test subject assembled and in-place against the test pole (when applicable). The step shall be chosen at a location approximately two-thirds of the total assembled vertical height. For ladder treestands capable of supporting two persons, the number of repetitive loading cycles shall be the number of steps multiplied by 1000 to account for two persons climbing.

7.7 Periodic checks at the end of each 3000 cycles shall be made and a note shall be made if the test subject, or load application apparatus, moves (shifts) from its initial equilibrium position on the mounting pile, whether the test subject continues to support the applied load, and in general whether any changes have occurred during the test.

7.8 A thorough inspection shall be made and noted to identify any and all yielding, cracking or other permanent deformation as a result of the repetitive loading.

## 8. Report

8.1 Recording of results shall include the following:

8.1.1 Identification of test subject model, manufacturer, and rated capacity.

8.1.2 Photograph of test subject.

8.1.3 Photograph of test set-up (three views: side, top, and end).

2

Copyright by ASTM Int'l (all rights reserved); Tue Apr 15 09:51:18 EDT 2008
Downloaded/printed by
Raymond Thompson () pursuant to License Agreement. No further reproductions authorized.

F 2128 – 05

8.1.4  Verification of calibration.

8.1.5  Date of test.

8.1.6  If movement (shifting) has been detected as given in 7.7, a description shall be recorded.

8.1.7  A description and detailed (close-up) photographs of any and all permanent deformation that has been observed and noted as given in 7.8 shall be recorded.

8.1.8  A note shall be recorded whether the test subject remained free of defects.

8.2  *Pass-Fail Criterion*:

8.2.1  Any cracking or other structural defects noted shall be a cause for failure of the repetitive load test.

8.2.2  If a treestand fails this test the stand and a copy of the test data shall be returned to the manufacturer.

## 9. Precision and Bias

9.1  No statement is made about either the precision or bias of Test Method F 2128 for measuring load capacity since the result merely states whether there is conformance to the criteria for success specified in the procedure.

## 10. Keywords

10.1  backbar; climbing aid; platform; treestand

## APPENDIX

### (Nonmandatory Information)

### X1. Additional Information

X1.1  This standard is provided for use by manufacturers of treestands and testing companies. Criteria has been developed for certification of treestands and this standard is an integral part of the certification. However, a treestand conforming to this standard alone does not constitute certification and those manufacturers desiring certification must meet all applicable standards as a minimum requirement.

*ASTM International takes no position respecting the validity of any patent rights asserted in connection with any item mentioned in this standard. Users of this standard are expressly advised that determination of the validity of any such patent rights, and the risk of infringement of such rights, are entirely their own responsibility.*

*This standard is subject to revision at any time by the responsible technical committee and must be reviewed every five years and if not revised, either reapproved or withdrawn. Your comments are invited either for revision of this standard or for additional standards and should be addressed to ASTM International Headquarters. Your comments will receive careful consideration at a meeting of the responsible technical committee, which you may attend. If you feel that your comments have not received a fair hearing you should make your views known to the ASTM Committee on Standards, at the address shown below.*

*This standard is copyrighted by ASTM International, 100 Barr Harbor Drive, PO Box C700, West Conshohocken, PA 19428-2959, United States. Individual reprints (single or multiple copies) of this standard may be obtained by contacting ASTM at the above address or at 610-832-9585 (phone), 610-832-9555 (fax), or service@astm.org (e-mail); or through the ASTM website (www.astm.org).*

Copyright by ASTM Int'l (all rights reserved); Tue Apr 15 09:51:18 EDT 2008
Downloaded/printed by
Raymond Thompson () pursuant to License Agreement. No further reproductions authorized.



**Designation: F 2126 – 06**

An American National Standard

# Standard Test Method for
# Treestand Static Load Capacity[1]

This standard is issued under the fixed designation F 2126; the number immediately following the designation indicates the year of original adoption or, in the case of revision, the year of last revision. A number in parentheses indicates the year of last reapproval. A superscript epsilon (ε) indicates an editorial change since the last revision or reapproval.

## 1. Scope

1.1 This test method covers the determination of the static load capacity of treestands in terms of a factor of safety relative to the manufacturer's rated capacity.

1.2 The values stated are in inch-pound units and are to be regarded as the standard.

1.3 *This standard does not purport to address all of the safety concerns, if any, associated with its use. It is the responsibility of the user of this standard to establish appropriate safety and health practices and determine the applicability of regulatory limitations prior to use.*

## 2. Referenced Documents

2.1 *ASTM Standards:* [2]
F 2531  Test Method for Load Capacity of Treestand Seats

## 3. Terminology

3.1 The terminology and definitions in the referenced documents are applicable to this test method.

3.2 *Definitions:*

3.2.1 *backbar or V-bar*—adjustable component of a climbing treestand or handclimber that engages the tree to provide support. The backbar may be rigid or flexible.

3.2.2 *climbing stick*—device used to assist climbing a tree primarily to a fixed position treestand. A structure that is secured to the tree and allows the user to support his weight and climb to the desired height on the tree.

3.2.3 *climbing treestand*—treestand that provides both the means to ascend the tree, and allow the user to remain at a desired elevation.

3.2.4 *handclimber, or climbing aid*—device to assist climbing with a climbing treestand. A structure that allows the user to support his weight when lifting a climbing treestand with his legs.

3.2.5 *ladder treestand*—treestand that is secured to the tree at the elevation where the platform is located. (The ladder treestand may be secured to the tree at other locations and has steps that are used to reach the platform or hunting position.)

3.2.6 *non-climbing, fixed position or hang-on treestand*—treestand that is secured to the tree at the elevation where it is used. (The user usually ascends the tree by some means and then lifts the treestand to the desired position and secures it for use.)

3.2.7 *platform*—horizontal structural area of a treestand on which the user stands and/or places his feet.

3.2.8 *treestand*—device designed to be affixed to a tree or its branches so as to permit an individual to sit or stand thereon for the purpose of attaining an elevated position from which to observe, photograph or hunt.

3.2.9 *tripod or tower stand*—tripod or tower stand is constructed to be self-supporting and is not required to be secured to a tree.

## 4. Summary of Test Method

4.1 A climbing treestand is mounted so that its platform is perpendicular or slightly above horizontal to a rigid wood or metal pole when the rated load is applied parallel to the mounting pole. A fixed position or ladder treestand shall be mounted with the platform perpendicular to the mounting pole. A tripod stand shall be positioned so that the platform is perpendicular to the application of the load. A climbing stick shall be mounted such that the steps are perpendicular to the pole. The platform is equipped with deflection measurement devices. The load is applied step-wise and recordings are made of the load and deflection at each step until yielding or permanent deflection occurs or until twice the rated load is applied. The ladder, tripod and climbing sticks do not require deflection measurements be taken.

## 5. Significance and Use

5.1 This test method is intended for quality assurance and production control purposes.

## 6. Apparatus

6.1 A rigid round wood or metal pole, preferably vertical, is used to mount the subject product such that pole deflection is minimized.

---

[1] This test method is under the jurisdiction of ASTM Committee F08 on Sports Equipment and Facilities and is the direct responsibility of Subcommittee F08.16 on Archery Products.

Current edition approved May 1, 2006. Published May 2006. Originally approved in 2001. Last previous edition approved in 2001 as F 2126 – 01.

[2] For referenced ASTM standards, visit the ASTM website, www.astm.org, or contact ASTM Customer Service at service@astm.org. For *Annual Book of ASTM Standards* volume information, refer to the standard's Document Summary page on the ASTM website.

Copyright © ASTM International, 100 Barr Harbor Drive, PO Box C700, West Conshohocken, PA 19428-2959, United States.

1

Copyright by ASTM Int'l (all rights reserved); Tue Apr 15 09:51:07 EDT 2008
Downloaded/printed by
Raymond Thompson () pursuant to License Agreement. No further reproductions authorized.

6.1.1 The mounting pole diameter shall be 10 in. (254 mm), ± 1 in. (25.4 mm).

6.2 The load shall be applied using either calibrated weights or a mechanical device in conjunction with a calibrated load cell.

6.2.1 The use of calibrated weights requires that weight placement be accurate to assure that the load application centroid is coincident with the boundaries defined and meets the requirements as given in 6.4. Caution should be exercised for operator protection with the use of weights in case of slippage or premature failure.

6.2.2 The use of a mechanical device such as a tensile testing machine or hydraulic power, in combination with pulleys, fulcrums or bearings to re-direct forces, requires the use of a calibrated load cell attached adjacent to the test subject to account for friction losses.

6.3 Calibrated deflection measuring devices (such as dial indicators or optical laser) shall be used to measure movement of the test subject under load. The accuracy of the measuring devices shall be at within 0.010 in. (0.254 mm) and repeatable within 0.005 in. (0.127 mm). The devices shall measure movement parallel to the direction of the applied load and shall be mounted in such a manner to eliminate deflection of the test apparatus and be placed, as a minimum, as follows:

6.3.1 There shall be at least two measurements taken at the load; one on each side and 6 in. (152.4 mm) from the center of load application.

6.3.2 A deflection measurement shall be taken at two points furthest from the mounting pole, one on each side symmetrical with the test subject.

6.3.3 A deflection measurement shall be taken at two points 6 in. (152.4 mm) from the mounting pole, one on each side symmetrical with the test subject.

6.4 The application of the load shall be at the centroid of the platform area for standing platforms or the centroid of the users load application area for handclimber (climbing aids).

6.4.1 For standing platforms, the load shall be applied to the test subject over one hundred 100 in.$^2$ (0.065 m$^2$) area by means of a flat square steel plate 10-in. (254-mm) wide and a minimum of ½-in. (12.7-mm) thick. The edges of the load plate adjacent to the test subject shall be de-burred with 0.015/0.030 in. (0.381/0.762 mm) radius to reduce damage to the test subject by sharp corners. A single layer of thin masking tape may be applied to the surface of the load plate contacting the test subject to reduce scratching and improve friction.

NOTE 1—Load attachment structure must be secured to this load plate therefore fabrication by welding must assure that the plate remain flat and free of distortion.

6.4.2 Handclimbers (climbing aids) shall have the load applied along the centroid of the supporting structure furthest from the test pole (which by design must be capable of directly supporting the user's weight during normal use) by means of a 4-in. (101.6-mm) wide steel plate or rigid shape of sufficient length to horizontally span the width of the test subject.

6.4.3 For two piece (stand/sit) climbing treestands with movable non-rigid seats (such as mesh, slings, or similar) that can be slid forward or backward during normal use, two additional separate tests shall be conducted on the seat. The first test shall be conducted with the load applied to the centroid of the non-rigid platform with the non-rigid platform located in its normal position, typically in the center of supporting structure, using the square plate in accordance with 6.4.1. The second test shall be conducted with the load applied along the centroid of the supporting structure furthest from the test pole, which by design must be capable of directly supporting the user's weight during normal use. (For example, the horizontal framing member of a treestand where the user must support his or her weight during normal stand up/sit down climbing procedures.) For this second case, a rigid steel bar should be used to distribute the load over a 16-in. (406.4-mm) wide area length of the supporting structure

6.5 For fixed position treestands, the test shall be repeated with the load applied to the seat and in accordance with 6.4.1, 7.5 and 7.7. For climbing treestands in which the seat is not used during the climbing, that is, a handclimber or climbing aid is used, refer to Test Method F 2531 for seat requirements.

6.6 In addition to the platform ladder, tripod and climbing sticks shall have a minimum of two steps tested for static load with the load applied over a 3-in. (76.2-mm) wide portion of the step in the center of the step, or where a foot would interface with the step.

## 7. Procedure

7.1 Read instructions accompanying the test subject to ascertain the proper procedure for use and mounting and secure the test subject to the mounting pole such that the platform (plane of the platform) is perpendicular to the mounting pole. If necessary, use minimum auxiliary temporary means to maintain the subject in the correct position during set-up. (Frictional forces, without a load on the subject, may not be sufficient in some cases for the subject to remain in position. A small band on the mounting pole may be necessary).

7.2 By geometric means, determine the location of the centroid of the platform area and mark accordingly. Place the load plate centerline coincident with the centroid of the platform.

7.3 Determine if the test subject will deflect sufficiently during the test to allow the load plate to slip or shift. If so, provide auxiliary means such as clamps or stops to eliminate sideways movement of the load plate. The load must be applied as given in 6.4 and must be continuously applied parallel to the mounting pole throughout the entire test.

7.4 Locate and mount deflection measurement devices, or reference points using optical laser, as given in 6.3.

7.5 The initial load for beginning the test shall be one-fourth of the test subjects' rated capacity. Example: a test subject with a rated capacity of 400 lbs (882 kg) shall begin the test at a load of 100 lbs (200 kg). Loads shall be increased by 25 % increments up to the test subjects' rated capacity after which the load shall be increased to 150 %, 175 % and 200 % of the rated capacity, respectively. After the load meets or exceeds the rated capacity, it shall be returned to zero and checked for yielding.

7.6 At each load value exceeding the rated capacity (test point), the load and all deflection measurements shall be recorded. The load shall then be removed and the deflection measurements re-recorded. A note shall be made of any

2
Copyright by ASTM Int'l (all rights reserved); Tue Apr 15 09:51:07 EDT 2008
Downloaded/printed by
Raymond Thompson () pursuant to License Agreement. No further reproductions authorized.

F 2126 – 06

measurement that does not return to within 0.200 in. (5.080 mm) of its initial value. After the load is removed, all deflection measurements shall be checked, and the test subject visually inspected for permanent deformations by yielding.

7.7 The load shall incrementally increase until it is determined that (1) a factor of safety of 2.0 has been met, or (2) permanent deformation (yielding) has occurred.

## 8. Report

8.1 Deflection readings shall be discarded only when a calibration change is discovered after rendings have been made or when improper operator techniques can be cited.

8.2 Recording of results shall include the following:

8.2.1 Identification of test subject model, manufacturer, and rated capacity.

8.2.2 Photograph of test subject.

8.2.3 Photograph of test set-up (three views: side, top, and end).

8.2.4 Load and deflection measurements at all test points.

8.2.5 Verification of calibration.

8.2.6 Date of test.

8.3 *Determination of Factor of Safety*:

8.3.1 When yielding or permanent deformation has been reached as given in 7.7, the corresponding load in pounds shall be noted as the yield load.

8.3.2 The factor of safety shall be calculated by dividing the manufacturer's rated capacity of the test subject into the resulting yield load. For example, rated capacity-300 lbs (661.4 kg), yield load-630 lbs (1,388.9 kg); therefore the factor of safety is 630/300 or 2.10 (usually noted as 2.10 SF).

8.3.3 The factor of safety must meet or exceed 2.0.

8.4 *Pass-Fail Criterion*:

8.4.1 A treestand is considered failed if it cannot support twice its rated load capacity without yielding or permanent deformation. The deflection measurements can be used as an indication of permanent deformation but shall not be used as pass-fail criterion.

8.4.2 If a treestand fails this test, the treestand and a copy of the test data shall be returned to the manufacturer.

## 9. Precision and Bias

9.1 No statement is made about either the precision or bias of this test method for measuring load capacity since the result merely states whether there is conformance to the criteria for success specified in the procedure.

## 10. Keywords

10.1 backbar; climbing aid; climbing stick; platform; treestand; tripod

## APPENDIX

(Nonmandatory Information)

### X1. Additional Information

X1.1 This test method is provided for use by manufacturers of treestands and testing companies. Criteria has been developed for certification of treestands and this test method is an integral part of the certification. However, a treestand conforming to this test method alone does not constitute certification and those manufacturers desiring certification must meet all applicable standards as a minimum requirement.

*ASTM International takes no position respecting the validity of any patent rights asserted in connection with any item mentioned in this standard. Users of this standard are expressly advised that determination of the validity of any such patent rights, and the risk of infringement of such rights, are entirely their own responsibility.*

*This standard is subject to revision at any time by the responsible technical committee and must be reviewed every five years and if not revised, either reapproved or withdrawn. Your comments are invited either for revision of this standard or for additional standards and should be addressed to ASTM International Headquarters. Your comments will receive careful consideration at a meeting of the responsible technical committee, which you may attend. If you feel that your comments have not received a fair hearing you should make your views known to the ASTM Committee on Standards, at the address shown below.*

*This standard is copyrighted by ASTM International, 100 Barr Harbor Drive, PO Box C700, West Conshohocken, PA 19428-2959, United States. Individual reprints (single or multiple copies) of this standard may be obtained by contacting ASTM at the above address or at 610-832-9585 (phone), 610-832-9555 (fax), or service@astm.org (e-mail); or through the ASTM website (www.astm.org).*

Copyright by ASTM Int'l (all rights reserved); Tue Apr 15 09:51:07 EDT 2008
Downloaded/printed by
Raymond Thompson () pursuant to License Agreement. No further reproductions authorized.



**Designation: F 2120 – 06**

An American National Standard

## Standard Practice for
## Testing Treestand Load Capacity[1]

This standard is issued under the fixed designation F 2120; the number immediately following the designation indicates the year of original adoption or, in the case of revision, the year of last revision. A number in parentheses indicates the year of last reapproval. A superscript epsilon (ε) indicates an editorial change since the last revision or reapproval.

### 1. Scope

1.1 This practice provides guidance for testing the load capacity of treestands.

1.2 The values stated are in inch-pound units and are to be regarded as the standard.

1.3 *This standard does not purport to address all of the safety concerns, if any, associated with its use. It is the responsibility of the user of this standard to establish appropriate safety and health practices and determine the applicability of regulatory limitations prior to use.*

### 2. Referenced Documents

2.1 *ASTM Standards:* [2]

F 2125 Test Method for Treestand Static Stability

F 2126 Test Method for Treestand Static Load Capacity

F 2128 Test Method for Treestand Repetitive Loading Capability

F 2531 Test Method for Load Capacity of Treestand Seats

### 3. Terminology

3.1 The terminology and definitions in the referenced documents are applicable to this practice.

3.2 *Definitions:*

3.2.1 *backbar*—adjustable component of a climbing treestand or handclimber that engages the tree to provide support.

3.2.2 *climbing treestand*—treestand that provides both the means to ascend the tree, and allow the user to remain at a desired elevation.

3.2.3 *handclimber, or climbing aid*—device to assist climbing with a climbing treestand. A structure that allows the user to support his weight when lifting a climbing treestand with his legs.

3.2.4 *non-climbing, fixed position or hang-on treestand*—treestand that is secured to the tree at the elevation where it is used. (The user usually ascends the tree by some means and then lifts the treestand to the desired position and secures it for use.)

3.2.5 *platform*—horizontal structural area of a treestand on which the user stands and/or places his feet.

3.2.6 *treestand*—device designed to be affixed to a tree or its branches so as to permit an individual to sit or stand thereon for the purpose of attaining an elevated position from which to observe, photograph or hunt.

### 4. Summary of Practice

4.1 This practice provides guidelines for the selection of tests for the evaluation of the load capacity of treestands in accordance with manufacturer's capacity rating, particularly for quality assurance and adequacy of safety factors including:

4.1.1 Static load test.

4.1.2 Stability and adherence test.

4.1.3 Repetitive loading test.

NOTE 1—Climbing treestands only.

4.1.4 Treestand seat loading test.

4.1.5 In the event of a repetitive load failure, manufacturer is to submit two additional stands for testing for final acceptance.

### 5. Significance and Use

5.1 This practice is provided to develop and maintain uniformity in practices for the evaluation of the load capacity of treestands, particularly with regard to quality assurance and safety factors.

5.2 It is emphasized that the use of these procedures will not alter the validity of data determined with specific test methods, but provides guidance in the interpretation of test results (valid or invalid) and guidance in the selection of a reasonable test procedure in those instances where no standard exists today.

### 6. Selection of Test Procedures

6.1 The following methods are recommended for individual units and situations:

---

[1] This practice is under the jurisdiction of ASTM Committee F08 on Sports Equipment and Facilities and is the direct responsibility of Subcommittee F08.16 on Archery Products.

Current edition approved May 1, 2006. Published May 2006. Originally approved in 2001. Last previous edition approved in 2001 as F 2120 – 01.

[2] For referenced ASTM standards, visit the ASTM website, www.astm.org, or contact ASTM Customer Service at service@astm.org. For *Annual Book of ASTM Standards* volume information, refer to the standard's Document Summary page on the ASTM website.

Copyright © ASTM International, 100 Barr Harbor Drive, PO Box C700, West Conshohocken, PA 19428-2959, United States.

Copyright by ASTM Int'l (all rights reserved); Tue Apr 15 09:35:03 EDT 2008
Downloaded/printed by
Raymond Thompson () pursuant to License Agreement. No further reproductions authorized.

F 2120 – 06

6.1.1 An individual test unit of the specified model shall be selected at random.

6.1.2 The test unit shall first be visually inspected for any flaws, defects, missing parts, etc. and any discrepancies so noted. The test unit shall also be checked, and so noted, to assure that instructions are included with the unit.

6.1.3 The initial test performed shall be a repetitive loading test in accordance with Test Method F 2128.

6.1.4 After successful testing as given in 6.1.3, a stability and adherence test in accordance with Test Method F 2125.

6.1.5 After successful testing as given in 6.1.4, a static load test shall be performed in accordance with Test Method F 2126.

6.1.6 After successful testing as given in 6.1.5, a static load test of the treestand seat shall be performed in accordance with Test Method F 2531.

## 7. Failure Criterion

7.1 During all testing, yielding, permanent deformation, cracks or other structural defects shall be cause for failure. Visual inspection shall be the main inspection method; however, other non-destructive test methods may be used to determine if yielding has occurred.

7.2 During static stability and adherence testing, the stands will rotate as the load is applied. No sudden movement of the stand shall occur that could cause the user to lose their balance.

## 8. Keywords

8.1 adherence; backbar; climbing aid; platform; treestand

## APPENDIX

### (Nonmandatory Information)

### X1. Additional Information

X1.1 This practice is provided for use by manufacturers of treestands and testing companies. Criteria has been developed for certification of treestands and this practice is an integral part of the certification. However, a treestand conforming to this practice alone does not constitute certification and those manufacturers desiring certification must meet all applicable standards as a minimum requirement.

ASTM International takes no position respecting the validity of any patent rights asserted in connection with any item mentioned in this standard. Users of this standard are expressly advised that determination of the validity of any such patent rights, and the risk of infringement of such rights, are entirely their own responsibility.

This standard is subject to revision at any time by the responsible technical committee and must be reviewed every five years and if not revised, either reapproved or withdrawn. Your comments are invited either for revision of this standard or for additional standards and should be addressed to ASTM International Headquarters. Your comments will receive careful consideration at a meeting of the responsible technical committee, which you may attend. If you feel that your comments have not received a fair hearing you should make your views known to the ASTM Committee on Standards, at the address shown below.

This standard is copyrighted by ASTM International, 100 Barr Harbor Drive, PO Box C700, West Conshohocken, PA 19428-2959, United States. Individual reprints (single or multiple copies) of this standard may be obtained by contacting ASTM at the above address or at 610-832-9585 (phone), 610-832-9555 (fax), or service@astm.org (e-mail); or through the ASTM website (www.astm.org).

Copyright by ASTM Int'l (all rights reserved); Tue Apr 15 09:35:03 EDT 2008
Downloaded/printed by
Raymond Thompson () pursuant to License Agreement. No further reproductions authorized.



**Designation: F 2125 – 05[ε1]**

An American National Standard

# Standard Test Method for
# Treestand Static Stability and Adherence[1]

This standard is issued under the fixed designation F 2125; the number immediately following the designation indicates the year of original adoption or, in the case of revision, the year of last revision. A number in parentheses indicates the year of last reapproval. A superscript epsilon (ε) indicates an editorial change since the last revision or reapproval.

ε[1] Note—Title was corrected editorially in June 2006.

## 1. Scope

1.1 This test method covers the determination of the static stability and adherence of treestands relative to the manufacturer's rated capacity.

1.2 The values stated are in inch-pound units and are to be regarded as standard.

1.3 *This standard does not purport to address all of the safety concerns, if any, associated with its use. It is the responsibility of the user of this standard to establish appropriate safety and health practices and determine the applicability of regulatory limitations prior to use.*

## 2. Terminology

2.1 The terminology and definitions in the referenced documents are applicable to this test method.

2.2 *Definitions:*

2.2.1 *backbar or V-bar*—adjustable component of a climbing treestand or handclimber that engages the tree to provide support. The backbar may be rigid or flexible.

2.2.2 *climbing stick*—device used to assist climbing a tree primarily to a fixed position treestand. A structure that is secured to the tree and allows the user to support his weight and climb to the desired height on the tree.

2.2.3 *climbing treestand*—treestand that provides both the means to ascend the tree, and allow the user to remain at a desired elevation.

2.2.4 *handclimber, or climbing aid*—device to assist climbing with a climbing treestand. A structure that allows the user to support his weight when lifting a climbing treestand with his legs.

2.2.5 *ladder treestand*—treestand that is secured to the tree at the elevation where the platform is located. (The ladder

treestand may be secured to the tree at other locations and has steps that are used to reach the platform or hunting position.)

2.2.6 *non-climbing, fixed position or hang-on treestand*—treestand that is secured to the tree at the elevation where it is used. (The user usually ascends the tree by some means and then lifts the treestand to the desired position and secures it for use.)

2.2.7 *platform*—horizontal structural area of a treestand on which the user stands and/or places his feet.

2.2.8 *treestand*—device designed to be affixed to a tree or its branches so as to permit an individual to sit or stand thereon for the purpose of attaining an elevated position from which to observe, photograph or hunt.

2.2.9 *tripod or tower stand*—tripod or tower stand is constructed to be self-supporting and is not required to be secured to a tree.

## 3. Summary of Test Method

3.1 A climbing treestand is mounted so that its platform is perpendicular to a rigid wood or metal pole when the rated load is applied parallel to the mounting pole, at selected points. A fixed position or ladder stand shall be mounted with the platform perpendicular to the mounting pole. A tripod stand shall be positioned so that the platform is perpendicular to the application of the load. A climbing stick shall be mounted such that the steps are perpendicular to the pole. The platform is equipped with deflection measurement devices. The load is applied, in order, at the selected points and recordings are made of the deflection at each point unless the test subject moves from its initial position or until permanent deflection from the load occurs. During this test, the test subject will rotate, but shall not slip or have permanent deformation.

3.2 In addition, for climbing treestands, only the test given in 3.1 is duplicated, except that the treestand platform is not perpendicular to the mounting pole, but at an angle approximately 15°, such as that used in ascending or descending a tree.

---

[1] This test method is under the jurisdiction of ASTM Committee F08 on Sports Equipment and Facilities and is the direct responsibility of Subcommittee F08.16 on Archery Products.

Current edition approved Oct. 1, 2005. Published October 2005. Originally approved in 2001. Last previous edition approved in 2001 as F 2125 – 01.

Copyright © ASTM International, 100 Barr Harbor Drive, PO Box C700, West Conshohocken, PA 19428-2959, United States.

Copyright by ASTM Int'l (all rights reserved); Mon Apr 14 17:33:49 EDT 2008
Downloaded/printed by
Raymond Thompson () pursuant to License Agreement. No further reproductions authorized.

F 2125 – 05<sup>ε1</sup>

## 4. Significance and Use

4.1 This test method is intended for quality assurance and production control purposes. This test method is not intended to be an independent material or product-acceptance test.

## 5. Apparatus

5.1 A rigid round wood or metal pole, preferably vertical, is used to mount the subject product such that pole deflection is minimized.

5.1.1 The mounting pole diameter shall be 10 in. (254 mm) ± 1 in. (2.54 mm).

5.2 The load shall be applied using either calibrated weights or a mechanical device in conjunction with a calibrated load cell.

5.2.1 The use of calibrated weights requires that weight placement be accurate to assure that the load application centroid is coincident with the boundaries defined and meets the requirements as given in 5.3.1 and in 5.4.3. Caution should be exercised for operator protection with the use of weights in case of slippage or premature failure.

5.2.2 The use of a mechanical device such as a tensile testing machine or hydraulic power, in combination with pulleys, fulcrums or bearings to re-direct forces, requires the use of a calibrated load cell attached adjacent to the test subject to account for friction losses.

5.3 Calibrated deflection measuring devices (such as dial indicators or optical laser) shall be used to measure movement of the test subject under load. The accuracy of the measuring devices shall be at within .010 in. (0.254 mm) and repeatable within .005 in. (0.127 mm). The devices shall measure movement parallel to the direction of the applied load and shall be mounted in such a manner to eliminate deflection of the test apparatus and be placed, as a minimum, as follows:

5.3.1 There shall be at least four platform deflection measurements taken when the load is applied.

5.3.1.1 One measurement on each side of the test subject, symmetrical about the test subject centerline and at points furthest from the mounting pole, that is, the outermost corners of the platform.

5.3.1.2 One measurement on each side of the test subject, symmetrical about the test subject centerline and at points closest to the mounting pole, but on the outermost sides of the platform, that is, the outermost edges closest to the mounting pole.

5.4 The application of the load shall be at the points given in 5.3.1 on the platform area.

5.4.1 The load shall be applied, one at a time, to the points as given in 5.3.1.1, each side, and then as given in 5.3.1.2, each side.

5.4.2 The load shall be applied to the test subject over a 50 in.$^2$ (0.032 m$^2$) area by means of a flat rectangular steel plate 5 in. (127 mm) wide by 10 in. (254 mm) long and a minimum of ½ in. (12.7 mm) thick. The edges of the load plate adjacent to the test subject shall be deburred with 0.015/0.030 in. (0.381/0.762 mm) radius to reduce damage to the test subject by sharp corners. A single layer of thin masking tape may be applied to the surface of the load plate contacting the test subject to reduce scratching and improve friction.

Note 1—Load attachment structure must be secured to this load plate therefore fabrication by welding must assure that the plate remain flat and free of distortion.

5.4.3 The load plate shall be positioned on the test subject with its long axis and its center as close to the point as given in 5.3.1 as possible, yet maintaining the 50 in.$^2$ (0.032 m$^2$) contact area. The centerline of the load plate need not be parallel to the major axis (axis of symmetry) of the test subject.

## 6. Procedure

6.1 Read instructions accompanying the test subject to ascertain the proper procedure for use and mounting and secure the test subject to the mounting pole such that the platform (plane of the platform) is approximately perpendicular to the mounting pole when its rated load is applied. If necessary, use minimum auxiliary temporary means to maintain the subject in the correct position during set-up. (Frictional forces, without a load on the subject, may not be sufficient in some cases for the subject to remain in position. A small band on the mounting pole may be necessary).

6.2 By geometric means, determine the location of the load application points as given in 5.3.1 and 5.4.3 and mark accordingly.

6.3 Determine if the test subject will deflect sufficiently during the test to allow the load plate to slip or shift. If so, provide auxiliary means such as clamps or stops to eliminate sideways movement of the load plate. The load must be applied as given in 5.4 and must be continuously applied parallel to the mounting pole throughout the entire test.

6.4 Locate and mount deflection measurement devices, or reference points using optical laser, as given in 5.3.

6.5 The initial trial load for beginning the test, at the first test point only, shall be 80 % of the test subjects' rated capacity. For example, a test subject with a rated capacity of 300 lbs (661.4 kg) shall begin the test at a trial load of 240 lbs (529.1 kg).

6.5.1 The trial load shall be applied to one of the two points as given in 5.3.1.1. Place the load plate centerline coincident with the mark as given in 5.4.3. With the initial trial (80 %) load, verify that the test subject does not move (shift) from its initial static equilibrium position on the mounting pole and that deflection from the load returns to its value with no yielding. If this initial trial load verification fails, record the test as a failure to meet trial load conditions.

6.5.2 After verification of the initial trial load, perform a load test at the test subjects' rated capacity. Duplicate this test at the opposite (remaining) point as given in 5.3.1.1 and repeat for the test points given in 5.3.1.2.

6.6 At each of the four test points, the load and all deflection measurements shall be recorded. The load shall then be removed and the deflection measurements re-recorded. A note shall be made of any measurement that does not return to within 0.200 in. (5.080 mm) of the maximum measured deflection from its initial position (before loading). A note shall be made for any test point in which the test subject moves (shifts) from its initial static equilibrium position on the mounting pole.

2

Copyright by ASTM Int'l (all rights reserved); Mon Apr 14 17:33:49 EDT 2008
Downloaded/printed by
Raymond Thompson () pursuant to License Agreement. No further reproductions authorized.

F 2125 – 05$^{\epsilon 1}$

6.7   Climbing treestands are only to be retested at: (*1*) approximately 15° below level, and (2) approximately 15° above level, in accordance with the manufacturer's instructions.

6.7.1   The application of the load for a standing platform only shall be at a point that is the geometric centroid of the test subject's placement area for the users' feet while ascending or descending a tree. Repeat the test procedure as given in 6.3-6.6 at each angle.

6.7.2   The application of the load for a sitting platform (the upper platform of a two piece stand/sit climbing treestand) shall be with a load plate as given in 5.4.2. Repeat the test procedure as given in 6.3-6.6 at each angle, except that only two points instead of four, specifically those given in 5.3.1.1 shall be used at each angle.

## 7. Report

7.1   Deflection readings shall be discarded only when a calibration change is discovered after readings have been made or when improper operator techniques can be cited.

7.2   Recording of results shall include the following:

7.2.1   Identification of test subject model, manufacturer, and rated capacity.

7.2.2   Photograph of test subject.

7.2.3   Photograph of test set-up (three views: side, top, and end).

7.2.4   Load and deflection measurements at all test points.

7.2.5   Verification of calibration.

7.2.6   Date of test.

7.2.7   If yielding or permanent deformation has been reached, or movement (shifting) has been detected as given in 6.6 or 6.7 (for climbing treestands), the corresponding load in pounds and the test point shall be noted.

7.3   *Pass-Fail Criterion*:

7.3.1   A treestand is considered failed if (after applying loads and measurements in accordance with 5.3.1) yielding or permanent deformation has been reached, or movement (shifting) has been detected as given in 6.6 or 6.7 in any section of the treestand.

7.3.2   A treestand is considered failed if (after applying loads and measurement in accordance with 5.3.1) the treestand shifts as defined in 6.6 or 6.7.

7.3.3   If a treestand fails this test, the stand and a copy of the test data shall be returned to the manufacturer.

## 8. Precision and Bias

8.1   No statement is made about either the precision or bias of this test method for measuring load capacity since the result merely states whether there is conformance to the criteria for success specified in the procedure.

## 9. Keywords

9.1   backbar; climbing aid; climbing stick; platform; treestand; tripod

## APPENDIX

(Nonmandatory Information)

## X1. Additional Information

X1.1   This standard is provided for use by manufacturers of treestands and testing companies. Criteria has been developed for certification of treestands and this standard is an integral part of the certification. However, a treestand conforming to this standard alone does not constitute certification and those manufacturers desiring certification must meet all applicable standards as a minimum requirement.

ASTM International takes no position respecting the validity of any patent rights asserted in connection with any item mentioned in this standard. Users of this standard are expressly advised that determination of the validity of any such patent rights, and the risk of infringement of such rights, are entirely their own responsibility.

This standard is subject to revision at any time by the responsible technical committee and must be reviewed every five years and if not revised, either reapproved or withdrawn. Your comments are invited either for revision of this standard or for additional standards and should be addressed to ASTM International Headquarters. Your comments will receive careful consideration at a meeting of the responsible technical committee, which you may attend. If you feel that your comments have not received a fair hearing you should make your views known to the ASTM Committee on Standards, at the address shown below.

This standard is copyrighted by ASTM International, 100 Barr Harbor Drive, PO Box C700, West Conshohocken, PA 19428-2959, United States. Individual reprints (single or multiple copies) of this standard may be obtained by contacting ASTM at the above address or at 610-832-9585 (phone), 610-832-9555 (fax), or service@astm.org (e-mail); or through the ASTM website (www.astm.org).

3

Copyright by ASTM Int'l (all rights reserved); Mon Apr 14 17:33:49 EDT 2008
Downloaded/printed by
Raymond Thompson () pursuant to License Agreement. No further reproductions authorized.



**US Consumer Product Safety Commission**

▶ Consumer Safety  ▶ About CPSC  ▶ Library - FOIA  ▶ Business

CPSC Home > Voluntary Standards > Current

## *Voluntary Standards*

**Hunting Treestands** *(Last Updated 11/07/2006)*

The U.S. Consumer Product Safety Commission (CPSC) staff is participating in voluntary standards activities to develop safety-related performance requirements for treestands and treestand fall arrest systems (full-body harnesses) typically used by bow hunters. The voluntary standards establish the procedures and requirements for testing treestand load capacity, static stability, and repetitive loading capacity. The standards also establish the test methods for dynamically evaluating fall arrest systems. The standards include:

- ASTM F2125, Standard Test Method for Treestand Static Stability
- ASTM F2126, Standard Test Method for Treestand Static Load Capacity
- ASTM F2127, Standard Test Method for Treestand Adherence
- ASTM F2128, Standard Test Method for Treestand Repetitive Loading Capability
- ASTM F2337, Standard Test Method for Treestand Fall Arrest Systems

In 2005, an estimated 5,686 injuries associated with treestand use were treated in U.S. hospital emergency departments. From 1980 – 2001, CPSC staff is aware of 63 deaths associated with treestands. The majority of injuries/deaths resulted from hunters falling out of treestands while not wearing a safety harness. In some instances, hunters wearing safety harnesses suffered serious injury or death after becoming entangled or suspended in the harness for extended periods without a means of self-rescue. Since 2001, there have been at least 4 reported cases in which hunters wearing full body harnesses were killed, injured or left dangling after falling from trees because they were unable to execute a means of self rescue.

CPSC staff is continuing to study how to improve the safety of fall arrest systems and self-rescue measures and to investigate ways to identify and eliminate potential strangulation risks that may be associated with specific fall arrest systems.

**Additional Information**

➔  **Voluntary Standard and Code Activities:**

- ASTM Subcommittee on Tree Stands Meeting, January 17, 2007

- ASTM Subcommittee on Tree Stands Meeting, January 4, 2006

- ASTM Subcommittee on Tree Stands Meeting, May 6, 2005

- Correspondence to ASTM International
  July 31, 2003. Re: Comments on Ballot for Treestand Fall Arrest Systems

➔  **CPSC Staff Reports, Memoranda and Contracts:**

- Briefing Package on Petition CP-02-3 regarding Hunting Tree Stands, Part 1



PLAINTIFF'S EXHIBIT
75

- Briefing Package on Petition CP-02-3 regarding Hunting Tree Stands, Part 2

↩ **ASTM International**

- For further information concerning ASTM standards related to hunting treestands, contact Katharine Morgan at kmorgan@astm.org or ASTM International at http://www.astm.org

↩ **Contact CPSC**

- For additional information or to comment, please contact cpsc-os@cpsc.gov

- Join a voluntary standards **Email Subscription List**

**Back to Voluntary Standards Menu**

Consumer Safety (Home) | About CPSC | Library | Business

# Raymond G. Thompson
### Technical Resume

**Manager:**        Vista Engineering and Consulting LLC
**President:**       Vista Engineering Inc.

**Contact Information:**

rthompson@vistaeng.com
**Work Phone** 205-307-6550
**Home Phone** 205-979-8952
**Cell Phone**    205-586-9151

**Education:**

B.S.E., University of Alabama at Birmingham (UAB), Materials Engineering, 1974.

M.S.E., UAB, Materials Engineering, 1975.

Ph.D., Vanderbilt University, Materials Science and Engineering, 1979.

**Professional Experience:**

President Vista Engineering, Inc.  February 1998 to present.

Manager Vista Engineering and Consulting, LLC October 2005 to present

President and CEO MontEagle Corp.  September 1996 to February 1998.

Research Professor of Materials Science & Engineering, UAB, Birmingham, Alabama, 1997–2002.

Tenured Professor of Materials Science & Engineering, UAB, Birmingham, Alabama, 1989–1997.

Visiting Scientist, Royal Institute of Technology, Stockholm, Sweden, 1996 - 1996.

Tenured Associate Professor of Materials Engineering, UAB, Birmingham, Alabama, 1985 - 1988.

Associate Research Professor, Department of Metallurgy and Materials Engineering, Colorado School of Mines; Golden, Colorado, January 1989 - June, 1989.

Assistant Professor of Materials Engineering, UAB, Birmingham, Alabama, 1981 - 1985.

Assistant Professor of Materials Engineering, Clemson University, Clemson, South Carolina, 1978 - 1981.

**UAB Appointments:**

Director of Materials Research, Experimental Program to Stimulate Competitive Research, 1986– 1997. (Participants: Auburn Univ., Univ. of Alabama, UAB, Univ. of Alabama Huntsville, Alabama A&M).

Graduate Program Director, Department of Materials Science and Engineering, 1991 - 93.

Campus Director of the Materials Science Ph.D. Program, UAB, 1991 - 93.



PLAINTIFF'S EXHIBIT 16

**Raymond G. Thompson**                                                    **Page 2**

**Membership in Professional Societies:**
American Society for Materials, 1975-Present.
American Welding Society, 1980-Present.
The Metallurgical Society-AIME, 1975-Present.
American Society for Engineering Education
American Ceramic Society
Materials Research Society

**Professional Registration:**
Registered Professional Engineer, State of Alabama #15061
Registered Professional Engineer, State of Arkansas #12079
Licensed Professional Engineer, State of South Carolina #23965

**Participation in Technical Committees:**
Failure Analysis Committee, Member, ASM International, 2003 - Present
Alloy Phase Diagram Committee, Co-Chair, ASM International, 2001 – 2003.
Alloy Phase Diagram Committee, Member, ASM International, 1998 - Present
Joining Division Council (ASM), Metals and Ceramics Committee, Vice-Chairman, 1985-87.
Welding Research Council, Chairman High Alloys subcommittee, 1985-7
Welding Research Council, Vice-chairman High Alloys Subcommittee, 1984
Welding Research Council, Member High Alloys Subcommittee, 1984 - 1990
Technical Referee, Metallurgical Transactions.
Technical Referee, Welding Journal Research Suppl.
Technical Referee, Acta. Materials
Editorial Board of Science and Technology of Welding and Joining.

**Service:**
Chairman, Birmingham Section of American Society for Materials (ASM), 2000
ASM International Nominating Committee, 2001
Symposium Organizer – Joining and Repair of Gas Turbine Engines II, ASM International, 2002.
Symposium Organizer – Joining and Repair of Gas Turbine Engines II, ASM International, 1999.
Symposium Committee – Alloy 718, TMS, 1988.
Symposium Committee – Alloy 718, 625 and Derivatives, TMS, 1991.
Symposium Committee – Alloy 718, 625, 706 and Derivatives, TMS, 1994.
Symposium Committee – Alloy 718, 625, 706 and Derivatives, TMS, 1997.
Technical Referee, Metallurgical Transactions
Technical Referee, U.S. Civilian Research and Development Foundation

Raymond G. Thompson                                          Page 3

Reviewer, National Science Foundation

Navy Welding Technology Evaluation Team to India, 1987

China Invitation Speaker by Metals Society of China, 1986, 1992

US – China Superalloys Speakers in China, 1998

**Patents:**

The first patent identified has been in use for 10 years by Southwire Corp. in the production of
electrical conductor cable for overhead trolley cars and light trains. The patent allows conductor
cable to be cut, brazed and spliced together while on a continuous drawing mill.

Patent # 5215246, Thompson et. al., "Method and Apparatus for Brazing", June 1, 1993.

Patent Applied For, 2003, Thompson et. al., "Application of modulated wave packets for eddy
current inspection".

Patent Applied For, 2005, R. G. Thompson, "Means To Prevent Failure Of Hard And Brittle
Coatings.."

Patent Applied For, 2005, Thompson et. al., "Carbon-Modified Electrodes For Low Energy Nuclear
Reactors"

**Awards and Honors:**

Fellow, American Welding Society (AWS), 2005

Fellow, American Society of Materials (ASM International), 2004.

ASM established the honor of Fellow of the Society to provide recognition of members for
distinguished contributions in the field of materials science and engineering and to develop a
forum for technical and professional leaders to serve as advisors to the Society.

Savage Award, by the American Welding Society, 1995.

V. L. Acoff, R. G. Thompson, R. D. Griffin and B. Radhakrishnan, "Effect of Postweld Heat
Treatment on Ti-14%Al-21%Nb Fusion Zone Structure and Hardness," Welding Journal
Research Suppl., 74, 1995, 1s - 9s.

This is the award given by AWS for the outstanding publication in the Welding Journal (refereed)
for 1995.

Adams Award, by the American Welding Society, 1985.

This is an annual award given to the university educator who demonstrated outstanding service in
teaching and research related to welding metallurgy and processing.

Outstanding Publication, Vanderbilt School of Engineering, 1981.

Alpha Sigma Mu, Materials Engineering Honor Society, 1977.

Graduate Engineering Student of the Year, University of Alabama in Birmingham, 1974.

Raymond G. Thompson                                          Page 4

Engineering Student of the Year, University of Alabama in Birmingham, 1973.

Tau Beta Phi, Engineering Honor Society, 1973.

NASA Technology Awards

New Technology Award NASA 1983 (new methods for studying microfissuring in alloy 718)

New Technology Award NASA 1982 (new methods for studying microfissuring in alloy 718)


**Competitively Awarded Grants (since 1990):**


National Science Foundation – STTR Phase I with The University of Alabama, "Integrated Design of Nanostructured Diamond Coated Drills (for Dry Drilling of High-strength Automotive Powertrain Components)", 2008, $150,000.

Missile Defense Agency – SBIR Phase I, "POSS-Based Conformal Coating with Active Tin Whisker Mitigation Properties.", 2008, $100,000.

National Science Foundation – SBIR Phase I, "Nanocrystalline Diamond X-ray Windows", 2007, $100,000.

National Science Foundation – SBIR Phase II & IIB, "Nanocrystalline Diamond Coated Cutting Tools", 2003-06, $1,100,000.

National Science Foundation – SBIR Phase I, "Nanocrystalline Diamond Coated Cutting Tools", 2003, $100,000.

Dept. of Defense, Metals Affordability Initiative, Cooperative Agreement Project: RRA-3, Microstructure Modeling and Ingot Grain Refinement for Turbine Disks, 2001 – 2002, $150,000.

National Science Foundation - SBIR, "Interface Design for Diamond-Coated Steel", 2001, $100,000.

National Science Foundation, DMR-8807915, 9112251, 9417326, "Microstructural Evolution During Materials Processing," 1988-1998, $1,115,109.

NSF-EPSCoR I, II, III, "A State Plan for Improving Materials Science and Engineering Research in Alabama," 1986-1998, $12,095,871.

NSF, "Acquisition of a Vacuum Melting System," NSF-DMR-9207816, 1992-1993, $132,500.

Department of Energy (Basic Energy Sciences), "Migration of Constitutionally Liquated Films," 1991-1995, $225,324. (with B. Radhakrishnan).


**Other Grants and Contracts as P.I. (since 1990):**

DOE, "Intergranular Stress Corrosion Cracking of Stainless Steel", 1996, 2000, 2001. $75,000.

CCT Inc., SBIR – Phase 2, "Monte Carlo Simulation of Microstructures," 1997-1999, $290,000.

Pratt and Whitney Corp., "Computational Thermodynamics," 1996, $10,000.

Raymond G. Thompson                                    Page 5

INCO Corp., "Alloy Development through Computational Thermodynamics," 1996-1998, $20,000.

CCT Inc., SBIR – Phase 1, "Monte Carlo Simulation of Microstructures," 1995-1996, $85,000.

DOE-Howmet "Advanced Alloy 718 Castings," 1992-1994, $102,000.

Rockwell International, "Advanced Alloy Casting," 1992-1994, $71,540.

Cray, "Microstructural Modeling," 1992-1993, $21,500.

NASA, "Effect of Boron on Intergranular Hot Cracking in Ni-Cr-Fe Alloys," 1989-1990, $51,569.

### Books:

**Joining and Repair of Gas Turbine Engines,** Ed. Donald Tillack and Raymond Thompson, ASM, 1998.

### Publications:

Papers Published In Journals

"Characterizations of Nanocrystalline Diamond Coating Cutting Tools," Hu, J., Y.K. Chou, R.G. Thompson, J. Burgess, and S. Street, Surface and Coatings Technology, in review, 2007.

"Nanocrystalline Diamond Coating Tools for Machining High-strength Al alloys," Hu, J., Y.K. Chou, and R.G. Thompson, International Journal of Refractory Metals and Hard Materials, in press, 2007.

"On Stress Analysis of Diamond Coating Cutting Tools," Hu, J., Y.K. Chou, and R.G. Thompson, Transactions of NAMRI/SME, Vol. 35, pp. 177-184, 2007.

"The Influence of Sulfur on Stress-Rupture Fracture in INCONEL 718 Superalloys", J.X. Dong, X.S. Xie, and R.G. Thompson, Met Trans, 31A., 2000, 2135-2144.

"Interfacial Adhesion And Toughness Of Nano-Structured Diamond Coatings", Neeta Toprani, Shane Catledge, Raymond Thompson, and Yogesh K. Vohra, J. of Materials Research, 15, 2000, pp. 1052.

"Segregation Of Sulfur And Phosphorus In Nickel-Base Alloy 718", Dong, J.X., Liu, X.B., Xie, X.S, Thompson, R.G, Acta Metallurgica Sinica (English Letters), v 10, n 6, 1997, pp 510-514.

"Computer Simulation of Grain Growth with Second Phase Particle Pinning," J. Gao, R.G. Thompson, and B.R. Patterson, Acta mater., Vol. 45, Issue 9, 1997, pp. 3653-3658.

"Characterization of Constitutional Liquid Film Migration in Nickel-base Alloy 718", V. Acoff and R.G. Thompson, Met. Trans., 27A, 1996, 2692-2703.

"Effect of Second Phase Precipitation on Limiting Grain Growth in Alloy 718," G. Muralidharan and R.G. Thompson, Scripta Materialia, Vol. 36, No. 7, 1997, pp. 755-761.

"Real Time-Temperature Models for Monte Carlo Simulations of Normal Grain Growth," J. Gao and R.G. Thompson, Acta Materialia, Vol. 44, Issue 11, 1996, pp. 4565-4570.

"Mathematics of Microstructure Evolution", J. Gao, R.G. Thompson and B. R. Patterson, ed. Chen, L., Fultz, B., Cahn, J., Manning, J., Morral, J., and Simmons, J., EMPMD Monograph Series, TMS SIAM, 1996, pp.31.

"Effect of Postweld Heat Treatment on Ti-14%Al-21%Nb Fusion Zone Structure and Hardness,"V. L. Acoff, R. G. Thompson, R. D. Griffin and B. Radhakrishnan, Welding Journal Research Suppl., 74, 1995,1s - 9s.

"The Effect of Weld HAZ Liquation Kinetics on Liquation Cracking Susceptibility of Alloy 718," B. Radhakrishnan and R. G. Thompson, Met. Trans., 24B, 1993, 1409-1422.

"Kinetics of Grain Growth in the Weld HAZ of Alloy 718," B. Radhakrishnan and R. G. Thompson, Met. Trans., 24A, 1993, 2773-2786.

"A Model for the Solidification of Grain Boundary Liquid in the HAZ of Welds," B. Radhakrishnan and R. G. Thompson, Met. Trans., vol. 23A, June, 1992, 1783-1799.

"Effect of Heat Treatment on Microstructure and Microhardness of Spot Welds in Ti-26Al-11Nb," V. L. Acoff, R. G. Thompson, R. D. Griffin and B. Radhakrishnan, J. of Materials Science and Engineering, A152, 1992, pp. 304-309.

"A Phase Diagram Approach to Study Liquation Cracking in Alloy 718," B. Radhakrishnan and R. G. Thompson, Met. Trans., vol. 22A, 1991, 887-902.

"On the Relationship Between Carbon Content, Microstructure, and Intergranular Hot Cracking in Cast Nickel Alloy 718," R. G. Thompson, D. E. Mayo, and B. Radhakrishnan, Met. Trans., vol. 22A, 1991, 557-567.

"Liquid Film Migration in the HAZ of Alloy 718," B. Radhakrishnan and R. G. Thompson, Scripta Met., vol. 24, 1990, 537-542.

"Interface Segregation in a Nickel Base Superalloy," M. C. Koopman and R. G. Thompson, Microbeam Analysis - 1990, Eds. J. R. Michael and Peter Ingram, San Francisco Press, Inc., 1990.

"Solidification of Alloy 718: A Phase Diagram Approach," B. Radhakrishnan and R. G. Thompson, Met. Trans., vol. 20A, 1989, 2866-2868.

"Analysis of Precipitation in Cast Alloy 718," G. Muralidharan, R. G. Thompson, and S. D. Walck, Ultramicroscopy, vol. 29, 1989, 277-283.

"A Quantitative Microstructural Study of Intergranular Liquation and its Relationship to Hot Cracking in Alloy 718," B. Radhakrishnan and R. G. Thompson, Metallography, vol. 21, 1988, 453-471.

"Grain Boundary Chemistry Contributions to Intergranular Hot Cracking," R. G. Thompson, B. Radhakrishnan, and D. E. Mayo, Journal De Physique-Colloque C5, suppl. au n 10, 1988, 471-482.

"Effect of Heat Treatment on Microfissuring in Alloy 718", R. G. Thompson, J.R. Dobbs, D. E. Mayo, Welding Journal, v 65, n 11, Nov, 1986, 299s-304s.

"Relationship Between Grain Size and Microfissuring in Alloy 718", R. G. Thompson, J. J. Cassimus, D. E Mayo, J. R. Dobbs, Welding Journal, v 64, n 4, 1985, 91s-96s.

"Microstructural Evolution in the HAZ of Inconel 718 and Correlation with the Hot Ductility Test", R. G. Thompson and S. Genculu, Welding Journal, v 62, n 12, 1983, 337s-345s.

"In the mechanism of Intergranular Embrittlement by Phosphorus in Transformer Steel", R. G. Thompson, C. L. White, J. J. Wert, and D. S. Eaton, Met. Trans., v. 12A, 1981, 1339-1351.

### Papers Published In Conference Proceedings (since 1990)

"Nano-Diamond Coatings for Machining Applications," Hu, J., Y.K. Chou, and R.G. Thompson, 2008 TMS Annual Meeting & Exhibition, New Orleans LA, March 2008.

"Cutting Edge Radius Effects on Diamond Coated Cutting Tools: From Deposition to Machining," Hu, J., Y.K. Chou, and R.G. Thompson, Proceedings of 2007 ASME International Manufacturing Science and Engineering Conference, MSEC2007-31043, 2007.

"Nanocrystalline Diamond Coated Cutting Tools," Hu, J., Y. K. Chou, and R.G. Thompson, Proceedings of ASM Material Science and Technology (MS&T) Conference, Detroit, MI, September 17-20, 2007

"Microstructure Analysis and Modeling of Ingot to Billet Conversion in Alloy 718", R. G. Thompson, G. M. Janowski, W. D. Carden, J. M. Papo and H. Ning, Materials Science Forum, Vols. 426-432 (2003) pp. 809 – 814, (THERMEC 2003 Conf., Madrid Spain).

"Nanocrystalline Diamond Coatings", R. Thompson, W. Carden, Y. Vohra, M. Koopman, Surface Engineering Coatings and Heat Treatments (ASM International, 13th IFHTSE Congress, 2002, Columbus Ohio), ASM International Publisher. ISBN 0-87170-781-0.

"Business – Engineering Curriculum Experiment Produces Results", R. G. Thompson, M. M. Gee, A. Eberhardt, L. K. Vogle, and G. M. Edwards, 2001 ASEE Annual Conference Proceedings, Albuquerque, NM.

"The Influence of Sulfur on Stress-Rupture Fracture in INCONEL 718 Superalloys", J.X. Dong, X.S. Xie, and R.G. Thompson, Met Trans, 31A., 2000, 2135-2144

"A DICTRA Simulation of θ - phase Dissolution in Al-Cu Alloys", Raymond G. Thompson and Curt Malam, Materials Research Society Symposium - Proceedings Nucleation and Growth Processes in Materials, v580, 2000, Boston, MA.

"Segregation Behavior of Phosphorous and its Effect on Microstructure and Mechanical Properties in Alloy System Ni-Cr-Fe-Mo-Nb-Ti-Al", X.S. Xie, J.X. Dong, R.G. Thompson, et. al., Superalloys 718, 625, 706 and Various Derivatives, ed. E.A. Loria, TMS, 1997, pp.531.

"Phase Formation Modeling of an Alloy 706 Casting Using Computational Thermodynamics", B.A. Boutwell, R.G. Thompson, N. Saunders, S.K. Mannan, and J.J. deBarbadillo, Superalloys 718, 625, 706 and Various Derivatives, ed. E.A. Loria, TMS, 1997, pp.99.

"Monte Carlo Simulation of Solidification", J. Gao and R.G. Thompson, Superalloys 718, 625, 706 and Various Derivatives, ed. E.A. Loria, TMS, 1997, pp.77.

"Development of Monte Carlo Simulation of Grain Growth in HAZ," J. Gao, R.G. Thompson, and Y. Cao, Proceedings of 4th International Conference on Trends in Welding Research, ed. H. B. Smartt, J. A. Johnson, S. A. David, ASM, 1995, 199 – 204.

"Analysis of Weld HAZ Hot Cracks in Al-Li Alloy 2195," R.G. Thompson, Light Alloys for Aerospace Applications III, TMS, Editors E. W. Lee, 1995.

**Raymond G. Thompson**                                                      Page 8

"Constitutional Liquid Film Migration in the Weld HAZ of a Nickel Base Superalloy," V. L. Acoff and R.G. Thompson, Proceedings of 4th International Conference on Trends in Welding Research, ed. H. B. Smartt, J. A. Johnson, S. A. David, ASM, 1995, 241 – 246.

"Microstructural Analysis of Fine Grain Alloy 718 Castings," R.G. Thompson B. Boutwell, Superalloys 718, 625 and 706, Amer. Soc. For Materials, Pittsburgh, PA., June, 1994.

"Auger Study of Elemental Segregation to Hot-Crack Surfaces in Al-Li Welds," R.G. Thompson, Advanced Earth-to-Orbit Propulsion Technology Proceedings, NASA-MSFC, Huntsville Al., 1994.

"Characterization of Constitutional Liquid Film Migration in Alloy 718," V.L. Acoff, R. D. Griffin and R.G. Thompson, Annual Electron Microscopy Proceedings, New Orleans LA., 1994.

"Constitutional Liquid Film Migration," V.L. Acoff and R.G. Thompson, Solid-Solid Phase Transformations Proceeding, The Materials Society, Pittsburgh, PA., 1994.

"Monte Carlo Simulation of HAZ Grain Growth", R.G. Thompson and Y. Liu, International Conference on Modeling and Control of Joining Processes Proceedings, AWS, 1993.

"Grain Boundary and Interface Cohesion in the Presence of a Steep Hydrogen Gradient (A preliminary Auger-Fracture Study)", R.G. Thompson, B.H. King, M.C. Koopman and D.W. Davis, Advanced Earth-to-Orbit Propulsion Technology Proceedings, NASA-MSFC, 1992.

"Monte Carlo Simulation of Grain Growth in the HAZ", Y. Shen, B. Radhakrishnan and R.G. Thompson, Proceedings of the 3rd International Conference on Trends in Welding Research, Eds: S.A. David and J.M. Vitek, ASM, 1993, pp. 259-263.

"Modeling of Subsolidus Liquation in the Weld Heat Affected Zone", B. Radhakrishnan and R.G. Thompson, Proceedings of the 3rd International Conference on Trends in Welding Research, Eds: S.A. David and J.M. Vitek, ASM, 1993, pp. 321-326.

"Effect of Heat Treatment on Microstructure and Microhardness of Spot Welds in Ti-26Al-11Nb", High Temperature Aluminides and Intermetallics Proceedings, TMS, San Diego CA, 1991.

"Grain Boundary Chemistry of Alloy 718-Type Alloys," R. G. Thompson, M. C. Koopman and B. H. King, Superalloy 718, 625 and Derivatives, Editor: Ed Loria, TMS, 1991, pp. 53-70.

"Modeling of Microstructural Evolution in the Weld HAZ", B. Radhakrishnan and R. G. Thompson, Metal Science of Joining, Ed. M.J. Cieslak, et al., TMS, 1991, pp. 31-40.

"A Study of the Effects of Phosphorus, Sulfur, Boron and Carbon on Laves and Carbide Formation in Alloy 718," C. Chen, R. G. Thompson and D. W. Davis, Superalloys 718, 625 and Derivatives, Ed: Ed Loria, TMS, 1991, pp. 81-96.

"Interface Segregation in a Nickel Base Superalloy", M. C. Koopman and R. G. Thompson, Microbeam Analysis-1990, Eds. J. R. Michael and P. Ingram, San Francisco Press, Inc., 1990.

"Intergranular Liquation Effects on Weldability", R. G. Thompson, Weldability of Materials, ASM, 1990, pp. 57-63.

**Presentations (Since 2000):**

Dr. Thompson listing of presentations at national and international meetings was lost in 1999. He made his first national research presentation in 1975 at the Annual ASM-TMS Convention in Las Vegas, NV. Since that time an informal count has the number at well over 100. His invited international presentations include China (1986, 1993, 1998), India (1987), Greece (1991), Japan (1993), Sweden (1996), France (1996), Norway (1998), Spain (2003), and Israel (2003).

"Cutting Edge Radius Effects on Diamond Coated Cutting Tools: From Deposition to Machining," Hu, J., Y.K. Chou, and R.G. Thompson, ASME International Manufacturing Science and Engineering Conference, MSEC2007-31043, 2007.

"Nanocrystalline Diamond Coated Cutting Tools," Hu, J., Y. K. Chou, and R.G. Thompson, ASM Material Science and Technology (MS&T) Conference, Detroit, MI, September 17-20, 2007

"Modeling Microstructure Evolution in Alloy 718 Ingot to Billet Conversion" W. C. Carden and R. G. Thompson, American Society for Materials, Annual Meeting, Pittsburgh PA, 2003.

"Fatigue Failure in a Threaded Eyebolt: A Case Study" W. C. Carden and R. G. Thompson, American Society for Materials, Annual Meeting, Pittsburgh PA, 2003.

"Spot Weld Failure in Galvanized Steel Sheets: A Case Study", R. G. Thompson and W. C. Carden, American Society for Materials, Annual Meeting, Pittsburgh PA, 2003.

"Failure Analysis of a Spot Weld and Eyebolt", R. G. Thompson and W. C. Carden, American Society for Materials, Birmingham, AL, 2003.

"Nanodiamond Coatings for Cutting Tools", R. G. Thompson, UAB Tech Day, Birmingham AL, 2003.

"Nanodiamond Coatings for Cutting Tools", R. G. Thompson, Birmingham Venture Club, Birmingham AL, 2003.

"Nanocrystalline Diamond Coatings", R. G. Thompson, W. C. Carden, Y. Vohra, M. Koopman, ASM International, 13th IFHTSE Congress, Columbus, OH, 2002.

"Nanodiamond Coatings for Cutting Tools", R. G. Thompson, BTG, Birmingham AL, 2002.

"Nanodiamond Coatings for Cutting Tools", R. G. Thompson, Emerging Technology Partners, Birmingham AL, 2002.

"Failure Analysis", R. G. Thompson, Soc. Women Engineers, Birmingham AL, 2002.

"Nanodiamond Coatings", R. G. Thompson and Y. Vohra, Kennametal Corp., Latrobe PA, 2001.

"Mitigation of Microfissuring", R. G. Thompson, Boeing Corp., Los Angeles CA, 2001.

"Basics of Process Metallurgy", American Society for Materials Educational Course, Birmingham Section of ASM, Organized by Dr. Raymond G. Thompson, Vista Engineering Inc, 2001.

"Critical Care Ground Safety - What You Should Know", L. L. Demmons, R. G. Thompson, Assoc. Air Medical Services, Salt lake City, UT, 2000.

"A DICTRA Simulation of θ - phase Dissolution in Al-Cu Alloys", Raymond G. Thompson and Curt Malam, Materials Research Society Symposium - Proceedings Nucleation and Growth Processes in Materials, v580, 2000, Boston, MA.

**University Teaching:**

Teaching

Dr. Thompson spent 24 years in teaching undergraduate and graduate Materials Engineering as an Assistant Professor of Engineering at Clemson University and a Professor of Engineering at UAB. During that period, he developed and taught courses in many aspects of metallurgy, ceramics, polymers, mechanical properties, processing, failure analysis and design. His graduate students work in industry and academia in the USA and abroad.

Teaching Welding Engineering

Dr. Thompson developed and taught courses in welding metallurgy, weld processing and nondestructive testing while at UAB. These courses were well attended at both the undergraduate and graduate levels. These courses were taught as advanced undergraduate and graduate electives in the Materials Engineering Department.

- Nondestructive Evaluation of Engineering Materials, 3 semester hrs
- Welding Processes, 3 semester hrs
- Welding Metallurgy, 3 semester hrs

Teaching Undergraduate

He taught in the Ceramic Engineering Department at Clemson from 1978 – 1981. While there he taught introductory materials engineering, failure analysis, and mechanical metallurgy. From 1981 – 2002, he taught in the Materials Engineering Department at the University of Alabama at Birmingham. Dr. Thompson was responsible for courses including:

- Introduction to Engineering
- Materials Engineering I
- Materials Engineering II
- Physical Metallurgy
- Fracture Mechanics and Failure Analysis
- Mechanical Behavior of Materials
- Materials Selection and Design
- Senior Design I
- Senior Design II

Dr. Thompson was responsible for developing and teaching the capstone senior design sequence for both the Materials Engineering and Mechanical Engineering Departments. As part of this undergraduate teaching effort, he was responsible for the following awards:

- Sterne Library Grant to establish an engineering design collection. The award was used to purchase approximately 100 leading texts on engineering design related to materials selection and engineering mechanics. (with Dr. A. Eberhardt, $5,000)
- Grant to establish the Materials and Mechanical Engineering Senior Design Lab. This grant

was used to equip a laboratory for the development of senior design projects from conception through prototype production. (with Dr. A. Eberhardt, $35,000)

- National Science Foundation Grant: Designs for the Disabled. (Dr. A. Eberhardt, PI) This grant was a continuing grant to support the design from conception to prototype production of devices to assist disabled persons. The designs were most often done in conjunction with the United Cerebral Palsy of Birmingham in support of their facilities for childcare and adult homes. ($20,000 per year)
- National Collegiate Inventors and Innovators Alliance grant for collaborative design in education (with Drs. Eberhardt and Gee). This grant supported collaboration between the Engineering Scholl senior design course and the Business School entrepreneurship course. Student teams from these two courses jointly produced a business plan and prototype for capstone design projects. ($45,000)

### Teaching Graduate

He developed and taught the following courses at the Graduate level:

- Advanced Mechanical Metallurgy
- Physical Metallurgy
- Fracture Mechanics
- Structures and Properties of Surfaces and Interfaces
- Computational Thermodynamics of Materials
- Diffusional Phase Transformations

As a member of the Graduate School faculty, Dr. Thompson served as Graduate Program Director for the Department of Materials Engineering. He also served as Director of UAB's interdisciplinary Materials Science Ph D program for Materials Engineering, Biomedical Engineering, Physics, Chemistry, and Biochemistry.

He served as graduate advisor on 18 Master and Ph. D. committees and sat as a committee member for numerous other student research theses and dissertations at Clemson Univ., UAB, Univ. of Alabama, UAH, Royal Institute of Technology Stockholm, Sweden, and Norwegian Technical University in Trondhiem, Norway.

### Theses and Dissertations Directed:

"Nucleation in a Ni-Based Superalloy Utilizing Computational Thermodynamics and Diffusional Kinetics," B. Boutwell, Ph.D. Dissertation, UAB, 1999.

"Computer Simulation of Grain Growth in the HAZ," J. Gao, Ph.D. Dissertation, 1997.

"Liquid Film Migration," Hongjun (Aaron)Zuo, Ph.D. Dissertation, UAB, 1996.

"Constitutional Liquid Film Migration," V. Acoff, Ph.D. Dissertation, UAB, 1994.

"The Role of Impurity Content on Carbide Shape, Size and Distribution," M. Koopman, Masters Thesis, UAB, 1994.

"Monte Carlo Simulation of Grain Growth," Y. Shen, Masters Thesis, UAB, 1994.

"Post Weld Heat Treatment of Titanium Aluminide," V. Acoff, Masters Thesis, UAB, 1991.

"Continuous Cooling Transformation in the Heat Affected Zone of 1040 Steel," J. R. Dobbs, Masters Thesis, UAB, 1991.

"Effects of Carbon and Boron on Solidification of 718 Type Nickel Alloys," Chungeng Chen, Masters Thesis, UAB, 1991.

"Interfacial Sulfur Segregation in Nickel Superalloy 718," Dolores W. Davis, Masters Thesis, UAB, 1990.

"The Effect of Intergranular Liquid Distribution on Hot Cracking Susceptibility of Alloy 718," B. Radhakrishnan, Ph.D. Dissertation, UAB, 1989.

"Stability of Cu Thin Films on Porous and Nonporous Cordierite Substrates," J. C. Poret, Masters Thesis, UAB, 1989.

"The Effect of Intergranular Precipitates on Grain Growth in Nickel Alloy 718," G. Muralidharan, Masters Thesis, UAB, 1988.

"Dielectric Constant Behavior in the Cordierite-Glass-Pore System," C. J. Shyu, Masters Thesis, UAB, 1988.

"Effect of Intergranular Cracks on the Fatigue Behavior of Alloy 718," E. L. Bradley, III, Masters Thesis, UAB, 1988.

"The Effect of Electromagnetic Stirring on the Microstructure of Continuous Cast Steel," Ji-Yu Hong, Masters Thesis, UAB, 1987.

"The Effects of Sulfur and Carbon on the Microfissuring Susceptibility of Cast Nickel Alloy 718," D. E. Mayo, Masters Thesis, UAB, 1987.

"A Correlation of Microstructure with Hot-Ductility in the Heat-Affected Zone of Inconel 718," Semih Genculu, Masters Thesis, UAB, 1982.

## Experimental Program to Stimulate Competitive Research – EPSCoR:

Dr. Thompson's definitive contribution to graduate education and program development came through his management in the Alabama EPSCoR Program. EPSCoR started as an NSF initiative to improve research skills in states historically under funded by federal research grants. Alabama became eligible for the program in 1985. Dr. Thompson led a proposal for EPSCoR support of materials research. The Alabama proposal, led by Biochemist Dr. Ken Pruitt with materials research as the lead component, received the highest rating and was funded in a hotly contested NSF competition. The materials research component became known as the Alabama EPSCoR Materials Research Program. It eventually came to include seven universities; University of Alabama, Auburn University, University of Alabama at Birmingham (UAB), University of Alabama at Huntsville (UAH), Alabama A&M University, Tuskegee University and University of South Alabama. Dr. Thompson was chosen to lead the program and he directed it for 10 years. This program was especially important to welding education and research at UAB (Thompson) and Auburn University (Chin, Fergus, Gale).

Faculty Development

Alabama EPSCoR supported the development over 100 faculty in the area of materials research during the period 1987 – 1999. During this same period, participating faculty supported over 200 graduate students. The yearly average number of refereed publications per faculty more than doubled. The average number of research proposals per faculty tripled. The funded research in materials went from under $1M per year to over $10M per year. The number of faculty participating in materials engineering research more than tripled during the program.

### Program Development

At the beginning of the Alabama EPSCoR Materials Research program in 1985 there were no Materials PhD programs in the state. By 1990, Alabama had PhD programs in Materials Engineering at Alabama, Auburn, and the University of Alabama at Birmingham. The state also had Materials Science PhD programs at Alabama, the University of Alabama at Birmingham, and the University of Alabama at Huntsville. The state also saw emphasis in materials research at departments of physics, chemistry, biochemistry and bioengineering. These programs remain healthy today, turning out exciting research and productive graduate students.

The Alabama EPSCoR Materials Research program was also responsible for funding or supporting a host of laboratory and instrumentation acquisitions. Materials research equipment expenditures exceeded $5M in the first 5 years of the program.

The later years of the program saw the development of several Multi-campus Materials Research Centers including Composites, Biomedical Surfaces, and Smart Materials.

**Litigation Client List 1/00 – 3/08** (depositions and courtroom testimony)

Dr. Raymond G. Thompson

HMRT
Mr. Bruce Munson
RE:     Greisen v. Southern Chip
Johnson County, AR
Civil Action # CIV-97-108
2000 - D

Campbell & Springer
Mr. Stewart Springer
Leon Garmon, Gadsden AL
Re: David Leaks v. Alabama Power
Jefferson County, AL
Civil Action # CV-97-829-WHR
2000 - P

Rhea, Boyd & Rhea
Donald Rhea
Re: David Hammett v. Palm Harbor
Homes
US Northern District of AL
Civil Action # CV-98-PT-2154-M
2000 - P

Shelby & Cartee
Robert Roden
Re: Snider v. Victor Equipment
Jefferson County AL
Civil Action # CV-99-4927
2001 - P

Cory, Watson, Crowder & Degaris
Mr. Dennis Weaver
Re: McGuffie v. Drury
Hale County Alabama
Civil Action # CV-98-154
2001 - P

Alvis and Willingham
Mr. Rick Alvis
Re: Fraley v. Yamaha
Northern District Alabama
CV-S-3360-NW
2002 - P

HMRT
Mr. Bruce Munson
Re: Brock v. Eagle Metal
AR
CIV-2001-57
2002 - D

Peters and Redditt
Mr. Mark Redditt
Re: Hallmark v. Carling Blower
AL
Civil Action # CV-98-2229
2002 – D

Moraitakis, Kushel & Pearson
Mr. Albert Pearson III
Re: Keairns v. Brunswick Corp.
GA
Civil Action # 97 – CV- 93
2002 – P Deposition and Trial (2005)

Brinkley & Chesnut
Mr. Allen Brinkley
Re: Jenkins v. Emerson El. Co.
AL
CV01-S-3269-NE
2002 – P

Cory, Watson, Crowder & Degaris
Craig Niedenthal
Re: Boothe v. Alabama Power Co
Civil Action # CV-00-272
AL
2002 – P

Brooks Law Firm
Eugene Brooks IV
Re: Frazier v. DeWalt Industrial Tool Co.
Savannah, GA
Civil Action # CV-402-216
2003 – P

McCutchen, Blanton, Johnson, & Barnette
Pope D. Johnson, III
Re: Trimnal v. Newmark International, Inc.
TN
Civil Action # 3:02-1244-10
2003 – D

Marsh, Rickard & Bryan, P.C.
Jeffery Rickard
Re: Doyle Handley v. PIVCO, Parks
        Industrial Valve, Inc., et al.
Colbert County, AL
Circuit Court Case Action # CV 01-534
2003 – P

Christian and Small LLP
Bibb Allen
Re: Hays v. Southern Broadcasting,
others
Civil Action # CV-01-5794
AL
2004 – P

Marsh, Rickard & Bryan
Michael Beard
Re: Larry Sanders v. Inductotherm
Case Action # CV-99-5329
AL
2004 – P Deposition and Trial (2005)

Hurlburt, Privat & Monrose
M. Blake Monrose
Re: Guillory et al v Marriott, et al
Civil District Court #97-1231
Parish of Orleans, LA
2004 – D

Bradley, Arant Rose & White LLP
Dylan Black
Re: Lindsey, et al. v. Sloss Industries
Corporation, et al.
Jefferson County, AL
Civil Action # CV-02-2329
2004 – D  Deposition and Trial (2005)

H. Lynn Shoemaker Law Office
H. Lynn Shoemaker
Re: Ward v. Lowe's, et al
Kingsport, TN
Case # C34206(L)
2004 - P

Pate Lloyd & Cochrun, LLP
R. Gordon Pate
Re: Kimberly Smith v Icon Health &
Fitness, K-Mart
Alabama
Civil Action # CV-04-JEO-0382-S
2004 - P

Bartimus Frickleton Robertson Obetz
James P. Frickleton
Re: Beena Kushwah v. Lennox, et al
Circuit Court of the City of St. Louis
State of Missouri
Cause No. 032-00808
2005 - P

Mink & Blair
Robert L. Estes
Re: Moore v. Hardwoods of Morristown, Inc.
Circuit Court for Hamblen County,
Tennessee
No. 04CV057
2005 - D

Huckabay, Munson, Rowlett & Moore, P.A.
Bruce Munson
Re: Jones v. First Marine Insurance Co.
Circuit Court of Little River County,
Arkansas
No. CV-2004-42
2005 – D

Campbell Law Office
J. Michael Campbell, Esq.
Re: Horton, et al., v. Toyota Motor Corp, et al.
Jefferson County, AL
Civil Action # CV-2003-5300
2005 – P

Lucas, Wash, Petway, Tucker & Stephens
Kent McCain
Re: Kelley v. Rhett Butler Trucking
Covington County, AL
Civil Action No. CV-04-95
2005 – P

Cusimano, Keener, Roberts, Kimberley &
Miles P.C.
David Kimberley
Re: Horn v. Fadal Machining Centers
Civil Action No. CV-03-249
Talladega County, AL
2005 – P

Bowles & Cottle
John I. Cottle III
Re: Gross v Randall Price, et al
Civil Action # CV- 2005-200
Elmore County, AL
2006 - D

Marsh, Rickard & Bryan
Jeffrey C. Rickard
Re: Lindley v Magnolia Trailers, et al.
Civil Action # CV 2005-27
Marion County, AL
2006 - P

Harris & Harris
Stephanie Lynton
Re: AIG Baker v. Bonsal Co., et al
Civil Action # CV 05-604
Jefferson County, AL
2006 – P

Cabaniss Johnston
Jarrod J. White
Re: Trustmark v. Sealy, Caribbean I
building
Civil Action # 2002-905-JLF
Baldwin County, AL
2007 - D

Pittman Dutton Kirby & Hellums PC
Carter Clay
Re: DeWaun King v. Alpin Engineer
Products
Civil Action No. 05-766
Mobile County, AL
2007 - P

Taylor & Taylor
Gregory M. Zarzaur
Re: Janes vs. Zimmer, Inc.
Civil Action No. CV-02-1438
Mobile County, AL
2007 – P

Weathington & Moore
Alexander Weisskopf
Re: McCreless vs. Global Upholstery Co.
Civil Action No. CV-AR-05-1964-R
Northern District of Alabama
2007 - P

Pittman, Dutton, Kirby & Hellums, PC
Michael Bradley
Re: Carson & Clemons v. O.K. Tire Store
Civil Action No. CV 07-031
Tuscaloosa County, AL
2007 – P

Marsh, Rickard & Bryan
Roger Lucas
Re: Murphy v Marvin's Inc., et al.
Civil Action # CV 2007-901153.00
Jefferson County, AL
2008 - P

**VISTA ENGINEERING**

Engineering simple solutions

Vista Engineering Inc.

Fee Schedule
January 1, 2008

Fees – Senior Engineer/Expert Witness

Dr. Raymond G. Thompson PhD, PE

| | |
|---|---|
| Discovery and Analysis | $265 per hour |
| Testimony | $265 per hour |

Fees – Senior Engineer

Mr. John Cassimus, BSE

Mr. Jim MacRae, BSE, MBA

Discovery and Analysis  $176 per hour

Fees –Engineer

Mr. Dustin Nolen, BS, MTE

Mr. Andrew Hodges, BSE, MSE

Discovery and Analysis  $135 per hour

Fees – Project Technician/Scientist, BS

Discovery and Analysis  $88 per hour

Fees – Project Assistant

$62.5 per hour

Prints of pictures - $.85ea
CDs of pictures - $15
VHS or DVC tapes or VCD - $25
Scanning Electron Microscope - $165 per hour

Engineering Simple Solutions ©

vista engineering & consulting, llc

phone: 205.307.6550

fax: 205.307.6551

1500 1st ave. no, b117  birmingham, alabama 35203   www.vistaeng.com

# IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

**LARRY STEPHENS and**      )
**DEBORA**      )
**STEPHENS,**      )
     )
       **Plaintiffs,**      )
     )
**v.**      )**Civil Action No.: 2:07CV128-10**
     )
**STRONG BUILT, INC.;**      )
     )
       **Defendants.**      )

## PLAINTIFF'S EVIDENTIARY SUBMISSION IN SUPPORT OF PLAINTIFF'S REPSONSE TO DEFENDANT'S MOTION TO PRECLUDE AND MOTION FOR SUMMARY JUDGMENT

1. Exhibit 1- Depo of Larry Stephens, p.37, 89-91.
2. Exhibit 2- Depo Dwight Jones, p. 36, 53.
3. Exhibit 3- Depo Ken Killen 8,16-19,21,36,38,48, 73,74.
4. Exhibit 4- Depo Jaiton Stephens pp. 16,17.
5. Exhibit 5- Depo David Stephens p. 100.
6. Exhibit 6-Depo LJ Smith- 12,13, 22-25, 47,50,51,55
7. Exhibit 7-Depo Ellis Sisk- 27,31, 34,39.
8. Exhibit 8-Depo Raymond Thompson- 161,165-166, 169, 170, 172,174-175, 187,192,193.
9. Exhibit 9- Expert Report of Raymond Thompson.
10. Exhibit 10-Calculations performed by Raymond Thompson.
11. Exhibit 11- Structural Welding Code, used by Raymond Thompson.
12. Exhibit 12-Mechinical Engineering Design, Sixth Edition, used by Raymond Thompson.
13. Exhibit 13-Hollow Structural Sections-Dimensions and Section Properties, used by Dr. Raymond Thompson.

14. Exhibit 14- Standard Test Method for Tree Stand Repetitive Loading Capability, used by Dr. Raymond Thompson.
15. Exhibit 15- US Consumer Product Safety Commission Voluntary Standards on Hunting Treestands, used by Dr. Thompson.
16. Exhibit 16- Technical Qualifications and Resume of Dr. Raymond Thompson.

/s/ Dennis R. Weaver

_____

Dennis R. Weaver
Attorney for Plaintiffs

Of Counsel:
Weaver Tidmore, LLC
300 Cahaba Park Circle
Suite 200
Birmingham, AL 35243

## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | |
|---|---|
| **LARRY STEPHENS and DEBORA STEPHENS,** | ) ) ) ) |
| **Plaintiffs,** | ) ) |
| **v.** | ) **Civil Action No.:2:07CV128-10** |
| | ) |
| **STRONG BUILT, INC.;** | ) ) |
| **Defendants.** | ) |

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the Plaintiffs' Evidentiary Submission together with Exhibits 1 through 16; Plaintiff's Memorandum Brief in Opposition to Defendant Strongbuilt, Inc.'s Motion to Preclude Certain Opinions of Plaintiffs' Expert Witness for Failure to Satisfy the *Daubert* Standard; and, Plaintiffs' Memorandum Brief in Opposition to Defendant Strongbuilt, Inc.'s Motion for Summary Judgment to the following:

David A. Lee, Esq.
Parsons, Lee & Juliano, P.C.
2801 Highway 280 South
300 Protective Center
P. O. Box 530630
Birmingham, AL 35223-2480
(205) 326-6600

/s/ DENNIS R. WEAVER

_____

DENNIS R. WEAVER
Attorney for Plaintiffs

OF COUNSEL:
Weaver Tidmore LLC
300 Cahaba Park Circle
Suite 200
Birmingham, AL 35242
(205) 980-6065
(205) 980-6165
rweaver@weavertidmorelaw.com